UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

PETER JOSEPH POLINSKI,

                 Plaintiff,

                                               6:23-CV-0316
v.                                          (DNH/ML)

ONEIDA COUNTY SHERIFF, in his official
and individual capacities; COMPTROLLER
OF CITY OF UTICA, William Moorehouse;
KEYBANK OF THE CITY OF UTICA; and
CITY OF UTICA,

                    Defendants.

_____

APPEARANCES:                                OF COUNSEL:

PETER JOSEPH POLINSKI
  Plaintiff, *Pro Se*
5735 Cavanaugh Road, Suite 614
Marcy, New York 13403

CORPORATION COUNSEL – CITY OF UTICA        ZACHARY OREN, ESQ.
  Counsel for Defendants Comptroller of the City      Assistant Corp. Counsel
  of Utica and City of Utica
1 Kennedy Plaza, 2nd Floor
Utica, New York 13502


MIROSLAV LOVRIC, United States Magistrate Judge


**ORDER and REPORT-RECOMMENDATION**

      The Clerk has sent a *pro se* amended complaint in the above captioned action together

with an application to proceed *in forma pauperis* filed by Peter Joseph Polinski ("Plaintiff") to

the Court for review.  (Dkt. Nos. 2, 4.)  For the reasons discussed below, I grant Plaintiff's *in*

*forma pauperis* application and recommend that Plaintiff's Amended Complaint be dismissed in its entirety.  (Dkt. Nos. 2, 4.)

## I.      BACKGROUND

On March 9, 2023, Plaintiff commenced this action by filing a *pro se* Complaint against defendants Oneida County Sheriff, Comptroller of City of Utica, KeyBank of the City of Utica, and City of Utica (collectively "Defendants").  (Dkt. No. 1.)  On March 17, 2023, Plaintiff filed an amended complaint as of right, which supersedes his original complaint.  (*See* Dkt. No. 4 [Am. Compl.]); *Int'l Controls Corp v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect.").  Thus, presently before the undersigned for review pursuant to 28 U.S.C. § 1915, is Plaintiff's Amended Complaint.  (Dkt. No. 4.)

The Amended Complaint is thirty-one pages with an attached exhibit that is ninety-five pages in length.  (*See generally* Dkt. No. 4.)  The Amended Complaint and its attachment are predominantly a series of incoherent text, devoid of factual assertions.  (*Id*.)

Although not clear from the Amended Complaint, Plaintiff appears to allege that on October 31, 2022, he provided checks to "THE CITY OF UTICA FINANCE DEPARTMENT OFFICE OF THE COMPTROLLER" but that those payments were "fraudulently transferred by [Defendants] the Comptroller of Utica and Key Bank."  (Dkt. No. 4 at 8.)

The Amended Complaint alleges that on March 1, 2023, two Oneida County Sheriffs went to Plaintiff's parents' home, where Plaintiff does not live.  (*Id*.)  Plaintiff alleges that, on March 1, 2023, he explained to an Oneida County Sheriff that "the instruments were legal tender and that the instruments needed to go to the Treasury Window" and "the authority behind the negotiable instrument law."  (Dkt. No. 4 at 9.)

Plaintiff alleges that on March 7, 2023, his father (Peter Anthony Polinski) received a phone call (from an unspecified individual) "menacing and harassing him with threats of violence, to kidnap his son with an unlawful arrest."  (Dkt. No. 4 at 8-9.)

Plaintiff's Amended Complaint lists numerous statutes, contains biblical references, and refers to, *inter alia*, the Magna Carta, the 1620 Mayflower Compact, and the 1689 English bill of rights.  (*See generally* Dkt. No. 4; Dkt. No. 4 at 7.)  Notwithstanding, the Amended Complaint references the following thirteen "counts" that appear to be Plaintiff's claims: (1) a claim that Defendants violated Plaintiff's constitutional rights under color of law pursuant to 42 U.S.C. § 1983; (2) a claim that Defendants conspired to interfere with Plaintiff's civil rights pursuant to 42 U.S.C. § 1985; (3) a claim of conspiracy against Defendants pursuant to 18 U.S.C. § 241; (4) a claim of deprivation of rights under color of law against Defendants pursuant to 18 U.S.C. § 242; (5) a claim that Defendants interfered with commerce pursuant to 18 U.S.C. § 1951; (6) a claim that Defendants conspired to commit an offense or defraud the United States pursuant to 18 U.S.C. § 371; (7) a claim that Defendants refused to pay as evidence of embezzlement pursuant to 18 U.S.C. § 3487; (8) a claim that Defendants committed the misdemeanor of menacing in the third degree in violation of N.Y. Penal Law § 120.15; (9) a claim that Defendants violated Plaintiff's rights pursuant to 18 U.S.C. 1961; (10) a claim that Defendants violated Plaintiff's rights pursuant to 18 U.S.C. § 875; (11) a claim that Defendants violated Plaintiff's rights pursuant to 18 U.S.C. § 471; (12) a claim that Defendants violated Plaintiff's rights pursuant to 18 U.S.C. § 641; and (13) a claim that Defendants violated Plaintiff's rights pursuant to 18 U.S.C. § 115.  (Dkt. No. 4 at 25-27.)

As relief, Plaintiff seeks damages in the amount of $39,000,000.00 from each Defendant for a total of $195,000,000.00 in compensatory damages, treble punitive damages, a "permanent

injunction and restraining order . . . requiring Defendants to adopt appropriate policies related to the hiring and supervision of its police officers . . . who are . . . depriving [Plaintiff] of his Constitutional Rights"; and such other relief as may be just and proper.  (Dkt. No. 4 at 29-30.)

Plaintiff also filed a motion for leave to proceed *in forma pauperis*.  (Dkt. No. 2.)

## II.    PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $402, must ordinarily be paid.  28 U.S.C. § 1914(a).  A court is authorized, however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action.  28 U.S.C. § 1915(a)(1).[1]  After reviewing Plaintiff's *in forma pauperis* application (Dkt. No. 2), the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's application to proceed *in forma pauperis* is granted.[2]

## III.   LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party or parties have been served and have had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed, notwithstanding payment of the filing fee.  *Fitzgerald v. First East Seventh Street Tenants Corp.*,

---

[1]    The language of that section is ambiguous because it suggests an intent to limit availability of *in forma pauperis* status to prison inmates.  *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses").  The courts have construed that section, however, as making *in forma pauperis* status available to any litigant who can meet the governing financial criteria.  *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

[2]    Plaintiff is reminded that, although his application to proceed *in forma pauperis* has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

221 F.3d 362, 364 (2d Cir. 2000) (a district court "may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the required filing fee[.]"); *see also Pflaum v. Town of Stuyvesant, Columbia Cnty., N.Y.*, 11-CV-0335, 2016 WL 865296, at *1, n.2 (N.D.N.Y. Mar. 2, 2016) (Suddaby, C.J.) (finding that the Court had the power to address and dismiss additional theories of the plaintiff's retaliation claim *sua sponte* because those theories were so lacking in arguable merit as to be frivolous).  In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources.  *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974).

## IV.    ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).  Having reviewed Plaintiff's Amended Complaint with this principle in mind, I recommend that all causes of action be dismissed.

Plaintiff's Amended Complaint is nearly impossible to decipher.  (*See generally* Dkt. No. 4.)  The Amended Complaint is replete with pseudo-legal jargon of the kind typically used by litigants who affiliate themselves with the sovereign citizen movement.  (*Id.*)  The sovereign citizen movement is "a loosely affiliated group who believe that the state and federal governments lack constitutional legitimacy and therefore have no authority to regulate their behavior; the FBI has labeled the sovereign citizens a domestic terrorist group."  *United States v. Ulloa*, 511 F. App'x 105, 107 (2d Cir. 2013).

I recommend dismissal of Plaintiff's Amended Complaint because it is frivolous.  By way of example, the Amended Complaint states the following:

> By the grace of God almighty, and through the supremacy clause of the Constitution (Article VI Clause 2 & 3) and the below-listed treaties of supreme law, it is I alone, who shall determine my status, standing, honor and jurisdiction.  I hereby invoke and stand upon all my natural rights, given by my God, which are written in the documents listed below.  These, and all others, are universally known as supreme law of the land:

(Dkt. No. 4 at 7.)

"People who identify as sovereign citizens use maneuvers like [a] notary presentment to avoid paying debts or to collect debts that are not actually owed." *Balash-Ioannidou v. Contour Mortg. Corp.*, 22-CV-4506, 2022 WL 3358082, at *2 (E.D.N.Y. Aug. 15, 2022) (citing *Kesick v. Ulloa*, 10-CV-1248, 2012 WL 2873364, at *3 (N.D.N.Y. July 12, 2012) (McAvoy, J.) (the plaintiff filed fraudulent papers entitled "notary presentment" with the Town of Ulster Justice Court falsely claiming that a Justice of the Ulster Town Court owed him the sum of $176,000,000.00); *McKay v. U.S. Bank*, 14-CV-0872, 2015 WL 5657110, at *2 (M.D. Ala. Sept. 24, 2015) (denying plaintiffs' request for declaratory judgment that the defendant was not the real mortgage holder and to quiet title based upon their mailing of a "notarial presentment" and a "notarial notice of Dishonor" to the defendant bank)); *see Muhammad v. Smith*, 13-CV-0760, 2014 WL 3670609, at *2 (N.D.N.Y. July 23, 2014) (D'Agostino, J.) ("Theories presented by redemptionist and sovereign citizen adherents have not only been rejected by the courts, but also recognized as frivolous and a waste of court resources.") (collecting cases).

As a result, I recommend that Plaintiff's Amended Complaint be dismissed as frivolous.

In the alternative, I recommend that Plaintiff's Amended Complaint be dismissed in its entirety (a) in part for failure to state a claim upon which relief may be granted, and (b) in part for lack of standing.

### A.      Plaintiff's Claims Asserting Various New York State and Federal Criminal Provisions

To the extent that Plaintiff attempts to assert claims pursuant to New York State Penal Law § 120.15, and 18 U.S.C. §§ 115 (Influencing, Impeding, or Retaliating Against a Federal Officer), 241 (Conspiracy against Rights), 242 (Deprivation of Rights under Color of Law), 371 (Conspiracy to Commit Offense or to Defraud the United States), 471 (Obligations or Securities of United States), 641 (Public Money, Property or Records), 875 (Interstate Communications), and 1951 (Interference with Commerce by Threats or Violence), I recommend that those claims be dismissed because Plaintiff lacks standing to pursue them.

There is no private right of action to enforce state or federal criminal statutes.  *See generally Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *see also Walker v. CIBC Ltd.*, 20-CV-1337, 2021 WL 3518439, at *5 (N.D.N.Y. Apr. 13, 2021) (Hummel, M.J.) ("It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's jurisdiction."), *report-recommendation adopted by* 2021 WL 3204860 (N.D.N.Y. July 29, 2021) (McAvoy, J.); *McFadden v. Ortiz*, 12-CV-1244, 2013 WL 1789593, at *3 (N.D.N.Y. Apr. 26, 2013) (D'Agostino, J.) (holding that "there is no private right of action to enforce either state or federal criminal statutes.").

As a result, I recommend dismissal of all of Plaintiff's claims that are premised on alleged violations of federal or state criminal laws.  *See Walsh v. Krantz*, 386 F. App'x 334, 336 (3d Cir. 2010) (affirming district court dismissal that found there was no "private right of enforcement" for violations of 18 U.S.C. § 875); *Lawton v. Wells Fargo Bank, N.A.*, 22-3294, 2023 WL 2539000, at *4 (E.D. Pa. Mar. 16, 2023) (citing *Luckett v. Bure*, 290 F.3d 493, 497 (2d

Cir. 2002) (no cause of action for forgery); *McCann v. Falato*, 14-4869, 2015 WL 6445859, at *3 (D.N.J. Oct. 23, 2015) (no cause of action under 18 U.S.C. § 371)) (dismissing the plaintiff's claims pursuant to 18 U.S.C. §§ 371, 471 because those "are criminal statutes that do not contain private rights of action."); *Allen v. FMR LLC*, 23-CV-0031, 2023 WL 142903, at *2 (D. Ariz. Jan. 10, 2023) (dismissing the plaintiff's claims pursuant to 18 U.S.C. §§ 471, 641 because "these are criminal statutes and do not create any private right of action."); *Isaacs v. Steven Allen Isaacs*, 21-CV-1912, 2022 WL 18492546, at *4 n.7 (M.D. Fla. Oct. 27, 2022) (citing *Pompura v. Paxton*, 16-CV-1099, 2016 WL 11586260, at *3 (W.D. Tex. Sept. 30, 2016) (finding that 18 U.S.C. § 641 does not provide for a private right of action and collecting cases)) (dismissing the plaintiff's claims for lack of subject matter jurisdiction and noting that "several of the federal statutes Plaintiff references do not provide private causes of action."); *Hall v. Sampson*, 21-CV-4839, 2022 WL 2068248, at *2 n.2 (E.D. Pa. June 8, 2022) (collecting cases) (holding that the plaintiff cannot bring criminal charges against the defendants through a private lawsuit and that claims pursuant to, *inter alia*, 18 U.S.C. §§ 241, 371 do not give rise to a civil cause of action); *Barnaby v. Michigan State Gov't*, 22-CV-1146, 2022 WL 19005214, at *4 (W.D. Mich. Dec. 14, 2022) (dismissing the plaintiff's claim pursuant to 18 U.S.C. § 471 because it is a criminal statute that does "not provide a private right of action."); *Ojeda v. Mendez*, 20-CV-3910, 2021 WL 66265, at *3 (E.D.N.Y. Jan. 7, 2021) (quoting *Connecticut Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 86-87 (2d Cir. 1972)) (holding that 18 U.S.C. § 1951 is a federal criminal statute, which may be "prosecuted by the Federal Government, not . . . by private complaints," but noting that it is a predicate act for purposes of a RICO violation and thus, the allegations may be relevant to the surviving RICO claim); *Lewis v. Soc. Sec. Admin.*, 20-CV-9277, 2020 WL 6647424, at *3 (S.D.N.Y. Nov. 10, 2020) (dismissing as frivolous the plaintiff's

claim pursuant to, *inter alia*, 18 U.S.C. § 1951 because it seeks to prosecute the defendant for

violations of the Hobbs Act); *Patterson v. Patterson*, 16-CV-0844, 2019 WL 1284346, at *7

(W.D.N.Y. Mar. 20, 2019) (quoting *Christian v. Town of Riga*, 649 F. Supp. 2d 84, 91

(W.D.N.Y. 2009)) ("Courts within this Circuit have accordingly held consistently that criminal

charges under New York law 'cannot be prosecuted by a private person.'"); *Brett v. Rodriguez*,

15-CV-2366, 2016 WL 3704917, at *3-4 (M.D. Pa. Mar. 21, 2016) (finding that 18 U.S.C. §

115, as a criminal statute, does not create a private right of action); *Walthour v. Herron*, 10-

01495, 2010 WL 1877704, at *2 (E.D. Pa. May 6, 2010) (recognizing no private right of action

under, *inter alia*, 18 U.S.C. §§ 241, 371).

As a result, I recommend that, in the alternative, Plaintiff's claims pursuant to New York

State Penal Law § 120.15, and 18 U.S.C. §§ 115, 241, 242, 371, 471, 641, 875, and 1951, be

dismissed because Plaintiff lacks standing to pursue them.

**B.      Claim Pursuant to 42 U.S.C. § 1983**

"To state a valid claim under § 1983, the plaintiff must allege that the challenged conduct

(1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a

right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen*

*v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865,

875-76 (2d Cir. 1994)).  Thus, § 1983 does not create any independent substantive right, but

rather "provides a civil claim for damages" to "redress . . . the deprivation of [federal] rights

established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999).

**1.      Defendant Key Bank**

Generally, private parties are not state actors, and are not liable under § 1983. *Sykes v.*

*Bank of Am.*, 723 F.3d 399, 406 (2d Cir. 2013) (quoting *Brentwood Acad. v. Tenn. Secondary*

*Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("[T]he United States Constitution regulates only the Government, not private parties . . . .") (internal quotation marks and citations omitted). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.'" *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 941 F.2d 1292, 1295-96 (2d Cir. 1991) (citing *Blum v. Yartsky*, 457 U.S. 991, 1002 (1982)). A private defendant may be held liable only as "a willing participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)). Claims under § 1983 can be brought against private entities by "showing that a person acting under color of state law . . . collaborated with a private person . . . to deprive the plaintiff of a constitutional right." *Fries v. Barns*, 618 F.2d 988, 990 (2d Cir. 1980) (citing *Adickes*, 398 U.S. at 144).

With respect to Defendant Key Bank of the City of Utica, the Amended Complaint fails to allege facts plausibly suggesting that it is a state actor or that it collaborated with a state entity to deprive Plaintiff of a constitutional right.

As a result, I recommend that Plaintiff's claim pursuant to 42 U.S.C. § 1983 against Defendant Key Bank be dismissed for failure to state a claim upon which relief may be granted.

### 2.    Defendants Oneida County Sheriff, Comptroller of the City of Utica, and City of Utica

Although Defendants Oneida County Sheriff, Comptroller of the City of Utica, and City of Utica are state actors for purposes of liability pursuant to 42 U.S.C. § 1983, the extremely terse allegations in the Complaint fail to allege that they violated Plaintiff's rights under any statute or constitutional provision.

10

### a.   Defendant Oneida County Sheriff

A claim against the Oneida County Sheriff in his official capacity, is essentially a suit against the Oneida County Sheriff's Department.[3]  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007)("An official capacity suit against a public servant is treated as one against the governmental entity itself.").

A municipality may only be named as a defendant in certain circumstances.  In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983.  A municipality may not be held liable solely because it employs a tortfeasor.  *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 36 (2010).  Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury.  *Monell*, 436 U.S. at 694.

To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation.  *Id.*; *Dominguez v. Beame*,

---

[3]     It is unclear at this juncture whether Plaintiff's claims against Defendant Oneida County Sheriff in his official capacity, should be deemed as claims against the County of Oneida or the Oneida County Sheriff's Department.  *Compare Carthew v. Cnty. of Suffolk*, 709 F. Supp. 2d 188, 195 (E.D.N.Y. 2010) ("It is well settled that an entity such as the Suffolk County Police Department is an 'administrative arm' of the same municipal entity as Suffolk County and thus lacks the capacity to be sued."), *and Krug v. Cty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (McAvoy, J.) ("A city police department is not an independent, suable entity separate from the municipality in which the police department is organized."), *with DiJoseph v. Erie Cnty.*, 18-CV-0919S, 2020 WL 4194136, at *8 (W.D.N.Y. July 21, 2020) (noting that "[u]nder New York State Constitution article XIII, § 13(a) a county cannot be made liable for the acts of its sheriff" and finding that the County—absent a local law agreeing to assume liability for the Sheriff's actions—is not the proper defendant in a claim pursuant to 42 U.S.C. § 1983 against the Sheriff).  However, this distinction is immaterial for purposes of this Order and Report-Recommendation.

603 F.2d 337, 341 (2d Cir. 1979).  Official policy includes the decisions of a government's lawmakers, the acts of policymaking officials, and practices that are so widespread as to "practically have the force of law."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  Municipal liability may also be shown by establishing that a policymaking official ordered or ratified the employees' actions either expressly or tacitly.

Finally, municipal liability can, under limited circumstances, be based upon a failure to properly train the municipality's employees.  *Connick*, 563 U.S. at 51.  However, municipal liability is most tenuous when a claim turns on the failure to train.  *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell")).  To satisfy the statute, a municipality's failure to train its employees must amount to "'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'"  *Id.* (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

Here, the Amended Complaint fails to allege facts plausibly suggesting a basis for municipal liability.  Plaintiff appears to complain of a single incident, during which the officers did not act properly.  There is no indication that Plaintiff can assert a policy or custom which would support municipal liability based on these facts.  In addition, none of Plaintiff's allegations reflect a failure to train or "deliberate indifference" to the rights of persons who would come into contact with the deputies of the Oneida County Sheriff's Department who allegedly interacted with Plaintiff and his father on March 1, 2023.

To the extent that Plaintiff asserted a claim pursuant to 42 U.S.C. § 1983 against the Oneida County Sheriff in his individual capacity, I recommend that it be dismissed for failure to state a claim upon which relief may be granted.

In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability.  Consistent with other circuits, the Second Circuit concluded that "there is no special rule for supervisory liability," and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.'"  *Tangreti*, 983 F.3d at 618.[4]  The Second Circuit explained that, "'the factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary.  The violation must be established against the supervisory official directly."  *Id.* (quoting *Iqbal*, 556 U.S. at 676).  "District courts discussing *Tangreti* agree that the decision invalidated the *Colon* test and mandates that a plaintiff must establish a violation against the supervisory official directly."  *Fabrizio v. Smith*, 20-CV-0011, 2021 WL 2211206, at *10 (N.D.N.Y. Mar. 10, 2021) (Lovric, M.J.) (collecting cases), *report and recommendation adopted*, 2021 WL 2211023 (N.D.N.Y. June 1, 2021) (Suddaby, C.J.).

---

[4]     Before *Tangreti*, various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement.  *Pearce v. Estate of Longo*, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011) (Hurd, J.) (recognizing that several district courts in the Second Circuit have debated *Iqbal*'s impact on the five *Colon* factors), *rev'd on other grounds sub nom.*, *Pearce v. Labella*, 473 F. App'x 16 (2d Cir. 2012) (summary order); *Kleehammer v. Monroe Cnty.*, 743 F. Supp. 2d 175, 185 (W.D.N.Y. 2010) (holding that "[o]nly the first part of the third *Colon* categories pass *Iqbal*'s muster . . . ."); *D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that *Iqbal* eliminated *Colon*'s personal involvement standard).

Here, Plaintiff fails to allege facts plausibly suggesting any action taken by Defendant Oneida County Sheriff individually.  (*See generally* Dkt. No. 4.)  The Amended Complaint alleges that "two Oneida County sheriffs" went to his parents' house on March 1, 2023, where he does not live.  (Dkt. No. 4 at 8-9.)  However, there is only one Oneida County Sheriff, *see* N.Y. County Law § 650; *see generally DiJoseph v. Erie Cnty.*, 18-CV-919S, 2020 WL 4194136, at *8 (W.D.N.Y. July 21, 2020) ("A sheriff is an elected county officer."), thus, it appears that Plaintiff was referring to two deputies of the Oneida County Sheriff's Department.  Further, in any event, the Amended Complaint does not allege that Plaintiff interacted with the employees of the Sheriff's Department who allegedly went to his parents' property.  Moreover, Plaintiff fails to allege facts plausibly suggesting that these individuals violated his rights in any way.  In addition, Plaintiff's allegation that he "explained to an Oneida County Sheriff that the instruments were legal tender" and "the authority behind the negotiable instrument" does not allege that his rights were violated by Defendants or any employee of the Oneida County Sheriff's Department.  (Dkt. No. 4 at 9.)

As a result, I recommend that Plaintiff's claim pursuant to 42 U.S.C. § 1983 against Defendant Oneida County Sheriff in his individual and official capacities be dismissed for failure to state a claim upon which relief may be granted.

### b.    Defendant Comptroller of the City of Utica

To the extent that Plaintiff asserts a claim against Defendant Comptroller of the City of Utica in his official capacity, it is essentially a claim against the City of Utica because the Comptroller is an arm of the City of Utica and is not amenable to suit.  *See Aikman v. Cnty. of Westchester*, 491 F. Supp. 2d 374, 380 (S.D.N.Y. 2007) (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against [municipal] officials sued in their official capacity . . . should be treated as

14

suits against the [municipality]."); *see also Zuk v. Gonzalez*, 07-CV-0732, 2007 WL 2163186, at

*2 (N.D.N.Y. July 26, 2007) ("[T]o the extent that Plaintiff has named the individual Defendants

in their official capacities, he has in essence named Onondaga County . . . as a Defendant.")).

Courts within the Second Circuit regularly dismiss with prejudice official-capacity claims

against a public official when the claims are duplicative of the claims against the governmental

entity for which the official works. *See Kanderskaya v. City of N.Y.*, 11 F. Supp. 3d 431, 435

(S.D.N.Y. 2014) (dismissing with prejudice claims against a police officer sued in an official

capacity "because they are duplicative of [the plaintiff's] other claims against [the

municipality]") *aff'd*, 590 F. App'x 112 (2d Cir. 2015); *Quinn v. Gould*, 19-CV-0820, 2020 WL

1234553, at *4 (D. Conn. Mar. 13, 2020) ("[D]istrict courts within the Second Circuit

consistently dismiss claims asserted against officials in their official capacities as duplicative

where the plaintiff has named the municipal entity as a defendant.") (citations omitted).

As a result, I recommend that Plaintiff's claim pursuant to 42 U.S.C. § 1983 against

Defendant Comptroller of the City of Utica in his official capacity be dismissed as duplicative of

his claim against Defendant City of Utica.

With respect to Plaintiff's claim pursuant to 42 U.S.C. § 1983 against Defendant

Comptroller of the City of Utica in his individual capacity, I recommend that it be dismissed for

failure to state a claim upon which relief may be granted.

As set forth above in Part IV.B.2.a. of this Order and Report-Recommendation, pursuant

to the Second Circuit's holding in *Tangreti*, "plaintiff must plead and prove 'that each

Government-official defendant, through the official's own individual actions, had violated the

Constitution.'" *Tangreti*, 983 F.3d at 618. The Amended Complaint alleges that Plaintiff

"tendered payment to THE CITY OF UTICA FINANCE DEPARTMENT OFFICE OF THE

COMPTROLLER" but that his payments were "fraudulently transferred . . . under 18 U.S. Code § 648." (Dkt. No. 4 at 8.) This conclusory allegation fails to allege facts plausibly suggesting that Defendant Comptroller of the City of Utica took any action that violated Plaintiff's rights.

As a result, I recommend that Plaintiff's claim pursuant to 42 U.S.C. § 1983 against Comptroller of the City of Utica be dismissed for failure to state a claim upon which relief may be granted.

### c.      Defendant City of Utica

As set forth above in Part IV.B.2.a. of this Order and Report-Recommendation, a municipality may be held liable pursuant to 42 U.S.C. § 1983 only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Monell*, 436 U.S. at 694.

The Amended Complaint fails to allege facts plausibly suggesting that the City of Utica's policies deprived Plaintiff of his constitutional rights. As a result, I recommend that Plaintiff's claim pursuant to 42 U.S.C. § 1983 against Defendant City of Utica be dismissed for failure to state a claim upon which relief may be granted.

### C.      Claim Pursuant to 42 U.S.C. § 1985

Although the Amended Complaint fails to specify which of § 1985's three subdivisions Plaintiff intends to invoke, only § 1985(3) is relevant here.[5]

"[T]o make out a violation of § 1985(3) . . . , the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any

---

[5]      Section 1985(1) provides a damages action against two or more persons who conspire to prevent, by force, intimidation or threat, any federal officer from performing his or her official duties. Section 1985(2) provides a cause of action against two or more persons who conspire to obstruct justice in the federal courts by force, intimidation, or threat. None of the facts alleged in the Amended Complaint relate in any way to these causes of action.

person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Brotherhood of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 103 S. Ct. 3352, 3356 (1983). A "conspiracy" requires, for purposes of Section 1985, "a plurality of actors committed to a common goal." *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 456 (S.D.N.Y. 1998), *aff'd*, 182 F.3d 899 (2d Cir. 1999).

In addition, a claim pursuant to Section 1985 requires that a plaintiff allege "some racial or [ ] otherwise class-based animus behind the conspirators' action." *Palmieri v. Lynch*, 392 F.3d 73, 86 (2d Cir. 2004). The Amended Complaint fails to allege any racial or class-based animus behind the alleged conspirators' action. (*See generally* Dkt. No. 4.) "When a plaintiff fails to establish membership in a protected group, a civil rights conspiracy complaint under Section 1985 must be dismissed." *Morpugo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 339 (E.D.N.Y. 2010).

Here, Plaintiff does not allege any race or class-based animus behind Defendants' actions. Thus, Plaintiff does not sufficiently allege a conspiracy pursuant to 42 U.S.C. § 1985 between Defendants and/or others to deprive Plaintiff of any federally protected rights. As a result, I recommend that Plaintiff's claim pursuant to 42 U.S.C. § 1985 against Defendants be dismissed for failure to state a claim upon which relief may be granted.

### D.   RICO (18 U.S.C. § 1691 et seq.) Claim[6]

It is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).  Section 1964 establishes a private right of action for individuals who are harmed by racketeering activity.  18 U.S.C. § 1964.  This private right of action permits a plaintiff to bring a RICO claim for sustaining injuries "in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  Generally, a plaintiff bringing a civil RICO claim under "Section 1962(c) must allege that (1) the defendant has violated the substantive RICO statute, and (2) the plaintiff was injured in his business or property 'by reason of a violation of section 1962.'"  *Malvar Egerique v. Chowaiki*, 19-CV-3110, 2020 WL 1974228, at *7 (S.D.N.Y. Apr. 24, 2020) (quoting *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (citing 18 U.S.C. § 1962(c))), *vacated in part on other grounds by Weiss v. David Benrimon Fine Art LLC*, 20-CV-3842, 2021 WL 6128437 (2d Cir. Dec. 28, 2021) (summary order).  More specifically, to assert a civil RICO claim under Section 1962(c), a plaintiff must allege the following elements: "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Additionally, a plaintiff asserting a civil RICO claim must plead facts plausibly suggesting a

---

[6]     Under General Order #14 and N.D.N.Y. L.R. 9.2, a party who files a RICO claim must also file a Civil RICO statement within thirty days after the filing date of the Complaint.  Despite thirty days having elapsed since the filing of his Amended Complaint (and his Complaint, which also appeared to assert a RICO claim [Dkt. No. 1 at 25-26]), Plaintiff has failed to file a Civil RICO statement.  (*See generally* docket sheet.)  As a result, I recommend that Plaintiff's RICO claim be dismissed.  *See Poole v. Bendixen*, 20-CV-0697, 2021 WL 3737780, *12 (N.D.N.Y. Aug. 24, 2021) (Suddaby, C.J.); *Murphy v. Onondaga Cnty.*, 18-CV-1218, 2022 WL 819281, *6 (N.D.N.Y. Mar. 18, 2022) (Sharpe, J.).

resulting "domestic injury" to their business or property.  *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2111 (2016).

The Amended Complaint fails to allege facts plausibly suggesting the existence of an "enterprise" within the meaning of RICO.  More specifically, Plaintiff fails to allege facts plausibly suggesting that Defendants constitute, control, or participate in any enterprise with a distinguishable existence or purpose.  *See Mackin v. Auberger*, 59 F. Supp. 3d 528, 543 (W.D.N.Y. 2014) ("Plaintiff fails to allege that [the defendants] had a common or shared purpose or that they functioned as a continuing unit.").  In addition, the Amended Complaint fails to allege any facts plausibly suggesting that Defendants functioned as a continuing unit.  "Without such an enterprise, a RICO claim like [Plaintiff]'s must fail."  *Liang v. City of New York*, 10-CV-3089, 2013 WL 5366394, at *13 (E.D.N.Y. Sept. 24, 2013); *see also Peterson v. City of New York*, 11-CV-3141, 2012 WL 75029, at *3-4 (S.D.N.Y. Jan. 9, 2012) (dismissing the plaintiff's RICO claim because "[t]he existence of a RICO enterprise is a necessary element for liability" and the plaintiff failed to allege facts plausibly suggesting the existence of a RICO enterprise).

Moreover, I find that the Amended Complaint fails to allege facts plausibly suggesting a pattern of racketeering activity. 18 U.S.C. § 1961(5) (To sufficiently allege a "pattern of racketeering activity," a plaintiff must allege at least two acts of "racketeering activity" that occur within ten years of each other); *Westester Cnty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 608 (S.D.N.Y. 2015) (emphasis in original) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir 1999)) (To qualify as a "pattern" of racketeering activity, the predicate acts "must be from the crimes listed in [Section] 1961(1) and they must be 'related, *and* . . . amount to or pose a threat of continued criminal activity.'").  Although the Amended Complaint lists statutes that constitute "racketeering activity" (*see, e.g.*, Dkt. No. 4 at 26

[referring to 18 U.S.C. § 1951]), it fails to allege facts plausibly suggesting that Defendants engaged in those predicate acts.[7]

For each of these alternative reasons, I recommend that Plaintiff's RICO claim be dismissed.

### E.    Claim Pursuant to 18 U.S.C. § 3487

To the extent that Plaintiff attempts to assert a claim against Defendants pursuant to 18 U.S.C. § 3487, I recommend that it be dismissed.  18 U.S.C. § 3487 states that, "[t]he refusal of any person . . . charged with the safe-keeping . . . of the public money . . . belonging to the United States, . . . to transfer or disburse any such money, promptly, upon the legal requirement of any authorized officer, shall be deemed . . . prima facie evidence of . . . embezzlement."  Thus, 18 U.S.C. § 3487 does not provide a private cause of action and relates solely to evidence sufficient to establish embezzlement.

As a result, I recommend that Plaintiff's claim pursuant to 18 U.S.C. § 3487 be dismissed.

## V.    OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint

---

[7]        For example, to demonstrate that Defendants engaged in extortion, Plaintiff must allege that Defendants "obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce, by . . . extortion or attempt[ed] or conspire[d] so to do, or commit[ted] or threaten[ed] physical violence to any person or property in furtherance of a plan or purpose to do [so]."  18 U.S.C. § 1951; *see also McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992).  Extortion is defined as the "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2); *Entretelas Americanas S.A. v. Soler*, 19-CV-3658, 2020 WL 9815186, at *10 (S.D.N.Y. Feb. 3, 2020), *aff'd*, 840 F. App'x 601 (2d Cir. 2020), *as amended* (Jan. 7, 2021) (citation omitted).  "[F]atal" to an extortion claim is "[t]he absence of allegations of force, violence or fear."  *Entretelas Americanas*, 2020 WL 9815186, at *10 (collecting cases).

gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.").  Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[8]

Here, I find that leave to replead would be futile with respect to Plaintiff's claims pursuant to: (1) New York State and federal criminal provisions (including New York State Penal Law § 120.15, and 18 U.S.C. §§ 115, 241, 242, 371, 471, 641, 875, and 1951); (2) 18 U.S.C. § 3487; and (3) 42 U.S.C. § 1983 against Defendant Comptroller of the City of Utica in his official capacity, because the issues with those claims are substantive such that a better pleading will not cure them.  *See Maretta-Brooks v. Comm'r of Soc. Sec.*, 22-CV-1261, 2023 WL 2655195, at *6 (N.D.N.Y. Mar. 27, 2023) (Lovric, M.J.) (recommending dismissal without leave to replead the plaintiff's claims alleging violations of criminal statutes "because the

---

[8]      *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

problem with those claims is substantive such that a better pleading will not cure it"); *Maretta-Brooks v. Hanuszczak*, 18-CV-0426, 2018 WL 2021480, at * (N.D.N.Y. Apr. 26, 2018) (Peebles, M.J.) (recommending dismissal without leave to amend the plaintiff's claims pursuant to 18 U.S.C. §§ 241, 242); *McFadden v. Ortiz*, 12-CV-1244, 2013 WL 1789593, at *5 (N.D.N.Y. Apr. 26, 2013) (D'Agostino, J.) (dismissing without leave to amend the plaintiff's claims seeking to enforce New York State criminal statutes).

Although I have serious doubts about whether Plaintiff can replead to assert an actionable claim pursuant to (1) 42 U.S.C. § 1983 against Defendants (a) Key Bank of the City of Utica, (b) City of Utica, (c) Oneida County Sheriff in his official and individual capacities, and (d) Comptroller of the City of Utica in his individual capacity; (2) 42 U.S.C. § 1985 against Defendants, and (3) 18 U.S.C. § 1961 against Defendants, given that this is the Court's first review of Plaintiff's pleading, out of an abundance of caution, I recommend that he be permitted to replead the Amended Complaint with respect to those claims.

If Plaintiff chooses to file a second amended complaint, he should note that the law in this circuit clearly provides that "'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.'" *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any second amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named

defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such second amended complaint will replace the existing Amended Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED only for purposes of filing and any appeal unless the trial court certifies in writing that the appeal is not taken in good faith**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS** the Amended Complaint (Dkt. No. 4) as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further respectfully

**RECOMMENDED in the alternative** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's Amended Complaint (Dkt. No. 4) to the extent that it asserts claims based on (1) 42 U.S.C. § 1983 against Defendants (a) Key Bank of the City of Utica, (b) City of Utica, (c) Oneida County Sheriff in his official and individual capacities, and (d) Comptroller of the City of Utica in his individual capacity; (2) 42 U.S.C. § 1985 against Defendants, and (3) 18 U.S.C. § 1961 against Defendants, because it fails to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further respectfully

**RECOMMENDED in the alternative** that the Court **DISMISS WITHOUT PREJUDICE AND WITHOUT LEAVE TO REPLEAD** Plaintiff's Amended Complaint

(Dkt. No. 4) to the extent that it asserts claims based on New York State and federal criminal provisions (including New York State Penal Law § 120.15, and 18 U.S.C. §§ 115, 241, 242, 371, 471, 641, 875, and 1951) because Plaintiff lacks standing to pursue claims pursuant to those statutes; and it is further respectfully

      **RECOMMENDED in the alternative** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD** Plaintiff's Amended Complaint (Dkt. No. 4) to the extent that it asserts claims based on (1) 18 U.S.C. § 3487 against Defendants; and (2) 42 U.S.C. § 1983 against Defendant Comptroller of the City of Utica in his official capacity, for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

      **ORDERED** that the Clerk of the Court shall file a copy of this order, report, and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[9]

---

[9]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[10]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: April  17 , 2023
        Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[10]     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

2016 WL 865296
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

William PFLAUM, Individually and as a Citizen,
Resident and Taxpayer of Town of Stuyvesant, Plaintiff,

v.

TOWN OF STUYVESANT, COLUMBIA CTY.,
N.Y.; and Valerie Bertram, Individually and as
Supervisor of Town of Stuyvesant, Defendants.

1:11-CV-0335 (GTS/DJS)
|
Signed 03/02/2016

**Attorneys and Law Firms**

WILLIAM PFLAUM, Plaintiff, Pro Se [1], 3 Rybka Road, Box
40, Stuyvesant Falls, NY 12174.

BRYAN D. RICHMOND, ESQ., THOMAS J. MORTATI,
ESQ., BURKE, SCOLAMIERO, MORTATI & HURD, LLP,
Attorneys for Defendants, 9 Washington Square, Suite 201,
P.O. Box 15085, Albany, NY 12212-5085.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this civil rights action
filed by William Pflaum ("Plaintiff") against the Town of
Stuyvesant ("Town") and Valerie Bertram, Town Supervisor
("Bertram") (collectively, "Defendants"), is Defendants'
motion for summary judgment pursuant to Fed. R. Civ. P. 56.
(Dkt. No. 59.) For the reasons set forth below, Defendants'
motion is granted.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Complaint**
As a result of the Court's prior decisions (Dkt. Nos. 17,
26), Plaintiff's sole remaining claim in this action is his
First Amendment retaliation claim. More specifically, as
articulated in his Complaint (which was drafted by Plaintiff,
*pro se*, and therefore must be construed with special
solicitude), that claim alleges three separate ways he was
retaliated against for publicly criticizing Town officials. [2]

First, Plaintiff alleges that, in retaliation for filing charges
of ethical violations against Defendant Bertram, she (a)
"collaborated with and supported" the Town's Fire Chief
to deny and/or threaten to deny fire protection to Plaintiff,
(b) "supported and encouraged" various Town employees
to "illegal[ly] revo[ke] ... Plaintiff's permit to operate his
business," and (c) "supported and encouraged" the Town
Assessor's "campaign to intimidate Plaintiff by linking [his]
political speech [with his] real estate assessment." (Dkt. No.
1, ¶¶ 20-23, 116 [Pl.'s Compl.].)

Second, Plaintiff alleges that, in retaliation for writing
columns on his Internet blog regarding corruption among the
Town's public officials, the Town filed false criminal charges
against him. (*Id.*, ¶ 116.)

Third, and finally, Plaintiff alleges that, in retaliation for
criticizing Bertram, the Town Assessor, and the Town, the
Town Assessor used his authority to raise taxes in order to
intimidate Plaintiff into silence. (*Id.*, ¶¶ 23, 39, 47, 116.)

**B. Defendants' Motion for Summary Judgment**
**\*2** In their motion for summary judgment, Defendants
request the dismissal of Plaintiff's Complaint in its entirety.
(Dkt. No. 59.) In support of their motion, Defendants make
the following four arguments. First, Defendants argue that
there was no adverse action against Plaintiff in that there
was no actual chilling of Plaintiff's First Amendment speech
or any other damages. (Dkt. No. 61, at 3-8 [Defs.' Mem. of
Law].)

Second, Defendants argue that, in any event, any such adverse
action was not motivated or substantially caused by Plaintiff's
First Amendment speech. (*Id.* at 5-6.)

Third, in the alternative, Defendants argue that Bertram was
not personally involved in any deprivation of fire protection
services to Plaintiff. (*Id.* at 5, 8-10.)

Fourth, and finally, Defendants argue that Bertram is entitled
to qualified immunity. (*Id.*)

**C. Plaintiff's Opposition Memorandum of Law**
Generally construed, Plaintiff makes five arguments in
opposition to Defendants' motion. First, Plaintiff argues that
he engaged in protected speech by creating an Internet blog
on which he publicly criticized Town officials and exposed

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 27 of 311

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

their illegal activities. (Dkt. No. 65, at 3 [Pl.'s Opp'n Mem. of Law].)

Second, Plaintiff argues that Town officials took adverse action against him by issuing noise violations against him with respect to loud dog barking on his property, retaining special prosecutors to pursue civil suits and criminal charges against him, encouraging harassment and extra-judicial threats against him, and treating him differently from other residents. (*Id.* at 4-5.) As a result, Plaintiff argues that he suffered a chilling effect on his blogging as well as monetary damages due to the expense required to oppose the Town's retaliatory activities. (*Id.* at 6-8.)

Third, Plaintiff argues that the timing of these adverse actions, i.e., that they began after he created his blog, establishes the causal connection between his protected speech and the adverse actions. (*Id.* at 5.)

Fourth, Plaintiff argues that Bertram is not entitled to qualified immunity because it was not objectively reasonable to believe that her actions did not violate Plaintiff's First Amendment rights. (*Id.* at 5-6.) According to Plaintiff, these actions consisted of (1) threatening to fire the Town's Dog Control Officer if he did not serve Plaintiff with a criminal charge related to dog barking, and (2) retaining special prosecutors to pursue this charge against Plaintiff without first obtaining the Town's approval. (*Id.* at 9.)

Fifth, Plaintiff argues that municipal liability extends to the Town because of the actions of Bertram, the Town's supervisor, and her position as a policymaker. (*Id.* at 8-9.)

Finally, the Court notes that Plaintiff spends considerable time in his opposition papers arguing the merits of issues not raised by Defendants in their motion. For example, Plaintiff discusses the Town's denial of his FOIL requests, the Town's failure to respond appropriately to alleged vandalism of his property, and the sufficiency of the evidence that led to the issuance of noise violations related to dog barking. (*See generally id.*, at 3-4, 6-9; Dkt. No. 67, ¶¶ 4, 14, 25, 27, 36, 56-107 [Pl.'s Decl.].)

### D. Defendants' Reply Memorandum of Law
In reply to Plaintiff's opposition memorandum of law, Defendants make two arguments. First, Defendants argue that, because Plaintiff has not complied with Local Rule 7.1(a)(3) in his response to their statement of material facts, their

statement of material facts should be deemed admitted. (Dkt. No. 74, at 2-6 [Defs.' Reply Mem. of Law].)

**\*3** Second, Defendants argue that the record is devoid of any admissible evidence that Bertram was personally involved in an alleged deprivation of fire protection services with regard to Plaintiff's residence. (*Id.* at 6-7.) Furthermore, Defendants argue that Plaintiff cannot demonstrate that any adverse action was taken because he was never actually deprived of fire protection services and his subjective belief that the fire department may not respond to a fire at his residence is insufficient to create a genuine dispute of fact. (*Id.* at 7-8.)

### E. Statement of Material Facts

#### 1. Plaintiff's Failure to Comply with N.D.N.Y. Local Rule 7.1

Before reciting the material facts of this case, the Court must address Plaintiff's response to Defendant's Rule 7.1 Statement of Material Facts. Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court requires a party moving for summary judgment to submit a statement of material facts supported by specific citations to the record where those facts are established. N.D.N.Y. L.R. 7.1(a)(3). The non-moving party's subsequent response must mirror the moving party's statement of material facts by (1) admitting and/or denying each of the moving party's factual assertions in matching numbered paragraphs and (2) supporting any denials with specific citations to the record where the factual issues arise. *Id.* Importantly, "[t]he Court shall deem admitted any properly supported facts set forth in the [moving party's] Statement of Material Facts that the [non-moving] party does not specifically controvert." *Id.*

This Court's "Local Rule requirements are not empty formalities." *Bombard v. Gen. Motors Corp.*, 238 F. Supp. 2d 464, 467 (N.D.N.Y. 2002) (Munson, J.) (stating that "[t]he courts of the Northern District have adhered to a strict application of Local Rule 7.1[a][3]'s requirement on summary judgment motions"); *accord*, *Cross v. Potter*, 09-CV-1293, 2013 WL 1149525, at *3 (N.D.N.Y. Mar. 19, 2013) (McAvoy, J.). Indeed, the underlying purpose of this rule "is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment." *Youngblood v. Glasser*, 10-CV-1430, 2012 WL 4051846, at *4 (N.D.N.Y. Aug. 22, 2012) (Peebles, M.J.); *see also* 🔖 *N.Y. Teamsters Conference Pension &*

Case 6:23-cv-00316-DNH-ML Document 13 Filed 04/18/23 Page 28 of 311

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

*Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005) (noting that "Rules governing summary judgment practice are essential tools for district courts, permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of 'hunt[ing] through voluminous records without guidance from the parties'") (quoting 🔖 *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 [2d Cir. 2001]).

In the present case, Plaintiff has failed to respond appropriately to Defendants' Rule 7.1 Statement of Material Facts. Specifically, Plaintiff has failed to admit and/or deny each of Defendants' factual assertions in matching numbered paragraphs. Indeed, Defendants' Rule 7.1 Statement contains 71 paragraphs of factual assertions, while Plaintiff's 7.1 Response contains only 11 paragraphs. (*Compare* Dkt. No. 62 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 66 [Pl.'s Rule 7.1 Response].) Moreover, many of Plaintiff's responses are conclusory in nature and/or contain legal arguments. The Court notes that, when he responded to Defendants' motion, Plaintiff was represented by counsel. Accordingly, the Court will accept the factual assertions in Defendants' 7.1 Statement as true to the extent that the evidence in the record supports these facts. *See Davis v. Cumberland Farms, Inc.*, 10-CV-0480, 2013 WL 375477, at *4 (N.D.N.Y. Jan. 29, 2013) (Scullin, J.) (accepting the defendant's statement of material facts as true where plaintiff neither admitted nor denied defendant's factual assertions); 🔖 *Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 5 n.3 (N.D.N.Y. 2012) (D'Agostino, J.) (accepting the third-party defendants' statement of material facts as true because the defendant/third-party plaintiff failed to respond to it in accordance with Local Rule 7.1[a][3] ).

**2. Undisputed Material Facts**

**\*4** For purposes of this motion, the undisputed material facts are as follows. Gerald Ennis has served as the Zoning Enforcement Officer for the Town of Stuyvesant continuously since 2003. (Dkt. No. 62, ¶ 43 [Defs.' Rule 7.1 Statement].) In this capacity, Mr. Ennis issued Plaintiff a Class 2 Home Occupation Permit in August, 2009. (*Id.*, ¶ 44.) Under this permit, "[n]o unusual appearances, noise, vibration, smoke, dust, odors, heat, glare or electrical disturbances that exceed those normally produced by a resident shall be permitted." (*Id.*, ¶ 45.) Following the issuance of this permit, Mr. Ennis received numerous noise complaints from Plaintiff's neighbors in regard to increasingly loud barking

from dogs on Plaintiff's property. (*Id.*, ¶¶ 46-47.) Following an investigation into these complaints, Mr. Ennis concluded that Plaintiff's "home dog kennel which housed up to 50 dogs at a time was producing noise levels that exceeded those normally produced by a resident and, accordingly, [Plaintiff] was in violation of his Permit." (*Id.*, ¶ 48.)

On December 7, 2009, Mr. Ennis issued Plaintiff a notice of violation, which informed Plaintiff that the Town had received several complaints about the noise coming from his property and directed Plaintiff to remedy the violation by December 23, 2009. (*Id.*, ¶ 49.) Subsequently, Plaintiff contacted Mr. Ennis and requested that his phone number be given to those who had complained with instructions that they contact Plaintiff directly when there are noise issues so he can rectify any problems. (*Id.*, ¶ 50.) However, after a few months had passed, Plaintiff stopped answering his neighbors' phone calls; and, as a result, his neighbors made new complaints to Mr. Ennis. (*Id.*, ¶ 51.) After receiving these complaints and personally observing the loud noise emanating from Plaintiff's property, Mr. Ennis issued a second notice of violation to Plaintiff on April 26, 2010. (*Id.*, ¶¶ 52-53.) In response, Plaintiff advised Mr. Ennis that he would erect a sound barrier to remedy the issue. (*Id.*, ¶ 54.)

According to Mr. Ennis, he waited "some time" for Plaintiff to erect, or apply for a permit to construct, a sound barrier but neither action was taken. (*Id.*, ¶¶ 55-56.) After continuing to receive noise complaints, Mr. Ennis issued a third notice of violation to Plaintiff on August 9, 2010. (*Id.*, ¶ 56.) On the same day, Mr. Ennis met with Bertram and the Town Attorney to discuss the noise issue on Plaintiff's property. (*Id.*, ¶ 57.) The Town Attorney advised Bertram that Mr. Ennis had the authority to revoke Plaintiff's home occupation permit if he determined that Plaintiff was in violation of the permit's conditions. (*Id.*, ¶ 37.) As a result, Bertram advised Mr. Ennis that he may revoke Plaintiff's permit if he determined that the permit's conditions had been violated. (*Id.*, ¶ 38.) Later that same day (August 9, 2010), Mr. Ennis made the decision to revoke Plaintiff's permit and notified Plaintiff of that fact. (*Id.*, ¶¶ 39, 59.) Neither Plaintiff's statements concerning various issues in the Town nor his postings on various Internet sites had any bearing on the decision to revoke Plaintiff's permit. (*Id.*, ¶¶ 40, 61.)

Plaintiff testified at his deposition that the basis for his claim that he was deprived of fire protection services is that, "in 2011, or perhaps late 2010," a local fire department chief, Steve Montie, posted an online statement that Plaintiff should

move out of town. (*Id.*, ¶ 14.) Plaintiff testified that the post was made in response to one of his earlier posts on a local town Internet forum; in Plaintiff's post, he had complained of alleged ethical violations committed by Bertram. (*Id.*, ¶¶ 15-16.) The alleged post by Mr. Montie states in its entirety as follows:

> William,
>
> How much more of this are you going to do ? ? ? ? You are wasting more tax payer dollars than its worth. Man up correct your problems and move on, or better yet move out.
>
> S

(*Id.*, ¶ 19.) The author of this post is not identified by name but only by the email address stuyvesantchief@fairpoint.net; and, as indicated above, the post is signed only as "S." (*Id.*, ¶ 18.)

**\*5** Plaintiff testified that the statements in the alleged post amounted to a threatened denial of fire department services because "the fire chief told me I should move out of town, which makes me wonder if there was a fire at my house would he come." (*Id.*, ¶ 20.) However, Plaintiff testified that no one has ever told him that the fire department would not respond if there was a fire at his house. (*Id.*, ¶ 22.) In addition, Plaintiff testified that there are two distinct fire departments in the Town, Stuyvesant Company 1 and Stuyvesant Company 2, which divide their responses to emergency calls in the Town geographically. (*Id.*, ¶ 23.) Steve Montie is the Chief of Stuyvesant Company 1 and a different chief controls Company 2. (*Id.*, ¶ 25.) Plaintiff's property is located in the geographic area covered by Company 2. (*Id.*, ¶ 24.) According to Bertram, she did not "in any way direct any fire department to deprive or threaten to deprive [Plaintiff] of fire services." (*Id.*, ¶ 33.)

Finally, Plaintiff testified that there was "never" a time that he did not publicize or speak out against some issues based upon any actions by the Town and the alleged efforts to silence him did not work. (*Id.*, ¶ 26.) In fact, following the alleged actions by the Town, Plaintiff did more blogging and increased his "political activities against the Town." (*Id.*, ¶ 27.) With respect to his business, Plaintiff testified that, despite losing his business permit in August, 2010, he continued to operate his business uninterrupted without a permit as he had before it was issued in 2009. (*Id.*, ¶ 29.) Accordingly, there was

no interruption to Plaintiff's business as a result of his home business permit being revoked. (*Id.*, ¶¶ 28, 30.)

## II. STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted); *see also* Fed. R. Civ. P. 56(e)(2). As the Supreme Court has famously explained, "[the non-moving party] must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986). As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movign party. Anderson, 477 U.S. at 255. In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." Celotex v. Catrett, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(c), (e). However, when the moving party has met this initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(c), (e). Where the non-movant fails to deny the factual assertions contained in the movant's Rule 7.1 Statement of Material Facts in matching numbered paragraphs supported by a citation to admissible record evidence (as required by Local Rule 7.1[a][3] of the Court's Local Rules of Practice), the court may not rely solely on the movant's Rule 7.1 Statement; rather, the court must be

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 30 of 311

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

satisfied that the citations to evidence in the record support the movant's assertions. *See* 🔖 *Giannullo v. City of N.Y.*, 322 F.3d 139, 143, n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

## III. ANALYSIS

### A. Whether Plaintiff Suffered an Adverse Action

**\*6** After carefully considering the matter, the Court answers this question in the negative for the reasons set forth in Defendants' memorandum of law and reply memorandum of law. (Dkt. No. 61, at 3-8 [Defs.' Mem. of Law]; Dkt. No. 74, at 6-8 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following two points.

As this Court noted in its prior decisions, in order to state a claim for retaliation under the First Amendment, "a plaintiff must prove (1) his conduct was protected by the First Amendment, (2) the defendants' actions were motivated or substantially caused by the exercise of that right, and (3) defendants' actions effectively 'chilled' the exercise of plaintiff's First Amendment right." *Pflaum*, 937 F. Supp. 2d at 303 (citing *Dillon v. Morano*, 497 F.3d 247, 251 [2d Cir. 2007]). "In cases 'involving criticism of public officials by private citizens,' the Second Circuit has generally 'impose[d] an actual chill requirement for First Amendment retaliation claims[,]' i.e., a requirement that the plaintiff allege and ultimately prove an 'actual chill' of his First Amendment rights." *Hafez v. City of Schenectady*, 894 F. Supp. 2d 207, 221 (N.D.N.Y. 2012) (D'Agostino, J.) (quoting 🔖 *Gill v. Pidlypchak*, 389 F.3d 379, 381 [2d Cir. 2004]). "To establish this element, it is not enough for the plaintiff simply to show that he changed his behavior in some way; he must show that the defendant intended to, and did, prevent or deter him from exercising his rights under the First Amendment." *Hafez*, 894 F. Supp. 2d at 221. "However, 'where the retaliation is alleged to have caused an injury separate from any chilling effect, such as a job loss or demotion, an allegation as to a chilling effect is not necessary to state a claim.'" *Id.* (quoting 🔖 *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 239 [E.D.N.Y. 2009]); *see also Brink v. Muscente*, 11-CV-4306, 2013 WL 5366371, at \*7 (S.D.N.Y. Sept. 25, 2013) (noting that, in private citizen cases, "various forms of concrete harm have been substituted for the 'actual chilling' requirement").

First, it is clear from Plaintiff's deposition testimony that there was no actual chilling of his protected speech as a result of Defendants' actions. As discussed above, Plaintiff admitted that he increased his political activities and continued to publicize his opinions against the Town in the face of its alleged efforts to silence him. "Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." 🔖 *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001); *see also* 🔖 *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995) (finding no chilling effect where, after an arrest, the plaintiff continued to publish his newspaper through which he criticized the village government); 🔖 *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir. 1992) (finding no chilling effect where, after the filing of a lawsuit, the plaintiff continued to write criticizing editorials in the same manner as before the lawsuit).

Second, to the extent that Plaintiff argues that he perceived the online post regarding the loss of fire protection as a real threat, he is still required to show that his perception was objectively reasonable, i.e., "that the defendant[s'] actions had some actual, non-speculative chilling effect." 🔖 *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002); *see also* 🔖 *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) (holding that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"). Plaintiff's subjective belief that the online post constituted a real threat, without more, is insufficient to demonstrate an actual chilling effect on his First Amendment rights. Indeed, as discussed above in Point I.E.2. of this Decision and Order, Plaintiff admitted that no one had told him that the fire department would not respond if there was a fire at his house. Moreover, a different fire chief than the one who allegedly authored the online post is responsible for responding to fire calls in the location of Plaintiff's residence.

### B. Whether There Was a Causal Connection Between Plaintiff's Speech and Any Adverse Action

**\*7** After carefully considering the matter, the Court answers this question in the negative for the reasons set forth below.

To establish the second element of his First Amendment retaliation claim, "plaintiff must provide specific proof of defendants' improper motivation with either circumstantial or direct evidence." *Media All., Inc. v. Mirch*, 09-CV-0659, 🔖 2011 WL 3328532, at \*5 (N.D.N.Y. Aug.

2, 2011) (D'Agostino, J.) (citing *Curley*, 285 F.3d at 73). "Circumstantial evidence includes close temporal proximity between plaintiff's speech and the alleged retaliatory act." *Mirch*, 2011 WL 3328532, at *5.

"Regardless of the presence of retaliatory motive, however, a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 [1977]). "Plaintiff has the initial burden of showing that an improper motive played a substantial part in defendant's action. The burden then shifts to defendant to show it would have taken exactly the same action absent the improper motive." *Scott*, 344 F.3d at 288.

### 1. Revocation of Plaintiff's Business Permit

In denying Defendants' underlying motion to dismiss Plaintiff's First Amendment claim, this Court held that Plaintiff had sufficiently alleged a concrete harm through the loss of his business permit, and consequently, the loss of business income, as a result of Defendants' alleged retaliatory actions. *Pflaum*, 937 F. Supp. 2d at 308. Having carefully reviewed the record, the Court finds that Plaintiff has failed to create a genuine dispute of material fact regarding Defendants' alleged improper motive. Specifically, with respect to the revocation of his business permit, the undisputed facts establish that the Town received complaints regarding the noise emanating from Plaintiff's property. Plaintiff was given two [3] noise violations over the course of approximately one year and ample opportunity to rectify the problem. (Dkt. No. 67, Attach. 5.) Because the noise problem and complaints continued, Mr. Ennis revoked Plaintiff's permit. [4] Even if Plaintiff were able to establish that an improper motive played a part in this decision, it is clear to the Court that, under these circumstances, the revocation would have still occurred. Indeed, Plaintiff challenged the decision to revoke his permit in appeals made to the Town's Zoning Board of Appeals and in two actions filed in New York State Supreme Court. (Dkt. No. 67, Attachs. 1 & 2.) Although Plaintiff was successful in his state court actions, those decisions were based, in part, upon the Town's failure to follow proper procedure, rather than the merits of the Town's decision. (*Id.*)

### 2. Criminal Charges

**\*8** Plaintiff has also failed to demonstrate an improper motive with respect to his claim that he received false criminal charges in retaliation for comments on his website about corruption among public officials. Plaintiff relies on the temporal proximity of these charges with a meeting he had with Bertram and his filing of an Article 78 petition in New York State Supreme Court. More specifically, Plaintiff argues that he began an Internet blog on or about January 1, 2011, and in that blog reported on what he perceived to be the illegal activities of Town officials. (Dkt. No. 67, ¶ 15 [Pl.'s Decl.].)

For example, on January 1, 2011, Plaintiff wrote about the alleged inflation of billable time by the Town Attorney that was spent on work paid for by the Town. (*Id.* at 65:8-11.) Around the same time, Plaintiff met with Bertram to discuss his discovery of specific instances of corruption by public officials, including the alleged inflation of billable work by the Town Attorney. (Dkt. No. 59, Attach. 7, at 62:13-15; 64:9-15 [Pl.'s Dep. Tr.].) On January 15, 2011, a few days after this meeting occurred, Plaintiff was issued a criminal summons for the offense of "habitual loud barking," in violation of N.Y. Local Law § 1. (*Id.* at 61:19-22; Dkt. No. 68, Attach. 7 [Criminal Summons]; Dkt. No. 67, ¶ 15 [Pl.'s Decl.].) Plaintiff testified at his deposition that the Town Attorney went to great lengths to research the Local Law that he was charged under and assisted one of Plaintiff's neighbors in drafting an affidavit upon which the criminal summons was based. (Dkt. No. 59, Attach. 7, at 65:17-21 [Pl.'s Dep. Tr.]; Dkt. No. 67, ¶ 107 [Pl.'s Decl.].) Plaintiff argues that he is the first Town resident to be charged under this section of the Local Law. (Dkt. No. 67, ¶¶ 100, 106 [Pl.'s Decl.].) Finally, Plaintiff argues that Bertram retained outside counsel to pursue this charge against him, which was later dismissed. (Dkt. No. 67, ¶¶ 5, 19, 21 [Pl.'s Decl.]; Dkt. No. 59, Attach. 7, at 57:16-18 [Pl.'s Dep. Tr.].)

Thereafter, in October 2011, Plaintiff filed an Article 78 petition in New York State Supreme Court challenging the Town's denial of Plaintiff's FOIL requests. (Dkt. No. 59, Attach. 7, at 67:7-12 [Pl.'s Dep. Tr.].) Plaintiff sought disclosure of the information in the FOIL requests to substantiate his belief that Town officials were engaging in illegal activities. (Dkt. No. 67, ¶¶ 43-44 [Pl.'s Decl.].) One week after commencing that action, Plaintiff received a second criminal summons for the same offense related to loud

dog barking. (Dkt. No. 68, Attach. 7 [Appearance Ticket]; Dkt. No. 59, Attach. 7, at 56:16-19; 67:7-12 [Pl.'s Dep. Tr.].) Plaintiff testified that he had "almost no dogs" on his property in October 2011. (Dkt. No. 59, Attach. 7, at 67:8-10 [Pl.'s Dep. Tr.].) According to Plaintiff, that charge was neither dismissed nor withdrawn, but "vanished." (*Id.*, at 57:19-58:9.)

While Plaintiff's allegations may plausibly suggest that an improper motive played a role in the charges brought against him, Defendants have submitted admissible record evidence that establishes otherwise. (Dkt. No. 59, Attach. 17.) Specifically, the criminal information in question is signed by one of Plaintiff's neighbors, Frederick Platt, and states, in part, that "my complaint is that the dogs at Glencadia Dog Camp exhibit ongoing habitual barking/howling at any given time of day or night. This has been an issue since the Fall of 2009." (*Id.*) Furthermore, an affidavit filed by Wes Powell, the Town's Dog Control Officer, states that he received repeated complaints from Mr. Platt throughout 2010, culminating in the noise complaint that served as the basis for the criminal charge. (Dkt. No. 59, Attach. 16, ¶¶ 3-5 [Powell Aff.].) Mr. Powell states that the complaint was written by Mr. Platt in his presence and that no Town official directed Mr. Powell to serve Plaintiff with the criminal summons. (*Id.*, ¶¶ 7-10.)

**\*9** Conversely, Plaintiff has not submitted any admissible record evidence supporting his claim that the Town Attorney (who is not a party) played any role in the charge being filed against him or that he is the only resident to have ever been charged under this section of the Local Law. Similarly, Plaintiff's contention that the Town pressured Mr. Platt to file a complaint against him (Dkt. No. 67, ¶ 7[Pl.'s Decl.] ) is unsubstantiated. While the timing of the charge may appear suspicious, the Town cannot control when its residents decide to file a complaint and, in light of the record evidence demonstrating that there was a preexisting noise problem on Plaintiff's property, the complaint is unsurprising. Moreover, the fact that Plaintiff *believes* the Town shored up its criminal charge against him is of little, if any, materiality. Finally, because the second charge seemingly "vanished," no documentation or evidence (other than the appearance ticket itself) has been submitted with respect to that charge. In any event, because the charge was never prosecuted, Plaintiff has failed to support his claim that he suffered any harm. Accordingly, the Court finds that Plaintiff has failed to meet his burden in demonstrating an improper motive with respect to this charge.

### 3. Town Assessor Gleason

Plaintiff claims that Town Assessor Howard Gleason (also not a party) threatened to raise his property taxes for engaging in political activities when Mr. Gleason hand delivered a letter to Plaintiff before a public meeting. (Dkt. No. 69, Attach. 18, at 3 [Letter from Pl. to Gleason]; Dkt. No. 67, ¶ 29 [Pl.'s Decl.].) The only evidence submitted with respect to this claim is not the original letter from Mr. Gleason to Plaintiff but letter correspondence from Plaintiff to Mr. Gleason. (Dkt. No. 69, Attach. 18, at 3 [Letter from Pl. to Gleason].) Plaintiff's letter to Mr. Gleason, dated October 5, 2010, states that Plaintiff interpreted Mr. Gleason's attempt to speak with him about tax filings before a town hall meeting as threatening in nature due to the "timing and manner of the interaction." (*Id.*) This is because Plaintiff "had announced [his] intention to call for a referendum frequently and in many forums prior to appearing for the meeting." (*Id.*) Furthermore, Plaintiff requested that, in order to "avoid the impression that you coordinate your tax-related activities with other people in government in order to intimidate free speech, please do not present important information to me in such an information [sic] and unverifiable way." (*Id.*)

However, Mr. Gleason's response to Plaintiff's letter suggests that their interaction was not meant as a threat to raise Plaintiff's taxes or "was in any way politically motivated." (Dkt. No. 69, Attach. 18, at 4 [Letter from Pl. to Gleason].) More specifically, Mr. Gleason explains that he needed to re-assess Plaintiff's property in light of the fact that Plaintiff was now running a kennel (business) on his property and decided to hand deliver his letter knowing that Plaintiff would be present for the town hall meeting. (*Id.*) Moreover, Mr. Gleason reassured Plaintiff that politics do not dictate how he performs his job and promised that all future communication will be transmitted through mail rather than in-person. (*Id.*)

Plaintiff has failed to submit any additional evidence with respect to his tax assessment, that his taxes were improperly raised or that Mr. Gleason acted with a retaliatory animus. [5] Similarly, no evidence has been submitted to substantiate Plaintiff's claim that Bertram encouraged Mr. Gleason to use his authority as Town Assessor to intimidate Plaintiff. In sum, Plaintiff has wholly failed to satisfy his burden demonstrating that he suffered harm as a result of any action taken by Mr. Gleason and that Mr. Gleason acted with an improper motive.

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 33 of 311

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

**\*10**  For all of these reasons, the Court finds that Plaintiff has failed to create a genuine dispute of material fact with respect to his First Amendment claim. Because the Court has reached this conclusion, it need not, and does not, consider the merits of Defendant Bertram's alternative qualified immunity argument.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 59) is **GRANTED**. The Clerk of the Court is directed to enter judgment in favor of the Defendants and close this case.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 865296

# Footnotes

1    Although Plaintiff is currently proceeding *pro se*, the Court notes that he had counsel when preparing his response to Defendant's motion for summary judgment. Accordingly, no need exists to construe Plaintiff's response with the special solicitude ordinarily afforded to *pro se* litigants.

2    The Court notes that, while it did not previously (i.e., in its prior decisions) liberally construe Plaintiff's retaliation claim as arising under three separate theories, it does so now. The Court further notes that it has the power to address these two additional theories for each of two alternative reasons: (1) because Defendants moved for dismissal of Plaintiff's retaliation claim in its entirety, Plaintiff has had sufficient notice and an opportunity to be heard with respect to the two theories in question; and (2) in any event, even if Plaintiff cannot be said to have had such notice and an opportunity to be heard, he filed his Complaint *pro se* and the Court finds the two theories to be so lacking in arguable merit as to be frivolous, *see Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (recognizing that district court has power to *sua sponte* dismiss *pro se* complaint based on frivolousness notwithstanding fact that plaintiff has paid statutory filing fee).

3    As discussed above, Plaintiff was actually given three noise violations. However, because his permit was revoked on the same day that he received the third violation, the Court will disregard the third violation for purposes of this analysis.

4    The Court notes that Plaintiff spends considerable time in his opposition papers disputing the sufficiency of the evidence and procedures that were followed that led to the issuance of noise violations. (*See generally* Dkt. No. 67, ¶¶ 56-95 [Pl.'s Decl.].) However, this Court is not the proper forum for that dispute. Furthermore, to the extent that the New York Supreme Court observed that there appeared "to have been a disproportionate amount of time and money spent on [the noise violation] notice," and that the records did not "reveal a real issue with dog-barking," those observations are not binding upon this Court. (Dkt. No. 67, Attach. 2, at 6.) Setting aside the fact that the observations constitute dicta, Defendants have submitted admissible record evidence demonstrating that Mr. Ennis acted upon complaints made to him by residents of the Town, which Plaintiff has failed to properly dispute.

5    For example, with regard to this lack of additional evidence regarding retaliatory animus, Plaintiff has failed to adduce admissible record evidence establishing that, even assuming Mr. Gleason knew of Plaintiff's intent to engage in protected speech, the so-called "manner of the interaction" by Mr. Gleason (i.e., the hand delivery of the letter) was in fact unusual for Mr. Gleason given the date of the letter and the date of the public meeting. Moreover, Plaintiff has failed to adduce admissible record evidence that the so-called "timing ...

of the interaction" is significant, given his rather constant exercise of his First Amendment rights during the time in question.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 3358082
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Anna T. BALASH-IOANNIDOU, Plaintiff,

v.

CONTOUR MORTGAGE CORPORATION;
Wilmington Savings Fund Society, FSB, Defendants.

22-CV-4506 (AMD) (LB)
|
Signed August 15, 2022

**Attorneys and Law Firms**

Anna T. Balash-Ioannidou, Astoria, NY, Pro Se.

### MEMORANDUM AND ORDER

ANN M. DONNELLY, United States District Judge:

*1 On July 22, 2022, the *pro se* plaintiff, Anna T. Balash-Ioannidou, filed a complaint against defendants Contour Mortgage Corporation ("Contour") and Wilmington Savings Fund Society, FSB ("Wilmington") in the United States District Court for the Southern District of New York seeking declaratory and injunctive relief with regards to foreclosure proceedings involving real property located in Astoria, Queens County, New York. (ECF No. 1.) The plaintiff also submitted an unsigned order to show cause seeking to enjoin "all actions ... including calculations, notice of sale, auction of property, sale of property and transfer" of the property located at 21-08 30 th Avenue, Astoria, New York ("the property") in her Supreme Court of the State of New York, Queens County, Index No. 707379/2015 ("Queens County Supreme Court") foreclosure action. (ECF No. 2.) On August 1, 2022, the action was transferred to this Court. For the reasons set forth below, the case is dismissed for lack of subject matter jurisdiction.

### BACKGROUND

On July 14, 2015, a foreclosure action was instituted against the plaintiff in Queens County Supreme Court seeking final judgment and the sale of the property to satisfy the mortgage in the amount of $645,300.00. Contour was the original lender; Wilmington now holds the mortgage and lien and is the "current foreclosing party" on the property in the Queens County Supreme Court foreclosure action. (ECF No. 1 at 2.) The plaintiff asserts that she has "issued a payment through Notary Presentment to Defendants in the amount of $645,300.00" to satisfy her debt, as well as a "Notary Protest" and a "Certificate of Dishonor." (*Id.* at 3.) She seeks this Court's involvement in the dispute over her alleged satisfaction of the mortgage, for removal of the lien on the property and for "injunctive relief from the ongoing foreclosure action." (ECF No. 1 at 4-5.)

### STANDARD OF REVIEW

In reviewing the plaintiff's complaint, the Court is mindful that the submissions of a *pro se* litigant must be construed liberally and interpreted "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006). A district court may dismiss a *pro se* action *sua sponte*, that is, on its own—even if the plaintiff has paid the requisite filing fee—if the action is frivolous, *Fitzgerald v. First East Seventh Street Tenants Corp.*, 221 F.3d 362, 363-64 (2d Cir. 2000), or if the court lacks subject matter jurisdiction over the matter. Fed. R. Civ. P. 12(h)(3). "Failure of subject matter jurisdiction is not waivable and may be raised at any time by a party or by the court *sua sponte*. If subject matter jurisdiction is lacking, the action must be dismissed." *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700-01 (2d Cir. 2000); *see* Fed. R. Civ. P. 12(h)(3). Federal subject matter jurisdiction is available only when a "federal question" is presented, 28 U.S.C. § 1331, or when plaintiffs and defendants are of diverse citizenship, and the amount in controversy exceeds $75,000, 28 U.S.C. § 1332.

### DISCUSSION

#### A. *Younger* Abstention

*2 Under the abstention doctrine set out by the Supreme Court in *Younger v. Harris*, 401 U.S. 37, 43-45 (1971), this Court lacks jurisdiction over the plaintiff's claims. "The defining feature of *Younger* abstention is that even though either a federal or a state court could adjudicate a given claim, when there is an ongoing state proceeding in which the claim can be raised, and when adjudicating the claim in

federal court would interfere unduly with the ongoing state proceeding, the claim is more appropriately adjudicated in state court." *Kirschner v. Klemons*, 225 F.3d 227, 236 (2d Cir. 2000). *Younger* abstention is triggered by three categories of state court proceedings: (1) "state criminal prosecutions," (2) "civil enforcement proceedings," and (3) civil proceedings that "implicate a State's interest in enforcing the orders and judgments of its courts." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72-73 (2013).

Here, the third prong of the *Sprint* rationale applies. "[F]ederal court intervention in an on-going state foreclosure proceeding ... [is] generally barred by *Younger v. Harris*." *Fequiere v. Tribeca Lending*, No. 14-CV-812, 2015 WL 1412580, at *7 (E.D.N.Y. Mar. 20, 2015) (quoting *Marcelo v. EMC Mortg. Corp.*, No. 10-CV-5964, 2011 WL 1792671, at *4 (E.D.N.Y. May 6, 2011)). The plaintiff seeks declaratory injunctive relief relating to the same property that is the subject matter of the underlying state court actions. The plaintiff's remedies are therefore limited to state court—either in the original venue, or on appeal to the state appellate court. *Younger* abstention bars her from seeking injunctive and declaratory relief in a federal court.

### B. The Anti-Injunction Act

The plaintiff's request for injunctive relief is also precluded by the Anti-Injunction Act, which provides that, "[a] court of the United States may not grant an injunction to stay proceedings in State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. This provision applies when the requested injunction would either stay the ongoing state proceedings or prevent the parties from enforcing an order that has already issued. *See Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Eng'rs.*, 398 U.S. 281, 294 (1970). Courts in this Circuit have consistently held that the Anti-Injunction Act applies in the context of pending state court foreclosure proceedings. *See DiMicco v. CitiMortgage, Inc.*, No. 20-CV-755, 2020 WL 804949, at *3 (E.D.N.Y. Feb. 18, 2020); *Abbatiello v. Wells Fargo Bank, N.A.*, No. 15-CV-4210, 2015 WL 5884797, at *5 (E.D.N.Y. Oct. 8, 2015) (collecting cases).

### C. Frivolous Claim

Finally, the Court would dismiss this case even if it had jurisdiction, because the claims are frivolous. The basis for the plaintiff's claim is that she has satisfied her debt and is entitled to release from the lien on her property because she mailed a "notary presentment" and related documents to defendants. (ECF No. 1 at 1-4.) These documents (*id.* at 7-18), appear to be asserting some sort of "sovereign citizen" claim. *See United States v. Ulloa*, 511 F. App'x 105, 107 n.1 (2d Cir. 2013) ("[S]overeign citizens are a loosely affiliated group who believe that the state and federal governments lack constitutional legitimacy and therefore have no authority to regulate their behavior; the FBI has labeled the sovereign citizens a domestic terrorist group."). People who identify as sovereign citizens use maneuvers like the notary presentment to avoid paying debts or to collect debts that are not actually owed. *See, e.g., Kesick v. Ulloa*, No. 10-CV-1248, 2012 WL 2873364, at *3 (N.D.N.Y. July 12, 2012) (Ulloa filed fraudulent papers entitled "notary presentment" with the Town of Ulster Justice Court falsely claiming that a Justice of the Ulster Town Court owed him the sum of $176,000,000.00); *see also McKay v. U.S. Bank,* No. 14-CV-872, 2015 WL 5657110, at *2 (M.D. Ala. Sept. 24, 2015) (denying plaintiffs' request for declaratory judgment that the defendant was not the real mortgage holder and to quiet title based upon their mailing of a "notarial presentment" and a "notarial notice of Dishonor" to the defendant bank). To the extent the plaintiff claims that her notary presentment discharges her debt, the claim lacks an arguable basis in law or fact. *Muhammad v. Smith*, No. 13-CV-760, 2014 WL 3670609, at *2 (N.D.N.Y. July 23, 2014) ("Theories presented by redemptionist and sovereign citizen adherents have not only been rejected by the courts, but also recognized as frivolous and a waste of court resources.") (collecting cases).

### CONCLUSION

**\*3** Accordingly, the instant *pro se* complaint is dismissed without prejudice for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(h)(3). The motion for preliminary injunctive relief is denied. Further, in keeping with its duty to liberally construe *pro se* complaints, the Court has considered whether to grant leave to amend the complaint but finds that amendment would be futile. *See Johnson v. Univ. of Rochester Med. Ctr.*, 642 F.3d 121, 124-25 (2d Cir. 2011).

Although the plaintiff paid the filing fee to bring this action, the Court certifies pursuant to 28 U.S.C. § 1915 (a)(3) that any *in forma pauperis* appeal from this order would not be

taken in good faith. ⚑ *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 3358082

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2012 WL 2873364

United States District Court,
N.D. New York.

Susan KESICK, Plaintiff,

v.

Richard Enrique ULLOA, Luis Wilfredo
Rivera, and John Doe, Defendants.

No. 1:10–CV–1248.
|
July 12, 2012.

### DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

### I. INTRODUCTION

**\*1** Plaintiff Susan Kesick commenced this action asserting claims pursuant to the civil Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), and New York State common law. [1] Plaintiff moves for summary judgment on her RICO claims, or, in the alternative, for default judgment against Defendants for failing to provide any discovery. *See* dkt. # 13. Defendant Richard Enrique Ulloa's request for permission to file late opposition papers to Plaintiff's motion for summary judgment, *see* dkt. # 26, was denied. *See* 5/4/12 by Dec. & Ord., dkt. # 28. Defendant Rivera filed no response to the motion, and Defendant Doe has not been identified. For the reasons that follow, Plaintiff's motion for summary judgment is granted in part as against Defendants Ulloa and Rivera. The claims against defendant John Doe are dismissed for failure to name and serve the individual.

### II. STANDARD OF REVIEW

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, *see Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see O'Hara v. National Union Fire Ins. Co. of Pittsburgh, PA,* 642 F.3d 110, 116 (2d Cir.2011) ("Summary judgment is appropriate only if, after

drawing all permissible factual inferences in favor of the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."). Even though the motion is unopposed, the Court may not grant summary judgment unless it determines that the moving party is entitled to judgment as a matter of law. *Vermont Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 242 (2d Cir.2004); *see also D.H. Blair & Co., Inc. v. Gottdiener,* 462 F.3d 95, 110 (2d Cir.2006) ("Even unopposed motions for summary judgment must fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law.") (internal quotation marks omitted).

### III. BACKGROUND

Due to Defendants' failures to file proper opposition to the pending motion despite being served with the motion papers and the Northern District's "NOTIFICATION OF THE CONSEQUENCES OF FAILING TO RESPOND TO A SUMMARY JUDGMENT MOTION," *see* dkt. # 19, the supported factual allegations in Plaintiff's papers are deemed admitted for purposes of this motion. *See* Fed.R.Civ.P. 56(e) (2); N.D.N.Y. L.R. 7.1(a)(3); *see also Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Edwards v. INS,* 59 F.3d 5, 8 (2nd Cir.1995) ("While a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them."); *N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 648–49 (2d Cir.2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1(a)(3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998) (*per curiam* ) (accepting as true material facts contained in unopposed local rule statement of material facts). These facts are as follows.

**\*2** On March 1, 2009, as the result of a traffic stop, a criminal complaint was sworn out against Defendant Ulloa by Ulster County Deputy Sheriff George F. Goodwin. The criminal complaint accused Ulloa of Aggravated Unlicensed

Operation of a Motor Vehicle ("AUO"), a misdemeanor violation of Section 511 of the New York Motor Vehicle and Traffic Law. In connection therewith, Ulloa was issued an appearance ticket directing him to appear before the Ulster Town Court at 2:30 p.m. on March 4, 2009. Ulloa failed to appear in Town Court on the designated return date.

On March 5, 2009, Plaintiff Susan Kesick, a Justice of the Ulster Town Court reviewed and signed an Arrest Warrant for Ulloa on his misdemeanor AUO charge and for his failure to appear in Town Court the previous day. Ulloa was subsequently arrested, appeared before the Town Court, and released on bail on April 8, 2009. At the time of his release, Kesick signed an Order for Ulloa to undergo a psychological evaluation pursuant to Criminal Procedure Law Article 730 to determine if he possessed the capacity to understand the proceedings against him. Plaintiff asserts that, thereafter and as part of a pattern of racketeering activity by a criminal enterprise and furtherance of a scheme to defraud, extort, and otherwise damage Kesick, Defendants Ulloa, Rivera and Doe, with the assistance of others, began sending and filing fraudulent notices, liens and UCC Financing Statements as set forth below.

On April 21, 2009, Ulloa commenced an action against Kesick by filing with the Ulster County Clerk's Office and mailing Kesick an "Order" and "Criminal Complaint" together with two additional nonsensical documents identified as: "Notice and Demand: Writ of Error Coram Nobis Demand For Reversal of Order Due to Lack of Jurisdiction" ("Writ of Error") and "Petition for Writ of Mandamus for an Order to Cease and Desist the Action in 'Town of Ulster Court', 'Ulster Town Court' " ("Writ of Mandamus"). Defendant Rivera assisted Defendant Ulloa with these documents and attested to their accuracy. Ulloa also sent, by registered United States Mail, the "Order" and "Criminal Complaint" to Eric Dinallo, Superintendent of the New York State Insurance Commissioner's Office. Ulloa also mailed his "criminal complaint" to numerous other persons, including Deputy Chief Administrative Judge Jan Plummadore, Ulster County Executive Michael Hein, New York State Attorney General Andrew Cuomo, and New York State Comptroller Thomas DiNapoli.

In his "criminal complaint", Ulloa falsely accused Kesick, Deputy Goodwin and Assistant Ulster County District Attorney David Boole of kidnaping, conspiracy, racketeering, perjury, money laundering and mail fraud, among other crimes. Included as an exhibit to Defendant's "criminal

complaint" was an "Invoice" in the amount of $8,820,750.00 for some unknown purpose. Despite having failed to personally serve Kesick or any of the other defendants named in the action, on June 4, 2009, Ulloa filed an "Order for Summary Judgment" which the Court deemed a notice of motion seeking a default judgment.

**\*3** On June 17, 2009, Kesick served Answers to Defendant's "Criminal Complaint", "Writ of Error," and "Writ of Mandamus." Thereafter, Kesick and the other named defendants cross-moved for various forms of relief, including dismissal of the action. On July 28, 2009, Ulloa filed with the Town of Ulster Justice Court Clerk and mailed an "Affidavit of Negative Averment, Opportunity to Cure, and Counterclaim" ("Negative Averment"). Ulloa's Negative Averment was a purportedly self executing document in which he claims to be owed several million dollars for "crimes," fraud, racketeering and theft of public funds, plus interest, treble and punitive damages.

On August 24, 2009, Ulloa filed with the Town of Ulster Justice Court and mailed a "Demand for Payment", "Invoice" and "Affidavit of Notary Presentment" (hereinafter "Notary Presentment") falsely claiming that Kesick owed him the sum of $176,000,000.00. Ulloa's "Demand for Payment", "Invoice" and "Notary Presentment" falsely accuse Kesick of committing numerous civil and criminal wrongs including, *inter alia,* fraud, racketeering, theft of public funds and continuing trespass. Ulloa's fraudulent papers were also sent via United States Mail to the numerous individuals listed in the Notary Presentment.

On September 20, 2009, Defendants filed with the Town of Ulster Justice Court Clerk and mailed a "Second Demand for Payment", "Invoice" and "Notary Presentment" again falsely claiming Kesick owed Ulloa the sum of $176,000,000.00. Defendants' "Second Demand for Payment", "Invoice" and "Notary Presentment" again falsely accuse Kesick of committing various civil and criminal wrongs including, *inter alia,* fraud, racketeering, theft of public funds and continuing trespass. Plaintiff believes that Defendants' "Second Demand for Payment", "Invoice" and "Notary Presentment" were sent via United States Mail to the numerous individuals listed in the Notary Presentment.

On October 23, 2009, Defendants filed with the Town of Ulster Justice Court Clerk a "Final Demand for Payment", "Invoice" and "Notary Presentment", again reasserting the false claim that Kesick owed Ulloa the sum of

$176,000,000.00. Defendants' "Final Demand for Payment", "Invoice" and "Notary Presentment" again falsely accuse Kesick of committing various civil and criminal wrongs including, *inter alia*, fraud, racketeering, theft of public funds and continuing trespass. Plaintiff believes that Defendants' "Final Demand for Payment", "Invoice" and "Notary Presentment" were sent via United States Mail to the numerous individuals listed in the Notary Presentment.

On November 10, 2009, Defendants filed with the Town of Ulster Justice Court Clerk and the Ulster County Clerk and mailed a bogus "Notice of Final Determination and Judgment in Nihil Dicit" (hereinafter "Judgment"), signed by Ulloa, falsely purporting to be a final judgment in the amount of $176,000,000, and indicating that it was a "self executing power of attorney to file liens and encumbrances against any and all property" owned by Kesick.

 **4** On January 7, 2010, New York Acting Supreme Court Justice Kimberly A. O'Conner issued a Decision and Order dismissing the action against Kesick based upon lack of personal jurisdiction. Despite the fact the action against Kesick had been dismissed, on February 12, 2010, Defendants mailed UCC–1 Financing Statement No.: 20100212008230 and a "Notice of Claim of Maritime Lien" to the New York State Department of State for purposes of filing those documents. In the UCC–1 filing, Ulloa falsely claimed an interest in virtually all of Kesick's personal and real property to satisfy an alleged lien in the sum of $5,280,000,000.00 (or $176,000,000.00 in silver).

The New York State Department of State records reflect that Ulloa has filed no less than 35 similar liens and UCC–1 Financing Statements in New York as against various government entities, public servants, judges, banks, law firms and private individuals on nearly identical fraudulent grounds. Moreover, Ulloa filed dozens of similarly false liens and UCC–1 financing statements against other government entities, public servants, judges, banks, law firms and private individuals in the State of Washington. Although Kesick has thus far been unable to locate or discover additional liens filed against her in other states, she believes that, given Ulloa's pattern of harassment and fraudulent filings as against others (including actions for which he has been convicted of multiple felonies), Ulloa has filed (or will file in the future) similar liens and financing statements against her personal and real property.

There never has been any contract or agreement between Kesick and Ulloa that would give rise to any lien or security interest in any of Kesick's real or personal property in favor of Ulloa. In fact, Kesick did not know who Ulloa was until he was brought before her Court on the misdemeanor Vehicle and Traffic Law charge. There is no truth to the statements contained in the documents filed by Defendants in the New York State Courts and Office of the Secretary of State which purportedly perfect a security interest in Kesick's real and personal property.

Defendants have also caused false information regarding Kesick's creditworthiness to be filed in the permanent records of the State of New York, and these cannot be erased. Further, Ulloa has demonstrated his willingness to initiate lawsuits against Kesick without any basis in law or fact, in an attempt to maliciously harass, intimidate and extort money or other benefits from her and other government employees. Plaintiff asserts that Ulloa's frivolous lawsuits and proceedings have already caused immeasurable harm to her name, reputation and mental health.

Kesick was also called as a victim/witness by the Ulster County District Attorney to give testimony to a grand jury that indicted Ulloa on state criminal charges. As a direct result of giving this testimony, Kesick has fears about what Ulloa and/or his associates may do to her or her family. Kesick points to a "summons" (a copy of which was filed in Ulloa's federal criminal case) showing that a dozen people convened a "de jure" court in Ulster County calling for their "County Rangers" to arrest Kesick and seize her assets to cover a purported $176,000,000 debt. *See United States v. Ulloa,* Case No. 1:10–cr–00321 (N.D.N.Y.), dkt. # 62. Kesick viewed this summons as a threat. The Ulster Police Department issued a security bulletin concerning Ulloa and published it to all Town Court and Town Hall employees warning of the "credible concern" to Kesick's safety posed by Defendants and their conspirators. Due to security concerns caused by Defendants, bullet proof glass was installed inside the Ulster Town Hall building and security has otherwise been tightened in the Town Hall, Town Court courtroom and the Court Clerk's Office.

 **5** Kesick was partially successful in an action in New York State Supreme Court against Ulloa. On February 9, 2011, New York State Acting Supreme Court Justice Melkonian, recognizing the "obvious frivolity" of Ulloa's filings against Kesick, issued an injunction prohibiting Ulloa from filing any further *pro se* actions or proceedings against Kesick without

prior court approval. That injunction is only valid with regard to New York State courts, and does not extend to the federal system.

On December 30, 2010, after a three day jury trial, Ulloa was found guilty of all seven counts of a Superseding Indictment that charged him with Mail Fraud, in violation of 18 U.S.C. §§ 1341, 1349 and 2. The conduct in that case is the same fraudulent actions complained of herein and which included conduct directed at numerous victim, including Kesick. *See United States v. Ulloa,* Case No. 1:10–cr–00321, dkt. # 103, Trial Tr. at 26–27. On December 14, 2011, Defendant Ulloa was sentenced to 60 months imprisonment by this Court.

Plaintiff commenced this action asserting RICO claims pursuant to 18 U.S.C. § 1964(c) (First, Second, and Third Claims), state common law abuse of process (Fourth Claim), and state common law prima facie tort (Fifth Claim). On this motion, Kesick seeks a judgment in her favor on the First, Second and Third Claims; an inquest on the amount of damages that should be awarded; [2] and an Order that:

>(1) Defendant Ulloa be enjoined and restrained from filing or participating, directly or indirectly, in any future lawsuits in the Federal Courts, pro se, as against Justice Kesick, her family or her property without first obtaining approval of a Judge of this Court;

>(2) Defendants be enjoined and restrained from associating with the Tri–Republic Assembly, or any of its members, for any commercial purpose;

>(3) Defendants be prohibited from filing any liens or other purported interest in Justice Kesick's personal or real property; and

>(4) Defendants be directed to refrain from any contact with Justice Kesick or members of her family and to remain no less than 1000 feet from her or any members of her family, their places of work and property.

Pl. MOL p. 9.

## IV. DISCUSSION

### a. Doe Defendant
The John Doe defendant has not been identified or served with process. The time to do so has expired. Consequently, all claims against John Doe are dismissed for failure to prosecute.

### b. Summary Judgment on RICO Claims
To establish a RICO claim, a plaintiff must show: "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of § 1962." *De Falco v. Bernas,* 244 F.3d 286, 305 (2d Cir.2001); *see also* 18 U.S.C. § 1964(c) (to have a remedy under RICO, a plaintiff must be "injured in his business or property by reason of a violation of section 1962"). To prevail on a claim under § 1962(c), a plaintiff must demonstrate: (1) that the defendant is a person who (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly ... participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *see also DeFalco,* 244 F.3d at 306 (A civil RICO violation consists of the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.") (citing *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). The Court will address these elements seriatim.

#### 1. The Defendants are persons covered by RICO.
**\*6** A "person" for RICO purposes "includes any individual capable of holding a legal or beneficial interest in property". 18 U.S.C. § 1961(3). Defendants, both citizens and residents of New York and the United States, are individuals capable of owning property.

#### 2. The Defendants committed two or more acts constituting a pattern of racketeering activity.
In order to recover under RICO, Plaintiff must also establish that the defendants committed two or more acts constituting a "pattern of racketeering activity". 18 U.S.C. § 1962(5). A pattern of racketeering activity requires "at least two acts of racketeering activity" occurring within ten years of each other. 18 U.S.C. § 1961(5). RICO defines "racketeering activity" as "any act or threat" involving a number of crimes and offenses, including mail fraud. 18 U.S.C. § 1961(1). "To establish a pattern, a plaintiff must [ ] make a showing that

the predicate acts of racketeering activity by a defendant are 'related, and that they amount to or pose a threat of continued criminal activity.' " *DeFalco v. Bernas,* 244 F.3d 286, 321 (2d Cir.2001) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)); *see United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir.1989). A plaintiff can establish that acts are related by proof of temporal proximity, common goals, similarity of methods, or repetition. There must also be some relationship between the acts and the alleged enterprise. *Indelicato,* 865 F.2d at 1384.

"The ... so-called 'continuity' requirement can be satisfied either by showing a 'closed-ended' pattern—a series of related predicate acts extending over a substantial period of time—or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Spool v. World Child Intern. Adoption Agency,* 520 F.3d 178, 183 (2d Cir.2008) (citations omitted). To satisfy closed-ended continuity, Plaintiff must generally demonstrate that the RICO predicate activity occurred over a period of two or more years. *See id.* at 184 ("Since the Supreme Court decided *H.J. Inc.,* we have never held a period of less than two years to constitute a 'substantial period of time.') (citations omitted); *see also id.* ("Although we have not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity, particularly where, as here, ... the activities alleged involved only a handful of participants and do not involve a complex, multi-faceted conspiracy.") (internal quotation marks and citations omitted). "To satisfy open-ended continuity, the plaintiff ... must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 243 (2d Cir.1999). This threat is generally presumed when the enterprise's business is primarily or inherently unlawful. *Id.* at 242–43.

**\*7** As indicated above, Defendant Ulloa was convicted by a jury of multiple counts of mail fraud for the conduct underlying this action. Moreover, Plaintiff has demonstrated that Defendants used the U.S. mail to further their scheme against her on at least nine separate occasions over a period of approximately a year and a half.[3] In this regard, Defendants

utilized the United States mails in conjunction with their filing of frivolous lawsuits and "criminal complaints," fake court orders, bogus liens, as well as threatening and dunning collection demands seeking sums ranging from $8 Million to over $5.8 Billion dollars against Kesick and numerous other victims. Defendants' acts are related inasmuch as they share a common purpose to defraud others and to serve as a weapon of retribution, both of which are directly related to the purpose of the enterprise which was to defraud others and seek retribution against individuals and entities that Defendants felt had displeased them. The enterprise did not engage in a legitimate business, and Plaintiff has presented proof of Ulloa's intent to continue such unlawful activity against Kesick and other Ulster County officials.

Plaintiff's proof establishes that Defendants engaged in a pattern of racketeering activity through acts of mail fraud that are temporally proximate to each other, evince a common goal, are similar in their methods, are repetitive, and which constitutes a threat of continuing criminal activity beyond the period during which the predicate acts were performed. Defendants' racketeering activity consisted of a series of related predicate acts that are committed over a substantial period of time, and satisfies the "pattern of racketeering activity" element of the Act under the open-ended continuity theory.

### 3. Defendants were participants in a RICO enterprise the activities of which affected interstate commerce.

Plaintiff must also establish that Defendants were participants in a RICO enterprise the activities of which affected interstate commerce. An enterprise for RICO purposes includes "any union or group of individuals associated in fact." 18 U.S.C. § 1961(4); *Pahmer v. Greenberg,* 926 F.Supp. 287, 300 (E.D.N.Y.1996) *aff'd sub nom. Shapiro v. Cantor,* 123 F.3d 717 (2d Cir.1997). "For an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 174 (2d Cir.2004) (citation and internal quotation marks omitted). The enterprise, however, must be distinct from the pattern of activity in which it engages. *Kottler v. Deutsche Bank AG,* 607 F.Supp.2d 447, 458 (S.D.N.Y.2009). The enterprise must also have a "longevity sufficient to permit these associates to pursue the enterprise's purpose," *Boyle v. United States,*

556 U.S. 938, 129 S.Ct. 2237, 2243–44, 173 L.Ed.2d 1265 (2009), and the enterprise's purpose must affect interstate commerce.

**\*8** Plaintiff has established that Defendants were participants in the "TriRepublic Assembly," which is a group of persons subscribing to the "sovereign citizen" movement. *See United States v. Ulloa,* Case No. 1:10–CR–00321, dkt # 103, Trial Tr. at 61–62. The Tri–Republic Assembly is comprised of individuals from the states of New York, New Jersey and Vermont. *Id.* at 61. Defendant Ulloa personally appeared before a "de jure" court of this group in Ulster County which called for their "county Rangers" to arrest Kesick and/or seize her assets to cover a purported $176,000,000 debt. *Id.; see also United States v. Ulloa,* Case No. 1:10–CR–00321, dkt # 62 (a "summons" from the "Assembly" purporting to order certain individuals, including Plaintiff, to appear before the "Judicial Department of the Assembly"); Kesick Dec. at ¶ 45.

Defendants, acting in concert with each other and purportedly with members of the Tri–Republic Assembly, mailed to Kesick and others, and filed with the New York State Supreme Court, "Demands", "Orders", "Writs" and "Criminal Complaints" falsely claiming to be owed $176,000,000 from Plaintiff. *See* Kesick Dec. at ¶¶ 9–14, Ex. E, F, G and H; *United States v. Ulloa,* Case No. 1:10–CR–00321, dkt 103, Trial Tr. at 103–115. This enterprise consisted of a number of individuals acting in concert, and the enterprise itself was distinct from the pattern of mail fraud activity in which it engaged. Further, the enterprise existed for a sufficient period of time to pursue its purpose of, *inter alia,* defrauding and inflicting retribution upon multiple individuals and entities as demonstrated by Ulloa's conduct in his criminal trial and in the instant case. These facts satisfy the enterprise requirement of a RICO claim.

Finally, the mail fraud predicate crimes satisfy the interstate commerce element for civil RICO claims. *See Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983); *see also DeFalco,* 244 F.3d at 309; *Tavakoli–Azar v. Crescent Mgmt. Inc.,* 1999 WL 1052016 (S.D.N.Y.1999); *Khaimi v. Schonberger,* 664 F.Supp. 54, 60 (E.D.N.Y.), aff'd, 838 F.2d 1203 (2d Cir.1987). Based on the foregoing, Plaintiff has established that Defendants directly or indirectly participated in an enterprise the activities of which affected interstate commerce thereby satisfying prongs 5–7 of the of the RICO test

### *4. RICO injury and Causation*

A RICO plaintiff "can only recover to the extent that ... [s]he has been injured in h[er] business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985). Thus, Plaintiff must show injury to "business or property," and demonstrate that such injury was "by reason of" the substantive RICO violation under both factual and proximate causation. *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 120 (2d Cir.) (quoting 18 U.S.C. § 1964(c)), *cert. denied,* 540 U.S. 1012, 124 S.Ct. 532, 157 L.Ed.2d 424 (2003); *see Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 457, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006); *Holmes v. Sec. Inv. Protection Corp.,* 503 U.S. 258, 259, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Breslin Realty Dev. Corp. v. Schackner,* 457 F Supp 2d 132, 136–37 (E.D.N.Y.2006).

**\*9** Proximate cause, in this context, refers not to the foreseeability of harm to a plaintiff, but instead to the directness of the relationship between the purported enterprise's alleged criminal acts and the plaintiff's injuries. *McBrearty v. Vanguard Group, Inc.,* 353 Fed. Appx. 640, 641–42 & n. 1 (2d Cir.2009). Acts that merely "furthered, facilitated, permitted or concealed an injury which happened or could have happened independently of the act" do not directly cause that injury, and thus do not proximately cause it. *DeSilva v. North Shore– Long Island Jewish Health Sys., Inc.,* 770 F.Supp.2d 497, 524 (E.D.N.Y.2011) (quoting *Red Ball Interior Demolition Corp. v. Palmadessa,* 874 F.Supp. 576, 587 (S.D.N.Y.1995)).

*Picard v. Kohn,* —— F.Supp.2d ——, 2012 WL 566298, at \*3 (S.D.N.Y. Feb.12, 2012).

Defendants' actions plainly caused Kesick to incur legal expenses in defending against the bogus lawsuits and fraudulent liens. In this regard, Kesick has established a RICO injury proximately caused by the racketeering activity. *See Sykes v. Mel Harris and Associates, LLC,* 757 F.Supp.2d 413, 427–28 (S.D.N.Y.2010).[4]

While the filing of the false liens surely damaged Kesick's creditworthiness rating which, in turn, could have caused

RICO Bus.Disp.Guide 12,252

damage to her business or property interests, Plaintiff has not presented evidence of actual damage in this regard. Without this evidence, summary judgment cannot be granted on the portion of Plaintiff's claims seeking to recover for the damages arising from the negative impact on her credit rating. *See* *Elsevier Inc. v. W.H.P.R., Inc.,* 692 F.Supp.2d 297, 310 (S.D.N.Y.2010) (A plaintiff can adequately plead RICO damages by alleging lost profits where they constitute an injury to plaintiff's business, were proximately caused by the alleged racketeering, and are not merely speculative.); *cf.* *McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 228–29 (2d Cir.2008) (reasoning that a RICO plaintiff cannot recover benefit of the bargain or "expectancy" damages in "fraud in the inducement" cases because RICO "compensates only for injury to 'business or property,' " not for injury to an expectation interest that would not have existed absent the alleged RICO violation) (*quoting* 18 U.S.C. § 1964(c)).

Further, although Kesick avers that Defendants' racketeering activities caused her mental strain and distress arising from her fear of Defendants and their co-conspirators in the TriRepublic Assembly, "RICO provides recovery for injury to business and property; it does not provide recovery for physical and emotional injuries." *Williams v. Dow Chemical Co.,* 255 F.Supp.2d 219, 225 (S.D.N.Y.2003) (citing cases). Thus, RICO damages are not available for this portion of her claims.

Based on the foregoing, summary judgment is granted on Plaintiff's First, Second and Third Claims to the extent she seeks to recover for legal expenses in defending against the bogus lawsuits and fraudulent liens, and the expenses incurred in this regard will be tripled. The motion is denied as to other sought after damages. Kesick is directed to submit proof of her expenses incurred in defending against Defendants' racketeering activities, and Defendants will then have the opportunity to submit opposition. The Court will then determine whether a genuine question of material fact exists as to the expenses incurred such to require a trial on this issue.

### 5. Injunctive Relief

**\*10**  As indicated above, Plaintiff seeks various forms of injunctive relief. Section 1964(a) authorizes the district courts to:

prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ... imposing reasonable restrictions on the future activities ... of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce ....

18 U.S.C. § 1964(a).

"The Court thus has the power under RICO to enter reasonable injunctions against RICO violators restricting their future business activities. Congress intended the courts to grant injunctive relief to prevent RICO violators from returning to a particular type of organization or certain lines of business 'to corrupt anew.' " *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 683 F.Supp. 1411, 1441 (E.D.N.Y.1988), *aff'd,* 879 F.2d 20 (2d Cir.1989) (quoting 116 Cong. Rec. 592 (1970) (remarks of Sen. McClellan); 115 Cong.Rec. 9568 (1969) (remarks of Sen. McClellan); Senate Report at 82).

Due to the nature of the RICO violations established here, the Court will permanently enjoin and retrain Defendants from:

(1) filing or participating, directly or indirectly, in any future lawsuits in the Federal Courts as against Plaintiff Susan Kesick, her family or her property without first obtaining approval of a Judge of this Court; and

(2) from filing any liens or other purported interest on Plaintiff Susan Kesick's personal or real property.

Plaintiff has not, however, established entitlement under § 1964(a) to the injunctive relief she seeks which would prohibit Defendants from associating with the Tri–Republic Assembly, or any of its members, for any commercial purpose; or that would grant Plaintiff and members of her family orders of protection. This relief appears beyond the authority granted by § 1964(a) in that it does not

RICO Bus.Disp.Guide 12,252

prevent Defendants from returning to the particular type of organization that formed the basis of the RICO violations.

### c. Default Judgment

Plaintiff also seeks default judgment against Defendants on the non-RICO claims pursuant to Rule 37(b) and (c). Rule 37(b) provides that when a party fails to comply with a discovery order, a court may impose sanctions, including "striking pleadings in whole or in part" and "rendering a default judgment against the disobedient party." Fed.R.Civ.P. 37(b)(2)(A)(iii), (vi). Rule 37(c)(1) (C) provides that, when a party fails to provide Rule 26 disclosures, the Court may, *inter alia,* "impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)."

Rule 37 sanctions maybe imposed in the discretion of the court. 🚩 *S. New England Tel. Co. v. Global NAPs Inc.,* 624 F.3d 123, 143 (2d Cir.2010). However, the Second Circuit has "consistently recognized that Rule 37 sanctions are applicable in 'extreme circumstances,' where 'a party fails to comply with the court's discovery orders willfully, in bad faith, or through fault.' " *Robertson v. Dowbenko,* 443 Fed. Appx. 659, 660 (2d Cir.2011) (quoting *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.,* 845 F.2d 1172, 1176 (2d Cir.1988) (internal quotation marks omitted)); *see also* 🚩 *Bobal v. Rensselaer Polytechnic Inst.,* 916 F.2d 759, 764 (2d Cir.1990).

*\*11* In "evaluating a district court's exercise of discretion" to impose Rule 37 sanctions, we have relied upon factors including: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of ... noncompliance." 🚩 *Agiwal v. Mid Island Mortg. Corp.,* 555 F.3d 298, 302 (2d Cir.2009) (internal quotation marks omitted). Rule 37 sanctions, including the most severe, "may be imposed ... against a plaintiff who is proceeding pro se, so long as a warning has been given that noncompliance can result" in a sanction.

🚩 *Valentine v. Museum of Modern Art,* 29 F.3d 47, 50 (2d Cir.1994) (affirming dismissal sanction after a pro se plaintiff failed to appear for his deposition); *see also* 🚩 *Bobal,* 916 F.2d at 764 (explaining that, before the district court dismissed a case as a Rule 37 sanction, the district court should have informed pro se litigant that violation of a court order would result in such a dismissal).

*Robertson,* 443 Fed. Appx. at 660–61.

Plaintiff asserts that Defendants failed to provide any discovery despite that the magistrate judge "carefully explained to the Defendants their duties to supply ... their Rule 26(a) disclosures at the Rule 16 conference," and despite that Defendants acknowledged receiving Plaintiff's Interrogatories and Document Requests. *See* Pl. MOL, p. 11. Nevertheless, Plaintiffs have failed to establish that Defendants failed to comply with a discovery order. Even assuming that the magistrate judge's explanation of the dictates of Rule 26(a) could be considered a discovery order, Plaintiff has failed to establish that Defendants were warned of the sanction of a default judgment being taken against them if they did not respond. Moreover, there is no indication that Plaintiff sought to enforce its discovery rights by seeking a compliance order. Under these circumstances, the Court does not find that this case constitutes an extreme circumstance where a default is required. However, and to move this case to finality, Plaintiff is granted leave to file, within sixty (60) days, a second summary judgment motion addressed to the state common law claims. [5]

### V. CONCLUSION

For the reasons discussed above, Plaintiff's motion for summary judgment [dkt. # 13] is **granted in part and denied in part.**

The motion is granted on Plaintiff's behalf and against Defendants Richard Enrique Ulloa and Luis Wilfredo Rivera as to liability on the First, Second, and Third Claims to the extent Plaintiff seeks to recover treble damages arising from the legal costs and expenses incurred defending against the bogus lawsuits and fraudulent liens by Defendants Ulloa and Rivera. The motion is denied as to other sought after damages. Kesick is directed to submit proof within sixty (60) days of her expenses incurred in the defending against Defendants' racketeering activities, and Defendants will then have an additional sixty (60) days to submit opposition, if any, to the sought after damages. The Court will then determine whether a genuine question of material fact exists as to the expenses incurred such to require a trial on any such issues.

*\*12* Due to the nature of the RICO violations established here, Defendants Richard Enrique Ulloa and Luis Wilfredo Rivera are **permanently enjoined and retrained from:**

(1) filing or participating, directly or indirectly, in any future lawsuits in the Federal Courts against Plaintiff Susan Kesick, her family, or her property without first obtaining approval of a Judge of this Court; and

(2) filing any liens or other purported interest on Plaintiff Susan Kesick's personal or real property.

The motion for other forms of injunctive relief is **denied.**

The motion for a default judgment on the state common law claims is **denied.** Plaintiff is granted leave to file, within sixty (60) days of the date of this Decision and Order, a second summary judgment motion on the state common law claims. [6]

All claims against John Doe are dismissed without prejudice.

**IT IS SO ORDERED**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2873364, RICO Bus.Disp.Guide 12,252

---

### Footnotes

1    The state common law claims are for abuse of process and prima facie tort.

2    Plaintiff seeks an award of treble compensatory damages, punitive damages, costs, and attorneys' fees.

3    These mailings are:

1) Defendants sent, by registered United States Mail, the "Order" and "Criminal Complaint" to Eric Dinallo, Superintendent of the New York State Insurance Commissioner's Office. (*See* Kesick Dec., Exhibit "E" and "F").

2) On July 28, 2009, Defendants filed with the Town of Ulster Justice Court Clerk and mailed an "Affidavit of Negative Averment, Opportunity to Cure, and Counterclaim" ("Negative Averment"), (*See* Kesick Dec., Exhibit "L").

3) On August 24, 2009, Defendants filed with the Town of Ulster Justice Court and mailed a "Demand for Payment", "Invoice" and "Affidavit of Notary Presentment" (hereinafter "Notary Presentment") falsely claiming Justice Kesick owed Uolla the sum of One Hundred Seventy Six Million and 00/100 Dollars ($176,000,000.00). (*See* Kesick Dec., Exhibit "M").

4) On September 20, 2009, Defendants filed with the Town of Ulster Justice Court Clerk and mailed a "Second Demand for Payment", "Invoice" and "Notary Presentment" again falsely claiming Justice Kesick owed Ulloa the sum of One Hundred Seventy Six Million and 00/100 Dollars ($176,000,000.00). (*See* Kesick Dec., Exhibit "N").

5) On October 23, 2009, Defendants filed with the Town of Ulster Justice Court Clerk a "Final Demand for Payment", "Invoice" and "Notary Presentment", again reasserting the false claim that Justice Kesick owed Ulloa the sum of One Hundred Seventy Six Million and 00/100 Dollars ($176,000,000.00). (*See* Kesick Dec., Exhibit "O").

6) On November 10, 2009, Defendants mailed and filed with the Town of Ulster Justice Court Clerk and the Ulster County Clerk a bogus "Notice of Final Determination and Judgment in Nihil Dicit" (hereinafter "Judgment"), signed by Defendant, falsely purporting to be a final judgment in the amount of $176,000,000,

and indicating that it was a "self executing power of attorney to file liens and encumbrances against any and all property" owned by Justice Kesick. (*See* Kesick Dec., Exhibit "P").

7) On February 12, 2010, Defendants mailed and filed UCC–1 Financing Statement No.: 201002120082030 and a "Notice of Claim of Maritime Lien" (together with copies of Exhibits L–O) with the New York State Department of State. (*See* Kesick Dec., Exhibit "R").

8) Defendant Ulloa filed dozens of similarly false liens and UCC–1 financing statements against other government entities, public servants, judges, banks, law firms and private individuals in the State of Washington, acts for which he was ultimately convicted and sentenced to 60 months in prison by this Court. (*See* Kesick Dec ., Exhibit "T").

9) On November 22, 2010, Defendant Ulloa filed a "summons" in his Federal criminal case showing a dozen other people convened a "de jure" court in Ulster County calling for their "county Rangers" to arrest Justice Kesick and seize her assets to cover a purported $176,000,000 debt. (*See* Case No. 1:10–cr–00321, dkt # 62).

4    (Finding a RICO injury sufficient to confer standing where "defendants' pursuit of default judgments and attempts to enforce them against plaintiffs proximately caused [plaintiffs] injuries, ... which include the freezing of personal bank accounts and incurring of legal costs to challenge those default judgm ents.") (citing *Baisch v. Gallina,* 346 F.3d 366, 373–74 (2d Cir.2003)).

5    The instant motion neither addresses the merits of these claims, nor does it put Defendants on notice that a substantive determination would be sought on such claims.

6    The instant motion does not address the merits of these claims, nor does it put Defendants on notice that a substantive determination would be sought on such claims.

---

**End of Document**                                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5657110
Only the Westlaw citation is currently available.
United States District Court,
M.D. Alabama,
Northern Division.

Wayne McKAY and Shondra McKay, Plaintiffs,
v.
U.S. BANK, National Associaton, as
trustee for the Certificate Holders of the
LXS 2007–15N Trust Fund, Defendant.

No. 2:14–cv–872–TFM.
|
Signed Sept. 24, 2015.

**Attorneys and Law Firms**

John Scott Hooper, Hooper Law Firm, Montgomery, AL, for Plaintiffs.

Gregory Carl Cook, Balch & Bingham LLP, Birmingham, AL, John W. Naramore, Griffin Lane Knight, Balch & Bingham LLP, Montgomery, AL, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

TERRY F. MOORER, United States Magistrate Judge.

#### I. *Introduction*

**\*1** Plaintiffs filed this declaratory judgment action against Defendant U.S. Bank, National Association, as trustee for the Certificate Holders of the LXZ 2007–15N Trust Fund ("U.S.Bank") asking this Court to declare "that Defendant is not a party in interest as against Plaintiffs and or Plaintiff's [sic] real property." and seeking "a declaration to quiet title in favor of Plaintiffs and against Defendants [sic]." (Doc. 1 p. 2). The defendant filed a *Motion to Dismiss and Brief in Support* (Docs. 12 and 13) to which it attached as exhibits the following: a copy of the Plaintiffs' Mortgage on the property identified as 2722 Albemarle Road Montgomery, Alabama 36107 (Doc. 13–1) [1] ; a copy of the Adjustable Rate Note for the property identified above (Doc. 13–2); and a copy of the Assignment of Mortgage from MERS as nominee for Bayrock Mortgage Corporation to Defendant U.S Bank. (Doc. 13–3). The plaintiffs filed a *Response to the Motion to Dismiss* (Doc. 17) to which they attached an affidavit from

Rosemary A. Parks, "the substitute of the holder of the power of Attorney" for Plaintiffs. (Doc. 17–1).

#### II. *Standard of Review*

When considering the appropriate standard to apply on a motion to dismiss where parties have filed documents outside the complaint with the Court, the Eleventh Circuit has held that

> "the court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed. In this context, 'undisputed' means that the authenticity of the document is not challenged."

*D.L. Day, v. Taylor,* 400 F.3d 1272, 1276 (11th Cir.2005) citing *Horsley v. Feldt,* 304 F.3d 1125, 1134 (11th Cir.2002). Further, "[a] Rule 12(b)(6) motion tests the legal sufficiency of the complaint....[I]n order to survive a motion to dismiss for failure to state a claim, the plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.' " *Coggins v. Abbett,* 2008 WL 2476759 \*4 citing *Bell Atlantic Corp., v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929) (2007).

The standard for a motion to dismiss under Rule 12(b)(6) was explained in *Twombly* and refined in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) as follows:

> Two working principles underlie our decision in *Twombly.* First, the tenet that a court must accept as true all the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Rule 8 marks a notable and generous departure from the hypertechnical,

code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief.

**\*2**  *Iqbal,* 129 S.Ct. at 1949–50 (citations and internal edits omitted).

The *Twombly–Iqbal* two-step analysis begins "by identifying the allegations in the complaint that are not entitled to the assumption of truth" because they are conclusory. *Id.,* at 195; *Mamani v. Berzain,* 2011 U.S.App. Lexis 17999, at \*12, 2011 WL 3795468 (11th Cir. Aug. 29, 2011) ("Following the Supreme Court's approach in *Iqbal,* we begin by identifying conclusory allegations in the Complaint."). After conclusory statements are set aside, the *Twombly–Iqbal* analysis requires the Court to assume the veracity of well-pleaded factual allegations, and then to determine whether they "possess enough heft to set forth 'a plausible entitlement to relief.' " *Mack v. City of High Springs,* 486 Fed. App'x 3, 6 (11th Cir.2012) (quotation omitted.) "To survive a motion to dismiss, a complaint need not contain 'detailed factual allegations' but instead the complaint must contain 'only enough facts to state a claim to relief that is plausible on its face.' " *Maddox v. Auburn Univ. Fed. Credit Union,* 2010 U.S. Dist. Lexis 127043 at \*4. Establishing facial plausibility, however, requires more than stating facts that establish mere possibility. *Mamani,,* 2011 U.S.App. Lexis 17999, at \*22–\*23, 2011 WL 3795468 ("The possibility that -if even a possibility has been alleged effectively-these defendants acted unlawfully is not enough for a plausible claim."). Plaintiff is required to "allege more by way of factual content to nudge [her] claim ... across the line from conceivable to plausible." *Iqbal,* 129 S.Ct. at 1952 (internal editing and citation omitted.)

## III. *Discussion*

The claims in this case arise from U.S. Bank's status as mortgagee of Plaintiffs' Mortgage. (Doc. 1 para. 2). On December 12, 2006, Plaintiffs executed a Mortgage in favor of MERS, as nominee for Bayrock Mortgage Corporation ("Bayrock") to secure a Note evidencing an $82,400.00 home loan from Bayrock to Plaintiffs. The defendant has filed with the Court a copy of the Mortgage, the Note and the Assignment at issue in this case (Docs.13–1, 13–2, 13–3). The Plaintiffs have not objected to the authenticity of these documents; nor does the Court have any reason to doubt that these documents are anything other than what they appear to be on their face. Thus, the authenticity of these documents is "undisputed". Furthermore, these documents form the basis of Plaintiffs' claim and as such are "central" to Plaintiffs' claim. *D.L. Day,* 400 F.3d at 1276. Accordingly, the Court concludes that these documents are properly before the Court for its consideration on the Motion to Dismiss. *Id.*

Plaintiffs allegedly mailed U.S. Bank a "notarial presentment" on July 17, 2014, which U.S. Bank allegedly received on July 21, 2014. (Doc. 1 para. 4). This "notarial presentment" purportedly asserted that U.S. Bank was not the party of interest to enforce Plaintiff's Mortgage, and apparently requested that U.S. Bank produce the original Note and Mortgage. (*Id.* at para. 5). Plaintiffs also allegedly mailed U.S. Bank a "notarial notice of Dishonor" on August 4, 2014, which was allegedly received by U.S. Bank on August 11, 2014. (*Id.* at para. 7). Plaintiffs alleged that U.S. Bank has not responded to either the "notarial presentment" or the "notarial notice of dishonor." (*Id.* paras. 6, 8). Plaintiffs claim that U.S. Bank is not in possession of the original Note or original Mortgage—notwithstanding that U.S. Bank has attached copies of the same to this motion. (*Id.* para. 9); *see* (Doc. 13–1 and 13–2). Plaintiffs' Note and Mortgage are now part of a securitized pool, of which U.S. Bank is Trustee. (Doc. 1, paras.2, 10); *see* (Doc. 13–3). Plaintiffs now seek a declaratory judgment (1) against U.S. Bank declaring that U.S. Bank is not a party in interest as to Plaintiffs or Plaintiffs' property, and (2) to quiet title in favor of Plaintiffs and against U.S. Bank. (*Id.* at p. 2).

**\*3**  It is undisputed that Plaintiffs have not made a mortgage payment since June 2013, yet are still living in their house. Defendant argues that the Plaintiffs' Complaint is due to be dismissed for three reasons. First, Plaintiffs incorrectly argue that the principles of presentment and dishonor of negotiable instruments apply to this case. Second, Plaintiffs

incorrectly argue that U.S. Bank is not a party in interest to this case. Third, Plaintiffs fail to adequately plead a quiet title claim. The Court will address each of these arguments below. The Court notes that Plaintiffs' response to Defendant's Motion to Dismiss is simply a restatement, almost verbatim, of the claims in their complaint and offers no factual or legal argument to rebut those arguments presented by Defendant. (Doc. 17). The Court will address each of Defendants arguments in turn below.

**(1) Ala.Code §§ 7–3–501 to 503 do not apply to this case.**

Plaintiffs claim that U.S. Bank has "admitted that it is not the party to enforce the note and mortgage on Plaintiffs' property and [U.S. Bank] is not in possession of the original note." (Doc. 1, paras 4–8). This claim is not supported by any relevant law or fact. First, Plaintiffs claim that they mailed U.S. Bank a "notarial presentment alleging that [U.S. Bank] was not the party of interest to enforce the mortgage and that for [U.S. Bank] to produce the original mortgage and note under Code of Alabama 7–3–501." (Doc. 1, para.4). This section defines "presentment" as follows:

> "*a demand made by or on behalf of a person entitled to enforce an instrument (i) to pay the instrument made to* the drawee *or party obliged to pay the instrument,* or in the case of a note or accepted draft payable at a bank, to the bank, or (ii) to accept a draft made to the drawee.*"

Ala.Code 7–3–501 (emphasis added). By the clear terms of the statute, presentment is a power to be exercised "by or on behalf of a person entitled to enforce the instrument," and against "a party obliged to pay the instrument". *Id.* Plaintiffs appear to claim that they are entitled to make a demand for presentment, and that they are entitled to demand payment from U.S. Bank. This is a backwards reading and interpretation of the statute. As the parties indebted under their home loan and obliged to pay the Note, Plaintiffs are the parties to whom presentment could be made. There is no allegation that U.S. Bank, as the party entitled to enforce the Note, has made any demand for presentment on Plaintiffs. Thus the doctrine of presentment is inapplicable to the facts of this case and is not a basis for this Court to conclude that U.S.

Bank has "admitted" anything related to Plaintiffs' Mortgage as Plaintiffs claim. (Doc. 1, paras 4–8).

Similarly, Plaintiffs' contentions related to dishonor are inapplicable and without merit. (Doc. 1 paras. 6–8). Ala.Code 7–3–502(a)(1)–(3) provides generally that a note is dishonored if the note is not paid on the day of presentment (if necessary) or on the day it becomes payable. For the concept of dishonor to apply, the party obligated to pay it, must fail to pay it. Thus, Plaintiffs, as the parties obligated to pay the amount of the Note, are the only parties who could dishonor the Note. Thus the doctrine of dishonor is inapplicable [2] to the facts of this case and is not a basis for this Court to conclude that U.S. Bank has "admitted" anything related to Plaintiffs' Mortgage as Plaintiffs claim. (Doc. 1, paras 4–8).

**(2) 12 U.S.C. § 2605(k)(1)(d) does not apply.**

**\*4** Plaintiffs cite 12 U.S.C. § 2605(k)(1)(d) for the proposition that U.S. Bank had "ten (10) business days to rebut the Notarial Presentment of Plaintiffs or the same is deemed admitted as presented. "(Doc. 1, para.5). This Section states as follows:

(k) Servicer prohibitions

(1) In general

   A servicer of a federally related mortgage shall not—

(D) fail to respond within 10 business days to a request from a borrower to provide the identity, address, and other relevant contact information about the owner or assignee of the loan.

By its clear terms, this statute applies to a "servicer of a federally related mortgage". Plaintiffs have not alleged that U.S. Bank is the servicer of their Mortgage; nor do Plaintiffs allege in their Complaint that they ever actually requested identity and contact information about the owner or assignee of the loan. Rather they assert that their "Notarial Presentment alleg[ed] that [U.S. Bank] was not the party of interest to enforce the mortgage and that for [U.S. Bank] to produce the original mortgage or note." (Doc. 1, para.4). The information sought by Plaintiff is clearly not contemplated by this Code section. Thus, this Code section is inapplicable to the facts of this case and is not a basis for this Court to conclude that U.S. Bank has "admitted" anything related to Plaintiffs' Mortgage as Plaintiffs claim. (Doc. 1, paras.4–8).

**(3) U.S. Bank is a party in interest as to Plaintiffs' Mortgage**

Plaintiffs seek declaratory relief that U.S. Bank "is not a party in interest as against Plaintiffs and or Plaintiff's [sic] real property." (Doc. 1, p. 2). Plaintiffs first theory to support this argument is that U.S. Bank failed to comply with the statutory requirements relating to presentment, dishonor, and information requests. For the reasons stated in sections (1) and (2) above, the Court concludes this theory has no merit.

Plaintiffs' second theory to support their request for declaratory relief is based partly upon their claim that U.S. Bank "must possess both [the Note and Mortgage] to be the party in interest to enforce the mortgage." (Doc. 1 para. 9). The law is clear; this "split the note" theory has been consistently rejected by Alabama courts. *See, e.g.,* 🚩 *Coleman v. BAC Servicing,* 104 So.3d 195, 205 (Ala.Civ.App.2012) (holding that "Alabama law specifically contemplates that there can be a separation" of the note and mortgage); *See, also, Orton v. Matthews,* 2013 WL 5890167 * 4 (N.D. Ala. Nov 1, 2013) (granting motion to dismiss on basis that the " 'split the note' theory has been roundly rejected by Alabama courts"). Thus, the Court concludes that this theory does not support the conclusion that U.S. Bank is not a party in interest to Plaintiffs' mortgage, as Plaintiffs claim.

Further, the Court recognizes Plaintiffs acknowledge that U.S. Bank is Trustee of the Trust (Doc. 1 para. 2). Under the law, if a trustee possesses "customary powers to hold, manage, and dispose of assets," then that trustee is a real party in interest. 🚩 *Navarro Sav. Ass'n v. Lee,* 446 U.S. 458, 464, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980). Section Q of the Mortgage provides as follows:

**\*5** "MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the property ... [or] releasing and cancelling this Security Instrument."

(Doc. 13–1 p. 4). Additionally, the Mortgage provides that

"[t]he Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to [Plaintiffs]."

(Doc. 13–1 p. 16 para. 20). Also, the recorded U.S. Bank assignment provides that the Mortgage was assigned to U.S.

Bank, as trustee. (Doc. 13–3). Thus, the facts are undisputed that U.S. Bank is now the mortgagee of Plaintiffs' Mortgage, and Plaintiffs agreed to terms in the Mortgage establishing that the mortgagee has the power to exercise enforcement rights granted in the Mortgage. Thus, the Court concludes that Plaintiffs claim that U.S. Bank is not a real party in interest fails; and thus no declaratory relief is due on this claim.

**(4) Plaintiffs' Quiet Title claim is due to be dismissed.**

Plaintiffs also seek "a declaration to quiet title in favor of Plaintiffs and against Defendants." (Doc. 1 p. 2). An action to quiet title is the appropriate test to determine which among the parties claiming right of title and possession holds superior title. 🚩 *Gardner v. Key,* 594 So.2d 43, 44 (Ala.1991). Plaintiffs quiet title claim is based, in whole or in part, on the arguments made pursuant to Alabama and federal law as discussed above in sections (1), (2) and (3). To the extent that these arguments serve as the basis for Plaintiffs' quiet title claim, the Court concludes that the quiet title claim is due to be dismissed.

Furthermore, the Court concludes that Plaintiffs' quiet title claim should be dismissed because it does not meet the required pleading standards for a quiet title action. Under Alabama law, any person "in peaceable possession of lands [and] ... claiming to own the same, ... [whose] title thereto, or any party thereof, is ... disputed ..., may commence an action to settle the title to such land and to clear up all doubts or disputes concerning the same." *Ala.Code* § 6–6–540. A plaintiff establishes a prima facie case to quiet title when "it is shown that [the plaintiff] is in peaceable possession of the land, either actual or constructive, at the time of the filing of the bill and that there was no suit pending to test the validity of the title. *Woodland Grove Baptist Church, v. Woodland Grove Cmty. Cemetery Ass'n, Inc.,* 947 So.2d 1031, 1036 (Ala.2006) (citations omitted.)

Indeed, in order to meet the "plausibility" pleading standard articulated by *Twombly* and *Iqbal,* a plaintiff's complaint must include enough factual allegations to lift the stated claim out of the realm of mere speculation. 🚩 *Twombly,* 550 U.S. at 555. Here, Plaintiffs fail to identify or attempt to connect factual allegations to any of the elements of a quiet title cause of action. Indeed, the only part of the Complaint that remotely relates to such a claim is the factual allegation that Plaintiff's "own a home". (Doc. 1 para. 1). Thus, the Court concludes that under the "plausibility" standard of *Twombly* and *Iqbal,*

Plaintiffs fail to adequately plead a cause of action to quiet title.

**IV.** *Conclusion*

**\*6** Accordingly, the Court concludes that Defendant U.S. Bank's *Motion to Dismiss the Complaint* (Doc. 12) is GRANTED and that this case is due to be dismissed with prejudice. A separate Order will be issued.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5657110

---

## Footnotes

1   The Lender identified in the Mortgage is Bayrock Mortgage Corporation for whom Mortgage Electronic Registration Systems, Inc. ("MERS") acts as nominee. (Doc. 13–1 pp. 2–3).

2   Further, *Ala.Code* 7–3–503 which relates to notice of dishonor, is similarly inapplicable to this case.

---

**End of Document**                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 3670609
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jamil Abdul MUHAMMAD, Plaintiff,
v.
Judge Martin E. SMITH; Jason White, Assistant
District Attorney; Broome County Courts, 6th
District; American Bar Association; United States
of America; and State of New York, Defendants.

No. 3:13–cv–760 (MAD/DEP).
|
Signed July 23, 2014.

**Attorneys and Law Firms**

Jamil Abdul Muhammad, Albion, NY, pro se.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

**\*1**  Plaintiff, who is currently a New York State prisoner but was not at the time this action was filed, commenced this civil rights action asserting claims against a sitting judge, an assistant district attorney, a county court, and the American Bar Association. *See* Dkt. No. 1. In an October 16, 2013 Report, Recommendation, and Order, Magistrate Judge Peebles conducted an initial review of the complaint and recommended that the complaint be dismissed, with leave to replead only as to any claims asserted against Defendant American Bar Association. *See* Dkt. No. 19.

Currently before the Court is Magistrate Judge Peebles' Report, Recommendation, and Order and Plaintiff's objections thereto.

**II. BACKGROUND**

Plaintiff's complaint and his many subsequent filings are largely unintelligible. In his complaint, Plaintiff identifies himself as a "Moor/Sovereign/a Freeman On The Land/ a

Man, Real Live Flesh and Blood [.]" Dkt. No. 1 at 3. Plaintiff claims that, through his "unalienated rights under UCC 1–207(308)," he is "entitled to any Interpleted Funds relative to JAMIL ABDUL MUHAMMAD, and the defendant is determined to be Barred from any collection of my alleged debt from JAMIL ABDUL MUHAMMAD relating to Jamil Abdul Muhammad and defendant had in no 'CLAIM IN FACT.' " *Id.* at 5.

From other submissions submitted by Plaintiff, it appears that Plaintiff was sentenced by Broome County Court Judge Martin E. Smith, a named Defendant, based upon a plea of guilty entered in that court. *See* Dkt. No. 7 at 2. Plaintiff appears to allege that, as a result of those proceedings, Judge Smith is guilty of kidnapping, and is liable for conspiracy to violate his civil rights in violation of ⚑ 18 U.S.C. § 241. *See id.* Further, Plaintiff makes vague references to a clerk in Binghamton named "Karen," and claims that she and other Defendants have placed him in imminent harm. *See* Dkt. No. 21 at 4–5. Plaintiff asks the Court to award him "the dismissal of said charges" and to release him "by implying said 'habeas corpus' granting [him] immediate release of confinement[.]" *Id.* at 5.

In a Report, Recommendation, and Order, Magistrate Judge Peebles granted Plaintiff's motion to proceed *in forma pauperis* and then conducted an initial review of the complaint. *See* Dkt. No. 19. Magistrate Judge Peebles noted that Plaintiff's complaint failed to meet the minimal pleading standards set forth in Rule 8 of the Federal Rules of Civil Procedure, as well as *Twombly* and its progeny. *See id.* at 7. In light of his *pro se* status, however, Magistrate Judge Peebles considered Plaintiff's subsequent filings to determine if he has set forth a plausible claim against any named Defendant. *See id.* at 8.

Magistrate Judge Peebles first found that Defendants Smith and White are entitled to absolute immunity because Plaintiff's claims against them are associated with his prosecution in Broome County. *See id.* at 8–9. Further, the report found that Plaintiff's claims brought pursuant to ⚑ 18 U.S.C. § 241 should be dismissed because it is a criminal statute that does not give rise to a private cause of action. *See id.* at 9 n. 6 (citations omitted). Next, Magistrate Judge Peebles concluded that Plaintiff's claims against the Broome County Courts must be dismissed because they are an extension of the state, immune from suit under the Eleventh Amendment. *See id.* at 10. Thereafter, Magistrate Judge

Peebles found that the Court should dismiss Plaintiff's claims against Defendant American Bar Association ("ABA") because Plaintiff failed to allege any facts to plausibly suggest that Defendant ABA is a state actor, or that it acted under color of state law when allegedly violating Plaintiff's rights. *See id.* at 10–11. Finally, Magistrate Judge Peebles recommended that the Court dismiss all claims with prejudice, except those asserted against Defendant ABA. *See id.* at 12–13.

**\*2**  Currently before the Court are Magistrate Judge Peebles Report, Recommendation, and Order, and Plaintiff's objections thereto. Additionally pending before the Court are several letter motions, along with an amended complaint Plaintiff filed after the issuance of the Report, Recommendation, and Order.

## III. DISCUSSION

### A. Redemptionist and sovereign citizen theories

Plaintiff's assertions appear to be based, at least in part, on the "redemptionist" theory or the related "sovereign citizen" theory, which are frivolous legal theories that have been consistently rejected by federal courts. *See* 🔖 *Monroe v. Beard,* 536 F.3d 198, 203 n. 4 (3d Cir.2008). The United States Court of Appeals for the Third Circuit explained:

> "Redemptionist" theory ... propounds that a person has a split personality: a real person and a fictional person called the "strawman." The "strawman" purportedly came into being when the United States went off the gold standard in 19[3]3, and, instead, pledged the strawman of its citizens as collateral for the country's national debt. Redemptionists claim that government has power only over the strawman and not over the live person, who remains free. Individuals can free themselves by filing UCC financing statements, thereby acquiring an interest in their strawman. Thereafter, the real person can demand that government officials pay enormous sums of money to use the strawman's name or, in the case

of prisoners, to keep him in custody. If government officials refuse, inmates are encouraged to file liens against correctional officers and other prison officials in order to extort their release from prison. Adherents of this scheme also advocate that inmates copyright their names to justify filing liens against officials using their names in public records such as indictments or court papers.

*Id.* (citation omitted). [1]

Plaintiff also apparently adheres to the Redemptionist theory regarding the use of capital letters:

> Redemptionists claim that by a birth certificate, the government created strawmen out of its citizens. A person's name spelled in English, that is with initial capital letters and small letters, represents the real person, that is, the flesh and blood person. Whenever a person's name is written in total capitals, however, as it is on a birth certificate, the Redemptionists believe that only the strawman is referenced, and the flesh and blood person is not involved.

*McLaughlin v. CitiMortgage, Inc.,* 726 F.Supp.2d 201, 210 (D.Conn.2010) (internal quotation marks omitted); *see also Bryant v. Wash. Mut. Bank,* 524 F.Supp.2d 753, 758–61 (W.D.Va.2007).

Theories presented by redemptionist and sovereign citizen adherents have not only been rejected by the courts, but also recognized as frivolous and a waste of court resources. *See McLaughlin v,* 726 F.Supp.2d at 210 (providing detailed explanation of the redemptionist theory and rejecting it); *Charlotte v. Hanson,* 433 Fed. Appx. 660, 661 (10th Cir.2011) (rejecting the sovereign citizen theory as having no conceivable validity in American law) (citation omitted). A prisoner's attempt "to avoid the consequences of his criminal

conviction" based on the redemptionist theory, has been recognized as "legally frivolous," *Ferguson—El v. Virginia,* No. 3:10CV577, 2011 WL 3652327, *3 (E.D.Va. Aug.18, 2011),* and civil cases based on redemptionist and sovereign citizen theories have been found to be "utterly frivolous" and "patently ludicrous," using "tactics" that are "a waste of their time as well as the court's time, which is paid for by hard-earned tax dollars." *Barber v. Countrywide Home Loans, Inc.,* No. 2:09cv40, 2010 WL 398915, *4 (W.D.N.C. Oct.7, 2009).*

**\*3** In short, Plaintiff seeks to avoid the consequences of his conviction by suggesting he exists as two separate legal entities and that the State of New York and Broome County do not have jurisdiction over both entities and thus must release him and pay him damages. Such a theory is legally frivolous. *See Tirado v. New Jersey,* No. 10–3408(JAP), 2011 WL 1256624, *4–5 (D.N.J. Mar.28, 2011)* (observing a similar argument "has absolutely no legal basis"); *Marshall v. Fla. Dep't Corr.,* No. 10–CV–20101, 2010 WL 6394565, *1 (S.D.Fla. Oct.27, 2010).* Although the Court finds that these theories are frivolous, in light of his *pro se* status, the Court will consider each possible claim in greater detail.

**B. The Report, Recommendation, and Order**
Section 1915(e) (2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[2] Thus, although the Court has the duty to show liberality toward pro se litigants, *see Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam), and should exercise "extreme caution ... in ordering *sua sponte* dismissal of a *pro se* complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond, ..." *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983) (internal citations omitted), the court also has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action *in forma pauperis .* [3]

When reviewing a complaint, the court may also look to the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure provides that a pleading that sets forth a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

*See* Fed.R.Civ.P. 8(a)(2). The purpose of Rule 8 " 'is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, ... prepare an adequate defense,' " and determine whether the doctrine of res judicata is applicable. *Hudson v. Artuz,* No. 95 CIV. 4768, 1998 WL 832708, *1 (S.D.N.Y. Nov.30, 1998)* (quoting *Powell v. Marine Midland Bank,* 162 F.R.D. 15, 16 (N.D.N.Y.1995) (quoting *Brown v. Califano,* 75 F.R.D. 497, 498 (D.D.C.1977))) (other citation omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). Although the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show [n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed.R.Civ.P. 8(a) (2)).

**\*4** When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1) (2006). When a party, however, files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011)* (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1) (2006).

A litigant's failure to file objections to a magistrate judge's report-recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See* ⚠️ *Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec 'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a) and former 6(e) of the Federal Rules of Civil Procedure).

Having reviewed the Report, Recommendation, and Order and Plaintiff's objections thereto, the Court finds that Magistrate Judge Peebles correctly determined that Plaintiff's claims should be dismissed. As explained below, however, the Court rejects Magistrate Judge Peebles' recommendation insofar as it found that Plaintiff should be permitted a chance to amend his complaint as to Defendant ABA.

Section 1983 itself does not create any substantive rights; rather, it provides a procedural mechanism for redressing the deprivation of rights created by the Constitution or laws of the United States. *See Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). To state a cognizable claim under Section 1983, a plaintiff must allege that " '(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States.' " *Weiss v. Inc. Village of Sag Harbor,* 762 F.Supp.2d 560, 568 (E.D.N.Y.2011) (quoting *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999)).

**\*5** The Supreme Court, in *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), established a two-prong test for determining when a private party's actions can be deemed to satisfy Section 1983's requirement that the challenged conduct was "under color of state law." Actions of a private party can be deemed "fairly attributable" to the state, and therefore treated as action taken "under color of state law," when (1) the deprivation is "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," and (2) "the party charged with the deprivation [is] a person who may fairly be said to be a state actor ." *Hollander v. Copacabana Nightclub,* 624 F.3d 30, 33 (2d Cir.2010) (quoting *Lugar,* 457 U.S. at 937). A private party's actions may be attributable to the state under the second *Lugar* prong if it meets one of three tests: (1) "The 'compulsion test': the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state"; (2) "The 'public function test': the entity 'has been delegated a public function by the [s]tate' "; or (3) "The 'joint action test' or 'close nexus test': the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies." *Hollander,* 624 F.3d at 34 (quoting *Sybalski v. Indep. Grp. Home Living Program, Inc.,* 546 F.3d 255, 257 (2d Cir.2008) (internal citations omitted)).

In the present matter, Defendant ABA is a private party which does not meet any of the three tests set forth above. Courts throughout the United States have already addressed this question and they have unanimously held that the American Bar Association is not a state actor for purposes of a Section 1983 action. *See Hu v. American Bar Ass'n,* 334 Fed. Appx. 17, 18–19 (7th Cir.2009) (finding that the district court properly dismissed the plaintiff's complaint because the ABA is not a state actor); *Lawline v. American Bar Ass 'n,* 956 F.2d 1378, 1385 (7th Cir.1992) (concluding that "private bar associations are not state actors for the purpose of Section 1983"); *Rohan v. American Bar Ass'n,* No. 93 CV 1338, 1995 WL 347035, \*6–\*7 (E.D.N.Y. May 31, 1995) (holding that the ABA is a professional association, not a state actor, even though admission to practice law in New York State requires graduation from an ABA-accredited law school, because "the State of New York has not explicitly delegated to the ABA its responsibility for setting the requirements that an individual must meet in order to be licensed as an attorney-at-law" and "any conferral of monopoly status on the ABA by New York State does not convert the ABA into a state actor"); *see also The Real Estate Bar Ass'n for Mass., Inc. v. Nat'l Real Estate*

*Info. Servs.,* 608 F.3d 110, 121–22 (1st Cir.2010) (finding that state bar association was not a state actor).

**\*6** In the present matter, the Court agrees that Defendant ABA is not a state actor for Section 1983 purposes. New York has not expressly delegated to the ABA its responsibility for setting the requirements to practice law in New York; rather, to become a member of the New York Bar, an individual must comply with the Rules of the New York Court of Appeals on admission to practice. *See Rohan,* 1995 WL 347035, at \*5. Further, the ABA was neither established by the State of New York, nor is it funded or supported by the State. *See id.* at \*7 (citations omitted). Additionally, school accreditation has been recognized as a function of private entities, rather than one that "has been traditionally the exclusive prerogative of the State." *Id.* (quotation and other citation omitted).

Based on the foregoing, the Court finds that Defendant ABA is not a state actor. As such, the Court rejects Magistrate Judge Peebles' recommendation only insofar as the report recommended that the Court dismiss the claims against Defendant ABA without prejudice. Although the Court should generally permit a *pro se* litigant an opportunity to amend, dismissal with prejudice is appropriate where, as here, any amendment of the complaint would be futile.

Further, the Court finds that Magistrate Judge Peebles correctly determined that Defendants Smith and White are entitled to absolute immunity since Plaintiff has raised claims against them in their capacities as a judge and prosecutor. *See Hill v. City of New York,* 45 F.3d 653, 660–61 (2d Cir.1995) (quotation omitted); *DuQuin v. Kolbert,* 320 F.Supp.2d 39, 40–41 (W.D.N.Y.2004) (citation omitted). Additionally, Plaintiff's claims against the Broome County Courts are barred by the Eleventh Amendment. *See Thomas v. Bailey,* No. 10–cv–51, 2010 WL 662416, \*1 (E.D.N.Y. Feb.22, 2010). Finally, to the extent that Plaintiff is seeking his immediate release from custody, such relief is only available from this Court by way of a writ of habeas corpus, issued pursuant to 28 U.S.C. § 2254. *See Preiser v. Rodriguez,* 411 U.S. 475, 498–99, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1975); *see also Brown v. Freeport Police Dept.,* Nos. 13 CV 4047, 13 CV 6514, 2014 WL 279847, \*5 (E.D.N.Y. Jan.23, 2014) (citation omitted).

**C. Plaintiff's amended complaint**
In his amended complaint, Plaintiff names as Defendants the "United States of America/Foreign Corporation of United States," and the State of New York, as well as the previously named Defendants. *See* Dkt. No. 34 at 1–2. In the amended complaint, Plaintiff claims that the "United States of America is guilty of criminal infringement of intellectual property, failure of consideration, act of indemnity, insurance fraud, securities fraud," as well as an apparent violation of section 34 of the Judiciary Act [4] and a conspiracy with the other named Defendants in violation of 18 U.S.C. § 241. *See id.* at 4. Plaintiff claims that Defendants' actions were "in violation of misnomer contracts of surety" and led to his "wrongfull [sic] imprisonment via commercial claims alleging DEATH and DEBT." *Id.* Plaintiff is seeking his immediate release, in addition to \$150,0000,000 "upon court ordered 'Release' from cestui que vie life insurance policy and foreign corporation of United States." *Id.* at 6. Additionally, Plaintiff asks the Court to "expunge all criminal proceedings, charges, finger prints, DNA, blood, mugshots, arrest/arrest record of alleged charges do to illegal commercial ... surety contracts alleging DEATH or DEBT upon 'RELEASE' being granted." *Id.*

**\*7** Having reviewed the amended complaint, the Court finds that Plaintiff has failed to plausibly allege that he is entitled to any of the relief he seeks. A plaintiff may not collect damages for his alleged wrongful imprisonment or conviction without first showing "that [his] conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck v. Humphrey,* 512 U.S. 477, 487, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Here, Plaintiff has made no such showing and a review of the Department of Corrections and Community Supervision website demonstrates that Plaintiff is still incarcerated.

Additionally, 18 U.S.C. § 241 is a criminal statute which does not create a private cause of action. *See Storm–Eggink v. Gottfried,* 409 Fed. Appx. 426, 427 (2d Cir.2011) (citing cases).

Again, as discussed above, Plaintiff's claims against Defendants Smith and White must be dismissed because they are entitled to absolute immunity. *See Hill,* 45 F.3d at 660–61 (quotation omitted); *DuQuin,* 320 F.Supp.2d at 40–41 (citation omitted). Additionally, Plaintiff's claims against the Broome County Courts and the State of New York are barred by the Eleventh Amendment. *See Thomas,* 2010 WL

662416, at * 1. Further, to the extent that Plaintiff is seeking his immediate release from custody, such relief is only available from this Court by way of a writ of habeas corpus, issued pursuant to 28 U.S.C. § 2254. *See* *Preiser,* 411 U.S. at 498–99; *see also* *Brown,* 2014 WL 279847, at *5 (citation omitted). Finally, Plaintiff alleges no facts against Defendant United States. Rather, the United States appears to have been included as a Defendant solely under Plaintiff's ludicrous sovereign citizen and redemptionist theories, which are subject to dismissal.

Based on the foregoing, the Court finds that Plaintiff's amended complaint fails to set forth any non-frivolous causes of action. Since permitting additional amendment would be futile, Plaintiff's amended complaint is dismissed with prejudice.

In view of the frivolous nature of Plaintiff's claims, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and, therefore, *in forma pauperis* status is denied for the purpose of an appeal. *See* *Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962); *see also* *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).

After carefully considering Magistrate Judge Peebles' Report, Recommendation, and Order, Plaintiff's objections thereto, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' October 16, 2013 Report, Recommendation, and Order is **ADOPTED in part and REJECTED in part;** [5] and the Court further

**ORDERS** that Plaintiff's complaint and amended complaint are **DISMISSED with prejudice;** and the Court further

**\*8 ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall terminate all pending motions not addressed in this Memorandum–Decision and Order as moot; and the Court further

**ORDERS** that the Clerk of the Court shall serve Plaintiff with a copy of this Memorandum–Decision and Order.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3670609

### IV. CONCLUSION

## Footnotes

1    The Court notes that Plaintiff was convicted of Falsifying Business Records in the First Degree.

2    To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

3    "Dismissal of frivolous actions pursuant to 28 U.S.C. § 1915e is appropriate to prevent abuses of the process of the court," *Nelson v. Spitzer,* No. 9:07–CV–1241, 2008 WL 268215, *1 n. 3 (N.D.N.Y. Jan.29, 2008) (citation omitted), as well as "to discourage the filing of [baseless lawsuits], and [the] waste of judicial ... resources[.]" *Neitzke,* 490 U.S. at 327.

4    Originally § 34 of the Judiciary Act of 1789, the Rules of Decision Act, now contained in 28 U.S.C. § 1652, reads: "The laws of the several states, except where the Constitution or treaties of the United States or Acts

of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." It is unclear how an improper application of the Rules of Decision Act violated Plaintiff's rights and Plaintiff's nearly incomprehensible filings provide no insight.

5    Magistrate Judge Peebles' Report, Recommendation, and Order is only rejected insofar as it recommended that the Court dismiss Defendant ABA without prejudice.

---

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3518439
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Myrna Althia Alicia WALKER, Plaintiff,
v.
CIBC LIMITED, Defendant.

1:20-CV-1337 (TJM/CFH)
|
Signed 04/13/2021

**Attorneys and Law Firms**

Myrna Althia Alicia Walker, 841 Western Avenue, Apartment
2A, Albany, New York 12203, Plaintiff pro se.

### REPORT-RECOMMENDATION & ORDER

CHRISTIAN F. HUMMEL, UNITED STATES
MAGISTRATE JUDGE

#### I. In Forma Pauperis

**\*1** Plaintiff pro se Myrna Althia Alicia Walker purported
to commence this action on October 28, 2020, by submitting
a complaint and application to proceed in forma pauperis
("IFP") in lieu of paying the Court's filing fee. See Dkt.
No. 1 ("Compl."); Dkt. No. 2. On March 15, 2021, plaintiff
submitted a supplement to her complaint. Dkt. No. 4. On
April 6, 2021, plaintiff submitted an additional filing entitled
"Emergency Petition for the Death Penalty Against Adethia
Keshia Fitten and Others on the Principle Found in the Law of
Necessity." Dkt. No. 5. On April 7, 2021, plaintiff submitted
additional 86 pages to supplement to her complaint. Dkt. Nos.
6, 7. On April 8, 2021, plaintiff submitted additional exhibits
and a letter requesting to file those exhibits under seal. Dkt.
No. 8.

The Court has reviewed plaintiff's IFP application and
determines that she financially qualifies to proceed IFP for
purposes of filing only. [1]

#### II. Legal Standards

Section 1915(e) of Title 28 of the United States Code
directs that, when a plaintiff seeks to proceed IFP, "the court
shall dismiss the case at any time if the court determines
that ... the action or appeal (i) is frivolous or malicious;
(ii) fails to state a claim on which relief may be granted;
or (iii) seeks monetary relief against a defendant who is
immune from such relief." 28 U.S.C. § 1915(e)(2)(B). It
is a court's responsibility to determine that a plaintiff may
properly maintain his complaint before permitting her to
proceed with her action. As plaintiff is representing himself,
the court must afford plaintiff special solicitude; thus, it is
to consider her claims "liberally" and "interpret them 'to
raise the strongest arguments that they suggest.' " Cold Stone
Creamery, Inc. v. Gorman, 361 F. App'x 282, 286 (2d Cir.
2010) (summary order) (quoting Brownell v. Krom, 446
F.3d 305, 310 (2d Cir. 2006)).

Pleading guidelines are set forth in the Federal Rules of
Civil Procedure. Specifically, Rule 8 provides that a pleading
which sets forth a claim for relief shall contain, inter alia,
"a short and plain statement of the claim showing that the
pleader is entitled to relief." See FED. R. CIV. P. 8(a)(2).
"The purpose ... is to give fair notice of the claim being
asserted so as to permit the adverse party the opportunity to
file a responsive answer, prepare an adequate defense and
determine whether the doctrine of res judicata is applicable."
Flores v. Graphtex, 189 F.R.D. 54, 54 (N.D.N.Y. 1999)
(internal quotation marks and citations omitted). Rule 8 also
requires the pleading to include:

> (1) a short and plain statement of the grounds for the court's
> jurisdiction ...;
>
> (2) a short and plain statement of the claim showing that
> the pleader is entitled to relief; and
>
> (3) a demand for the relief sought ....

FED. R. CIV. P. 8(a). Although "[n]o technical form is
required," the Federal Rules make clear that each allegation
contained in the pleading "must be simple, concise, and
direct." Id. at 8(d).

**\*2** Further, Rule 10 of the Federal Rules provides in
pertinent part that:

> [a] party must state its claims or
> defenses in numbered paragraphs,

each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 54 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). As the Second Circuit has held, "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citations omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citations omitted). In such cases of dismissal, particularly when reviewing a pro se complaint, the court generally affords the plaintiff leave to amend the complaint. Simmons v. Abruzzo, 49 F.3d 83, 86-87 (2d Cir. 1995). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).

### III. Initial Review

#### A. Plaintiff's Complaint

Plaintiff purports to bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000, et seq. On her form Title VII complaint, she indicates that defendant discriminated against her due to her race and color, religion, sex, and "my date of birth – Easter." Compl. at 2. Plaintiff further indicates, through checking the boxes on the form complaint, that defendant terminated her employment, failed to promote, engaged in unequal terms and conditions of employment, retaliated against her, and "forced prostitution; [i]dentity theft, which is used to do Bank frauds & Poisonings." Id.

Plaintiff's complaint, inclusive of exhibits, is 158 pages long. Dkt. No. 1. Included with the exhibits to the complaint is an Equal Employment Opportunity Commission ("EEOC") dismissal notice[2] noting that plaintiff's EEOC charge was not timely filed and the EEOC was closing its file. Dkt. No. 1-1. The remainder of the exhibits appended to the complaint appear to be an 80-page letter relating to apparent visa fraud that plaintiff sent to The US Department of Justice; the United States Department of Homeland Security, Immigration and Customs Enforcement; and the Federal Bureau of Investigation; as well as an incident report dated May 29, 2019, regarding an apparent rape of plaintiff. Dkt. No. 1-2 at 81-82.

**\*3** The supplement plaintiff filed on March 15, 2021, is 112 pages long. Dkt. No. 4. The supplement appears to be filings from a complaint plaintiff had before Supreme Court, Rensselaer County against Unity House of Troy and Joseph Posa. Id. The "emergency motion," filed on April 4, 2021, is 22 pages long, with 70 additional pages of exhibits. Dkt. No. 5. These exhibits are (1) various transfer orders and orders of protection plaintiff either sought or obtained against various individuals in family court proceedings in different counties (dkt. no. 5-1); (2) a residential lease agreement from July 2018, for a property in Troy, New York, with landlord Joseph Posa (dkt. no. 5-2); (3) records from a proceeding before the Rensselaer County Supreme Court in a case captioned Myrna Althia Alicia Walker vs. "Change of Name" Heidi Elizabeth Zuach (dkt. no. 5-3); and (4) a lease agreement dated May 2, 2017, between Capital Group Management LLC and plaintiff for a property in Troy, New York (dkt. no. 5-4). The submission filed on April 7, 2021, is 59 pages long and includes various orders of protection, a USPS tracking number report, a Unity House Domestic Violence Services Transitional Housing Program Handbook, a form from the Rensselaer County Department of Social Services, earnings statements, a New York State

incident report from 2018, an eviction notice, a letter from the Unity House Transitional Housing program, a "notice" letter, and a "birth registration" form. Dkt. No. 6-6. The exhibits filed on April 7, 2021, appear to be letters plaintiff sent to the New York State Department of Labor, United States Department of Homeland Security, Immigration and Customs Enforcement, and the EEOC, apparently related to "pandemic unemployment compensation benefits." See dkt. no. 7.

Plaintiff's complaint discusses Allison Carolyn Rattray, the Corporate Secretary and Legal Counsel of defendant CIBC First Caribbean International Bank (Jamaica) Limited. Dkt. No. 1 at 3. Plaintiff contends that Ms. Rattray kills unidentified people "with her married name" and drinks plaintiff's blood. Id. Apparently, plaintiff contends that Ms. Rattray is or was her "employer" who "uses the drinking blood of the employee to kill the employing the employment agreement and the incomes paid by direct deposit as the consideration for the blood that is drank before the killings and the doomings if [sic] innocent persons." Id. at 4. Plaintiff also appears to suggest that Ms. Rattray and her husband, "Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica, force plaintiff to use "illegal psychotropic medicines," cocaine, and alcohol. Id. at 5. Plaintiff refers to an employment agreement she signed with Ms. Rattray in 1995 and appears to suggest that since that date, Ms. Rattray "has been stalking the Plaintiff inside her bedroom, bathroom mirror, on her cell phone from 1995 even until today October 20, 2020 even the bathroom stables has visual and audio devices inside of them." Id. at 6. The Complaint then appears to proceed to explain why Ms. Rattray and her various family members are carrying out unspecified killings. See generally Dkt. No. 1. Plaintiff further suggests that through her employment with defendant, both defendant and the Commercial Division of the Supreme Court of Jamaica

> has been using me as a sex doll; as sex services; as sex product also incorporating The University of the West Indies Hospital to do surgeries; using illegal force of The Jamaican police; using the illegal Force of the Jamaican Army; using the illegal force of the Jamaican parliament to have men from any where have sex with The Plaintiff because The Plaintiff was born on the day the crucifixion was

celebrated, that is Easter and Good Friday.

Id. at 13. Plaintiff asks the Court for

> an Injunction to stop, restrain and prevent Allison Carolyn Rattray (maiden name Smith), Corporate Secretary and Legal Counsel, CIBC FirstCarribean Jamaica; her husband, Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica, King Street, Kingston, Jamaica, West Indies Deryke Smith, her brother; Lacelles Smith retired lecturer The University of the West Indies, Jamaica, West Indies; and the Rhoda Ford children and others from practicing their religion in a way that results in the death or harm or injury of The Rights of The Plaintiff and or the mother of The Plaintiff and or the siblings of The Plaintiff; and or any member of The Public, which includes anyone in the global community.

Id. at 14. As for plaintiff's causes of action, plaintiff lists:

> forced religion imposed on The Plaintiff whom is the employee by The Employer, CIBC Limited. The Forced Religion imposed on Myrna Althia Alicia Walker [ ] to kill innocent Persons. The daily murders of innocent Persons is used to supply the demands of the global organ Donor list. The staff is Allison Carolyn Rattray.

**\*4** Dkt. No. 1 at 69. As for a second cause of action is

employment discrimination – I chose a career path to be an Attorney-At-Law. Allison Carolyn Rattray (maiden name Smith) my (former) then manager at CIBC had be fired; told me that (1) I am not worthy to be an Attorney-at-Law because of my Race (2) I was not worthy to be in the same Profession as her. She has been defaming my character ever since.

Id. at 70. Third cause of action is listed as employment discrimination - compensation: denied increases in my salary verbally communicated to be by Ms. Cherlyn Blackman my Senior Manager of 3% in 2004; Denied Promotion communicated to be by my Human Resources Regional Director, Jerime Cjnttihs-Bell; denied fringe benefits that accompanied my five (5) CIBC Achievers awards – my salary was split and part paid to my aunt." Id. In the prayer for relief, plaintiff requests:

> (1) an Injunction(s) for Criminal Indictment(s) of Allison Carolyn (Smith) Rattray, Corporate Secretary and Legal Counsel CIBC for her forced Prostitution of The Plaintiff and Others; (2)An Injunction to prevent and stop all Prostitution or abuse of The Plaintiff; (3) Restitution(s) by CIBC for lost Incomes and fringe benefits[; and] (4) Job Reference letter from CIBC and an apology and my land Title Deed.

Id. at 71.

### B. Analysis

First, plaintiff's complaint fails to meet the pleading requirements of Rules 8 and 10. Her complaint does not present a short and plain statement of the claim showing that she is entitled to relief. FED. R. CIV. P. 8. Further, she does

not present her claims in numbered paragraphs, limited to one "circumstance" per paragraph. FED. R. CIV. P. 10. Instead, her complaint is a lengthy, disjointed, difficult to follow narrative. Her complaint clearly "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales, 167 F.R.D. at 355.

Second, plaintiff's claims, insofar as she seeks to bring them under Title VII are (1) barred by the statute of limitations, and (2) fail to state a claim for employment discrimination in violation of Title VII.[3] To the extent plaintiff suggests that she was discriminated against in violation of Title VII insofar as she was told that she was inadequate due to her race or denied promised promotions because of her race, dkt. no. 1 at 70, even if plaintiff could provide additional factual support and clarification for the alleged discrimination, plaintiff provides that the alleged discrimination occurred as early as 1995 until 2004, and would be beyond the statute of limitations of Title VII. Indeed, plaintiff's entire employment with defendant occurred outside of the statute of limitations as she suggests that her employment began in January 1995 and that she was terminated in March 2009. Dkt. No. 1 at 52-53. Thus, the complained-of actions occurred more than 300 days prior to when plaintiff appears to have filed a complaint with the EEOC. See Gunning v. New York State Just. Ctr. for Prot. of People with Special Needs, No. 1:19-CV-1446 (GLS/CFH), 2020 WL 5203673, at *3 (N.D.N.Y. Sept. 1, 2020) ("Title VII's statute of limitations bars claims based upon events that occurred more than 300 days prior to filing a charge of discrimination with a state or local employment agency, and, therefore, "[a] plaintiff may bring a claim under Title VII only for acts of discrimination that occurred within the statutory period set by 42 U.S.C. § 2000e–5(e)(1).") (quoting Patterson v. Cnty. of Oneida, 375 F.3d 206, 220 (2d Cir. 2004)). The undersigned notes that plaintiff does not indicate when she filed a complaint with the EEOC. However, she submits the EEOC's dismissal letter, dated September 10, 2020, which states that plaintiff did not timely file a complaint with the EEOC. Dkt. No. 1-1. As plaintiff likely filed her EEOC complaint in 2020,[4] appears to have been last employed by defendant in 2009, and complains of alleged employment discrimination occurring as early as 1995, her filing of an EEOC complaint in 2020 is clearly more than 300 days after the alleged discrimination occurred. Thus, any

cognizable Title VII claims arising out of her employment with defendant are barred by the statute of limitations.

**\*5**  However, even if the statute of limitations was not an issue, plaintiff's claims still must fail because plaintiff's claims fail to state any cognizable legal claim under the United States Constitution, federal statute, or state law, and ultimately fails establish this Court's jurisdiction under federal question or diversity jurisdiction. [5] Plaintiff makes several disjointed, confusing claims about being sold as a prostitute against her will by defendant's employees and other nonparties, defendant's employees and others murdering innocent people, defendant's employees drinking plaintiff's blood, and being stalked and prostituted by various officials from Jamaica and employees of defendant's company. See generally dkt. nos. 1, 4, 6, 7. Plaintiff makes several allegations against her former supervisor, Ms. Rattray, and says the various physical wrongdoings Ms. Rattray committed against plaintiff were all due to "The employment agreement between The Plaintiff and CIBC FirstCarribean Jamaica." Dkt. No. 1 at 60-61. Although plaintiff's submissions seem to suggest that she was employed by defendant at some point in time, and that a supervisor told her she could not be a lawyer due to her race and denied promised salary increases for unclear reasons, nothing about the factual allegations pleadings suggest that she presents a valid employment discrimination claim under Title VII or any other statute.

The Court is at a loss as to how the allegations in the complaint relate to a valid employment discrimination claim or any valid legal claim. Plaintiff presents a difficult to comprehend series of allegations against various individuals – many of whose connections to her apparent former employer is difficult, if not impossible, to comprehend – who she alleges forced her into prostitution, performed plastic surgeries on her against her will, installed "spying devices" into plaintiff's body, forced her to undergo various injections, and involved plaintiff in murder scheme that is somehow related to her Easter birthday. See Dkt. No. 1 at 56-60. Plaintiff also sets forth unexplained allegations that appear to involve Ms. Rattray and others, such as "an abuse of a veteran of the United States Army by the said Allison Carolyn Rattray" (dkt. no. 1 at 54). Plaintiff submits dozens of pages of exhibits and supplements that appear to relate to cases filed in other courts, orders of protection obtained in other courts, unemployment insurance issues, police reports, and documents sent to various federal agencies. See dkt. nos. 4, 5, 6, 7. The relevance of this deluge of documents is entirely unclear.

Further, to the extent plaintiff requests injunctions (dkt. no. 1 at 71) to prevent defendant's employees from prostituting or harming plaintiff or seeks some kind of prosecution of defendant's employees for criminal conduct, this Court does not have authority to direct persons to cease engaging in illegal activity through a civil suit as it is not a law enforcement agency. It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's jurisdiction. See generally 🚩 Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); McFadden v. Ortiz, 5:12-CV-1244(MAD/ATB), 2013 WL 1789593 (N.D.N.Y. Apr. 26, 2013) (noting that there is no private right of action to enforce either state or federal criminal statutes).

Next, plaintiff files an "emergency motion" for the Death Penalty, [6] which appears to ask the United States Supreme Court to enforce the death penalty against various individuals who plaintiff contends engaged in "drug assisted surgeries on The Plaintiff herein to induce The Coronavirus ahead of the proposed mass vaccination of the US public, which is set for May 1, 2021[,]" implanting maggots into plaintiff's bones, releasing poisons into plaintiff's body, "install[ing] television" and "Netflix Television" into plaintiff's eye and spinal cord, "alter[ing]" plaintiff's "joints to make [her] walk in [sic] all four" to be "displayed as a naked dog on a lease [sic]," and other similar allegations. See Dkt. No. 5. As discussed above, this Court does not have the authority or jurisdiction to sua sponte impose the death penalty in a civil case nor can it seek the criminal prosecution of individuals or at the request of a plaintiff or decide the ultimate punishment if convicted after a criminal trial.

**\*6**  Generally, in cases involving pro se plaintiffs, a court should not dismiss a complaint without granting leave to amend "at least once" "when a liberal reading of the complaint gives any indication that a valid claim might be stated." 🚩 Branum v. Clark, 927 F.2d 698, 704-05 (2d Cir. 1991). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." 🚩 Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000); see also 🚩 Cortec Indus. Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be

dismissed with prejudice."). The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a pro se plaintiff's complaint to proceed. See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp., 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may sua sponte dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " Aguilar v. United States, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998)); see also Neitzke v. Williams, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); Pino v. Ryan, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint."). Thus, although the Court must show special solicitude to pro se litigants, see Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and is to exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond, ..." Anderson v. Coughlin, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted), the Court also has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis.

Even if, arguendo, the statute of limitations was not a jurisdictional bar and plaintiff had been able to establish this Court's jurisdiction, the undersigned would still recommend dismissal with prejudice on its initial review as plaintiff's complaint is "factually frivolous." See Bennett v. Mnuchin, 6:20-CV-243 (BKS/TWD), 2020 WL 1674068 (citing Denton v. Hernandez, 504 U.S. 25, 32-33 (1992)) (holding that a court may dismiss a factually frivolous claim when the allegations are "clearly baseless," including claims that

"describ[e] fantastic or delusional scenarios."); Brown v. New York State Educ. Dept., 8:18-CV-169 (TJM/CFH), 2018 WL 1865547, at *2 (N.D.N.Y. Mar. 19, 2018) (dismissing pro se plaintiff's complaint with prejudice where "it is clear that no federal claim can be stated on these facts[.]"). Accordingly, the undersigned recommends dismissal with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as any leave to amend would be clearly futile.

### IV. Conclusion

**WHEREFORE**, for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's in forma pauperis application (dkt. no. 2) be granted for purposes of filing only; and it is

**RECOMMENDED**, that plaintiff's complaint (dkt. no. 1) be **DISMISSED WITH PREJUDICE**; and it is further

**RECOMMENDED**, that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) be **DISMISSED**; and it is further

**RECOMMENDED**, that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be **DISMISSED AS MOOT**.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has FOURTEEN (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a). [7]

### All Citations

Slip Copy, 2021 WL 3518439

## Footnotes

1    Plaintiff is still financially responsible for any other fees or costs she may incur.

2    It appears that the EEOC dismissal notice is dated September 10, 2020. Dkt. No. 1-1.

3    A plaintiff establishes "a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class." Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005) overruled on other grounds Zarda v. Altitude Express, Inc., 883 F.3d 100 (2d Cir. 2018).

4    As the EEOC dismissal notice is dated September 10, 2020, the Court makes the reasonable inference that plaintiff filed her EEOC complaint some time in 2020.

5    Even if this Court were to assess this case as seeking to proceed under diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), the plaintiff has also failed to set forth a cognizable state law claim. Scherer v. Equitable Life Assur. Soc'y of the United States, 347 F.3d 394, 397 (2d Cir. 2003) (quoting 28 U.S.C. § 1332(a)) (noting that diversity jurisdiction "confers original jurisdiction on the federal district courts with respect to 'all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States.' ").

6    This "emergency motion" notes that it is presented to the United States Supreme Court, but contains a caption including this Court. It is unclear if this is a document plaintiff intends to submit before this Court, or before the United States Supreme Court. See dkt. no. 5.

7    If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3204860
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Myrna Althia Alicia WALKER, Plaintiff,

v.

CIBC LIMITED, Defendant.

1:20-CV-1337 (TJM/CFH)
|
Signed 07/29/2021

**Attorneys and Law Firms**

Myrna Althia Alicia Walker, Albany, NY, Pro Se.

### DECISION and ORDER

THOMAS J. McAVOY, Senior United States District Judge

## I. INTRODUCTION

**\*1** This case was before the Hon. Christian F. Hummel, United States Magistrate Judge, for an initial review of plaintiff's complaint and other filings pursuant to 28 U.S.C. § 1915(e)(2)(B). Judge Hummel recommends that plaintiff's complaint (dkt. no. 1) be dismissed with prejudice; that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) be dismissed; and that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be dismissed as moot. *See* April 13, 2021 Report-Recommendation & Order, dkt. no. 10. Plaintiff did not file objections directed to Judge Hummel's recommendations, and the time to do so has expired. Plaintiff did, however, file an amended complaint. For the reasons that follow, the Court adopts Judge Hummel's recommendations, and independently reviews plaintiff's amended complaint and finds it fails to assert viable causes of action.

## II. DISCUSSION

### a. Complaint

As Judge Hummel explains, plaintiff *pro se* Myrna Althia Alicia Walker purported to commence this action on October 28, 2020, by submitting a complaint and application to proceed in forma pauperis ("IFP") in lieu of paying the Court's filing fee. *See* Dkt. No. 1 ("Compl."); Dkt. No. 2. On March 15, 2021, plaintiff submitted a supplement to her complaint.

Dkt. No. 4. On April 6, 2021, plaintiff submitted an additional filing entitled "Emergency Petition for the Death Penalty Against Adethia Keisha Fitten and Others on the Principle Found in the Law of Necessity." Dkt. No. 5. On April 7, 2021, plaintiff submitted an additional 86 pages to supplement to her complaint. Dkt. Nos. 6, 7. On April 8, 2021, plaintiff submitted additional exhibits and a letter requesting to file those exhibits under seal. Dkt. No. 8.

Plaintiff purports to bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000, *et seq.* On her form Title VII complaint, she indicates that defendant discriminated against her due to her race and color, religion, sex, and "my date of birth – Easter." Compl. at 2. Plaintiff further indicates, through checking the boxes on the form complaint, that defendant terminated her employment, failed to promote, engaged in unequal terms and conditions of employment, retaliated against her, and "forced prostitution; [i]dentity theft, which is used to do Bank frauds & Poisonings." *Id.* Plaintiff's complaint, inclusive of exhibits, is 158 pages long. Dkt. No. 1. The exhibits include an 80-page letter relating to apparent visa fraud that plaintiff sent to the US Department of Justice, the United States Department of Homeland Security, Immigration and Customs Enforcement, and the Federal Bureau of Investigation, as well as an incident report dated May 29, 2019, regarding an apparent rape of plaintiff.

The supplement plaintiff filed on March 15, 2021 is 112 pages long. Dkt. No. 4. The supplement appears to be filings from a complaint plaintiff had before the Supreme Court, Rensselaer County against Unity House of Troy and Joseph Posa. *Id.* The "emergency motion," filed on April 4, 2021, is 22 pages long, with 70 additional pages of exhibits. Dkt. No. 5. These exhibits are (1) various transfer orders and orders of protection plaintiff either sought or obtained against various individuals in family court proceedings in different counties (dkt. no. 5-1); (2) a residential lease agreement from July 2018, for a property in Troy, New York, with landlord Joseph Posa (dkt. no. 5-2); (3) records from a proceeding before the Rensselaer County Supreme Court in a case captioned Myrna Althia Alicia Walker vs. "Change of Name" Heidi Elizabeth Zuach (dkt. no. 5-3); and (4) a lease agreement dated May 2, 2017, between Capital Group Management LLC and plaintiff for a property in Troy, New York (dkt. no. 5-4). The submission filed on April 7, 2021, is 59 pages long and includes various orders of protection, a USPS tracking number report, a Unity House Domestic Violence Services Transitional Housing Program

Handbook, a form from the Rensselaer County Department of Social Services, earnings statements, a New York State incident report from 2018, an eviction notice, a letter from the Unity House Transitional Housing program, a "notice" letter, and a "birth registration" form. Dkt. No. 6-6. The exhibits filed on April 7, 2021 appear to be letters plaintiff sent to the New York State Department of Labor, United States Department of Homeland Security, Immigration and Customs Enforcement, and the EEOC, apparently related to "pandemic unemployment compensation benefits." *See* dkt. no. 7.

**\*2** Plaintiff's complaint discusses Allison Carolyn Rattray, allegedly the Corporate Secretary and Legal Counsel of defendant CIBC First Caribbean International Bank (Jamaica) Limited. Dkt. No. 1 at 3. Plaintiff contends that Ms. Rattray kills unidentified people "with her married name" and drinks plaintiff's blood. *Id.* Apparently, plaintiff contends that Ms. Rattray is or was her "employer" who "uses the drinking blood of the employee to kill employing the employment agreement and the incomes paid by direct deposit as the consideration for the blood that is drank before the killings and the doomings if [sic] innocent persons." *Id.* at 4. Plaintiff also appears to suggest that Ms. Rattray and her husband, "Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica," forced plaintiff to use "illegal psychotropic medicines," cocaine, and alcohol. *Id.* at 5. Plaintiff refers to an employment agreement she signed with Ms. Rattray in 1995 and appears to suggest that since that date, Ms. Rattray "has been stalking the Plaintiff inside her bedroom, bathroom mirror, on her cell phone from 1995 even until today October 20, 2020 even the bathroom staples [sic] has visual and audio devices inside of them." *Id.* at 6. The Complaint then appears to proceed to explain why Ms. Rattray and her various family members are carrying out unspecified killings. *See generally* Dkt. No. 1. Plaintiff further suggests that through her employment with defendant, both defendant and the Commercial Division of the Supreme Court of Jamaica

> has been using me as a sex doll; as sex services; as sex product also incorporating The University of the West Indies Hospital to do surgeries; using illegal force of The Jamaican police; using the illegal Force of the Jamaican Army; using the illegal force of the Jamaican parliament to have

men from any where have sex with The Plaintiff because The Plaintiff was born on the day the crucifixion was celebrated, that is Easter and Good Friday.

*Id.* at 13. Plaintiff asks the Court for

> an Injunction to stop, restrain and prevent Allison Carolyn Rattray (maiden name Smith), Corporate Secretary and Legal Counsel, CIBC First Carribean Jamaica; her husband, Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica, King Street, Kingston, Jamaica, West Indies Deryke Smith, her brother; Lacelles Smith retired lecturer The University of the West Indies, Jamaica, West Indies; and the Rhoda Ford children and others from practicing their religion in a way that results in the death or harm or injury of The Rights of The Plaintiff and or the mother of The Plaintiff and or the siblings of The Plaintiff; and or any member of The Public, which includes anyone in the global community.

*Id.* at 14.

As for plaintiff's first cause of action, plaintiff lists:

> forced religion imposed on The Plaintiff whom is the employee by The Employer, CIBC Limited. The Forced Religion imposed on Myrna Althia Alicia Walker [ ] to kill innocent Persons. The daily murders of innocent Persons is used to supply the demands of the global organ Donor list. The staff is Allison Carolyn Rattray.

Dkt. No. 1 at 69. As for a second cause of action is

> employment discrimination – I chose a
> career path to be an Attorney-At-Law.
> Allison Carolyn Rattray (maiden name
> Smith) my (former) then manager at
> CIBC had me fired; told me that (1)
> I am not worthy to be an Attorney-at-
> Law because of my Race (2) I was not
> worthy to be in the same Profession
> as her. She has been defaming my
> character ever since.

*Id.* at 70. The third cause of action is listed as

> employment        discrimination    -
> compensation: denied increases in my
> salary verbally communicated to me
> by Ms. Cherlyn Blackman my Senior
> Manager of 3% in 2004; Denied
> Promotion communicated to me by
> Human Resources Regional Director,
> Jerime Cjnttihs-Bell; denied fringe
> benefits that accompanied my five (5)
> CIBC Achievers awards – my salary
> was split and part paid to my aunt.

*Id.* In the prayer for relief, plaintiff requests:

> (1) an Injunction(s) for Criminal
> Indictment(s) of Allison Carolyn
> (Smith) Rattray, Corporate Secretary
> and Legal Counsel CIBC for her
> forced Prostitution of The Plaintiff and
> Others; (2) An Injunction to prevent
> and stop all Prostitution or abuse of
> The Plaintiff; (3) Restitution(s) by
> CIBC for lost Incomes and fringe
> benefits[; and] (4) Job Reference letter
> from CIBC and an apology and my
> land Title Deed.

*Id.* at 71.

Judge Hummel found (a) that plaintiff's complaint fails to meet the pleading requirements of Fed. R. Civ. P. 8 and 10, *see* Dkt. 10 at 8-9; (b) plaintiff's claims under Title VII (1) are barred by the statute of limitations, and (2) fail to state a claim for employment discrimination in violation of Title VII, *see id.* at 9-10; and (c) apart from the Title VII claims, "plaintiff's claims fail to state any cognizable legal claim under the United States Constitution, federal statute, or state law, and ultimately fails [to] establish this Court's jurisdiction under federal question or diversity jurisdiction." *Id.* at 10. Judge Hummel indicated that he was

> **\*3** at a loss as to how the allegations in the
> complaint relate to a valid employment discrimination
> claim or any valid legal claim. Plaintiff presents a
> difficult to comprehend series of allegations against
> various individuals – many of whose connections to her
> apparent former employer is difficult, if not impossible, to
> comprehend – who she alleges forced her into prostitution,
> performed plastic surgeries on her against her will, installed
> "spying devices" into plaintiff's body, forced her to undergo
> various injections, and involved plaintiff in a murder
> scheme that is somehow related to her Easter birthday. *See*
> Dkt. No. 1 at 56-60. Plaintiff also sets forth unexplained
> allegations that appear to involve Ms. Rattray and others,
> such as "an abuse of a veteran of the United States Army by
> the said Allison Carolyn Rattray" (dkt. no. 1 at 54). Plaintiff
> submits dozens of pages of exhibits and supplements that
> appear to relate to cases filed in other courts, orders
> of protection obtained in other courts, unemployment
> insurance issues, police reports, and documents sent to
> various federal agencies. See dkt. nos. 4, 5, 6, 7. The
> relevance of this deluge of documents is entirely unclear.

*Id.* at 11.

Judge Hummel also concluded that to the extent plaintiff requests injunctions (dkt. no. 1 at 71) to prevent defendant's employees from prostituting or harming plaintiff or seeks some kind of prosecution of defendant's employees for criminal conduct, this Court does not have authority to direct persons to cease engaging in illegal activity through a civil suit as it is not a law enforcement agency. *Id.* at 11-12.

As to plaintiff's "emergency motion" for the Death Penalty, Judge Hummel found that it appears to ask the United States Supreme Court to enforce the death penalty against various

individuals who plaintiff contends engaged in "drug assisted surgeries on The Plaintiff herein to induce The Coronavirus ahead of the proposed mass vaccination of the US public, which is set for May 1, 2021[,]" implanting maggots into plaintiff's bones, releasing poisons into plaintiff's body, "install[ing] television" and "Netflix Television" into plaintiff's eye and spinal cord, "alter[ing]" plaintiff's "joints to make [her] walk in [sic] all four" to be "displayed as a naked dog on a leash [sic]," and other similar allegations. *See* Dkt. No. 5. Judge Hummel concluded that "this Court does not have the authority or jurisdiction to *sua sponte* impose the death penalty in a civil case nor can it seek the criminal prosecution of individuals or at the request of a plaintiff or decide the ultimate punishment if convicted after a criminal trial." Dkt. 10 at 12.

Judge Hummel concluded that although the Court must show special solicitude to *pro se* litigants, and is to exercise "extreme caution ... in ordering sua sponte dismissal of a *pro se* complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond, ..." *id.* at 14 (quoting ⚑ *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted)), the Court also has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action *in forma pauperis. Id.* Judge Hummel concluded:

> Even if, *arguendo,* the statute of limitations was not a jurisdictional bar and plaintiff had been able to establish this Court's jurisdiction, the undersigned would still recommend dismissal with prejudice on its initial review as plaintiff's complaint is "factually frivolous." *See Bennett v. Mnuchin,* 6:20-CV-243 (BKS/TWD), 2020 WL 1674068 (citing ⚑ *Denton v. Hernandez,* 504 U.S. 25, 32-33 (1992)) (holding that a court may dismiss a factually frivolous claim when the allegations are "clearly baseless," including claims that "describ[e] fantastic or delusional scenarios."); *Brown v. New York State Educ. Dept.,* 8:18-CV-169 (TJM/CFH), 2018 WL 1865547, at *2 (N.D.N.Y. Mar. 19, 2018) (dismissing *pro se* plaintiff's complaint with prejudice where "it is clear that no federal claim can be stated on these facts[.]"). Accordingly, the undersigned recommends dismissal with prejudice pursuant to ⚑ 28 U.S.C. § 1915(e)(2)(B)(i) as any leave to amend would be clearly futile.

**\*4** *Id.* at 14. As indicated above, Judge Hummel also recommends that plaintiff's "Emergency Motion for the Death

Penalty" (dkt. no. 5) be dismissed, and that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be dismissed as moot. *Id.* at 15.

After examining the record, this Court has determined that the recommendations in the Report-Recommendation and Order are not subject to attack for plain error or manifest injustice. Further, even if plaintiff's amended complaint is treated as an objection, the Court has completed a *de novo* review and has determined to adopt Magistrate Judge Hummel's recommendations for the reasons stated in his report.

**b. Amended Complaint**

As indicated, plaintiff filed an amended complaint after Judge Hummel recommended that the complaint be dismissed with prejudice. After a review of the amended complaint, the Court finds that it too must be dismissed with prejudice.

Plaintiff's amended complaint is a form Title VII complaint. *See* dkt. no. 11. She indicates that the defendant is "CIBC Limited/Michael Capatide CEO CIBC." *Id.* at ¶ 3(b). [1] Plaintiff checks the boxes indicating that the defendant discriminated against her on account of her "race or color," "religion," "sex (or sexual harassment)," "national origin," and "other" indicating on the line that follows: "my right to marry; my right to life; my right to work and provide for my daily living expenses." *Id.* at ¶ 6. Where plaintiff is asked to indicate what the complained-of conduct involves, she checked the boxes for "failure to employ," "termination of employment," "failure to promote," "unequal terms and conditions of employment," "retaliation," and "other acts as specified below" after which she writes: "I am being sex trafficked by CIBC First Caribbean staff in lieu of my salary." *Id.* at ¶ 7. In the section of the amended complaint asking for the facts underlying her claims, plaintiff asserts she is being sex trafficked because she was born on Easter and that the sex trafficking is in lieu of her salary paid to her by CIBC First Caribbean Jamaica." *Id.* ¶ 8. She also asserts that "the force" of the Jamaican Police, the Jamaican Judiciary, the Jamaican Hospital, and the University of the West Indies are conspiring with her "Walker relatives used to commit crimes with my identity using identity theft of Myrna Suzette Walker employed by Jamaican government Judge Barrington Andrew Rattray & Allison Carolyn Rattray." *Id.* In addition, she asserts that "Adethia Keisha Fitten is physically cutting me to create presumed consent for the crimes organized by Judge Barrington Andrew Rattray." *Id.*

The First Cause of Action alleges "forced organized criminality using the salary that was paid to the plaintiff by CIBC First Caribbean Jamaica January 1, 1995 to March 28, 2009." It also asserts that Myrna Suzette Walker "is a thief," and that "Allison Carolyn Rattray ... hired Myrna Suzette Walker and her five (5) children and Adethia Keisha Fitten to steal and to say that the stealing was done by the plaintiff." Plaintiff also appears to indicate that "to do the stealing," Myrna Suzette Walker "and others" repeatedly physically injure plaintiff. As discussed by Judge Hummel, these allegations do not provide plaintiff with a timely Title VII cause of action, *see, e.g.,* Am. Compl. attach. 4, dkt. no. 11-4 at 1,[2] nor do they provide a basis for the relief plaintiff seeks. *See* Dkt. 11, at 5.[3]

**\*5** The Second Cause of Action asserts violations of the "Human Rights Act of 1998." The Human Rights Act of 1998 appears to be a law or act of Parliament in the United Kingdom. *See Brady v. Wks. Med. Ctr.*, No. 19-CV-00655-SM, 2019 WL 6529870, at *2 (D.N.H. Nov. 12, 2019)*("A law in effect in the United Kingdom bears that title.")(citing Human Rights Act 1998, ch. 42, http://www.legislation.gov.uk/ukpga/1998/42/contents), *report and recommendation approved*, No. 19-CV-655-SM, 2019 WL 6529459 (D.N.H. Dec. 4, 2019); *Simpson v. Dauphin Cty. Hous. Auth.*, No. 1:16-CV-01747, 2017 WL 2375702, at *2, n. 4 (M.D. Pa. Apr. 26, 2017) ("Simpson also references a 'Human Rights Act of 1998,' which as best we can tell refers to an Act of Parliament of the United Kingdom, not applicable in this jurisdiction."), *report and recommendation adopted*, No. 1:16-CV-1747, 2017 WL 2362510 (M.D. Pa. May 31, 2017). The Human Rights Act of 1998 does not provide plaintiff with a viable cause of actions against the defendant for any events occurring in the Northern District of New York over which this Court would have jurisdiction. *See Brady*, 2019 WL 6529870, at *2.

The Third Cause of Action is confusing but appears to be a claim seeking unpaid wages. *See* dkt. no. 11 at 4 (stating at the start of Third Cause of Action: "The right to my paycheck."). Plaintiff asserts that her aunt Myrna Suzette Walker "assisted by CIBC First Caribbean staff Allison Carolyn Rattray has been falsely selling me as a whore in lieu of my current income(s) from JC Penney, Aerotek, Walmart, Fidelis Care and more." However, Myrna Suzette Walker, Allison Carolyn Rattray, JC Penney, Aerotek, Walmart, or Fidelis Care are not defendants in this action. Further, plaintiff does not assert when it was that she worked at JC Penney, Aerotek, Walmart, or Fidelis Care, or when or where it was that Myrna

Suzette Walker and Allison Carolyn Rattray purportedly took actions preventing plaintiff from receiving her wages from these employers. The claim in this regard fails to assert a viable cause of action under Title VII. In addition, in nearly incomprehensible fashion plaintiff ends the Third Cause of Action by asserting: "The rapes of me by co-workers is [sic] recorded and published. Walmart staff a [sic] man named Donnell she [sic] gave permission to live in my apartment as well as Fidelis Care Health Insurance staff- Rashid Rardon." These allegations fail to provide a sufficient basis for the Court to discern any viable cause of action under Title VII or any other law or statute over which the Court would have jurisdiction.

Accordingly, for the reasons set forth above plaintiff's amended complaint will be dismissed. Because the allegations in the amended complaint are factually frivolous, and because plaintiff filed an amended complaint that did not cure the pleading defects pointed out by Judge Hummel, dismissal will be with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as any leave to amend would be futile.

## III. CONCLUSION

For the reasons discussed above, the Court **ACCEPTS AND ADOPTS** Judge Hummel's recommendations in the April 13, 2021 Report-Recommendation & Order, dkt. no. 10. Thus, it is hereby

**ORDERED** that plaintiff's complaint (dkt. No. 1) is **DISMISSED with prejudice**; and it is further

**ORDERED** that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) is **DENIED and DISMISSED**; and it is further

**ORDERED** that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) is **DENIED and DISMISSED as moot**.

Based on the Court's review of the amended complaint, it is hereby

**ORDERED** that plaintiff's amended complaint (dkt. No. 11) is **DISMISSED with prejudice**.

The Clerk of the Court may mark this file as closed.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 3204860

## Footnotes

1    At paragraph 3(a) asking to identify the defendant, plaintiff writes: "Not Applicable"

2    Dkt. no. 11-4 is a letter from Maureen Kielt, Director of the EEOC Buffalo Local Office to plaintiff in the matter of *Walker v. CIBC* confirming that plaintiff indicated that her "last date of harmed occurred on March 24, 2009, when [she] was terminated," thus making her EEOC administrative claim against CIBC untimely. Dkt. No. 11-4 at 1.

3    In the Prayer for Relief, plaintiff requests the Court to grant the following relief:

    1. The plaintiff <u>do</u> <u>not</u> [sic] want to be a party to the religious killing business of Myrna Suzette Walker; her five children; and CIBC First Caribbean Jamaica staff, Allison Carolyn Rattray and her husband Judge Barrington Andrew Rattray, Supreme Court of Jamaica;

    2. The plaintiff do not [sic] want cocaine nor any thing to ingest from anyone, by force or otherwise.

    3. The plaintiff wants full restitution socially, physically, professionally.

    Dkt. 11, at 5 (emphasis in original).

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1789593
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Alexander McFADDEN, Plaintiff,

v.

Jose D. ORTIZ, Executive Officer Chase JP
Morgan Chase & Co., and James Simon, Manager
Chase JP Morgan Chase & Co., Defendants.

No. 5:12–CV–1244 (MAD/ATB).
|
April 26, 2013.

**Attorneys and Law Firms**

Alexander McFadden, Pine City, NY, pro se.

Jose D. Ortiz, Executive Officer for Chase JP Morgan Chase & Co., Houston, TX.

James Simon, Manager for Chase JP Morgan Chase & Co., New York, NY.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

*1 Plaintiff *pro se* Alexander McFadden ("McFadden"), an inmate at the Southport Correctional Facility ("SCF"), filed this action pursuant to 42 U.S.C. § 1983. In his complaint, Plaintiff appears to allege that Defendants, two executives of Chase JP Morgan Chase & Co. ("Chase"), violated his constitutional rights through conduct that, in some way, involved a bank account. *See* Dkt. No. 1 at ¶ 4.

On August 7, 2012, Magistrate Judge Andrew T. Baxter issued an Order and ReportRecommendation, recommending that the Court dismiss Plaintiff's complaint in its entirety with prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5. Currently before the Court are Plaintiff's objections to Magistrate Judge Baxter's August 7, 2012 Order and ReportRecommendation.

**II. BACKGROUND**

In his Order and Report–Recommendation dated August 7, 2012, Magistrate Judge Baxter recommended that Plaintiff's motion to proceed *in forma pauperis* ("IFP") should be denied by the Court and, upon review of the complaint, that this action be dismissed in its entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at 9. Further, Magistrate Judge Baxter recommended that if the Court approves his report, the Court should certify that any appeal from this matter will not be taken in good faith pursuant to 28 U.S.C. § 1915(a)(3). *See id.*

Regarding Plaintiff's complaint, Magistrate Judge Baxter's Order and ReportRecommendation recommends that because there is no indication that either Defendant acted under "color of state law," and because there are no allegations that either or both Defendants "conspired" with any state actors to bring this action under section 1983, Plaintiff's complaint should be dismissed. *See* Dkt. No. 5 at 5.

Regarding Plaintiff's claim that Defendants violated New York Penal Law by offering false documents for filing, tampering with public records, and falsifying business records, Magistrate Judge Baxter recommended that because there is no private right of action to enforce either state or federal criminal statutes, Plaintiff is barred from bringing a claim to enforce these provisions of the New York State Criminal Law. *See* Dkt. No. 5 at 6.

Accordingly, Magistrate Judge Baxter recommended this Court hold that, due to Plaintiff's failure to state a claim under 42 U.S.C. § 1983 upon which relief can be granted, combined with the courts inability to determine what venue might be appropriate, Plaintiff's motion for IFP should be denied, and Plaintiff's complaint should be dismissed in its entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at 9.

In his "objections" to Magistrate Judge Baxter's Order and Report–Recommendation, Plaintiff simply provides the Court with language from various cases discussing various types of objections and the Court's authority to review unpreserved errors. *See* Dkt. Nos. 14, 15.

### III. DISCUSSION

**A. Review of a magistrate judge's decision**

**\*2**  If a party files specific objections to a magistrate judge's report-recommendation, the district court performs a *"de novo* determination of those portions of the report of specified proposed findings or recommendations to which objections is made." 28 U.S.C. § 636(b)(1) (2006). However, if a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that were presented] to the magistrate judge," the court simply reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). At the conclusion of the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. *In Forma Pauperis* application**

In order for a plaintiff to proceed without payment of any fees, he must first meet the financial criteria for IFP status. *See* 28 U.S.C. § 1915(a)(1). The plaintiff must submit an affidavit, including a statement of all assets, establishing his inability to pay the filing fee of $350.00. *See id.* Here, Plaintiff submitted a standard IFP application form, but answered only some of the relevant questions. Furthermore, while Plaintiff is incarcerated and has filed a motion to proceed IFP, his application states that, in the past twelve months, he has had income from "[b]usiness, profession or other self employment," and has "millions of dollars" in "cash, checking or savings accounts." *See* Dkt. No. 2 at ¶¶ 3, 4. Plaintiff, however, does not answer the question that asks him to "describe the source of money and state the amount received and what you expect you will continue to receive ." *See id.* at ¶ 3. Plaintiff answers "yes" to the questions asking whether he owns "real estate, stocks, bonds, securities, other financial instruments, automobile or any other assets." *See id.* at ¶ 5. Once again, however, Plaintiff does not complete the question by describing the property and stating its value. *See id.* Lastly, the form indicates that Plaintiff only has $9.60 in his prison account, and that during the last six months prior to this application, the average balance in his prison account was $4.03. *See* Dkt. No. 2 at 2.

If Plaintiff's claims are true and he does in fact have millions of dollars and real estate or other valuable property, then he cannot meet the financial requirements for proceeding IFP. Generally, when plaintiff has failed to properly complete the IFP request, the court will deny IFP without prejudice and allow plaintiff to resubmit the form with proper information. However, in this case, based upon the inadequacy of Plaintiff's responses, combined with his failure to state a plausible cause of action and the fact that amendment would be futile as discussed below, even if Plaintiff met the financial requirements for IFP, the Court would still find dismissal of this action to be proper.

**C. Sufficiency of the complaint**

*1. Legal Standard*

**\*3**  In addition to determining whether Plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if it determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B) (i)-(iii).

*2. Application*

*a. Color of state law*

Plaintiff brings this complaint pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1. To state a claim under section 1983, a plaintiff must allege two elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a deprivation of her rights or privileges as secured by the Constitution of the United States. *See Annis v.*

County of Westchester, 136 F.3d 239, 245 (2d Cir.1998). Under extremely limited circumstances not alleged here, private actors, such as Defendant, may be held liable under section 1983. *See White v. Monarch Pharmaceuticals,* Inc., No. 08–CV–0430, 2009 WL 3068217, \*1 (2d Cir. Sept. 28, 2009); *see also Rendell—Baker v. Kohn,* 457 U.S. 830, 838–42 (1982). The law does not reach private conduct, no matter how "discriminatory or wrongful." *Annis,* 136 F.3d at 245 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1002 (1982)).

In the present matter, Plaintiff names two executives of Chase as Defendants. Along with being very difficult to determine what these Defendants allegedly did to Plaintiff, there is no indication that either Defendant acted under color of state law. Moreover, the complaint does not allege or suggest that Defendants conspired with a state actor to violate his constitutional rights. Further, Plaintiff does not allege any conduct attributable to either Defendant sufficient to establish their personal involvement in any alleged constitutional deprivation. *See* Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted).

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss the complaint.

### b. Criminal statutes

Plaintiff states in the "Causes of Action" section of his complaint that Defendants violated the New York Penal Law regarding falsifying business records, tampering with public records, and offering false documents for filing. *See* Dkt. No. 1 (citing N.Y. PENAL LAW §§ 175.10, 175.25, and 175.35). Even if this is true, however, there is no private right of action to enforce either state or federal criminal statutes. *See* Abrahams v. Incorporated Village of Hempstead, No. 08–CV–2584, 2009 WL 1560164, *8 (E.D.N.Y. June 2, 2009) (holding that dismissal of civil suit for perjury was proper because there is no private right of action for perjury under New York Law). Therefore, even assuming, *arguendo,* that Defendants violated some criminal statutes, Plaintiff may not bring a claim based on those statutes to enforce New York Criminal Law.

**\*4** As such, Magistrate Judge Baxter correctly recommended the Court find that Plaintiff has failed to allege a plausible cause of action.

### c. Venue

Venue in federal-question cases is generally determined by 28 U.S .C. § 1391(b) which provides that

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, ... or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). In this case, one of the Defendants is listed with a Houston, Texas address, while the other Defendant is listed as having a New York City address. *See* Dkt. No. 1 at ¶¶ 3(a) and (3)(b). Thus, neither of the Defendants reside, or are located, in the Northern District of New York. Plaintiff is incarcerated at Southport Correctional Facility, located in the Western District of New York. Therefore, since both Plaintiff and one of the Defendants are New York residents, this case could clearly not be brought as a diversity action. Moreover, under Plaintiff's section 1983 claim, venue is not proper in the Northern District of New York. All Defendants do not reside in the same state, neither Defendant is located in this district, and the complaint does not allege any conduct that occurred in the Northern District of New York.

Under 28 U.S.C. § 1406, a district court faced with a case brought "laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The Second Circuit has suggested that "a district court should not dismiss for improper venue on its own motion except in extraordinary circumstances." Concession Consultants, Inc. v. Mirisch, 355 F.2d 369 (2d Cir.1966).

In the present matter, the Court finds and agrees with Judge Baxter's Order and ReportRecommendation that this case presents precisely the extraordinary circumstances making it proper for the Court to dismiss for improper venue *sua sponte.*

### d. Leave to amend

When a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint

gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citations omitted). Of course, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] cause of action is substantive" such that "better pleading will not cure it ." *Id.* (citation omitted); *see also Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993).

 **\*5** Here, the Court agrees with Magistrate Judge Baxter that any attempt by Plaintiff to amend his complaint would be futile. As discussed, although Plaintiff alleges "due process violations," section 1983 does not permit such actions to be brought against private individuals absent some involvement by the state. Moreover, Plaintiff does not have the right to enforce New York State criminal statutes.

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss Plaintiff's complaint with prejudice.

### IV. CONCLUSION

After carefully considering Magistrate Judge Baxter's Order and Report–Recommendation, the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's August 7, 2012 Order and Report–Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further **ORDERS** that Plaintiff's application to proceed *in forma pauperis* is **DENIED;** and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii); and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve Plaintiff with a copy of this Memorandum–Decision and Order in accordance with Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1789593

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2539000
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Leo W. LAWTON, Jr. et al.

v.

WELLS FARGO BANK, N.A. et al.

CIVIL ACTION NO. 22-3294
|
Signed March 16, 2023

**Attorneys and Law Firms**

Leo W. Lawton, Jr., Lansdowne, PA, Pro Se.

Kimberly J. Lawton, Lansdowne, PA, Pro Se.

Aaron M. Bender, Reed Smith LLP, Princeton, NJ, for Wells
Fargo Bank, N.A.

Justin G. Weber, Troutman Peppe Hamilton Sanders LLP,
Harrisburg, PA, Samuel D. Harrison, Troutman Pepper
Hamilton Sanders LLP, Philadelphia, PA, for UMB Bank.

Meredith Hantske Wooters, Manley Deas Kochalski, LLC,
Columbus, OH, for Manley, Deas & Kochalski LLC.

**MEMORANDUM**

MCHUGH, United States District Judge

**\*1** In this action, *pro se* Plaintiffs Kimberly Lawton
and Leo W. Lawton Jr. assert several claims alleging that
their mortgage agreement is fraudulent. Although Plaintiffs
sued four defendants, their pleadings include only minimal
allegations against one Defendant – Wells Fargo – and no
factual allegations against the remaining three. Even under
the lenient pleading standards afforded to *pro se* litigants, the
Complaint fails to state a claim. As a result, I will grant the
Defendants' motions to dismiss.

**I. Relevant Background**

Plaintiffs' *pro se* Complaint is extremely sparse.[1] From the
minimal context provided in the Complaint, I can discern that
Plaintiffs Kimberly Lawton and Leo W. Lawton Jr. represent
that they purchased a home from Wells Fargo in Lansdowne,
Pennsylvania in 2008.[2] Compl., ECF 1 at 4. According to

Plaintiffs, the deed to that property was conveyed to Kimberly
Lawton on June 2, 2008, as a "Warranty Deed ... with no
mortgages, liens or conditions." *Id.* at 8. Closing on the house
occurred about one month later and, although the mortgage
agreement is allegedly dated for that same day, Plaintiffs
assert that neither the mortgage agreement nor the deed were
presented to them. *Id.* Nonetheless, the conveyance of the
deed was insured, and the deed itself was delivered to Ms.
Lawton a few months later. *Id.*

According to Plaintiffs, a subsequent title investigation on
the property revealed defects in the chain of title. *Id.*
Plaintiffs further assert that, because the deed and the
mortgage agreement were not presented at settlement and
closing for review, the documents "cannot stand with the
mortgage agreement." *Id.* Plaintiffs seem to claim that the
discrepancy in the timing of the conveyance, the closing/
mortgage agreement, and delivery of the deed is evidence
of fraud, and that the only other possible explanation is
that Ms. Lawton "attempt[ed] to resell the house back to
herself." *Id.* As a result, Plaintiffs contend that Wells Fargo
is the perpetrator of mortgage fraud and that the mortgage
agreement is void. *Id.* at 8-9.

**\*2** A pending state court docket (No. CV-2018-6187 in
Delaware County)[3] reveals that Wells Fargo initiated a
foreclosure proceeding against Kimberly Lawton in August
2018. After Wells Fargo effectuated service and the Lawtons
failed to respond, the court entered an order of default
judgment and a writ of execution in mortgage foreclosure.
One year later, Ms. Lawton entered an appearance in the
action and filed her first petition to postpone the Sheriff's
sale. It appears that, in September 2021, UMB Bank was
substituted into the action for Wells Fargo, and Wells Fargo
was dismissed as a party. Although the date of the Sheriff's
sale is not apparent from the state court docket, Ms. Lawton
filed an affidavit of truth on September 27, 2022, which was
construed as a petition to set aside the sale. According to my
review of the docket, as of March 16, 2023, the foreclosure
action is still pending.

Plaintiffs filed this Complaint in August 2022, asserting
several federal constitutional, criminal, and civil claims.
Defendants Wells Fargo, UMB Bank, and Manley, Deas, and
Kochalski LLC ("MDK") each filed a Motion to Dismiss. *See*
ECF 7, 9, 13. Plaintiffs also sued a fourth Defendant, Justin
F. Kobeski, who represented Wells Fargo in the state court
foreclosure proceeding. In December 2022, Plaintiffs moved
for an extension of time to serve Mr. Kobeski, which I granted.

**Lawton v. Wells Fargo Bank, N.A., Slip Copy (2023)**

*See* ECF 15, 17. Plaintiffs have still not provided any evidence of service.

## II. Legal Standard

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III. Discussion

Plaintiffs' central allegation challenges the validity of their mortgage agreement, attaching a great deal of significance to the fact that the agreement was not presented to them at closing. From here, Plaintiffs attempt to argue a host of claims. Unfortunately, their claims are impenetrable and, to the extent that sense can be made of them, no count presents a cognizable claim. I will thus grant Defendants' motions to dismiss. As to the non-moving Defendant, Plaintiffs' claims will be dismissed under Federal Rule of Civil Procedure 4(m) for failure to effectuate service.

### A. Plaintiffs fail to state a claim against Wells Fargo, UMB Bank, and MDK.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although "detailed factual allegations" are not required, Plaintiffs must plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation"; indeed, they must include "factual enhancements" and not just "labels and conclusions" to beat dismissal. *Id.* (cleaned up); *see Fung v. Wells Fargo Bank*, No. 20-1099, 2022 WL 475813, at *4 (D.N.J. Feb. 16, 2022) ("To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible."). Courts hold *pro se* pleadings, however, "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

In this case, even under the more liberal pleading standard afforded to *pro se* litigants, Plaintiffs do not present sufficient factual matter to state a claim for relief. As to UMB Bank and MDK, Plaintiffs fail to assert any factual allegations

whatsoever, listing these parties as defendants and then neglecting to mention them again. Plaintiffs' Complaint is thus insufficient and those motions to dismiss will be granted.

*See* *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) ("[P]ro se litigants still must allege sufficient facts in their complaints to support a claim."); *Fantone v. Latini*, 780 F.3d 184, 193 (3d Cir. 2015) (same). And while Plaintiffs do at least name Wells Fargo in their Complaint as a perpetrator of mortgage fraud, their factual allegations remain almost negligible. [4] Moreover, several of Plaintiffs' legal claims provide no cognizable cause of action, likewise warranting dismissal. Having found dismissal of all claims appropriate under Rule 12(b)(6), I will not reach Defendants' remaining arguments. [5]

### *1. Mail and wire fraud in violation of* 18 U.S.C. §§ 1341, *1343, 1344*

**\*3** In their first claim under the mail and wire fraud statutes, Plaintiffs assert a "jurisdictional challenge" [6] alleging a right to property along with a "forgery" claim alleging that Defendant (1) stole a consumer's identity for profit, (2) "fraudulent[ly] manipulat[ed]" states courts in Texas and Pennsylvania, and (3) "transport[ed] illegal documents" across state lines. Compl., ECF 1 at 6.

Preliminarily, to the extent that Plaintiffs are "bringing claims pursuant to federal criminal statutes, [they have] failed to state a claim because such statutes do not give rise to civil liability." *Newsuan v. Newsuan*, No. 12-6043, 2012 WL 5431958, at *2 (E.D. Pa. Nov. 7, 2012) (Slomsky, J); *see also* *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."). Neither the federal statutes for mail fraud nor wire fraud, which Plaintiffs cite, nor the statute for forgery, confer a private cause of action unto litigants. *See, e.g., Kenny v. Porrino*, No. 18-2729, 2020 WL 919703, at *3 n.6 (D.N.J. Feb. 26, 2020) (no cause of action under §§ 1341 and 1343); *Brown v. Demchak*, No. 21-1185, 2021 WL 4552964, at *3 (W.D. Pa. Oct. 5, 2021) (no cause of action under § 1344); *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002) (no cause of action for forgery).

Further, even if I construed this claim as one for civil fraud, Plaintiffs cannot meet the heightened pleading standard of Fed. R. Civ. P. 9(b). Rule 9(b) provides that "a party must state with particularity the circumstances constituting fraud or mistake." *Foglia v. Rental Ventures Management LLC*, 754 F.3d 153, 155 (3d Cir. 2014); *see Kaul v. Christie*, 372 F. Supp. 3d 206, 229 (D.N.J. 2019) (finding that *pro se* plaintiffs with fraud claims are "not exempt from meeting the heightened pleading requirements of Rule 9(b)"). As the Third Circuit has explained, a plaintiff alleging fraud must support its allegations "with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where, and how of the events at issue." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (cleaned up); *see Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004) (explaining that Rule 9(b) requires plaintiffs to give defendants notice of the "precise misconduct with which they are charged," including "who made a misrepresentation to whom and the general content of the misrepresentation") (citations omitted). Minimally, plaintiffs must plead: (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his or her damage. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (citations omitted).

Applying the standard set forth in Rule 9(b) – and considering both Plaintiffs' statement of the case and the specific language included in count one – I conclude that Plaintiffs have not pled the elements of fraud with the requisite specificity. Their vague claims of "mortgage fraud," "stealing a consumer's identity," and "transporting illegal documents" do not provide the "who, what, when, where, and how" of these alleged events, and they do not identify a specific misrepresentation of material fact or the person who made it. Plaintiffs' statements regarding the failure to present the deed at closing shed no further light on their allegations, as they neglect to specify the content of a particular misrepresentation made. Because there is simply not enough information for me to piece together the basic facts of a claim, this count must be dismissed.

*2. Embezzlement in violation of 18 U.S.C. § 31*

**\*4** Plaintiffs next allege that Defendant received money "through deceptive practices and by way of misrepresenting a consumer ... for financial gain." Compl., ECF 1 at 6. They further allege that Defendant "purchas[ed] a home in the name of Kimberly Lawton by falsifying documents." *Id.* Although Plaintiffs cite 18 U.S.C. § 31 for "embezzlement and theft" in support of their claim, there is no such crime in that section of the United States Code. Had Plaintiffs cited the correct criminal statute, there would still be no private cause of action and thus no cognizable claim. *See Boyd v. Wilmington Trust Co.*, 630 F. Supp. 2d 379, 384-85 (D. Del. 2009) (confirming that there is no private cause of action under the criminal statutes for theft and embezzlement). And, even if I interpreted this count as one for fraudulent misrepresentation, there would still be insufficient facts plead under Rule 9(b).[7] This claim is thus dismissed.

*3. Conspiracy to commit fraud in violation of 18 U.S.C.*
*§ 371 and forgery in violation of 18 U.S.C. § 471*

Under this count, Plaintiffs allege that Wells Fargo perpetrated a "conspiracy to commit fraud upon the United States" by using Housing and Urban Development programs, acquiring mortgages under false pretenses, and falsifying documents to close on those properties. Compl., ECF 1 at 6. Plaintiffs also allege a "mis-appropriation [sic] of government funds through FHA programs." *Id.*

Once again, the statutes that Plaintiffs cite are criminal statutes that do not contain private rights of action. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 190 (1994) (refusing to recognize private rights of action "from a criminal prohibition alone"); *Luckett*, 290 F.3d at 497 (no cause of action for forgery); *McCann v. Falato*, No. 14-4869, 2015 WL 6445859, at \*3 (D.N.J. Oct. 23, 2015) (no cause of action under 18 U.S.C. § 371). Moreover, Plaintiffs cite to the federal statute criminalizing counterfeiting, 18 U.S.C. § 471, but bring no allegation of such misconduct. Construing this count as civil fraud will also not save Plaintiffs' claims, as it would still fail under Rule 9(b). Additionally, even if Plaintiffs' claim under the criminal conspiracy statute is construed as one for civil conspiracy, Plaintiffs' claim would not survive.

To plead a civil conspiracy claim, plaintiffs must make "specific factual allegations of combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events." *Hammond v. Creative Fin. Planning Org., Inc.*, 800 F. Supp. 1244, 1249 (E.D. Pa. 1992) (Huyett, J.). Here, Plaintiffs simply do not plead any specifics about an agreement or understanding among Defendants – they do not even name those allegedly involved – and instead make only conclusory allegations of wrongdoing. As a result, Plaintiffs' conspiracy claim is dismissed.

### 4. Denial of due process in violation of the Fifth Amendment

Plaintiffs next raise a claim for violation of due process under the Fifth Amendment. The "jurisdictional challenge" that Plaintiffs assert here is difficult to comprehend but seems to challenge Defendant's standing and its rights to the Lansdowne property. Regardless of how Plaintiffs describe this claim, it is dismissed because, as a private entity, Wells Fargo is not constrained by the Fifth Amendment. *See Nguyen v. U.S. Catholic Conference*, 719 F.2d 52, 54 (3d Cir. 1983) ("The limitations of the fifth amendment restrict only federal government action and not the actions of private entities."). Civil suits for damages under the Fifth Amendment may only be brought against federal officials. *See Davis v. Passman*, 442 U.S. 228, 230, 233 (1979) (finding a cause of action for damages under the Fifth Amendment against federal officials); *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 71, 74 (2001) (limiting *Passman* to suits against individual federal officials).

### 5. Civil rights violations under the Fair Housing Act and Fifth Amendment

**\*5** In count five, Plaintiffs state that they are African Americans who "were targeted before the alleged date of sale July 10, 2008 and used in a scheme to acquire financing through public governmental agencies." Compl., ECF 1 at 6. Further, they aver that Wells Fargo "took advantage of unexpecting minority homeowners." *Id.* Plaintiffs allege that these actions violated their rights under the Fifth Amendment and the Fair Housing Act (FHA). *Id.*

Any Fifth Amendment claim is barred, as discussed above. Further, Plaintiffs have not adequately pleaded an FHA

claim. To establish a violation of the FHA, a plaintiff "can show either discriminatory treatment or discriminatory effect alone, without proof of discriminatory intent." *Doe v. City of Butler, Pa.*, 892 F.2d 315, 323 (3d Cir. 1989) (citations omitted and cleaned up). Here, given the dearth of information regarding the allegedly fraudulent mortgage, it is not clear *how* Defendants discriminated against Plaintiffs. Indeed, Plaintiffs received a mortgage and bought their home without issue. It is not until now, over a decade later, that they raise claims about discriminatory conduct but without specifying the kind of differential or adverse treatment to which they were subject. *See Carter v. Hamilton Affordable Housing, LLC*, No. 09-2399, 2009 WL 3245483, at \*4-5 (D.N.J. Oct. 6, 2009) (requiring, for example, a plaintiff pleading racial discrimination under the Fair Housing Act to show that similarly situated residents of a different race were treated differently). Even though Plaintiffs plead a protected class, I cannot discern without more factual context any (1) intentional discrimination or (2) discriminatory effect. Plaintiffs' FHA claim is therefore dismissed.

### 6. Violations of RICO and the Civil Rights Act

Lastly, Plaintiffs allege violations of RICO and the Civil Rights Act, claiming that Wells Fargo "created a [c]onsortium of businesses" to "corrupt and deceive" minorities benefitting from government programs. Compl., ECF 1 at 7. Further, they state that Wells Fargo used "an array of financial institutions to support their agenda" of orchestrating mortgage fraud. *Id.*

Plaintiffs' civil rights claim fails in part because they do not identify the particular statutory provision that they maintain was violated. *See Wardlaw v. City of Phila.*, No. 21-1942, 2022 WL 717258, at \*6 (E.D. Pa. Mar. 10, 2022). But even if they had, there are insufficient facts pled to make out a civil rights violation.

Additionally, Plaintiffs argue that Wells Fargo violated the RICO Act, which creates criminal and civil liability for any person who:

> uses or invests income derived "from a pattern of racketeering activity" to acquire an interest in or to operate an enterprise engaged in interstate commerce, § 1962(a); who acquires or maintains an interest in or control of such an enterprise "through a pattern of racketeering activity," § 1962(b); who, being employed by or associated with such an enterprise, conducts or participates in the conduct of

its affairs "through a pattern of racketeering activity," §
1962(c); or, finally, who conspires to violate the first three
subsections of § 1962, § 1962(d).

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232-33 (1989);
*see* 18 U.S.C. § 1962. Under any of the four provisions,
Plaintiffs' claims fail.

First, Plaintiffs cannot plausibly allege a "pattern of
racketeering activity" because they only reference one
purportedly fraudulent transaction. *See* 18 U.S.C.§
1961(5) (explaining that a "pattern of racketeering activity"
requires "at least two acts of racketeering activity" within
a ten-year period); *Banks v. Wolk*, 918 F.2d 418, 421
(3d Cir. 1990) ("[N]o defendant can be liable under RICO
unless he participated in two or more predicate offenses
sufficient to constitute a pattern."). Moreover, "to prove
a pattern ... a plaintiff or prosecutor must show that the
racketeering predicates are related, and that they amount to
or pose a threat of continued criminal activity." *United States
v. Bergrin*, 650 F.3d 257, 266-67 (3d Cir. 2011) (citation
omitted and cleaned up); *see* *Jung v. Bank of Am., N.A.*,
No. 3:16-CV-00704, 2016 WL 5929273, at *10 (M.D. Pa.
Aug. 2, 2016) (dismissing RICO claim where "allegedly
fraudulent mortgage and foreclosure on which Plaintiff bases
her RICO claim constitutes a single transaction directed at
a single piece of property affecting only Plaintiff"). Here,
while Plaintiffs vaguely refer to a consortium of businesses
that "deceive[s] targeted groups of people," they reference
only one fraudulent transaction throughout the Complaint and
establish no threat of continued criminal activity. Without
establishing any other racketeering activities outside of their
own allegedly fraudulent mortgage agreement, Plaintiffs'
claim falls short of meeting the RICO requirements. [8]

**\*6** Second, Plaintiffs have not adequately alleged the
existence of a RICO enterprise. An enterprise includes "any
union or group of individuals associated in fact," and "reaches
'a group of persons associated together for a common purpose
of engaging in a course of conduct.' " *Boyle v. United
States*, 556 U.S. 938, 944 (2009) (citing *United States v.
Turkette*, 452 U.S. 576, 580 (1981)). Such an enterprise "is
proved by evidence of an ongoing organization, formal or
informal, and by evidence that the various associates function
as a continuing unit ... separate and apart from the pattern
of activity in which it engages." *Turkette*, 452 U.S. at

583. "[A]n association-in-fact enterprise must have at least
three structural features: a purpose, relationships among those
associated with the enterprise, and longevity sufficient to
permit these associates to pursue the enterprise's purpose."
*Boyle*, 556 U.S. at 946.

Here, Plaintiffs fail to identify specific individuals or parties
associated with an enterprise, the relationships between them,
or how any entity participated in the management, direction,
or operation of the purported enterprise. *See* *Univ. of Md.
at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534,
1539 (3d Cir. 1993); *Alejandro v. Freedom Mortgage Corp.*,
No. 22-900, 2022 WL 3913550, at *3 (E.D. Pa. Aug. 30,
2022) (McHugh, J.). Plaintiffs vaguely allege that Defendant
"created a [c]onsortium of businesses," but do not describe
this consortium in any detail, failing to name parties involved
or describe how it is organized. Compl., ECF 1 at 7. In the
absence of a properly pleaded enterprise, Plaintiffs' RICO
claim necessarily fails.

### B. Plaintiffs' Complaint against Mr. Kobeski must be dismissed for failure to effectuate service.

In addition to failing to state a claim, Plaintiffs' Complaint
against Defendant Justin F. Kobeski must also be dismissed
for failure to effectuate service. *See* Fed. R. Civ. P. 4(m). I
have already provided Plaintiffs with an extension of time to
serve Mr. Kobeski. ECF 17. Because that extension expired
on January 21, 2023, and Plaintiffs have still not provided
proof of service, Federal Rule of Civil Procedure 4(m)
requires me to "dismiss the action without prejudice."

### IV. Conclusion

For the reasons set forth above, Defendants' Motions to
Dismiss are granted. Because Plaintiffs bring counts one
through four of their Complaint pursuant to statutes and
constitutional provisions that do not give rise to private causes
of actions against non-governmental defendants, they will
be dismissed with prejudice. Although counts five and six
are dismissed without prejudice, Plaintiffs are cautioned that
Rule 11(b) of the Federal Rules of Civil Procedure applies
with equal force to *pro se* litigants as well as to lawyers. An
appropriate order follows.

### All Citations

Slip Copy, 2023 WL 2539000

## Footnotes

1     Plaintiffs provide some additional detail in their "Objection to Mnaley, Deas & Kochalski LLC Memorandum,"

ECF 16, but I cannot consider these facts when ruling on Defendants' Motions. *See* *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that courts may only consider "allegations contained in the complaint, exhibits attached to the complaint and matters of public record" in ruling on a motion to dismiss).

2     Wells Fargo responds that it did not become involved with the Lawtons until September 1, 2011, when their original mortgagee assigned the Lawtons' mortgage to Wells Fargo. Indeed, the original mortgage, of which I may take judicial notice as a publicly recorded document, was executed to Mortgage Electronic Registration Systems, Inc. as a nominee for Superior Home Mortgage Corp. *See* *Stone v. JPMorgan Chase Bank, N.A.*, 415 F. Supp. 3d 628, 631 n.1 (E.D. Pa. 2019) (McHugh, J.) (taking notice of a mortgage assignment record); *see also* *Fed. R. Evid. 201(b)* (permitting notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 139 (E.D. Pa. 2012) (Buckwalter, J.) ("On a motion to dismiss, courts take judicial notice of documents which are matters of public record.").

3     I may take judicial notice of the contents of another Court's docket. *Orabi v. Att'y General of the U.S.*, 738 F.3d 535, 537 n.1 (3d Cir. 2014).

4     For example, Wells Fargo is named in Plaintiffs' "statement of claim," but Plaintiffs do not directly attribute the conduct described in counts one through four to Wells Fargo or, for that matter, to any other defendant. Nonetheless, reading the Complaint liberally, I find the allegations within these individual counts are intended to be lodged against Wells Fargo, who, notably, interprets the Complaint that way as well.

5     I add only that the scope of the *Rooker-Feldman* doctrine continues to be in flux, and likely does not apply in a case such as this, where the underlying injury appears to be caused by an allegedly fraudulent mortgage agreement and not the state court's default judgment in the pending foreclosure action. *See* *Vuyanich v. Smithton Borough*, 5 F.4th 379, 385-86 (3d Cir. 2021).

6     Plaintiffs raise a separate "jurisdictional challenge" under the Fifth Amendment, which I address below.

7     To the extent Plaintiffs intended to bring a claim for conversion or civil embezzlement, the claim itself is opaque at best, and it is not this Court's job to articulate a claim on behalf of a pleading party. *See* *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) ("[W]e do not believe it is the proper function of the district court to assume the role of advocate for the pro se litigant."); *Freeman v. Allentown School District*, No. 19-4336, 2019 WL 4805224, at *2 (E.D. Pa. Oct. 1, 2019) (Leeson, Jr., J.) ("[T]he Court should not attempt to rewrite the pleadings to include claims that were never presented, nor must the Court explore exhaustively all potential claims of a *pro se* plaintiff.") (cleaned up).

8     Not only that but, because fraud is the predicate act of their RICO claim, Plaintiffs also must satisfy the heightened pleading standard of *Federal Rule of Civil Procedure 9(b)*, which they have failed to do. *See* *Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002); *Lum*, 361 F.3d at 223–24.

**End of Document**                                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2539000
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Leo W. LAWTON, Jr. et al.

v.

WELLS FARGO BANK, N.A. et al.

CIVIL ACTION NO. 22-3294
|
Signed March 16, 2023

**Attorneys and Law Firms**

Leo W. Lawton, Jr., Lansdowne, PA, Pro Se.

Kimberly J. Lawton, Lansdowne, PA, Pro Se.

Aaron M. Bender, Reed Smith LLP, Princeton, NJ, for Wells Fargo Bank, N.A.

Justin G. Weber, Troutman Peppe Hamilton Sanders LLP, Harrisburg, PA, Samuel D. Harrison, Troutman Pepper Hamilton Sanders LLP, Philadelphia, PA, for UMB Bank.

Meredith Hantske Wooters, Manley Deas Kochalski, LLC, Columbus, OH, for Manley, Deas & Kochalski LLC.

### MEMORANDUM

MCHUGH, United States District Judge

**\*1** In this action, *pro se* Plaintiffs Kimberly Lawton and Leo W. Lawton Jr. assert several claims alleging that their mortgage agreement is fraudulent. Although Plaintiffs sued four defendants, their pleadings include only minimal allegations against one Defendant – Wells Fargo – and no factual allegations against the remaining three. Even under the lenient pleading standards afforded to *pro se* litigants, the Complaint fails to state a claim. As a result, I will grant the Defendants' motions to dismiss.

### I. Relevant Background

Plaintiffs' *pro se* Complaint is extremely sparse.[1] From the minimal context provided in the Complaint, I can discern that Plaintiffs Kimberly Lawton and Leo W. Lawton Jr. represent that they purchased a home from Wells Fargo in Lansdowne, Pennsylvania in 2008.[2] Compl., ECF 1 at 4. According to

Plaintiffs, the deed to that property was conveyed to Kimberly Lawton on June 2, 2008, as a "Warranty Deed ... with no mortgages, liens or conditions." *Id.* at 8. Closing on the house occurred about one month later and, although the mortgage agreement is allegedly dated for that same day, Plaintiffs assert that neither the mortgage agreement nor the deed were presented to them. *Id.* Nonetheless, the conveyance of the deed was insured, and the deed itself was delivered to Ms. Lawton a few months later. *Id.*

According to Plaintiffs, a subsequent title investigation on the property revealed defects in the chain of title. *Id.* Plaintiffs further assert that, because the deed and the mortgage agreement were not presented at settlement and closing for review, the documents "cannot stand with the mortgage agreement." *Id.* Plaintiffs seem to claim that the discrepancy in the timing of the conveyance, the closing/mortgage agreement, and delivery of the deed is evidence of fraud, and that the only other possible explanation is that Ms. Lawton "attempt[ed] to resell the house back to herself." *Id.* As a result, Plaintiffs contend that Wells Fargo is the perpetrator of mortgage fraud and that the mortgage agreement is void. *Id.* at 8-9.

**\*2** A pending state court docket (No. CV-2018-6187 in Delaware County)[3] reveals that Wells Fargo initiated a foreclosure proceeding against Kimberly Lawton in August 2018. After Wells Fargo effectuated service and the Lawtons failed to respond, the court entered an order of default judgment and a writ of execution in mortgage foreclosure. One year later, Ms. Lawton entered an appearance in the action and filed her first petition to postpone the Sheriff's sale. It appears that, in September 2021, UMB Bank was substituted into the action for Wells Fargo, and Wells Fargo was dismissed as a party. Although the date of the Sheriff's sale is not apparent from the state court docket, Ms. Lawton filed an affidavit of truth on September 27, 2022, which was construed as a petition to set aside the sale. According to my review of the docket, as of March 16, 2023, the foreclosure action is still pending.

Plaintiffs filed this Complaint in August 2022, asserting several federal constitutional, criminal, and civil claims. Defendants Wells Fargo, UMB Bank, and Manley, Deas, and Kochalski LLC ("MDK") each filed a Motion to Dismiss. *See* ECF 7, 9, 13. Plaintiffs also sued a fourth Defendant, Justin F. Kobeski, who represented Wells Fargo in the state court foreclosure proceeding. In December 2022, Plaintiffs moved for an extension of time to serve Mr. Kobeski, which I granted.

*See* ECF 15, 17. Plaintiffs have still not provided any evidence of service.

## II. Legal Standard

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III. Discussion

Plaintiffs' central allegation challenges the validity of their mortgage agreement, attaching a great deal of significance to the fact that the agreement was not presented to them at closing. From here, Plaintiffs attempt to argue a host of claims. Unfortunately, their claims are impenetrable and, to the extent that sense can be made of them, no count presents a cognizable claim. I will thus grant Defendants' motions to dismiss. As to the non-moving Defendant, Plaintiffs' claims will be dismissed under Federal Rule of Civil Procedure 4(m) for failure to effectuate service.

### A. Plaintiffs fail to state a claim against Wells Fargo, UMB Bank, and MDK.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although "detailed factual allegations" are not required, Plaintiffs must plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation"; indeed, they must include "factual enhancements" and not just "labels and conclusions" to beat dismissal. *Id.* (cleaned up); *see Fung v. Wells Fargo Bank*, No. 20-1099, 2022 WL 475813, at *4 (D.N.J. Feb. 16, 2022) ("To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible."). Courts hold *pro se* pleadings, however, "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

In this case, even under the more liberal pleading standard afforded to *pro se* litigants, Plaintiffs do not present sufficient factual matter to state a claim for relief. As to UMB Bank and MDK, Plaintiffs fail to assert any factual allegations whatsoever, listing these parties as defendants and then neglecting to mention them again. Plaintiffs' Complaint is thus insufficient and those motions to dismiss will be granted.

*See* *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) ("[P]ro se litigants still must allege sufficient facts in their complaints to support a claim."); *Fantone v. Latini*, 780 F.3d 184, 193 (3d Cir. 2015) (same). And while Plaintiffs do at least name Wells Fargo in their Complaint as a perpetrator of mortgage fraud, their factual allegations remain almost negligible. [4] Moreover, several of Plaintiffs' legal claims provide no cognizable cause of action, likewise warranting dismissal. Having found dismissal of all claims appropriate under Rule 12(b)(6), I will not reach Defendants' remaining arguments. [5]

### 1. Mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, 1344

**\*3** In their first claim under the mail and wire fraud statutes, Plaintiffs assert a "jurisdictional challenge" [6] alleging a right to property along with a "forgery" claim alleging that Defendant (1) stole a consumer's identity for profit, (2) "fraudulent[ly] manipulat[ed]" states courts in Texas and Pennsylvania, and (3) "transport[ed] illegal documents" across state lines. Compl., ECF 1 at 6.

Preliminarily, to the extent that Plaintiffs are "bringing claims pursuant to federal criminal statutes, [they have] failed to state a claim because such statutes do not give rise to civil liability." *Newsuan v. Newsuan*, No. 12-6043, 2012 WL 5431958, at *2 (E.D. Pa. Nov. 7, 2012) (Slomsky, J); *see also* *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."). Neither the federal statutes for mail fraud nor wire fraud, which Plaintiffs cite, nor the statute for forgery, confer a private cause of action unto litigants. *See, e.g., Kenny v. Porrino*, No. 18-2729, 2020 WL 919703, at *3 n.6 (D.N.J. Feb. 26, 2020) (no cause of action under §§ 1341 and 1343); *Brown v. Demchak*, No. 21-1185, 2021 WL 4552964, at *3 (W.D. Pa. Oct. 5, 2021) (no cause of action under § 1344); *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002) (no cause of action for forgery).

Further, even if I construed this claim as one for civil fraud, Plaintiffs cannot meet the heightened pleading standard of Fed. R. Civ. P. 9(b). Rule 9(b) provides that "a party must state with particularity the circumstances constituting fraud or mistake." *Foglia v. Rental Ventures Management LLC*, 754 F.3d 153, 155 (3d Cir. 2014); *see Kaul v. Christie*, 372 F. Supp. 3d 206, 229 (D.N.J. 2019) (finding that *pro se* plaintiffs with fraud claims are "not exempt from meeting the heightened pleading requirements of Rule 9(b)"). As the Third Circuit has explained, a plaintiff alleging fraud must support its allegations "with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where, and how of the events at issue." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (cleaned up); *see Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004) (explaining that Rule 9(b) requires plaintiffs to give defendants notice of the "precise misconduct with which they are charged," including "who made a misrepresentation to whom and the general content of the misrepresentation") (citations omitted). Minimally, plaintiffs must plead: (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his or her damage. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (citations omitted).

Applying the standard set forth in Rule 9(b) – and considering both Plaintiffs' statement of the case and the specific language included in count one – I conclude that Plaintiffs have not pled the elements of fraud with the requisite specificity. Their vague claims of "mortgage fraud," "stealing a consumer's identity," and "transporting illegal documents" do not provide the "who, what, when, where, and how" of these alleged events, and they do not identify a specific misrepresentation of material fact or the person who made it. Plaintiffs' statements regarding the failure to present the deed at closing shed no further light on their allegations, as they neglect to specify the content of a particular misrepresentation made. Because there is simply not enough information for me to piece together the basic facts of a claim, this count must be dismissed.

### 2. Embezzlement in violation of *18 U.S.C. § 31*

**\*4** Plaintiffs next allege that Defendant received money "through deceptive practices and by way of misrepresenting a consumer ... for financial gain." Compl., ECF 1 at 6. They further allege that Defendant "purchas[ed] a home in the name of Kimberly Lawton by falsifying documents." *Id.* Although Plaintiffs cite 18 U.S.C. § 31 for "embezzlement and theft" in support of their claim, there is no such crime in that section of the United States Code. Had Plaintiffs cited the correct criminal statute, there would still be no private cause of action and thus no cognizable claim. *See Boyd v. Wilmington Trust Co.*, 630 F. Supp. 2d 379, 384-85 (D. Del. 2009) (confirming that there is no private cause of action under the criminal statutes for theft and embezzlement). And, even if I interpreted this count as one for fraudulent misrepresentation, there would still be insufficient facts plead under Rule 9(b). [7] This claim is thus dismissed.

### 3. Conspiracy to commit fraud in violation of *18 U.S.C. § 371* and forgery in violation of *18 U.S.C. § 471*

Under this count, Plaintiffs allege that Wells Fargo perpetrated a "conspiracy to commit fraud upon the United States" by using Housing and Urban Development programs, acquiring mortgages under false pretenses, and falsifying documents to close on those properties. Compl., ECF 1 at 6. Plaintiffs also allege a "mis-appropriation [sic] of government funds through FHA programs." *Id.*

Once again, the statutes that Plaintiffs cite are criminal statutes that do not contain private rights of action. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 190 (1994) (refusing to recognize private rights of action "from a criminal prohibition alone"); *Luckett*, 290 F.3d at 497 (no cause of action for forgery); *McCann v. Falato*, No. 14-4869, 2015 WL 6445859, at \*3 (D.N.J. Oct. 23, 2015) (no cause of action under 18 U.S.C. § 371). Moreover, Plaintiffs cite to the federal statute criminalizing counterfeiting, 18 U.S.C. § 471, but bring no allegation of such misconduct. Construing this count as civil fraud will also not save Plaintiffs' claims, as it would still fail under Rule 9(b). Additionally, even if Plaintiffs' claim under the criminal conspiracy statute is construed as one for civil conspiracy, Plaintiffs' claim would not survive.

To plead a civil conspiracy claim, plaintiffs must make "specific factual allegations of combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events." *Hammond v. Creative Fin. Planning Org., Inc.*, 800 F. Supp. 1244, 1249 (E.D. Pa. 1992) (Huyett, J.). Here, Plaintiffs simply do not plead any specifics about an agreement or understanding among Defendants – they do not even name those allegedly involved – and instead make only conclusory allegations of wrongdoing. As a result, Plaintiffs' conspiracy claim is dismissed.

### 4. Denial of due process in violation of the Fifth Amendment

Plaintiffs next raise a claim for violation of due process under the Fifth Amendment. The "jurisdictional challenge" that Plaintiffs assert here is difficult to comprehend but seems to challenge Defendant's standing and its rights to the Lansdowne property. Regardless of how Plaintiffs describe this claim, it is dismissed because, as a private entity, Wells Fargo is not constrained by the Fifth Amendment. *See Nguyen v. U.S. Catholic Conference*, 719 F.2d 52, 54 (3d Cir. 1983) ("The limitations of the fifth amendment restrict only federal government action and not the actions of private entities."). Civil suits for damages under the Fifth Amendment may only be brought against federal officials. *See Davis v. Passman*, 442 U.S. 228, 230, 233 (1979) (finding a cause of action for damages under the Fifth Amendment against federal officials); *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 71, 74 (2001) (limiting *Passman* to suits against individual federal officials).

### 5. Civil rights violations under the Fair Housing Act and Fifth Amendment

**\*5** In count five, Plaintiffs state that they are African Americans who "were targeted before the alleged date of sale July 10, 2008 and used in a scheme to acquire financing through public governmental agencies." Compl., ECF 1 at 6. Further, they aver that Wells Fargo "took advantage of unexpecting minority homeowners." *Id.* Plaintiffs allege that these actions violated their rights under the Fifth Amendment and the Fair Housing Act (FHA). *Id.*

Any Fifth Amendment claim is barred, as discussed above. Further, Plaintiffs have not adequately pleaded an FHA

claim. To establish a violation of the FHA, a plaintiff "can show either discriminatory treatment or discriminatory effect alone, without proof of discriminatory intent." *Doe v. City of Butler, Pa.*, 892 F.2d 315, 323 (3d Cir. 1989) (citations omitted and cleaned up). Here, given the dearth of information regarding the allegedly fraudulent mortgage, it is not clear *how* Defendants discriminated against Plaintiffs. Indeed, Plaintiffs received a mortgage and bought their home without issue. It is not until now, over a decade later, that they raise claims about discriminatory conduct but without specifying the kind of differential or adverse treatment to which they were subject. *See Carter v. Hamilton Affordable Housing, LLC*, No. 09-2399, 2009 WL 3245483, at \*4-5 (D.N.J. Oct. 6, 2009) (requiring, for example, a plaintiff pleading racial discrimination under the Fair Housing Act to show that similarly situated residents of a different race were treated differently). Even though Plaintiffs plead a protected class, I cannot discern without more factual context any (1) intentional discrimination or (2) discriminatory effect. Plaintiffs' FHA claim is therefore dismissed.

### 6. Violations of RICO and the Civil Rights Act

Lastly, Plaintiffs allege violations of RICO and the Civil Rights Act, claiming that Wells Fargo "created a [c]onsortium of businesses" to "corrupt and deceive" minorities benefitting from government programs. Compl., ECF 1 at 7. Further, they state that Wells Fargo used "an array of financial institutions to support their agenda" of orchestrating mortgage fraud. *Id.*

Plaintiffs' civil rights claim fails in part because they do not identify the particular statutory provision that they maintain was violated. *See Wardlaw v. City of Phila.*, No. 21-1942, 2022 WL 717258, at \*6 (E.D. Pa. Mar. 10, 2022). But even if they had, there are insufficient facts pled to make out a civil rights violation.

Additionally, Plaintiffs argue that Wells Fargo violated the RICO Act, which creates criminal and civil liability for any person who:

> uses or invests income derived "from a pattern of racketeering activity" to acquire an interest in or to operate an enterprise engaged in interstate commerce, § 1962(a); who acquires or maintains an interest in or control of such an enterprise "through a pattern of racketeering activity," § 1962(b); who, being employed by or associated with such an enterprise, conducts or participates in the conduct of

its affairs "through a pattern of racketeering activity," § 1962(c); or, finally, who conspires to violate the first three subsections of § 1962, § 1962(d).

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232-33 (1989); *see* 18 U.S.C. § 1962. Under any of the four provisions, Plaintiffs' claims fail.

First, Plaintiffs cannot plausibly allege a "pattern of racketeering activity" because they only reference one purportedly fraudulent transaction. *See* 18 U.S.C.§ 1961(5) (explaining that a "pattern of racketeering activity" requires "at least two acts of racketeering activity" within a ten-year period); *Banks v. Wolk*, 918 F.2d 418, 421 (3d Cir. 1990) ("[N]o defendant can be liable under RICO unless he participated in two or more predicate offenses sufficient to constitute a pattern."). Moreover, "to prove a pattern ... a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *United States v. Bergrin*, 650 F.3d 257, 266-67 (3d Cir. 2011) (citation omitted and cleaned up); *see* *Jung v. Bank of Am., N.A.*, No. 3:16-CV-00704, 2016 WL 5929273, at *10 (M.D. Pa. Aug. 2, 2016) (dismissing RICO claim where "allegedly fraudulent mortgage and foreclosure on which Plaintiff bases her RICO claim constitutes a single transaction directed at a single piece of property affecting only Plaintiff"). Here, while Plaintiffs vaguely refer to a consortium of businesses that "deceive[s] targeted groups of people," they reference only one fraudulent transaction throughout the Complaint and establish no threat of continued criminal activity. Without establishing any other racketeering activities outside of their own allegedly fraudulent mortgage agreement, Plaintiffs' claim falls short of meeting the RICO requirements. [8]

**\*6** Second, Plaintiffs have not adequately alleged the existence of a RICO enterprise. An enterprise includes "any union or group of individuals associated in fact," and "reaches 'a group of persons associated together for a common purpose of engaging in a course of conduct.' " *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citing *United States v. Turkette*, 452 U.S. 576, 580 (1981)). Such an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit ... separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at

583. "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.

Here, Plaintiffs fail to identify specific individuals or parties associated with an enterprise, the relationships between them, or how any entity participated in the management, direction, or operation of the purported enterprise. *See* *Univ. of Md. at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993); *Alejandro v. Freedom Mortgage Corp.*, No. 22-900, 2022 WL 3913550, at *3 (E.D. Pa. Aug. 30, 2022) (McHugh, J.). Plaintiffs vaguely allege that Defendant "created a [c]onsortium of businesses," but do not describe this consortium in any detail, failing to name parties involved or describe how it is organized. Compl., ECF 1 at 7. In the absence of a properly pleaded enterprise, Plaintiffs' RICO claim necessarily fails.

### B. Plaintiffs' Complaint against Mr. Kobeski must be dismissed for failure to effectuate service.

In addition to failing to state a claim, Plaintiffs' Complaint against Defendant Justin F. Kobeski must also be dismissed for failure to effectuate service. *See* Fed. R. Civ. P. 4(m). I have already provided Plaintiffs with an extension of time to serve Mr. Kobeski. ECF 17. Because that extension expired on January 21, 2023, and Plaintiffs have still not provided proof of service, Federal Rule of Civil Procedure 4(m) requires me to "dismiss the action without prejudice."

### IV. Conclusion

For the reasons set forth above, Defendants' Motions to Dismiss are granted. Because Plaintiffs bring counts one through four of their Complaint pursuant to statutes and constitutional provisions that do not give rise to private causes of actions against non-governmental defendants, they will be dismissed with prejudice. Although counts five and six are dismissed without prejudice, Plaintiffs are cautioned that Rule 11(b) of the Federal Rules of Civil Procedure applies with equal force to *pro se* litigants as well as to lawyers. An appropriate order follows.

### All Citations

Slip Copy, 2023 WL 2539000

## Footnotes

1   Plaintiffs provide some additional detail in their "Objection to Mnaley, Deas & Kochalski LLC Memorandum," ECF 16, but I cannot consider these facts when ruling on Defendants' Motions. *See* *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that courts may only consider "allegations contained in the complaint, exhibits attached to the complaint and matters of public record" in ruling on a motion to dismiss).

2   Wells Fargo responds that it did not become involved with the Lawtons until September 1, 2011, when their original mortgagee assigned the Lawtons' mortgage to Wells Fargo. Indeed, the original mortgage, of which I may take judicial notice as a publicly recorded document, was executed to Mortgage Electronic Registration Systems, Inc. as a nominee for Superior Home Mortgage Corp. *See* *Stone v. JPMorgan Chase Bank, N.A.*, 415 F. Supp. 3d 628, 631 n.1 (E.D. Pa. 2019) (McHugh, J.) (taking notice of a mortgage assignment record); *see also* *Fed. R. Evid. 201(b)* (permitting notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 139 (E.D. Pa. 2012) (Buckwalter, J.) ("On a motion to dismiss, courts take judicial notice of documents which are matters of public record.").

3   I may take judicial notice of the contents of another Court's docket. *Orabi v. Att'y General of the U.S.*, 738 F.3d 535, 537 n.1 (3d Cir. 2014).

4   For example, Wells Fargo is named in Plaintiffs' "statement of claim," but Plaintiffs do not directly attribute the conduct described in counts one through four to Wells Fargo or, for that matter, to any other defendant. Nonetheless, reading the Complaint liberally, I find the allegations within these individual counts are intended to be lodged against Wells Fargo, who, notably, interprets the Complaint that way as well.

5   I add only that the scope of the *Rooker-Feldman* doctrine continues to be in flux, and likely does not apply in a case such as this, where the underlying injury appears to be caused by an allegedly fraudulent mortgage agreement and not the state court's default judgment in the pending foreclosure action. *See* *Vuyanich v. Smithton Borough*, 5 F.4th 379, 385-86 (3d Cir. 2021).

6   Plaintiffs raise a separate "jurisdictional challenge" under the Fifth Amendment, which I address below.

7   To the extent Plaintiffs intended to bring a claim for conversion or civil embezzlement, the claim itself is opaque at best, and it is not this Court's job to articulate a claim on behalf of a pleading party. *See* *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) ("[W]e do not believe it is the proper function of the district court to assume the role of advocate for the pro se litigant."); *Freeman v. Allentown School District*, No. 19-4336, 2019 WL 4805224, at *2 (E.D. Pa. Oct. 1, 2019) (Leeson, Jr., J.) ("[T]he Court should not attempt to rewrite the pleadings to include claims that were never presented, nor must the Court explore exhaustively all potential claims of a *pro se* plaintiff.") (cleaned up).

8   Not only that but, because fraud is the predicate act of their RICO claim, Plaintiffs also must satisfy the heightened pleading standard of *Federal Rule of Civil Procedure 9(b)*, which they have failed to do. *See* *Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002); *Lum*, 361 F.3d at 223–24.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 91 of 311

McCann v. Falato, Not Reported in Fed. Supp. (2015)

2015 WL 6445859
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

James MCCANN, Plaintiff,
v.
Deirdre M. FALATO, et al., Defendants.

Civil Action No. 14-4896 (MAS) (TJB)
|
Signed 10/23/2015

**Attorneys and Law Firms**

James McCann, Ortley Beach, NJ, pro se.

Robert R. Fuggi, Fuggi Law Firm, Lynne A. Dunn, Hiering Dupignac Stanzione Dunn & Beck, Anthony Merlino, Township of Toms River, Toms River, NJ, for Defendants.

**MEMORANDUM OPINION**

SHIPP, District Judge

**\*1** Plaintiff James McCann ("Plaintiff" or "McCann"), proceeding pro se, brings suit through his Amended Complaint against Defendants Raymond R. Hoather (President of Fotografixusa Inc.) ("Hoather"); Fotografixusa Inc. ("Fotografixusa"); Fuggi Law Firm, Robert R. Fuggi, Esq., Jr., Ronald Rosa, Esq., Catherine Koslej (as legal secretary of Fuggi Law Firm) (together, "Fuggi Defendants"); Shore Community Bank and its past and present Board of Directors and Officers ("SCB"), Robert T. English (individually and as President and CEO of SCB), Rosanne Citta (individually and as a Board Member) (together, "Bank Defendants"); Mark Callazzo (individually and as an officer of SCB), Callazzo Properties, RMS Title & Appraisal Services (together, "Callazzo Defendants"); Howard Butensky, Esq. ("Butensky Defendant"); The Law Firm of Ostrowitz Law, Alan R. Ostrowitz Esq. (together, "Ostrowitz Defendants"); Mayor Thomas F. Kelaher, and the Township of Toms River (including the entire Town Council and Town Clerk) (together, "Township Defendants") (collectively, "Defendants"). (ECF No. 40.) Fuggi Defendants, Township Defendants, Ostrowitz Defendants, Bank Defendants, and Butensky Defendant (collectively, "Moving Defendants") move to dismiss

Plaintiff's Amended Complaintpursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction or, in the alternative, pursuant to Rule 12(b)(6) for failure to state a claim. (ECF Nos. 41, 42, 43, 45, 49.) Bank Defendants also move to dismiss Plaintiffs Amended Complaint pursuant to Rule 12(b)(2) for lack of personal jurisdiction and Rule 12(b)(5) for failure to serve. (ECF No. 45.) The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons stated below, the Court grants Moving Defendants' motions to dismiss for lack of jurisdiction.

**I.** *Background*

Because McCann's Amended Complaint largely recites the same allegations previously alleged by Hoather against similar defendants in *Hoather v. Fuggi Law Firm, P.C.,* and Hoather in his previous suit incorporated by reference all of McCann's current allegations, the Court will refer the parties to the background previously set forth in that matter. (Op. at 2, *Hoather v. Fuggi Law Firm, P.C.,* No. 14–7629 (D.N.J. July 30, 2015), ECF No. 53.) In short, McCann brings this lawsuit as a shareholder of Fotografixusa seeking loss of earnings due to the malicious prosecution of an action against Hoather as President of Fotografixusa. McCann alleges that Defendants manufactured evidence to support their frivolous claims against Hoather, and as a result, he suffered considerable loss of earnings and loss of income. McCann asserts a wide range of claims, including conspiracy to defraud, manufacturing evidence, violations of N.J.S.A. 2C:21–1a and N.J.S.A. 2C:28–4, malfeasance, false charges, tortious interference, violation of ethics rules, intentional infliction of emotional distress, violation of constitutional right to social security, violation of 18 U.S.C. §§ 371 and 1346, as well as violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. (ECF No. 40.) McCann asserts that jurisdiction properly lies in this Court pursuant to 28 U.S.C. §§ 1331, 1332, and the Entire Controversy Doctrine.

**II.** *Subject Matter Jurisdiction*

**\*2** A motion to dismiss for lack of subject matter jurisdiction is governed by Federal Rule of Civil Procedure 12(b) (1). The party invoking jurisdiction bears the burden of

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 92 of 311

McCann v. Falato, Not Reported in Fed. Supp. (2015)

proof. 🚩 *Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n, Inc.,* 227 F.3d 62, 69 (3d Cir.2000). "A district court can grant a 🔖 Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction based on the legal insufficiency of a claim." 🔖 *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1408 (3d Cir.1991). If the court finds that it lacks subject matter jurisdiction, the court must dismiss the action. 🔖 Fed.R.Civ.P. 12(h)(3).

Generally, if a jurisdictional question is closely related to a case's merits, a court assumes that it has jurisdiction in order to reach the merits on a 🔖 Rule 12(b)(6) motion; the present case, however, falls within an exception to the default rule, and the Court can dismiss the case pursuant to 🔖 Rule 12(b)(1) without reaching the merits. *See Bell v. Hood,* 327 U.S. 678, 682–83 (1946). Though often confused in federal question cases, a 🔖 Rule 12(b)(1) motion should not be misunderstood as a 🔖 Rule 12(b)(6) motion because the standards and burdens for each motion differ drastically. 🔖 *Gould Elecs., Inc. v. United States,* 220 F.3d 169, 178 (3d Cir.2000). *In* 🔖 *Bell v. Hood,* 327 U.S. 678 (1946), the Supreme Court established the default rule for 🔖 Rule 12(b)(1) dismissals in cases where the plaintiff alleges a violation of the Constitution or a federal statute:

> Whether the complaint states a cause of action on which relief could be granted is a question of law and ... it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.

🔖 *Bell,* 327 U.S. at 682. Thus, where a court ultimately finds that a complaint fails to state a claim in such cases, the court must dismiss the claim pursuant to 12(b)(6), *not* 12(b)(1). *See id.* There are, however, two exceptions to this default rule:

a court can dismiss a claim on a 🔖 Rule 12(b)(1) motion if the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction" or is "wholly insubstantial and frivolous." 🔖 *Gould Elecs., Inc.,* 220 F.3d at 178 (quoting 🔖 *Kehr Packages, Inc.,* 926 F.2d at 1409). Here, the Court finds that the instant matter falls within the exception for wholly insubstantial and frivolous claims.

### III. *Analysis*

#### A. Diversity Jurisdiction

McCann asserts that this Court has jurisdiction pursuant to 🔖 28 U.S.C. § 1332 because the aggregate of his claims exceeds the $75,000 threshold. (Am.Compl.10.) "To establish diversity jurisdiction under 🔖 28 U.S.C. § 1332(a), the party asserting jurisdiction must show that there is complete diversity of citizenship among the parties and an amount in controversy exceeding $75,000." *Schneller ex rel. Schneller v. Crozer Chester Med. Ctr.,* 387 F. App'x 289, 292 (3d Cir.2010). A court may properly dismiss a complaint for lack of subject matter jurisdiction in the absence of complete diversity—i.e., where the plaintiff and any defendant are citizens of the same state. McCann states that he is domiciled in New Jersey (Am.Compl.7), and McCann further alleges that all Defendants are located in New Jersey, except Rosa Citta (Am.Compl.7–8). Because Plaintiff and multiple defendants are citizens of New Jersey there is not complete diversity, and this Court does not have diversity jurisdiction over this case.

#### B. Federal Question Jurisdiction and the Entire Controversy Doctrine

**\*3** McCann additionally asserts that this Court has jurisdiction pursuant to 🔖 28 U.S.C. § 1331 and the "Doctrine of the Entire Controversy." (Am.Compl.6.) Under 🔖 28 U.S.C. § 1331, "[f]ederal question jurisdiction arises where federal law creates the cause of action, or where the complaint, on its face, poses a federal question." *Schneller,* 387 F. App'x at 292 (citing 🔖 *Club Comanche, Inc. v. Gov't of V.I.,* 278 F.3d 250, 259 (3d Cir.2002)). Separate and apart from federal question jurisdiction, the entire controversy doctrine is a doctrine of preclusion and distinct from a court's subject matter jurisdiction. *See* 🔖 *Rycoline Prods., Inc. v. C & W Unlimited,* 109 F.3d 883, 886 (3d Cir.1997). Thus, this Court only has subject matter jurisdiction to hear this matter if

Plaintiff has alleged a claim arising under federal law that is not wholly insubstantial or frivolous.

The Court finds that Plaintiffs allegations of violation of his right to social security and violations of 18 U.S.C. §§ 371 and 🚩 1346 are frivolous because none of the statutes cited by McCann support a private civil cause of action. Thus, McCann's only remaining federal claim is his RICO violation claim. This Court previously dismissed a similar RICO claim brought by Hoather because of his failure to plead sufficient facts to demonstrate the predicate act with particularity or a pattern of racketeering activity. (Op. at 7–10, *Hoather,* No. 14–7629.) The Court further denied Hoather leave to amend his complaint because in the voluminous opposition briefs and papers filed in support, Hoather offered no more claims or allegations to set forth a federal claim. Here, McCann's Amended Complaint suffers from similar deficiencies. McCann does not cite to a specific section of RICO that was violated, but only generally alleges that Defendants' conduct of manufacturing evidence was a conspiracy to deceive the district court in the prior lawsuit against Hoather. This allegation is wholly insubstantial to support a RICO claim, and therefore, this Court does not have federal question jurisdiction over this case.

### C. Supplemental Jurisdiction

McCann's remaining claims are based on state law and he asserts that this Court has jurisdiction pursuant to 🚩 28 U.S.C. § 1367. In relevant part, the supplemental jurisdiction statute provides: "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action." 🚩 28 U.S.C. § 1367. "The supplemental jurisdiction statute does not provide federal courts with an independent basis of subject matter jurisdiction." *Griffin v. Twp. of Clark,* No. 09–4853, 2012 WL 4190509, at *2 (D.N.J. Sept. 17, 2012) (citing 🚩 *Storino v. Borough of Point Pleasant Beach,* 322 F.3d 293, 299–300 (3d Cir.2003) ("[A]bsent jurisdiction over the federal claim, the District Court did not have supplemental jurisdiction over ... [the plaintiff's] state law claims"); 🚩 *MCI Telecomms. Corp. v. Teleconcepts, Inc.,* 71 F.3d 1086, 1102 (3d Cir.1995) (holding that district court could not exercise supplemental jurisdiction over state claims because there was no accompanying federal claim "sufficient to confer subject matter jurisdiction on the court")). Because this Court already found that it did not have diversity or federal question jurisdiction, there is no basis upon which this Court may exercise supplemental jurisdiction over the state law claims.

### IV. *Conclusion*

For the reasons set forth above, the Court grants Moving Defendants' motions to dismiss pursuant to 🚩 Rule 12(b)(1) of the Federal Rules of Civil Procedure. An order consistent with this Memorandum Opinion will be entered.

### All Citations

Not Reported in Fed. Supp., 2015 WL 6445859

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 142903
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Justin Robert ALLEN, Plaintiff,
v.
FMR LLC, et al., Defendants.

No. CV-23-00031-PHX-SMM
|
Signed January 10, 2023

**Attorneys and Law Firms**

Justin Robert Allen, Phoenix, AZ, Pro Se.

### ORDER

Stephen M. McNamee, Senior United States District Judge

**\*1** Pending before the Court are Plaintiff's Application to Proceed In Forma Pauperis (Doc. 1) and Complaint (Doc. 1). For the following reasons, the Court will grant Plaintiff's Application to Proceed In Forma Pauperis and exercise its authority pursuant to 28 U.S.C. § 1915(e)(2) to dismiss Plaintiff's Complaint with leave to amend.

### I. Application to Proceed In Forma Pauperis

The Application states that Plaintiff has very little monthly income and that this income is vastly outweighed by his expenses. (Doc. 2) Because the Application, signed under penalty of perjury, indicates that Plaintiff is financially unable to pay the filing fee, the Court will grant Plaintiff's IFP application and screen Plaintiff's Complaint pursuant to 28 U.S.C. § 1915(e)(2).

### II. Screening IFP Complaints Pursuant to 28 U.S.C. § 1915(e)(2)

#### A. Legal Standard

When a party seeks to proceed without paying fees or costs, as Plaintiff does here, a district court is required to "dismiss the case at any time if the court determines" that the "allegation of poverty is untrue" or that the "action or appeal" is "frivolous or malicious," "fails to state a claim on which relief may be granted," or "seeks monetary relief against a defendant

who is immune from such relief." 28 U.S.C. § 1915(e)(2); see also Lopez v. Smith, 203 F.3d 1122, 1126 n.7 (9th Cir. 2000) (noting that § 1915(e) applies to all IFP complaints, not merely those filed by prisoners). Accordingly, "section 1915(e) not only permits but requires a district court to dismiss an in forma pauperis complaint that fails to state a claim." Lopez, 203 F.3d at 1127.

A complaint is frivolous if it is based on a nonexistent legal interest or delusional factual scenario. Neitzke v. Williams, 490 U.S. 319, 327-30 (1989); see also Denton v. Hernandez, 504 U.S. 25, 32-33 (1992) (dismissal is also appropriate when the facts alleged are "clearly baseless," "fanciful," "fantastic," or "delusional"). This Court has "not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." Neitzke, 490 U.S. at 328.

In addition to being nonfrivolous, a pleading must contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). The pleading must "put defendants fairly on notice of the claims against them." McKeever v. Block, 932 F.2d 795, 798 (9th Cir. 1991). While Rule 8 does not demand detailed factual allegations, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

#### B. Analysis

**\*2** The Court finds that Plaintiff's Complaint is frivolous and fails to state a plausible claim.

The Complaint is Frivolous

The Complaint is frivolous and must be dismissed because it is centered around a fantastical and conspiratorial factual scenario. See Neitzke, 490 U.S. at 327-30. The Complaint,

which lists 806 Defendants and seeks $999,999,999,999.99 in damages, is centered around allegations that various Defendants have been operating a "long running scheme" involving various transfers of large sums of money in and out of his Fidelity investment account. The allegations involve conspiracy and bribery relating to every major U.S. bank and phone provider, and state, local, and federal officials, including all members of the Securities and Exchange Commission. Plaintiff alleges that the federal or Arizona state governments have been "acting to make it impossible for someone locate me." (Doc. 1 at 9). Plaintiff also claims that unspecified powerful and famous individuals have been "impersonating," "gangstalking," and "clon[ing]" him.

Because the facts alleged are fantastical and clearly baseless, the Court must dismiss Plaintiff's complaint. See Denton, 504 U.S. at 32-33.

### The Complaint Fails to State a Plausible Claim
Further, despite the many statutes that Plaintiff bring claims under, the Complaint fails to state a claim under which relief may be granted. The Complaint purports to bring a cause of action under 18 U.S.C. § 641, 18 U.S.C. § 471, 18 U.S.C. § 1028, 18 U.S.C. § 1348, and 18 U.S.C. § 1349. (Doc. 1 at 8). However, these are criminal statutes and do not create any private right of action.

The Complaint also requests relief for breach of fiduciary duty under 15 U.S.C. § 80a-35. (Id.) This statute only creates a private right of action for officers, directors, investment advisers, principal underwriters, or depositors of a registered investment company. 15 U.S.C. § 80a-35(a). Because Plaintiff has not alleged that he has any of these roles with a registered investment company, he may not bring a claim under this statute.

Plaintiff also bring a claim under 41 U.S.C. § 6503. (Id.) However, this statute pertains to situations where a party breaches a contract it made with the United States under 41 U.S.C. § 6502, "for the manufacture or furnishing of materials, supplies, articles, or equipment, in an mount exceeding $10,000 ...." The statute provides the United States with remedies for when such a contract is breached by a nongovernmental entity or individual. As such, the statute does not provide Plaintiff with a cause of action to sue Defendants.

On its cover page, the Complaint lists 29 U.S.C. § 1109. (Doc. 1 at 1). This statute creates liability for fiduciaries under the Employee Retirement Income Security Act (ERISA). The Complaint, however, makes no mention of ERISA and the Court is unable to see how this statute relates to Plaintiff's allegations. The cover page also lists 15 U.S.C. § 78o, which allows anyone affected by an order, rule, or regulation issued by the Administrator of the Federal Energy Administration to petition the Administrator for redress. Again, the Court is unable to draw a connection between the facts alleged and this statute.

*3 The Complaint alleges violations of 42 U.S.C. § 423, without offering any further detail. (Id.) However, this statute, which delineates social security eligibility and payments, does not provide a cause of action or otherwise appear to have any relation to Plaintiff's factual allegations. Similarly, Plaintiff alleges a violation of 31 U.S.C. § 5311, which does not create a cause of action. (Id.)

The Complaint alleges a violation of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78DD-1, et seq. However, Plaintiff fails to explain how his factual allegations bear any relation to this Act. The Complaint does not reference any foreign official or political party.

In sum, Plaintiff has failed to show that he is entitled to relief under any of the statutes that he has brought claims under.

Accordingly,

**IT IS HEREBY ORDERED granting** Plaintiff's Application to Proceed In Forma Pauperis. (Doc. 2).

**IT IS FURTHER ORDERED dismissing without prejudice** Plaintiff's Complaint (Doc. 1) as frivolous and for failure to state a plausible claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2).

**IT IS FURTHER ORDERED** that Plaintiff may file an amended complaint on or before February 7, 2023. Failure to file an amended complaint shall result in immediate dismissal of this action.

**All Citations**

Slip Copy, 2023 WL 142903

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 18492546
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Orlando Division.

Robert Louis ISAACS, Plaintiff,
v.
STEVEN ALLEN ISAACS, Estate of Albert
Isaacs and Cars Asset Group, LLC, Defendants.

Case No: 6:21-cv-1912-PGB-LHP
|
Signed October 27, 2022.

**Attorneys and Law Firms**

Robert Louis Isaacs, Cape Canaveral, FL, Pro Se.

Spencer Mahar Gledhill, Fassett, Anthony & Taylor, PA, Orlando, FL, for Defendants.

**REPORT AND RECOMMENDATION**

LESLIE HOFFMAN PRICE, UNITED STATES MAGISTRATE JUDGE

**\*1 TO THE UNITED STATES DISTRICT COURT:**
This cause came on for consideration without oral argument on the following motions filed herein:

> **MOTION: DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT AND MOTION FOR MORE DEFINITE STATEMENT (Doc. No. 23)**

> **FILED: March 4, 2022**

> **THEREON** it is **RECOMMENDED** that the motion be **DENIED WITHOUT PREJUDICE in part and GRANTED in part.**

> **MOTION: MOTION TO DISMISS DEFENDANTS' MOTION TO DISMISS AND PROVIDE A MORE DEFINITE STATEMENT (Doc. No. 38)**

> **FILED: April 21, 2022**

> **THEREON** it is **RECOMMENDED** that the motion be **DENIED AS MOOT.**

**I. INTRODUCTION**
On November 15, 2021, Plaintiff Robert Louis Isaacs, appearing *pro se*, filed the above-styled case on behalf of himself and CARS Asset Partnership, Ltd., against Defendants Steven Allen Isaacs, the Estate of Albert Isaacs, and CARS Asset Group, LLC. Doc. No. 1. On March 3, 2022, with leave of Court, Plaintiff filed an amended complaint, this time on behalf of himself only and adding CARS Asset Partnership, Ltd., as a Defendant, along with Steven Allen Isaacs, the Estate of Albert Isaacs, and CARS Asset Group, LLC. Doc. No. 22. The amended complaint is the operative pleading in this case.

The amended complaint is confusing at best. It is 84 pages in length and consists of 157 numbered paragraphs, with an additional 86 pages of attachments. Doc. No. 22; Doc. No. 22-1. It appears to center around facts related to the conversion of CARS Asset Partnership, Ltd. to CARS Asset Group, LLC and the disposition of Albert Isaacs' Estate. As listed in the amended complaint, Plaintiff alleges nine causes of action: (i) "Count 1: Albert Isaacs violation of UPA and FRULPA' claiming to live by all the laws of partnerships under perjury risk and oath', on exhibit FRE 902 compliant;" (ii) "Count 2: exploitation of a disabled adult;" (iii) "Count 3: Violation of 🏳 18 U.S. Code 641 Illegal conversation of public money, property, or records;" (iv) "Count 4: Improper use of Florida Statute Law 731.103(3);" (v) "Count 5: Ltd, formation failure from inception opening day one (1) per The Companies Act of 2013 section 149;" (vi) "Count 6: Albert Isaacs-General Partner is bound by the Partnership by the General partner's wrongful acts;" (vii) "Count 7: fs 620.8404 2(a)2(a); General Standards of partner's conduct;" (viii) "Count 8: statute of limitations – divested of ones property by wrongful procedures of predecased [sic] defamation US Code 28 US Code 4101;" and (ix) "Count 9: violation of windup violation of the entire Florida Statute section by all defendants." Doc. No. 22, at ¶¶ 85-131. Plaintiff appears to ask for both declaratory and injunctive relief, as well as monetary relief and prejudgment interest, although the precise amount is unclear. *Id.*, at ¶¶ 143-55. [1]

Two motions have been referred to the undersigned for the issuance of a report and recommendation. First, Defendants Steven Allen Isaacs and Cars Asset Group, LLC's (collectively "Defendants") [2] motion to dismiss the amended complaint or in the alternative for more definite statement,

pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 12(e). Doc. No. 23. Second, Plaintiff's motion to dismiss Defendants' motion to dismiss, Doc. No. 38, which the undersigned interprets as a response to Defendants' motion to dismiss. *See id.*, at 8 ("Plaintiff serves response to the defendant's dismissal allegations by number."). [3]

**\*2** In their motion, Defendants argue that Plaintiff's amended complaint should be dismissed for lack of subject matter jurisdiction (both federal question and diversity of citizenship); [4] and that Plaintiff's claims are barred by the *Rooker-Feldman* doctrine. [5] Doc. No. 23. Defendants further argue that Plaintiff's claims are time-barred under the applicable statutes of limitations, and that the amended complaint fails to state a cause of action. *Id.* Alternatively, Defendants move pursuant to Federal Rule of Civil Procedure 12(e) for a more definite statement. *Id.* Plaintiff opposes dismissal in his response. Doc. No. 38.

Defendants' motion is now ripe for consideration. Upon review, the undersigned finds that Plaintiff's amended complaint constitutes an impermissible shotgun pleading, which makes it both impossible to understand the claims asserted against any of the Defendants and impossible to determine whether subject matter jurisdiction exists. Thus, as discussed below, the undersigned will respectfully recommend that the Court deny without prejudice Defendants' motion to dismiss on the substantive grounds raised under Rules 12(b)(1) and 12(b)(6), but grant the motion as to the alternative request for repleader under Rule 12(e). [6] The undersigned will further recommend that the Court dismiss the amended complaint as a shotgun pleading, and permit Plaintiff leave to file a second amended complaint that both complies with the dictates of Federal Rules of Civil Procedure 8 and 10 and sufficiently alleges subject matter jurisdiction.

## II. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so as to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Additionally, "[a] party must state its claims ... in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). Although a court

must accept as true well pleaded allegations, it is not bound to accept a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For purposes of this analysis, exhibits attached to the complaint are "part of the pleading for all purposes." Fed. R. Civ. P. 10(c); *see also Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) ("[D]ocuments attached to a complaint or incorporated in the complaint by reference can generally be considered by a federal court in ruling on a motion to dismiss under Rule 12(b)(6).").

"A complaint that fails to comply with Rules 8 and 10 may be classified as a 'shotgun pleading.' " *Luft v. Citigroup Glob. Mkts. Realty Corp.*, 620 F. App'x 702, 704 (11th Cir. 2015). There are four basic categories of shotgun pleadings: 1) those in which "each count adopts the allegations of all preceding counts;" 2) those that do not re-allege all preceding counts but are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action;" 3) those that do not separate each cause of action or claim for relief into a different count; and 4) those that assert multiple claims against multiple defendants without specifying which applies to which. *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015). "The unifying characteristic of all types of shotgun pleadings is that they fail to ... give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323. *See also Arrington v. Green*, 757 F. App'x 796, 797 (11th Cir. 2018) ("We construe *pro se* pleadings liberally, holding them to a less stringent standard than those drafted by attorneys. Nevertheless, we 'have little tolerance for shotgun pleadings.' ") (citing *Hughes v. Lott*, 350 F.3d 1157, 1160 (11th Cir. 2003), and quoting *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018)).

**\*3** When faced with a shotgun pleading, the proper course is to move for repleader under Rule 12(e). *See Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996) ("Under the Federal Rules of Civil Procedure, a defendant faced with a [shotgun] complaint such as Anderson's is not expected to frame a responsive pleading. Rather, the defendant is expected to move the court, pursuant to Rule 12(e), to require the plaintiff to file a more definite statement."); *Dibbs v. Hillsborough Cty., FL*, No. 8:12-

cv-2851-T-23TGW, 2013 WL 12367008, at *2 n.5 (M.D. Fla. Oct. 30, 2013) ("The preferred response to a shotgun pleading is a 🔖 Rule 12(e) motion."). Similarly, a court faced with a shotgun pleading has the inherent authority to *sua sponte* demand repleader of such complaints pursuant to 🔖 Rule 12(e). *See* 🔖 *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1275 (11th Cir. 2006) ("We also remind district courts of their supervisory obligation to *sua sponte* order repleading pursuant to 🔖 Federal Rule of Civil Procedure 12(e) when a shotgun complaint fails to link adequately a cause of action to its factual predicates."); 🔖 *Anderson*, 77 F.3d at 366 (stating that defendant is "expected" to move the court for a more definite statement in response to a shotgun pleading and, failing that, the district court should *sua sponte* strike a shotgun complaint and require plaintiff to make a more definite statement); 🔖 *Rehberg v. Paulk*, No. 1:07-CV-22 (WLS), 2010 WL 11575155, at *3 (M.D. Ga. Dec. 13, 2010) (noting shotgun complaint can be stricken *sua sponte* under 🔖 Rule 12(e) but addressing Defendants' motion under 🔖 Rule 12(e) instead). *See also Hewlett Packard Enterprise Company v. Digicom Technology, LLC*, No. 6:18-cv-1847-Orl-40GJK, 2018 WL 7412892, at *1 (M.D. Fla. Nov. 1, 2018) (noting that "[s]hotgun pleadings are routinely dismissed *sua sponte* for violation of Federal Rules of Civil Procedure 8(a)(2) and 10(b).").

A *pro se* complaint should be construed leniently, but a court does not have "license ... to rewrite an otherwise deficient pleading [by a *pro se* litigant] in order to sustain an action." 🚩 *GJR Invs. v. Cnty. of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998), *overruled on other grounds by* 🔖 *Iqbal*, 556 U.S. 662. *See also* 🔖 *Gilmore v. Hodges*, 738 F.3d 266, 281 (11th Cir. 2013) ("[L]iberal construction is not the same thing as wholesale redrafting."). *Pro se* parties must comply with the minimum pleading standards set forth in the Federal Rules of Civil Procedure and the Local Rules. *Nawab v. LVNV Funding LLC*, No. 5:12-cv-129-Oc-10PRL, 2012 WL 12918283, at *1 (M.D. Fla. Nov. 19, 2012).

## III. ANALYSIS

As noted above, Plaintiff's amended complaint is overly lengthy, and while Plaintiff presents his facts in numbered paragraphs, they remain confusing, combine the recitation of various statutes and regulations with factual allegations, and

are not presented in any sort of chronological or other logical fashion. Simply put, it is impossible for the undersigned – and in turn Defendants – to ascertain the factual or legal basis for any of the claims Plaintiff purports to assert.

Accordingly, the undersigned finds that the amended complaint constitutes the second type of shotgun pleading in that the amended complaint is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *See* 🔖 *Weiland*, 792 F.3d at 1321–22. For example, the amended complaint begins with forty (40) pages of facts that are not obviously connected to any particular cause of action, and Plaintiff does not reference any of these facts in any of his nine claims for relief. Doc. No. 22, at 41–75. And for several claims, Plaintiff recites at length various statutes, regulations, and legal concepts, without any connection to any facts or any Defendants. *Id.*, at 43–52, 61–72.

The amended complaint also constitutes the fourth type of shotgun pleading, in that Plaintiff does not specify which of his nine alleged counts are against which Defendants. For example, Count I lists "Albert Isaacs" in the caption, but then discusses the other Defendants without specifying which acts are allegedly performed by which Defendant. Doc. No. 22, at 41–52. Count VII at various points names all Defendants, without tying them to any specific acts. *Id.*, at 60. And for several of the other counts, Plaintiff merely references "Defendants" without any specificity, or does not identify any Defendant whatsoever. *Id.*, at 53–54 (Count II); 57 (Count V); 61-72 (Counts VIII-IX). *See* 🔖 *Weiland*, 792 F.3d at 1322–23, n.14 (listing Eleventh Circuit cases addressing pleadings that assert multiple claims against multiple defendants without specifying which applies to which).

 **\*4** In sum, while Plaintiff has attempted to list his allegations in numbered paragraphs and used headings, the organization of his amended complaint prevents a reader from knowing which allegations support which claims against which Defendants. Thus, at present, the undersigned is unable to determine whether the amended complaint in fact contains any claims for relief. The amended complaint clearly does not contain a "short and plain statement of the claim showing the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so as to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]" 🔖 *Twombly*, 550 U.S. at 555.

Because the undersigned recommends dismissal of the amended complaint as a shotgun pleading, the undersigned will further recommend that dismissal on the substantive grounds listed in Defendants' motion to dismiss pursuant to 🔖 Rule 12(b)(6) (Doc. No. 23) is not warranted at this time. *See* 🔖 *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (refusing to "decide whether some of [plaintiff's] claims were subject to dismissal under 🔖 Rule 12(b)(6), leaving for another day a decision about other claims following repleader on remand," because such "[p]iecemeal adjudication ... does not promote judicial efficiency."); *Ally v. Hous. Auth. of City of Orlando, Fla.*, No. 6:20-cv-1518-WWB-LRH, 2021 WL 2446760, at *4 & n.5 (M.D. Fla. Apr. 8, 2021), *report and recommendation adopted*, 2021 WL 2446712 (M.D. Fla. May 4, 2021) (finding 🔖 Rule 12(b)(6) arguments premature and declining to address them when the shotgun complaint was due to be repleaded (citing 🔖 *Magluta*, 256 F.3d at 1284)); *Alvarez v. Lakeland Area Mass Transit Dist.*, No. 8:19-cv-1044-T-33SPF, 2019 WL 2868943, at *3 (M.D. Fla. July 3, 2019) ("Because the [Amended] Complaint is a shotgun complaint, repleader is necessary and the Court need not delve into the merits of the claims at this juncture." (quoting *Madak v. Nocco*, No. 8:18-cv-2665-T-33AEP, 2018 WL 6472337, at *3 (M.D. Fla. Dec. 10, 2018))).

For this same reason, the undersigned recommends that the Court decline to address Defendants' subject matter jurisdiction challenges to the amended complaint under 🔖 Fed. R. Civ. P. 12(b)(1). Given the shotgun nature of the amended complaint, the undersigned is simply unable to ascertain what, if any, federal statutes may provide jurisdiction, nor is the undersigned able to ascertain the citizenship of each of the named parties. General citations to federal statutes and/or constitutional amendments, without tying such legal authority to any specific cause of action or factual allegations, is insufficient to establish jurisdiction under 28 U.S.C. § 1331,[7] and Plaintiff wholly fails to assert any allegations concerning any party's citizenship for purposes of establishing jurisdiction under 🔖 28 U.S.C. § 1332.[8] However, in the event the Court provides Plaintiff with an opportunity to file a second amended complaint, Plaintiff should be directed to assert allegations sufficient to establish subject matter jurisdiction under either 28 U.S.C. §§ 1331 or 🔖 1332.

**\*5** Although Plaintiff previously filed an amended complaint, this is the first time that a Court has addressed the sufficiency of Plaintiff's allegations. And because Plaintiff's complaint constitutes a shotgun pleading, dismissal of the complaint, with an opportunity to replead, is appropriate. *See, e.g., Ally*, 2021 WL 2446760, at *4 (granting in part motion to dismiss and striking *pro se* complaint as second type of shotgun pleading with leave to replead); *Pyatt v. Gimenez*, No. 1:20-CV-20827, 2020 WL 4003495, at *5 (S.D. Fla. July 15, 2020) (dismissing complaint with leave to replead where it "suffer[ed] from the second and fourth 'sins' of asserting multiple claims against multiple defendants without specifying which of the defendants is responsible for which acts or omissions and of alleging conclusory, vague, and immaterial facts not obviously connected to any particular cause of action."). *See also* 🔖 *Cramer v. Florida*, 117 F.3d 1258, 1263 (11th Cir. 1997) ("[W]e note that the district court, acting on its own initiative, should have stricken [the shotgun pleading] and instructed counsel to replead their cases ....").

Should Plaintiff file an amended complaint, he is cautioned that he must include factual allegations stating a plausible claim for relief, which requires him to "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🔖 *Iqbal*, 556 U.S. at 678 (citations omitted). Therefore, in an amended complaint, Plaintiff must allege clearly the legal basis of the cause of action, whether a constitutional provision, treaty, statute, or common law. Plaintiff must name as defendants only those persons who are responsible for the alleged violations. He must allege in the body of the amended complaint, under a section entitled "Statement of Facts," how each named defendant participated in the activity that allegedly violated his rights. Plaintiff must allege some causal connection between each defendant named and the injury he allegedly sustained. *See* Fed. R. Civ. P. 8; 10. One generally cannot be held liable for the actions and/or omissions of others, but can only be held responsible if he or she participated in the deprivation of a person's rights or directed such action and/or omission that resulted in such deprivation. Plaintiff must also separately allege each cause of action in separate counts. Plaintiff must specifically allege the harm or injury cause by the actions and/or omissions of the defendant(s) and the relief sought. And finally, as noted above, Plaintiff must assert the basis for this Court's subject matter jurisdiction over the case, either under 28 U.S.C. § 1331 or 🔖 28 U.S.C. § 1332.

Because Plaintiff is currently proceeding without a lawyer, I direct his attention to the Court's website, http://www.flmd.uscourts.gov. On the Court's homepage, Plaintiff can find basic information and resources for parties who are proceeding without a lawyer in a civil case by clicking on the "For Litigants" tab and then clicking on "Litigants without Lawyers."

## IV. RECOMMENDATION

For the reasons stated herein, **I RESPECTFULLY RECOMMEND** that the Court:

1. **DISMISS** the amended complaint (Doc. No. 22) without prejudice as a shotgun pleading;

2. **PERMIT** Plaintiff to file an amended complaint, within a time established by the Court;

3. **DENY WITHOUT PREJUDICE** Defendants' Motion to Dismiss (Doc. No. 23) as it relates to their claims under Rules 12(b)(1) and 12(b)(6), and **GRANT** Defendants' alternative request for a more definite statement under Rule 12(e); and

4. **DENY AS MOOT** Plaintiff's Motion to Dismiss Defendants' Motion to Dismiss (Doc. No. 38), to the extent the Court finds that Plaintiff is requesting any form of affirmative relief in this filing.

**DONE** and **ORDERED** in Orlando, Florida on October 27, 2022.

## All Citations

Slip Copy, 2022 WL 18492546

---

## Footnotes

1       For example, at points Plaintiff lists $112 million, $4 million, and then states he is seeking damages "in excess of $10,000.00." Doc. No. 22, at ¶¶ 146, 154-55.

2       On May 10, 2022, the Court dismissed without prejudice and terminated as a party Defendant Cars Asset Partnership, Ltd. Doc. No. 44. The Estate of Albert Isaacs has not, to date, answered or otherwise responded to the amended complaint, nor has the Estate of Albert Isaacs joined in the presently pending motion to dismiss. However, it is unclear from a review of the docket whether the Estate of Albert Isaacs has been properly served. *See* Doc. No. 23, at 2, n.1.

3       Despite prior guidance from the undersigned, Plaintiff continues to title his responses to Defendants' motions as motions to dismiss. *See, e.g.*, Doc. Nos. 25, 27, 30-31, 38. Upon review, the undersigned will treat Plaintiff's most recent filling (Doc. No. 38) as a response to Defendants' motion to dismiss. However, to the extent that Plaintiff's filing can be construed as a motion requesting affirmative relief, the undersigned will recommend that the motion be denied as moot.

4       Defendants do not challenge the amount in controversy. *See* Doc. No. 23, at 6-7.

5       *See* *Rooker v. Fidelity Tr. Co.*, 263 U.S. 413 (1923), and *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

6       Defendants' alternative argument for repleader under Rule 12(e) is perfunctory at best; they do not specifically argue shotgun pleading, nor do they cite to any legal authority, but do recognize that the pleading is "unnecessarily lengthy, repetitive, and nonsensical [and that] [m]ost of the individually numbered paragraphs include confusing statements[ ]." Doc. No. 23, at 23–24. Despite the perfunctory nature of this

argument, given the Court's obligation to *sua sponte* dismiss shotgun pleadings and order repleader, the undersigned finds Defendants' alternative argument well taken.

7    The undersigned also notes that several of the federal statutes Plaintiff references do not provide private causes of action. *See, e.g., Pompura v. Paxton*, No. A-16-CV-1099-RP-ML, 2016 WL 11586260, at *3 (W.D. Tex. Sept. 30, 2016) (finding that 🚩18 U.S.C. § 641 does not provide for a private right of action and collecting cases); *Keyter v. Bush*, No. 08-97, 2008 WL 613129 (D. Del. Mar. 5, 2008) (no private right of action under 18 U.S.C. § 2384); *Zajac v. Clark*, No. 2:13-cv-714-FtM-29DNF, 2015 WL 179333, at *8 (M.D. Fla. Jan. 14, 2015) (there is no private right of action under 18 U.S.C. §§ 1621 and 1622); *McArthur v. C-Town Super Market*, No. 3:21-cv-972 (SRU), 2022 WL 2981573, at *5 (D. Conn. July 28, 2022) (citing Rouhi v. Kettler, No. 19-3052-SAG, 2020 WL 3451871, at *3 (D. Md. June 24, 2020) (10 U.S.C. § 921 does not provide for a private right of action); *Thomas v. Franklin*, No. 8:19-cv-179-T-33TGW, 2019 WL 1281174, at *2 (M.D. Fla. Mar. 20, 2019) (finding no private right of action under 28 U.S.C. § 4101).

8    For diversity jurisdiction purposes under 🚩28 U.S.C. § 1332, an individual is a citizen of the state in which he or she is domiciled, which is the state where the individual maintains his or her "true, fixed, and permanent home." *McCormick v. Aderholt*, 293 F.3d 1254, 1257–58 (11th Cir. 2002). A corporation, on the other hand, is a citizen of the state in which it is incorporated and the state in which the corporation's principal place of business is located. 🚩28 U.S.C. § 1332(c)(1). An unincorporated business entity, such as a partnership or limited liability company, is a citizen of every state in which each of its individual members are citizens. *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   6

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 103 of 311

Pompura v. Paxton, Not Reported in Fed. Supp. (2016)

2016 WL 11586260
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, Austin Division.

Shane M. POMPURA, Plaintiff,

v.

Warren K. PAXTON, Defendant.

A-16-CV-1099-RP-ML
|
Signed 09/30/2016

**Attorneys and Law Firms**

Shane M. Pompura, Spring, TX, pro se.

**ORDER ON *IN FORMA PAUPERIS* STATUS
AND REPORT AND RECOMMENDATION
ON THE MERITS OF THE CLAIMS**

MARK LANE, UNITED STATES MAGISTRATE JUDGE

**\*1**  TO THE HONORABLE ROBERT PITMAN UNITED
STATES DISTRICT JUDGE:

The Magistrate Court submits this Report and
Recommendation to the United States District Court pursuant
to 28 U.S.C. § 636(b) and Rule 1 of Appendix C of the
Local Court Rules of the United States District Court for the
Western District of Texas, Local Rules for the Assignment of
Duties to United States Magistrate Judges.

Before the court is Plaintiff's Application to Proceed *In Forma
Pauperis* (Dkt. #2). Because Plaintiff is requesting permission
to proceed *in forma pauperis*, this court must review and make
a recommendation on the merits of Plaintiff's claims pursuant
to 28 U.S.C. § 1915(e).

**I. REQUEST TO PROCEED *IN FORMA PAUPERIS***
The court has reviewed Plaintiff's financial affidavit and
determined he is indigent and should be granted leave to
proceed *in forma pauperis*. Accordingly, the Court hereby
**GRANTS** Plaintiff's request for *in forma pauperis* status. The
Clerk of the Court shall file the complaint without payment
of fees or costs or giving security therefor pursuant to 28
U.S.C. § 1915(a). This indigent status is granted subject to

a later determination the action should be dismissed if the
allegation of poverty is untrue or the action is found frivolous
or malicious pursuant to 28 U.S.C. § 1915(e). Plaintiff is
further advised, although he has been granted leave to proceed
*in forma pauperis*, a court may, in its discretion, impose costs
of court at the conclusion of this lawsuit, as in other cases.

*Moore v. McDonald*, 30 F.3d 616, 621 (5th Cir. 1994).

As stated below, this court has made a § 1915(e) review
of the claims made in this complaint and is recommending
Plaintiff's claims be dismissed without prejudice under 28
U.S.C. § 1915(e). Therefore, service upon Defendant should
be withheld pending the District Court's review of the
recommendations made in this Report. If the District Court
declines to adopt the recommendations, then service should
be issued at that time upon Defendant.

**II. REVIEW OF THE MERITS OF THE CLAIM**

**A. Factual Background**

Plaintiff Shane M. Pompura brings this case against the
Attorney General of Texas, Warren K. Paxton. Plaintiff claims
federal question jurisdiction exists and when asked to list the
specific federal statutes, federal treaties, or Constitutional
provisions at issue, Plaintiff answers "theft; fraud; duties of
Warren K. Paxton for non performance; 18 U.S.C. 641, U.S.
Code, 18 U.S.C. 653; U.S. Code Section 653." Dkt. #1 at 3.

Plaintiff claims there is over $ 75,000 in controversy because

> Attorney compensation for non
> performance of Attorney General and
> his duties, loss of work from legal
> proceedings, calculation of income
> falsely represented with attorney
> general's knowledge/never corrected,
> documents from court to attorney
> general not legal/attorney general
> accepted false claims/documents,
> attorney general has been obtaining
> interest from deposits of support and
> utilizing for his best interest.

Dkt. #1 at 4.

Plaintiff contends that the events giving rise to his claim began on or about August 2011. Dkt. #1 at 4. Plaintiff asserts the following facts underlie his claim: "Attorney General has not performed sworn duties. Attorney General accepts falsified income and documents. Attorney General's office holds deposits and utilizes interest of the children of Texas for other purposes." Dkt. #1 at 5.

**\*2** To describe his injury, Plaintiff claims,

> My children and I have been stolen from for 5 plus years by this division of state. The fraud and theft that we have been victims of by the attorney general, will never recover the years in court fighting for monies due/attorney general's duty and to be stolen from as well as all families involved with this system in Texas.

Dkt. #1 at 5. Plaintiff seeks $ 750,000,000 in relief and that

> the state of Texas to restructure the attorney general/child support division and due its duties as it is built for. I am due damages for the known fraud of income documents accepted, lack of response from attorney general for amounts owed to my children, the theft of the deposits and lengths of time to get support once taken, the corruption from the division to local courts and all fraud that is accepted that has taken from my children.

Dkt. #1 at 5.

### B. Standard of Review

Because Plaintiff has been granted leave to proceed *in forma pauperis*, the court is required by statute to review his

Complaint. Section 1915(e)(2) provides in relevant part that "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2). Pro se complaints are liberally construed in favor of the plaintiff. *Haines v. Kerner*, 404 U.S. 519, 20–21 (1972). However, the petitioner's *pro se* status does not offer him an "impenetrable shield, for one acting pro se has no license to harass others, clog the judicial machinery with meritless litigation, and abuse already overloaded court dockets." *Farguson v. MBank Houston N.A.*, 808 F.2d 358, 359 (5th Cir. 1986).

A complaint is frivolous, if it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325, (1989); *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997). A claim lacks an arguable basis in law when it is "based on an indisputably meritless legal theory." *Neitzke*, 490 U.S. at 327. A claim lacks an arguable basis in fact when it describes "fantastic or delusional scenarios." *Id.* at 327–28.

Federal question jurisdiction, exists if a case "arises under the Constitution, treaties or laws of the United States." 28 U.S.C. § 1331. The complaint must establish that (1) federal law creates the cause of action, or (2) federal law is a necessary element of one of the well-pleaded claims. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808-09 (1988).

### C. Discussion

Although Plaintiff claims the court can hear his claims under federal question jurisdiction, no federal question is apparent from Plaintiff's description of his claims. Generic allegations of "theft," "fraud," and any failure of Defendant Paxton to perform his duties related to Plaintiff's child support payments are not federal causes of action. Plaintiff also claims federal jurisdiction based on 18 U.S.C. §§ 641 and 653, but these are statutes concerning property of the United States and a "disbursing officer of the United States, or any department or agency thereof." The Texas Attorney General is not an officer of the United States, and any child support payments are not

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 105 of 311

Pompura v. Paxton, Not Reported in Fed. Supp. (2016)

property of the United States. Therefore, 🚩18 U.S.C. §§ 641 and 653 are not implicated by the alleged facts.

**\*3**  Moreover, 🚩18 U.S.C. §§ 641 and 653 are criminal statutes. Federal courts have repeatedly held that violations of criminal statutes do not give rise to a private right of action. *See, e.g. Ivey v. Nat'l Treasury Employee's Union*, 2007 WL 915229 at \*5 (D.D.C. Mar. 27, 2007) (no private cause of action under 🚩18 U.S.C. §§ 1001 & 1621); *Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 807 (D. Utah 1988) (same as to 18 U.S.C. § 1505); *Weiland v. Byrne*, 392 F. Supp. 21, 22 (N.D. Ill. 1975) (same as to 18 U.S.C. §§ 1505 & 1621); 🚩*Cok v. Cosentino*, 876 F.2d 1, 2 (1st Cir. 1989) (no private cause of action under 🚩18 U.S.C. § 241); *Risley v. Hawk*, 918 F. Supp. 18, 21 (D.D.C. 1996) (same); 🚩*Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994) (same as to 18 U.S.C. § 242); 🚩*Dugar v. Coughlin*, 613 F. Supp. 849, 852 (S.D.N.Y. 1985) (no private cause of action under 🚩sections 241, 🚩241, and 🚩245); *Rockefeller v. U.S. Court of Appeals Office for Tenth Circuit Judges*, 248 F. Supp. 2d 17, 23 (D.C. 2003) (no private right of action under 18 U.S.C. § 371). More specifically, courts have held there is no private right of action under 🚩18 U.S.C. § 641, *see, e.g., Hill v. Colvin*, 2016 WL 727177 (M.D.N.C. Feb. 23, 2016) (citing cases); *Perez v. Law Offices of D. Clunk, Co. L.P.A.*, 2015 WL 4430350 (N.D. Ohio July 20, 2015) (citing cases), or 18 U.S.C. § 653, 🚩*Cooney v. Cal. Pub. Utils. Comm'n*, 2014 WL 4590040 (N.D. Cal. Sept. 15, 2014). Plaintiff has failed to demonstrate that any of the asserted criminal statutes provide a private cause of action.

Accordingly, this case does not arise under the Constitution, treaties, or laws of the United States, and the court is without jurisdiction to hear this case.

## III. ORDER AND RECOMMENDATIONS
The Magistrate Court hereby **GRANTS** Plaintiff's Application to Proceed *In Forma Pauperis* (Dkt. #2). The Magistrate Court **RECOMMENDS** the District Court **DISMISS WITHOUT PREJUDICE** Plaintiff's cause of action pursuant to 🚩28 U.S.C. § 1915(e)(2).

## IV. WARNING
The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See* 🚩*Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 🚩28 U.S.C. § 636(b)(1)(C); 🚩*Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); 🚩*Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).

## All Citations

Not Reported in Fed. Supp., 2016 WL 11586260

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2068248
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Anthony J. HALL, Plaintiff,

v.

Frank SAMPSON, et al., Defendants.

CIVIL ACTION No. 21-CV-4839
|
Signed 06/08/2022

**Attorneys and Law Firms**

Anthony J. Hall, Philadelphia, PA, Pro Se.

**MEMORANDUM**

YOUNGE, District Judge

**\*1** Plaintiff Anthony J. Hall, a convicted prisoner incarcerated at the Federal Detention Center in Philadelphia, filed this civil action pursuant to 🏳 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), based on allegations that he was illegally prosecuted, convicted and imprisoned on conspiracy and drug charges. (ECF No. 2.) ("Compl.") For the following reasons, the Court will dismiss the Complaint for failure to state a claim pursuant to 28 U.S.C. § 1915A(b)(1).

**I. FACTUAL ALLEGATIONS** [1]

Hall's claims arise from criminal proceedings presided over by the Honorable Wendy Beetlestone and the criminal investigation that resulted in those proceedings. *United States v. Gordon*, Crim. A. No. 15-0496-9 (E.D. Pa.). On August 17, 2016, Hall was charged with one count of conspiracy to distribute phencyclidine ("PCP") and one count of possession with intent to distribute PCP. The charges were included in the Second Superseding Indictment in the multi-defendant case. *Id.* (ECF No. 94.) Thereafter, a bench warrant issued for Hall's arrest; Hall was detained at SCI-Graterford at the time. *Id.* (ECF No 105.) On September 14, 2016, Hall appeared at a hearing before a Magistrate Judge at which he pled not guilty and stipulated to pretrial detention. *Id.* (ECF No. 159.) Following a 22-day jury trial before the Honorable Wendy

Beetlestone, on December 19, 2018, the jury returned no verdict on the charges against Hall. *Id.* (ECF No. 780.)

On August 6, 2019, Hall was charged with 4 counts of possession with intent to distribute PCP and one count of conspiracy to distribute PCP. *Id.* (ECF No. 866 at 2-3, 60-63.) The charges were included in the Third Superseding Indictment in the same multi-defendant case. Following a six-day jury trial before the Honorable Wendy Beetlestone, on October 13, 2019, the jury returned a verdict of guilty against Hall on two counts of possession with intent to distribute PCP and one count of conspiracy to distribute PCP. (ECF No. 943.) Hall was found not guilty on the remaining two counts of possession with intent to distribute. (*Id.*) A sentencing hearing is currently scheduled for July 19, 2022. *Id.* (ECF No. 1135.)

Hall's Complaint names the following Defendants: (1) Drug Enforcement Agency ("DEA") Special Agent Frank Sampson; (2) DEA Task Force Officer Efrain Torres; (3) Assistant United States Attorney ("AUSA") Sozi Pedro Tulante; (4) AUSA Mary Teresa Soltis; (5) DEA Task Force Officer Kyle Boyd; (6) DEA Group Supervisor Raymond Franklin; (7) AUSA Anthony J. Wzorek; and (8) Judge Beetlestone. The Defendants are sued in their individual and official capacities. (Compl. at 4.) The gist of Hall's claims is that the investigation resulting in the charges against him was riddled with error, and that the decision to try him a second time following his acquittal on similar charges was the result of vindictive prosecution.

**\*2** Hall includes lengthy, detailed allegations regarding the investigation and prosecution of the charges against him. In short, Hall claims that the DEA, its agents, its task force officers, and the AUSAs assigned to his criminal case "conducted a constitutionally inadequate investigation ... planted evidence, falsified documents, committed perjury, to falsely arrest, indict and convict the Plaintiff." (*Id.* at 41.) He alleges that the "evidence against Plaintiff is exclusively recorded telephone conversation captured over the Title III wiretap, which the Government believes the Plaintiff was a participant. The Government has not to date produced no evidence, visual or physical, that the Plaintiff sold or purchase PCP. The Plaintiff is facing a mandatory ten (10) years to life imprisonment." (*Id.* at 33-34.)

Hall asserts the following claims pursuant to 🏳 42 U.S.C. § 1983 – violations of his Fourth, Fifth, Eighth and Fourteenth amendment rights, and violations of 🏳 42 U.S.C. § 1985 and

various criminal statutes.[2] He raises the following claims under *Bivens* – illegal seizure, and due process and equal protection violations. (*Id.* at 3, 34.) He seeks an award of compensatory and punitive damages. (*Id.* at 41.) He also requests that his conviction be overturned, that a new Judge be appointed to his case, and that he be granted a new trial on the charges included in the Second Intervening Indictment only. (*Id.* at 36-37.)

## II. STANDARD OF REVIEW

Although Hall has paid the filing fee in full, the Court has the authority to screen his Complaint pursuant to 28 U.S.C. § 1915A. *See* Shane v. Fauver, 213 F.3d 113, 116 n.2 (3d Cir. 2000) (recognizing that the district courts have the authority to screen a prisoner complaint pursuant to § 1915A(b)(1) even if the prisoner is not proceeding *in forma pauperis*). Section 1915A requires that the Court "review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a). In doing so, the Court must dismiss a complaint or any portion thereof that "is frivolous, malicious, or fails to state a claim upon which relief may be granted," *id.* § 1915A(b)(1), or that "seeks monetary relief from a defendant who is immune from such relief," *id.* § 1915A(b)(2).

**\*3** Whether a complaint fails to state a claim under § 1915A(b)(1) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See* Neal v. Pa. Bd. of Prob. & Parole, No. 96-7923, 1997 WL 338838, at \*1 (E.D. Pa. June 19, 1997); *see also* Tourscher v. McCullough, 184 F.3d 236, 240 (3d Cir. 1999). Accordingly, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotations omitted). " 'At this early stage of the litigation,' '[the Court will] accept the facts alleged in [the *pro se*] complaint as true,' 'draw[ ] all reasonable inferences in [the plaintiff's] favor,' and 'ask only whether [that] complaint, liberally construed, ... contains facts sufficient to state a plausible [ ] claim.' " Shorter v. United States, 12 F.4th 366, 374 (3d Cir. 2021) (quoting Perez v. Fenoglio, 792 F.3d 768, 774, 782 (7th Cir. 2015)). Conclusory allegations do not

suffice. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). As Hall is proceeding *pro se*, the Court construes his allegations liberally. Vogt v. Wetzel, 8 F. 4th 182, 185 (3d Cir. 2021) (citing Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 244-45 (3d Cir. 2013)).

## III. DISCUSSION

Hall brings constitutional claims against federal actors pursuant to 42 U.S.C. § 1983 and *Bivens.* However, because § 1983 does not apply to federal actors, the Court will construe all of Hall's claims as having been raised pursuant to *Bivens. Bivens* provides a judicially recognized remedy for constitutional violations committed by federal actors in limited circumstances.[3] Since *Bivens* was decided in 1971, the Supreme Court "has repeatedly refused to extend *Bivens* actions beyond the specific clauses of the specific amendments [of the Constitution] for which a cause of action has already been implied, or even to other classes of defendants facing liability under those same clauses." Vanderklok v. United States, 868 F.3d 189, 200 (3d Cir. 2017). The Supreme Court has recognized an implied private action against federal officials in only four cases: (1) *Bivens* itself, which recognized an implied cause of action for violation of the Fourth Amendment's right against unreasonable searches and seizures; (2) Davis v. Passman, 442 U.S. 228 (1979), which recognized a claim for gender discrimination in the employment context under the Fifth Amendment's Due Process Clause; (3) Carlson v. Green, 446 U.S. 14 (1980), which recognized a claim against prison officials for inadequate medical care in the prison context under the Eighth Amendment; and (4) Farmer v. Brennan, 511 U.S. 825 (1994), which concerned a claim under the Eighth Amendment against prison officials for failure to protect a prisoner from violence by another prisoner. Shorter, 12 F.4th at 371-373 ("*Farmer* made clear[ ] ... that an Eighth Amendment *Bivens* remedy is available to a transgender prisoner who has been assaulted by a fellow inmate.").

**\*4** Because expanding *Bivens* is "a 'disfavored' judicial activity," *see* Ziglar v. Abbasi, 137 S. Ct. 1843, 1857 (2017), a "rigorous inquiry ... must be undertaken before implying a *Bivens* cause of action in a new context or against a new category of defendants." Vanderklok, 868 F.3d at 200.

That inquiry involves determining whether the case presents a new context for a *Bivens* claim that has not been recognized by the Supreme Court and, if so, asking whether "special factors counsel hesitation in expanding *Bivens*." *Mack v. Yost*, 968 F.3d 311, 320 (3d Cir. 2020); *see also* *Abbasi*, 137 S. Ct. at 1857-58.

Here, Hall alleges that his conviction and incarceration are the result of a constitutionally deficient investigation and irregularities in his prosecution. Hall's claims concerning his arrest, detention and criminal prosecution are best construed as claims for malicious prosecution, as he was detained pursuant to a warrant. *See* *Johnson v. United States*, No. 20-3256, 2021 WL 1626512, at *2 (3d Cir. Apr. 27, 2021) (*per curiam*) ("[T]he Magistrate Judge correctly concluded that because Johnson was arrested pursuant to a warrant, his claims for false arrest and false imprisonment were, in essence, malicious prosecution claims."). Thus, based on the allegations therein, the Court construes Hall's Complaint as presenting claims for malicious prosecution, as well as claims that the Defendants conspired to secure his unlawful conviction by, among other things, fabricating evidence against him.[4] Whether or not these claims present viable *Bivens* claims is immaterial at present, because the claims may not proceed at this time.

The Supreme Court has held that "to recover damages [or other relief] for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus[.]" *Heck*, 512 U.S. at 486-87 (footnote and citation omitted); *see also* *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005) ("[A] state prisoner's § 1983 action is barred (absent prior invalidation) — no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings) — if success in that action would necessarily demonstrate the invalidity of confinement or its duration." (emphasis omitted)); *Vanderklok*, 868 F.3d at 199 (the Supreme Court has only recognized a *Bivens* remedy in a handful of contexts and "has plainly counseled against creating new *Bivens* causes

of action"). "Although *Heck* involved a § 1983 action by a state prisoner, the reasoning in *Heck* has been applied to bar *Bivens* claims." *Lora-Pena v. F.B.I.*, 529 F.3d 503, 506 n.2 (3d Cir. 2008).

**\*5** The favorable termination doctrine applies to malicious prosecution claims, as well as claims based on alleged fabrication of evidence. *Floyd v. Attorney Gen. of Pennsylvania*, 722 F. App'x 112, 114 (3d Cir. 2018) (*per curiam*) ("Because Floyd's malicious prosecution and fabrication of evidence claims do not accrue until the criminal proceedings have terminated in Floyd's favor, and Floyd has not demonstrated as much, they are barred by *Heck*."). Additionally, *Heck* has been applied to preclude claims under § 1985. *Zhai v. Cedar Grove Municipality*, 183 F. App'x 253, 255 (3d Cir. 2006) (*per curiam*) (civil rights claims under §§ 1985 and 1986 were barred by *Heck*).

Here, success on Hall's claims would necessarily undermine the validity of his intact conviction because his Complaint challenges the constitutionality of his prosecution, conviction and related imprisonment. Accordingly, his claims for damages are barred by *Heck*. *See* *Garrett v. United States*, 771 F. App'x 139, 141 (3d Cir. 2019) (*per curiam*) ("Here, because Garrett's claims directly challenged the validity of his federal conviction and sentence—which have not been invalidated— his complaint sought the sort of relief that is plainly barred by *Heck*." (internal quotations omitted)); *Murphy v. Bloom*, 443 F. App'x 668, 669 (3d Cir. 2011) (*per curiam*) (holding that *Heck* barred *Bivens* claims where plaintiff "alleged that the defendants conspired to alter his trial transcript and to include a false declaration in his sentencing memorandum"); *Stuler v. United States*, 301 F. App'x 104, 106 (3d Cir. 2008) (*per curiam*) (*Heck* applied in *Bivens* action in which the bulk of plaintiff's complaint was "little more than a thinly veiled attempt to attack his criminal conviction ... under the guise of a civil action"). Accordingly, Hall's claims will be dismissed without prejudice to Hall filing a new case only in the event his conviction is first invalidated, whether on appeal or otherwise.[5]

## IV. CONCLUSION

**\*6** For the foregoing reasons, the Court will dismiss Hall's Complaint as legally baseless, pursuant to 28 U.S.C. § 1915A(b)(1). Although leave to amend would be futile, the Court will dismiss Hall's challenges to his conviction without

prejudice to him filing a § 2255 motion in his criminal case, and will dismiss his remaining civil claims without prejudice to reassertion in a new civil action only in the event his conviction is reversed, vacated, or otherwise invalidated. *See* 🚩 *Curry v. Yachera*, 835 F.3d 373, 379 (3d Cir. 2016).

An appropriate Order follows, which shall be docketed separately.

**All Citations**

Slip Copy, 2022 WL 2068248

## Footnotes

1   The following facts are taken from the Complaint, exhibits to the Complaint, and public records, which the Court may consider in evaluating Hall's claims. *See* 🚩 *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

2   Hall asserts claims under 🚩 18 U.S.C. §§ 241 and 242. These sections establish criminal liability for certain deprivations of civil rights and conspiracy to deprive civil rights. 🚩 *Molina v. City of Lancaster*, 159 F. Supp. 2d 813, 818 (E.D. Pa. 2001); *Figueroa v. Clark*, 810 F. Supp. 613, 615 (E.D. Pa. 1992); *see* 🚩 *United States v. Philadelphia*, 644 F.2d 187 (3d Cir. 1980) (declining to create civil remedy under 🚩 18 U.S.C. §§ 241 and 🚩 242). However, a plaintiff cannot bring criminal charges against defendants through a private lawsuit, and these sections do not give rise to a civil cause of action. *U.S. ex rel. Savage v. Arnold*, 403 F. Supp. 172, 174 (E.D. Pa. 1975). Hall also cites 18 U.S.C. § 71, which relates to theft from interstate shipments. The Court assumes that he intended to cite 18 U.S.C. § 371, relating to conspiracy, which also does not provide for a right of action. *See Walthour v. Herron*, No. 10-1495, 2010 WL 1877704 at *3 (E.D. Pa. May 6, 2010) (no private right of action exists under 🚩 18 U.S.C. §§ 241, 🚩 242, 🚩 245, 🚩 247, 371 or 🚩 1951); *Jones v. Lockett*, No. 08-16, 2009 WL 2232812 at *8 (W.D. Pa. July 23, 2009) ("It is clear that the criminal statutes invoked by Plaintiff, i.e., 🚩 18 U.S.C. §§ 241, 371 and 🚩 1341 do not provide for a private cause of action.") Hall also cites 18 U.S.C. § 1519 relating to destroying, altering or falsifying documents in a federal investigation, and 18 U.S.C. § 1623 relating to perjury, which also do not provide a private right of action. *Antonelli v. Kennedy Hosp.*, No. 17-13780, 2018 WL 443455, at *2 (D.N.J. Jan. 16, 2018) (no private right of action under 18 U.S.C. 1519).

3   Although *Bivens* provides a remedy against federal actors, "[a]n action against government officials in their official capacities constitutes an action against the United States; and *Bivens* claims against the United States are barred by sovereign immunity, absent an explicit waiver." *Lewal v. Ali*, 289 F. App'x 515, 516 (3d Cir. 2008) (*per curiam*); *see also* 🚩 *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *Ynfante v. United States*, Civ. A. No. 13-767, 2015 WL 631055, at *5 (M.D. Pa. Feb. 12, 2015) ("[A] *Bivens* claim can only be asserted against individual officials."). Accordingly, the constitutional claims against the Defendants in their official capacities are in essence claims against the United States that must be dismissed on sovereign immunity grounds. *See Brooks v. Bledsoe*, 682 F. App'x 164, 169 (3d Cir. 2017) (*per curiam*) ("To the extent that Brooks is suing the BOP employees in their official capacities, his claim fails as actions against prison officials in their official capacities are considered actions against the United States, and *Bivens* claims against the United States are barred by sovereign immunity, absent an explicit waiver."); *Bell v. Rossott*, 227 F. Supp. 2d 315, 320 (M.D.

Pa. 2002) (dismissing claim against individual federal defendants sued in their official capacity because the claims are essentially made against the United States).

4    The Court notes that "[m]otions pursuant to 28 U.S.C. § 2255 are the presumptive means by which federal prisoners can challenge their convictions or sentences that are allegedly in violation of the Constitution," although § 2241 may be used when the remedy provided by § 2255 is "inadequate or ineffective." *Okereke v. United States*, 307 F.3d 117, 120 (3d Cir. 2002). In other words, a § 2255 motion is the proper way to challenge a federal conviction, rather than a *Bivens* action. *See Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003) ("Okoro adhered steadfastly to his position that there were no drugs, that he was framed; in so arguing he was making a collateral attack on his conviction, and *Heck* holds that he may not do that in a civil suit, other than a suit under the habeas corpus statute or its federal-defendant equivalent, 28 U.S.C. § 2255."); *Beverly v. Reno*, 23 F.3d 158, 159 (7th Cir. 1994) (federal prisoner cannot circumvent § 2255 "by bringing an independent civil action"); *see generally Abbasi*, 137 S. Ct. at 1863 ("[W]hen alternative methods of relief are available, a *Bivens* remedy usually is not."). The Court will not construe Hall's Complaint as such a motion because the sentencing Judge is in a better position to determine the validity of any challenges to his conviction. Furthermore, this Court does not possess the authority to revoke or alter an order issued by a federal judge in another federal proceeding. *See Smith v. Meyers*, 843 F. Supp. 2d 499, 505 (D. Del. 2012) ("The structure of the federal courts does not allow one judge of a district court to rule directly on the legality of another district judge's judicial acts or to deny another district judge his or her lawful jurisdiction.").

5    There are other reasons why Hall's claims fail. Notably, judges are entitled to absolute immunity from liability based on acts or omissions taken in their judicial capacity, so long as they do not act in the complete absence of all jurisdiction. *See Stump v. Sparkman*, 435 U.S. 349, 355-56 (1978). Similarly, prosecutors are entitled to absolute immunity from liability for acts that are "intimately associated with the judicial phase of the criminal process" such as "initiating a prosecution and ... presenting the State's case." *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976); *see also See Van de Kamp v. Goldstein*, 555 U.S. 335, 348-49 (2009). However, the Court need not address these or other defects in Hall's Complaint as alternative reasons for dismissal. Moreover, to the extent the Complaint could be construed as raising claims based on the DEA's investigation consideration of which would not be barred by *Heck*, it is apparent from the face of the Complaint that those claims are time-barred because Hall knew or should have known of those violations more than two years before he filed the Complaint in the instant action.

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2022 WL 19005214
Only the Westlaw citation is currently available.
United States District Court, W.D.
Michigan, Southern Division.

Owen W. BARNABY, Plaintiff,

v.

MICHIGAN STATE
GOVERNMENT. et al., Defendants.

Case No. 1:22-cv-1146
|
Signed December 14, 2022

**Attorneys and Law Firms**

Owen W. Barnaby, Kennesaw, GA, Pro Se.

Bryan William Beach, MI Department of Attorney General
(Civil Rights & Elections), Lansing, MI, Kimberly Karen
Pendrick, MI Dept Attorney General (Civil Rights/Liberties),
Detroit, MI, for Defendants.

**REPORT AND RECOMMENDATION**

SALLY J. BERENS, United States Magistrate Judge

 *1  Plaintiff Owen Barnaby, a citizen of Georgia, has sued the
State of Michigan and numerous other parties, including but
not limited to, current Governor Gretchen Whitmer, former
Governors Rick Snyder and Jennifer Granholm, the Michigan
Supreme Court, and the State Bar of Michigan, alleging that
they violated his constitutional rights, as well federal and
state civil and criminal statutes, in connection with a 2010 tax
foreclosure of real property that he owned in Berrien County,
Michigan. Barnaby invokes federal question jurisdiction
based on his constitutional and federal statutory claims
and supplemental jurisdiction over his state-law claims. He
alleges that his damages exceed $75,000, but he does not
expressly invoke diversity jurisdiction under 28 U.S.C. §
1332(a).

Although Barnaby paid the filing fee in this action when he
filed his complaint, I have reviewed the current operative
pleading—the second amended complaint—pursuant to
Apple v. Glenn, 183 F.3d 477 (6th Cir. 1999), because
Plaintiff and this action have a history in this Court. Under

Apple, a court may dismiss an action *sua sponte* "for lack of
subject matter jurisdiction pursuant to Rule 12(b)(1) of the
Federal Rules of Civil Procedure when the allegations of a
complaint are totally implausible, attenuated, unsubstantial,
frivolous, devoid of merit, or no longer open to discussion."
Id. at 479–80; *see also* Wagenknecht v. United States,
533 F.3d 412, 417 (6th Cir. 2008). Based upon my review, I
recommend that the Court dismiss Plaintiff's second amended
complaint for lack of subject matter jurisdiction because it is
no longer open to discussion and devoid of merit.

**I. Background**

The Sixth Circuit previously set forth the pertinent facts
surrounding the foreclosure as follows:

> In 2010, the defendants foreclosed on
> and then sold Barnaby's real property
> when he failed to pay property taxes.
> Two years after the sale at auction,
> Barnaby moved for a new foreclosure
> hearing. He claimed that the sale
> violated a partial-payment plan that
> he and the country [sic] treasurer
> had orally agreed upon to keep
> his property out of foreclosure. The
> state court denied Barnaby's motion
> after an evidentiary hearing, finding
> that he had not established that an
> agreement existed. In one of several
> post-judgment filings, Barnaby argued
> that the defendants sold his property
> in violation of state law because they
> did not first obtain a foreclosure
> judgment. At a hearing, the state court
> recognized defendants' error but still
> denied Barnaby's motion. The court
> held that, under Michigan law, a sale
> of property can be set aside only if
> the sales procedure was so egregious
> that it violated due process. Because
> Barnaby had notice of the auction, was
> present for it, and understood that his
> property had been sold, and because he
> then waited several years before suing
> to protect his rights, the state court held

that the procedure did not violate due process. Barnaby appealed, to no avail.

*Barnaby v. Witkowski*, 758 F. App'x 431, 433 (6th Cir. 2018).

**\*2** On December 12, 2014, Barnaby filed a complaint in this Court against Berrien County and Berrien County Treasurer Bret Witkowski, alleging a federal due process claim and several state-law claims arising out of the 2010 foreclosure. Subsequently, the parties consented to have Magistrate Judge Ellen Carmody conduct all proceedings in the case, including entry of a final judgment, pursuant to 28 U.S.C. § 636(c). On January 21, 2016, Judge Carmody granted the defendants' motion to dismiss based on the *Rooker–Feldman* doctrine. *Barnaby v. Witkowski*, No. 1:14-cv-1279, 2016 WL 245227 (W.D. Mich. Jan. 21, 2016). Barnaby appealed, and the Sixth Circuit reversed and remanded the case because it found that Barnaby did not allege injuries arising from the state-court judgment. 2017 WL 3701727, at \*2 (6th Cir. Feb. 17, 2017). Following remand and a period of discovery, the defendants moved to dismiss and/or for summary judgment. On January 12, 2018, Judge Carmody granted the motion, finding that the state-court judgment barred Barnaby's claims under the doctrines of res judicata and collateral estoppel and that certain claims were subject to dismissal on other grounds as well. 2018 WL 387961 (W.D. Mich. Jan. 12, 2018). Barnaby appealed the judgment, and the Sixth Circuit affirmed. 758 F. App'x 431 (6th Cir. 2018). The court of appeals concluded that Judge Carmody correctly found that Barnaby's claims were barred by res judicata and collateral estoppel because they all depended on Barnaby's allegation that he and Defendant Witkowski entered into a partial payment agreement that Defendant Witkowski violated by selling Barnaby's property at auction, which the state court found Barnaby failed to prove. The court also found that the state court's ruling that the sale procedure did not violate Barnaby's due process rights barred his due process claim in federal court. *Id.* at 436. Following the affirmance, Barnaby filed a Rule 60(b) motion for relief from judgment, which Judge Carmody denied on April 9, 2019. (Case No. 1:14-cv-1279, ECF No. 180.) Barnaby appealed that order, and the Sixth Circuit affirmed it on October 8, 2019. (*Id.*, ECF No. 194.) Barnaby filed a second Rule 60(b) motion, which I denied on August 23, 2021. (*Id.*, ECF No. 202.) I denied Barnaby's motion for reconsideration on September 10, 2021.

(*Id.*, ECF No. 206.) Barnaby appealed the orders to the Sixth Circuit, which affirmed them on September 26, 2022. 2022 WL 5263832 (6th Cir. Sept. 26, 2022).

Unsuccessful in this Court, Barnaby sought relief in another court. On October 5, 2022, he filed a complaint in the Eastern District of Michigan against the State of Michigan, the current and former Michigan governors, Michigan's attorney general, Witkowski, Berrien County, and others. (ECF No. 1.) Once again, the subject of this complaint was the alleged wrongful foreclosure in 2010. On October 13, 2022, the court entered an order noting that Barnaby had failed to plead any viable claims and did not "make a single allegation concerning any act or omission by any particular Defendant." Therefore, the court granted Barnaby leave to file an amended complaint before dismissing the action. (ECF No. 4.) Barnaby filed his first amended complaint on November 14, 2022. (ECF No. 6.) Without leave, he filed a second amended complaint on November 28, 2022. (ECF No. 10.) On December 5, 2022, the court transferred the action to this district because the real property at issue is located in Berrien County, and thus within this district. (ECF No. 11.) In its transfer order, the court observed that Michigan Attorney General Dana Nessel, the Office of the Governor of the State of Michigan, the State Bar of Michigan, and the Michigan Supreme Court —the only four defendants who could arguably be deemed to be located in that district for purposes of venue—have no apparent connection to the claims. (*Id.* at PageID.231.) The court further noted that "the allegations in Barnaby's pending complaint are substantially similar to those raised in the earlier case and may, in fact, be duplicative of the earlier case." (*Id.*)

## II. Discussion

### A. Claim and Issue Preclusion

As set forth above, Barnaby's prior action in this Court resulted in a final judgment. Claim and issue preclusion are separate prongs of the affirmative defense commonly known as res judicata and normally must be raised by the defendant. However, the Supreme Court has held that a district court may raise the defense *sua sponte* in "special circumstances," including where "a court is on notice that it has previously decided the issue presented." *Arizona v. California*, 530 U.S. 392, 412 (2000); *see also Holloway Constr. Co. v. U.S. Dep't of Labor*, 891 F.2d 1211, 1212 (6th Cir. 1989) (holding that a district court may raise res judicata based

on its own prior judgment *sua sponte*). Because the prior judgment was rendered in federal court, the preclusive effect is determined by federal common law. *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008); *see also* Restatement (Second) of Judgments § 87 ("Federal law determines the effects under the rules of res judicata of a judgment of a federal court.").

The doctrine of claim preclusion provides that, if an action results in a judgment on the merits, that judgment operates as an absolute bar to any subsequent action on the same cause between the same parties or their privies, with respect to every matter that was actually litigated in the first case, as well as every ground of recovery that might have been presented. *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 582 (6th Cir. 1994); *see Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 467 n.6 (1982); *Bowen v. Gundy*, No. 96-2327, 1997 WL 778505, at * 1 (6th Cir. Dec. 8, 1997). Claim preclusion operates to relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, prevent inconsistent decisions, and encourage reliance on adjudication. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). To apply the doctrine of claim preclusion, the court must find that (1) the previous lawsuit ended in a final judgment on the merits; (2) the previous lawsuit was between the same parties or their privies; and (3) the previous lawsuit involved the same claim or cause of action as the present case. *Allen*, 449 U.S. at 94; *accord Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981).

**\*3**  "Issue preclusion ... bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Taylor*, 553 U.S. at 892. Issue preclusion applies where: (1) the identical issue was raised and actually litigated in a prior proceeding; (2) the determination of the issue was necessary to the outcome of the prior proceeding; (3) the prior proceeding resulted in a final judgment on the merits; and (4) the party against whom issue preclusion is sought had a full and fair opportunity to litigate the issue in the prior proceeding. *Aircraft Braking Sys. Corp. v. Local 856, Int'l Union, United Auto., Aerospace & Agric. Implement Workers, UAW*, 97 F.3d 155, 161 (6th Cir. 1996).

All requirements for claim and issue preclusion are met here. For claim preclusion, the previous lawsuit resulted

in a final judgment, was between Barnaby as Plaintiff and Witkowski and Berrien County as Defendants, and Barnaby asserts the same claims—gross negligence, theft, violation of due process, and fraudulent misrepresentation and omission—all of which arose out of the 2010 foreclosure proceedings. For issue preclusion, the validity of the tax foreclosure was raised in the prior case and was necessary to the outcome, a final judgment was issued, and Barnaby had a full and fair opportunity to litigate the issue. Judge Carmody determined that the precise issue—the validity of the foreclosure proceeding—had been raised in, and decided by, the state court.

The fact that Barnaby has added numerous other parties to this action who are either in privity with Witkowski and Berrien County or have no factual connection to the 2010 foreclosure does not change the above analysis. Likewise, his new allegation of a wide-ranging conspiracy, presumably under 42 U.S.C. § 1983, provides no escape from claim and issue preclusion. A civil conspiracy under Section 1983 is "agreement between two or more persons to injure another by unlawful action." *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985)). The plaintiff must show the existence of a single plan, that the alleged co-conspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff. *Id.*; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). The Sixth Circuit has held that "vague and conclusory allegations, unsupported by material facts, are not sufficient to state a conspiracy claim under § 1983." *Becker v. Clinton*, No. 99-3811, 2000 WL 553911, at *1 (6th Cir. Apr. 28, 2000) (citing *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)). Barnaby's 68-page second amended complaint contains only the following conspiracy-related allegation littered throughout the pleading in discussing each Defendant: Defendants "concocted, disguised, designed an evil plot and an elaborate scheme which stole and defrauded Plaintiff of his properties by their willful and wanton misconduct of forgeries." (ECF No. 10 at PageID.188.) This is nothing more than a legal conclusion devoid of factual content, which does not plausibly allege a conspiracy. Finally, Barnaby's forgery allegations do not save his claim from the preclusion doctrines. He refers to forged quit-claim deeds, a forged judgment of foreclosure or notice of judgment

of foreclosure, and forged certificates of foreclosure, all used to "permanently steal and defraud [Barnaby] of his ... properties." (*Id.* at PageID.174.) Although Barnaby's forgery allegations are somewhat vague, it appears that they are rooted in his contention that procedural errors invalidated the foreclosure process, resulting in "forged" documents. But this assertion merely seeks to relitigate the state court's judgment, which concluded that the deficiencies in the process were not so egregious that they violated Barnaby's right to due process. In other words, the foreclosure was deemed valid. In the end, Barnaby is left with the same set of facts that were before the state court.

**\*4** Therefore, Barnaby's claims are barred by claim and issue preclusion. *See Brammell v. Whipple*, No. 0:09-22, 2009 WL 649164, at \*1 (E.D. Ky. Mar. 10, 2009) (dismissing the plaintiff's petition pursuant to *Apple* because the claim had been "fully and finally litigated," and was "no longer open to discussion").

### B. Devoid of Merit

Plaintiff cites several statutes that have no application to his claims and/or do not provide a private right of action. For example, 18 U.S.C. § 471 criminally punishes "whoever, with intent to defraud, falsely makes, forges, counterfeits, or alters any obligation or other security of the United States[.]" This case does not involve an "obligation or other security of the United States," and the statue does not provide a private right of action. *See Malcom v. Colonial Life & Accident Co.*, Nos. 21-11514, 21-12142, 2022 WL 468949, at \*2 (E.D. Mich. Feb. 15, 2022). Similarly, there is no private right of action under the federal mail fraud statute, 18 U.S.C. § 1341. *See Saro v. Brown*, 11 F. App'x 387, 388 (6th Cir. 2001) ("The district court also properly concluded that Saro possessed no private right of action against Brown for alleged violations of 18 U.S.C. §§ 1341 & 1343. Violations of these sections of the federal criminal code do not give rise to independent, private causes of action."); *Ryan v. Ohio Edison Co.*, 611 F.2d 1170, 1178–79 (6th Cir. 1979) (holding that 18 U.S.C. § 1341 does not create a private cause of action). The same is true to the extent Barnaby intends to assert claims under Michigan's criminal forgery statute, Mich. Comp. Laws § 750.248. *See White v. Perron*, No. 2:20-cv-247, 2021 WL 3855589, at \*17 (W.D. Mich. Aug. 30, 2021) ("This Court and other courts have concluded that Michigan's criminal forgery statute, Mich. Comp. Laws § 750.248, does not explicitly authorize a private cause of action." (internal quotation marks

omitted) (collecting cases)). Finally, although Barnaby's intent is not clear, to the extent he asserts a claim under Michigan's Unauthorized Practice of Law (UPL) statute, Mich. Comp. Laws § 600.916(1), the Sixth Circuit has held in an unpublished order that the statute neither expressly nor impliedly creates a private cause of action for damages. *Jaiyeola v. Brundage*, No. 22-1083, unpublished Ord. at 4–5 (6th Cir. Nov. 14, 2022).

Barnaby has included the State Bar of Michigan (SBM) and the Michigan Supreme Court (MSC) in his pleading because the SBM dismissed his UPL complaint against Witkowski, a non-attorney, for representing Berrien County in the state-court proceeding in 2010. He claims that the SBM ignored the evidence against Witkowski and was thus derelict in its duty to investigate and prosecute Witkowski's unauthorized practice of law. (ECF No. 10 at PageID.194.) He includes the MSC because it oversees the SBM and failed to provide an appeal process for Barnaby's UPL complaint. (*Id.* at 195–96.) If Barnaby had alleged viable legal claims against the SBM and the MSC, which he has not, those claims would be barred by the Eleventh Amendment to the extent he seeks damages against them. *See Dubuc v. Michigan Bd. of Law Examiners*, 342 F.3d 610, 615 (6th Cir. 2003) (holding that SBM is an arm of the MSC and thus entitled to Eleventh Amendment immunity); *Goldman v. Consumers Credit Union*, No. 1:16-cv-1372, 2017 WL 2491754, at \*5–6 (W.D. Mich. June 9, 2017) (immunity under the Eleventh Amendment extends to Michigan courts, including the MSC); *Moore v. Attorney Grievance Comm'n*, No. 12-CV-12671, 2012 WL 6553404, at \*3 (E.D. Mich. Sept. 11, 2012), *report and recommendation adopted*, 2012 WL 6553755 (E.D. Mich. Dec. 14, 2012) (MSC immune from suit under the Eleventh Amendment because Michigan Courts are arms of the State of Michigan).

**\*5** Finally, the State of Michigan and Michigan's Governor and Attorney General, sued in their official capacities, are also immune under the Eleventh Amendment. *See Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 732–33 (6th Cir. 2022) (Michigan Governor); *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004) (State of Michigan); *Tyson v. Whitmer*, No. 2:21-CV-11150, 2021 WL 2682805, at \*3 (E.D. Mich. June 30, 2021) ("Governor Whitmer, Attorney General Nessel, and the State of Michigan are entitled to Eleventh Amendment immunity on the plaintiff's claims for monetary damages (or other retrospective relief) against them in their official capacities.").

### III. Conclusion

For the foregoing reasons, I recommend that this action be dismissed for lack of subject matter jurisdiction because Barnaby's claims are barred by claim and issue preclusion and thus are "no longer open to discussion," and are also "devoid of merit." *Apple,* 183 F.3d at 479.

### NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

### All Citations

Slip Copy, 2022 WL 19005214

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 66265
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Michael Angelo OJEDA and Carmen
Rosa Torres Ojeda, Plaintiffs,
v.
Alfonso MENDEZ, Police Officer, Badge
# 7899; New York Police Department;
Internal Affairs Bureau; et al., Defendants.

20-CV-3910(EK)(LB)
|
Signed 01/07/2021

**Attorneys and Law Firms**

Michael Angelo Ojeda, Brooklyn, NY, pro se.

Carmen Rosa Torres Ojeda, Brooklyn, NY, pro se.

John J.P. Howley, The Howley Law Firm P.C., New York, NY, for Defendant Police Benevolent Association.

Zachary Kalmbach, New York City Law Department, New York, NY, for Defendants Bill de Blasio, City of New York.

Blake Garrett Goldfarb, Burns & Harris, New York, NY, for Defendant Seth A. Harris.

## **MEMORANDUM & ORDER**

ERIC KOMITEE, District Judge:

*1  Plaintiffs Michael Angelo Ojeda and Carmen Rosa Torres Ojeda filed this *pro se* action in August 2020. The Court has reviewed the complaint *sua sponte* and determined that it names certain defendants who are immune from suit and asserts certain claims under statutes that provide no private cause of action. Accordingly, and for the reasons stated below, Plaintiffs' claims against Justice Dawn Jimenez-Salta, Justice Sylvia Ash, the State of New York, the Clerk's Office of the Kings County Supreme Court, the Office of Court Administration, the New York City Police Department and its Internal Affairs Bureau, the New York City Department of Consumer and Worker Protection, Mitu Maruf (a/k/a Maruf Alam), Zaki Isaac Tamir, and Clark Pena are dismissed. This action will proceed at this stage against the remaining defendants: the City of New York, Mayor Bill de

Blasio, Police Officer Alfonso Mendez, the Police Benevolent Association of New York City, Bonita E. Zelman, Seth A. Harris, and Felix W. Ortiz.

## **I. Background**

This action arises out of the tragic death of Plaintiffs' daughter Briana. The following facts are as alleged in the complaint. On August 27, 2010, Briana experienced a severe asthma attack. As Ms. Ojeda rushed Briana by car to Long Island College Hospital in Brooklyn, they encountered Officer Mendez, who, for reasons that are not clear in the complaint, stopped Ms. Ojeda and asked what they were doing. Ms. Ojeda urged Officer Mendez to perform CPR on Briana; however, he responded, "I do not know CPR and I don't do CPR." Ms. Ojeda continued to the hospital, where Briana was pronounced dead.

Following their daughter's death, Plaintiffs pursued legal and political efforts to seek redress. The allegations in the complaint are somewhat confusing, but it appears that in or around 2011, Plaintiffs brought a wrongful death action in New York State court against the City, Officer Mendez and other defendants, and this action was dismissed in 2016. Plaintiffs contend that their attorneys in that action, defendants Bonita E. Zelman and Seth A. Harris, "r[an] [the] case into the ground," including by improperly filing the "Notice of Claim" "directly [with] the Comptroller and Legal Counsel for the City of New York ... so that [the] case could be put into the counterfeit system." In addition, certain individuals and entities in the court system allegedly engaged in a "Ponzi Scheme" and failed "to follow required procedural law." The targets of those allegations are Justice Dawn Jimenez-Salta and Justice Sylvia Ash of the New York State Supreme Court, who presided over the proceedings; the Clerk's Office of the Supreme Court of Kings County; and the New York State Office of Court Administration. In retaliation for the lawsuit, Plaintiffs allege that defendant New York City Department of Consumer and Worker Protection (named in the complaint by its former title, the New York City Department of Consumer Affairs) removed them from the "DARP program." [1]

*2  Plaintiffs also campaigned for "Briana's Law," which New York State passed in 2017, requiring police officers to be trained in CPR every two years. Plaintiffs allege, among other things, that during this campaign defendants Felix Ortiz, a New York State Assembly Member, and his

aide Mitu Maruf (a/k/a Maruf Alam), improperly requested "personal favors" from Plaintiffs. Sometime later, Plaintiffs established a foundation in Briana's name — the "Briana Lives Foundation, Inc." However, Plaintiffs allege that its founders, defendants Zaki Isaac Tamir and Clark Pena, "hijack[ed]" the organization for their own financial gain.

In general, throughout the complaint, Plaintiffs allege that certain defendants — including the New York City Police Department and its Internal Affairs Bureau, the Police Benevolent Association of New York City (a union), the City of New York, the State of New York, and Mayor Bill de Blasio — conspired with others "[to] cover up" Officer Mendez's allegedly criminal conduct.

At the end of the complaint, Plaintiffs set out a number of counts. They bring civil claims pursuant to the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968; due process claims under the Fourteenth Amendment, which the Court construes as brought pursuant to 42 U.S.C. § 1983; claims for "Federal Negligence — *United States v. Carroll Towing*" and "46 U.S. Code § 30509 Intentional Infliction of Emotional Distress," which the Court construes as state-law tort claims;[2] and causes of action under numerous criminal statutes.

## II. Legal Standard

The Court is mindful that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (cleaned up). However, a district court has the inherent power to dismiss *sua sponte* a case, or a claim, as frivolous — even if (as is the case here) a *pro se* plaintiff has paid the filing fee. *Fitzgerald v. First East Seventh Street Tenants Corp.*, 221 F.3d 362, 363-64 (2d Cir. 2000). A claim is frivolous when it is "based on an indisputably meritless legal theory." *Jordan v. New York State Dep't of Labor*, 811 F. App'x 58, 59 (2d Cir. 2020) (citing *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)). In addition, a complaint will also be dismissed when "it is clear that the defendants are immune from suit." *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999).

## III. Discussion

### A. Defendants Immune from Suit

Certain defendants here are clearly immune from suit. First, judges are accorded absolute immunity from suits for damages arising out of judicial acts performed in their judicial capacities. *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991) (judges are immune from suit except for actions taken in a non-judicial capacity or in the complete absence of jurisdiction). This absolute judicial immunity "is not overcome by allegations of bad faith or malice," nor can a judge "be deprived of immunity because the action he took was in error ... or was in excess of his authority." *Id.* at 11, 13. Plaintiffs' only claims against Justices Ash and Jimenez-Salta relate to their official actions presiding over the state court proceedings — failing to hold a required "preliminary conference" at one point, and improperly "resurrect[ing] a case" at another. These actions were clearly taken within their judicial capacities. Thus, defendants Ash and Jimenez-Salta are immune from suit for damages, and the claims against them are dismissed.

**\*3** Second, Plaintiffs name the State of New York and several of its agencies as defendants. States and their agencies possess sovereign immunity, as memorialized in the Eleventh Amendment. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). The Eleventh Amendment bars suits for damages against states and state agencies absent a state's consent or a valid abrogation of a state's sovereign immunity by an act of Congress. *Id.* at 99-100. Plaintiffs have not identified any waiver of sovereign immunity that would permit them to bring suit against the State of New York or any of its agencies based on Plaintiffs' state court cases or legislative efforts. Indeed, "New York State has not waived its sovereign immunity from Section 1983 claims, nor did Congress override that immunity by enacting Section 1983." *Nolan v. Cuomo*, No. 11-CV-5827, 2013 WL 168674, at \*7 (E.D.N.Y. Jan. 16, 2013) (internal citations omitted). Accordingly, Plaintiffs' claims against the State of New York, the Clerk's Office of the Kings County Supreme Court, and the Office of Court Administration are dismissed.

Finally, Plaintiffs name multiple New York City agencies as defendants. Federal courts look to state law to decide whether

a municipal entity is amenable to suit in federal court. Fed. R. Civ. P. 17(b)(3). Here, the New York City Charter is the relevant authority. *See, e.g.*, *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 160 (2d Cir. 2008). The Charter provides that actions and proceedings to recover penalties for legal violations shall be brought against the City of New York and not any agency thereof, except where otherwise provided by law. N.Y.C. Charter Ch. 17, § 396. Therefore, agencies of New York City are not "suable" entities. *See e.g.*, *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007); *Baily v. New York City Police Dept.*, 910 F. Supp. 116, 117 (E.D.N.Y. 1996). Accordingly, the New York City Police Department, the N.Y.P.D.'s Internal Affairs Bureau, and the New York City Department of Consumer and Worker Protection are dismissed.

## B. Causes of Action Based in Federal Criminal Laws

Plaintiffs allege that all defendants violated one or more criminal statutes. For example, they bring one count against Officer Mendez for second degree murder, and allege that certain defendants' conduct amounts to treason. Plaintiffs invoke a multitude of criminal statutes, including 18 U.S.C. § 225 (continuing financial crimes enterprise), 18 U.S.C. § 471 (counterfeiting), 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1503 (obstruction of justice), 18 U.S.C. § 1510 (obstruction), 18 U.S.C. § 1511 (obstruction), 18 U.S.C. § 1581 (peonage), 18 U.S.C. § 1951 (interference with commerce by threats or violence), 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), 18 U.S.C. § 2381 (treason), 18 U.S.C. § 2384 (seditious conspiracy), and murder in the second degree, N.Y. Penal Law § 125.25.

"It is a truism, and has been for many decades, that in our federal system crimes are always prosecuted by the Federal Government, not ... by private complaints." *Connecticut Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 86–87 (2d Cir. 1972); *see also Sheehy v. Brown*, 335 Fed. Appx. 102, 104 (2d Cir. 2009) ("[F]ederal criminal statutes do not provide private causes of action."). Accordingly, all counts under criminal statutes (except for RICO) are dismissed because they do not provide a private right of action. In addition, defendants Mitu Maruf (a/k/a Maruf Alam), Zaki Isaac Tamir,

and Clark Pena are dismissed from this action, because the complaint asserts only criminal law causes of action against them.

Some of the defendants' alleged conduct, however, relates to crimes that are also predicate acts to a RICO violation. *See, e.g.*, 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1503 (obstruction of justice), 18 U.S.C. § 1511 (obstruction of state or local law enforcement). As the Court is allowing the alleged RICO violation(s) to proceed past this stage, those allegations may be relevant to one or more surviving claims.

## IV. Conclusion

**\*4** In sum, the following defendants are dismissed: Justice Dawn Jimenez-Salta, Justice Sylvia Ash, the State of New York, the Clerk's Office of the Kings County Supreme Court, the Office of Court Administration, the New York City Police Department and its Internal Affairs Bureau, the New York City Department of Consumer and Worker Protection, Mitu Maruf (a/k/a Maruf Alam), Zaki Isaac Tamir, and Clark Pena.

The remaining defendants are the City of New York, Mayor Bill de Blasio, Officer Alfonso Mendez, the Police Benevolent Association of New York City, Bonita E. Zelman, Seth A. Harris, and Felix W. Ortiz. In addition, the counts brought under criminal statutes (except for RICO) are dismissed as to all remaining defendants.

Plaintiffs request an extension of time to serve the complaint and summonses. ECF No. 33. This request is granted as to the remaining defendants not already served — Officer Alfonso Mendez, Felix W. Ortiz, and Bonita Zelman. Plaintiffs must serve these defendants within forty-five days of the date of this Order and file proof of service with the Court. Fed. R. Civ. P. 4(l). If proper service against a defendant is not made, and if Plaintiffs fail to show good cause as to why such service has not been made, the defendant may be dismissed. Fed. R. Civ. P. 4(m).

In the event that Plaintiffs elect to proceed *in forma pauperis* on appeal from this Order, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any such appeal would not be taken in good faith and therefore denies *in forma pauperis* status. *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 66265

### Footnotes

1   The Complaint does not explain what the "DARP program" is; however, it may be a reference to New York City's Directed Accident Towing Program.

2   Plaintiffs purport to bring counts under " 46 U.S. Code § 30509 Intentional Infliction of Emotional Distress" and "Federal Negligence — *United States v. Carroll Towing*." Section 30509 is a maritime statute. Similarly, *United States v. Carroll Towing Co.*, 159 F.2d 169 (2d Cir. 1947), sets forth the "well-established principles of Second Circuit maritime negligence law." *See, e.g., In re Nagler*, 246 F. Supp. 3d 648, 658 (E.D.N.Y. 2017). Accordingly, the court construes these claims as being brought in tort law for intentional infliction of emotional distress and negligence.

2020 WL 6647424
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Regina LEWIS, Plaintiff,

v.

SOCIAL SECURITY ADMINISTRATION; Social
Security Administrative Judge Gallagher; Orange
County Department of Social Services; Orange County
Commissioner; Darcie Miller LCSW-R; Independent
Living Chief Executive Officer Doug Hovey, Defendants.

20-CV-9277 (LLS)
|
Signed 11/09/2020
|
Filed 11/10/2020

**Attorneys and Law Firms**

Regina Lewis, Newburgh, NY, pro se.

ORDER OF DISMISSAL

LOUIS L. STANTON, United States District Judge:

**\*1** Plaintiff, appearing *pro se*, brings this action alleging
that Defendants "are robbing [her] in violation of the Hobbs
Act ... [1]8 U.S.C. § 1951." By order dated November 9,
2020, the Court granted Plaintiff's request to proceed without
prepayment of fees, that is, *in forma pauperis* (IFP). For the
reasons set forth in this order, the Court dismisses this action.

**STANDARD OF REVIEW**

The Court must dismiss an IFP complaint, or any portion
of the complaint, that is frivolous or malicious, fails to state
a claim on which relief may be granted, or seeks monetary
relief from a defendant who is immune from such relief. 28
U.S.C. § 1915(e)(2)(B); *see* Livingston v. Adirondack
Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998). The Court
must also dismiss a complaint when the Court lacks subject
matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds,
the Court is obliged to construe *pro se* pleadings liberally,
Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009), and
interpret them to raise the "strongest [claims] that they
*suggest*," Triestman v. Fed. Bureau of Prisons, 470 F.3d
471, 474 (2d Cir. 2006) (internal quotation marks and
citations omitted) (emphasis in original). But the "special
solicitude" in *pro se* cases, id. at 475 (citation omitted), has
its limits – to state a claim, *pro se* pleadings still must comply
with Rule 8 of the Federal Rules of Civil Procedure, which
requires a complaint to make a short and plain statement
showing that the pleader is entitled to relief.

The Supreme Court has held that under Rule 8, a complaint
must include enough facts to state a claim for relief "that
is plausible on its face." Bell Atl. Corp. v. Twombly,
550 U.S. 544, 570 (2007). A claim is facially plausible if
the plaintiff pleads enough factual detail to allow the Court
to draw the inference that the defendant is liable for the
alleged misconduct. In reviewing the complaint, the Court
must accept all well-pleaded factual allegations as true.
Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). But it
does not have to accept as true "[t]hreadbare recitals of the
elements of a cause of action," which are essentially just legal
conclusions. Twombly, 550 U.S. at 555. After separating
legal conclusions from well-pleaded factual allegations, the
Court must determine whether those facts make it plausible –
not merely possible – that the pleader is entitled to relief. *Id.*

**BACKGROUND**

Plaintiff Regina Lewis participates in a supported housing
program operated by Independent Living, Inc. ("Independent
Living") (ECF 2 at 4.) Plaintiff attaches to her complaint
a July 25, 2018 letter from Independent Living's program
manager, which informs Bourne & Kenney Apartments that
Independent Living will "be responsible for paying [to the
landlord] the full amount of the rent totaling $997.00 on a
monthly basis until Regina secures her own benefits." (*Id.*)
The letter indicates that "[o]nce Regina secures benefits,
[Independent Living] will calculate her portion of the rent,
which should be 30% of her income and [it] will pay the
remainder of the rent total." (*Id.*)

**\*2** Plaintiff applied to the Orange County Department of
Social Services (DSS) for a monthly public assistance grant of

$412. She alleges that she authorized $300 of this grant to be paid "directly to [her] landlord, Bourne and Kenney." (*Id.* at 2.) But Plaintiff's landlord never received money from DSS, and instead Independent Living, Inc., received $300 from DSS even though it "is not [her] landlord." (*Id.*)

Plaintiff asserts that "the Social Security Administration and [Administrative Law] Judge Gallagher are robbing" her, in violation of the Hobbs Act, 18 U.S.C. § 1951. (*Id.* at 1.) Plaintiff receives Supplemental Security Income (SSI), and DSS seeks "to recoup $8,213.95," even though Plaintiff never authorized DSS to pay Independent Living on her behalf. (*Id.*) Plaintiff has been threatened with "discharge from the SPOA rental subsidy program" if she "refused to accept DSS." Moreover, "[a]ll three programs, SPOA, Independent Living and DSS ... acted in concert to rob" her. (*Id.*)

Plaintiff contends that there is nothing to "justify the kickback to Independent Living," and that "DSS stole from" her. In Plaintiff's view, "[t]his is money laundering, and every transfer of $300.00 per month to Independent Living constitutes interstate commerce violations, in violation of 18 U.S. Code § 875, Interstate communications 18 U.S. Code § 1349, Wire fraud in violation of 18 U.S. Code § 1343 and Bank fraud in violation of 18 U.S. Code § 1344. Mail fraud 18 U.S. § 1341." (*Id.* at 2-3.)

## DISCUSSION

"[T]he Social Security Administration ("SSA") is allowed ... to use a portion of an SSI recipient's initial, retroactive SSI award—covering the period when the applicant's SSI application was pending—to reimburse states and their political subdivisions for interim assistance benefits they have provided to the SSI applicant." *Warren v. Roberts*, No. 15-CV-7850 (NRB), 2017 WL 2782176, at *1 (S.D.N.Y. June 12, 2017). As a condition of eligibility for State public assistance, applicants must "sign an [interim assistance reimbursement (IAR) ] authorization, permitting the local social services districts to receive IAR from SSA for state and local public assistance funds expended during the pendency of the applicants' SSI applications." *Id.* at *3. The "decision to withhold SSI payments for the purpose of reimbursing states for interim assistance is not subject to judicial review." 42 U.S.C. § 1383(g)(5)." *Id.* at *7 (granting motion to dismiss for lack of jurisdiction). [1]

The Court therefore lacks jurisdiction over Plaintiff's claims that defendants have "robbed" her of money from her initial social security payment by repaying to DSS the interim assistance that she received while awaiting SSI benefits. *See, e.g., Jones v. Comm'r of Soc. Sec.*, No. 17-CV-6558 (CJS), 2017 WL 6372504, at *6 (W.D.N.Y. Dec. 12, 2017) (holding that under 42 U.S.C. § 1383(g)(5), the court "lacks subject matter jurisdiction over Plaintiff's attempt to recoup the $9,838.18 that was deducted from his SSI back payment" and dismissing *pro se* plaintiff's claims "that the Commissioner of Social Security and Monroe County Department of Human Services improperly confiscated [SSI] benefits from him"); *Ortega v. New York State Office of Temp. Disability Assistance*, No. 18-CV-7293 (KAM) (RER), 2020 WL 1929067, at *3 (E.D.N.Y. Apr. 21, 2020) ("[T]he plain language of Section 1383(g)(5), considered in context with the rest of the statute, demonstrates Congress's intent to place plaintiffs' claims outside this Court's subject matter jurisdiction.").

**\*3** Moreover, Plaintiff's allegations seeking to prosecute criminal charges against defendants under various criminal statutes must also be dismissed as frivolous. *See Leeke v. Timmerman*, 454 U.S. 83, 87 (1981) (holding that "the decision to prosecute is solely within the discretion of the prosecutor"); *Conn. Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 87 (2d Cir. 1972) (holding that prosecutors possess discretionary authority to bring criminal actions, and they are "immune from control or interference by citizen or court."). The Court therefore dismisses as frivolous Plaintiff's claims seeking to prosecute Defendants for violations of the Hobbs Act and other federal criminal statutes based on allocation of her public benefit payments.

The Second Circuit has held that courts should dismiss without prejudice claims of incompetent persons who appear without a guardian *ad litem* or counsel. *See Berrios v. N.Y.C. Hous. Auth.*, 564 F.3d 130, 135 (2d Cir. 2009). Because the Court does not resolve Plaintiff's claim on the merits, it need not address the issue of Plaintiff's competency. *See Denton v. Hernandez*, 504 U.S. 25, 34 (1992) (dismissal of an IFP complaint on ground of frivolousness is not a dismissal on the merits). In an abundance of caution, however, the Court dismisses Plaintiff's claims without prejudice. *See Berrios*, 564 F.3d at 135. Should Plaintiff file an action that

is not meritless on its face, the Court will revisit the issue of Plaintiff's competency.

**CONCLUSION**

Plaintiff's complaint, filed *in forma pauperis* under 28 U.S.C. § 1915(a)(1), is dismissed without prejudice. 28 U.S.C. § 1915(e)(2)(B)(i).

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 6647424

**Footnotes**

1    The Social Security Act provides: "The provisions of subsection (c) [providing that the Commissioner's final decision is subject to judicial review] shall not be applicable to any disagreement concerning payment by the Commissioner of Social Security to a State pursuant to the preceding provisions of this subsection [governing reimbursement to States for interim assistance payments] nor the amount retained by the State (or political subdivision)." 42 U.S.C. § 1383(g)(5). Federal regulations require states to hold hearings if an applicant wishes to challenge a state's decision "regarding the amount of the repayment the State keeps or the amount of any excess the State pays to you" from the SSA reimbursements. 20 C.F.R. § 416.1920. The regulations explicitly provide: "You are not entitled to a Federal hearing on the State's actions regarding repayment of interim assistance." *Id.*

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1284346

Only the Westlaw citation is currently available.

United States District Court, W.D. New York.

John P. PATTERSON, Plaintiff,

v.

Joel M. PATTERSON, Sergeant, Five Points Correctional Facility, Shari L. Kampnich, Correctional Officer, Five Points Correctional, William S. Palmer, Correctional Officer, Five Points Correctional Facility, Matthew R. Piotrowski, Correctional Officer, Five Points Correctional Facility, and Joanne L. Springer, Facility Nurse, Five Points Correctional Facility, Defendants.

1:16-CV-00844 EAW
|
Signed 03/20/2019

**Attorneys and Law Firms**

John P. Patterson, Marcy, NY, pro se.

Joel J. Terragnoli, New York State Attorney General, Buffalo, NY, for Defendants.

### DECISION AND ORDER

ELIZABETH A. WOLFORD, United States District Judge

### INTRODUCTION

**\*1** Plaintiff John P. Patterson ("Plaintiff"), proceeding *pro se*, is an inmate currently housed at the Marcy Correctional Facility ("Marcy"). Plaintiff brings the instant action pursuant to ⚑42 U.S.C. § 1983 and New York Penal Law Article 130, alleging that defendants Joel M. Patterson ("Sergeant Patterson"), Shari L. Kampnich ("Kampnich"), William S. Palmer ("Palmer"), Matthew R. Piotrowski ("Piotrowski"), and Joanne L. Springer ("Nurse Springer") (collectively "Defendants") committed various violations of Plaintiff's state and constitutional rights arising from an alleged assault that occurred while he was housed at the Five Points Correctional Facility ("Five Points"). (Dkt. 12).

Presently before the Court is Plaintiff's motion for a preliminary injunction (Dkt. 21), and Defendants' partial motion to dismiss (Dkt. 22). For the reasons that follow,

Plaintiff's motion for a preliminary injunction is denied, and Defendants' partial motion to dismiss is granted.

### BACKGROUND

**I. Factual History**

The following facts are taken from Plaintiff's Amended Complaint (Dkt. 12), the operative complaint in the instant action. As is required at this stage of the proceedings, the Court has treated Plaintiff's allegations as true.

On November 22, 2013, Plaintiff was housed at Five Points, one of three maximum security prisons in the state of New York that has a residential mental health unit ("RMHU"). (*Id.* at ¶¶ 12-13). He was in his RMHU cell when a nurse made her evening rounds with Officer Kimball to administer medication. (*Id.* at ¶ 13). Officer Kimball asked Plaintiff why he had his pants down when Plaintiff's pants were not actually down. (*Id.*). The nurse said that Plaintiff's pants were not down, and Plaintiff got into an argument with Officer Kimball. (*Id.* at ¶ 14). Officer Kimball then threatened to take Plaintiff across to the infirmary, an area with no cameras, so that he could beat Plaintiff up. (*Id.*). In response, Plaintiff became suicidal and swallowed the arms of his glasses. (*Id.* at ¶ 15).

At approximately 7:00 p.m., Plaintiff was transported to the Cayuga Medical Center in Ithaca, New York by Piotrowski and Kampnich so he could get an endoscopy to remove the glasses arms from his stomach. (*Id.* at ¶ 16). The procedure could not be performed at that time, and Plaintiff returned to Five Points, arriving at approximately 12:30 a.m. (*Id.* at ¶¶ 17-18). Piotrowski escorted Plaintiff to the infirmary while Kampnich returned the transport vehicle. (*Id.* at ¶ 19). Palmer was at the infirmary's desk when Plaintiff checked in, and Plaintiff was placed in the infirmary holding pen. (*Id.*). Sergeant Patterson and Kampnich joined Piotrowski and Palmer at the infirmary desk, and Kampnich referred to Plaintiff as "the Penis Flasher." (*Id.* at ¶ 20). Nurse Springer entered the infirmary and took Plaintiff's vital signs. (*Id.* at ¶ 21). Sergeant Patterson informed Plaintiff that until the objects he swallowed were removed, he would have to spend the night in a dry cell.[1] (*Id.* at ¶ 22).

**\*2** Palmer opened up the door to the dry cell, and Plaintiff was told to step inside. (*Id.* at ¶ 23). Plaintiff had on handcuffs, a waist chain, and leg restraints. (*Id.*). As Plaintiff stepped in, Sergeant Patterson pushed him from behind, and Kampnich

tripped him. (*Id.*). Unable to catch himself because of his restraints, Plaintiff fell to the ground and struck his face. (*Id.* at ¶ 24). Palmer then kicked the left side of Plaintiff's face, fracturing Plaintiff's upper left molar. [2] (*Id.* at ¶ 25). Sergeant Patterson told Palmer "not the face" because Plaintiff had to return to the medical center in the morning. (*Id.* at ¶ 26). Then Sergeant Patterson, Palmer, Piotrowski, and Kampnich kicked and punched Plaintiff in the head, back, ribs, and legs, causing bruises and contusions on his legs, exacerbating a low-back injury, and busting his lip. (*Id.* at ¶¶ 27-28). Piotrowski grabbed Plaintiff by his shirt collar, causing him to pass out momentarily. (*Id.* at ¶ 29).

When Plaintiff came to, the corrections officers were forcing him to stand with his face shoved in the corner of the cell, getting blood from his lip onto the wall. (*Id.* at ¶ 30). Plaintiff was then ordered to kneel on the bed so his leg restraints could be removed, and afterwards he was told to stand. (*Id.* at ¶¶ 31-32). Kampnich and Palmer held Plaintiff on either side by his shirt, and one of them lifted his collar. (*Id.* at ¶ 33). Plaintiff jumped back, and he was punched on his head, back, and ribs before being thrown to the ground on his stomach with his pants around his thighs. (*Id.* at ¶¶ 33-34). Palmer held his upper body down, one or two of the other correctional officers held down his legs, and Kampnich said, "So you like showing your dick!" (*Id.* at ¶ 35). Plaintiff's underwear was pulled down further and either Sergeant Patterson, Kampnich, or Piotrowski pulled on Plaintiff's penis and then penetrated his anus with a small object. (*Id.*). Plaintiff tried to yell out, but Palmer covered his mouth to keep him from screaming. (*Id.*). One of the corrections officers choked Plaintiff by his shirt collar, causing him to pass out again. (*Id.* at ¶ 36).

When Plaintiff regained consciousness, Defendants were gone. (*Id.* at ¶ 37). Sergeant Brinkeroff banged on his door, and Plaintiff told him he needed to report a sexual assault and be looked at by Nurse Springer. (*Id.* at ¶ 38). Sergeant Brinkeroff said Nurse Springer would be there shortly. (*Id.*).

At approximately 12:45 a.m., Plaintiff was seen by Nurse Springer. He was stripped down to his boxers, and Nurse Springer looked him up and down and began to leave. (*Id.* at ¶ 40). Plaintiff told her he had been sexually assaulted and listed his injuries, but Nurse Springer just said "yeah, yeah," before walking out of the room. (*Id.*). She came back two minutes later and gave Plaintiff a wet paper towel to wipe the blood off his face and ignored Plaintiff when he asked if she had reported the sexual assault. (*Id.* at ¶ 42). In the medical report

about the appointment, Nurse Springer stated that Plaintiff had no visible injuries. (*Id.* at ¶ 48).

At 8:00 a.m. on November 23, 2013, Plaintiff returned to the Cayuga Medical Center for the endoscopy. (*Id.* at ¶ 43). He told the first nurse he saw that he had been sexually and physically assaulted at Five Points. (*Id.* at ¶ 44). His doctor notified the New York State Police and the Inspector General's Office about his claims, and while Plaintiff was waiting for his medical procedure, an Inspector General officer came to speak with him. (*Id.* at ¶¶ 46-47). At approximately 10:00 a.m., Plaintiff was given a sexual assault nurse exam ("S.A.N.E. exam"), where the nurse reported the following injuries: (1) three small rectal tears and a small amount of bleeding; (2) an abrasion on his lower lip; (3) a fracture on his left upper molar tooth; (4) a tender, red mid-back; (5) an abrasion on his right shin; and (6) a small abrasion on his lower leg. (*Id.* at ¶¶ 48-49). Plaintiff had the endoscopy to have the glasses arms removed from his stomach, and he returned to Five Points around 1:30 p.m. (*Id.* at ¶ 50).

**\*3** From November 22 to December 20, 2013, Plaintiff was held at Five Points under suicide watch and with a camera order. (*Id.* at ¶ 51). On December 20, 2013, he was sent to the Central New York Psychiatric Center where he stayed for three months, and then he was placed in the mental health behavioral unit at the Great Meadow Correctional Facility ("Great Meadow"). (*Id.*).

On February 20, 2014, Plaintiff filed a grievance regarding the November 23, 2013, incident. Around February or March 2014, after Plaintiff filed his grievance, Plaintiff was served with a misbehavior report alleging that he had assaulted Five Points staff. (*Id.* at ¶ 59). The report stated that Plaintiff initiated the altercation and included the medical report where Nurse Springer stated Plaintiff had no visible injuries. (*Id.* at ¶ 62). A disciplinary hearing was conducted, and the charges against Plaintiff were dismissed due to Kampnich's conflicting testimony. (*Id.* at ¶ 67). Plaintiff requested the hearing disposition and tape number, which he never received. (*Id.*). On March 27, 2016, Plaintiff submitted a request pursuant to New York's Freedom of Information Law ("FOIL request") for the papers related to the incident as well as the hearing disposition and tape number. (*Id.* at ¶ 69). On April 27, 2016, Plaintiff received a response that said there were "no such documents to give" to Plaintiff. (*Id.* at ¶ 71). Plaintiff contacted the Prisoners Legal Service of New York ("PLS"), and a PLS attorney called Great Meadow about the hearing and was told it was still pending. (*Id.* at ¶ 74).

**Patterson v. Patterson, Not Reported in Fed. Supp. (2019)**

Case 6:23-cv-00316-DNH-ML Document 13 Filed 04/18/23 Page 125 of 311

Sometime between 2013 and 2016, Plaintiff was transferred to Attica Correctional Facility, and on November 28, 2016, he was transferred to Marcy. (Dkt. 6). On February 9, 2017, he was transferred to Great Meadow (Dkt. 9), and then back to Attica on July 19, 2017 (Dkt. 14). Sometime in 2018, Plaintiff was transferred to Five Points (Dkt. 21), and on October 29, 2018, he was transferred to the Central New York Psychiatric Center. (Dkt. 26). As of December 19, 2018, Plaintiff resides at Marcy. (Dkt. 28).

## II. Procedural History

Plaintiff filed the instant lawsuit on October 21, 2016. (Dkt. 1). On April 14, 2017, he was granted leave to proceed *in forma pauperis*, and the Court allowed his § 1983 claims for excessive use of force, deliberate indifference, and conspiracy to proceed. (Dkt. 11). Plaintiff was also given the opportunity to amend his complaint so as to properly assert a retaliation claim based on his allegations that Defendants filed a false misbehavior report. (*Id.* at 12). On May 8, 2017, Plaintiff filed an Amended Complaint re-alleging the false misbehavior report claim, and also asserting claims for equal protection against Nurse Springer, retaliation against Nurse Springer, and violations of New York Penal Law. (Dkt. 12). On April 18, 2018, the Court dismissed Plaintiff's false misbehavior report claim and directed service of the Amended Complaint, original complaint, and the April 14, 2017, and April 18, 2018, Orders on Sergeant Patterson, Kampnich, Palmer, Piotrowski, and Nurse Springer. (Dkt. 18). [3]

**\*4** On June 22, 2018, Plaintiff moved for a preliminary injunction. (Dkt. 21). On July 19, 2018, Defendants filed a partial motion to dismiss Plaintiffs claims for equal protection, violations of New York Penal Law, retaliation, conspiracy, injunctive relief, and against them in their official capacities. (Dkt. 22). No responses were filed to either motion. Palmer passed away on September 9, 2018. [4] (Dkt. 25).

## DISCUSSION

## I. Motion for Preliminary Injunction

After Plaintiff was transferred to Five Points sometime in 2018, he filed a motion for a preliminary injunction, asking to be moved from Five Points to a different correctional facility.

(Dkt. 21 at 5). Plaintiff was moved from Five Points to the Central New York Psychiatric Center on October 29, 2018 (Dkt. 26), and then to Marcy on December 19, 2018 (Dkt. 28). As Plaintiff is no longer housed at Five Points, Plaintiff's motion is denied as moot. *See, e.g., McPherson v. Coombe, 992 F. Supp. 229, 232 (W.D.N.Y. 1997)* (holding the transfer of the inmate to a different correctional facility rendered his preliminary injunction motion moot).

## II. Motion to Dismiss

### A. Legal Standards

#### 1. 12(b)(1) Motion to Dismiss

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that the court retains jurisdiction." *Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)*. "When considering a motion to dismiss for lack of subject matter jurisdiction or for failure to state a cause of action, a court must accept as true all material factual allegations in the complaint." *Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998)*. "[T]he district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Luckett v. Bure, 290 F.3d 493, 496-97 (2d Cir. 2002)*. "Indeed, a challenge to the jurisdictional elements of a plaintiff's claim allows the Court to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Celestine v. ML Vernon Neighborhood Health Ctr., 289 F. Supp. 2d 392, 399 (S.D.N.Y. 2003), aff'd, 249 F. App'x 851 (2d Cir. 2007)*. "The court may consider affidavits and other materials beyond the pleadings but cannot rely on conclusory or hearsay statements contained in the affidavits." *Young v. United States, No. 12-CV-2342 ARR SG, 2014 WL 1153911, at \*6 (E.D.N.Y. Mar. 20, 2014)* (quotation omitted).

#### 2. 12(b)(6) Motion to Dismiss

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010)*. A court should consider

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 126 of 311

Patterson v. Patterson, Not Reported in Fed. Supp. (2019)

the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N. Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2279 (2017). To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ).

**\*5** "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.' " *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

### B. Official Capacity Claims and Request for Injunctive Relief

Plaintiff alleges claims against Defendants in their official capacities and requests injunctive relief that he not be housed at Five Points at any time in the future. (Dkt 12 at 44). Defendants seek to dismiss Plaintiff's request for injunctive relief and his claims against them in their official capacities. (Dkt. 22-1 at 6-7, 18-21).

Under the Eleventh Amendment, states and their agencies are immune from suits brought by private parties in federal court, unless Congress "unequivocally expresses its intent" to abrogate that immunity and "acts pursuant to a valid exercise of power," or a state waives its immunity. *In re Charter Oak Assocs.*, 361 F.3d 760, 765 (2d Cir. 2004) (quotations and citation omitted). This jurisdictional bar applies "whether the relief sought is legal or equitable." *Papasan v. Allain*, 478 U.S. 265, 276 (1986). The protections of the Eleventh Amendment extend to state officials acting in their official

capacity. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *see also Fulton v. Goord*, 591 F.3d 37, 45 (2d Cir. 2009); *K & A Radiologic Tech. Servs., Inc. v. Comm'r of Dep't of Health*, 189 F.3d 273, 278 (2d Cir. 1999). "This is so because ... a judgment against a public servant in his official capacity imposes liability on the entity that he represents[.]" *Graham*, 473 U.S. at 169 (quotations and citation omitted).

However, "a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment —for prospective, injunctive relief from violations of federal law." *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007). When determining whether a claim "avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' " *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alteration in original) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment) ).

"Neither the Supreme Court nor the Second Circuit has directly addressed whether a violation that is not currently in progress may nevertheless be considered 'ongoing' where the possibility of a future violation exists." *Babyrev v. Lanotte*, No. 16 Civ. 5421 (ER), 2018 WL 388850, at \*4 (S.D.N.Y. Jan. 11, 2018). However, the other circuits that have examined this issue "have held that the challenged action need not literally 'be in progress' to defeat a claim of sovereign immunity; rather, 'where there is a threat of future enforcement that may be remedied by prospective relief, the ongoing and continuous requirement has been satisfied.' " *Doe v. Annucci*, No. 14 Civ. 2953(PAE), 2015 WL 4393012, at \*16 (S.D.N.Y. July 15, 2015) (quoting *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999) ); *see Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 330 (4th Cir. 2001) ("The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent."); *Vickery v. Jones*, 100 F.3d 1334, 1346 (7th Cir. 1996) ("[T]he *Young* exception permits relief against state officials only when there is an ongoing or threatened violation of federal law."); *Han v. U.S. Dep't of Justice*, 45 F.3d 333, 338 (9th Cir. 1995) (holding the Eleventh Amendment bars suits where "[t]here is no allegation that the

state defendants are likely to approve third party agreements in the future or that plaintiffs otherwise face a threat of harm from the state defendants' future actions").

**\*6** Plaintiff fails to allege an ongoing violation or threat of future enforcement of federal law that would entitle him to injunctive relief. Plaintiff requests that he not be transferred back to Five Points, alleging that if he is, Defendants will retaliate against him by assaulting him and tampering with his mail and food. (Dkt. 12 at 45). Such statements merely speculate as to possible future conduct by Defendants; Plaintiff does not allege that Defendants are currently engaging in unconstitutional behavior or that a policy could be enforced against Plaintiff in violation of his constitutional rights. *See Lee v. O'Harer*, No. 9:13-CV-1022, 2014 WL 7343997, at \*11 (N.D.N.Y. Dec. 23, 2014) (dismissing the plaintiffs request for injunctive relief because "[e]ven plaintiff's retaliation claim, if it were to proceed, does not allege anything other than speculative future conduct. There is no allegation of any ongoing policy that could be enjoined"); *see also Vega v. Semple*, No. 3:17-CV-107 (JBA), 2018 WL 4656236, at \*12 (D. Conn. Sept. 27, 2018) (allowing a claim for prospective injunctive relief to go forward because the plaintiffs' allegations "are not merely speculative" and state a continuous violation of law), *appeal filed*, No. 18-3176 (2d Cir. Oct. 24, 2018). [5]

The Court therefore finds Plaintiff's request for injunctive relief is insufficient to avoid the protections extended to state actors by the Eleventh Amendment, as are his claims against Defendants in their official capacities, and they are accordingly dismissed.

### C. Equal Protection Claim

Plaintiff alleges that Nurse Springer violated his equal protection rights. (Dkt. 12 at ¶ 83). For the reasons that follow, the Court finds the Amended Complaint fails to state an equal protection claim.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). "Plaintiffs in such cases generally allege that they have been arbitrarily classified as members of an identifiable group." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008) (quotation omitted). " 'Unless a classification trammels fundamental personal rights or

is drawn upon inherent suspect distinctions such as race, religion, or alienage,' the courts must presume that the distinctions made are constitutional as long as they are 'rationally related to a legitimate state interest.' " *Robles v. Dennison*, 745 F. Supp. 2d 244, 301 (W.D.N.Y. 2010) (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976), *aff'd*, 449 F. App'x 51 (2d Cir. 2011) ).

However, "an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that [he] has been irrationally singled out as a so-called 'class of one.' " *Id.* "To state an equal protection claim based on a theory of selective enforcement, a plaintiff must plausibly allege ... that he was treated differently from other similarly situated individuals." *Lanning v. City of Glen Falls*, 908 F.3d 19, 29 (2d Cir. 2018). "He also must show that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not 'reasonably related to [any] legitimate penological interests.' " *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (alteration in original) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001) ).

**\*7** Plaintiff has failed to allege either that he was a member of a protected class or that he was treated differently from other similarly situated individuals. *See, e.g., Roman v. Donelli*, 347 F. App'x 662, 663 (2d Cir. 2009) (holding the prisoner's equal protection claim was properly dismissed because he "has not established that he is a member of a protected class, nor has he established an equal protection violation under a 'class of one' theory"); *Green v. Martin*, 224 F. Supp. 3d 154, 171 (D. Conn. 2016) (dismissing the prisoner's equal protection claim because he did not allege that he was a member of a protected class or that he was treated differently from a similarly situated inmate). Plaintiff alleges that Nurse Springer "neglecting to report my sexual assault complaint was an act of discrimination in violation of my equal protection [rights] under the United States Constitution." (Dkt. 12 at ¶ 83). Plaintiff's conclusory statements are not sufficient to state an equal protection claim. *See A'Gard v. Perez*, 919 F. Supp. 2d 394, 406 (S.D.N.Y. 2013) (holding the plaintiff failed to state a claim for denial of equal protection "because the Amended Complaint states no facts demonstrating that the plaintiff was treated differently from similarly situated inmates"); *Marrero v. Kirkpatrick*,

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 128 of 311

Patterson v. Patterson, Not Reported in Fed. Supp. (2019)

659 F. Supp. 2d 422, 424-25 (W.D.N.Y. 2009) (dismissing the prisoner's equal protection claim because he made the allegation "in conclusory fashion"). Accordingly, the Court grants Defendants' motion to dismiss as to this claim.

### D. New York Penal Law Claims

Plaintiff alleges that Defendants violated 🏳️New York Penal Law §§ 130.20(1), 🏳️130.25(1), 🏳️130.55, and 🏳️130.60. The Court dismisses these claims for the reasons that follow.

Under New York law, "[i]n the absence of an express private right of action, plaintiffs can seek civil relief in a plenary action based on a violation of the statute only if a legislative intent to create such a right of action is fairly implied in the statutory provisions and their legislative history." *Cruz v. TD Bank, N.A.*, 22 N.Y.3d 61, 70 (2013) (quotation omitted). Determining whether a private right of action exists depends on three factors: "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme."

🏳️*Sheehy v. Big Flats Cmty. Day, Inc.*, 73 N.Y.2d 629, 633 (1989). Defendants do not contest the first two factors, but rather whether a private right of action for these New York Penal Law sections would be consistent with the legislative scheme. (Dkt. 22-1 at 9-10); *see* 🏳️*Sheehy*, 73 N.Y.2d at 634 ("[W]e must, most importantly, determine the consistency of [finding a private right] with the purposes underlying the legislative scheme." (internal alteration, quotation, and emphasis omitted) ).

Plaintiff does not have a private right to bring claims pursuant to 🏳️New York Penal Law §§ 130.20(1), 🏳️130.25(1), 🏳️130.55, and 🏳️130.60. New York courts decline "to recognize a private right of action in instances where the Legislature specifically considered and expressly provided for enforcement mechanisms in the statute itself." *Cruz*, 22 N.Y.3d at 71. Courts within this Circuit have accordingly held consistently that criminal charges under New York law "cannot be prosecuted by a private person." 🏳️*Christian v. Town of Riga*, 649 F. Supp. 2d 84, 91 (W.D.N.Y. 2009); *see, e.g., Ong v. Park Manor (Middletown Park) Rehab. And Healthcare Ctr.*, 51 F. Supp. 3d 319, 348 n.19 (S.D.N.Y. 2014) (discussing that a provision of N.Y. Penal Law "cannot form the basis of a civil claim, nor can it form the basis of a

🏳️§ 1983 or related claim given that those statutes apply only to violations of federal constitutional rights"); *Peterec v. Hilliard*, No. 12-CV-3944 (CS), 2013 WL 5178328, at *8 (S.D.N.Y. Sept. 16, 2013) ("[P]rivate citizens do not have a private cause of action for criminal violations." (quotation omitted) ); *Smith v. N.Y.C. Police Dep't*, No. 06 Civ. 15436(JSR)(KNF), 2010 WL 423039, at *5 (S.D.N.Y. Feb. 4, 2010) ("[A]n individual cannot bring a private cause of action for alleged criminal violations."), *report and recommendation adopted*, 2010 WL 2008839 (S.D.N.Y. May 17, 2010); *Moore v. N.Y.C. Dep't of Educ.*, No. 03 Civ.2034(LAP), 2004 WL 691523, at *5 (S.D.N.Y. Mar. 31, 2004) ("These claims [pursuant to N.Y. Penal Law] must be dismissed because plaintiff has set forth no authority to support his claim that a private right of action to enforce rights allegedly created by these provisions exists.").

**\*8** Moreover, the New York state legislature provided a civil cause of action for victims who have suffered from the acts defined under various sections of New York Penal Law Article 130. *See* 🏳️Civil Practice Law and Rules ("CPLR") § 213-c ("[A] civil claim or cause of action to recover from a defendant ... for physical, psychological or other injury or condition suffered by a person as a result of acts by such defendant of rape in the first degree as defined in 🏳️section 130.35 of the penal law, or criminal sexual act in the first degree as defined in 🏳️section 130.50 of the penal law, or aggravated sexual abuse in the first degree as defined in 🏳️section 130.70 of the penal law, or course of sexual conduct against a child in the first degree as defined in 🏳️section 130.75 of the penal law may be brought within five years."). The legislature's designation of express provisions of Article 130 of New York Penal Law that may be pursued in a civil action indicates that the legislature did not intend for there to be a private right to pursue the remaining provisions, including those invoked by Plaintiff. *See* 🏳️*Sheehy*, 73 N.Y.2d at 636 ("Where the Legislature has not been completely silent but has instead made express provision for civil remedy, albeit a narrower remedy than the plaintiff might wish, the courts should ordinarily not attempt to fashion a different remedy ... at least where ... the two statutes address the same wrong."); *see also* 🏳️*People ex rel. Spitzer v. Grasso*, 42 A.D.3d 126, 135, 836 N.Y.S.2d 40 (1st Dep't 2007) (applying *expressio unius* to disallow the state Attorney General from bringing causes of action against corporate officers "other than the [five] causes of

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 129 of 311

Patterson v. Patterson, Not Reported in Fed. Supp. (2019)

action the Legislature expressly authorized" in the statute). Additionally, the phrasing of the statute indicates that the New York Legislature only intended for the victims of defendants convicted of, or at least charged with, those crimes to be able to pursue civil claims under the statute's purview. *See* CPLR § 213-c ("[A] civil claim or cause of action to recover from a defendant ... for physical, psychological or other injury or condition suffered by a person as a result of acts by such defendant[.]").

Moreover, the state civil statutes that specifically reference the provisions invoked by Plaintiff either discuss legal consequences that stem from a conviction under those sections of the New York Penal Law or use them to articulate term definitions. *See, e.g.,* Dom. Rel. §§ 170, 200 (citing behaviors defined in N.Y. Penal § 130.20 as a cause for filing an action for separation or divorce); Veh. & Traff. § 509-cc (listing N.Y. Penal §§ 130.20, 130.25, and 130.55 as offenses that disqualify a person from being a school bus driver); Alco. Bev. Cont. § 53.1 (stating a conviction under N.Y. Penal §§ 130.55 or 130.60 may cause revocation of a license or permit issued pursuant to the Alcohol Beverage Control Law). Not one of these statutes indicates that the legislature intended for there to be a private right of action pursuant to New York Penal Law §§ 130.20(1), 130.25(1), 130.55, or 130.60.

The Court accordingly finds that a private right of action for Plaintiff's New York Penal Law claims would not be consistent with New York's legislative scheme, and grants Defendants' motion to dismiss them.

#### E. Retaliation Claim

Plaintiff alleges that Nurse Springer violated his First Amendment rights after he told her that Sergeant Patterson, Kampnich, Piotrowski, and Palmer had assaulted him on November 23, 2013. (Dkt. 12 at ¶ 83). He claims she retaliated against his verbal report by ignoring his medical concerns related to the incident. (*Id.*). The Court grants Defendants' motion as to this claim for the following reasons.

To make out a § 1983 retaliation claim, an inmate must show the following: (1) he was engaged in constitutionally protected conduct; and (2) the prison officials conduct was taken in retaliation for the inmate's protected conduct.

*Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996). A prisoner's claims of retaliation are examined with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995). "Prisoner plaintiffs may rely on circumstantial evidence to prove their retaliation claims, such as temporal proximity of events, but in doing so, the plaintiff also must usually provide some non-conclusory evidence that raises an inference of retaliatory animus in order to proceed to trial." *Parks v. Blanchette,* 144 F. Supp. 3d 282, 331 (D. Conn. 2015) (quotation omitted).

"While courts in this Circuit have found that verbal complaints may be protected for the purposes of a First Amendment retaliation claim, the Second Circuit has yet to articulate a bright line rule regarding constitutionally protected oral speech by an inmate." *Booker v. Griffin,* No. 16-CV-00072 (NSR), 2018 WL 1614346, at *17 (S.D.N.Y. Mar. 31, 2018). *Compare McIntosh v. United States,* No. 14-CV-7889 (KMK), 2016 WL 1274585, at *26 (S.D.N.Y. Mar. 31, 2016) ("[T]here is authority in the Second Circuit for the proposition that verbal complaints can be protected action for purposes of a First Amendment retaliation claim."), *with Allah-Kasiem v. Sidorowicz,* No. 09 Civ. 9665(DLC), 2012 WL 2912930, at *9 (S.D.N.Y. July 17, 2012) ("Having chosen not to use the grievance process provided by [DOCCS], [the plaintiff] cannot claim that his comments to [the defendant] are entitled to the same protection that adheres to properly filed grievances."). Additionally, the vast majority of cases that address whether a prisoner's verbal complaints may constitute protected speech do so in the context of prisoners complaining to corrections officers—the Court's research found only one case in this Circuit where instead a law librarian was implicated, *see White v. Westchester County,* No. 18-CV-730 (KMK), 2018 WL 6726555, at *1, *16 (S.D.N.Y. Dec. 21, 2018) ("Plaintiff has plausibly alleged that he was engaging in protected speech both when he approached [the defendant] to notarize his notice of claim against [the other defendants] and when he confronted [the defendant] about her harassment of him."), and none involving complaints made to medical staff. [6]

**\*9** "Qualified immunity insulates public officials from claims for damages where their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Defore v. Premore,* 86 F.3d 48, 50 (2d Cir. 1996) (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982) ). " 'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id.* "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* at 590.

Nurse Springer is entitled to qualified immunity as to Plaintiff's retaliation claim. Assuming the truth of Plaintiffs claims, Nurse Springer's alleged conduct occurred on November 23, 2013, and the law surrounding whether a prisoner's verbal complaints are protected speech was unsettled then, and is still unsettled as of the issuance of this Decision. *See Booker*, 2018 WL 1614346, at *17 (holding the defendants were entitled to qualified immunity at the pleadings stage as to the First Amendment retaliation claim "[b]ecause the law is not well-settled regarding whether an inmate's verbal complaint constitutes protected speech"); *Ford v. Martuscello*, No. 9:14-cv-01566 (DNH/DEP), 2016 WL 5322166, at *4 (N.D.N.Y. June 23, 2016) ("[T]he Second Circuit has yet to articulate a bright line rule regarding constitutionally protected oral speech by an inmate[.]"), *report and recommendation adopted*, 2016 WL 5256901 (N.D.N.Y. Sept. 22, 2016); *see also Rodriguez v. Phillips*, 66 F.3d 470, 479 (2d Cir. 1995) (granting qualified immunity where an officer allegedly retaliated against a prisoner for verbally defending another inmate because there was "no clearly established First Amendment right to approach and speak to" the officer).

Accordingly, the Court grants Defendants' motion as to Plaintiff's retaliation claim. [7]

### F. Conspiracy to Cover-Up Claim

Plaintiff alleges Defendants conspired to file a false misbehavior report against him to cover up their unlawful use of force. The Court dismisses Plaintiff's conspiracy claim for the reasons that follow.

To state a conspiracy claim in violation of constitutional rights under § 1983, a plaintiff must allege: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).

The intracorporate conspiracy doctrine provides that "if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own ... officers[ ] and employees, each acting within the scope of his employment[,] there can be no actionable conspiracy." *O'Diah v. Neth*, No. 6:10-CV-6592(MAT), 2013 WL 6440610, at *4 (W.D.N.Y. Dec. 9, 2013) (quotation and citation omitted) (alterations in original). "[A]n exception to the doctrine applies when individual employees are pursuing personal interests wholly separate and apart from the entity[.]" *Anemone v. Metro. Transp. Auth.*, 419 F. Supp. 2d 602, 604 (S.D.N.Y. 2006).

**\*10** "While exact specifics are not required, 'the pleadings must present facts tending to show agreement and concerted action.' " *Graham v. Peters*, No. 13-CV-705JTC, 2013 WL 5924727, at *2 (W.D.N.Y. Oct 31, 2013) (quoting *Anilao v. Spota*, 774 F. Supp. 2d 457, 512-13 (E.D.N.Y. 2011) ). Plaintiff is required to " 'make an effort to provide some details of time and place and the alleged effects of the conspiracy.' In addition, a plaintiff must plead facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993) ).

Plaintiff has failed to allege that Defendants acted to inflict an unconstitutional injury on him. The Amended Complaint alleges that Defendants conspired to file a false misbehavior and medical report against Plaintiff regarding the events of November 23, 2013, to cover up their unlawful use of force on Plaintiff. (Dkt. 12 at ¶¶ 62-63). "[T]here is no constitutional right to be free from the cover-up of a past constitutional violation." *Lewis v. Havernack*, No. 9:12-CV-0031 (GLS/DEP), 2013 WL 1294606, at *12 (N.D.N.Y. Mar. 28, 2013), *report and recommendation adopted*, 2013 WL 1294592 (N.D.N.Y. Mar. 28, 2013); *see James v. Annucci*, No. 9:17-CV-0843 (GTS/DEP), 2018 WL 4565771, at *4 (N.D.N.Y. Sept. 24, 2018) ("General allegations that a party conspired to cover up a past constitutional violation are insufficient to establish liability under Section 1983."); *De Ponceau v. Bruner*, No. 9:09-CV-0605 (GTS/DEP), 2012 WL 1030415,

at *7 (N.D.N.Y. Feb. 21, 2012) ("A claim that a prison employee has taken steps to conceal evidence of a past constitutional violation which is not ongoing does not alone state a cognizable constitutional claim under 42 U.S.C. § 1983."), *report and recommendation adopted by* 2012 WL 1014821 (N.D.N.Y. Mar. 23, 2012). Rather, Plaintiff must allege that the conspiracy itself inflicted some sort of unconstitutional injury, such as a deprivation of due process rights. *See Barrett v. United States,* 798 F.2d 565, 578 (2d Cir. 1986) (finding the existence of a constitutional deprivation when a cover-up resulted in a lower settlement figure).

The Court previously addressed how Defendants' alleged conduct impacted Plaintiff's due process rights in its April 14, 2018, and April 18, 2018, Orders in the context of Plaintiff's false misbehavior report claim. (Dkt. 11 at 11-12; Dkt. 18 at 2-3). "In general, a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Willey v. Kirkpatrick,* 801 F.3d 51, 63 (2d Cir. 2015) (quotation omitted). There are two exceptions to this rule: "when an inmate is able to show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right." *Id.* (quotation omitted). The Court found Plaintiff has not alleged that he was disciplined because of the conspiracy or allegedly false misbehavior report (Dkt. 18 at 3)—in fact, he alleges that the charges brought against him were dismissed after a disciplinary hearing or are still pending (Dkt. 12 at ¶¶ 67, 74). As Plaintiff alleges that he was not disciplined, he has failed to allege, nor could he allege, that any agreement between Defendants resulted in a deprivation of his due process rights. *See McCloud v. Prack,* 55 F. Supp. 3d 478, 483 (W.D.N.Y. 2014) (holding the plaintiff's allegations could not establish a constitutional deprivation because "the

misbehavior reports issued against plaintiff, arising out of the incidents in question, were dismissed").

**\*11** Plaintiff also alleges that Nurse Springer falsified her medical report as part of the cover-up. (Dkt. 12 at ¶ 62 ("Defendant Joann L. Springer, misrepresented the altercation of Nov. 23, 2013 by falsifying the medical report, which she wrote in conspiracy with [the other defendants], that Plaintiff (me) had no [visible] injuries[.]") ). A guard or nurse's failure to document an inmate's injuries is not a constitutional deprivation, and bare allegations that a medical report was used to cover up a conspiracy are not sufficient to state a conspiracy claim pursuant to § 1983. *See Tavares v. N.Y.C. Heath and Hosps. Corp.,* No. 13-cv-3148 (PKC) (MHD), 2015 WL 158863, at *9 (S.D.N.Y. Jan. 13, 2015) (holding the plaintiff's allegations that medical staff tried to cover-up for the defendants in their medical report was not sufficient to state a conspiracy claim); *Evans v. Murphy,* No. 12CV365, 2013 WL 2250709, at *3 (W.D.N.Y. May 22, 2013) ("[T]he plaintiff asserts that [a prison official] failed to document [the plaintiff's] injuries to cover-up the incident. Such a claim does not state a constitutional claim."). [8]

Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's conspiracy claim.

## CONCLUSION

For the forgoing reasons, Plaintiff's motion for a preliminary injunction (Dkt. 21) is denied, and Defendants' partial motion to dismiss (Dkt. 22) is granted.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1284346

## Footnotes

1     A dry cell is a cell with no sink or toilet; only a bedframe and mattress. (Dkt. 12 at ¶ 22).

2     The tooth was so severely damaged that it later had to be removed. (Dkt. 12 at ¶ 25).

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 132 of 311

Patterson v. Patterson, Not Reported in Fed. Supp. (2019)

3    To the extent the Court's April 18, 2018, Order references Plaintiff's deliberate indifference claim as being dismissed (Dkt. 18 at 2), any such statement was in error. Only the false misbehavior report claim was dismissed, as stated in the decretal section of the Order. (*Id.* at 4). Plaintiff's deliberate indifference claim has not been dismissed and may proceed to discovery.

4    An order will issue under separate cover addressing the procedural implications raised by Defendants' filing of the suggestion of death of Palmer.

5    Although this argument was not raised by Defendants, another potential problem with Plaintiff's request for injunctive relief is that any Defendants named in the instant lawsuit do not appear to have the authority to decide where Plaintiff is housed, and therefore it is not certain that Plaintiff's injury could be redressed if he is granted the injunctive relief he seeks. *See* NY Correction Law § 72.2 ("The commissioner, or the superintendent or director of an institution in which an inmate is confined, may permit an inmate to be taken, under guard, to any place or for any purpose authorized by law[.]").

6    Liberally construing Plaintiff's allegations, as is required when a plaintiff proceeds *pro se*, Plaintiff could claim that Nurse Springer retaliated against him for telling Sergeant Brinkeroff that he needed to report a sexual assault. (Dkt. 12 at ¶ 38). However, the Court finds that even if that were Plaintiff's claim, Nurse Springer would still be entitled to qualified immunity for the reasons discussed below.

7    In its April 14, 2017, Order, the Court noted that while filing a grievance is a constitutionally protected activity for retaliation purposes, Plaintiff did "not allege that his filing of the grievance was the substantial or motivating factor behind the Misbehavior report." (Dkt. 11 at 11-12). The Court afforded Plaintiff leave to file an amended complaint to cure this defect (*id.* at 12), but Plaintiff's Amended Complaint failed to do so (Dkt. 12 at 23-31). Accordingly, the Court dismissed Plaintiff's false misbehavior report claims in its April 18, 2018, Order. (Dkt. 18 at 3).

8    Additionally, as discussed above, to the extent that Plaintiff alleges Nurse Springer engaged in retaliatory conduct by issuing a false medical report in response to his verbal complaint, she is entitled to qualified immunity. Moreover, Plaintiff has not alleged facts demonstrating "that [D]efendants entered into an agreement, express or tacit," to retaliate against him—his conspiracy claim instead centers around Defendants' alleged cover-up. *Warren*, 33 F. Supp. 2d at 177; *see supra* note 7.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 133 of 311

Brett v. Rodriguez, Not Reported in Fed. Supp. (2016)

2016 WL 3704917
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Frank BRETT, Plaintiff,

v.

U.S. Marshal Louis RODRIGUEZ, et al., Defendants.

CIVIL ACTION NO. 1:15-CV-02366
|
Signed 03/21/2016

**Attorneys and Law Firms**

Frank Brett, Harrisburg, PA, pro se.

**REPORT AND RECOMMENDATION**

KAROLINE MEHALCHICK, United States Magistrate
Judge

**\*1** This action was commenced by the filing of a complaint
in this matter on December 9, 2015, by *pro se* Plaintiff Frank
Brett. The Court has reviewed the complaint in accordance
with 28 U.S.C. § 1915(e). For the reasons provided
herein, the Court respectfully recommends dismissal of
this complaint pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)
without leave to amend, as the complaint is frivolous insofar
as it contains claims that lack an arguable basis in law or fact.

**I. BACKGROUND**

On December 9, 2015, *pro se* Plaintiff Frank Brett
commenced this action by filing a complaint, an application
to proceed *in forma pauperis*, and a motion to file documents
under seal. (Doc. 1; Doc. 2; Doc. 3). By separate Order,
the Court granted Brett's application to proceed *in forma
pauperis*, but denied his motion to file documents under seal.

This largely illegible handwritten pleading containing
rambling, unclear, and nonsensical assertions, is characteristic
of Brett's numerous other filings in federal court.[1] Brett
names U.S. Marshal Rodriguez, U.S. Marshal Leonard,
Vincent Burns, Mr. Monet, and Corey Hines as Defendants in
the caption of the complaint. The civil action template form
and ten-page attachment contain the following allegations:
(1) that U.S. Marshal Rodriguez violated Brett's civil rights

by directing the Internal Revenue Service to stalk and harass
him; (2) that Corey Hines, an "Eastern Pa. Federal Court
Clerk," retaliated against Brett in 2014 and 2015 in violation
of 18 U.S.C. § 115(c)(2) by following him to Florida and
Harrisburg, Pennsylvania, and by giving out his personal
information; (3) that Vincent Burns, Mr. Monet, and Mr.
Man "all reside at the Bethesda Mission[2] and have called
[him] gay, ... [and] a retarded Forrest Gump"; (4) that Vincent
Burns, Mr. Lovejoy, Mr. Bolton, Beth Bolton, Joe Rivera, and
others broke into his home; and (5) Mr. Allen "picked up
[Brett's] bed with [him] in it and moved [him] without [him]
saying a word in a threatening matter." (Doc. 2, at 2). The
remaining nine pages of the complaint contain an extensive
list of license plate numbers. (Doc. 2-1, at 2-9).

**II. Section 1915 (E) (2) STANDARD**

**\*2** Under 28 U.S.C. § 1915(e)(2), the Court is required
to dismiss an action brought *in forma pauperis* if it is
"frivolous." *See* 28 U.S.C. § 1915(e)(2)(B)(i). Under this
statute, an *in forma pauperis* action may be dismissed *sua
sponte* for frivolousness "at any time," before or after service
of process. *See* 28 U.S.C. § 1915(e)(2); *Walker v. Sec.
Office of SCI Coal Twp.*, Civil No. 3:CV-08-1573, 2010 WL
1177338, at \*4 (M.D. Pa. Mar. 25, 2010).

An action is "frivolous where it lacks an arguable basis in
either law or fact." *Neitzke v. Williams*, 490 U.S. 319, 325
(1989); *see also Thomas v. Barker*, 371 F. Supp. 2d 636,
639 (M.D. Pa. 2005). To determine whether it is frivolous, a
court must assess a complaint "from an objective standpoint
in order to determine whether the claim is based on an
indisputably meritless legal theory or clearly baseless factual
contention." *Deutsch v. United States*, 67 F.3d 1080, 1086
(3d Cir. 1995) (citing *Denton v. Hernandez*, 504 U.S.
25, 34 (1992)); *Thomas*, 371 F. Supp. 2d at 639. Factual
allegations are "clearly baseless" if they are "fanciful,"
"fantastic," or "delusional." *See* *Denton*, 504 U.S. at
32-33. "[A] finding of factual frivolousness is appropriate
when the facts alleged rise to the level of the irrational or
the wholly incredible, whether or not there are judicially
noticeable facts available to contradict them." *Denton*, 504
U.S. at 33. A district court is further permitted, in its sound
discretion, to dismiss a claim "if it determines that the claim

is of little or no weight, value, or importance, not worthy of serious consideration, or trivial." *Deutsch*, 67 F.3d at 1089.

## III. DISCUSSION

### A. FEDERAL CLAIMS

Having reviewed the complaint, the Court cannot ascertain a clear legal basis for a non-frivolous federal claim within this Court's jurisdiction. Therefore, this action must be dismissed as legally frivolous. [3]

**\*3** As an initial matter, aside from referencing the "Civil Rights Act of 1983" on the civil cover sheet, the complaint itself is completely devoid of any facts establishing that Brett was deprived of a right secured by the Constitution in violation of 42 U.S.C. § 1983. (Doc. 2-2, at 1). Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.

Section 1983 does not create substantive rights, but rather provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To state a § 1983 claim, a plaintiff must demonstrate that the defendants, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). The "under color of state law" requirement excludes from its reach "merely private conduct, no matter how discriminatory or wrongful." *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982). Here, it is beyond cavil that the defendants and non-parties identified in the complaint are private citizens and federal employees, not arms of the state. Under limited circumstances, a private individual may be liable under § 1983 if his or her conduct is so closely related to governmental conduct that it can be fairly viewed as conduct of the state

itself. However, none of the conduct alleged by Brett can be fairly viewed as state action.

Moreover, there is no legal basis for a federal civil rights claim grounded on alleged defamatory statements. Indeed, "[s]lander and defamation are not actionable under a constitutional tort theory." *Akins v. Kasheta*, Civil Action No. 3:CV-06-1704, 2006 WL 2828821, at \*4 (M.D. Pa. Sept. 29, 2006); *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 402 (3d Cir. 2000) ("The Supreme Court has made clear that federal courts are not to view defamatory acts as constitutional violations."); *Brett v. Izzi*, No. 1:CV-11-1528, 2011 WL 5237912, at \*7 (M.D. Pa. Sept. 8, 2011) *report and recommendation adopted*, No. 1:11-CV-01528, 2011 WL 5314193 (M.D. Pa. Nov. 1, 2011) ("Plaintiff's claim that Defendants ... slandered him fails to state a cognizable claim under § 1983 since a state law tort claim against private persons is not a basis for liability in [a §]1983 action.").

Finally, Brett's reliance on 18 U.S.C. § 115 is misplaced. 18 U.S.C. § 115 criminalizes the act of influencing, impeding or retaliating against a federal official by threatening or injuring a family member. This criminal statute, however, does not create a private right of action. *See Brett v. Brett*, 503 Fed.Appx. 130, 132 (3d Cir. 2012) ("[C]riminal statutes do not give rise to civil liability."); *see also Allen v. Admin. Office of Pa. Courts*, 270 Fed.Appx. 149, 150 (3d Cir. 2008) (unpublished); *United States v. Friedland*, 83 F.3d 1531, 1539 (3d Cir. 1996) ("[T]he United States Attorney is responsible for the prosecution of all criminal cases within his or her district.").

**\*4** Under the circumstances presented, these claims are clearly based on indisputably meritless legal theories and thus this action should be dismissed as legally frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i).

### B. STATE LAW CLAIMS

The Court construes the *pro se* complaint as asserting state law claims for slander and defamation. Where a district court has dismissed all claims over which it had original jurisdiction, the Court may decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3). Whether the Court will exercise supplemental jurisdiction is within its discretion. *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009). That decision should be based on "the values

of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Ordinarily, when all federal law claims have been dismissed and only state law claims remain, the balance of these factors indicates that these remaining claims properly belong in state court. *Cohill*, 484 U.S. at 350. Finding nothing in the record to distinguish this case from the ordinary one, the balance of factors in this case "point[s] toward declining to exercise jurisdiction over the remaining state law claims." *See Cohill*, 484 U.S. at 350 n.7. Therefore, it is recommended that the Brett's state law claims be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## IV. RECOMMENDATION

Based on the forgoing, it is recommended that:

1. All federal claims be **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B)(i);

2. All remaining state law claims be **DISMISSED WITHOUT PREJUDICE** to Plaintiff refiling these claims in state court pursuant to 28 U.S.C. § 1367(c)(3);

3. Leave to amend be **DENIED** as futile, *see Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Coleman v. Gettysburg Coll.*, 335 F. Supp. 2d 586, 590 (M.D. Pa. 2004); and

4. The Clerk of Court be directed to **CLOSE** this case.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3704917

## Footnotes

1    As noted by a magistrate judge presiding in the United States District Court for the Eastern District of North Carolina, as of February of 2013, Brett has unsuccessfully pursued "scores" of cases in twelve different federal districts. *See Brett v. Hansen*, No. 5:12-CV-127-BR, 2013 WL 663914, at *3 n.5 (E.D.N.C. Feb. 25, 2013) *report and recommendation adopted*, No. 5:12-CV-00127-BR, 2013 WL 1187433 (E.D.N.C. Mar. 22, 2013). A district judge presiding in the United States District Court for the Eastern District of Pennsylvania identified at least thirty-eight cases Brett has filed that have been dismissed as frivolous or for failure to state a claim. *See Brett v. Sampson*, No. 15-3711 (E.D. Pa. Sept. 21, 2015). With respect to the cases Brett has filed in this District, by this Court's own calculation, it appears that this action is one of at least eight actions dismissed for failure to state a claim or for lack of jurisdiction. *See e.g., Brett v. Owner Don Traube, et al.*, No. 1:12-cv-00713 (dismissing action for lack of subject matter jurisdiction on May 15, 2012); *Brett v. U.S. Marshal[ ]s, et al.*, No. 1:12-cv-01495 (dismissing action for failure to file an amended complaint that states a claim for relief on October 16, 2012); *Brett v. U.S. Marshal Steve, et al.*, No. 1:13-cv-0597 (dismissing action for failure to file an amended complaint that state a claim for relief on January 5, 2015); *Brett v. Brady, et al.*, No. 1:13-cv-02624 (dismissing action for failure to file an amended complaint that states a claim for relief on February 19, 2014).

2    The Bethesda Mission is a homeless shelter for men located in Harrisburg, Pennsylvania.

3    Based upon the description of Brett's claims as set forth in the Background Section of this Report and Recommendation, it is clear that this action rests upon clearly baseless factual contentions as well. The complaint is replete with "fanciful," "fantastic," and "delusional" factual allegations. *See Denton*, 504 U.S. at 32-33. The Court notes that this is not the first time Brett's complaint has been deemed frivolous. Indeed, it appears many, if not all, of the allegations in the complaint relate to matters that Plaintiff has raised in numerous actions filed in both this court and several other federal courts. *See, e.g., Brett v. Unknown Latin*

**Brett v. Rodriguez, Not Reported in Fed. Supp. (2016)**

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 136 of 311

*Am. Man*, No. CIV.A. 12-1751-GMS, 2013 WL 1775524, at \*2 (D. Del. Apr. 24, 2013); *Brett v. Wright*, No. CIV.A. 12-706-GMS, 2012 WL 4061792, at \*2 (D. Del. Sept. 13, 2012) (dismissing as frivolous Brett's complaint, which referred to automobile accidents that occurred on March 23, 2012 and April 1, 2012, and sought to assert a slander claim against various non-parties because "all of them, at different times, called him gay, retarded, and Forrest Gump"); *Brett v. Wheeler*, No. CV 15-1141-GMS, 2016 WL 541130, at \*1 (D. Del. Feb. 9, 2016) (dismissing the complaint as frivolous where Plaintiff alleged that Defendants stole his civil rights, stalked him in ten states, called him gay and touched him inappropriately in Florida, and hit him with a Cadillac, causing injuries); *Brett v. Jenkins*, No. 6:14-cv-426-Orl-36DAB, 2014 U.S. Dist. LEXIS 57871, at \*1 (M.D. Fla. Mar. 20, 2014) (identifying a series of frivolous actions filed by Plaintiff), *report and recommendation adopted*, 2014 U.S. Dist. LEXIS 57867 (M.D. Fla. Apr. 25, 2014); *Brett v. Curtis*, No. 8:14-cv-727-T-33EAJ, 2014 U.S. Dist. LEXIS 54982, at \*3 n. 2 (M.D. Fla. Apr. 1, 2014) (same), *report and recommendation adopted*, 2014 U.S. Dist. LEXIS 54980 (M.D. Fla. Apr. 21, 2014).

---

**End of Document**                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1877704
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Victor WALTHOUR, Sr., Plaintiff,

v.

Judge Jon HERRON, Defendant.

Civil Action No. 10–01495.
|
May 6, 2010.

**Attorneys and Law Firms**

Victor Walthour, Sr., Garnet Valley, PA, pro se.

Geri Romanello St. Joseph, Administrative Office Of Pennsylvania Courts, Philadelphia, PA, for Defendant.

***OPINION AND ORDER***

SLOMSKY, District Judge.

**\*1** This case was instituted by *pro se* Plaintiff, Victor Walthour, Sr., on April 5, 2010. The Complaint (Doc. No. 1) alleges that on March 24, 2010 Defendant, the Honorable John W. Herron (improperly captioned as "Judge Jon Herron"), signed a decree removing Plaintiff as the legal guardian of Plaintiff's wife, Mrs. Rosalyn Walthour. (Compl., 3.) The only further averments are that a person named Sheila Gibson was also involved and that court reporters witnessed this event. (*Id.*) The Complaint asserts federal question jurisdiction under 18 U.S.C. §§ 241, 242, 245, 247, 371 and 1951, and 42 U.S.C. §§ 1983, 1985, 1986, and 3631. (*Id.* at 2.) The relief sought by Plaintiff includes:

> Removal of decision making duties[.] Everything he has now and in the future [.] Everything his wife has now and in the future[.] Everything any offspring has now and in future[.] Everything his in-laws have now and

in future [.] Everything his parents have now and in future[.]

(*Id.* at 3–4.)

Before the Court is a Motion to Dismiss (Doc. No. 3) and supporting Memorandum of Law (Doc. No. 4) filed by Judge Herron. Plaintiff filed a response in the form of a Motion (Doc. No. 6) requesting that Judge Herron's Motion to Dismiss be denied (hereinafter "Plaintiff's Response in Opposition"). Plaintiff's Response in Opposition states in full:

> Now this day 16 April 2010 I ask that the motion to dismiss be denied.

> 1) Knowledge is power, I have the knowledge that a Judge cannot open and alter a settlement brokered by another Judge who ordered it sealed!

(Pl.'s Response in Opposition, 1.)

Attached to Plaintiff's Response in Opposition is a copy of a March 24, 2010 Interim Order and Opinion from the Court of Common Pleas of Philadelphia, Orphan's Court Division, signed by Judge Herron (hereinafter "Exhibit A"). From this Opinion, it is apparent that Plaintiff's wife is incapacitated and is the beneficiary of a trust for her care and maintenance, which is worth approximately $9,649,643. (*Id.* at Exhibit A, 1.)

On February 16, 2010, Judge Herron held a hearing regarding the proposed spending plan under Mrs. Walthour's trust. (*Id.*) After this hearing, Judge Herron Ordered that Plaintiff be removed as co-guardian of his wife's estate because the proposed spending plan was wasteful of Mrs. Walthour's assets. (*Id.*) The proposed spending plan would have resulted in a projected annual income deficit of approximately $368,500. (*Id.*) The concluding paragraphs of Judge Herron's Opinion state that:

> Victor Walthour, co-guardian, fails to appreciate the significant financial issues and in consideration of his testimony during the proceedings, this Court deems him unqualified to serve as co-guardian and orders that he cease to serve in this capacity.

> A further hearing shall take place on April 13, 2010 at 10:00 a.m. in Courtroom 416 City Hall at which time the remaining guardian Ms. Hobkirk shall appear and present

an alternative care plan for the Incapacitated Person [i.e., Rosalyn Walthour].

**\*2**   (*Id.* at Exhibit A, 2.)

For reasons stated below, the Court will grant Defendant's Motion and dismiss the Complaint in its entirety.

## I. MOTION TO DISMISS STANDARD

The motion to dismiss standard has undergone recent transformation, culminating with the Supreme Court's Opinion in *Ashcroft v. Iqbal,* ——U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). After *Iqbal* it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" in defeating a motion to dismiss. *Id.* at 1949; *see also Bell Atlantic Corp. V. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Applying the principles of *Iqbal,* the Third Circuit in *Fowler v. UPMC Shadyside,* 578 F.3d 203 (3d Cir.2009), articulated a two part analysis that district courts in this Circuit must conduct in evaluating whether allegations in a complaint survive a motion to dismiss.

First, the factual and legal elements of a claim should be separated, meaning "a District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11. Second, the Court must determine whether the facts alleged in the complaint demonstrate that the plaintiff has a "plausible claim for relief." *Id.* at 211. In other words, a complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. *Id.* (citing *Phillips v. County of Allegheny* 515 F.3d 224, 234–35 (3d Cir.2008)). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.' " *Iqbal,* 129 S.Ct. at 1950. This "plausibility" determination under step two of the analysis is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

In this case, the allegations contained in Plaintiff's Complaint will be liberally construed, as pleadings filed by *pro se* plaintiffs are held to a less stringent standard than formal pleadings drafted by attorneys. *Erickson v. Pardus,* 551

U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *see also* Fed.R.Civ.P. 8(e) ("[p]leadings must be construed so as to do justice"). Plaintiff has not indicated whether he is suing Judge Herron in his official or personal capacity. Therefore, in deciding this Motion to Dismiss and construing Plaintiff's Complaint liberally, the Court will infer that Plaintiff intended to sue Judge Herron in both his official and personal capacity.

## II. DISCUSSION

### A. Failure to State a Claim Upon Which Relief May be Granted

### 1. Claims Under Criminal Statutes: 18 U.S.C. §§ 241, 242, 245, 247, 371 and 1951

A private individual may sue under a federal statute only when Congress intended to create a private right of action. *See Gonzaga Univ. v. Doe,* 536 U.S. 273, 284–85, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) ("where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit").

**\*3**   In this case, Plaintiff asserts a violation of his rights under the following federal criminal statutes: 18 U.S.C. §§ 241, 242, 245, 247, 371 and 1951. (Compl., 2.) These statutes do not provide a private right of action under which Plaintiff may sue. *See Powers v. Karen,* 786 F.Supp. 46, 51 (E.D.N.Y.1991) ("because [18 U.S.C. §§ ] 241 and 242 do not provide for a private right of action, plaintiff's reliance on them is misplaced"), *aff'd,* 963 F.2d 1522 (2d Cir.1992); *People ex rel. Snead v. Kirkland,* 462 F.Supp. 914, 920 (E.D.Pa.1978) ("[ 18 U.S.C. § 245] permits federal prosecution for interference with a long list of federally protected activities; it confers neither substantive rights nor a private right of action for damages"); *Vega v. Daniels,* No. 07–1193, 2009 WL 80434, \*10 (E.D.Cal. Jan.13, 2009) (noting that 18 U.S.C. § 247 does not provide a "basis for Plaintiff to pursue claims of violation of his constitutional rights"); *Rockefeller v. U.S. Court of Appeals Office for Tenth Circuit Judges,* 248 F.Supp.2d 17, 23 (D.D.C.2003) (finding that there is no private right of action under 18 U.S.C. § 371); *Peterson v. Philadelphia Stock Exchange,* 717 F.Supp. 332, 336 (E.D.Pa.1989) ("The Hobbs Act [ 18 U.S.C. §

1951] contains no language which suggests it can provide civil relief.")

It is clear that none of the criminal statues cited by Plaintiff provide him with a private right of action. Generally, crimes are prosecuted by the government not by private citizens. Therefore, Plaintiff's claims under 18 U.S.C. §§ 241, 242, 245, 247, 371 and 1951 will be dismissed for failure to state a claim upon which relief may be granted.

**2. Claims Under Civil Rights Statutes: 42 U.S.C. §§ 1983, 1985, 1986, and 3631**

*a. Claims Under 42 U.S.C. § 1983*

The civil rights statute 42 U.S.C. § 1983 provides in pertinent part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

Thus, in order to properly plead a Section 1983 claim, Plaintiff must allege (1) conduct by a person, (2) who acted under color of state law, (3) which caused a deprivation of a federally protected right. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

Although a state official, such as Judge Herron, is literally a "person," a suit for money damages against a state official

in his official capacity is, in reality, a claim against the state itself. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). A state is not a "person" within the meaning of Section 1983. *Id.* at 64. As the Supreme Court explained in *Will:*

> **\*4** Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties.... Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity ...

*Id.* at 66. In other words, a claim against Judge Herron in his official capacity is simply a claim against the state, and a state cannot be sued under Section 1983 for money damages. [1]

Moreover, to adequately plead a § 1983 claim, Plaintiff must allege a deprivation of a federally protected right. Plaintiff has failed to do so. The primary factual allegation contained in the Complaint is that Judge Herron signed a decree removing Plaintiff as the guardian of his wife. This factual averment does not demonstrate a violation of any federally protected right by Judge Herron. Therefore, Plaintiff's Section 1983 claim must be dismissed for failure to state a claim upon which relief may be granted.

*b. Claims Under 42 U.S.C. § 1985*

Section 1985(3) allows an action to be brought by one harmed by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3); *Farber v. City of Patterson,* 440 F.3d 131, 134 (3d Cir.2006). To state a claim under Section 1985(3), Plaintiff must allege:

> (1) a conspiracy; (2) for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Farber,* 440 F.3d at 134 (quoting *United Bhd. of Carpenters & Joiners v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)).

This civil rights provision was not "intended to provide a federal remedy for 'all tortious, conspiratorial interferences with the rights of others,' or to be a 'general federal tort law.' " *Id.* at 135 (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 101–02, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Rather, Plaintiff must allege "some racial, *or perhaps otherwise class-based,* invidiously discriminatory animus behind the conspirators' action." *Id.* (quoting *Griffin,* 403 U.S. at 102) (emphasis in original). Thus, the conspiracy alleged must have been motivated by discriminatory animus against an identifiable class, and the discrimination must have been invidious. *Id.*

Plaintiff's Complaint is devoid of any allegations of any of the elements required to establish a Section 1985 claim. Therefore, Plaintiff's Section 1985 claim will be dismissed.

### c. Claims Under 42 U.S.C. § 1986

Section 1986 provides in relevant part:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented ...

**\*5** 42 U.S.C.A. § 1986.

Thus, to state a claim under Section 1986, Plaintiff must have stated a valid claim under 42 U.S.C. § 1985. *Bieros v. Nicola,* 839 F.Supp. 332, 336 (E.D.Pa.1993). As noted above, Plaintiff has failed to do so. Accordingly, Plaintiff's Section 1986 claim will be dismissed.

### d. Claims Under 42 U.S.C. § 3631

Section 3631 is a violations and penalties provision under the Fair Housing Act. It provides that penalties may be imposed against:

> Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—
>
> (a) any person because of his race, color, religion, sex, handicap ..., familial status ..., or national origin and because he is or has been selling, purchasing, renting, financing, occupying, or contracting or negotiating for the sale, purchase, rental, financing or occupation of any dwelling ...

42 U.S.C. § 3631.

Plaintiff's allegation that Judge Herron signed a decree removing Plaintiff as Mrs. Walthour's guardian fails to demonstrate any willful interference with Plaintiff's rights under the Fair Housing Act. Even construing the *pro se* Complaint liberally, the Court is unable to discern any relationship between Plaintiff's Fair Housing Act claim and the allegations in the Complaint. Therefore, Plaintiff's Section 3631 claim will be dismissed.

**B. Judicial Immunity**

Notwithstanding the fact that Plaintiff has failed to state any claims upon which relief may be granted, the Court also finds that Judge Herron is entitled to judicial immunity for all claims against him in his personal capacity. A judicial officer, in the performance of his duties as a judge, is absolutely immune from suit in his personal capacity and is not liable for his judicial acts. *Azbuko v. Royal,* 443 F.3d 302, 303 (3d Cir.2006) (*per curiam* ). A judge will not be deprived of his judicial immunity even if his actions were in error, or in excess of his authority, or were taken with malice. *Stump v. Sparkman,* 435 U.S. 349, 356–57, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Azbuko,* 443 F.3d at 303. "[O]nly when he has acted in the 'clear absence of all jurisdiction' " will a judge be subject to liability. *Stump,* 435 U.S. at 356–57.

The allegations in Plaintiff's Complaint involve actions that were clearly taken in the performance of Defendant's duties as a judge. There are no facts to suggest that Judge Herron's conduct relates to actions taken in the clear absence of all jurisdiction. Accordingly, Judge Herron is entitled to judicial immunity for all claims against him in his personal capacity.

**III. CONCLUSION**

For all of the aforementioned reasons, Plaintiff's Complaint will be dismissed in its entirety. An appropriate Order follows.

***ORDER***

AND NOW, this 6th day of May, 2010, upon consideration Plaintiff's Complaint (Doc. No. 1), Defendant's Motion to Dismiss and supporting Memorandum of Law (Doc. Nos. 3 and 4), and Plaintiff's response thereto (Doc. No. 6), it is ORDERED that Defendant's Motion to Dismiss is GRANTED, this case is DISMISSED, and all pending motions are DENIED AS MOOT.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1877704

---

## Footnotes

1    After the 1996 amendments to Section 1983, it is clear that a judicial officer may be sued in his official capacity for injunctive relief (i.e., non-monetary damages), but only where a declaratory decree was violated or declaratory relief was unavailable. 42 U.S.C. § 1983; *Catanzaro v. Cottone,* 228 Fed. App'x 164, 167 (3d Cir.2007). This is a very narrow avenue for relief and Plaintiff has failed to adequately allege that a declaratory decree was violated or that declaratory relief was unavailable to him.

---

**End of Document**                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 2211023
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ederick FABRIZIO, a/k/a Ederick Fabricio, Plaintiff,
v.
Supt. Brandon SMITH; Igp T. Mauro; C.O.
Riley; C.O. Oliver; and C.O. Laster, Defendants.

9:20-CV-0011 (GTS/ML)
|
Signed 06/01/2021

**Attorneys and Law Firms**

EDERICK FABRIZIO, Plaintiff, Pro Se, Calle 13-A DDY,
Villa del Rey IV, Caguas, Puerto Rico 00727.

HON. LETITIA A. JAMES, Attorney General for the State
of New York, DAVID C. WHITE, ESQ., Assistant Attorney
General, Counsel for Defendants, The Capitol, Albany, New
York 12224.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

 **\*1** Currently before the Court, in this *pro se*
prisoner civil rights action filed by Ederick Fabrizio
("Plaintiff") against the five above-captioned employees
of the New York State Department of Corrections and
Community Supervision ("Defendants"), is United States
Magistrate Judge Miroslav Lovric's Report-Recommendation
recommending that Defendants' motion to dismiss for failure
to state a claim be granted with respect to Plaintiff's retaliation
claim against Defendant Laster based upon the March 2018
search and Plaintiff's retaliation claims against Defendants
Mauro and Smith, but that Defendants' motion be denied in

all other respects. (Dkt. Nos. 33, 39, 42.) The parties have
not filed objections to the Report-Recommendation, and the
deadline by which to do so has expired. (*See generally* Docket
Sheet.)

After carefully reviewing the relevant papers herein,
including Magistrate Judge Lovric's thorough Report-
Recommendation, the Court can find no clear-error in
the Report-Recommendation. [1] Magistrate Judge Lovric
employed the proper standards, accurately recited the facts,
and reasonably applied the law to those facts. As a result,
the Report-Recommendation is accepted and adopted in its
entirety for the reasons set forth therein, and Defendants' first
motion to dismiss is granted in part and denied in part as
recommended in the Report-Recommendation.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Lovric's Report-
Recommendation (Dkt. No. 42) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion to dismiss for failure to
state a claim (Dkt. No. 33) is **GRANTED in part** with respect
to the following claims:

 (1) Plaintiff's retaliation claim against Defendant Laster
 based upon the March 2018 search; and

 (2) Plaintiff's retaliation claims against Defendants Mauro
 and Smith; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 33)
is **DENIED in part** in all other respects.

**All Citations**

Slip Copy, 2021 WL 2211023

**Footnotes**

1    When no objection is made to a report-recommendation, the Court subjects that report-recommendation to
     only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing
     such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record
     in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at
     \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's]

report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

---

**End of Document**                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 2211023
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ederick FABRIZIO, a/k/a Ederick Fabricio, Plaintiff,
v.
Supt. Brandon SMITH; Igp T. Mauro; C.O.
Riley; C.O. Oliver; and C.O. Laster, Defendants.

9:20-CV-0011 (GTS/ML)
|
Signed 06/01/2021

**Attorneys and Law Firms**

EDERICK FABRIZIO, Plaintiff, Pro Se, Calle 13-A DDY,
Villa del Rey IV, Caguas, Puerto Rico 00727.

HON. LETITIA A. JAMES, Attorney General for the State
of New York, DAVID C. WHITE, ESQ., Assistant Attorney
General, Counsel for Defendants, The Capitol, Albany, New
York 12224.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

 **\*1** Currently before the Court, in this *pro se*
prisoner civil rights action filed by Ederick Fabrizio
("Plaintiff") against the five above-captioned employees
of the New York State Department of Corrections and
Community Supervision ("Defendants"), is United States
Magistrate Judge Miroslav Lovric's Report-Recommendation
recommending that Defendants' motion to dismiss for failure
to state a claim be granted with respect to Plaintiff's retaliation
claim against Defendant Laster based upon the March 2018
search and Plaintiff's retaliation claims against Defendants
Mauro and Smith, but that Defendants' motion be denied in

all other respects. (Dkt. Nos. 33, 39, 42.) The parties have
not filed objections to the Report-Recommendation, and the
deadline by which to do so has expired. (*See generally* Docket
Sheet.)

After carefully reviewing the relevant papers herein,
including Magistrate Judge Lovric's thorough Report-
Recommendation, the Court can find no clear-error in
the Report-Recommendation. [1] Magistrate Judge Lovric
employed the proper standards, accurately recited the facts,
and reasonably applied the law to those facts. As a result,
the Report-Recommendation is accepted and adopted in its
entirety for the reasons set forth therein, and Defendants' first
motion to dismiss is granted in part and denied in part as
recommended in the Report-Recommendation.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Lovric's Report-
Recommendation (Dkt. No. 42) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion to dismiss for failure to
state a claim (Dkt. No. 33) is **GRANTED in part** with respect
to the following claims:

  (1) Plaintiff's retaliation claim against Defendant Laster
       based upon the March 2018 search; and

  (2) Plaintiff's retaliation claims against Defendants Mauro
       and Smith; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 33)
is **DENIED in part** in all other respects.

**All Citations**

Slip Copy, 2021 WL 2211023

**Footnotes**

1      When no objection is made to a report-recommendation, the Court subjects that report-recommendation to
       only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing
       such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record
       in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at
       *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's]

report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 4194136
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Michael DIJOSEPH, Plaintiff,

v.

ERIE COUNTY, Defendant.

18-CV-919S
|
Signed 07/21/2020

**Attorneys and Law Firms**

Lindy Korn, Richard Joseph Perry, Jr., Law Office of Lindy Korn, PLLC, Buffalo, NY, for Plaintiff.

Michelle M. Parker, Erie County Department of Law, Buffalo, NY, for Defendant.

**DECISION AND ORDER**

WILLIAM M. SKRETNY, United States District Judge

**I. INTRODUCTION**

**\*1** Before this Court is the second attempt of Defendant Erie County (or the "County") to dismiss this case (Docket No. 13; cf. Docket No. 5). The County now moves for judgment on the pleadings, under 🚩Federal Rule of Civil Procedure 12(c); its motion for this Court to consider extrinsic evidence pursuant to 🚩Rule 12(d); for summary judgment under Rule 56, and for dismissal of this action for failure to state a claim under 🚩Rule 12(b)(6) (Docket No. 13). In support of this motion, the County submitted its attorney's Declaration, a Memorandum of Law, and Statement of Facts (id.). Responses to this motion were due by July 7, 2020, with replies by July 14, 2020 (Docket No. 14). Following responses (Docket No. 15) and reply by the County (Docket No. 16), this motion was deemed submitted without oral argument.

Earlier, the County moved to dismiss the original Complaint (Docket No. 5). That motion was denied, and Plaintiff was granted leave to amend (Docket No. 9, Decision and Order of May 5, 2020, 2020 WL 2126976); familiarity with that Decision and Order is presumed. There, this Court denied

the County's motion to dismiss the First Cause of Action but dismissed without prejudice the Second Cause of Action (granting leave to Plaintiff to amend) (id. at 14, 15-17). Plaintiff later amended the Complaint (Docket No. 10), the County answered (Docket No. 11) and filed the pending motion (Docket No. 13).

For the reasons stated herein, Defendant's present motion (Docket No. 13) to consider extrinsic evidence is **granted**, its motion to convert the pending motion for judgment on the pleadings (id.) into a summary judgment motion is **granted**, and its converted motion for summary judgment to dismiss this action for failure to state a claim (id.) is **granted**.

**II. BACKGROUND**

A. Complaint and Amended Complaint

This is a civil rights action pursuant to 🚩42 U.S.C. § 1983 commenced by a former Erie County Sheriff's deputy alleging violations of his due process and First Amendment rights in the eventual termination (Docket No. 10, Am. Compl.; see also Docket No. 1, Compl.). Following denial of the County's motion (Docket No. 5) to dismiss (Docket No. 9, Decision & Order), Plaintiff duly amended his Complaint (Docket No. 10) and alleges that he was a deputy with the rank of sergeant who was demoted for his Facebook posts (Docket No. 10, Am. Compl. ¶¶ 5-8). Plaintiff grieved the demotion (id. ¶ 9). Defendant then brought charges against Plaintiff and later terminated him (id. ¶¶ 10-11). Plaintiff claims that the New York State Civil Service Law was not followed in his demotion or termination (because he was denied a pre-deprivation hearing) (id. ¶¶ 12-13).

Plaintiff now alleges in the First Cause of Action that the County violated his right to due process in his demotion and termination, that he was deprived of a hearing due under the Civil Service Law (id. ¶¶ 15, 21-27). He claims a property interest in his continued employment (id. ¶ 18). He also alleges that Sheriff Timothy Howard and Superintendent Thomas Diina (head of Jail Management Division) were officers of the County (id. ¶¶ 20, 19). He argues that his demotion did not comport with the process due under 🚩Civil Service Law § 75 (id. ¶¶ 21, 23, 25-26). Defendant, through Superintendent Diina and Sheriff Howard, deprived Plaintiff of his property interest in his continued employment (id. ¶ 24 a.-d.).

**\*2**  The Second Cause of Action alleges that the County violated Plaintiff's free speech rights by demoting him for his Facebook posts (id. ¶¶ 29-48). In disciplining and demoting Plaintiff, the County did not identify which Facebook post was referred to in the notice of discipline (id. ¶¶ 33, 40). Plaintiff, however, did not attach with the Amended Complaint the notice of discipline or his Facebook posts and he does not surmise which were the allegedly offending posts. Plaintiff admits that he authored these posts (id. ¶ 38)[1] although none of these posts identified Plaintiff as a Sheriff's deputy or referred to the County (id. ¶¶ 43, 44). The County also did not identify "a putatively lawful reason for" Plaintiff's demotion (id. ¶ 45) and Plaintiff denies that the County had a lawful justification for the demotion (id. ¶ 46).

Plaintiff demands past lost wages and benefits; damages for his pain, suffering, loss of enjoyment of life, humiliation, and other injuries; reimburse medical costs Plaintiff incurred due to stress; and recovery of costs and attorneys' fees (id., WHEREFORE Cl. ¶¶ A, B, C, D). He also wants reinstatement on the Sheriff's Department payroll at his former title with reinstatement of pension and health care status (id. Cl. ¶¶ E, F [first] ).

Erie County answered the Amended Complaint (Docket No. 11). There, the County denied hiring, demoting, or terminating Plaintiff, claiming that Sheriff Howard did (id. ¶¶ 2, 6, 7, 8, 9, 10, 11, 12, 13). Among the affirmative defenses asserted, the County argues that this case should be dismissed because a necessary party, Sheriff Howard, was not named as a defendant (id. ¶ 15). The County also claimed that the Amended Complaint fails to state a claim (id. ¶ 19). The County also alleged that Plaintiff's claims are time-barred (id. ¶¶ 16-18).

On June 16, 2020, this Court referred this case to Magistrate Judge Michael Roemer for pretrial proceedings (Docket No. 12). Three days later, the County filed the present motion (Docket No. 13).

B. County's Motion for Judgment on Pleadings and Other Relief (Docket No. 13)

The County now moves to include extrinsic documents under Federal Rule of Civil Procedure 12(d) and consider dismissal of Plaintiff's Amended Complaint (with those documents) (Docket No. 13, Def. Memo. at 5-6). These extrinsic documents are Plaintiff's grievance of his demotion and the letter from the Erie County Sheriff with the effective

date of his termination (id. at 2; id., Def. Atty. Decl. ¶¶ 23-24, 26-27; Docket No. 5, Def. Atty. Decl., Ex. A, Grievance #2015-25, Ex. C, letter of Chief John Greenan to Plaintiff dated Aug. 18, 2016). With inclusion of those documents, the County argues that its present motion for judgment on the pleadings (under Rule 12(c)) should be converted into a motion for summary judgment under Rules 12(d) and 56 (id., Def. Memo. at 6). The County also submits its Rule 56 Statement (Docket No. 13, Def. Statement).

The County's substantive argument turns on Plaintiff's failure to name as a defendant his actual employer, Sheriff Howard. The County denies employing, demoting, or terminating Plaintiff, that Sheriff Howard did (id., Def. Memo. at 7). Under New York State law, the Sheriff is a "constitutionally-authorized elected official," (id.), N.Y. Const. art. XIII, § 13(a); see N.Y. County Law § 400(1), and the Sheriff is empowered to hire staff, N.Y. County Law § 652(2). Erie County Charter Article 21 provides that deputies and employees of the Erie County Sheriff are employed by the Erie County Sheriff, Erie County Code § 2103. The County concludes that, under Rule 19 the Sheriff was a necessary party and, since he was not named, this action should be dismissed because the named defendant (Erie County) is not Plaintiff's employer (Docket No. 13, Def. Memo. at 7-8). Joining the Sheriff now, however, would be futile because claims from 2015 against him are now time-barred under the three-year statute of limitations for civil rights claim under 42 U.S.C. § 1983 (id. at 8; id., Def. Atty. Decl. ¶ 22).

**\*3**  According to the County's Statement of Facts (id., Def. Statement), the Sheriff demoted Plaintiff due to Plaintiff's Facebook posts on August 17, 2015 (id. ¶ 1; see also Docket No. 15, Pl. Memo. at 2). There, Plaintiff was accused of violating departmental policies for making a Facebook post saying, "he was going home and squeeze into some thight [sic] polyester pants just to make everyone feel better," and Plaintiff was demoted on August 17 for that post (Docket No. 5, Def. Atty. Decl., Ex. A, Grievance #2015-25). Plaintiff grieved the demotion, arguing that the discipline was too harsh and without just cause, pointing to lesser sanctions imposed upon other Jail Management Division deputies for their online posts (id.).

The date the Sheriff terminated Plaintiff was after further charges were lodged against Plaintiff and Plaintiff was effectively terminated on August 23, 2016 (Docket No. 13,

Def. Statement ¶¶ 3, 4; Docket No. 5, Def. Atty. Decl., Ex. A, Grievance #2015-25, Ex. C, letter of John Greenan for Sheriff Howard to Plaintiff dated Aug. 18, 2016). This termination letter was on the Sheriff's letterhead and issued by the Sheriff's Chief of Administrative Services, John Greenan (Docket No. 13, Def. Statement ¶¶ 5, 6).

C. Responses and Reply to Present Motion

Plaintiff filed a five-page memorandum in response to the County's motion (Docket No. 15) but did not file a statement of facts regarding a converted summary judgment motion. Plaintiff argues that the County's contention rests upon the fallacy that the County and the Sheriff are "not the same party in interest," which plaintiff vehemently denies (id., at 1). "By operation of law, the county is the party in interest for any agency within it. This includes the 🚩 Sheriffs' [sic] Department" (id. (emphasis in original)). Plaintiff cites no authority there for that proposition but a few pages later he quotes Judge Lawrence Vilardo's decision in 🚩 Davis v. Erie County Sheriff Department, No. 17CV955, 2019 WL 4926289, 2019 U.S. Dist. LEXIS 173798 (W.D.N.Y. Oct. 7, 2019), holding under New York County Law § 54 that the County "may be held liable for acts committed by the Sheriff and his deputies," 🚩 2019 WL 4926289, at *1, 2019 U.S. Dist. LEXIS 173798, at *2 (emphasis removed) (id. at 1, 2019 U.S. Dist. LEXIS 173798, at 3, 2, 2019 WL 4926289). Plaintiff denies that the Sheriff is a necessary party (id. at 1, 2019 U.S. Dist. LEXIS 173798, at 2, 3, 2019 WL 4926289), hence he does not address the statute of limitations for claims against the Sheriff. Plaintiff contends that the County admits in its motion (Docket No. 13, Def. Statement ¶ 1; Docket No. 15, Pl. Memo. at 2) that the Sheriff's Department deliberately injured Plaintiff by demoting him because of his Facebook posts (Docket No. 15, Pl. Memo. at 2), although that statement said that the Sheriff demoted Plaintiff (Docket No. 13, Def. Statement ¶ 1). Plaintiff concludes that the County's arguments are "unreasonable, vexatious and frivolous" and subject to sanction under Federal Rule of Civil Procedure 11 (although Plaintiff has not filed a separate motion for sanctions under that rule or served the requisite notice seeking the County's withdrawal of the offending motion prior to moving for sanctions, see Fed. R. Civ. P. 11(c)(2)) or 28 U.S.C. § 1927 (imposition of costs on attorney for vexatious litigation) (id. at 4). Plaintiff also did not object to conversion of the County's motion or inclusion of extrinsic material.

The County replies that Plaintiff has not objected to the County's Rule 56 Statement, thus the facts therein are not controverted (Docket No. 16, Def. Atty. Reply Decl. ¶ 2; id., Def. Reply Memo. at 3). The County contends Plaintiff misconstrues Davis and the County distinguishes that Title VII case where that plaintiff erroneously sued the Sheriff's Department rather than the suable entity, 🚩 Erie County (id., Def. Atty. Reply Decl. ¶¶ 3-8, Exs. C-E; id., Def. Reply Memo. at 2-3). The County emphasized that Davis was a Title VII action (which would make the County a proper party) while this case is not (id., Def. Reply Memo. at 3), see, e.g., 🚩 Sassaman v. Gamache, 566 F.3d 307, 315-16 (2d Cir. 2009) (individuals are not subject to liability under Title VII); 🚩 42 U.S.C. § 2000e(b) (defining "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees"). The County reaffirms that amendment to name Sheriff Howard now would be futile because of the statute of limitations (Docket No. 16, Def. Atty. Reply Decl. ¶ 9). Given the distinction between 🚩 § 1983 alleged here and Title VII, the County denies that the present motion is frivolous or sanctionable (Docket No. 16, Def. Reply Memo. at 3-4).

**III. DISCUSSION**

A. APPLICABLE STANDARDS

1. Judgment on the Pleadings, 🚩 Rule 12(c)

**\*4** 🚩 Rule 12(c) is codification of common law demurrer where the substantive merits of a claim or defense is resolved on the pleadings, see 5C Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure—Civil § 1367, at 205-06 (3d ed. 2004). This rule is used when the material facts are not in dispute and judgment can be entered on the merits by focusing on the pleadings, exhibits thereto, matters incorporated by reference, and facts taken by the Court on judicial notice, see id. at 206-07. A 🚩 Rule 12(c) motion "has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court," id. at 208.

This Court is required to view the facts presented in the pleadings in the light most favorable to the nonmoving party,

id., § 1368, at 227; see Patel v. Searles, 305 F.3d 130, 133-34 (2d Cir. 2002), cert. denied, 538 U.S. 907, 123 S.Ct. 1486, 155 L.Ed.2d 227 (2003), here Plaintiff. As would occur with a Rule 12(b)(6) motion, all well pleaded factual allegations in the Amended Complaint are assumed to be true and the County's contravening assertions are deemed to be false, 5C Federal Practice and Procedure, supra, § 1368, at 230; Patel, supra, 305 F.3d at 133-34; thus, the nonmovant "has the benefit of all possible favorable assumptions," 5C Federal Practice and Procedure, supra, § 1368, at 230, 237. "[R]easonable inferences and intendments from these facts are drawn in favor of the nonmoving party," id. at 245.

Rule 12(c) standards are similar to those for a Rule 12(b)(6) motion, id. at 238; Oneida Indian Nation of N.Y. v. City of Sherill, N.Y., 337 F.3d 139, 152 (2d Cir. 2005). The movant, however, does not admit to portions of the pleadings that are conclusions of law, legally impossible facts, or matters that would not be admitted in evidence at trial, 5C Federal Practice and Procedure, supra, § 1368, at 243-44.

Given the limitations in Rule 12(c) and its focus on the allegations in pleadings, "the moving party always should consider employing a summary judgment motion rather than a motion for judgment on the pleadings," id. at 253. A genuine material issue of fact in the pleadings will prevent successfully framing a Rule 12(c) motion, id. at 253, 255.

### 2. Conversion of Rule 12(c) Motion into Summary Judgment Motion

Like accepting materials outside of the pleadings for Rule 12(b) motion, district courts have the discretion in a motion for judgment on the pleadings to accept additional materials and convert the motion into a motion for summary judgment, 5C Federal Practice and Procedure, supra, § 1370, at 267-68, 272-73. Usually, submissions of affidavits and exhibits to establish that no material issues of fact exist result in the motion for judgment on pleadings converting into a summary judgment motion, see id. at 274-75.

If, as here, materials outside the pleadings are presented in a Rule 12(c) motion, and are not excluded by the Court, "the motion must be treated as one for summary judgment under Rule 56. All parties must be given reasonable opportunity to

present all material that is pertinent to the motion," Fed. R. Civ. P. 12(d). Courts enjoy "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it," 5C Federal Practice and Procedure, supra, § 1366, at 159; see Friedl v. City of N.Y., 210 F.3d 79, 83 (2d Cir. 2000); see also DiJoseph v. Erie County, 2020 WL 2126976, at *4 (Docket No. 9, Decision and Order at 8). Courts will exercise this discretion and convert the motion when the proffered material "is likely to facilitate the disposition of the action," id. at 165.

### 3. Summary Judgment Rule 56

 **\*5** Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit under governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine" dispute, in turn, exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party," id. In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion," Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (internal quotations and citations omitted).

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003); Fed. R. Civ. P. 56(a). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the nonmovant. Ford, supra, 316 F.3d at 354.

The Local Civil Rules of this Court require that movant and opponent each submit "a separate, short, and concise" statement of material facts, and if movant fails to submit such a statement it may be grounds for denying the motion, W.D.N.Y. Loc. Civ. R. 56(a)(1), (2). The movant is to submit facts in which there is no genuine issue, id. R. 56(a)(1), while the opponent submits an opposing statement of material facts as to which it is contended that there exists a genuine issue to be tried, id. R. 56(a)(2). Each numbered paragraph in the movant's statement will be deemed admitted unless specifically controverted by a correspondingly numbered paragraph in the opponent's statement, id. Absent such an opposing statement, the facts alleged by the movant are deemed admitted. Each statement of material fact is to contain citations to admissible evidence to support the factual statements and all cited authority is to be separately submitted as an appendix to that statement, id. R. 56(a)(3).

4. Failure to State a Claim Standard, Rule 12(b)(6)

Defendant has moved to dismiss the Complaint on the grounds that it states a claim for which relief cannot be granted (Docket No. 13, Notice of Motion). Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court cannot dismiss a complaint unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, supra, 550 U.S. 554, a Complaint must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face," id. at 570 (rejecting longstanding precedent of Conley, supra, 355 U.S. at 45-46, 78 S.Ct. 99); Hicks v. Association of Am. Med. Colleges, 503 F.Supp.2d 48, 51 (D.D.C. 2007). To survive a motion to dismiss, the factual allegations in the Complaint "must be enough to raise a right to relief above the speculative level," Twombly, supra, 550 U.S. at 555, 127 S.Ct. 1955; Hicks, supra, 503 F.Supp.2d 48, 51. As recently reaffirmed by the Court in Ashcroft v. Iqbal, supra, 556 U.S. 662, 129 S.Ct. 1937,

**\*6** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state

a claim to relief that is plausible on its face.' [Twombly, supra, 550 U.S.] at 570, 127 S.Ct. 1955.... A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id., at 556, 127 S.Ct. 1955.... The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Ibid. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' Id., at 557, 127 S.Ct. 1955 ... (brackets omitted)."

Iqbal, supra, 556 U.S. at 678, 129 S.Ct. 1937 (citations omitted).

A Rule 12(b)(6) motion is addressed to the face of the pleading. The pleading is deemed to include any document attached to it as an exhibit, Fed. R. Civ. P. 10(c), or any document incorporated in it by reference, Goldman v. Belden, 754 F.2d 1059 (2d Cir. 1985). In considering such a motion, the court must accept as true all the well pleaded facts alleged in the Complaint. Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57 (2d Cir. 1985). However, conclusory allegations that merely state the general legal conclusions necessary to prevail on the merits and are unsupported by factual averments will not be accepted as true. New York State Teamsters Council Health and Hosp. Fund v. Centrus Pharmacy Solutions, 235 F. Supp. 2d 123 (N.D.N.Y. 2002).

5. Necessary Party, Rule 19

Upon a motion to dismiss because of nonjoinder, which the County is making here, this Court first must determine whether the absent party is needed for a just adjudication of the action under Rule 19(a), 7 Charles A. Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice & Procedure —Civil § 1611, at 158 (3d ed. 2001). If so, then this Court determines whether the missing party can be served or whether joining that party would deprive the Court of subject matter jurisdiction, id. If joinder cannot be made, this Court then looks at Rule 19(b) and determine whether the action can proceed with only the parties before the Court or should it be

dismissed because the absent party is deemed indispensable, id. at 162, 90 S.Ct. 1598. Rule 19(b) requires this Court to consider factors if an indispensable party cannot be joined whether "in equity and good conscience" the case should proceed. Those factors include

"(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

"(2) the extent to which any prejudice could be lessened or avoided by:

(A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

"(3) whether a judgment rendered in the person's absence would be adequate; and

"(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder."

Fed. R. Civ. P. 19(b).

"If the court concludes the action should not go forward without a person described in Rule 19(a) after a careful consideration of the factors listed in subdivision (b), the absentee is then regarded as indispensable and the action typically will be dismissed," 7 Federal Practice and Procedure, supra, § 1611, at 164. Nonjoinder has been seen as ousting the Court of jurisdiction, id. at 166, 90 S.Ct. 1598. Since indispensability is an equitable concept, courts "will not dismiss for nonjoinder when special circumstances would make it inequitable to do so," id. at 169, 90 S.Ct. 1598.

6. Civil Rights Statute of Limitations

An action under 42 U.S.C. § 1983 has a three-year limitations period, Melendez v. Schneidermann, No. 13CV622, 2014 WL 2154536, at *11 (N.D.N.Y. May 22, 2014) (Report & Recommendation, Baxter, Mag. J., adopted

by Sharpe, C.J.). Federal courts borrow state law personal injury statutes of limitations for § 1983 civil rights actions, Wilson v. Garcia, 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), in New York State the analogous limitations period is three years, Owens v. Okure, 488 U.S. 235, 250-51, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); see N.Y. CPLR 214(5). "Thus, unless the limitations period is tolled for some reason, a plaintiff must file his section 1983 civil rights action within three years of the accrual of each cause of action," Melendez, supra, 2014 WL 2154536, at *11. Accrual is determined, however, under federal law, Covington v. City of N.Y., 171 F.3d 117, 121 (2d Cir. 1999), and as such a cause of action accrues "when 'the plaintiff knows or has reason to know of the injury which is the basis of his action,' " Melendez, supra, 2014 WL 2154536, at *11, quoting Singleton v. City of N.Y, 632 F.3d 185, 191 (2d Cir. 1980) (internal quotation marks omitted). State tolling rules still determine whether limitations periods have been tolled, Abbas v. Dixon, 480 F.3d 636, 641 (2d Cir. 1997); Melendez, supra, 2014 WL 2154536, at *11.

B. Consideration of Extrinsic Materials and Conversion to Summary Judgment

*7 First, this Court determines what type of dispositive motion is presented here. The County filed a motion for judgment on the pleadings (Docket No. 13). Usually (as the title suggests) this motion is focused on the Amended Complaint and Answer since a motion for judgment on the pleading focuses on the four corners of the pleadings. The County also moves for leave to include extrinsic materials to these pleadings and convert the motion from a Rule 12 motion into a Rule 56 motion for summary judgment. Plaintiff is on notice about the extrinsic material (in fact, the County first introduced it in its first motion to dismiss, Docket No. 5) and the desire to convert the Rule 12 motion into a summary judgment motion. The County also furnished a Rule 56 Statement of Material Facts (Docket No. 13-3) and exhibits that refer back to the first motion to dismiss (Docket No. 5). Plaintiff has not opposed (or really addressed) these procedural motions.

Unlike when the County attempted to add this extrinsic material with its denied motion to dismiss the original

Complaint (Docket No. 9, Decision & Order at 10-13, 2020 WL 2126976, at *5-6), the County has answered (Docket No. 11) Plaintiff's Amended Complaint (Docket No. 10). Under 🚩 Rule 12(c), the extrinsic materials here also could be produced to show that there are no material issues of fact. This Court thus has the discretion to allow a defendant (while moving to dismiss) to add additional, relevant documents not included with the Amended Complaint (or the Answer).

Thus, the County's motion to incorporate extrinsic material is **granted.**

C. Conversion of the Motion for Judgment on the Pleadings into one for Summary Judgment, 🚩 Rule 12(d)

When conversion from a 🚩 Rule 12 motion is granted, a plaintiff is to be afforded the opportunity to present materials pertinent to a summary judgment motion, 🚩 Fed. R. Civ. P. 12(d). Here, Plaintiff was on notice from the first round of the motion to dismiss of the County's intention to bring in the extrinsic material (the grievance of Plaintiff's demotion) and to apply it as a summary judgment motion to dismiss the case. Plaintiff in responding to the present defense motion could have argued for notice or more time to respond or the necessity of discovery to respond; instead, Plaintiff briefly argued the law and relied on the County's factual recitation.

For purposes of the County's now summary judgment motion, this Court also considered the moving papers from the County's earlier motion to dismiss (Docket No. 5), with the County attorney's Declaration, attached exhibit, and counsel's review of the personnel record and reply affidavit from chief of the Sheriff's Department administrative services John Greenan also attesting to the contents of the personnel records (Docket No. 8, Aff. of John Greenan ¶¶ 8-9), confirming plaintiff's inaction after his termination. Plaintiff in his response (cf. Docket No. 15, Pl. Memo.) failed to submit a counterstatement of facts or even his opposing affidavit with exhibits; he relies upon the County's statement, arguing that it shows "the Sheriff's Department deliberately injured Plaintiff by demoting him from the rank of sergeant because of his 'facebook posts' " (id. at 2).

As alleged and briefed, there are no material issues of fact. The County's motion (Docket No. 13) to convert its motion for judgment on the pleadings into a summary judgment motion also is **granted**.

D. Motion for Summary Judgment for Failure to State a Claim

As so converted, the County seeks dismissal of this case because Plaintiff named the County and not the Sheriff and the time to add the Sheriff as a necessary party is barred by the statute of limitations. Plaintiff denies that the Sheriff is a necessary party, deeming him and the County as being equivalent. Deciding this issue requires analysis of the New York State Constitution, the New York County Law, and the relationship of the Sheriff to the County.

**\*8** A sheriff is an elected county officer, 🚩 N.Y. Const. art. XIII, § 13(a); N.Y. County Law § 180 (c. 1940); 🚩 Liquifin Aktiengesellschaft v. Brennan, 446 F. Supp. 914, 918 (S.D.N.Y. 1978) ("Brennan") (citing 🚩 Enstrom v. New York, 258 A.D. 672, 675, 17 N.Y.S.2d 964, 967 (2d Dep't 1940) and County Law § 180; see also Erie County Charter § 2101. The sheriff has different roles; the sheriff is a judicial officer, in common law the sheriff is an officer of the court and conservator of the peace within their county, 🚩 N.Y. County Law § 650; 🚩 Brennan, supra, 446 F. Supp. at 918. The sheriff also is a local officer, the elected law enforcer in the county, performing "such additional and related duties as may be prescribed by law and directed by the ... county legislature," 🚩 N.Y. County Law § 650. The sheriff also serves as a state officer for specific purposes, see 85 N.Y. Jur. 2d Police, Sheriff, and Related Officers § 68 (2020).

Under 🚩 New York State Constitution article XIII, § 13(a), a county cannot be made liable for the acts of its sheriff, 🚩 Hall v. County of Monroe, 110 A.D.2d 1088, 488 N.Y.S.2d 940 (4th Dep't 1985); 🚩 Stalteri v. County of Monroe, 107 A.D.2d 10781, 🚩 107 A.D.2d 1071, 486 N.Y.S.2d 555 (4th Dep't 1985); Wilson v. Sponable, 81 A.D.2d 1, 11, 439 N.Y.S.2d 549, 555 (4th Dep't 1981), appeal dismissed, 54 N.Y.2d 834 (1981). In Barr v. County of Albany, 50 N.Y.2d 247, 257, 428 N.Y.S.2d 665, 670, 406 N.E.2d 481 (1980), the New York State Court of Appeals recognized that a county by local law may assume responsibility for the tortious acts of its deputy sheriffs as distinct from the acts of the Sheriff.

Erie County enacted a local law that indemnifies employees (including Sheriff's Department) for actions taken in the course of their employment, see Saleh v. County of Erie, No. 12CV468, 2015 U.S. Dist. LEXIS 47166, at *19-20

(W.D.N.Y. Apr. 10, 2015) (Skretny, J.) (citing Erie County Legislature Resolution of Oct. 14, 1984, Comm. 14D-55); see also Saleh, No. 12CV468, Docket No. 35, Erie County Defs. Memo. of Law at 35 (1984 Erie County resolution was for indemnification only), while denying that the County intended to assume vicarious liability by that enactment, Saleh, supra, 2015 U.S. Dist. LEXIS 47166, at *19; see Villar v. County of Erie, 126 A.D.3d 1295, 1296-87, 5 N.Y.S.3d 747, 748 (4th Dep't 2015) (no local law in Erie County for County being held responsible for actions of Sheriff or deputies on the theory of respondeat superior). The Court placed the burden on that plaintiff to establish that the County assumed this liability, so those claims were dismissed absent proof of the County assumption of liability, Saleh, supra, 2015 U.S. Dist. LEXIS 47166, at *21.

In 1989, 🚩 article XIII, § 13(a), was amended to delete the sentence "But the county shall never be made responsible for the acts of the sheriff." The Fourth Department, in Marashian v. City of Utica, 214 A.D.2d 1034, 1034, 626 N.Y.S.2d 646, 647 (1995), held that this 1989 amendment "merely allows a county to accept responsibility for the negligent acts of the Sheriff; it does not impose liability upon the county for the acts of the Sheriff or his deputies on a theory of respondeat superior." See also Morey v. County of Erie, 117 A.D.3d 1381, 1385, 984 N.Y.S.2d 706, 709 (4th Dep't 2014) (denying county had vicarious liability for the conduct of deputy when that liability was not assumed by local law). Thus, counties can enact local laws to be responsible for the acts of its sheriffs, but that obligation does not arise on a theory of respondeat superior, e.g., Jones v. Seneca County, 154 A.D.3d 1349, 1349-50, 63 N.Y.S.3d 620, 622 (4th Dep't 2017) (citing cases); Saleh, supra, 2015 U.S. Dist. LEXIS 47166, at *19. Thus, there is a distinction between indemnification of County employees and accepting responsibility for those employees' actions under a respondeat superior theory.

 **9  In Villar v. Howard, 28 N.Y.3d 74, 78, 79, 41 N.Y.S.3d 460, 461, 462, 64 N.E.3d 280 (2016), the Court of Appeals held there was no statutory obligation for Erie County to indemnify the Sheriff under 🚩 General Municipal Law § 50-e(1)(b) (to then require service of a notice of claim against the County or Sheriff); see Mosey, supra, 117 A.D.3d at 1385, 984 N.Y.S.2d 706. This was despite the County being obligated to defend and indemnify Sheriff's Department employees pursuant to the collective bargaining agreement, Villar, supra, 28 N.Y.3d at 79, 64 N.E.3d 280, 41 N.Y.S.3d at 462; see also Docket No. 5, Def. Atty. Decl. Ex. B,

Collective Bargaining Agreement between Erie County and Teamsters Local 264, 2005-2016 at 1, 37, 39 (CBA for Sheriff's Department employees). The County cannot be held vicariously liable for the negligent acts of the Sheriff or his deputies, Villar v. Erie County, supra, 126 A.D.3d at 1296-97, 5 N.Y.S.3d at 748; Johanson v. County of Erie, 134 A.D.3d 1530, 1531, 22 N.Y.S.3d 763, 765 (4th Dep't 2015).

The Amended Complaint here alleges that Erie County employed Plaintiff and that Sheriff Howard and Superintendent Diina were officers of the County, hence the County demoted and terminated him (see Docket No. 10, Am. Compl. ¶¶ 7, 16, 19, 20, 24 (defendant County, "through the actions of Superintendent Diina, and Sheriff Howard," deprived Plaintiff of his due process rights), 30, 32, 39, 46).

In Davis, Magistrate Judge Michael Roemer found that defendant Erie County Sheriff's Department was not a separate (or suable) legal entity from Erie County and, rather than dismiss on this ground, recommended that Erie County be substituted for the named department, 🚩 2019 WL 4926289, at *1, 2019 U.S. Dist. LEXIS 173798, at *2, 3 (see also Docket No. 16, Def. Atty. Decl. ¶ 5, Ex. D, copy of Report & Recommendation, at 11); Loria v. Town of Irondequoit, 775 F. Supp. 599, 606 (W.D.N.Y. 1990) (Telesca, J.) (under New York law, citing cases, police department held to be mere administrative arm of the municipal corporation and without capacity to sue and be sued). Defendant Sheriff's Department objected, arguing that Erie County could not substitute for the department, 🚩 2019 WL 4926289, at *1, 2019 U.S. Dist. LEXIS 173798, at *2, because the Sheriff (and not the County) hires, trains, or supervises deputies, id. at *3, 439 N.Y.S.2d 549, 555, and there is no vicarious liability between the County and the Sheriff and his deputies, id. Judge Vilardo accepted and adopted Magistrate Judge Roemer's recommendation, id. Defendant Sheriff's Department cited to a portion of County Law § 54 to deny vicarious liability [2], but Judge Vilardo noted the sentence not cited which made claims excluded against the agency head a claim against the County, id. at *4, 439 N.Y.S.2d 549, 555. This sentence of section 54 provides that

> "Any lawful claims which but for this section would be claims against such head of an agency, department, bureau, or office shall be lawful claims against the county and shall be deemed to be the liability of the county."

N.Y. County L, § 54; see Davis, supra, 2019 WL 4926289, at *1, 2019 U.S. Dist. LEXIS 173798, at *4 (emphasis added). Judge Vilardo then concluded "thus, by the plain text of the statute, the county may be held liable for acts committed by the Sheriff or his deputies," Davis, supra, 2019 WL 4926289, at *1, 2019 U.S. Dist. LEXIS 173798, at *4. Furthermore, for a Title VII action, Judge Vilardo held that the County (and not the Sheriff) was the proper defendant, citing cases in this Court that found individual defendants are not subject to liability under Title VII, id. (citing Kretzmon v. Erie County, No. 11CV704, 2013 WL 636545, at *4, 2013 U.S. Dist. LEXIS 23270, at *13 (W.D.N.Y. Feb. 20, 2013) (Arcara, J.); see Sassaman, supra, 566 F.3d at 315-16; see also Brown v. County of Erie, No. 12CV251, 2013 WL 885993, at *3, 2013 U.S. Dist. LEXIS 32507, at *6-7 (W.D.N.Y. Mar. 8, 2013) (Arcara, J.) (allowing Title VII claim against Erie County and dismissing redundant claim against the Sheriff's Department, since department was not a suable entity)) Judge Vilardo also rejected the County's attempt to distance itself from the Sheriff's Department despite the County's argument that the department was not a separate legal entity, Davis, supra, 2019 WL 4926289, at *1-2, 2019 U.S. Dist. LEXIS 173798, at *4-5.

**\*10** Davis is distinguishable here because that case is a Title VII action which cannot be alleged against individuals and this case is under 42 U.S.C. § 1983 and could be named against individuals (such as the Sheriff). Plaintiff here also never named the Sheriff's Department as a party requiring this Court to identify the County as the real suable party in interest.

Plaintiff has argued that the proper party is Erie County because, under County Law § 54, any claim that can be lodged against the head of a department (here, the Sheriff) is lawfully against the County (Docket No. 15, Pl. Memo. at 3). Here this Court differs from Judge Vilardo. The County's relationship with the Sheriff historically is more complicated than simply assigning department head liability to the municipal government under the County Law. The State Constitution's long time exclusion of County responsibility or liability for its Sheriff's acts (cf. N.Y. Const. art. XIII, § 13(a) (1988)) now is manifest in allowing a County to opt-in and agree to be responsible for such liability by enactment of local law, Marashian, supra, 214 A.D.2d at 1034, 626 N.Y.S.2d at 647. Plaintiff has not alleged that Erie County has enacted a local law adopting respondeat superior liability here and, as noted above, courts have held that no such Erie County

local law exists. The only local law Erie County has enacted is an indemnification provision and not one adopting vicarious liability, Saleh, supra, 2015 U.S. Dist. LEXIS 47166, at *19. Plaintiff has not established the County's assumed vicarious liability, see id. at *21, 439 N.Y.S.2d 549, 555.

The County in this case cites to Article XIII, § 13(a), of the State Constitution, County Law §§ 400(1) and 652(2) identifying the Sheriff as a constitutionally authorized officer who hires his own staff (Docket No. 13, Def. Memo. at 7). The County also references its County Charter § 2103 and Article 15 of its Code which reaffirms that Sheriff's deputies and Sheriff's Department staff are employees of the Sheriff (id.). Erie County Charter § 2103 provides that employees of the Erie County Sheriff's Office are in the classified service under New York State Civil Service Law. Erie County Code § 15.03 states that the Sheriff appoints the undersheriff and such deputies, other clerks and employees within the limits of appropriations therefor. Those appointed by the Sheriff "serve during the pleasure of the sheriff," Erie County Code § 15.03(e) (cf. Docket No. 5, Def. Atty. Aff. Ex. B, collective bargaining agreement Art. 2 (preservation of management rights)).

Thus, in this case there is defendant Erie County, its non-suable (and not named in this action) Sheriff's Department, and the Sheriff himself (also not named as a defendant), and employees within the Sheriff's Department (none of which also were named as defendants). The County is liable for its own actions and (by local law and collective bargaining agreement) defends and indemnifies the Sheriff's Department employees, N.Y. County L. § 409(1); see Saleh, supra, 2015 U.S. Dist. LEXIS 47166, at *19; 85 N.Y. Jur. 2d Police, Sheriff, and Related Officers § 142.

The issue then is whether the Sheriff, as employer of Plaintiff and Sheriff's Department staff, is a necessary party under Rule 19. Plaintiff alleges in the Amended Complaint that the Defendant County demoted and later terminated him (Docket No. 10, Am. Compl. ¶¶ 7-8, 10-11). In the First Cause of Action, Plaintiff claims that "the County, through the actions of Superintendent Diina, and Sheriff Howard deprived Plaintiff of his property interest in continued employment" by demotion, deprivation of a hearing, lodging additional charges, and termination (id. ¶ 24). As for Plaintiff's termination, he alleges that the County terminated him and only names Superintendent Diina by name but without stating Diina's role in the termination (id. ¶¶ 28-48, 32). Plaintiff,

however, was placed on leave without pay on September 21, 2015, and if Plaintiff was unable to return to full duty within one year of commencement of leave, or by August 24, 2016, he would be terminated (Docket No. 5, Def. Atty. Decl. Ex. C, John Greenan letter of Sept. 21, 2015, at 1, 2) and was so terminated on August 23, 2016 (id., Ex. C, Greenan letter of Aug. 18, 2016). If this correspondence serves as Plaintiff's termination, the only person named is Greenan, a Sheriff's Department official indemnified by the County but who signed on behalf of Sheriff Howard.

 **\*11** The County argues that the demotion and termination decisions were "made by or on behalf of the Sheriff of Erie County," hence making him a necessary party (Docket No. 13, Def. Memo. at 7) coupled with its argument that the County never employed Plaintiff, but the Sheriff did (id.). The Sheriff employed Plaintiff as a deputy, but Plaintiff was paid by funds appropriated by Erie County, see Erie County Code § 15.03(a) (appointments "within the limits of the appropriations therefore").

This turns on the effect of the Erie County Code provision that appointees of the Sheriff "shall serve during the pleasure of the sheriff," id. Usually service at the pleasure of an employer means the ability of that employer to terminate employment, e.g., Catletti ex rel. Estate of Catletti v. Rampe, 334 F.3d 225, 227 (2d Cir. 2003). Service at pleasure also extends to personnel decisions short of termination, such as demotion. In Forrester v. White, 484 U.S. 218, 220-21 (1987), in deciding the scope of judicial immunity for administrative decisions, the Court considered the complaint of a probation officer challenging her demotion by the judge who appointed her where that probation officer served at the pleasure of the appointing judge.

The pleadings and the supplemental materials submitted in this case raise as issues of fact as to who demoted and later actually terminated Plaintiff. Again, under the Erie County Code appointee of the Sheriff serve at his pleasure, Erie County Code § 15.03(e). Appointment, reassignment, promotion, demotion, and ultimately termination is exclusively within the Sheriff's purview. Therefore, as the County asserts, the demotion and termination were either by the Sheriff or at his behest. As a result, the County (absent a local law agreeing to assume liability for the Sheriff's actions) is not the proper defendant and Sheriff Howard is a necessary party the First Cause of Action. As the County argues, raising that claim now would

be time barred by the three-year statute of limitation for civil rights claim.

Applying the Rule 19(b) factors to determine if this action should still survive despite missing the indispensable party, although the County Attorney would represent the Sheriff if he were named, the Sheriff would be prejudiced if this action were to continue to judgment against the County for the Sheriff's actions. Absent enacting a local law, the County cannot be held liable for the personal actions of the Sheriff. Thus, both the Sheriff and the County would be prejudiced if this action proceeds without the Sheriff as a defendant. It is not clear what alternative measures could be taken to avoid this prejudice or to mitigate its effect. Given the running of the statute of limitations, however, Plaintiff would lack an adequate remedy against the Sheriff had Plaintiff now commenced a separate action against him. Equitably and in good conscience this action **should not proceed absent the true appointing authority, Sheriff Howard**. There are no special circumstances that would make dismissal of this case inequitable because of indispensability, see 7 Federal Practice and Procedure, supra, § 1611, at 169.

Further, from the extrinsic evidence (Docket No. 5, Def. Atty. Decl. Ex. C; see Docket No. 8, Aff. of John Greenan ¶ 7) of the notices regarding Plaintiff's grant of leave without pay and potential termination (submitted without objection), Plaintiff was granted unpaid leave on September 2015 (a month after his demotion grievance, cf. Docket No. 5, Def. Atty. Decl. Ex. A; Docket No. 8, Greenan Aff. ¶ 4) and was notified that, barring submitting proof of illness, Plaintiff either had to return to full duty without restrictions or face termination. Further, Plaintiff was notified that if Plaintiff was unable to return to full duty within one year of commencing leave, or by August 24, 2016, he would be terminated. (Docket No. 5, Def. Atty. Decl. Ex. C, Sept. 21, 2015, and Oct. 20, 2015, letters; Docket No. 8, Greenan Aff. ¶ 7.) The record here does not indicate that Plaintiff notified the Sheriff's Department of his medical status, that he returned to full duty, or that he filed his objection to the proposed termination in 2016 (see Docket No. 8, Greenan Aff. ¶¶ 8-9). On August 18, 2016, Plaintiff was notified by Greenan for Sheriff Howard that Plaintiff was "administratively terminated" effective August 23, 2016 (Docket No. 5, Def. Atty. Ex. C, Aug. 18, 2016, letter). It appears that this termination is unrelated to Plaintiff's demotion; Plaintiff merely alleges that he was demoted and (months later) terminated implying the two events were connected. But this Court need not rest upon this since aspects of this termination have not been fleshed out, there has been

no discovery in this case, and this motion can be disposed of based upon the indispensable party, Sheriff Howard.

**\*12**  With the Sheriff responsible ultimately for Plaintiff's demotion and termination, his First Cause of Action alleged only against Erie County is **dismissed** and the County's converted motion for summary judgment (Docket No. 13) is **granted**.

As for the Second Cause of Action, Plaintiff alleges that he was demoted due to "Facebook posts" (<u>id.</u> ¶¶ 29-48), that he was a United States citizen denied of his right to freedom of speech (<u>id.</u> ¶¶ 31, 33, 35-47). Plaintiff admits that he authored these posts (<u>id.</u> ¶ 38) but did not attach the Facebook posts. The grievance letter now before this Court (Docket No. 5, Def. Atty. Decl. Ex. A) references a statement in an undated Facebook posting that Plaintiff was "going home and squeeze into some [tight] polyester pants just to make everyone feel better" (<u>id.</u> Docket No. 5, Def Atty. Decl. Ex. A at 1; <u>see</u> Docket No. 7, Pl. Memo. at page 19 of 20). Again, that grievance letter did not include a copy of the post or refer to other posts.

While this presents various issues of fact (what post led to the adverse action against Plaintiff; did they mention his employment with the Sheriff's Department, which he denies, Docket No. 10, Am. Compl. ¶ 43), the threshold matter is whether defendant Erie County employed Plaintiff and demoted him. As discussed regarding the First Cause of Action, the Sheriff (and not the County) employed and demoted Plaintiff and, absent a local law indemnifying him, the County is not responsible for the Sheriff's alleged tort. Therefore, the County's motion for summary judgment as to the Second Cause of Action also is **granted**.

E. Plaintiff's Sanctions Request

In his response, Plaintiff argued that sanctions under either Rule 11 or 28 U.S.C. § 1927 should be imposed against the County's motion (Docket No. 15, Pl. Memo. at 4). Given the disposition of the County's motion (<u>cf.</u> Docket No. 16, Def. Reply Memo. at 3-4) and the absence of a formal Rule 11 sanctions motion, including the predicate notice to the County

asking for withdrawal of the motion and the cooling off period before moving for sanctions, see Fed. R. Civ. P. 11(c), that request is **denied**.

## IV. CONCLUSION

Unlike the County's first attempt to introduce the extrinsic grievance material in its motion to dismiss (Docket No. 5), this Court **grants** Defendant Erie County's current Motion (Docket No. 13) to include extrinsic materials for its Motion for Judgment on the Pleadings (<u>id.</u>) and **converts** that motion into a Motion for Summary Judgment.

As so converted, defendant County's Motion for Summary Judgment (<u>id.</u>) is **granted, dismissing both the First Cause of Action and the Second Cause of Action**. Plaintiff's purported application for sanctions for the County's frivolous motion (Docket No. 15, Pl. Memo. at 4) is **denied**.

## V. ORDERS

IT IS HEREBY ORDERED, that the Defendant Erie County's Motion (Docket No. 13) to consider extrinsic evidence pursuant to 🚩 Rule 12(d) is GRANTED; its Motion to convert its Motion for Judgment on the Pleadings (<u>id.</u>) into one for Summary Judgment per 🚩 Rule 12(c) is also GRANTED,

FURTHER, that Defendant Erie County's converted Motion for Summary Judgment dismissing this case for failure to state a claim (<u>id.</u>) is GRANTED,

FURTHER, the Clerk of Court is directed to close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 4194136

**Footnotes**

1    This cures the defect noted in the original Complaint, <u>see</u> Docket No. 9, Decision & Order at 15-16, 2020 WL 2126976, at *7-8.

2    No head of any agency, department, bureau, or office of a county shall be liable to respond in damages to the county or to any other person for any act or omission of any employee of the county employed within the agency, department, bureau, or office of which he is such head. N.Y. County Law § 54; ⚑ Davis, supra, 2019 WL 4926289, at *1, 2019 U.S. Dist. LEXIS 173798, at *3.

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2163186

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Vladimir ZUK, Plaintiff,

v.

Esteban GONZALEZ, Captain, Onondaga County
Justice Center; Vincent Wasilewski, Assistant Chief,
Onondaga County Justice Center; Kevin Brisson,
Captain, Onondaga County Justice Center; Thomas
Metz, Lieutenant-Personnel Section; Anthony Callisto,
former Chief-Custody Division (Retried June,
2006); Richard Carbery, Chief-Custody Division,
Onondaga County Justice Center; Kevin Walsh,
Sheriff of Onondaga County; and Warren Darby,
Undersheriff of Onondaga County, Defendants.

No. 5:07-CV-732 (FJS/DEP).
|
July 26, 2007.

**Attorneys and Law Firms**

Vladimir Zuk, Syracuse, NY, pro se.

**MEMORANDUM-DECISION AND ORDER**

SCULLIN, Senior Judge.

**I. INTRODUCTION**

*1  There Clerk of the Court has sent Plaintiff's complaint to the Court for its review. *See* Dkt. No. 1. Plaintiff filed his complaint pursuant to Title VII of the Civil Rights Act of 1964, as amended and codified at ⚑ 42 U.S.C. § 2000e *et seq.,* and he has paid the filing fee for this action.

In his complaint, Plaintiff alleges, among other things, that, while he was an employee of Onondaga County at the Onondaga County Justice Center, Defendants discriminated against him in the course of his employment, denied him promotion, and retaliated against him on the basis of his national origin. [1]

**II. DISCUSSION**

Plaintiff names Esteban Gonzalez, Vincent Wasilewski, Kevin Brisson, Thomas Metz, Anthony Callisto, Richard Carbery, Kevin Walsh, and Warren Darby as Defendants. However, it is well-established that

> Title VII does not create individual liability for violations of its terms. ⚑ *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313-17 (2d Cir.1995). Only the employer may be held liable, and is in fact held vicariously liable for a hostile work environment created by a supervisor with immediate or successively higher authority over the victimized employee. ⚑ *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); ⚑ *Faragher v. Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

⚑ *Linder v. City of N.Y.,* 263 F.Supp.2d 585, 594-95 (E.D.N.Y.2003).

Therefore, the Court dismisses the above-named Defendants from this action in their personal capacity.

The question remains, however, whether Plaintiff may sue the aforesaid Defendants in their "official" capacity as representatives of the County of Onondaga.

> "[T]he Second Circuit has left open the question whether [Title VII] suits may be maintained against employees in their 'official capacity[.]' " *Guzman v. Round Hill Country Club, Inc.,* No. 3:03CV0851, 2003 WL 23212750, at *1 (D.Conn. Jan. 30, 2003) (citing ⚑ *Hafez v. Avis Rent A Car System, Inc.,* No. 99-9459, 2000 WL 1775508, *2 (2d Cir. Nov. 29, 2000)). However,

"most circuits either have rejected such suits outright, on the ground that employees cannot incur personal liability under Title VII, or have treated such suits as an action against the employer." *Id.* (footnote and citations omitted). This has been the "trend" in the district courts within the Second Circuit as well. *See id.* at *1, n. 4 (citing *McBride v. Routh,* 51 F.Supp.2d 153, 156-57 (D.Conn.1999) (citing cases)).

*Simpson v. N.Y. State Dep't of Civil Serv.,* No. 02-CV-1216, 2005 WL 545349, *9 (N.D.N.Y. Mar. 1, 2005).

For example, in *Bottge v. Suburban Propane,* 77 F.Supp.2d 310 (N.D.N.Y.1999), the court held "that [the Second Circuit's] individual liability bar applies to individual defendants in their official capacities, as well as to situations where the plaintiff seeks prospective injunctive relief against such individuals, under ... Title VII[.]" *Id.* at 313. The court explained further that "[t]he official/personal capacity distinction seems misplaced since it would place this Court in the position of holding someone liable without providing Plaintiff with a remedy at law." *Id.; see also* Gray v. Shearson Lehman Bros., Inc., 947 F.Supp. 132, 136 (S.D.N.Y.1996) (dismissing Title VII claims against individuals sued in their official capacities). The Court finds the courts' reasoning in *Simpson* and *Bottge* persuasive and, therefore, dismisses Plaintiff's Title VII claims against the individual Defendants in their official capacities as well.

**\*2** Since the Court has dismissed all of the claims against all of the individual Defendants, no Defendant remains. Nonetheless, to the extent that Plaintiff has named the individual Defendants in their official capacities, he has in essence named Onondaga County-his actual employer-as a Defendant. [2] *See Ciancio v. Gorski,* No. 98-CV-0714E, 1999 WL 222603, *1 (W.D.N.Y. Apr. 14, 1999) (holding that because the county employer would pay any judgment in an official capacity suit, the county employer was the proper defendant). Construing Plaintiff's complaint liberally in light of his *pro se* status, *see* Haines v. Kerner, 404 U.S. 519, 520 (1972), and in the interest of judicial economy, the Court will *sua sponte* substitute Onondaga County as the sole Defendant in place of the individually named Defendants. *See Ciancio,*

1999 WL 222603, at *1 (citing Fed.R.Civ.P.] 21 ("[p]arties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action and on such terms as are just"); *Cimemotion NV v. Lorimar-Telepictures Corp.,* 1989 WL 120083, *6 (S.D.N.Y. Oct. 5, 1989) (non-party over whom court could exercise personal jurisdiction would be added as defendant *sua sponte* under [Federal Rule of Civil Procedure] 21 "in the interest of the efficient administration of justice")).

### III. CONCLUSION

After carefully reviewing the entire file in this case and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Esteban Gonzalez, Vincent Wasilewski, Kevin Brisson, Thomas Metz, Anthony Callisto, Richard Carbery, Kevin Wash, and Warren Darby are dismissed as Defendants in this action; and the Court further

**ORDERS** that Onondaga County is *sua sponte* substituted as a Defendant in this action in place of the individual Defendants pursuant to Rule 21 of the Federal Rules of Civil Procedure; and the Court further

**ORDERS** that the Clerk of the Court shall add "Onondaga County" as a Defendant to the docket of this action; and the Court further

**ORDERS** that the Clerk of the Court shall issue a summons and forward it to Plaintiff, along with a packet containing General Order 25, which sets forth this District's Civil Case Management Plan. The Court advises Plaintiff that it is his responsibility to serve Defendant immediately with the summons, a copy of his complaint, and a packet containing General Order 25 in accordance with the Federal Rules of Civil Procedure; and the Court further

**ORDERS** that Defendant or its counsel shall file a formal response to Plaintiff's complaint as provided for in the Federal Rules of Civil Procedure subsequent to service of process on Defendant; and the Court further

**ORDERS** that Plaintiff shall immediately serve a copy of this Order upon any Defendant whom he has already served with process in this action; and the Court further

**ORDERS** that the parties must accompany any paper that they send to the Court or to the Clerk of the Court with a certificate setting forth the date on which they mailed a true and correct copy of the same to all opposing parties or their counsel. The Clerk of the Court shall return to the party who sent it any letter or other document that the Court or the Clerk of the Court receives that does not include a certificate of service that clearly states that the party served an identical copy on all opposing counsel. Plaintiff shall also comply with any requests of the Clerk's Office for any documents that are

necessary to maintain this action. All motions shall comply with this District's Local Rules; and the Court further

**\*3  ORDERS** that the Clerk of the Court shall serve a copy of this Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2163186

## Footnotes

1        Plaintiff attached to his complaint a copy of the right-to-sue letter that the Equal Employment Opportunity Commission ("EEOC") issued regarding the above allegations of discrimination. *See* Dkt. No. 1 at 19. Plaintiff alleges that he received the letter on April 13, 2007. *See id.* at 17.

2        Onondaga County, as the employer, is the proper defendant in a Title VII action. *See* 42 U.S.C. §§ 2000e and 2000e-2.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by   Goss v. City of New London,   D.Conn.,   February 8, 2022

2020 WL 1234553
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Adam MR. QUINN, Plaintiff,
v.
Brian GOULD & City of Bristol, Defendants.

No. 3:19-cv-820 (VAB)
|
Signed 03/13/2020

**Attorneys and Law Firms**

William Sylvester Palmieri, Law Offices of William S. Palmieri, LLC, New Haven, CT, for Plaintiff.

Channez M. Rogers, David S. Monastersky, Howd & Ludorf, LLC, Hartford, CT, for Defendants.

**RULING AND ORDER ON MOTION TO DISMISS**

VICTOR A. BOLDEN, UNITED STATES DISTRICT JUDGE

**\*1** Adam Quinn ("Plaintiff") has sued Chief Brian Gould and the City of Bristol (collectively, "Defendants"). Mr. Quinn alleges that the Defendants subjected him to a hostile work environment and retaliation, violating Title VII of the Civil Rights Act, as well as the Fourteenth Amendment of the U.S. Constitution's Equal Protection and Due Process Clauses. He also alleges negligent supervision, intentional infliction of emotional distress, and violations of the Connecticut Fair Employment Practices Act. Mr. Quinn sues Chief Gould in both his individual and official capacity.

Defendants have moved to dismiss claims against Chief Gould in his official capacity, as well as the equal protection, due process, negligent supervision, intentional infliction of emotional distress, and municipal liability claims against the City of Bristol. Defendants also contend that there is no basis for punitive damages.

Defendants have not challenged Plaintiff's claims under Title VII or the Connecticut Fair Employment Practices Act. As a result, those claims will proceed.

For the following reasons, the motion to dismiss is **GRANTED in part and DENIED in part.** All claims against Chief Gould in his official capacity are dismissed. The equal protection claim against Chief Gould in his individual capacity and the *Monell* claim against the City of Bristol will both proceed. The substantive due process claim is dismissed against Chief Gould in his individual capacity. The negligent supervision and intentional infliction of emotional distress claims are dismissed as to Chief Gould in his individual capacity and the City of Bristol.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

**A. Factual Allegations**
Mr. Quinn currently lives in Shelton, Connecticut and identifies as "an [sic] Hispanic male of Puerto Rican ancestry." Compl., ECF No. 1 ¶ 4 (May 28, 2019). During the relevant time period, Chief Gould "was the Chief of the Bristol Police Department" of the City of Bristol. *Id.* ¶ 5. Mr. Quinn worked as a police officer in Bristol, serving the Connecticut Police Department. *Id.* ¶ 9. He is allegedly one of two Hispanic police officers in the Bristol Police Department. *Id.* ¶ 11. "Apart from two African-American [o]fficers," the department allegedly is comprised of approximately 121 officers who "are exclusively white, non Hispanic Caucasian." *Id.* According to Mr. Quinn, he "was treated differently and more harshly than his white non Hispanic counterparts, by both supervisors and fellow Officers." *Id.* ¶ 12.

Mr. Quinn alleges that "his response time to emergency calls for medical assistance has been monitored, evaluated and scrutinized by the defendants," scrutiny not given to the non-Hispanic white officers. *Id.* ¶ 13. He also alleges that he responds "to emergency calls in a manner substantially similar" to other white, non-Hispanic officers. *Id.* ¶ 14. Defendants allegedly scrutinized him more in order to "fabricate discipline against Mr. Quinn." *Id.* ¶ 15. As a result, Mr. Quinn allegedly received discipline for "his response times to a small number of calls," even though Defendants recognized "that he timely responded to the overwhelming majority of such calls." *Id.* The emergency response time of white, non-Hispanic officers allegedly has never been monitored, "and no white non Hispanic officer has ever been disciplined for" emergency response times. *Id.* ¶ 16.

**\*2** Mr. Quinn also alleges that he "has been disciplined more harshly than non Hispanic officers" for his use of force. Compl. ¶ 17. "Although other similarly situated non Hispanic officers [allegedly] have used force similar to or greater than that used by [Mr. Quinn], no other officer has been disciplined for use of force" in the Bristol Police Department for seven years. *Id.*

Mr. Quinn's supervisors, Sergeant Edward Spyros, Sergeant Craig Duquette, Sergeant Matthew Moskowitz, Lieutenant Dennis Daigneault, Lieutenant Michael Healey, and Chief Gould, all allegedly treated him "differently from his similarly situated non Hispanic white colleagues." *Id.* ¶ 19. And all of these supervisors allegedly are "white and non Hispanic." *Id.*

In addition to his supervisors, Officer Gregory Lattanzio and Supervisor Lieutenant Dennis Diangeault allegedly "made a false complaint about" Mr. Quinn. *Id.* ¶ 20. Because of the false complaint, non Hispanic white males in the Bristol Police Department allegedly sought and obtained "an arrest warrant for [Mr. Quinn], and subject[ed] him to arrest." *Id.* Mr. Quinn allegedly received a thirty-day suspension as a result. *Id.* ¶ 21.

Mr. Quinn further alleges that the "false statements of his white, non Hispanic colleagues" caused his subsequent investigation and discipline. *Id.* ¶ 22. He contends that "white, non Hispanic supervisors of the defendant City order[ed] Officers to make or participate in complaints against him," when no complaint would have been made otherwise. *Id.* ¶ 23. The false statements allegedly subjected Mr. Quinn "to numerous Internal Affairs Investigations and a written agreement subjecting him to close monitoring, [allegedly] all with the intention of terminating him" from the Department. *Id.* ¶ 24.

The Internal Affairs investigations are allegedly "substantiated." *Id.* ¶ 25. Mr. Quinn alleges that other instances "where white, non Hispanic officers of the defendant City engaged in similar or worse conduct than alleged against [Mr. Quinn]" were determined to be "not substantiated." *Id.* "Discipline, including further suspension," allegedly was imposed because of these allegedly unfair Internal Affairs investigations." *Id.*

Sergeant Duquette and Lieutenant Daigneault allegedlly made "racist remarks about Hispanics" to Mr. Quinn. *Id.* ¶ 26.

The remarks allegedly "occurred at the workplace." *Id.* ¶ 27. The two officers allegedly made derogatory comments like, "Hey, we just arrested another Jose and maybe we should send his wetback ass back to Mexico[,]" and implied "all Hispanics are the same." *Id.* ¶ 27. Lieutenant Daigneault allegedly "has a history of harassment and discrimination." *Id.* ¶ 28. He allegedly "was forced to resign from the Glastonbury Police Department because of sexual harassment." *Id.* The City of Bristol allegedly knew of Lieutenant Daigneault's past when they hired him. *Id.* ¶ 31.

When Mr. Quinn allegedly complained of the discrimination and mistreatment of both Lieutenant Daigneault and Sergeant Duquette, neither "received anything more than a verbal reprimand from the defendant Gould for their conduct ..." *Id.* ¶ 31. After the complaints were submitted, Chief Gould allegedly "ordered [ ] white, non Hispanic personnel to 'document every little thing on Mr. Quinn' ... [to] further [discipline] him, up to termination." *Id.* ¶ 32.

In October 2017, Mr. Quinn allegedly overheard supervisor Lieutenant Healey "instruct another white, non Hispanic Sergeant, Ulric Berube, to [ ] scrutinize and document [Mr. Quinn]." *Id.* ¶ 33. Apparently Lieutenant Healey "said that he wanted [Mr. Quinn] to be documented" and that Mr. Quinn "was to be written up for any infraction, no matter how minor." *Id.*

**\*3** On or about February 15, 2018, Defendants allegedly "found against [Mr. Quinn] in five (5) Internal Affairs Investigations." *Id.* ¶ 35.

Mr. Quinn alleges that the "harassment and discrimination is continuous and ongoing ..." and that Defendants "have imposed, and continue[ ] to impose punishment [ ] and discipline upon [Mr. Quinn] in retaliation for his complaints, and because of his Hispanic race and/or heritage." *Id.* ¶ 35-36. Mr. Quinn allegedly suffers "an ongoing pattern of discrimination, harassment, disparate treatment, hostile work environment and retaliation." *Id.* ¶ 37.

Mr. Quinn claims that he has suffered and will continue to suffer future financial harm and loss "[a]s a direct and proximate result of the acts of the defendants[.]" *Id.* ¶ 41. His loss and suffering allegedly includes "loss of employment rights, duties, obligations or benefits, severe emotional distress, loss of personal and professional reputation, humiliation, embarrassment, loss of privacy, upset, anxiety,

inconvenience, physical harm, loss of property, and loss of employment opportunities." *Id.*

**B. Procedural History**

Mr. Quinn sought and received a right-to-sue letter from the U.S. Equal Employment Opportunity Commission and a Release of Jurisdiction from the Connecticut Commission on Human Rights and Opportunities. Compl. ¶ 38.

On May 28, 2019, Mr. Quinn filed this Complaint against Brian Gould and the City of Bristol ("Defendants"). Compl., ECF No. 1 (May 28, 2019) ("Compl.").

On August 26, 2019, Defendants filed a motion to dismiss. Mot. to Dismiss, ECF No. 11 (Aug. 26, 2019) ("Mot. to Dismiss").

On December 13, 2019, Plaintiff filed a memorandum in opposition. Pl.'s Mem. of Law in Opp., ECF No. 18-1 at 10 (Dec. 13, 2019) ("Pl.'s Opp'n").

**II. STANDARD OF REVIEW**

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification ... to render a claim plausible." *Arista Records LLC v. Doe*

*3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

**\*4** A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

**III. DISCUSSION**

**A. The Official Capacity Claims Against Chief Gould**

"[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs. of City N.Y.*, 436 U.S. 658, 690 n. 55 (1978). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007) ("An official capacity suit against a public servant is treated as one against the governmental entity itself.").

"[I]n a suit against a public entity, naming officials of the public entity in their official capacities add[s] nothing to the suit." *Davis v. Stratton*, 360 F. App'x 182, 183 (2d Cir. 2001) (internal quotation marks and citations omitted). To the extent individual defendants are sued in their official capacities, "these suits should be dismissed because the municipal entities are the real parties in interest, and thus 'a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.'" *Phillips v. Cty. of Orange*, 894 F. Supp. 2d 345, 384 n. 35 (S.D.N.Y. 2012) (quoting *Graham*, 473 U.S. at 166 (collecting cases)).

As a result, district courts within the Second Circuit consistently dismiss claims asserted against officials in their official capacities as duplicative where the plaintiff has named the municipal entity as a defendant. *Phillips*, 894 F. Supp. 2d at 384 n. 35 (collecting cases); *see, e.g., Kanderskaya v. City of N.Y.*, 11 F. Supp. 3d 431, 435 (S.D.N.Y. 2014) (dismissing with prejudice claims against police officer in official capacity "because they are duplicative of [the plaintiff's] other claims against [the municipality]") *aff'd*, 590 F. App'x 112 (2d Cir. 2015); *Ferreria v. Town of E. Hampton*, 56 F. Supp. 3d 211, 237 (E.D.N.Y. 2014) ("Because the Town is named as a defendant in the instant case, the Court grants summary judgment as to all claims for the individual defendants in their official capacities."); *Canzoneri v. Inc. Vill. of Rockville Ctr.*, 986 F. Supp. 2d 194, 205 (E.D.N.Y. 2013) (dismissing official capacity claims against individual officers "because they are duplicative of the *Monell* claims against the [municipality]"); *Wallikas v. Harder*, 67 F. Supp. 2d 82, 83-84 (N.D.N.Y. 1999) (noting that "claims against municipal officials in their official capacities are really claims against the municipality and, thus, are redundant when the municipality is also named as a defendant" and dismissing federal and state law claims asserted against country sheriffs in their official capacities).

\*5 Defendants argue that all claims "as to Chief Gould in his official capacity should be dismissed, as they are duplicative of the claims against the City." Defs.' Mem. of Law in Supp. of Mot. to Dismiss, ECF No. 11-1 at 6 (Aug. 26, 2019) ("Defs.' Mem."). Because claims against individual officials are essential claims against the government entity itself and because any resulting judgment would be redundant, Counts Two, Four, and Five against Chief Gould in his official capacity should be dismissed. *Id.* at 6-7.

Mr. Quinn responds that "[a]sserting official capacity claims against defendant Gould [ ] underscores the principal [sic] that Gould's actions are one and the same as the actions of the municipality and employer" for liability purposes. Pl.'s Opp'n at 10.

The Court disagrees.

Assuming Mr. Quinn would make a similar argument regarding his official capacity claims against Chief Gould, his official capacity claims against Chief Gould must be dismissed. "'As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects, other than name, to be treated as a suit against the entity.'" *O'Connor v. Pierson*, 568 F.3d 64, 71 (2d Cir. 2009) (citing *Graham*, 473 U.S. at 166).

Accordingly, Mr. Quinn's due process and equal protection claim (Count Two), negligent supervision (Count Four), and intentional infliction of emotional distress (Count Five) against Chief Gould in his official capacity will be dismissed.

## B. The Equal Protection Clause Claim

The Equal Protection Clause of the Fourteenth Amendment protects public employees from race discrimination and retaliation for complaining about race discrimination. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82 (2d Cir. 2015). Public employees may bring discrimination and retaliation claims under 42 U.S.C. § 1983 against a "responsible person acting under color of state law." *Id.* at 87; *cf. Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019) ("A plaintiff who claims sex discrimination in public employment in violation of the Fourteenth Amendment may bring suit pursuant to § 1983."). Any state employee "acting in his official capacity" acts "under color of state law." *Id.* at 88 (internal quotation marks omitted). A § 1983 claim must also allege that "as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges.'" *Padilla v. Harris*, 285 F. Supp. 2d 263, 267 (D. Conn. 2003) (quoting *Annis v. Cty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998)).

Fourteenth Amendment claims involving allegations of employment discrimination are evaluated under similar

standards as those used in Title VII employment discrimination cases. *See* 🚩 *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of ... the Equal Protection clause."). Employment discrimination cases under the Equal Protection Clause, then, are subject to the burden-shifting standard outlined in 🚩 *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Defendants argue that Mr. Quinn's equal protection claim should be dismissed because Mr. Quinn has failed to state a claim. Defs.' Mem. at 7. Specifically, Mr. Quinn cannot assert a claim under a "class of one" theory because it is inapplicable in the public employment context. *Id.* at 8. Nor can Mr. Quinn assert a claim under a selective enforcement theory, because, in Defendant's view, "he has failed to identify a single similarly-situated employee to whom he might be compared." *Id.* at 9. Mr. Quinn's allegations that he "was monitored more closely and disciplined more harshly ... failed to identify employees by protected classification or who have engaged in materially similar conduct, such that they might be considered similarly-situated comparators." *Id.* at 10-11.

*\*6* Mr. Quinn contends that he is "neither asserting a 'class of one' theory of liability, nor is he asserting official capacity claims against defendant Gould, where such claims are duplicative of claims asserted against the defendant Bristol[.]" Pl.'s Opp'n at 10. Instead, in his view, he has brought a selective enforcement equal protection claim and that he has sufficiently alleged 'he has been selectively treated compared with others similarly situated." *Id.* at 11-12. Specifically, he "has identified with the requisite, Iqbal satisfying certainty, the similarly situated comparators to whom he compares himself and his treatment at the hands of the defendants." *Id.* at 12 (emphasis in the original).

In their reply, Defendants reiterate that Mr. Quinn "has failed to plead facts sufficient to allege that he was treated differently than similarly situated comparators." Reply at 3. In their opinion, "the mere fact that Plaintiff alleges he is one of only two Hispanic police officers does not lend any factual support to his allegation that he is treated differently than similarly-situated non-Hispanic officers." *Id.* His identification of the body of police officers with whom he worked is insufficient to support his claim. *Id.* at 4.

The Court disagrees.

A claim of selective enforcement "arises when the government seeks to apply the law to a plaintiff differently than it would to other similarly situated individuals for constitutionally impermissible reasons such as on grounds of a plaintiff's race or malicious intent." *Gray v. Town of Easton*, 115 F. Supp. 3d 312, 319 (D. Conn. 2015). A selective enforcement claim closely mirrors a class-of-one claim, and it requires "a plaintiff prove[ ] that '(1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." 🚩 *Brown v. City of Syracuse*, 673 F.3d 141, 151-52 (2d Cir. 2012) (quoting 🚩 *Diesel v. Town of Lewisboro*, 232 F.3d 92, 104 (2d Cir. 2000)).

Courts in the Second Circuit have applied different comparator standards for selective enforcement claims. *Compare Yajure v. DiMarzo*, 130 F. Supp. 2d 568, 572 (S.D.N.Y. 2001) (articulating selective enforcement test as "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent") *with Gray*, 115 F. Supp. 3d at 319 ("But because the two theories [selective enforcement and class-of-one] themselves are so similar, there is little reason to suppose why a selective-enforcement claim should not require the same high degree of similarity between comparators as the Second Circuit requires for a class-of-one claim."); *see also* 🚩 *Hu v. City of N.Y.*, 927 F.3d 81, 93 (2d Cir. 2019) ("However, the similarity standard for an *Olech* claim is more stringent than the standard for a *LeClair* claim. While *Olech* requires an "extremely high" degree of similarity between a plaintiff and comparator, *LeClair* merely requires a reasonably close resemblance" between a plaintiff's and comparator's circumstances.").

In the Title VII context which requires a plaintiff to be "similarly situated in all material respects," all material respects means the plaintiff and the comparator "were subject to the same performance evaluation and discipline standards" or "to show that similarly situated employees who went undisciplined engaged in comparable conduct." 🚩 *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). This inquiry "requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's case, rather

than a showing that both cases are identical." *Id.* (citation omitted).

**\*7** Mr. Quinn argues that, besides the other handful of minority officers, none of the other 121 officers "shared his protective class characteristics." Pl.'s Opp'n at 12. He alleges that he "has been scrutinized and monitored more closely than his white, non Hispanic counterparts[,]" Compl. ¶ 13, that discipline was unequally applied, *id.* ¶¶ 15-17, that Internal Affairs investigations against him were "substantiated" as opposed to white, non Hispanic officers' investigations were typically found to be "not substantiated," *id.* ¶ 25, and that he repeatedly endured racial slurs and derogatory comments, *id.* ¶¶ 26-28.

Mr. Quinn thus has pled his equal protection claim with sufficient particularity. *See Hu*, 9237 F.3d at 97 (applying a lower degree of similarity required in pleading a selective enforcement claim and finding plaintiffs "satisfied the standard of plausibility by alleging differential treatment by the same defendant ... for the same conduct ... at the same jobsite"); *Komatsu v. City of New York*, 2019 WL 4805904, at *6 (S.D.N.Y. Sept. 30, 2019), *appeal docketed* No. 19-3169 (2d Cir. Oct. 2, 2019) (*pro se* plaintiff sufficiently established comparators through "others standing in line" when plaintiff was repeatedly denied entry to events at which Mayor De Blasio was to attend).

Accordingly, Defendant's motion to dismiss Mr. Quinn's equal protection claim will be denied.

### C. The Due Process Claim

The United States Constitution provides, "[N]or shall any state deprive any person of life, liberty, or property, without due process of law." U.S. Const. amdt. XIV, § 1. This provision "guarantee[s] more than fair process, and [ ] cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (internal quotation marks and citations omitted). "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the ... Fourteenth Amendment." *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976).

"To award damages under 42 U.S.C.§ 1983 for [an] alleged violation of procedural due process, a court must find that, as a result of conduct performed under color of state law, the plaintiff was deprived of life, liberty, or property without due process of law." *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996). Furthermore, a defendant in a § 1983 action may be held liable for damages, absent personal involvement in the alleged constitutional deprivation. *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended*, (Feb. 24, 2016).

" 'To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Emmerling v. Town of Richmond*, 434 F. App'x 10, 11-12 (2d Cir. 2011) (quoting *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009)); *see also Natale v. Town of Ridgefield*, 170 F.3d 258, 259 (2d Cir. 1999) (violation of the substantive standards of the Due Process Clause requires "conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.").

Defendants argue that Mr. Quinn "has failed to assert a cognizable property interest under the Constitution, and ... he has failed to plead any facts whatsoever to describe what process he alleges was due to him and how such due process was denied." Defs.' Mem. at 12. They also argue that because Mr. Quinn has alleged a cause of action under the Equal Protection Clause, "he may not also seek to do so under a substantive due process theory." *Id.*

**\*8** Mr. Quinn has not responded to this argument, and has not specified whether he intended to assert a substantive or procedural due process claim.

In their reply, Defendants argue that Plaintiff's failure to respond to Defendants' due process arguments renders his claim abandoned. Reply at 6.

The Court agrees.

Because Plaintiff has not articulated a procedure in which he was denied due process, the Court interprets Plaintiff's claim to be one of substantive due process.

"[W]here a 🚩 § 1983 plaintiff alleges a cause of action protected by an explicit textual source of the Constitution, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing that claim."

🚩 *Reed v. Town of Branford*, 949 F. Supp. 87, 90 (D. Conn. 1996) (internal quotation marks omitted) (quoting 🚩 *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)). "[L]oss of employment coupled with reputational harm [may] implicate[ ] cognizable liberty interests." 🚩 *Id.* 90-91 (citing 🚩 *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972)).

Mr. Quinn alleges "severe financial harm and loss, loss of employment rights, duties, obligations or benefits, severe emotional distress, loss of personal and professional reputation, humiliation, embarrassment, loss of privacy, ... anxiety, inconvenience, physical harm, loss of property, and loss of employment opportunities" as a result of Defendants' actions. Compl. ¶ 41. But Mr. Quinn fails to specify which constitutional rights were violated or which rights he invokes. Mr. Quinn potentially could "establish that he was deprived of a valid 'property interest' in a constitutionally-protected benefit," 🚩 *Kaluczky*, 57 F.3d at 210, but makes no specific allegations as to what his "loss of property" consists of or how, more specifically, he suffered "severe financial harm and loss," Compl. ¶ 41.

Without more specific allegations, Mr. Quinn's Complaint cannot sustain a substantive due process right. *See* 🚩 *Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)); *see also* 🚩⚠ *Velez*, 401 F.3d at 94 (plaintiff's substantive due process claim, based on allegations of violations of equal protection, were "either subsumed in her more particularized allegations, or must fail" because defendants' actions were not egregious as a matter of law).

Accordingly, Mr. Quinn's substantive due process claim will be dismissed.

**D. The Negligent Supervision Claim**
"A claim for negligent supervision establishes direct liability for an employer who fails to exercise reasonable care in supervising an employee." *Dumas v. The Price Chopper, Inc.*, No. WWMCV095004896S, 2010 WL 1889036, at *2 (Conn. Super. Ct. 201) (citing 🚩 *Seguro v. Cummiskey*, 82 Conn. App. 186, 191 (2004)). "To state a claim for negligent supervision, a plaintiff must plead and prove that he suffered an injury due to the defendant's failure to supervise an employee whom the defendant had a duty to supervise." 🚩 *Abate v. Circuitt-Wise, Inc.*, 130 F. Supp. 2d 341, 344 (D. Conn. 2001).

**\*9** The employer owes a duty only if "the defendant knew or reasonably should have known of the employee's propensity to engage in that type of tortious conduct." 🚩 *Id.* at 345 (citation omitted). "While no Connecticut case appears to spell out the elements of a claim for negligent supervision, it appears that such a claim must allege an injury in tort." *Deguzman v. Kramer*, No. 3:04-cv-2064 (JCH), 2005 WL 2030447, *2 (D. Conn. Aug. 23, 2005). Courts consider "whether a plaintiff can prove the four elements of a standard claim for negligence." *Id.* (citing 🚩 *Seguro*, 82 Conn. App. at 192). "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." 🚩 *McDermott v. State*, 316 Conn. 601, 609 (2015) (citing 🚩 *LePage v. Horne*, 262 Conn. 116, 123 (2002)). Within the duty prong, "there are two distinct considerations." 🚩 *LePage*, 262 Conn. at 123. "First it is necessary to determine the existence of a duty, and [second], if one is found, it is necessary to evaluate the scope of that duty." *Id.*

Defendants argue that the negligent supervision claim should be dismissed as both the City of Bristol and Chief Gould in his individual capacity are entitled to governmental immunity, Defs.' Mem. at 13, and that any release of governmental immunity from common law negligence requires specific statutory abrogation, *id.* at 14. In their view, the issues raised here involve discretionary actions, making governmental immunity applicable. *Id.* at 15. Furthermore, Defendants contend that Mr. Quinn must, and has not, alleged any exception to governmental immunity to a municipal employee's discretionary act. *Id.* at 16.

Mr. Quinn does not respond to this argument.

Defendants reply that Mr. Quinn abandoned his negligent supervision claim by failing to brief the argument in his opposition. Reply at 6.

The Court agrees.

Connecticut General Statute § 52-557n(a)(2), in pertinent part, provides:

> (2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by: (A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or willful misconduct; or (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law.

Conn. Gen. Stat. § 52-557n(a)(2)(A)-(B). It is well-settled in Connecticut that "a municipal corporation is not liable for negligence in the performance of a governmental function." *Williams v. City of New Haven*, 243 Conn. 763, 766 (1998) (quoting *Gordon v. Bridgeport Hous. Auth.*, 208 Conn. 161, 165 (1988)). Only a statute abrogates municipal immunity from liability for negligence. *Id.* at 767. In contrast, municipal employees maintain "qualified immunity in the performance of a governmental duty, but [ ] may be liable if he misperforms a ministerial act, as opposed to a discretionary act...." *Durrant v. Bd. of Educ.*, 284 Conn. 91, 95 n.4 (2007) (citation omitted).

"[M]inisterial refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion." *Id.* (citation omitted). Immunity from the performance of discretionary acts is subject to three exceptions: "first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm; second, where a statute specifically provides for a cause of action against a municipality or municipal official for failure

to enforce certain laws ...; and third, where the alleged acts involve malice, wantonness or intent to injure, rather than negligence." *Evon v. Andrews*, 211 Conn. 501, 505 (1989) (internal citations omitted).

Mr. Quinn has not identified any statutory abrogation which would suggest the City of Bristol is subject to liability. *See* Compl. ¶¶ 40-41; Pl.'s Opp'n (failing to mention a statutory abrogation).

**\*10** Chief Gould's liability in his individual capacity, however, depends on whether or not his actions were ministerial or discretionary, and, if he used his discretion, his alleged liability could be an exception. *See Napolitano v. Flynn*, 949 F.2d 617, 621 (2d Cir. 1991) (finding that a determination of qualified immunity as to state law claims turns on state law).

"Government acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature[,].... ministerial acts are performed in a prescribed manner without the exercise of judgment or discretion...." *Rodriguez v. Abbatiello*, 30 F. Supp. 3d 274, 277 (D. Conn. 1998). Acts performed "for the direct benefit of the public [ ] are supervisory or discretionary in nature." *Martel v. Metropolitan District Comm'n*, 275 Conn. 38, 48-49 (2005), *abrogated on other grounds by Ventura v. Town of E. Haven*, 330 Conn. 613 (2019); *see Martel*, 276 Conn. at 50-1 (defendants judgment "in determining whether to supervise, inspect and maintain the trails" were duties that "inherently required the exercise of judgment); *Evon*, 211 Conn. at 505-07 (action resulting from a failure to inspect adequately a rental dwelling was discretionary because the inspection involved the exercise of judgment). "[A]s a general rule, '[p]olice officers are protected by discretionary act immunity when they perform the typical functions of a police officer.' " *Ventura*, 330 Conn. at 631 (second alteration in the original) (quoting *Smart v. Corbitt*, 126 Conn. App. 788, 800 (2011)).

Mr. Quinn's allegations against Chief Gould are directed against his actions as a supervisor and the disciplinary decisions he allegedly made or the actions he allegedly encouraged other officers to take against Mr. Quinn. Because these actions are discretionary, Mr. Quinn's claims against Chief Gould cannot proceed. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent

with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief." (internal quotation marks omitted)).

Accordingly, the negligent supervision claim against the City of Bristol and Chief Gould in his individual capacity will be dismissed.

### E. Intentional Infliction of Emotional Distress

To prevail on an intentional infliction of emotional distress claim, "[i]t must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Watts v. Chittenden*, 301 Conn. 575, 586 (2011) (citing *Appleton v. Bd. of Educ.*, 264 Conn. 205, 210 (2005)). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine ... Only where reasonable minds disagree does it become an issue for the jury." *Geiger v. Carey*, 170 Conn. App. 459, 497 (2017) (quoting *Gagnon v. Housatonic Valley Tourism District Comm'n*, 92 Conn. App. 835, 846 (2006)). Extreme and outrageous conduct is conduct that goes "beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Appleton*, 254 Conn. at 210-11). "In order to state a cognizable cause of action, Plaintiff must not only allege each of the four elements, but also must allege facts sufficient to support them." *Golnik v. Amato*, 299 F. Supp. 2d 8, 15 (D. Conn. 2003); *see also Biro v. Hirsch*, 62 Conn. App. 11, 20 (2001) ("All four elements must be established to prevail on a claim for intentional infliction of emotional distress.").

**\*11** Conn. Gen. Stat. § 52-557n abrogates governmental immunity for a municipality and its officials. *Martin v. Town of Westport*, 108 Conn. App. 710, 729 (2008). Under this statute, "a political subdivision of the state shall not be liable for damages to person or property caused by: (A) [a]cts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or willful misconduct[,]" unless otherwise provided by law. Conn. Gen. Stat. § 52-557n(a)(2)(A). "[B]ecause recovery for intentional infliction of emotional distress, unlike that

for negligent infliction of emotional distress, requires an intent to cause injury; the safety interest of employees in being protected from intentional infliction of emotional distress is greater than the 'safety interest in being protected from negligent infliction of emotional distress.' " *Benton v. Simpson*, 78 Conn. App. 746, 757 (2003) (*quoting Perodeau v. Hartford*, 259 Conn. 729, 758 (2002)).

Defendants argue that Mr. Quinn's intentional infliction of emotional distress claim against both the City of Bristol and Chief Gould in his official capacity should be dismissed, because they are entitled to governmental immunity. Defs.' Mem. at 6. With regard to Chief Gould specifically, Defendants argue that Plaintiff's allegations that "he was more closely monitored than other employees and subject to internal affairs investigations," which found the allegations of misconduct substantiated, do not "rise to the level of extreme and outrageous" behavior. *Id.* In their view, "disciplinary action and investigations into alleged misconduct may reasonably be expected in a work environment, and are not actionable under a theory of intentional infliction of emotional distress." *Id.*

Mr. Quinn argues that Chief Gould, in his individual capacity, "has engaged in outrageous behavior, language and abuse as detailed in the plaintiff's Complaint." Pl.'s Opp. at 14. Chief Gould's conduct "is intolerable in civilized society[,]" and the motion to dismiss must be denied. *Id.*

Defendants reply that Mr. Quinn's allegations are conclusory and fail to identify what extreme or outrageous behavior by Chief Gould support his claim. Reply at 4.

The Court agrees.

Mr. Quinn's memorandum in opposition refers only to Chief Gould in his individual capacity, *id.* at 14, and the Court has already dismissed this claim against Chief Gould in his official capacity. The Court therefore only will analyze the intentional infliction of emotional against Chief Gould in his individual capacity. *See Benton*, 78 Conn. App. at 756 (finding that intentional infliction of emotional distress claims may proceed against individual employees).

Whether a defendant's conduct is "extreme or outrageous" is critical to an intentional infliction of emotional distress claim. " 'Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon

intentional infliction of emotional distress.' " *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 211 (2000) (quoting *Mellaly v. Eastman Kodak Co.*, 42 Conn. Sup. 17, 19 (1991)). Allegations of discrimination, discipline, and harassment have been found insufficient to support a claim for intentional infliction of emotional distress.

*White v. Martin*, 23 F. Supp. 2d 203, 208 (D. Conn. 1998) ("[T]he plaintiff has alleged in the most general of terms that [a defendant] discriminated against him, disciplined him, denied him a promotion, and harassed him. These allegations fall short of misconduct which exceeds 'all bounds usually tolerated by a decent society.' "); *see also Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 527 (2012) (collecting cases). Mr. Quinn's allegations do not contain specific allegations against Chief Gould or specific discriminatory actions taken by Chief Gould.

**\*12** Rather, Mr. Quinn seeks an intentional infliction of emotional distress claim against Chief Gould because of his role as a supervisor and the harassment or discrimination which occurred as a result of his direction or his oversight. His pleadings, however, fail to allege "conduct in the present case [which meets] this high threshold." *Perez-Dickinson*, 304 Conn. at 527; *see Voccola v. Rooney*, 136 F. Supp. 3d 197, 211 (D. Conn. 2015) ("[D]iscrimination is not *per se* extreme and outrageous."); *see also Twombly*, 550 U.S. at 556 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.").

Accordingly, Mr. Quinn's intentional infliction of emotional distress claim will be dismissed.

### F. Municipal Liability

A municipality is only subject to liability under § 1983 when the violation of the plaintiff's federally protected right is attributable to the enforcement or execution of a municipal policy, practice, or custom. *See Monell*, 436 U.S. at 694. "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996). Instead, "a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage'

with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 117 (1988) (internal quotation marks and citation omitted). Furthermore, "plaintiffs must show that the official policy, practice or custom was the 'moving force [behind] the constitutional violation,' [ ] which is to say that it actually caused the deprivation." *Hernandez v. Conn. Court Supp. Servs. Div.*, 726 F. Supp. 2d 153, 156-57 (D. Conn. 2009) (internal citations omitted).

"[T]o prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).

"Courts have recognized four ways for plaintiffs to demonstrate a policy or custom: (1) a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers [ ]; (2) conduct ordered by a municipal official with policymaking authority [ ]; (3) actions taken pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels [ ]; or (4) a failure to train municipal employees that amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact[.]" *Walker v. City of N.Y.*, No. 12 CIV. 5902 PAC, 2014 WL 1259618, at \*2 (S.D.N.Y. Mar. 18, 2014) (internal quotation marks omitted) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); and *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

Defendants argue that Mr. Quinn alleges "conclusory statements [which] do not set forth any factual allegations with respect to identifying what policies or customs exist as a result of the City's deliberate indifference to violations of constitutional rights." Defs.' Mem. at 24. In their view, Mr. Quinn's allegations also fail because they "are predicated solely on naked assertions and Plaintiff has pled no facts whatsoever to sufficiently allege[ ] that the city has a policy or custom [ ] result[s] [from] the City's deliberate indifference to the violation of constitutional rights[.]" *Id.*

**\*13** Mr. Quinn argues that he "has more than stated a case showing deliberate violations by high ranking, policy-setting

individuals such [as] the Chief, and numerous Supervisors." Pl.'s Opp'n at 15. He contends his allegations demonstrate "a pattern of discrimination, and retaliation against [ ] [Mr. Quinn]" and that defendants "harass[ed] him and creat[ed] a hostile work environment ... and fabricat[ed] false charges to punish" him. *Id.*

Defendants reply that Mr. Quinn "has failed to allege the existence of a municipal policy or custom that violates his constitutional rights, [and] that [he has] provided [no] facts as to how policymakers have engaged in conduct resulting in the denial of his constitutional rights or even what constitutional rights he alleges to have been denied." Reply at 5.

The Court disagrees.

Mr. Quinn alleged enduring frequent, persistent, and widespread harassment. Compl. ¶¶ 25-37. Chief Gould also allegedly condoned the actions and conduct against Mr. Quinn. Compl. ¶ 31 (Chief Gould gave only a "verbal reprimand" after Mr. Quinn filed a formal complaint). "[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that official's inaction constitutes a 'deliberate choice,' that acquiescence may be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (other citations omitted)). Thus, Mr. Quinn has sufficiently stated a claim under this theory.

Mr. Quinn also alleges facts sufficient for a claim of municipal liability under a theory of inadequate training. At the motion to dismiss stage, a plaintiff "need only plead that the city's failure to train caused the constitutional violation[.]" *Amnesty Am.*, 361 F.3d at 130 n.10. For this theory, he must "establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that plaintiffs identify a specific deficiency in the city's training program and establish that the deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation," *i.e.*, "that 'the officer's shortcomings ... resulted from ... a faulty training program' rather than from the negligent administration of a sound program or other unrelated circumstances." *Id.* at 129-30 (quoting *City of Canton*, 489 U.S. at 390-91).

"[W]hile *Monell* permits claims for the failure to have an adequate training program or to adequately supervise employees, such claims also require a showing of 'deliberate indifference.' " *Clarke v. Sweeney*, 312 F. Supp. 2d 277, 303 (D. Conn. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)).

"Deliberate indifference in this context may be demonstrated by evidence that there were 'foreseeable serious consequences' that could result from the absence of an adequate training policy or that the municipality 'fail[ed] to act in response to repeated complaints or constitutional violations by its officers.' " *Id.* (quoting Erwin Chemerinsky, Federal Jurisdiction, § 8.5 (4th ed. 2003)); *see also Voccola, 136 F. Supp. 3d at 209-10* (a municipality may be liable "when a municipality's failure to adopt a policy or custom demonstrates deliberate indifference to the violation of the plaintiff's constitutional rights"); *Patterson v. Cty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) ("It is sufficient to show ... that a discriminatory practice of municipal officials was so 'persistent or widespread' as to constitute a 'custom or usage with the force of law,' or that a discriminatory practice of subordinate employees was 'so manifest as to imply the constructive acquiescence of senior policy-making officials[.]' " (citations omitted)). "[T]he relevant inquiry is whether municipal policymakers had either actual or constructive knowledge of subordinates' unconstitutional practices and nonetheless permitted them to continue." *Hardy v. Town of Greenwich*, 2008 WL 5117370, at \*4 (D. Conn. Dec. 3, 2008) (citing *Amnesty Am.*, 361 F.3d at 126).

**\*14** Here, Mr. Quinn has alleged having been monitored and scrutinized and having been disciplined more harshly as a result. Compl. ¶¶ 14-15, 17. Supervisors allegedly made a false complaint which resulted in Mr. Quinn's arrest and made false statements which resulted in his investigation and discipline. *Id.* ¶¶ 20-22. Supervisors also allegedly encouraged other officers to make these false statements against him, *id.* ¶ 23, and allegedly tolerated racist statements made by other officers, and potentially made by said supervisors. *Id.* ¶ 27. Officers and supervisors were allegedly instructed to document as much as they could, so that Mr. Quinn would be written up for any infraction, and ultimately terminated him from the police force. *Id.* ¶¶ 32-36. Mr. Quinn filed formal complaints against two of the defendants. *Id.* ¶ 31. All actions allegedly were taken because of his race. His formal complaints indicate that Chief Gould knew or should have known of the ongoing problematic behavior.

Construing all of these allegations in the light most favorable to Mr. Quinn, as the Court must at this stage, he has sufficiently alleged a custom or policy of the City of Bristol Police Department to ignore, rather than address, racial discrimination against a Hispanic officer. *See*  *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992) (plaintiff did not need to prove active participation from a police commissioner, it was enough to demonstrate "that the actions of subordinate officers are sufficiently widespread to constitute the constructive acquiescence of senior policymakers."); *cf. Carmichael v. City of N.Y.*, 34 F. Supp. 3d 252, 263 (E.D.N.Y. 2014) (" '[I]solated acts ... by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability.' ") (quoting *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012)).

Accordingly, the motion to dismiss Mr. Quinn's *Monell* claim will be denied.

#### G. Punitive Damages

Defendants argue that it is well-settled law "that punitive damages may not be assessed against municipalities." Defs.' Mem. at 24.

Plaintiff does not respond to this argument.

In their reply, Defendants argue Mr. Quinn has abandoned his claim by failing to respond to it. Reply at 7.

The Court agrees.

Municipalities may not be exposed to punitive damages under § 1983. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("In sum, we find that considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith action of its officials."). "Although a municipality itself is immune from a claim for punitive damages, that immunity does not extend to a municipal official sued in his individual capacity." *New Windsor Volunteer Ambulance Corps., Inc. v. Meyers*, 442 F.3d 101, 123 (2d Cir. 2006).

Mr. Quinn impermissibly asserts a claim for punitive damages against the City of Bristol.

Accordingly, the motion to dismiss any claim for punitive damages will be granted.

### IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED in part and DENIED in part**. All claims against Chief Gould in his official capacity are dismissed.

The equal protection claim against Chief Gould in his individual capacity and the *Monell* claim against the City of Bristol will both proceed.

The substantive due process claim is dismissed against Chief Gould in his individual capacity. The negligent supervision and intentional infliction of emotional distress claims are dismissed as to Chief Gould in his individual capacity and the City of Bristol.

**SO ORDERED** at Bridgeport, Connecticut, this 13th day of March, 2020.

### All Citations

Slip Copy, 2020 WL 1234553

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:23-cv-00316-DNH-ML Document 13 Filed 04/18/23 Page 173 of 311

**Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)**

KeyCite Red Flag - Severe Negative Treatment

Vacated in Part by *Weiss v. David Benrimon Fine Art LLC,* 2nd Cir.(N.Y.), December 28, 2021

2020 WL 1974228

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Alejandro Domingo MALVAR EGERIQUE, Plaintiff,

v.

Ezra CHOWAIKI, David Benrimon Fine Art LLC,

Linda Benrimon, Piedmont Capital LLC, Avichai Rosen,

David Benrimon, and John Does 1-10, Defendants.

19 Civ. 3110 (KPF)

|

Signed 04/24/2020

**Attorneys and Law Firms**

Sidney N. Weiss, Sidney N. Weiss, Attorney at Law, New York, NY, for Plaintiff.

Adam Michael Felsenstein, Tannenbaum Helpern Syracuse & Hirschtritt LLP, New York, NY, for Defendant Ezra Chowaiki.

Luke William Nikas, Maaren Alia Shah, Quinn Emanuel Urquhart & Sullivan LLP, New York, NY, for Defendants David Benrimon Fine Art LLC, Linda Benrimon, Piedmont Capital LLC, Avichai Rosen, David Benrimon.

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

**\*1** Plaintiff Alejandro Domingo Malvar Egerique is understandably upset. He was deprived of two valuable artworks of which he was the rightful owner, and the person responsible for that deprivation was ultimately convicted of fraud charges in this District. Unsatisfied with the results of the criminal prosecution and a related bankruptcy proceeding, Plaintiff has decided to take matters into his own hands, bringing a civil lawsuit under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, against a wide swath of individuals (collectively, "Defendants") he blames for his losses. In relevant part, Plaintiff alleges that: (i) Ezra Chowaiki, the

convicted art dealer, used his art gallery to engage in a pattern of fraudulently acquiring and selling artwork; (ii) David and Linda Benrimon, through their art gallery David Benrimon Fine Art LLC ("DBFA"), engaged in a pattern of selling artwork that they had no legal right to sell; (iii) the Benrimons, through DBFA, engaged in the unlawful collection of debt; (iv) Avichai Rosen, through his enterprise, Piedmont Capital LLC ("Piedmont"), also engaged in the unlawful collection of debt; (v) Defendants conspired to facilitate each of the previously mentioned RICO violations; and (vi) Defendants committed analogous state-law claims of fraud, conversion, and replevin.

Because of the sanctions and stigma attendant to them, civil RICO claims are notoriously — and appropriately — difficult to plead. Chowaiki has moved to dismiss the claims against him, and the remaining Defendants, David and Linda Benrimon, DBFA, Piedmont, and Rosen (collectively, the "Benrimon Defendants"), have separately moved to dismiss the claims against them. The Benrimon Defendants have also moved for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. For various reasons outlined herein, Plaintiff has not pleaded viable RICO claims in this case. Accordingly, Chowaiki's motion to dismiss is granted in part and denied in part; the Benrimon Defendants' motion to dismiss is granted in part and denied in part; and the Benrimon Defendants' motion for Rule 11 sanctions is granted in part and denied in part.

**BACKGROUND**

**A. Factual Background** [1]

**1. The Parties**

**\*2** Plaintiff is a citizen and resident of Spain, and the owner of two works of art, *le Gueridon* by Pablo Picasso (the "Picasso"), and *Composition avec Profil de Femme* by Fernand Leger ("the Leger"). (Compl. ¶¶ 3, 4). Plaintiff acquired both works of art at a sale at Sotheby's in London on February 6, 2007. (*Id.* at ¶ 4). The Picasso was purchased as Lot 0152, and the Leger was purchased as Lot 0235. (*Id.*).

Because Plaintiff alleges several RICO enterprises involving different permutations of the defendants, a word about each Defendant is in order. During the relevant time period, Ezra Chowaiki was the Chief Executive Officer and one of the owners of Chowaiki & Co. Fine Art Ltd. (the "Gallery"), an art gallery in New York City. (Compl. ¶ 5). On or about

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 174 of 311

**Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)**

November 13, 2017, the Gallery filed a voluntary petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. *See* 🚩 *In re Chowaiki & Co. Fine Art Ltd.*, No. 17-13228 (MKV) (Bankr. S.D.N.Y. Nov. 13, 2017) (the "Bankruptcy Case"). Six months later, on May 3, 2018, Chowaiki pleaded guilty to a single count of wire fraud, in violation of 🚩 18 U.S.C. § 1343, in this District, relating to his theft of several pieces of artwork. *See United States v. Ezra Chowaiki*, No. 18 Cr. 323 (JSR) (the "Criminal Case"). As part of Chowaiki's plea and sentencing, Chowaiki agreed to forfeit to the United States 26 works of art that were the proceeds of his crimes. (*Id.*). The Picasso is one of the forfeited works. (*Id.*).

DBFA is an art gallery in New York City. (Compl. ¶ 6). David Benrimon is the Director and Chief Executive Officer of DBFA. (*Id.* at ¶ 7). Linda Benrimon is the Executive Director of DBFA. (*Id.* at ¶ 8). She is also the daughter of David Benrimon and the spouse of Avichai Rosen. (*Id.*). As Director and Executive Director of DBFA, respectively, David and Linda Benrimon buy and sell art for DBFA. (*Id.* at ¶ 19). Piedmont, of which Rosen is a principal, is a boutique investment manager specializing in strategic investments in alternative asset classes, including artwork. (*Id.* at ¶¶ 9-10).[2] As noted above, the Court refers to DBFA, David and Linda Benrimon, Avichai Rosen, and Piedmont as the "Benrimon Defendants."

### 2. Plaintiff Consigns the Picasso and the Leger to Chowaiki and the Gallery

Immediately after purchasing the Picasso and the Leger from Sotheby's in February 2007, Plaintiff installed them in his home in Spain, where they remained for eight years. (Compl. ¶ 34). On April 27, 2015, Plaintiff's brother, Benito Malvar, at Plaintiff's instruction and authority, and on Plaintiff's behalf, consigned the Picasso and the Leger to the Gallery. (*Id.* at ¶ 35). Plaintiff sent the two pieces of art to the Gallery that month (*id.* at ¶ 34), and they arrived in early June 2015 (*id.* at ¶ 36). After the consignments expired, Plaintiff — through his brother and through Chowaiki's agent — repeatedly demanded the return of the artwork. (*Id.* at ¶ 37). Chowaiki promised by telephone and email to return the artwork, but never did so. (*Id.* at ¶¶ 37, 105).

**\*3** Instead, Chowaiki converted the artwork for his own purposes. In January or February of 2017, Chowaiki, through the Gallery, sold and shipped the Leger from New York to Glowside Investment Trading, the listed address of which was 115 George Street, 4th Floor, Edinburgh, Scotland, United Kingdom. (Compl. ¶ 106). Chowaiki received money from that sale that was never shared with Plaintiff. (*Id.*). More troublingly, Glowside Investment Trading does not exist, and no such entity maintains an office at the address given in Edinburgh or elsewhere. (*Id.* at ¶ 107). Further, as described below, Plaintiff alleges that Chowaiki also sold the Picasso without Plaintiff's knowledge or authorization.

### 3. The Alleged Schemes

Plaintiff's Complaint outlines several frauds or schemes that, he alleges, constitute predicate acts sufficient to support his RICO claims. To set the stage for its legal analysis, the Court describes those schemes in the remainder of this section.

#### a. The Latamie Acts

The first scheme concerns the sale of Andy Warhol artwork in which DBFA is alleged to have been involved. On February 2, 2012, DBFA — or Benrimon Contemporary LLC, a related art gallery — sold a painting and a set of ten Mao Zedong prints, all by Warhol, to Marc Latamie and DM Fountain, Inc. ("DM"), Latamie's corporate entity, for $1,750,000. (Compl. ¶ 24). The Warhol painting was delivered to Latamie and DM. (*Id.*). However, neither DBFA nor Benrimon Contemporary LLC delivered the complete set of ten Mao Zedong prints to Latamie or DM. (*Id.*).

Cribbing from a state-court complaint filed by Latamie and DM against Benrimon Contemporary LLC, DBFA, David Benrimon, and son Leon Benrimon, Plaintiff alleges that, in connection with the Warhol transaction, Latamie and DM negotiated with, *inter alia*, several members of the Benrimon family. (Compl. ¶ 25). David and Linda Benrimon, in particular, repeatedly promised Latamie and DM that they (the Benrimons) would deliver the Warhol prints to the purchasers, despite the fact that Benrimon Contemporary LLC never had ownership, custody, or control over these prints. (*Id.* at ¶ 26). Plaintiff also alleges that David and Linda Benrimon, through DBFA, sold and delivered to others the very same Warhol prints that they supposedly sold, but failed to deliver, to Latamie and DM. (*Id.* at ¶ 27).

#### b. The Pledge Agreement Acts

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 175 of 311

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

The second scheme alleged by Plaintiff involved David and Linda Benrimon, through DBFA, acquiring works from Chowaiki and the Gallery — works they knew Chowaiki and the Gallery did not own — at deeply discounted prices. In support of this claim, Plaintiff alleges the following facts:

On September 19, 2017, David and Linda Benrimon, on behalf of DBFA, agreed to acquire three works of art in a bulk transaction from the Gallery. (Compl. ¶ 45). These were the Picasso; Takashi Murakami's *Jellyfish Eyes* (🔖 *Black I*) (the "Murakami"), which belonged to Thomas Morgan; and Pablo Picasso's *Le Clown* ("*Le Clown*"), which belonged to Andrew and Kristen Neumann. (*Id.*). David and Linda Benrimon structured this transaction with Chowaiki so that Piedmont would "lend" Chowaiki and his Gallery money that, by design, would not be repaid, using the works of art as "collateral" for the "loan." (*Id.* at ¶ 44).

Plaintiff cites several emails between David Benrimon and Chowaiki confirming the loan transactions. (Compl. ¶ 47). He also cites the loan documents comprising the transaction, which include: (i) a "Note" for a loan of $300,000.00 from Piedmont to the Gallery, to be repaid in 30 days, together with $50,000.00 interest, for a total uncompounded annual interest rate of 202.18%; (ii) a "Pledge Agreement" in which Piedmont is given the Picasso, the Murakami, and *Le Clown* as security for repayment of the loan; (iii) a "Shtar Isko"[3] in which the $300,000.00 loan creates a 50%-50% partnership between Piedmont and Chowaiki; and (iv) a "Release and Settlement Agreement" in which the parties agreed that, in light of the Gallery's failure to repay the $300,000.00 loan plus $50,000.00 in interest when due on October 19, 2017, all title and ownership of the three artworks passed to Piedmont. (*Id.* at ¶ 48). Plaintiff alleges that while Piedmont was listed as the lender in the documents, the transactions were negotiated by David and Linda Benrimon, on behalf of, and from, DBFA, and that the $300,000.00 loan was listed on the books and records of the Gallery as being from David Benrimon. (*Id.* at ¶ 50).

 **\*4**  Significantly, Plaintiff claims that, at the time of the loan agreement, the Benrimon Defendants knew or should have known that: (i) Chowaiki had a court-documented history of selling and pledging artwork, particularly previously consigned artwork, that neither he nor his Gallery owned or had a right to sell or pledge; (ii) Chowaiki was in desperate financial straits, had no assets, and was likely insolvent; (iii) Chowaiki was selling or pledging artwork that he did not own and had no right to sell or pledge; (iv) Chowaiki

needed the $300,000 to pay off another loan, and by depleting his inventory by hypothecating or selling three works of art at steeply discounted prices, it would be impossible to pay back the loan at 202.18% interest within 30 days, or to remain in business; (v) Chowaiki would not and could not fulfill the terms of the Shtar Isko to buy and sell works of art with the $300,000 loan because the $300,000 loan was needed immediately to pay off another loan; (vi) there was a real likelihood that Chowaiki would be arrested for his fraudulent activity; (vii) Chowaiki was selling artwork in bulk at deeply discounted prices, thus giving a clear warning that those works were stolen; and (viii) the price for the three works of art was less than one-third of their true value. (*Id.* at ¶ 55). Further, Plaintiff claims that while the Benrimon Defendants and Chowaiki were structuring the loan for which the Picasso was posted as collateral, the Benrimon Defendants had in their possession a document titled "Provenance" that described the most recent ownership of the Picasso as "Sale Sotheby's London, 6 February 2007, lot 152 Private Collection (acquired at the above sale)." (*Id.* at ¶ 52).

On October 4, 2017, David and Linda Benrimon, on behalf of DBFA, picked up the Picasso from the Gallery. (Compl. ¶ 62). Thereafter, the Benrimons transported the Picasso (or caused it to be transported) to Europe. (*Id.* at ¶ 21). The Picasso has been transported several times — once from Italy to Switzerland in the spring or summer of 2018, a second time from Switzerland to London in the summer or fall of 2018, and a third time from London to Switzerland a few weeks thereafter. (*Id.* at ¶ 64). Further, from March 13 through May 25, 2018, the Picasso was exhibited at the Tega Gallery in Milan. (*Id.* at ¶ 67). Plaintiff alleges that David and Linda Benrimon continue to pay for the Picasso's storage and concealment abroad. (*Id.* at ¶ 72).

### c. The Court Filing Acts

Critical to the success of these schemes of deprivation, Plaintiff alleges, were schemes to create false paper trails. In this regard, Plaintiff alleges that, in order to conceal the true nature of the acquisition of the three works of art by the $300,000 loan, each of the Benrimon Defendants caused numerous "fraudulent" electronic filings to be made in the Bankruptcy Case and Criminal Case. (Compl. ¶ 73). In those filings, Piedmont asserts ownership of the Murakami and *Le Clown*, two of the works taken as security for the $300,000 loan. (*Id.*). Further, Piedmont's verified petition for

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 176 of 311

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

the Murakami and *Le Clown* in the Criminal Case omits the existence of the Shtar Isko, which shows that Chowaiki and Piedmont were actually 50-50% equal partners and not unrelated *bona fide* purchasers for value. (*Id.* at ¶ 76). Plaintiff alleges that these filings were "fraudulent" because they were intended to deceive other owners of the artwork, the creditors of Chowaiki's Gallery, the victims of Chowaiki's crimes, the Bankruptcy Case Trustee, the courts, and law enforcement officials into believing that David and Linda Benrimon and DBFA had nothing to do with these fraudulent transactions. (*Id.* at ¶ 74).

#### d. The *Le Compotier* Acts

The fourth fraudulent scheme alleged in the Complaint concerns a transaction between the Benrimons and Chowaiki in which Plaintiff was not involved. In brief, David and Linda Benrimon acquired *Le Compotier* by Juan Gris from Chowaiki and the Gallery at some point before the summer of 2017. (Compl. ¶ 29). However, *Le Compotier* was owned by Eli Sakhai or his company, The Art Collection Inc., and Chowaiki and his Gallery had no right to sell it. (*Id.* at ¶ 30).

Plaintiff alleges that the Benrimons acquired *Le Compotier* with full knowledge of the fact that Chowaiki and his Gallery did not own it. (Compl. ¶ 29). As support, Plaintiff cites to a complaint filed by The Art Collection Inc. against David Benrimon and DBFA, in which Sakhai alleges that he "specifically told [defendant David Benrimon] that he [Sakhai] owned" *Le Compotier*, and that he (Sakhai) had consigned the work to the Gallery, but "had demanded that Chowaiki and Chowaiki & Co. return that painting to" Sakhai's corporation, and, further, that David Benrimon and DBFA should not pay either Chowaiki or his Gallery for the painting because neither Chowaiki nor his Gallery owned the painting or had the right to sell it to the Benrimons. (*Id.* at ¶ 31).

#### e. The Fraud Allegations Specific to Chowaiki

**\*5**  Plaintiff's Complaint also contains certain allegations directed specifically towards Chowaiki and his Gallery. (*See* Compl. ¶¶ 95-111). Specifically, Plaintiff alleges that from its inception through at least July 20, 2009, Chowaiki conducted the Gallery's affairs through repeated acts of wire fraud in which he obtained customers' artworks by fraudulently telling them he would sell them on consignment, when in

fact he used those artworks as collateral for loans. (*Id.* at ¶ 96). Plaintiff alleges that, during this time, Chowaiki used $13 million worth of artwork as collateral, without his clients' knowledge or consent. (*Id.* at ¶ 97).

Plaintiff's only specific example of this type of fraud is the conduct defined earlier as the Pledge Agreement Acts. To substantiate the allegation that Chowaiki engaged in similar conduct repeatedly, Plaintiff relies exclusively on documents filed in the Criminal Case and Bankruptcy Case. Beginning with the former, Plaintiff cites the criminal complaint filed against Chowaiki, which alleges that Chowaiki, with others,

> through the use of e-mail messages, telephone calls, and electronic fund transfers, defrauded purchasers and sellers of fine art by deceiving them into sending funds or artwork to his gallery in New York, New York under the false pretenses that CHOWAIKI would either use the funds to purchase works of art, or that he could sell the artworks that had been provided to him when, in truth and fact, CHOWAIKI never made such purchases and sales.

(Compl. ¶ 99 (quoting Criminal Case, Dkt. #1)). Plaintiff also notes that Chowaiki pleaded guilty to Count One of the Indictment, which charges:

> From at least in or about 2015 through at least in or about 2017, in the Southern District of New York and elsewhere, EZRA CHOWAIKI, the defendant, willfully and knowingly, having devised a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit,

CHOWAIKI, through the use of e-mail messages, telephone calls, and electronic fund transfers, defrauded purchasers and sellers of fine art by deceiving them into sending funds or artwork to his gallery in New York, New York under the false pretenses that CHOWAIKI would either use the funds to purchase works of art or that he would sell the artworks that had been provided to him.

(*Id.* at ¶ 100 (quoting Criminal Case, Dkt. #14)).

Ultimately, as part of Chowaiki's guilty plea and resulting conviction, Chowaiki admitted to the forfeiture of at least 26 works of art that he had stolen or otherwise fraudulently acquired (including the Picasso), worth over $16.6 million, and agreed to make restitution to his victims. (Compl. ¶ 101 (citing Criminal Case, Dkt. #16)). In the Criminal Case, the court adjudged Plaintiff's right to the Picasso to be superior to that of the Bankruptcy Case Trustee and the United States. (*Id.* at ¶ 102). Plaintiff alleges that no other party, including Piedmont, filed a petition with respect to the Picasso. (*Id.*).

Plaintiff also cites limited information from the Bankruptcy Case. Plaintiff notes that, in the Bankruptcy Case, there were 69 claims filed against the Gallery, totaling $56,249,794.49. (Compl. ¶ 103). Plaintiff alleges that almost all of those claims were made by claimants who had given Chowaiki money or art, only to have him convert the money or art for his own use. (*Id.*).

**B. Procedural Background**
**\*6** Plaintiff filed the Complaint on April 8, 2019. (Dkt. #1). On June 10, 2019, Defendants DBFA, David Benrimon, Linda Benrimon, Alex Benrimon, Lauren Benrimon, Piedmont, and Avichai Rosen filed a letter requesting a pre-motion conference for their proposed motion to dismiss under Rule 12(b)(6). (Dkt. #14). The same day, Chowaiki also filed a letter requesting a pre-motion conference for his proposed motion to dismiss. (Dkt. #17). Also on the same day, Plaintiff filed a letter in response to the two letters. (Dkt. #18). On June 11, 2019, the Benrimon Defendants filed a letter requesting a pre-motion conference before moving for sanctions pursuant to Fed. R. Civ. P. 11 against Plaintiff and his counsel. (Dkt.

#21). On June 14, 2019, Plaintiff filed a letter opposing the substance of the Benrimon Defendants' letter. (Dkt. #22).

The Court held a pre-motion conference on July 29, 2019, at which time the Court heard arguments from all parties on the Defendants' proposed motions and Plaintiff's proposed amended complaint. (Dkt. #27 ("July 29, 2019 Tr.")). On September 6, 2019, Plaintiff voluntarily dismissed Defendants Alex Benrimon and Lauren Benrimon from the action. (Dkt. #25). Plaintiff filed an amended complaint (the "Complaint") the same day. (Dkt. #26).

The Complaint alleges the following causes of action:

(i) a RICO claim against David and Linda Benrimon for engaging in pattern of racketeering activity through DBFA;

(ii) a RICO conspiracy claim against David and Linda Benrimon, Rosen, Chowaiki, and Piedmont for facilitating the RICO violations in Count I;

(iii) a RICO claim against Rosen for the collection of unlawful debt through Piedmont;

(iv) a RICO conspiracy claim against David and Linda Benrimon, DBFA, Rosen, and Chowaiki for facilitating the RICO violations in Count III;

(v) a RICO claim against David and Linda Benrimon for collection of unlawful debt through DBFA;

(vi) a RICO conspiracy claim against David and Linda Benrimon, Rosen, Chowaiki and Piedmont for facilitating the RICO violations in Count V;

(vii) a RICO claim against Chowaiki for a pattern of racketeering activity;

(viii) a RICO conspiracy claim against all of the Defendants for facilitating the RICO violations in Count VII;

(ix) a common-law fraud claim against Chowaiki and conspiracy to defraud claim against all the Benrimon Defendants;

(x) a conversion claim against all of the Defendants for Plaintiff's loss of the Picasso and a conspiracy to convert claim against all of the Defendants for Plaintiff's loss of the Leger; and

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 178 of 311

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

(xi) a replevin claim against all of the Defendants for Plaintiff's Leger.

(Compl. ¶¶ 112-53).

On October 18, 2019, Chowaiki filed his motion to dismiss. (Dkt. #29-31). The Benrimon Defendants filed their motion to dismiss on October 21, 2019. (Dkt. #32-34). The Benrimon Defendants filed their motion for sanctions the same day. (Dkt. #35-38). On November 18, 2019, Plaintiff filed a brief and declaration in opposition to both Chowaiki's and the Benrimon Defendants' motions to dismiss. (Dkt. #39-40). Plaintiff also filed a brief and declaration in opposition to the Benrimon Defendants' motion for sanctions. (Dkt. #41-42). Chowaiki filed his reply brief on December 6, 2019. (Dkt. #45). That same day, the Benrimon Defendants filed their replies in support of both their motion to dismiss and motion for sanctions. (Dkt. #46-48). On December 13, 2019, Plaintiff requested oral argument on the motions. (Dkt. #49). The Court has reviewed the motions and, for the reasons explained below, does not believe that oral argument would be useful.

## DISCUSSION

### A. Plaintiff Has Failed to Allege a Civil RICO Claim Against Any of the Defendants

#### 1. Motions to Dismiss Under 🚩 Fed. R. Civ. P. 12(b)(6)

A complaint survives a motion to dismiss under 🚩 Federal Rule of Civil Procedure 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " 🚩 *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🚩 *Id.*

**\*7** The heightened pleading standard specified in 🚩 *Twombly* "require[s] enough facts to nudge [the plaintiff's] claims across the line from conceivable to plausible." 🚩 *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (citing 🚩 *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). While a court should accept plaintiff's allegations from the complaint as true, it need not follow that course for any

of plaintiff's legal conclusions. *See* 🚩 *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Legal conclusions that are stated to support "[t]hreadbare recitals of the elements of a cause of action ... do not suffice." 🚩 *Id.* Therefore, a court is entitled to dismiss a complaint under 🚩 Rule 12(b)(6) if the plaintiff merely offers "labels and conclusions or a formulaic recitation of the elements of a cause of action." *Am. Fed'n of State, Cty. & Mun. Emp. Dist. Council 37 Health & Sec. Plan v. Bristol-Myers Squibb Co.*, 948 F. Supp. 2d 338, 344 (S.D.N.Y. 2013) (citing 🚩 *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

In resolving a 🚩 Rule 12(b)(6) motion, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (collecting cases). A court may also consider "matters as to which judicial notice may be taken, such as pleadings in other lawsuits and other public records[.]" *Rosado-Acha v. Red Bull Gmbh*, No. 15 Civ. 7620 (KPF), 2016 WL 3636672, at \*6 (S.D.N.Y. June 29, 2016) (quoting *Agron v. Douglas W. Dunham, Esq. & Assocs.*, No. 02 Civ. 10071 (LAP), 2004 WL 691682, at \*2 (S.D.N.Y. Mar. 31, 2004)) (internal quotation marks omitted); *see also* 🚩 *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under 🚩 Rule 12(b)(6)."); *see generally Goel v. Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016) (discussing documents that may properly be considered in resolving a 🚩 Rule 12(b)(6) motion).

More specifically, "[i]n the 🚩 Rule 12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice.*" *Jianjun Lou v. Trutex, Inc.*, 872 F. Supp. 2d 344, 350 n.6 (S.D.N.Y. 2012); *see also* 🚩 *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of pleading in another lawsuit). The Court may take judicial notice of a document filed in another court to establish the fact of such litigation and related filings, but not for the truth of the matters asserted in the other litigation. 🚩 *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (internal quotation marks and citation omitted); *accord In re Ridgemour Meyer Properties, LLC*, 599 B.R.

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 179 of 311

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

215, 220 (S.D.N.Y. 2019), *aff'd*, 791 F. App'x 279 (2d Cir. 2020) (summary order).

**2. Pleading a Civil Action Under RICO**

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1962(d) applies the same prohibitions to a defendant who conspires to violate subsection (c). Of particular significance here, RICO affords a private right of action to individuals who are harmed by racketeering activity. *See* 18 U.S.C. § 1964. This private right of action allows a plaintiff to bring a claim under RICO for sustaining injuries "in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). A plaintiff who proves injuries in his business or property may "recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" *Id.* A plaintiff bringing a civil RICO claim under Section 1962(c) must allege that: (i) the defendant has violated the substantive RICO statute; and (ii) the plaintiff was injured in his business or property "by reason of a violation of section 1962." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (citing 18 U.S.C. § 1962(c)); *accord Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008). To make out a substantive RICO violation, in turn, a plaintiff must allege the (i) conduct (ii) of an enterprise (iii) through a pattern (iv) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

**\*8** To establish a RICO conspiracy under 18 U.S.C. § 1962(d), a plaintiff must allege "a conspiracy to commit a substantive RICO violation." *Spool*, 520 F.3d at 183. "Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990). To make out a RICO conspiracy charge, under § 1962(d), a plaintiff must allege that the conspirator intended to further an endeavor that, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that the conspirator has adopted the goal of furthering or facilitating the criminal endeavor. *First Capital Asset Mgmt. Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) (quoting *Baisch v. Gallina*, 346 F.3d 366, 376-77 (2d Cir. 2003)). In the civil context, a plaintiff must allege that the defendant "knew about and agreed to facilitate the scheme." *Salinas v. United States*, 522 U.S. 52, 66, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997); *accord City of New York v. Bello*, 579 F. App'x 15, 17 (2d Cir. 2014) (summary order).

**a. The RICO Enterprise Requirement**

An "enterprise" within the meaning of the RICO statute includes any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise is proven by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

A RICO enterprise must be "an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524. As the Second Circuit has "long recognized, the plain language and purpose of the statute contemplate that a person violates the statute by conducting an enterprise through a pattern of criminality. It thus follows that a corporate person cannot violate the statute by corrupting itself." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (citing *Bennett v. U.S. Tr. Co. of N.Y.*, 770 F.2d 308, 315 (2d Cir. 1985)). Rather, a plaintiff bringing a RICO claim must allege the existence of two distinct entities — a person and an enterprise. *See id.* (quoting *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 438 n.15 (2d Cir. 2008)).

**b. The Pattern Requirement**

A "pattern of racketeering activity" requires at least two acts of "racketeering activity" occurring within 10 years of each other. *See* 18 U.S.C. § 1961(5); *accord Spool*, 520 F.3d

at 183. The term "racketeering activity" refers to the predicate acts necessary to sustain a RICO claim and includes mail fraud and wire fraud. *See* 18 U.S.C. § 1961(1). In order to constitute a "pattern" of racketeering activity, the predicate acts must be [i] related and [ii] constitute a threat of continued racketeering activity." *H.J. Inc., et al. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238-44, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *accord United States v. Alkins*, 925 F.2d 541, 551 (2d Cir. 1991).

### i. Relatedness

Predicate crimes must be related both to each other ("horizontal relatedness") and to the enterprise as a whole ("vertical relatedness"). *See Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017) (citing *United States v. Cain*, 671 F.3d 271, 284 (2d Cir. 2012)). "Vertical relatedness, which entails the simpler analysis, requires only 'that the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over the enterprise's affairs, or because the offense related to the activities of the enterprise.' " *Reich*, 858 F.3d at 61 (quoting *United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010)).

**\*9** "[P]redicate acts are horizontally related when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Reich*, 858 F.3d at 61 (emphasis in original) (quoting *H.J.*, 492 U.S. at 240, 109 S.Ct. 2893). "When dealing with 'an enterprise whose business is racketeering activity, such as an organized crime family,' horizontal relatedness can be established simply by linking each act to the enterprise." *Id.* (quoting *United States v. Coppola*, 671 F.3d 220, 243 (2d Cir. 2012) (internal punctuation and citations omitted)). "When dealing with an enterprise that is primarily a legitimate business, however, courts must determine whether there is a relationship between the predicate crimes themselves; and that requires a look at, *inter alia*, whether the crimes share 'purposes, results, participants, victims, or methods of commission.' " *Id.* (quoting *H.J.*, 492 U.S. at 240, 109 S.Ct. 2893). "[T]he overall pattern requirement, of which relatedness is one component, is a bulwark against the application of RICO to the perpetrators of isolated or sporadic

criminal acts." *United States v. Daidone*, 471 F.3d 371, 376 (2d Cir. 2006).

### ii. Continuity

To satisfy continuity, the plaintiff must establish either "a series of related predicate acts extending over a substantial period of time" ("closed-ended continuity") or "a threat of continuing criminal activity" ("open-ended continuity"). *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999). "RICO targets conduct that 'amounts to or poses a threat of continued criminal activity.' " *Reich*, 858 F.3d at 60 (alterations omitted) (quoting *H.J.*, 492 U.S. at 239, 109 S.Ct. 2893). "Such continuity can be closed-ended or open-ended." *Id.* "Criminal activity that occurred over a long period of time in the past has closed-ended continuity, regardless of whether it may extend into the future." *Reich*, 858 F.3d at 60. "As such, closed-ended continuity is 'primarily a temporal concept' " *id.* (quoting *Spool*, 520 F.3d at 184), "and it requires that the predicate crimes extend 'over a substantial period of time' " *id.* (quoting *H.J.*, 492 U.S. at 242, 109 S.Ct. 2893). The Second Circuit "generally requires that the crimes extend over at least two years." *Id.* (citing *Spool*, 520 F.3d at 184 ("Although we have not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity[.]")).

"On the other hand, criminal activity 'that by its nature projects into the future with a threat of repetition' possesses open-ended continuity, and that can be established in several ways." *Reich*, 858 F.3d at 60 (quoting *H.J.*, 492 U.S. at 241, 109 S.Ct. 2893). When, for example, "the business of an enterprise is primarily unlawful, the continuity of the enterprise itself projects criminal activity into the future." *Id.* (citing *Spool*, 520 F.3d at 185). "And similarly, criminal activity is continuous when 'the predicate acts were the regular way of operating that business,' even if the business itself is primarily lawful." *Id.* (quoting *Cofacredit*, 187 F.3d at 243).

### c. The Racketeering Activity Requirement

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 181 of 311

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

"Racketeering activity" is defined in 18 U.S.C. § 1961(1) to include a variety of offenses including, as relevant here, mail fraud under 18 U.S.C. § 1341; wire fraud under 18 U.S.C. § 1343; interstate transportation of stolen property under 18 U.S.C. §§ 2314 and 2315; and money laundering under 18 U.S.C. §§ 1956 and 1957. *See* 18 U.S.C. § 1961(1).

### i. Mail and Wire Fraud

The "essential elements of [mail and wire fraud] are [i] a scheme to defraud, [ii] money or property as the object of the scheme, and [iii] use of the mails or wires to further the scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (per curiam) (first alteration in original) (internal quotation mark omitted) (quoting *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015)). "Because the mail fraud and the wire fraud statutes use the same relevant language, [courts] analyze them the same way." *Id.* (internal quotation marks omitted) (quoting *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016)).

**\*10** "[T]he gravamen of the offense is the scheme to defraud." *Weaver*, 860 F.3d at 94 (alteration in original) (internal quotation marks omitted) (quoting *Greenberg*, 835 F.3d at 305). "In order to prove the existence of a scheme to defraud, [a party must prove both] 'that the misrepresentations were material' ... and that the defendant acted with fraudulent intent." *Id.* (quoting *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016)) (citing *Greenberg*, 835 F.3d at 305-06).

Claims for mail and wire fraud are subject to the heightened pleading standards of Rule 9(b), which requires that averments of fraud be stated with particularity. *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013). "To satisfy this requirement, a complaint must 'specify the time, place, speaker, and content of the alleged misrepresentations,' 'explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant[ ] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.' " *Id.* (quoting

*Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001) (alteration in original) (internal quotation marks omitted));

*accord Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) (holding that allegations of predicate wire fraud must "state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent."). This standard applies to all allegations of fraudulent predicate acts supporting a RICO claim. *First Capital*, 385 F.3d at 178-79.

### ii. Transportation and Receipt of Stolen Property

Section 2314 prohibits, among other things, the interstate or foreign transportation of stolen goods valued at $5,000 or more. 18 U.S.C. § 2314. The elements of such offense are: (i) the defendant transported property, as defined by the statute, in interstate or foreign commerce; (ii) the property was worth $5,000 or more; and (iii) the defendant knew the property was stolen, converted, or taken by fraud. *United States v. Wallach*, 935 F.2d 445, 466 (2d Cir. 1991). The definition of fraud in § 2314 is generally the same as under the mail and wire fraud statutes. *Id.* Where allegations of interstate or foreign transport of stolen property allege that the property has been taken by fraud, the allegations must meet the heightened requirement of Rule 9(b). *See Kades v. Organic Inc.*, No. 00 Civ. 3671 (LTS) (RLE), 2003 WL 470331, at \*9 (S.D.N.Y. Feb. 24, 2003) (noting that allegations of transportation of stolen property, mail fraud, and wire fraud must be pleaded with particularity); *Philan Ins. Ltd. v. Hall*, 748 F. Supp. 190, 195 (S.D.N.Y. 1990) (dismissing a RICO claim based on transportation of stolen property, mail fraud, and wire fraud where plaintiffs did not plead each of the elements of these acts with sufficient particularity "to withstand a motion to dismiss under Rules 12(b)(6) and 9(b)").

Section 2315 prohibits the knowing receipt, sale, concealment, possession, or disposition of stolen goods that have been transported interstate or abroad after being stolen, unlawfully converted, or taken. 18 U.S.C. § 2315. To prove a violation of § 2315, a plaintiff must establish that the goods received had been stolen, that the goods had a value

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 182 of 311

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

of at least $5,000, that the goods were "moving as," were "part of," or "constituted" interstate or foreign commerce, and that the defendant knew the goods had been stolen. *See United States v. Tashjian*, 660 F.2d 829, 839 (1st Cir. 1981), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981); *accord United States v. Kapeljoujnyj*, 547 F.3d 149, 153 (2d Cir. 2008).

### iii. Money Laundering

**\*11** To establish a violation of the money laundering statute, 18 U.S.C. § 1956, a plaintiff must first show "[i] that the defendant conducted a financial transaction; [ii] that the transaction in fact involved the proceeds of specified unlawful activity as defined in § 1956(c)(7); [and] [iii] that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity." *United States v. Maher*, 108 F.3d 1513, 1527-28 (2d Cir. 1997). The plaintiff must then make one of two additional showings: (a) that the defendant knew "the transaction was designed in whole or in part ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," 18 U.S.C. § 1956(a)(1)(B)(i); or (b) that the defendant conducted or attempted to conduct the transaction "with the intent to promote the carrying on of specified unlawful activity," *id.* § 1956(a)(1)(A)(i). A plaintiff need not allege money laundering with great particularity, but the plaintiff must plead all elements of the offense. *Tymoshenko v. Firtash*, 57 F. Supp. 3d 311, 322-23 (S.D.N.Y. 2014).

### d. The Domestic Injury Requirement

In addition to establishing the preceding elements, a plaintiff seeking to allege a civil RICO violation must also adequately plead a "domestic injury." *See RJR Nabisco, Inc. v. European Community*, ––– U.S. ––––, 136 S. Ct. 2090, 2111, 195 L.Ed.2d 476 (2016); *cf. City of Almaty, Kazakhstan v. Ablyazov*, 226 F. Supp. 3d 272, 281 (S.D.N.Y. 2016) ("*RJR Nabisco* makes clear that domestic injury to business or property is an independent requirement for bringing a private RICO action — separate and apart from the requirement of a substantive RICO violation that is either domestic

or permissibly extraterritorial[.]" (internal quotation marks omitted)), *motion to certify appeal denied*, No. 15 Civ. 5345 (AJN), 2017 WL 1424326 (S.D.N.Y. Apr. 20, 2017). After the Supreme Court's decision in *RJR Nabisco*, putative RICO violations are construed narrowly to adhere to the well-established presumption against extraterritoriality. *RJR Nabisco, Inc.*, 136 S. Ct. at 2108. This presumption holds that "federal laws will be construed to only have domestic application." *Id.* at 2100.

While establishing the requirement of "domestic injury" in *RJR Nabisco*, the Supreme Court left open the question of determining what constitutes a domestic injury, a question taken up by the Second Circuit in *Bascuñán v. Elasca*, 874 F.3d 806 (2d Cir. 2017). There, the Court stated explicitly that "a foreign resident may ... allege a civil RICO injury that is domestic." *Id.* at 814. The Court explained that, "[a]t a minimum, when a foreign plaintiff maintains tangible property in the United States, the misappropriation of that property constitutes a domestic injury." *Id.* The Court explained, however, that application of the domestic injury rule in any given context will, as a general matter, "depend on the particular facts alleged in each case" and "if a plaintiff alleges more than one injury, courts should separately analyze each injury to determine whether any of the injuries alleged are domestic." *Id.* at 818. The Court later "conclude[d] that an injury to tangible property is generally a domestic injury only if the property was physically located in the United States, and that a defendant's use of the U.S. financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign injury into a domestic one." *Id.* at 819. On the other hand, an "injury is domestic if the plaintiff's property was located in the United States when it was stolen or harmed, even if the plaintiff himself resides abroad." *Id.* at 820-21.

### B. Analysis

The Complaint in this case is both disjointed and replete with conclusory allegations. The Court has carefully reviewed Plaintiff's allegations to separate the wheat from the chaff and, in the remainder of this section, analyzes only those allegations that are well-pleaded.

Case 6:23-cv-00316-DNH-ML Document 13 Filed 04/18/23 Page 183 of 311

*Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)*

**1. The Court Dismisses Plaintiff's Substantive RICO Claim Against David and Linda Benrimon (Count I) and Plaintiff's RICO Conspiracy Claim Against David and Linda Benrimon, Rosen, Piedmont, and Chowaiki (Count II)**

**\*12** In his brief in opposition to the motions to dismiss, Plaintiff clarifies that his RICO claims against David and Linda Benrimon are as follows: the Benrimons managed and conducted the affairs of their gallery (and RICO enterprise) DBFA through a pattern of racketeering activity that included unlawfully or fraudulently selling artwork that they had no right to sell. (*See* Pl. Opp. 15-16). Plaintiff states that the predicate racketeering acts include the transportation and/or receipt of stolen property, money laundering, wire fraud, mail fraud, fraud in a bankruptcy proceeding, and fraudulent filings in this court. (*See id.* at 16).

Plaintiff argues that this racketeering activity began no later than February 2, 2012, when David and Linda Benrimon, or a company they controlled or owned, purported to sell an Andy Warhol painting and ten Warhol prints to Marc Latamie and DM for $1,750,000, and then, instead of delivering the prints, unlawfully sold (or attempted to sell) them through DBFA to others (*i.e.*, the Latamie Acts). (*See* Pl. Opp. 16). He claims that the racketeering activity continued when David and Linda Benrimon purchased *Le Compotier* by Juan Gris for DBFA with full knowledge that Chowaiki had no right to sell or dispose of that work, and that its owner had requested its return (*i.e.*, the *Le Compotier* Acts). (⚑*Id.*). And Plaintiff claims the racketeering activity continued further when David and Linda Benrimon, in the conduct of DBFA's business, negotiated with Chowaiki and his Gallery to acquire additional works of art at a sizable (and, Plaintiff claims, telltale) discount. (⚑*Id.*). They did so by structuring the $300,000 loan from Piedmont to Chowaiki secured by three artworks (the Picasso, the Murakami, and *Le Clown*) (*i.e.*, the Pledge Agreement Acts). (*Id.* at 16-17). Thereafter, David and Linda Benrimon took delivery of the Picasso at DBFA; deleted the Picasso's Provenance, which showed Plaintiff as the artwork's owner; and shipped the stolen Picasso to Milan, where they sold it for $441,000. (*Id.* at 17). Finally, Plaintiff alleges that David and Linda Benrimon's racketeering activity continued as they concealed their role in the loan transaction by having Piedmont make numerous false filings in the Bankruptcy and Criminal Cases (*i.e.*, the Court Filing Fraud). (⚑*Id.*).

**a. Plaintiff Has Failed to Plead a
"Pattern of Racketeering Activity"**

Even accepting Plaintiff's clarification, the Court concludes that the predicate acts here are far too disparate and inadequately pleaded to constitute a pattern of racketeering activity. To begin, the Latamie Acts are not horizontally related to the other predicate acts. "[P]redicate acts are horizontally related when they: have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Reich*, 858 F.3d at 61 (citation omitted). Plaintiff gestures at relatedness by asserting that the Latamie Acts had the "same purpose and function: to fraudulently sell and profit from other people's art-work and to conceal what was done." (Pl. Opp. 18). But Plaintiff fails to show, with the requisite specificity, just how the Latamie Acts relate to the other alleged predicate acts.

In point of fact, Plaintiff cannot make such a showing. The gravamen of the Latamie Acts is that a subset of the Defendants here (DBFA, David and Linda Benrimon) and "other members of the Benrimon family" (Leon Benrimon), along with Leon Benrimon's art gallery, Benrimon Contemporary LLC, failed to deliver artworks that either DBFA or Benrimon Contemporary LLC had sold to a *bona fide* purchaser. (*See* Compl. ¶¶ 24-27).[4] The alleged fraudulent sale at the center of the Latamie Acts occurred at least five years before the alleged predicate acts in the other three groups. The Latamie Acts also had nothing to do with Plaintiff and were directed instead at other alleged victims. And, most notably, the Latamie Acts had no connection to Chowaiki or the Gallery, and no connection to Rosen or Piedmont. In sum, Plaintiff fails to connect the Latamie Acts to the remainder of the alleged pattern of racketeering activity.

**\*13** Further, to the extent Plaintiff alleges that the Latamie Acts constitute wire fraud, in violation of ⚑18 U.S.C. § 1343 (*see* Compl. ¶ 26), he fails to meet the heightened pleading standards required by Rule 9(b). Plaintiff merely states that "[u]pon information and belief, and as further to be determined in discovery, during the [Latamie Acts] transaction, the purchasers of the Warhol, at all times negotiated with, *inter alia,* David and Linda Benrimon, and other members of the Benrimon family" (*id.* at ¶ 25); and that "David and Linda Benrimon, directly or at their instruction, by wire, telephone, and in person, continued to falsely, and

fraudulently, and repeatedly promise Mr. Latamie and DM, that they (the Benrimons) would deliver the Warhol prints to the purchasers" (*id.* at ¶ 26). Plaintiff's conclusory assertions fail to explain the "the time, place, speaker, and content of the alleged misrepresentations" *Cohen*, 711 F.3d at 359, and Plaintiff fails to explain the "information and belief" upon which his allegations are founded, *see Pilkington North Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 420 F. Supp. 3d 123, 142-43 (S.D.N.Y. 2019). For these reasons as well, Plaintiff fails to plead the Latamie Acts as predicate RICO acts.

The Court next considers whether the Court Filing Acts constitute part of David and Linda Benrimon's alleged pattern of racketeering activity. At the outset, the parties dispute the antecedent issue of whether the Court Filing Acts could qualify as predicate acts for RICO purposes. The Benrimon Defendants cite *Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018), in support of their argument that these acts cannot serve as predicate acts. In *Kim*, the plaintiff purported to allege various predicate acts of mail fraud, wire fraud, and obstruction of justice, allegedly committed by the defendants, citing declarations that were prepared, signed, and filed by defendants with full knowledge that they contained fraudulent representations intended to persuade the district court to find in their favor in a separate trademark and breach of contract dispute. *Id.* at 103.

The district court concluded that these litigation activities could not provide the basis for predicate acts under § 1962(c). 884 F.3d at 103-04. The Second Circuit agreed, reasoning as follows:

> Although we have not spoken directly on the issue, other courts have held that "[i]n the absence of corruption," such litigation activity "cannot act as a predicate offense for a civil-RICO claim." *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1087-88 (11th Cir. 2004) (deciding that the "alleged conspiracy to extort money through the filing of malicious lawsuits" were not predicate acts of extortion or mail fraud under RICO); *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003) (deciding that meritless litigation is not a predicate act of extortion under RICO); *Gabovitch*

*v. Shear*, 70 F.3d 1252 (table), 1995 WL 697319, at *2, 1995 U.S. App. LEXIS 32856 (1st Cir. 1995) (per curiam) (concluding that "proffering false affidavits and testimony to [a] state court" does not constitute a predicate act of extortion or mail fraud); *see also Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 171-72 (E.D.N.Y. 2010) (collecting cases from district courts in the Second Circuit deciding "that the litigation activities alleged in [the complaint before the court] cannot properly form the basis for RICO predicate acts"). We agree with the reasoning of these opinions and conclude that allegations of frivolous, fraudulent, or baseless litigation activities — without more — cannot constitute a RICO predicate act.

*Id.* at 104 (alterations in original). The Benrimon Defendants argue that *Kim* forecloses Plaintiff from relying on the Court Filing Acts as predicate acts for their RICO claims.

Plaintiff responds that *Kim* is inapposite because, in that case, the Second Circuit explicitly distinguished a district court case relied on by the plaintiff, *Sykes v. Mel Harris and Associates, LLC*, 757 F. Supp. 2d 413 (S.D.N.Y. 2010), where "the district court denied the defendants' motion to dismiss the plaintiffs' section 1962(c) claims, observing that the plaintiff pleaded a pattern of racketeering activity that included at least twenty allegedly fraudulent statements and eighteen acts involving use of the mail or wires over three years, in furtherance of the alleged fraud." *Id.* at 105 (internal quotations omitted). To a degree, Plaintiff is correct: The *Kim* Court did distinguish *Sykes* by explaining that "even though the defendants [in *Sykes*] used litigation to carry out their scheme, they also engaged in a variety of other out-of-court actions to further this activity.... [while] in the case at bar, by contrast, the entire alleged scheme involved the creation of fraudulent court documents." *Id.* But the *Kim* Court "decline[d] to reach the issue of whether all RICO actions based on litigation activity are categorically meritless," and limited its holding to "conclude only that where ... a plaintiff alleges that a defendant engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation activity alone cannot constitute a viable RICO predicate act." *Id.* Accordingly, Plaintiff contends that because the Court Filing Acts are not the only RICO violation

Case 6:23-cv-00316-DNH-ML  Document 13  Filed 04/18/23  Page 185 of 311

**Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)**

alleged — and because "the pattern is the fraudulent selling, and profiting from other people's art-work, and concealing what was done" (Pl. Opp. 20) — the Court may consider the Court Filing Acts as predicate acts of wire and mail fraud (⚑ ⚠ *id.* & n.3).

 **\*14** The Court need not resolve whether the Court Filing Acts could qualify as predicate RICO acts because, even if they could, they have not been properly pleaded here. The specific acts Plaintiff alleges in the Complaint are that David and Linda Benrimon caused numerous electronic filings to be made in the Bankruptcy Case and Criminal Case in which Piedmont asserted ownership of the Murakami and *Le Clown.* Plaintiff claims that those filings were fraudulent because: (i) they did not disclose the role or name of the real acquirers/purchasers, *i.e.*, David and Linda Benrimon and DBFA (Compl. ¶ 73); and (ii) Piedmont's petition in the Criminal Case did not disclose the existence of the Shtar Isko (*id.* at ¶ 76). Plaintiff further asserts that

> [t]he filings were each fraudulent and each was designed to deceive plaintiff, other owners of works of art, the creditors of Mr. Chowaiki's Gallery, the victims of Chowaiki's crimes, the Trustee in the Bankruptcy [C]ase, the courts, and law enforcement officials into believing that David and Linda Benrimon and David Benrimon Fine Art LLC had nothing to do with these fraudulent transactions[.]

(*Id.* at ¶ 74). In his brief in opposition to the motions to dismiss, Plaintiff adds that the "fraudulent filings conceal the fact that the $300,000.00 loan was not merely a loan, but was a device to conceal the fact that the Benrimon [D]efendants (and not Piedmont alone) knowingly were acquiring, at a steep discount, fraudulently obtained art belonging to other people and selling it for their own benefit and concealing what they were doing." (Pl. Opp. 20-21).

Despite the sweeping language, Plaintiff provides little in the way of support for his contention that these filings were indeed fraudulent. As it is permitted to do, the Court has reviewed the allegedly fraudulent filings incorporated by reference in the Complaint. The Bankruptcy Case filings

consist of (i) a proof of claim filed by Piedmont reciting Piedmont as the owner of the Murakami and *Le Clown* pursuant to the Release and Settlement Agreement between Piedmont and the Gallery (Bankruptcy Case, Claims 62, 63 (the "Piedmont Petition")), and (ii) a stipulation between the Bankruptcy Trustee and Piedmont, by which Piedmont agreed that " 'the Neumans [who Plaintiff contends are the lawful owners of *Le Clown*] would have right, title and interest in *Le Clown* ... and Piedmont further agreed to withdraw the Piedmont Petition' " (⚑ ⚠ *id.* at Dkt. #174 (the "Stipulation")). [5]

With respect to the Criminal Case, Plaintiff cites to Piedmont's petition in the district court asserting its interest as claimant in the Murakami and *Le Clown.* (Criminal Case, Dkt. #57). The remainder of Plaintiff's citations to the Criminal Case docket are to Piedmont's opposition to the Government's motion to dismiss its petition (*id.* at Dkt. #98); the oral argument held on the motion (*id.* at Dkt. #114 (transcript)); and Judge Rakoff's decision in that case, concluding, under New York property law and at the motion to dismiss stage, that Piedmont had acquired a legal interest in *Le Clown* as a *bona fide* purchaser for value (*id.* at Dkt. #119). A review of those documents reveals that Piedmont relied on the transaction documents — the pledge agreement documents and the later settlement agreement with the Gallery — to substantiate its interest in the relevant artwork. The Court cannot infer fraudulent intent on the part of Piedmont, let alone the remaining Benrimon Defendants, from Piedmont asserting an ownership interest in the artwork consistent with the loan transaction documents.

And despite Plaintiff's contention otherwise, the docket in the Criminal Case reveals that Piedmont *did* disclose the existence of the Shtar Isko. When Piedmont filed its petition for the Picasso in the Criminal Case, it included as an exhibit the Note between Piedmont and Chowaiki. (*See* Criminal Case, Dkt. #57). The Note explicitly states that the Gallery "shall pay, in accordance with Heter Iska, all outstanding principal to" to Piedmont. (*Id.* at Ex. A). Accordingly, Plaintiff's claim that the Benrimons defrauded the court by having Piedmont keep the existence of the Shtar Isko undisclosed, is belied by the public record in the Criminal Case of which the Court takes judicial notice. [6]

 **\*15** Further, Plaintiff cites nothing to suggest that David and Linda Benrimon had any duty to disclose their involvement with the artwork. Given that Piedmont was the entity with the right to the artwork, it is far from clear that David and Linda

Benrimon would be obligated to disclose their affiliations with Piedmont. Since Plaintiff has failed to allege or show that David and Linda Benrimon had a duty to disclose anything to the bankruptcy and criminal courts, Plaintiff's claim for fraud fails. *See* *United States v. Autuori,* 212 F.3d 105, 119 (2d Cir. 2000) ("[A]n omission can violate the fraud statute only in the context of a duty to disclose[.]"); *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,* 85 F. Supp. 2d 282, 296 (S.D.N.Y. 2000) ("In case of fraud resting on an alleged omission, plaintiff must allege facts giving rise to a duty to disclose."). Thus, Plaintiff has failed to plead the Court Filing Acts as predicate acts.

Having rejected two putative categories of racketeering acts, the Court is left to consider whether the *Le Compotier* Acts and the Pledge Agreement Acts constitute a pattern of racketeering activity. Put simply, these two sets of Acts do not a pattern of racketeering activity make. [7] Plaintiff has at best pleaded that on two instances, David and Linda Benrimon acquired artwork from either Chowaiki or the Gallery, knowing that neither Chowaiki nor the Gallery had the lawful ability to transfer it.

Plaintiff has demonstrated neither closed-ended nor open-ended continuity sufficient to satisfy the pattern requirement for racketeering activity. The *Le Compotier* Acts and the Pledge Agreement Acts are alleged to have occurred between "the summer of 2017" and May 2018. (Compl. ¶¶ 29, 67-68). But the Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time.' " *Spool,* 520 F.3d at 184 (quoting *Cofacredit,* 187 F.3d at 242); *see* *Ramiro Aviles v. S & P Glob. Inc.,* 380 F. Supp. 3d 221, 269 (S.D.N.Y. 2019) (noting that "two years may be the *minimum* duration necessary to find closed-ended continuity" (quotation omitted)). Because the putative predicate acts spanned less than a year's time, they do not satisfy the requirements of closed-ended continuity.

Plaintiff has likewise failed to demonstrate open-ended continuity, because there is no allegation that David and Linda Benrimon's "regular way of operating" DBFA involved retaining artwork after being informed that the individual from whom they purchased the artwork had no right to sell it; obtaining artwork as collateral on fraudulent loans; or falsifying chain of ownership records. *See Reich,* 858 F.3d at 60 (noting that "false phone calls were not [defendant's] regular way of operating its business" (quotation omitted)).

To the contrary, Plaintiff's Complaint acknowledges that DBFA "operates as an art gallery" (Compl. ¶ 6), and that David and Linda Benrimon "are in the business of buying and selling art, either for their own accounts or the account of [DBFA]" (*id.* at ¶ 19).

Nor do the predicate acts "imply a threat of continued activity." *Reich,* 858 F.3d at 60. Predicate acts imply a continued threat only when the acts are "inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement." *United States v. Aulicino,* 44 F.3d 1102, 1111 (2d Cir. 1995). By contrast, "frauds in the sale of property," such as those alleged here, "are not inherently unlawful." *Id.* These incidents are much better characterized as isolated and sporadic criminal acts, rather than a pattern of racketeering activity. *See* *United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir. 1989). For all of these reasons, Plaintiff's has not adequately pleaded that David and Linda Benrimon engaged in a pattern of racketeering activity.

### b. Plaintiff Has Failed to Plead That the Pledge Agreement Acts Constitute Wire Fraud or Transportation of Stolen Property

**\*16** To review, allegations sounding in fraud must be pleaded with particularity. *See* *Cohen,* 711 F.3d at 359. As a separate reason to dismiss Plaintiff's RICO claim against the Benrimon Defendants, the Court concludes that Plaintiff has failed to plead, with the requisite particularity, that the Pledge Agreement Acts depict an instance of fraud.

In stating a claim for fraud, a "plaintiff[ ] must allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Grp., Inc.,* 47 F.3d 47, 52 (2d Cir. 1995); *accord* *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir. 2006). "The requisite 'strong inference' of fraud may be established either [i] by alleging facts to show that defendants had both motive and opportunity to commit fraud, or [ii] by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito,* 47 F.3d at 52 (quoting *Shields v. CityTrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994)).

Plaintiff attempts to show that the Benrimon Defendants acted with fraudulent intent because Piedmont loaned Chowaiki $300,000 for which Chowaiki pledged artwork that the Benrimon Defendants knew to be stolen. But Plaintiff has pleaded no facts supporting his oft-repeated contention that the Benrimon Defendants knew that the artwork pledged as collateral was stolen. He asks the Court to infer as much based on several alleged facts about Chowaiki and the Gallery. (*See* Compl. ¶ 55). These allegations consist of the following facts: (i) Chowaiki had a court-documented history of selling and pledging stolen artwork that he had no right to sell or pledge; (ii) Chowaiki was in desperate financial straits; (iii) Chowaiki was selling or pledging artwork he did not own; (iv) Chowaiki needed the $300,000 from the loan with Piedmont to pay off another loan; (v) Chowaiki would not and could not fulfill the terms of the Shtar Isko; (vi) there was a real likelihood that Chowaiki would be arrested for his fraudulent activity; (vii) Chowaiki was selling artwork at deeply discounted prices; and (viii) the price of the three artworks was less than one-third of their true value. (⚑ *Id.*). Plaintiff claims that, from these facts, the Benrimon Defendants "knew or should have known" that Chowaiki was pledging them stolen artwork. But for several reasons these allegations do not plausibly allege that the Benrimon Defendants knew that they were buying stolen artwork, let alone give rise to a strong inference of fraudulent intent.

⚑ *First*, if claim (i) should have indicated to the Benrimon Defendants that Chowaiki was committing fraud, it should have indicated the same to Plaintiff, who nevertheless chose to consign his artwork with Chowaiki. At the pre-motion conference in this case, Plaintiff's counsel sourced his allegation that Chowaiki had a "court-documented history" of selling and pledging stolen artwork to an unrelated civil litigation, ⚑ *Mosionzhnik v. Chowaiki*, 41 Misc. 3d 822, 972 N.Y.S.2d 841 (Sup. Ct. N.Y. Cty. 2013). (*See* July 29, 2019 Tr. 7:10-19). Of note, the decision in that case was issued on July 29, 2013, two years *before* Plaintiff consigned his artwork with Chowaiki. Plaintiff would have the Court infer that this state-court decision should have signaled to the Benrimon Defendants that Chowaiki was a crook. But it is entirely unclear to the Court why a decision in a case in which they were neither named nor involved would have put the Benrimon Defendants on notice of Chowaiki's activities. And to the extent that public access to this decision would or should have alerted the Benrimon Defendants to Chowaiki's perfidy, the same argument can be directed at Plaintiff. Relatedly, the Court rejects Plaintiff's claim (vi) that

the Benrimon Defendants are liable under RICO for failing to predict that, some time off in the future, Chowaiki would be arrested and charged with wire fraud.

**\*17**  *Second*, Plaintiff does not elaborate on how the Benrimon Defendants would know claim (ii), that Chowaiki was in desperate financial straits. And Plaintiff's claim (iii), that Chowaiki was selling or pledging artwork he did not own, is a circular allegation when proffered for the purpose of showing that the Benrimon Defendants *knew* he was selling or pledging stolen artwork.

*Third*, Plaintiff's claims (iv) and (v) fail to give rise to an inference that the Benrimon Defendants knew that the pledged artwork was stolen. Again, Plaintiff fails to explain how the Benrimon Defendants obtained or should have obtained knowledge of Chowaiki's financial predicament. *Fourth*, claim (viii) does not help because the loan documents evidence that Chowaiki did not sell the pledged artwork to Piedmont; he used it as collateral for the loan. And Plaintiff has not adequately explained how or why the Benrimon Defendants would or should have known that Chowaiki was going to default on the loan. [8]

Plaintiff's strongest allegation is claim (vii), that Chowaiki was selling artwork at deeply discounted prices, giving clear warning that those works were stolen. But this still is insufficient to prove fraudulent intent. At the best, this allegation tends to show that the Benrimon Defendants should have been suspicious of Chowaiki. It certainly does not provide a "strong inference of fraud." ⚑ *Acito*, 47 F.3d at 52 (internal quotation marks omitted).

The pleading technique utilized by Plaintiff here is similar to that in ⚑ *Shields*, 25 F.3d at 1129 (2d Cir. 1994), where the Second Circuit rejected a plaintiff's attempt to "couple a factual statement with a conclusory allegation of fraudulent intent." This type of pleading does not suffice to meet the heightened pleading requirements of Rule 9(b), and Plaintiff therefore has not adequately pleaded the Pledge Agreement Acts as qualifying acts of wire fraud or of transportation or receipt of fraudulently obtained property. [9] The reality of the situation is that Chowaiki and the Benrimon Defendants were both participants in an elite, but opaque, fine art market. That Chowaiki and the Benrimon Defendants engaged in a transaction in which Chowaiki posted collateral that was stolen does not, in and of itself, give rise to the inference that the Benrimon Defendants were in on the fraud. On Plaintiff's

reasoning, any person who purchased artwork from Chowaiki or otherwise came to obtain artwork he had stolen would be subject to RICO liability.

### c. Plaintiff Has Failed to Plead a Nexus

**\*18** A RICO violation requires a specific relationship between the enterprise and the pattern of racketeering. *D. Penguin Bros. Ltd. v. City Nat. Bank*, 587 F. App'x 663, 667 (2d Cir. 2014) (summary order). Under § 1962(c), the enterprise's affairs must be conducted "through" the pattern of racketeering. *Id.* In other words, a plaintiff must also plausibly allege "that a nexus exist[s] between the enterprise and the racketeering activity that is being conducted." *Id.* (alteration in original) (quoting *First Capital*, 385 F.3d at 174). Plaintiff has failed to plead the required nexus for a RICO claim.

Although the Complaint parrots the RICO statute by alleging that David and Linda Benrimon "control, conduct or participate, directly or indirectly, in the conduct of [DBFA]'s affairs through a pattern of Racketeering Activity" (Compl. ¶ 20), it is devoid of any allegations supporting that characterization. To establish the required "nexus," Plaintiff must show that the Benrimons "engaged in racketeering through [DBFA] or leveraged the [DBFA] corporate structure to perpetrate the fraud." *D. Penguin Bros*, 587 F. App'x at 667; *see also* *United States v. Thai*, 29 F.3d 785, 815 (2d Cir. 1994) (finding that predicate acts must be "related to the enterprise's activities" or defendant must have been "enabled to commit the offense solely by virtue of his position in the enterprise").

There is no allegation that the Benrimons used or leveraged DBFA to commit any of the alleged RICO predicates. The Complaint itself alleges that the Latamie Acts were accomplished, at least in part, through a separate entity, Benrimon Contemporary LLC (*see* Compl. ¶¶ 24-28), which was owned by David Benrimon's son, who is not a defendant in this case. And Plaintiff does not explain how the Benrimons used or leveraged DBFA to commit the *Le Compotier* Acts, other than by proffering conclusory assertions that (i) the Benrimons acquired the artwork "through their conduct of the affairs of [DBFA]," and (ii) they "knew or should have known," "based on their conduct of the affairs of DBFA," that Chowaiki had no authority to sell the painting. (*Id.* at ¶¶ 29, 32). This form of generic and group pleading

— which does not state what David and Linda Benrimon each did, much less how such conduct involved DBFA — cannot establish the required nexus. Finally, with respect to the Pledge Agreement Acts and the Court Filing Acts, the Complaint itself alleges that the relevant transactions and court filings were conducted through Piedmont, not DBFA. (*See id.* at ¶¶ 34-80). Accordingly, when the Court analyzes the Complaint to discern a nexus between the alleged pattern of racketeering activity and the alleged enterprise, Plaintiff's RICO claim falls apart.

### d. Plaintiff Has Failed to Plead That Defendants Conspired to Participate in David and Linda Benrimon's Pattern of Racketeering Activity

Building on the foregoing analysis, the Court concludes that Count II of the Complaint must also be dismissed. In that count, Plaintiff alleges that the Benrimon Defendants and Chowaiki conspired to facilitate David and Linda Benrimon's racketeering activity in Count I. But beyond the allegations underlying the substantive RICO claim, Plaintiff has not pleaded any facts from which the Court could infer a conspiracy to commit a RICO violation. *See* *Hecht*, 897 F.2d at 25 (affirming dismissal of RICO conspiracy claim where complaint "d[id] not allege facts implying any agreement involving each of the defendants to commit at least two predicate acts"). And, as explained above, the allegations making out the substantive RICO claim are deficient. *See* *Johnson v. Nextel Commc'ns, Inc.*, 763 F. App'x 53, 56 (2d Cir. 2019) (summary order) (dismissing plaintiffs' RICO conspiracy claim for the same reasons that their substantive RICO claim was deficient). Accordingly, the Court dismisses Counts I and II of the Complaint.

### 2. The Court Dismisses Plaintiff's RICO Claims Predicated on Unlawful Debt Collection (Counts III, IV, V, and VI)

**\*19** Plaintiff's Complaint also contains several RICO claims based on unlawful debt collection. In particular, Count III of the Complaint alleges that Avichai Rosen conducted or participated in the conduct of the Piedmont enterprise's affairs through the collection of unlawful debt. (Compl. ¶¶ 119-21). Count IV alleges that David and Linda Benrimon, DBFA, and Chowaiki conspired with Rosen to conduct or participate in the affairs of Piedmont through the collection of unlawful debt. (*Id.* at ¶¶ 122-25). Count V alleges that David and Linda

Benrimon conducted or participated in the conduct of the DBFA enterprise's affairs through the collection of unlawful debt. (*Id.* at ¶¶ 126-28). And Count VI alleges that David and Linda Benrimon, Chowaiki, Rosen, and Piedmont conspired with each other in the collection of unlawful debt through the affairs of DBFA. (*Id.* at ¶¶ 129-32).

Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through ... unlawful collection of debt." 18 U.S.C. § 1962(c). The statute defines "unlawful debt" to mean (as relevant here) debt "which was incurred in connection with ... the business of lending money ... at a rate usurious under State or Federal law." *Id.* § 1961(6).

"The inclusion of 'collection of unlawful debt' as a major predicate for RICO liability seems to have been an explicit recognition of the evils of loan sharking, and there is no indication that Congress was taking aim at legitimate banking institutions." *Durante, Bros. & Sons, Inc. v. Flushing Nat'l Bank,* 755 F.2d 239, 250 (2d Cir. 1985). In consequence, the Second Circuit has interpreted the statute to make clear that a RICO claim for collection of unlawful debt does not encompass "occasional usurious transactions by one not in the business of loan sharking." *Id.* (noting that "[t]he target of [RICO] is ... not sporadic activity"). Instead, to state a claim under RICO for unlawful debt collection, the plaintiff must allege that "each defendant was lending money or a thing of value at a rate usurious under State or Federal law" and that "each defendant was in the business of doing so." *United States v. Persico,* No. 10 Cr. 147, 2011 WL 2433728, at *2 E.D.N.Y. June 14, 2011) (internal quotation marks omitted).

Plaintiff comes nowhere close to meeting his burden to state a claim for unlawful debt collection practices by any of the Defendants. The Complaint describes but one instance (the $300,000 loan from Piedmont to the Gallery) in which Piedmont made a usurious loan. [10] The remainder of Plaintiff's allegations on this point are wholly (and impermissibly) conclusory. (*See, e.g.,* Compl. ¶ 85 ("Piedmont and Avichai Rosen's business is to lend money or a thing of value at a usurious rate. This business involves extensive activity over a substantial period of time and constitutes a substantial portion of the activities of both Piedmont and Avichai Rosen.")). Plaintiff does not point to a single other instance in which any of the Defendants made a

usurious loan, and there is nothing in the Complaint to support his conclusory assertion that any of the Defendants is in the business of making usurious loans.

Accordingly, as in *Durante,* the Complaint here "gives no promise that [Plaintiff] will be able to establish that [any of the Defendants was] engaged in 'the business of' making usurious transactions." 755 F.2d at 250; *see also Weisel v. Pischel,* 197 F.R.D. 231, 241 (E.D.N.Y. 2000) (finding plaintiff had not established that defendant was in the business of making usurious transactions where "at no point in the complaint, or in any other document submitted to the court, do the plaintiffs describe other individuals or companies to whom [defendants] lent money or the usurious interest rates attached to any other loan by the defendants"); *Robidoux v. Conti,* 741 F. Supp. 1019, 1021-22 (D.R.I. 1990) (dismissing RICO claim for collection of unlawful debt where allegations involved just "two isolated incidents" in which defendant charged usurious rates). [11] And, because the Complaint does not provide any further allegations evidencing that Defendants "consciously agreed" to collect unlawful debts under § 1962(c), *see Black Radio Network, Inc. v. NYNEX Corp.,* 44 F. Supp. 2d 565, 581 (S.D.N.Y. 1999), the Complaint does not "set forth a conspiracy to commit such violations" under § 1962(d), *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1064 (2d Cir. 1996), *vacated on other grounds,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). Accordingly, Counts III, IV, V, and VI of the Complaint are dismissed.

### 3. The Court Dismisses Plaintiff's RICO Claims Against Chowaiki (Count VII) and His RICO Conspiracy Claim Against All Defendants (Count VIII)

**\*20** Count VII of the Complaint alleges a RICO claim against Chowaiki for engaging in a pattern of racketeering activity through the Gallery (Compl. ¶¶ 133-35), while Count VIII alleges that the remaining Defendants conspired with Chowaiki to facilitate his racketeering (*id.* at ¶¶ 136-40). According to Plaintiff, the pattern of racketeering activity consisted of numerous acts of wire fraud, transportation of stolen or fraudulently acquired property, money laundering, and various other acts. (*See* Pl. Opp. 13). A look at the substance of Plaintiff's allegations, however, makes clear that he has failed to state a RICO claim against Chowaiki.

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 190 of 311

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

With respect to Chowaiki, Plaintiff has pleaded only the following facts: (i) Chowaiki repeatedly promised to return the Picasso and the Leger to Plaintiff but never did; (ii) Plaintiff sold the Leger to another entity, while it belonged to Plaintiff; (iii) Chowaiki used the Picasso, and two other artworks that he did not own, as collateral for a loan. The remainder of Plaintiff's allegations against Chowaiki are conclusory. (*See* Compl. ¶ 96 ("Upon information and belief, from its inception, through at least July 20, 2009, Mr. Chowaiki, repeatedly conducted or participated, directly or indirectly, in the conduct of his Gallery's affairs by repeated acts of wire fraud in which he obtained his customers' art works by fraudulently telling them that he would sell them on consignment, whereas, he illegally used those artworks as collateral for loans, each such instance involving one act of wire fraud[.]"); *id.* at ¶ 100 (quoting wire fraud charging language against Chowaiki); *id.* at ¶¶ 29-30 (alleging that Chowaiki committed fraud by selling *Le Compotier* to the Benrimons despite not owning it, but failing to allege the time, place, speaker, and content of any misrepresentation)). Plaintiff seems to assume that because Chowaiki pleaded guilty to wire fraud, and because the Gallery filed for bankruptcy, it is obvious that Chowaiki can be held liable for RICO violations. While the docket in the Criminal Case undoubtedly contains factual material that could bolster Plaintiff's claims, he does not include any such information in his Complaint, nor does he adequately incorporate such material by reference. (*See, e.g.*, Compl. ¶¶ 98-99 (referring only to paragraphs 1 through 4 of the criminal complaint); *id.* at ¶ 101 (citing forfeiture order in the Criminal Case as evidence that Chowaiki stole the Picasso)). [12] Plaintiff's Complaint does not explain which artwork (other than his own and *Le Compotier*) was stolen, from whom Chowaiki stole any artwork, what misrepresentations he made to obtain such artwork, where it was transported, or how he disposed of such artwork. To the extent Plaintiff relies on predicate acts of wire or mail fraud or transportation of fraudulently obtained property, he must plead them with particularity, which he has failed to do. [13]

**\*21**  Further, the acts that Plaintiff does allege with some level of specificity could have spanned, at most, from August 2016 (which is when the Picasso and Leger consignments ended and Chowaiki began promising he would return the paintings (*see* Compl. ¶ 105)), to December 2017, when Chowaiki was arrested (*see* Criminal Case, Dkt. #4). Because the acts occurred over the span of a little more than one year, they cannot demonstrate closed-ended continuity.

*See* Spool, 520 F.3d at 184 ("Although we have not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity[.]"). And Plaintiff has not alleged open-ended continuity because, among other things, Chowaiki was criminally charged and sentenced to 18 months' imprisonment in Federal Bureau of Prisons custody. (*See* Compl. ¶ 5; Criminal Case, Dkt. #76). For this reason, Plaintiff has not adequately pleaded a RICO claim against Chowaiki. [14]

Plaintiff has also failed to plead a claim against the Benrimon Defendants for conspiracy to facilitate Chowaiki's pattern of racketeering activity. As explained above, Plaintiff has not adequately pleaded that the Benrimon Defendants knew that the collateral Chowaiki pledged to Piedmont was obtained fraudulently. (*See supra* 39-42). The most Plaintiff alleges is that the Benrimon Defendants bought *Le Compotier* from Chowaiki despite knowing that Chowaiki had no authority to transfer the artwork to them. (*See* Compl. ¶¶ 32-33). This was just one act. The remainder of Plaintiff's allegations merely incant that the Benrimon Defendants "knew or should have known" about Chowaiki's alleged scheme, or that they "could and should have" done more to vet the provenance of Chowaiki's artworks. (*See, e.g.*, Compl. ¶ 43 ("each of the defendants knew or should have known that the works of art to be sold were in the Gallery's continued possession as a result of fraud"); *id.* at ¶ 53 (defendants "could and should have demanded proof of how Mr. Chowaiki and/or his Gallery came into possession of that work of art"); *id.* at ¶ 55 ("each of the defendants knew, or should have known, that ... Mr. Chowaiki was selling or pledging works of art he did not own and had no right to sell or pledge")). The Court does not credit these conclusory statements about a defendant's knowledge. *See* Anonymous v. Simon, No. 13 Civ. 2927 (RWS), 2014 WL 819122, at \*4 (S.D.N.Y. Mar. 3, 2014). In any event, allegations about what the Benrimon Defendants "should have known" do not "show specifically that [they] had any 'meeting of the minds' [with Chowaiki] in the alleged violations," an essential feature of the required agreement. 4 K & D Corp. v. Concierge Auctions, LLC, 2 F. Supp. 3d 525, 545 (S.D.N.Y. 2014); Browning Ave. Realty Corp. v. Rosenshein, 774 F. Supp. 129, 145 (S.D.N.Y. 1991) (no "meeting of the minds" or agreement can be inferred from allegations about what a defendant "knew or should have known").

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 191 of 311

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

As yet another pleading deficiency, the Complaint lacks sufficient allegations that the Benrimon Defendants actually agreed with Chowaiki and with each other to violate RICO's substantive provisions. Plaintiff asserts in vague and conclusory terms that Defendants "conspired" and "agreed" with each other. (*See, e.g.,* Compl. ¶¶ 14, 57, 61, 108, 111, 137). But all that the Complaint shows is that the Benrimon Defendants and Chowaiki did business together on two separate occasions. Such allegations are plainly insufficient to show a RICO conspiracy. *See Foster v. 2001 Real Estate,* No. 14 Civ. 9434 (RWS), 2015 WL 7587360, at *6 (S.D.N.Y. Nov. 24, 2015); *Ray Larsen Assocs., Inc. v. Nikko America, Inc.,* No. 89 Civ. 2809 (BSJ), 1996 WL 442799, at *9 (S.D.N.Y. Aug. 6, 1996) (finding that conclusory allegations that defendants "agreed and conspired" do not provide a "factual basis for a finding of conscious agreement among [defendants] to commit predicate acts"). Accordingly, Counts VII and VIII of the Complaint are dismissed.

### 4. The Court Dismisses Plaintiff's RICO Claims Based on a Failure to Allege Domestic Injury

**\*22** In addition to the defects outlined above, the Complaint also fails to plead domestic injury. In *Bascuñán,* the Second Circuit instructed that an "injury to tangible property is generally a domestic injury only if the property was physically located in the United States." 874 F.3d at 819. The Court again explained that "[w]here the injury is to tangible property ... absent some extraordinary circumstance, the injury is domestic if the plaintiff's property was located in the United States when it was stolen or harmed, even if the plaintiff himself resides abroad." *Id.* at 820-21; *see Elsevier Inc. v. Grossmann,* No. 12 Civ. 5121 (KPF), 2017 WL 5135992, at *4 (S.D.N.Y. Nov. 2, 2017). "The [*Bascuñán*] court stressed that the focus of the domestic injury analysis is on the location of the plaintiff's property when it is harmed, and not on the location of the defendant when the wrongful conduct was committed." *Martin Hilti Family Tr. v. Knoedler Gallery, LLC,* 386 F. Supp. 3d 319, 345 (S.D.N.Y. 2019). Following from *Bascuñán,* Plaintiff has alleged domestic injury if his property was located in the United States when it was stolen or harmed, despite the fact that Plaintiff is a foreign resident. *See id.* at 346-47. Conversely, to the extent Plaintiff's property was located abroad when it was stolen or harmed, he has not alleged a domestic injury. *See id.* at 347.

The facts of this case resemble those in *Martin Hilti.* In that case, the plaintiff learned about and received false information about a painting when he visited the defendant-gallery in New York. 386 F. Supp. 3d at 346. The painting was not available to be shown to the plaintiff, however, so the gallery delivered the painting to Liechtenstein, so that the plaintiff could view the painting before deciding whether to purchase it. *Id.* The plaintiff then decided to purchase the painting and transferred money from its bank account in Liechtenstein to the defendant's bank account in New York. *Id.* In *Martin Hilti,* the defendant argued that plaintiff was injured in Liechtenstein, when the funds constituting the purchase price for the painting were transferred from the plaintiff's Liechtenstein bank account to defendant's bank account in New York. *Id.* The district court agreed with the defendant, explaining that the plaintiff's "injury occurred where it relinquished control over its property ... [and] [b]ecause [the plaintiff] relinquished control over its money in Liechtenstein — when it authorized a transfer of funds from its Liechtenstein bank account to [defendant's] New York account — the [plaintiff's] injury was suffered in Liechtenstein." *Id.* at 347-48.

Plaintiff here argues that his artwork was located in New York when it was stolen. He explains that he sent the Picasso and the Leger to Chowaiki on consignment in June 2015, and that it was only after termination of the consignment, once the artwork was already in New York, that the artwork was, in essence, stolen from him. (Pl. Opp. 33 (citing Compl. ¶¶ 35-37)). In opposition, Defendants point to the Complaint's repeated allegations that Chowaiki's scheme was to lure clients to consign their art with him and then sell or otherwise use the artwork in a way in which he was not authorized to do. (*See, e.g.,* Compl. ¶ 96 ("Upon information and belief, from its inception, through at least July 20, 2009, Chowaiki repeatedly conducted or participated, directly or indirectly, in the conduct of his Gallery's affairs by repeated acts of wire fraud in which he obtained his customers' art works by fraudulently telling them that he would sell them on consignment, whereas, he illegally used those artworks as collateral for loans[.]"); *id.* at ¶ 99 (describing Chowaiki's illegal practice as "defraud[ing] purchasers and sellers of fine art by deceiving them into sending funds or artwork to his gallery in New York, New York, under false pretenses")). They also point to Plaintiff's counsel's statements at the pre-motion conference, at which time counsel represented that Plaintiff was injured as part of Chowaiki's scheme of stealing

"artwork from abroad on consignment and other ways." (July 29, 2019 Tr. 5:11-15). From these allegations, Defendants reason that the fraud resulting in the alleged theft of the Picasso and the Leger was actually committed at the time Chowaiki represented that he would sell Plaintiff's works on consignment and remit the funds to Plaintiff, with no intention of doing so. Thus, the argument proceeds, Plaintiff's injury occurred in Spain, when Plaintiff was falsely induced into parting with his artwork, and not in the United States, where Chowaiki was located.

**\*23** The Court agrees with the Defendants that Plaintiff has failed to allege a domestic injury. While Plaintiff claims that he began demanding his artwork back after the expiration of the consignment period (*see* Compl. ¶ 37),[15] he also repeatedly alleges that Chowaiki "obtained his customers' art works by fraudulently telling them that he would sell them on consignment" (*id.* at ¶ 96), and that the purpose of the scheme was to "defraud[ ] ... sellers of fine art by deceiving them into sending ... artwork to [Chowaiki's] gallery in New York, New York under ... false pretenses" (*id.* at ¶ 99). The Court cannot turn a blind eye to these allegations when considering when and where Plaintiff's injury occurred. Accepting Plaintiff's own allegations, his injury occurred in Spain, when he relinquished control over the Picasso and the Leger to Chowaiki. Accordingly, Plaintiff's failure to allege a domestic injury provides yet another ground for dismissing his RICO claims.

## C. The Court Dismisses Certain of Plaintiff's State-Law Claims

Having dismissed Plaintiff's RICO claims, the Court now turns to Plaintiff's state-law claims for fraud, conspiracy to defraud, conversion, conspiracy to convert, and replevin. For the reasons explained below, Plaintiff's claims against Chowaiki for fraud, conversion, and replevin survive with respect to both the Picasso and the Leger, and Plaintiff's claims against the Benrimon Defendants for conversion and replevin survive with respect to the Picasso. Plaintiff's remaining state-law claims are dismissed.

### 1. The Court Has Subject Matter Jurisdiction to Consider Plaintiff's State-Law Claims

Chowaiki argues that if the Court dismisses the RICO claims, which are indisputably the only federal claims in this action, it should decline to exercise supplemental (or pendent) jurisdiction over Plaintiff's state-law claims. (Chowaiki Br. 19-20). He argues that, to the extent Plaintiff's claims are

viable against Chowaiki, they should be heard in state court in New York, rather than in federal court, in the absence of a viable federal cause of action. (🚩 *Id.*).

What Chowaiki fails to recognize is that the Court has original jurisdiction over this case in the forms of both subject matter *and* diversity jurisdiction. (*See* Compl. ¶ 1). The Court has diversity jurisdiction over this case because Plaintiff is a citizen of a foreign state (Spain) and is not a permanent resident of the United States; Defendants are all citizens of the United States; and the amount in controversy exceeds $75,000. *See* 🚩 28 U.S.C. § 1332(a)(2). Accordingly, the Court can exercise diversity jurisdiction over the remaining state-law claims, without resorting to supplemental jurisdiction. For this reason, the Court will maintain jurisdiction over this matter, despite the dismissal of the RICO claims.

As it happens, Chowaiki moves to dismiss the state-law claims only on jurisdictional grounds. In other words, he does not attack the adequacy of the pleading of those claims.[16] For this reason, Chowaiki's motion is denied insofar as it seeks dismissal of the state-law claims against him. The Court addresses the adequacy of the pleadings of the state-law claims only with respect to the Benrimon Defendants, who have actually challenged the viability of those claims as pleaded.

### 2. Plaintiff Has Not Adequately Pleaded Claims for Common-Law Fraud and Conspiracy to Defraud Against the Benrimon Defendants

**\*24** To state a claim for fraud under New York law, a plaintiff must allege that (i) the defendant made a misrepresentation or material omission of fact, (ii) that was false and known to be false by the defendant, (iii) made for the purpose of inducing the plaintiff to rely upon it, (iv) the plaintiff's justifiable reliance on the misrepresentation or material omission, and (v) injury. 🚩 *Pasternack v. Laboratory Corp. of America Holdings*, 27 N.Y.3d 817, 827, 59 N.E.3d 485 (2016); *see In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 212-13 (S.D.N.Y. 2019). As noted above, claims for fraud, even under state law, must also satisfy the heightened pleading requirements of Rule 9(b). *See* 🚩 *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009). To review, Rule 9(b) requires a plaintiff to specify the fraudulent statements, identify the speaker, state when and where the statements were made,

Case 6:23-cv-00316-DNH-ML Document 13 Filed 04/18/23 Page 193 of 311

*Malvar Egerique v. Chowaiki*, Not Reported in Fed. Supp. (2020)

and explain why the statements were fraudulent. *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004). To plead a viable claim for conspiracy to commit fraud under New York law, in addition to pleading the underlying fraud, the plaintiff must allege the following with the required specificity as to each defendant: "[i] an agreement among two or more parties, [ii] a common objective, [iii] acts in furtherance of the objective, and [iv] knowledge." *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 259 (S.D.N.Y. 2005).

As the Benrimon Defendants note (*see* Benrimon Br. 21 n.8), Plaintiff's fraud claim appears to allege only that the Benrimon Defendants conspired in Chowaiki's commission of fraud — that is, Plaintiff does not appear to allege a direct claim of fraud against the Benrimon Defendants. (*See* Compl. ¶¶ 141-44). However, the Complaint repeatedly states that the Benrimon Defendants "defrauded" Plaintiff. (*See, e.g., id.* at ¶¶ 21, 59, 63). For this reason, and for the avoidance of doubt, the Court considers both species of fraud claims.

Ultimately, the Court concludes that Plaintiff has not satisfied the pleading requirements with respect to either type of claim against the Benrimon Defendants. The Court dismisses the conspiracy to defraud claim because Plaintiff has failed to allege "a corrupt agreement" and "membership in the conspiracy by each defendant." *Cofacredit,* 187 F.3d at 240. Plaintiff repeatedly protests that the Benrimon Defendants "knew or should have known" about Chowaiki's scheme. (*See, e.g.*, Compl. ¶¶ 40, 43, 46, 54, 57, 60, 61, 86). However, his claim is supported only by conclusory allegations, which are insufficient to establish that the Benrimon Defendants had a "meeting of the minds" with Chowaiki. *See Browning Ave. Realty Corp.*, 774 F. Supp. at 145 (concluding that allegation that defendant "knew or should have known" of another defendant's fraud was insufficient to show that defendant entered into a conspiracy with the other defendant); *see also Gmurzynska v. Hutton*, 257 F. Supp. 2d 621, 630 (S.D.N.Y. 2004) ("[M]ere allegations that defendants knew one another, or had prior relationships unrelated to the wrongful acts alleged in the Complaint, are insufficient, standing alone, to set forth a conspiracy claim."). For this reason, Plaintiff's claim that the Benrimon Defendants conspired with Chowaiki to defraud him of the Picasso is dismissed.

To the extent Plaintiff attempts to assert a fraud claim directly against the Benrimon Defendants, that claim is also dismissed. Plaintiff has not alleged a single misstatement or omission that any of the Benrimon Defendants made to Plaintiff. Indeed, aside from alleging that Plaintiff demanded the return of the Leger from the Benrimon Defendants, Plaintiff has not alleged that the Benrimon Defendants had any communication with Plaintiff. Plaintiff vaguely asserts that the Benrimon Defendants intended for Plaintiff to rely on the documents evidencing the $300,000 loan. (*See* Compl. ¶ 59). However, Plaintiff does not allege that the Benrimon Defendants ever provided these documents to him, nor does he allege that (or even how) he reasonably could have relied on them. Accordingly, Plaintiff's fraud claim against the Benrimon Defendants is dismissed.

### 3. Plaintiff Has Adequately Pleaded a Conversion Claim Against the Benrimon Defendants as to the Picasso

**\*25** By contrast, Plaintiff's non-fraud-based state-law claims survive. Under New York law, to plead a claim of conversion, a plaintiff must establish that "[i] the property subject to conversion is a specific identifiable thing; [ii] plaintiff had ownership, possession[,] or control over the property before its conversion; and [iii] defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Murray Eng'g P.C. v. Remke*, No. 17 Civ. 6267 (KPF), 2018 WL 3773991, at \*13 (S.D.N.Y. Aug. 9, 2018). "The tort of conversion does not require defendant's knowledge that he is acting wrongfully, but merely an intent to exercise dominion or control over property in a manner inconsistent with the rights of another." *LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (quotation omitted). Further, New York distinguishes claims that the defendant wrongfully detained — in contrast to having wrongfully taken — the property in question. *Newbro v. Freed*, 409 F. Supp. 2d 386, 394 (S.D.N.Y. 2006). For claims of wrongful detention, where the possession is originally lawful, a conversion does not occur until the owner makes a demand for return of the property and the person in possession of the property refuses to return it. *See Regions Bank v. Wieder & Mastroianni, P.C.*, 526 F. Supp. 2d 411, 414 (S.D.N.Y. 2007).

Plaintiff alleges that the Benrimon Defendants converted the Picasso, and that they conspired with Chowaiki to convert the Leger. (*See* Compl. ¶¶ 145-49). Plaintiff has stated a claim for conversion against the Benrimon Defendants for the Picasso. The Benrimon Defendants do not dispute that

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 194 of 311

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

they had possession of the Picasso. They contend, however, that their original possession of the Picasso was lawful because they obtained possession of the Picasso through the Release and Settlement Agreement with Chowaiki, in which Chowaiki stated that he was "the record and beneficial owner" of the Picasso. (*See* Benrimon Br. 21 (quoting Compl. ¶ 49)). The Court agrees. As such, Plaintiff was required to make a demand on the Benrimon Defendants for the return of the Picasso. *See Marks v. Energy Materials Corp.*, No. 14 Civ. 8965 (GHW), 2015 WL 3616973, at *4-5 (S.D.N.Y. June 9, 2015).

The Benrimon Defendants argue that Plaintiff has insufficiently pleaded that the "demand and refusal" requirement was satisfied because "Plaintiff does not specify when he made his demand of each Benrimon Defendant, when each Benrimon Defendant refused, and the words or actions that each party used to convey the demand or refusal." (Benrimon Br. 23).[17] But in so doing, they misperceive the law. The reason for the demand and refusal requirement is simply so that a *bona fide* purchaser of property does not become a wrongdoer until he is informed of the defect of his title and has an opportunity to deliver the property to its true owner. *See Employers' Fire Ins. Co. v. Cotton*, 245 N.Y. 102, 105, 156 N.E. 629 (1927). But the demand and refusal requirement of a conversion claim, unlike Plaintiff's many fraud-based claims, need not be pleaded with particularity. Plaintiff has alleged that he "has requested each defendant [ ] return [the Picasso to him], and defendants have refused to do so." (Compl. ¶ 65). That is all Plaintiff must allege at this stage. The Benrimon Defendants' claim that they did not refuse to return the Picasso because they did not have it in the first place (*see* Benrimon Br. 23-24), is contrary to the well-pleaded allegations in the Complaint, which allegations plainly state that the Benrimon Defendants are in possession of the Picasso even today (*see* Compl. ¶¶ 71-72).

That said, to the extent Plaintiff has attempted to plead that the Benrimon Defendants conspired with Chowaiki to convert the Leger, the claim must be dismissed. As explained above, Plaintiff has alleged no facts to establish that the Benrimon Defendants had a "meeting of the minds" with Chowaiki. What is more, there are no non-conclusory allegations in the Complaint to show that the Benrimon Defendants even knew of Chowaiki's conversion of the Leger. Accordingly, the Court sustains Plaintiff's claim against the Benrimon Defendants for conversion of the Picasso, and dismisses his claim against them for conspiracy to convert the Leger.

### 4. Plaintiff Has Adequately Pleaded a Replevin Claim Against the Benrimon Defendants as to the Picasso

**\*26** Replevin is a remedy employed to recover specific, identifiable items of personal property. *TAP Manutenção e Engenharia Brasil S.A.* v. *Int'l Aerospace Grp., Corp.*, 127 F. Supp. 3d 202, 211 (S.D.N.Y. 2015). "To establish a claim for replevin, the plaintiff must prove two elements: [i] that plaintiff has a possessory right superior to that of the defendant; and [ii] that plaintiff is entitled to the immediate possession of that property." *Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, No. 10 Civ. 128 (PAC), 2013 WL 1775367, at *9 (S.D.N.Y. Apr. 25, 2013). Notably, New York allows a claim of replevin to lie even if the defendant is no longer in possession of the property in question. *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 456 (S.D.N.Y. 2014).

As with a conversion claim, "an innocent purchaser of stolen goods becomes a wrongdoer only after refusing the owner's demand for their return." *Kunstsammlungen Zu Weimar v. Elicofon*, 678 F.2d 1150, 1161 (2d Cir. 1982); *see also Williams v. Nat'l Gallery of Art, London*, No. 16 Civ. 6978 (VEC), 2017 WL 4221084, at *7 n.13 (S.D.N.Y. Sept. 21, 2017) ("[D]emand and refusal are requisite elements of the cause of action for replevin and conversion if defendant is a good faith purchaser." (quotation omitted)); *Dore v. Wormley*, 690 F. Supp. 2d 176, 183 (S.D.N.Y. 2010) ("Demand upon, and refusal of, the person in possession of the chattel to return it are essential elements of a cause of action in replevin." (citation and alteration omitted)).

Plaintiff has adequately pleaded a replevin claim against the Benrimon Defendants with respect to the Picasso. Plaintiff has claimed that he is the lawful owner of the Picasso; that he has a possessory right superior to that of the Benrimon Defendants because Chowaiki had no right to transfer title of the Picasso to them; and that he has made a demand on the Benrimon Defendants for its return, which demand was refused. The Benrimon Defendants' protestation that they no longer possess the Picasso must be ignored, as the Complaint alleges that the Benrimon Defendants possess the Picasso and continue to pay for its storage abroad. (*See* Compl. ¶¶ 71-72). Accordingly, Plaintiff has adequately pleaded a replevin claim against the Benrimon Defendants for the Picasso.

### D. The Court Denies Plaintiff's Request for Leave to Replead

Case 6:23-cv-00316-DNH-ML Document 13 Filed 04/18/23 Page 195 of 311

*Malvar Egerique v. Chowaiki*, Not Reported in Fed. Supp. (2020)

Plaintiff requests leave to replead his Complaint in the event the Court dismisses any of his claims. (Pl. Opp. 35). Plaintiff's request is denied with respect to his RICO claims. These claims have been dismissed on multiple grounds, and Plaintiff has failed to explain how a further amendment would cure the various deficiencies with these claims. *See Westgate Fin. Corp. v. Beinoni of N.Y. Inc.*, No. 10 Civ. 8102 (TPG), 2012 WL 219334, at *4 (S.D.N.Y. Jan. 25, 2012) (denying leave to replead RICO complaint on futility grounds where plaintiff did not explain how a further amendment would cure deficiencies); *see generally* 🔖 ⛔ *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (acknowledging that leave to amend a complaint may be denied when amendment would be futile).

Plaintiff's request is also denied insofar as the Court has dismissed his state-law claims. Plaintiff's amendment regarding claims against the Benrimon Defendants relating to the Leger would be futile, as (i) the Complaint contains no allegations tying the Benrimon Defendants to that artwork and (ii) Plaintiff concedes that the Benrimon Defendants are only responsible for the Leger through conspiratorial liability, a theory the Court has already rejected.

### E. The Court Grants in Part and Denies in Part the Benrimon Defendants' Motion for Rule 11 Sanctions

**\*27** The Court now turns to the Benrimon Defendants' motion for sanctions pursuant to Rule 11. Specifically, the Benrimon Defendants have moved for "all available sanctions under Rule 11 against Plaintiff and his counsel ... including by awarding the Benrimon Defendants their attorneys' fees and costs they have incurred in defending this action." (Benrimon Sanctions Br. 3).

### 1. Applicable Law

Federal Rule of Civil Procedure 11(b) provides, in relevant part, that [b]y presenting to the court a pleading, written motion, or other paper ... an attorney ... certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). The rule imposes on attorneys "an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing." 🔖 *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991).

The Second Circuit has offered the following guidance concerning the imposition of sanctions under Rule 11:

"A pleading, motion or other paper violates Rule 11 either when it has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." 🔖 ⛔ *Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002) (internal quotation marks omitted). For example, Rule 11 is violated "where it is patently clear that a claim has absolutely no chance of success under the existing precedents." 🚩 *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir. 1985), *superseded on other grounds by rule.*

*Sorenson v. Wolfson*, 683 F. App'x 33, 35 (2d Cir. 2017) (summary order); *see also* 🔖 *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 177 (2d Cir. 2012) (noting that Rule 11 sanctions for pleadings are subject to an "objective unreasonableness" standard); *cf. Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011) ("The fact that a legal theory is a long-shot does not necessarily mean it is sanctionable. The operative question is whether the argument is frivolous, *i.e.*, the legal position has 'no chance of success,' and there is 'no reasonable argument to extend, modify or reverse the law as it stands.' " (internal citations omitted)).

"As numerous courts in this Circuit have recognized, Rule 11 is particularly significant in the civil RICO context because commencement of a civil RICO action has an

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 196 of 311

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

almost inevitably stigmatizing effect on those named as defendants." *Edmonds v. Seavey*, No. 08 Civ. 5646 (HB), 2009 WL 4404815, at *3 (S.D.N.Y. Dec. 2, 2009) (internal quotation marks omitted) (citing *Hoatson v. New York Archdiocese*, No. 05 Civ. 10467 (PAC), 2007 WL 431098 (S.D.N.Y. Feb. 8, 2007) (quoting *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 660 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997))). That is, civil RICO is considered an "unusually potent weapon," often referred to as the "litigation equivalent of a thermonuclear device."

*See, e.g.*, *Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 449 (S.D.N.Y. 2007); *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 163 (S.D.N.Y. 2003); *Katzman*, 167 F.R.D. at 655 (quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)). Courts have not hesitated to impose sanctions under Rule 11 when RICO claims have been found to be frivolous. *Edmonds*, 2009 WL 440815, at *3 2009 WL 440815, at *3 (citing *Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 02 Civ. 2561 (KMW) (GWG), 2003 WL 22227956, at *13-14 (S.D.N.Y. Sept. 26, 2003) (admonishing plaintiff's counsel for frivolous RICO claim)); *see also, e.g.*, *O'Malley v. N.Y.C. Transit Auth.*, 896 F.2d 704, 709 (2d Cir. 1990) (remanding for imposition of sanctions where plaintiff "failed to allege even one act that could qualify as racketeering activity under RICO"); *Katzman*, 167 F.R.D. at 660 (finding a Rule 11 violation where "even a cursory examination of the requirements for bringing suit under RICO would have revealed the impossibility of the claim's success"); *McLoughlin v. Altman*, 1995 WL 640770, at *2 (S.D.N.Y. Oct. 31, 1995) (finding a Rule 11 violation where plaintiff failed "to properly plead a single element of a substantial RICO claim .... [which] manifest[ed] a total lack of legal research and preparation on the part of plaintiff's attorney"); *Levy v. Aaron Faber, Inc.*, 148 F.R.D. 114, 123 (S.D.N.Y. 1993) (imposing Rule 11 sanctions where "even a cursory investigation into the pleading requirements for RICO would have revealed the inadequacy of [plaintiff's] RICO pleading"). Further, Rule 11 sanctions may also be imposed for baseless factual allegations. *See Levine v. F.D.I.C.*, 2 F.3d 476, 479 (2d Cir. 1993). The creativity of an attorney may not transcend the facts of a given case. *See id.*; *accord In re Kelly*, 808 F.2d 549, 551 (7th Cir. 1986) (when an attorney "chose to state as fact what was at the best a guess and a hope, he engaged in misrepresentation").

**\*28** If a court determines that Rule 11(b) has been violated, Rule 11(c) authorizes the court to "impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). Such a sanction, however, "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4); *see LCS Grp., LLC v. Shire LLC*, No. 18 Civ. 2688 (AT), 2019 WL 1234848, at *18 (S.D.N.Y. Mar. 8, 2019) (concluding that appropriate sanctions on defendant and its counsel under Rule 11 for asserting frivolous RICO claims consisted of "reasonable attorney's fees and other expenses associated with briefing the motion to dismiss and the motion for sanctions"); *see also AJ Energy LLC v. Woori Bank*, No. 18 Civ. 3735 (JMF), 2019 WL 4688629, at *12 (S.D.N.Y. Sept. 26, 2019) (awarding attorney's fees and costs where complaint was implausible on its face and assertions clearly lacked reasonable evidentiary support).

If sanctions are imposed, a court must also consider how, if at all, to apportion them between counsel and client. To begin, the court must assess each one's respective responsibility for the offending conduct. *See United Republic Ins. Co., in Receivership v. Chase Manhattan Bank*, 315 F.3d 168, 171 (2d Cir. 2003) (concluding that Rule 11 sanctions should not be imposed on client where attorney bore principal responsibility for any sanctionable conduct); *Greenberg v. Hilton Int'l Co.*, 870 F.2d 926, 939 (2d Cir. 1989) (limiting Rule 11 sanctions to counsel where client unaware of abuses), *vacated on other grounds*, 875 F.2d 39, 42 (2d Cir. 1989); *see also Judin v. United States*, 110 F.3d 780, 785 (Fed. Cir. 1997) (analyzing analogous Court of Claims rule and finding that "[i]n imposing Rule 11 sanctions, a court may allocate sanctions between an attorney and client according to their relative fault" (citing *Borowski v. DePuy*, 850 F.2d 297, 305 (7th Cir. 1988))). At base, the court must distinguish clients who were not adequately advised by counsel that their conduct violated Rule 11 from clients who knew their actions were wrongful, or who misled their attorneys about the facts relating to, or the purposes underlying, the lawsuit.

Notably, additional restrictions pertain in the context of sanctions imposed for improper legal (as distinguished from factual) arguments. "Sanctions that involve monetary awards (such as a fine or an award of attorney's fees) may not be imposed on a represented party for causing a violation of subdivision (b)(2), involving frivolous contentions of law. Monetary responsibility for such violations is more properly placed solely on the party's attorneys." Fed. R. Civ. P. 11, 1993 Advisory Committee Notes.

### 2. Analysis

The Benrimon Defendants make four arguments for sanctions under Rule 11; *first*, that Plaintiff's RICO claims against them are frivolous; *second*, that Plaintiff's state-law claims are frivolous; *third*, that Plaintiff's allegations concerning the Shtar Isko are legally frivolous and factually wrong; and *fourth*, that Plaintiff continues to make false and unsubstantiated allegations tying the Benrimon Defendants to the Leger. For the reasons explained below, the Court awards the Benrimon Defendants' a portion of their attorneys' fees and costs in defending against certain of Plaintiff's RICO claims.

### a. The Court Finds the Safe Harbor Provision of Rule 11 to Be Satisfied

At the outset, the Court addresses the parties' dispute with regard to whether the Benrimon Defendants have complied with the safe harbor provision of Rule 11(c)(2). That provision requires a party seeking sanctions to serve its motion on the party to be sanctioned, pursuant to Rule 5, affording the party upon whom the motion is served 21 days to correct or withdraw the allegedly sanctionable filing. *See* Fed. R. Civ. P. 11(c)(2).

**\*29** Plaintiff argues that the Benrimon Defendants served their Rule 11 motion on him on October 16, 2019, only two days before the motion was filed with the Court, and that the Benrimon Defendants did not also serve upon him their brief in support of their motion to dismiss the Complaint. (*See* Pl. Sanctions Opp. 2). The declaration supporting Plaintiff's opposition to the sanctions motion attaches an email thread between counsel for the Benrimon Defendants and counsel for Plaintiff. (*See* Weiss Decl., Ex. 1). It demonstrates that, on the evening of October 16, 2019, counsel for the Benrimon Defendants sent their brief in support of the motion for sanctions to Plaintiff's counsel. (*Id.*). Plaintiff's counsel

responded the next day, confirming that he had received and reviewed the Benrimon Defendants' Rule 11 motion and responding, "we are not withdrawing the first amended complaint or case. In my opinion, your Rule 11 motion lacks any merit." (*Id.*). This exchange came after the Court's July 29, 2019 pre-motion conference, during which the Court engaged in an extensive colloquy with the parties about the bases for the Benrimon Defendants' motions to dismiss and for sanctions. (*See generally* July 29, 2019 Tr.). True to his word, Plaintiff and his counsel did not withdraw the first amended complaint or this action in response to the Benrimon Defendants' motions.

The Court recognizes that the safe harbor requirement is a strict procedural requirement. *See Star Mark Mgmt., 682 F.3d at 175; Hadges v. Yonkers Racing Corp., 48 F.3d 1320, 1328 (2d Cir. 1995)*. The Second Circuit has held, for instance, that informal warnings and requests for sanctions in letters, without separate service of the motion, do not trigger Rule 11's 21-day fair warning requirement.

*See Star Mark Mgmt., 682 F.3d at 175-76* (citing cases); *see also Gal v. Viacom International, Inc., 403 F. Supp. 2d 294, 309 (S.D.N.Y. 2005)* ("[T]he plain language of the rule states explicitly that service of the motion itself is required to begin the safe harbor clock — the rule says nothing about the use of letters"). At the same time, neither party points to any controlling law, and the Court's independent research discloses none, on the precise issue facing the Court: Whether a party seeking to file a sanctions motion must wait 21 days, when the party upon whom such motion was served explicitly confirms, in writing, that it will not withdraw or amend its allegedly sanctionable filing.

In *Perpetual Securities, Inc. v. Tang, 290 F.3d 132 (2d Cir. 2002)*, the Second Circuit held that the appellees' Rule 11 sanctions motion had been procedurally improper because it was not "made separate from other motions or requests."

*Id.* at 142. The appellees' sanctions motion had instead been included in a brief that addressed the underlying issues before the district court. *Id.* The district court's consequent award of sanctions under Rule 11 was thus found to be an abuse of discretion. *Id.* But rather than foreclosing the possibility of sanctions, the Second Circuit remanded the case back to the district court to reconsider the sanctions request, explicitly stating:

Our decision to remand for reconsideration of the sanctions issues does not conflict with our decision in 🚩 *Hadges* to reverse an award of sanctions for failure to adhere to the procedural requirements of Rule 11. *See* 🚩 *Hadges*, 48 F.3d at 1329. In 🚩 *Hadges*, it was clear that the sanctioned party would have corrected his misstatements had he been afforded the opportunity to do so; a reversal was thus appropriate. *See* 🚩 *id.* at 1328. *Here, there is no indication that Perpetual would have corrected or amended its frivolous arguments even had it been given the opportunity.*

🚩 *Id.* (emphasis added).

Courts have interpreted 🚩 *Perpetual Securities* to find that the "failure to follow the safe harbor provisions perfectly may be excused where there is 'no indication that [a party] would have corrected or amended its frivolous arguments even had it been given the opportunity.'" *Watkins v. Smith*, No. 12 Civ. 4635 (DLC), 2013 WL 655085, at *6 (S.D.N.Y. Feb. 22, 2013) (quoting 🚩 *Perpetual Securities*, 290 F.3d at 142); *see* 🚩 *id.* at *7 (holding that premature filing of sanctions motion was excused where it was clear that plaintiff would not have withdrawn or corrected his frivolous allegations); *see also Lan v. Time Warner, Inc.*, No. 11 Civ. 2870 (AT) (JCF), 2015 WL 4469838, at *1-2 (S.D.N.Y. July 13, 2015) (same). That is clearly the case here. In response to being served with the Benrimon Defendants' Rule 11 motion, Plaintiff's counsel confirmed in writing that he and his client would not be withdrawing the Complaint.[18] Plaintiff then proceeded to defend the allegations and claims in his Complaint on their merits. Even today, he stands by these allegations. Accordingly, the Court is certain that Plaintiff would not have withdrawn or amended the Complaint, even if he had been provided the full 21 days. Any technical violation of the safe harbor provision is therefore excused, and the

Court will consider the merits of the Benrimon Defendants' sanctions motion.

### b. The Benrimon Defendants Are Entitled to a Portion of the Reasonable Attorneys' Fees and Costs Incurred in Defending Against Certain of Plaintiff's RICO Claims

**\*30**  The Benrimon Defendants seek sanctions for defending against each of Plaintiff's RICO claims, and the Court thus begins its analysis with Count I of the Complaint, which alleges a substantive RICO claim against David and Linda Benrimon, and Count II, which alleges a RICO conspiracy claim. The Court has dismissed these claims for failure to satisfy the relatedness, continuity, and nexus requirements for a RICO claim. As previously detailed, Plaintiff's Complaint is brimming with conclusory allegations. The vast majority of Plaintiff's fraud allegations have not been pleaded with the particularity required by Rule 9(b), and his allegations as a whole fail to satisfy multiple RICO pleading requirements. But buried within this haystack of allegations, the Court has identified a few needles. These factual allegations, from which the Court was able to discern the existence of the *Le Compotier* Acts and the Pledge Agreement Acts, have not been (and, under the governing law, cannot be) joined together to show a pattern of racketeering activity. However, the Court cannot say that Plaintiff's attempt to do so was entirely frivolous or otherwise objectively unreasonable. Thus, the Court will not grant the Benrimon Defendants sanctions as to Counts I and II.

The Benrimon Defendants also seek sanctions for defending against Count VIII of the Complaint, which identifies the Gallery as a RICO enterprise and alleges that the Benrimon Defendants conspired with Chowaiki to facilitate the latter's pattern of racketeering activity through the enterprise. This claim fails for many of the same reasons that Counts I and II failed, and it is additionally inadequate because the Complaint lacks sufficient allegations that the Benrimon Defendants agreed with Chowaiki to violate RICO's substantive provisions, a required element of a RICO conspiracy. Again, however, this claim is not so far-fetched as to be sanctionable.

The unlawful debt collection claims, however, are a different story. Counts III through VI are predicated on the Benrimon Defendants' alleged violation of RICO through the "collection of unlawful debt." The Court dismisses these claims, as explained above, because the Complaint lacks

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 199 of 311

**Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)**

sufficient allegations that any of the Benrimon Defendants was "in the business" of making usurious loans, a required element for such claims. But dismissal is not enough.

In his original complaint (*see* Dkt. #1), Plaintiff failed to allege that any of the Benrimon Defendants was "in the business" of making usurious loans — a necessary element of an unlawful debt claim requiring allegations of "other individuals or companies to whom [defendants] lent money or the usurious interest rates attached to any other loan by the defendants." *Weisel*, 197 F.R.D. at 241. Instead, the original complaint alleged a single usurious loan by Piedmont. The Benrimon Defendants raised this deficiency in their pre-motion letter. (*See* Dkt. #14 at 2). And during the July 29, 2019 pre-motion conference, Plaintiff's counsel assured the Court that he would amend the complaint to "make it very clear" that the Benrimon Defendants were "making usurious loans, in the business of usurious loans." (July 29, 2019 Tr. 4:1-5).

Despite those assurances, the Complaint as amended still contains a single allegation of a single usurious transaction: the $300,000 loan from Piedmont to the Gallery. (Compl. ¶¶ 81-91). Yet, inexplicably, Plaintiff has attempted to string out this one instance to four separate causes of action that implicate all six Defendants. To do so, Plaintiff attempts to bolster his unlawful debt allegations by stating, in vague and conclusory fashion, that "Piedmont and Avichai Rosen's business is to lend money or a thing of value at a usurious rate." (Compl. ¶ 85). Such an allegation is, of course, patently insufficient. Worse yet, with respect to Count V, the Complaint lacks even conclusory allegations that the Benrimons were "in the business" of making usurious loans. Given the conspicuous absence of supporting allegations for these claims, the Court is in complete agreement with the Benrimon Defendants that the unlawful debt collection claims against them are particularly egregious, and that Plaintiff's persistence in advancing these claims for which he has no articulable legal or factual basis is objectively unreasonable. *See McCabe*, 761 F. App'x at 41 (noting that Rule 11 sanctions require "objective[ ] unreasonab[leness]").

**\*31** In imposing sanctions on Plaintiff for the unlawful debt collection claims in this case, the Court also considers the recklessness with which Plaintiff makes certain factual allegations. For example, as part of his RICO claims, Plaintiff alleges that the Benrimon Defendants committed fraud on the court in the Criminal Case by not disclosing the Shtar Isko, an agreement that, according to Plaintiff, shows that Piedmont

and Chowaiki "were actually 50%-50% equal partners — and not unrelated *bona fide* purchasers for value reasonably without knowledge to believe that the property was subject to forfeiture." (Compl. ¶ 76). The Benrimon Defendants argue that the allegations concerning the Shtar Isko are sanctionable because: (i) Piedmont did disclose the existence of the Shtar Isko in the Criminal Case; and (ii) it is settled law that a Shtar Isko document does not create a legally enforceable partnership. (Benrimon Sanctions Br. 8).

The Benrimon Defendants are correct that Plaintiff's allegation is factually inaccurate. When Piedmont filed its petition for the Picasso in the Criminal Case, it included as an exhibit the Note between Piedmont and Chowaiki. (*See* Criminal Case, Dkt. #57). The Note explicitly states that the Gallery "shall pay, in accordance with Heter Iska, all outstanding principal to" Piedmont. (*Id.* at Ex. A). This document is filed publicly on the Criminal Case docket, on which Plaintiff so heavily relies in his Complaint. In alleging that Piedmont did not disclose the existence of the Shtar Isko in the Criminal Case, Plaintiff either failed to conduct a reasonable inquiry into the Criminal Case, or alleged something he knew to be false. In either case, the accusation that the Benrimon Defendants committed a fraud on the criminal court was completely unwarranted. Plaintiff's failure to correct this allegation evinces a carelessness with lodging very serious accusations that greatly troubles the Court.

Having determined that sanctions are warranted for the unlawful debt collection RICO claims, the next issue concerns who, as between Plaintiff and his counsel, is responsible for the sanctionable conduct. On this record, the Court finds it difficult to discern the degree to which Plaintiff himself had a hand in making frivolous claims and unsupported factual contentions. But for several reasons, the Court believes the sanctions here are appropriately placed on Plaintiff's counsel.

⚑ *First*, the Court's decision to impose sanctions is, in large part, due to the Complaint's overstep in asserting four RICO claims for collection of unlawful debt against all six Defendants in this action, based on allegations of a single usurious loan. Putting aside the 1993 Advisory Committee Notes to Rule 11, which state that sanctions based on frivolous contentions of law are properly placed on a party's counsel, it was Plaintiff's counsel who was warned at the July 29, 2019 pre-motion conference that a single allegation of a usurious loan would not suffice to plead such RICO claims adequately. And it was Plaintiff's counsel who told the Court that he

would remedy such deficiency in the amended complaint, yet failed to do so. Thus, all facts before the Court indicate that Plaintiff's counsel is responsible for seeking to transmogrify a single transaction with a subset of Defendants into four RICO claims against all Defendants alleging that all were "in the business" of making usurious loans. The Complaint is signed by Plaintiff's counsel; Plaintiff's counsel appeared at the pre-motion conference; and Plaintiff's counsel wrote and filed the opposition briefs, defending the RICO claims. *See Edmonds*, 2009 WL 4404815, at *5 (sanctioning attorney whose "continued reliance on RICO to prosecute what [was] clearly a private wrong alleged against his former partners and their accounting firm, exhibit[ed] a fundamental lack of familiarity with, or misunderstanding of, the civil RICO statute and the grounds for such an action"); *Dangerfield*, 2003 WL 22227956, at *12-13 (sanctioning attorney where "no attorney conducting a reasonable inquiry into the legal viability of [plaintiff's] RICO claim could have thought it had any chance to succeed").

**\*32** *Second*, Plaintiff's counsel is also responsible for the inaccurate factual allegations. Plaintiff's counsel signed the Complaint, indicating that he made the necessary inquiry into the factual allegations substantiating the claims. At bottom, Plaintiff's counsel is responsible for the allegations concerning disclosure of the Shtar Isko and the reputational effects of asserting that the Benrimon Defendants committed fraud in both the Criminal Case and Bankruptcy Case. *See Hoatson*, 2007 WL 431098, at *9-10 (imposing sanctions on attorney where "the pleadings [were] so far removed from adequate that they cannot be said to have been filed in good faith or after a reasonable inquiry").

For these reasons, the Court has determined, despite resolving all doubts in his favor, that certain of Plaintiff's counsel's arguments concerning RICO are "losing *and* sanctionable." *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1994). The Court has determined that the Benrimon Defendants are entitled to a portion of the reasonable attorneys' fees and costs they incurred in defending against the RICO claims in Counts III, IV, V, and VI in this action. *See Bus. Guides, Inc.*, 498 U.S. at 548, 111 S.Ct. 922 (confirming that Rule 11 "states unambiguously that any signer must conduct a 'reasonable inquiry' or face sanctions"). In this regard, the Court recognizes that it has the discretion either to award an absolute number now that it believes fairly vindicates the purposes of Rule 11, or to wait and award fees and costs after review of a fee petition filed

by the Benrimon Defendants' counsel and responded to by Plaintiff's counsel. For several reasons, it chooses the former, and will order Plaintiff's counsel to pay a sanction of $20,000 to the Benrimon Defendants.

To begin, the Court recognizes that it may be difficult for defense counsel to separate out the precise amount of fees and costs that were attributable to defending against Plaintiff's unlawful debt collection counts specifically. Moreover, as this section makes clear, not all of Plaintiff's RICO arguments were sanctionable, even if all were ultimately unavailing. The Court also recognizes the disparity in size between Plaintiff's counsel and the Benrimon Defendants' counsel, and strives to sanction, without wholly bankrupting, Plaintiff's counsel. Finally, the Court realizes that a fee petition will itself generate attorneys' fees and costs for which Plaintiff's counsel should arguably be responsible, and wishes to minimize the resources that have been and are contemplated to be expended in this effort.

Ultimately, the Court is reminded that "the principal objective of the imposition of Rule 11 sanctions is not compensation of the victimized party but rather the deterrence of baseless filings and the curbing of abuses." *Caisse Nationale de Credit Agricole-CNCA v. Valcorp, Inc.*, 28 F.3d 259, 266 (2d Cir. 1994); *see also Estate of Calloway v. Marvel Entertainment Group*, 9 F.3d 237, 241 (2d Cir. 1993) ("Rule 11 is not a fee-shifting mechanism and does not create an entitlement in adverse parties to compensatory damages or attorney's fees.... Rather it is intended 'to maintain the integrity of the system of federal practice and procedure.' " (citation omitted)), *cert. denied*, 511 U.S. 1081, 114 S.Ct. 1829, 128 L.Ed.2d 459 (1984). The Court acknowledges that the $20,000 sanction imposed will not fully compensate the Benrimon Defendants for the fees and costs expended on the unlawful debt collection issue, but it will fully punish Plaintiff's counsel for his conduct in accordance with the letter and spirit of Rule 11.

### c. The Benrimon Defendants Are Not Entitled to Sanctions for Plaintiff's State-Law Claims

**\*33** The Benrimon Defendants also move for sanctions with respect to Plaintiff's state-law claims. Plaintiff's fraud claim against the Benrimon Defendants is dismissed because, as the Court explained above, Plaintiff has not alleged a single misstatement or omission that any of the Benrimon

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 201 of 311

Defendants made to Plaintiff. To the extent Plaintiff pleaded that the Benrimon Defendants conspired with Chowaiki to defraud Plaintiff, the Court has also dismissed this claim, as Plaintiff has not alleged any agreement between them to make any misrepresentation to Plaintiff. However, the Court has found that Plaintiff adequately pleaded his claims for conversion and replevin against the Benrimon Defendants, at least with respect to the Picasso. While Plaintiff's fraud arguments are a stretch, the Court finds that the filing of these state-law claims was not objectively unreasonable and, further, that some of the other factors that animated the Court's decision to impose sanctions for the RICO claims (*e.g.*, the allegations regarding the Shtar Isko and the stigmatizing effect of a RICO claim), are not present with respect to the state-law claims. For this reason, the Court will not sanction Plaintiff or his counsel for alleging these state-law claims against the Benrimon Defendants.

### d. The Benrimon Defendants Are Not Entitled to Sanctions for Plaintiff's Allegations Tying the Benrimon Defendants to the Loss of the Leger

The Benrimon Defendants' final argument on this point is that Plaintiff should be sanctioned because the Complaint contains numerous allegations that Plaintiff lost the Leger as a direct result of the Benrimon Defendants' actions. At the pre-motion conference in this case, counsel for Chowaiki explained to the Court and counsel for all parties that "the Benrimons had nothing to do with Leger at all." (July 29, 2019 Tr. 42:12-14). Plaintiff's counsel seemed to agree that the Benrimon Defendants were not directly responsible for the Leger. Counsel told the Court, with respect to the original complaint, that "[t]here were no allegations that [the Benrimon Defendants] participated in the Leger," and that "there certainly won't be [any] in the amended complaint." (*Id.* at 55:24-56:2). Plaintiff's counsel also clarified the allegation as stating that the Benrimon Defendants participated in a conspiracy with Chowaiki that led to Plaintiff's loss of the Leger.

The Benrimon Defendants now argue that, despite Plaintiff's counsel's assurances during the pre-motion conference, Plaintiff continues to assert that the Benrimon Defendants are responsible for the loss of the Leger. The Court understands this argument, but does not read the Complaint's allegations as accusing the Benrimon Defendants of directly causing Plaintiff to lose the Leger. The Benrimon Defendants cite to the following provisions of the Complaint:

- David and Linda Benrimon, David Benrimon Fine Art LLC, Piedmont Capital LLC, Avichai Rosen, and Ezra Chowaiki — each knowing that Ezra Chowaiki was engaged in a pattern of Racketeering Activity for the explicit purpose of fraudulently defrauding art-owners of the works of art they had consigned to the Gallery — agreed with each other to join, facilitate, further, and to participate in Ezra Chowaiki's pattern of Racketeering Activity, by their own actions, as set out in ¶¶ 21, 26, 28, 33, 59, 60, 61, 63, 64, 72, 75, 79, 80, 86, and related paragraphs, above, and conspired with each other to do so, in violation of ⚑ 18 U.S.C. § 1962 (d). As a result, plaintiff was injured by the loss, theft, fraudulent taking, or conversion of his Picasso, le Gueridon and his Leger. (Compl. ¶ 111).

- As a direct and proximate result of the conspiracy defendants' predicate actions in furtherance of violating ⚑ 18 U.S.C. § 1962(d), as described in above, plaintiff has been and is continuing to be injured in his business or property, including by the unlawful conversion of his Leger and his Picasso's le Gueridon, and as set forth more fully above. Each of the conspiracy defendants is jointly and severally liable to plaintiff pursuant to ⚑ 18 U.S.C. § 1964(c). (*Id.* at ¶ 140).

- Each of Linda and David Benrimon, Avichai Rosen, David Benrimon Fine Art LLC, and Piedmont Capital LLC, knowing that Ezra Chowaiki was defrauding plaintiff and other art owners of the art works they had consigned to Ezra Chowaiki's Gallery, and knowing of Ezra Chowaiki's scheme and plan to do so, conspired and agreed with Mr. Chowaiki to join that scheme and advance it, and engaged in actions, as set out in this Complaint to do so. And plaintiff was harmed thereby in the loss of le Gueridon and the Leger. (*Id.* at ¶ 143).

**\*34** • Each of the defendants, knowing that Ezra Chowaiki was unlawfully selling art consigned to his Gallery against their owners' wishes, agreed and conspired with each other to participate in that scheme. Each defendant intentionally took overt acts in furtherance of that agreement to defraud art owners of the art they had consigned to Mr. Chowaiki's Gallery. And plaintiff was harmed thereby by the loss of his le Gueridon and Leger. (*Id.* at ¶ 148).

(*See* Benrimon Sanctions Br. 10-11). The Court acknowledges the imprecision of these allegations, but reads them merely to allege Plaintiff's loss of the Leger as a result of a conspiracy between Chowaiki and the Benrimon Defendants, which is true to what Plaintiff's counsel stated at the pre-motion conference. Conversely, the Court does not read these allegations as indicating that "Plaintiff lost the Leger as a direct result of the Benrimon Defendants' actions." (⚑ *Id.* at 10). Accordingly, the Benrimon Defendants' motion for sanctions is denied insofar as it seeks sanctions for Plaintiff's allegation that the Benrimon Defendants were involved in Plaintiff's loss of the Leger.

## CONCLUSION

For the reasons explained above, the Court GRANTS IN PART and DENIES IN PART Defendants' motions to dismiss. All of the RICO claims in this action are dismissed. Plaintiff may pursue his state-law fraud, conversion, and replevin claims against Defendant Chowaiki for the Picasso and the Leger, and Plaintiff may pursue his state-law conversion and replevin claims against the Benrimon Defendants for the Picasso. All other state-law claims are dismissed.

Defendants are hereby ORDERED to file answers to the remaining claims against them on or before **May 15, 2020**.

Counsel for Plaintiff is ORDERED to pay sanctions under Fed. R. Civ. P. 11 in the amount of \$20,000 to the Benrimon Defendants on or before **May 22, 2020**.

The parties are hereby ORDERED to provide a proposed case management plan to the Court on or before **May 22, 2020**.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1974228

## Footnotes

1    The facts in this Opinion are drawn primarily from Plaintiff's First Amended Complaint ("Complaint" or "Compl." (Dkt. #26)), which is the operative pleading in this case. The Court notes here that the Complaint contains an abundance of conclusory allegations. For purposes of these motions, the Court considers and accepts only the factual allegations that are well-pleaded. *See* ⚑ *Lynch v. City of New York*, 952 F.3d 67, 74-76 (2d Cir. 2020).

     For ease of reference, the Court refers to Chowaiki's opening brief as "Chowaiki Br." (Dkt. #31); the Benrimon Defendants' opening brief as "Benrimon Br." (Dkt. #33); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #39); Chowaiki's reply brief as "Chowaiki Reply" (Dkt. #45); and the Benrimon Defendants' reply brief as "Benrimon Reply" (Dkt. #46). Further, the Court refers to the Benrimon Defendants' motion for Rule 11 sanctions as "Benrimon Sanctions Br." (Dkt. #36); Plaintiff's opposition to the Benrimon Defendants' motion for sanctions as "Pl. Sanctions Opp." (Dkt. #41); and the Benrimon Defendants' reply brief in support of their motion for sanctions as "Benrimon Sanctions Reply" (Dkt. #47).

2    Plaintiff also names John Does 1-10 as additional defendants "who, through their own actions, or their actions through agents, conspired with and/or participated in the pattern of racketeering acts and activity, the collection of unlawful debt, and other fraudulent and unlawful acts and activity set out [in the Complaint]." (Compl. ¶ 11).

3    A Shtar Isko, also called a "Heter Iska," is a document that is employed when one Jewish person lends money to another to avoid the Talmudic prohibition on lending money for interest. *See Madison Park Investors LLC*

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 203 of 311

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

*v. 488-486 Lefferts LLC,* 2015 N.Y. Slip Op. 30178(U) (Trial Order), 2015 WL 471786, at *10 n.3 (N.Y. Sup. Ct. Feb. 5, 2015).

4    Plaintiff contends that "the common purpose of all these Racketeering Activities is not changed by the fact that Mr. Benrimon's son (Ms. Benrimon's brother, Mr. Rosen's brother-in-law), was involved in yet another art gallery, allegedly acting as a front to help the Benrimons' gallery profit from selling art which was sold to others." (Pl. Opp. 19). But it *does* matter to the Court's analysis that the Latamie Acts involved a different group of players from the ones at the heart of Plaintiff's RICO claims in this Complaint because "no RICO violation can be shown unless there is proof of the specified relationship between the racketeering acts and the RICO enterprise." ⚑ *United States v. Indelicato,* 865 F.2d 1370, 1384 (2d Cir. 1989); *see* ⚑ *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). While the "enterprise" and "pattern of racketeering activity" are distinct elements of a RICO case, the existence of different players changes the mode of commission of the predicate activity.

     And though not part of its analysis, the Court observes that in the proceeding brought by Marc Latamie against Benrimon Contemporary LLC, upon which Plaintiff bases his allegations, the court found that the plaintiff there "ha[d] not uncovered any evidence to support his" theory that David Benrimon was the alter ego of Benrimon Contemporary LLC. (Dkt. #34, Nikas Decl., Ex. A).

5    The Court notes that the Stipulation was filed by the Bankruptcy Trustee, not Piedmont. (*See* Bankruptcy Case, Dkt. #174).

6    Those courts that have considered the issue have concluded uniformly that a Shtar Isko does not create a legally enforceable partnership. *See Madison Park,* 2015 WL 471786, at *10 n.3 (collecting cases); ⚑ *Edelkind v. Fairmont Funding, Ltd.,* 539 F. Supp. 2d 449, 454 (D. Mass. Mar. 6, 2008) (collecting cases).

7    *See* ⚑ *Sedima,* 473 U.S. at 496 n.14, 105 S.Ct. 3275:

     [T]he definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern "*requires* at least two acts of racketeering activity," ⚑ § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern."

8    Plaintiff's also contends that the Benrimon Defendants knew that Chowaiki stole the Picasso because the Provenance stated that it belonged to someone who bought the Picasso at Sotheby's in London on February 6, 2007, at Lot 152. (*See* Compl. ¶¶ 51-53; Pl. Opp. 2). While it is true that Plaintiff, rather than Chowaiki, was the purchaser of the Picasso at the Sotheby's sale, there is nothing in the Provenance that would put someone on notice of such fact. The Provenance makes no mention of Plaintiff by name; it merely states that ten years before Chowaiki's transaction with Piedmont, someone bought the work at Sotheby's. Plaintiff's further accusation that the Benrimon Defendants "deleted [the Picasso's] provenance which showed that [Plaintiff] was the artwork's owner" (Pl. Opp. 17), is entirely unfounded.

9    Plaintiff's allegations of money laundering are entirely conclusory. (*See* Compl. ¶ 16 ("The common and unifying purpose [of each RICO enterprise] was to ... launder the proceeds, if possible."); *id.* at ¶ 28 (summarily stating that "payment" for Warhol prints or painting "constitutes a violation of ⚑ 18 U.S.C. § 1956 (money laundering)"); *id.* at ¶ 61 (stating that Chowaiki's deposit of the $300,000 loan payment constitutes an act of wire fraud); *id.* at ¶ 78 ("Upon information and belief and as will be disclosed in discovery, [the Benrimon Defendants] by participating in the continued sending of money or things of value to pay for *le Gueridon's* storage, and to continue fraudulently selling *le Gueridon,* without disclosing the true owner of *le Gueridon,* all

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 204 of 311

in violation of wire fraud, money laundering, etc. statutes."); *id.* at ¶ 98 (describing Chowaiki's "illegal practice" of stealing artwork as money laundering violations); *id.* at ¶ 108 (describing Chowaiki's disposition of the Leger as money laundering)). His brief in opposition to the motions to dismiss does not elaborate on these conclusory assertions. (*See generally* Pl. Opp.).

10    The Court is not swayed by Plaintiff's attempt to disaggregate this single loan transaction into its component pieces in order to substantiate his claim that Piedmont and Rosen were in the business of making usurious loans. (*See* Compl. ¶¶ 85-86; Pl. Opp. 30).

11    Plaintiff argues that he need not allege multiple usurious loans made over a long period of time to state a RICO claim for usurious lending. (Pl. Opp. 26). He explains that "there is no requirement in the statute or case law that plaintiff must allege or prove multiple usurious loans, longevity, or a pattern of usurious loans to prevail on a claim that defendants 'were in the business of lending money or a thing of value at a rate usurious under State or Federal law.' " (🚩 *Id.*). Plaintiff is correct that there is nothing in the text of the RICO statute that requires multiple usurious loans be alleged. But, as explained above, the case law requires a plaintiff to show that the defendants were in the business of making usurious transactions, and Plaintiff's allegations on this point do not suffice.

12    The Court recognizes that a complaint may incorporate material or a document outside of the complaint by reference, and that a court can consider such incorporated material on a ⚑ Rule 12(b)(6) motion. *See* ⚑ *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). The problem here is that Plaintiff does not refer to portions of the Criminal Case docket that would support his RICO claim. *Cf.* ⚑🛑 *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (finding incorporation where complaint "explicitly refer[ed] to and relie[d] upon two of the documents at issue").

13    As explained ⚑🛑 *infra* note 9, Plaintiff has failed to allege, with any specificity, how the alleged predicate acts satisfy the elements of money laundering.

14    To the extent that Plaintiff means to allege that his consignment with Chowaiki was fraudulent *ab initio*, it fails for two reasons. ⚑ *First*, such a fraud is not pleaded with the specificity required by Rule 9(b). *Second*, the claim fails for want of domestic injury, as discussed ⚑ *infra.*

15    In Plaintiff's brief, he states that "[a]fter termination of the three-month consignment, Mr. Chowaiki, on multiple occasions, fraudulently induced Mr. Malvar to let the works of art remain in New York, [Compl.] ¶¶ 37, 105-106." (Pl. Br. 6). But the paragraphs of Plaintiff's Complaint that he cites do not state that Chowaiki induced Plaintiff to let the artwork remain in New York, nor do they state that the consignment lasted three months. The Complaint merely states that: (i) the artwork was given to Chowaiki on consignment; (ii) at some point, Plaintiff and his brother requested its return; (iii) Chowaiki repeatedly promised to return the artwork; (iv) Chowaiki never actually returned the artwork; and (v) Chowaiki sold the Leger to a company in the United Kingdom. (*See* Compl. ¶¶ 37, 105-06).

16    Indeed, Chowaiki explicitly states that "when the Complaint is distilled to its essential facts, it is plainly evident that it ... is, in actuality the proverbial sheep of [ ] state-law conversion and replevin claims[.]" (Chowaiki Br. 1).

17    It is unclear to the Court from where the Benrimon Defendants discern the requirement that a plaintiff must plead these specific facts to allege demand and refusal.

18    Plaintiff's argument that the Benrimon Defendants did not provide him with a copy of their brief in support of their motion to dismiss is a non-starter. The Benrimon Defendants' brief in support of their motion for sanctions

thoroughly describes the bases for the requested sanctions. (*See generally* Benrimon Sanctions Br.). And, further, the technical requirements of the safe harbor provision do not impose upon the Benrimon Defendants the obligation to provide Plaintiff with their brief in support of their separate motion to dismiss. *See* 🚩*Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 176-77 (2d Cir. 2012).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 206 of 311

Weiss v. David Benrimon Fine Art LLC, Not Reported in Fed. Rptr. (2021)

2021 WL 6128437
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Sidney N. WEISS, Appellant,
Alejandro Domingo Malvar Egerique, Plaintiff,
v.
DAVID BENRIMON FINE ART LLC, David
Benrimon, Linda Benrimon, aka Linda Rosen, Piedmont
Capital LLC, Avichai Rosen, Defendants-Appellees,

Ezra Chowaiki, Defendant. *

20-3842-cv
|
December 28, 2021

Appeal from orders of the United States District Court for the
Southern District of New York (Katherine Polk Failla, *Judge*).

**UPON DUE CONSIDERATION WHEREOF, IT IS
HEREBY ORDERED, ADJUDGED, AND DECREED**
that the April 24, 2020, order of the District Court be and
hereby is **VACATED** insofar as it ordered Sidney N. Weiss
to pay sanctions of $20,000 to David Benrimon Fine Art
LLC, Linda Benrimon, David Benrimon, Piedmont Capital
LLC, and Avichai Rosen, and the cause is **REMANDED** to
the District Court for further proceedings consistent with this
order.

**Attorneys and Law Firms**

FOR APPELLANT: Tyler Maulsby, Frankfurt Kurnit Klein
& Selz PC, New York, NY.

FOR DEFENDANTS-APPELLEES: Luke W. Nikas (Maaren
A. Shah, on the brief), Quinn Emanuel Urquhart & Sullivan,
LLP, New York, NY.

PRESENT: José A. Cabranes, Raymond J. Lohier, Jr., Eunice
C. Lee, Circuit Judges.

**SUMMARY ORDER**

**\*1** Plaintiff through his lawyer Weiss alleged that he in
2015 consigned an artwork by Picasso to an art gallery
operated by Ezra Chowaiki. In 2017, Piedmont Capital LLC
("Piedmont"), on behalf of David Benrimon Fine Art LLC
("DBFA"), loaned $300,000 to Chowaiki's gallery, which

wrongfully pledged as collateral Plaintiff's Picasso. The
loan was to be repaid in 30 days with $50,000 interest.
When Chowaiki's gallery failed to pay, DBFA took Plaintiff's
Picasso.

The District Court sanctioned Weiss for signing a pleading
that contained two claims. First, it held that Weiss without
"articulable legal or factual basis" certified a pleading
alleging that all of the appellees were in the business
of collecting usurious debts in violation of the Racketeer
Influenced and Corrupt Organizations Act ("RICO") based
only on the single loan from Piedmont to Chowaiki's gallery.
App'x 640. Second, it held that Weiss "reckless[ly]" certified
a pleading alleging that DBFA and its affiliates fraudulently
failed to disclose a Shtar Iksa, a document that, according
to Plaintiff, made Chowaiki and Piedmont 50%-50% equal
partners in connection with the loan. *Id.* Weiss appeals from
this sanctions ruling. We assume the parties' familiarity with
the underlying facts, the procedural history of the case, and
the issues on appeal.

**I.**

We reject Weiss's procedural argument. Rule 11(c)(2) of the
Federal Rules of Civil Procedure contains a 21-day "safe
harbor period." *Star Mark Mgmt., Inc. v. Koon Chun Hing
Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 176 (2d Cir.
2012). It requires that a motion for sanctions be served, and
that this motion "must not be filed or be presented to the court
if the challenged paper, claim, defense, contention, or denial
is withdrawn or appropriately corrected within 21 days after
service or within another time the court sets." Fed. R. Civ. P.
11(c)(2).

We have not reversed a district court's award of sanctions
despite the moving party's "failure to adhere to the procedural
requirements of Rule 11" and its safe harbor where "there
[was] no indication that [the sanctioned party] would have
corrected or amended its frivolous arguments even had
it been given the opportunity." *Perpetual Sec., Inc. v.
Tang*, 290 F.3d 132, 142 (2d Cir. 2002). By contrast, we
have reversed a Rule 11 sanctions award where "the record
indicate[d] that [the sanctioned party] would have withdrawn
or appropriately corrected his misstatements, thus avoiding
sanctions altogether." *Hadges v. Yonkers Racing Corp.*,
48 F.3d 1320, 1328 (2d Cir. 1995) (internal quotation marks
omitted).

**\*2** Here, although the time from service to filing was shorter than 21 days, Weiss clearly refused to change his position. Weiss responded to the served sanctions motion before it was filed, stating "we are not withdrawing the first amended complaint or case" and that the appellees' "Rule 11 motion lacks any merit." App'x 499. While the appellees did not send Weiss their accompanying motion-to-dismiss brief, this was not required. Star Mark, 682 F.3d at 176 (holding that Rule 11 "does not require the service of a memorandum of law or affidavits"). And we see no basis in law for Weiss's proposal that "a court must assess whether the recipient of a Rule 11 motion had sufficient time to consider his options before deciding whether to withdraw or amend the allegedly frivolous pleading." Weiss's Br. 29. Thus, the sanctions order was not procedurally improper.

## II.

We agree with Weiss that the District Court erred, or "abused its discretion," In re Sims, 534 F.3d 117, 132 (2d Cir. 2008) (alteration and citation omitted), by sanctioning him for bringing Plaintiff's RICO unlawful debt collection claims while alleging only one usurious loan. See Universitas Educ., LLC v. Nova Grp., Inc., 784 F.3d 99, 102 (2d Cir. 2015) ("We review all aspects of a District Court's decision to impose sanctions for abuse of discretion.") (quoting Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 333 (2d Cir. 1999)).

A court may sanction counsel for signing pleadings whose legal theories are not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2); see also id. 11(c). "[T]o constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend ... the law as it stands." Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990). "The fact that a legal theory is a long-shot does not necessarily mean it is sanctionable." Fishoff v. Coty Inc., 634 F.3d 647, 654 (2d Cir. 2011). The inquiry is one of "objective unreasonableness and is not based on the subjective beliefs of the person making the statement." StreetEasy, Inc. v. Chertok, 752 F.3d 298, 307 (2d Cir. 2014) (citation omitted).

The District Court reasoned that it was frivolous to allege that the appellees were involved in "the business of" making usurious loans based on "a single allegation of a single usurious transaction." App'x 640. In analyzing these claims, the District Court relied on our opinion in Durante Bros. & Sons v. Flushing Nat. Bank, 755 F.2d 239 (2d Cir. 1985). There, the district court dismissed some of the plaintiff's RICO claims before trial on statute of limitations grounds. Id. at 242. We vacated the judgment in part and remanded those claims, reasoning that the district court had applied the wrong statute of limitations. Id. at 248–49. We noted regarding the proceedings on remand that the remaining RICO claims "were adequately pleaded," but that "the complaint did not unequivocally allege that the defendants were in the business of making usurious loans." Id. at 249–50. We further stated that the requirement under RICO that the defendant act "in connection with 'the business of' making usurious loans seems aimed at ... the exclusion from the scope of the statute of occasional usurious transactions by one not in the business of loan sharking," and that "the target of RICO is not sporadic activity." Id. at 250 (alterations and citation omitted).

These statements in Durante were dicta. Only the statute of limitations issue was before us. See id. at 248–49. Our comments regarding the requirement that a RICO defendant act in "the business of" making usurious loans were not essential to the decision." Jimenez v. Walker, 458 F.3d 130, 142 (2d Cir. 2006). Indeed, we said as much, "leav[ing] for determination by the district court in the first instance the precise parameters of 'the business' of usury as intended by Congress." Durante, 755 F.2d at 250. Thus, Durante "[is] not and cannot be binding" on this issue, and only its "persuasiveness" is considered. Jimenez, 458 F.3d at 142.

**\*3** Weiss made colorable arguments supporting a broader standard than the one suggested in Durante. Most significantly, he cited a district court case that rejected the appellees' argument that "one loan cannot constitute a 'business.' " Middle States Knowlton Corp. v. Esic Cap., Inc., Nos. 82-CV-1911, 82-CV-1912, 82-CV-1913, 82-CV-1926, 82-CV-1941, 1985 WL 7441, at \*8 (D.D.C. Oct. 16, 1985) ("Even if the loan were the sole consummated transaction which [the defendant] undertook, we believe that [the defendant] was in the 'business' of lending money for

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 208 of 311

Weiss v. David Benrimon Fine Art LLC, Not Reported in Fed. Rptr. (2021)

profit."). Weiss also advanced various statutory arguments, and cited the New York Court of Appeals' treatment of a comparable state statute.

" 'However faulty,' [Weiss's] positions 'were not so untenable as a matter of law as to necessitate sanction.' " *Salovaara v. Eckert*, 222 F.3d 19, 34 (2d Cir. 2000) (alteration and citation omitted). Indeed, "[t]he mere fact that" a court in a different jurisdiction agreed with Weiss "is enough, in the absence of controlling authority to the contrary, to support a good faith argument for extension ... of existing law." *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 831 (2d Cir. 1992). Thus, we hold that it was error to sanction Weiss for bringing Plaintiff's RICO unlawful debt collection claims while alleging only one usurious loan. [1]

**III.**

We reject Weiss's argument that the District Court erred or abused its discretion in sanctioning him for alleging that the appellees committed fraud on the court by failing to disclose the Shtar Ikso. A court may sanction an attorney for signing a pleading that fails to comply with the requirement that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3); *see also id.* 11(c).

The Amended Complaint alleged that the appellees caused Piedmont's verified petition, submitted in Chowaiki's criminal case, to "omit the *Shtar Isko*, which shows that [Chowaiki and Piedmont] were actually 50%-50% equal partners – and not unrelated bona fide purchasers for value." App'x 145. The Parties agree that a Shtar Isko is a document "which creates a partnership between the [Jewish] borrower and [Jewish] lender in order to avoid a religious prohibition against the charging of interest." *Arnav Indus., Inc. Emp. Ret. Tr. v. Westside Realty Assocs.*, 579 N.Y.S.2d 382, 383 (1st Dep't 1992).

The District Court found that Plaintiff's claim was "factually inaccurate" and "careless[ ]." App'x 641. It pointed to a Note between Piedmont and Chowaiki, which was attached to Piedmont's petition in Chowaiki's criminal case. This Note states that payments would be made "in accordance with

Heter Iska." App'x 325. The District Court concluded that this text "disclose[d] the existence of the Shtar Isko." App'x 641.

The District Court did not abuse its discretion by adopting "a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990). Even assuming Weiss is correct that a Shtar Isko is a document while Heter Iska is a concept, it is "plausible in light of the record viewed in its entirety" that the Note's reference to Heter Iska disclosed the existence of the Shtar Isko. *United States v. Gonzalez*, 764 F.3d 159, 165 (2d Cir. 2014) (citation omitted). The District Court thus did not err in concluding that Weiss was "reckless[ ]" in signing a pleading that claimed that the failure to disclose the Shtar Isko was "part of the continuing fraud." App'x 145, 640.

**IV.**

**\*4** The District Court characterized its "decision to impose sanctions" as "*in large part*[ ] due to the Complaint's overstep in asserting four RICO claims for collection of unlawful debt against all six Defendants in this action, based on allegations of a single usurious loan." App'x 642 (emphasis added). It is not apparent that the District Court would have ordered Weiss to pay $20,000—or anything at all—based solely on his signing a pleading with reckless factual claims. Accordingly, we vacate the April 24, 2020, order imposing sanctions and remand the cause for further proceedings. *See Salovaara v. Eckert*, 222 F.3d 19, 34–35 (2d Cir. 2000).

**CONCLUSION**

For the foregoing reasons, we **VACATE** the April 24, 2020, order of the District Court insofar as it ordered Sidney N. Weiss to pay sanctions of $20,000 to David Benrimon Fine Art LLC, Linda Benrimon, David Benrimon, Piedmont Capital LLC, and Avichai Rosen, and we **REMAND** the cause to the District Court for further proceedings consistent with this order.

**All Citations**

Not Reported in Fed. Rptr., 2021 WL 6128437

## Footnotes

\*      The Clerk of Court is directed to amend the caption as set forth above.

1      Weiss challenges only the District Court's conclusion that he advanced a frivolous legal argument. We thus take no position on whether sanctions were appropriate based on his claims' lack of "factual basis." App'x 640 (noting Weiss's "attempt[ ] to string out this one [loan] into four separate causes of action that implicate all six Defendants," including while "lack[ing] even conclusory allegations").

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Purdie v. Brown, S.D.N.Y., November 3, 2015

2013 WL 5366394
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Gary LIANG, Plaintiff,

v.

The CITY OF NEW YORK; Raymond Kelly,
Commissioner of the New York City Police Department;
Brian J. Maguire, Deputy Inspector: of NYPD 109th
Precinct; New York City Police Department; Detective
Robert Zee, individually and in his official capacity as
a detective in the New York City Police Department;
Detective Albert Hawkins, individually and in his official
capacity as a detective in the New York City Police
Department; Detective Shim, individually and in his
official capacity as a detective in the New York City
Police Department; Detective Christopher Vaughn,
individually and in his official capacity as a detective
in the New York City Police Department; Detective
Scali, individually and in his official capacity as a
detective in the New York City Police Department;
Lieutenant Conforti, individually and in his official
capacity as a lieutenant: in the New York City Police
Department; Sergeant Michetti, individually and in his
official capacity as a sergeant in the New York City
Police Department; Sergeant Natoli, individually and in
his official capacity as a sergeant in the New York City
Police Department; "John Doe," individually and in his
official capacity as a New York City police officer, "John
Doe" being a fictitious name, the true name not known
at this time; "Jane Doe," individually and in her official
capacity as a New York City police offer, "Jane Doe"
being a fictitious name, the true name not known at this
time; Xin Xu; Bei Wang; Da Peng: Song; Ivan Quek,
aka Ivan Sun; and Yi Jing Tan, aka "Kerry," Defendants.

No. 10–CV–3089 (ENV)(VVP).
|
Sept. 24, 2013.

**Attorneys and Law Firms**

Chunyu Jean Wang, Wang Law Office, PLLC, Flushing, NY, for Plaintiff.

Elizabeth N. Krasnow, Shlomit Aroubas, Sumit Sud, New York City Law Department, Wei Ji, Alliance Law PLLC, New York, NY, Mingli Chen, Kevin Kerveng Tung, P.C., Thomas D. Gearon, Law Office of Thomas D. Gearon, P.C., Flushing, NY, for Defendants.

Ivan Quek, pro se.

***MEMORANDUM AND ORDER***

VITALIANO, District Judge.

**\*1** Plaintiff Gary Liang brings this civil rights action against defendants the City of New York ("the City"), the New York City Police Department ("NYPD"), Police Commissioner Raymond Kelly, Deputy Inspector Brian Maguire, Captain [1] Thomas Conforti, Sergeant Michetti, [2] Sergeant Brian Natoli, Detectives Robert Zee, Albert Hawkins, Jae Shim, Christopher Vaughn, and Edward Scali, and Police Officers "John Doe" and "Jane Doe" (collectively "the City defendants"), as well as against Xin Xu, Bei Wang, Da Peng Song, Ivan Quek (aka Ivan Sun) and Yi Jing Tan (aka Kerry Tan), individuals unaffiliated with the City (collectively "the non-City defendants"). Liang alleges violations of his constitutional rights relating to three occasions on which he was arrested. In his amended complaint, plaintiff sues the City and NYPD as institutional entities, defendants Kelly and Maguire in their official capacities, defendants Zee, Hawkins, Shim, Vaughn, Scali, Conforti, Michetti, Natoli, "John Doe," and "Jane Doe" in both their official and personal capacities, and all non-City defendants personally. (Am.Compl.(Dkt. No. 2) ¶¶ 8–26). The City defendants now move under Rule 12(b)(6) to dismiss all counts against them except for plaintiffs claim for unreasonable search and seizure. [3] For the reasons discussed below, the motion is granted.

*Factual Background*

Liang claims that this § 1983 action springs from the fact, he believes, that he is or was the target of a large conspiracy involving all defendants to deprive him of his civil rights. He alleges that the City defendants falsely arrested him on

three occasions in response to the non-City defendants' bribes or improper gratuities and false complaints. (Am.Compl.¶¶ 145–149). [4] He alleges further that, in the case of each arrest, NYPD officers unlawfully seized or searched his belongings, (*id.* ¶¶ 143–44), failed to read him his Miranda rights, (*id.* ¶ 90), declined to take a statement from him, (*id.* ¶ 91), prohibited him from contacting counsel for approximately 12 hours, (*id.* ¶ 92), and detained him for approximately 24 hours. (*Id.* ¶ 93). The charges stemming from all three arrests were dismissed on speedy trial grounds, pursuant to 🚩New York Criminal Procedure Law § 30.30. (*Id.* ¶¶ 53, 80, 89, 147(h)). At the center of the litigation vortex is defendant Tan, with whom Liang had been romantically involved from 1999 through 2007 [5] and with whom he co-owned several businesses. (*Id.* ¶¶ 27–28.)

## I. The July 9 Arrest

On or about July 5, 2007, Tan filed a complaint with NYPD's 109th Precinct in Queens. (Decl. of Elizabeth Norris Krasnow in Support of City Defs.' Mot. to Dismiss ("Krasnow Decl.") (Dkt. No. 54), Exh. B). During her interview with Detective Zee, Tan claimed Liang assaulted her and stole $5000 from her pocketbook before departing for Shanghai. (*Id.*). She showed Detective Zee bruises on her arms and legs that she attributed to Liang, and informed the detective that Liang would be returning from Shanghai on the night of July 8, 2007. (*Id;* Krasnow Decl., Exh. E). On that date, Detectives Zee and Shim met plaintiff at the airport and Detective Zee arrested him (without a warrant, according to Liang) for burglary, robbery, and assault. (Krasnow Decl., Exhs. D, E; Am. Compl. ¶¶ 36–44). [6] According to Liang, Zee claimed that the laptop Liang was carrying belonged to Tan, and seized both the laptop and Liang's passport. (Am.Compl.¶ 45). Additionally, Tan was at the 109th Precinct when Liang was brought in; she was permitted to search his belongings and to take several items, including Liang's apartment keys and ATM card. (*Id.* ¶¶ 49–50). Liang alleges that he received no property voucher for any of the items that were taken from him, and that none of the seizures were documented. (*Id.* ¶ 46).

## II. The February 28 Arrest

**\*2** On January 30, 2008, Tan obtained an order of protection against plaintiff ("the January 30 order of protection"). (*Id.* ¶ 54; Krasnow Decl., Exh. F). The order forbade Liang from communicating with Tan or going to her residence/place of business, but permitted "incidental contact at work and

apartment," (Exh. F), presumably because Liang and Tan co-owned properties and businesses. The addresses where Liang and Tan had joint interest are not explicitly listed on the order of protection. On February 28, 2008, Liang went with three friends to 41–40 Kissena Boulevard. (Am.Compl.¶ 57). Although the amended complaint is not entirely clear on this point, it seems to indicate that 41–40 Kissena Boulevard housed EW Studio, a business Liang and Tan jointly owned. (*Id.* ¶¶ 29, 64). Liang claims he had learned that Tan "had started her own company and had attempted to have the landlord assign the lease to this new company." (*Id.* ¶ 57). The purpose of Liang's visit, he claims, was to defend his property. [7] Upon encountering several people at the premises he determined were Tan's employees, and who are now also non-City defendants, [8] Liang called the police to report the intruders' presence in his store. (*Id.* ¶ 59).

Two uniformed officers arrived in response to Liang's call. (*Id.* ¶ 60). Shortly thereafter, Detectives Zee, Shim, and Hawkins arrived at the scene in plain clothes, but in response to a complaint by Tan, which they received by radio dispatch. (Krasnow Decl., Exh. H). The three detectives instructed the uniformed officers to "step aside," explaining that Liang was not permitted to be on the premises. (*Id.* ¶¶ 61– 63). Liang pointed out indicia of his business ownership —namely, two licenses on the wall bearing the name of one of Liang's companies, certificates of incorporation, and stock certificates. (*Id.* ¶¶ 65–66). However, Detective Shim discounted those business authorizations in favor of a customer's invoice that displayed the new company's name, "Sagar Wireless." (*Id.* ¶¶ 63, 67).

Next, Liang claims, Detective Zee searched his belongings without his permission, then instructed the uniformed officers to arrest him and one of his friends. (*Id.* ¶¶ 69–70). Following his arrest, Liang was charged, in a complaint authored by Detective Hawkins, with criminal contempt (violation of an order of protection) and trespassing. (*Id.* ¶ 71; Exh. G). The next day, February 29, Tan obtained a second order of protection prohibiting Liang from going to her residence or place of business and from contacting her ("the February 29 order of protection"). (Krasnow Decl., Exh. L).

## III. The June 18 Arrest

On March 24, 2008, in response to a complaint filed by Tan, Detective Vaughn issued a criminal complaint against Liang charging him with violating the February 29 order of protection by contacting Tan two days earlier and threatening

to kill her. (Krasnow Decl., Exhs. M, S; Am. Compl. ¶ 81). On or around 8 p.m. on May 30, Detective Vaughn and four other detectives went to plaintiff's apartment. (Am.Compl.¶¶ 82–83). After learning Liang was out, Detective Vaughn left his card with plaintiff's doorman. (*Id* .) On June 18, 2008, Liang voluntarily surrendered at the 109th Precincts station house and was arrested by Detective Vaughn. (*Id* . ¶ 84; Krasnow Decl., Exh. T). Liang claims he had an alibi for March 22, 2008, the date of the alleged violation, but that Detective Vaughn refused to take his statement. (Am.Compl.¶¶ 87–88).

### IV. Liang's Post–Arrest Allegations

**\*3** Liang relies on a number of happenings that occurred after one or more of the arrests. First, he claims that, on July 9, 2007, Detective Zee, and/or someone affiliated with Detective Zee and at his behest, went to the office of Allen Chiu, Liang's attorney, and threatened him not to close on a real estate transaction that Liang and Tan had negotiated earlier to transfer a condo from Tan to Liang's mother. (*Id.* ¶¶ 31, 52). Second, he alleges that, on or about July 13, 2007, Detective Zee "activated a demo line phone, which allows the user to make free calls to any number and is supposed to be reserved to either mobile phone carrier employees or affiliates." (*Id.* ¶ 55). Third, he alleges that, "on or about November 10, 2007, Defendant Hawkins activated a wireless account with EW Studio Inc., one of Plaintiffs businesses." (*Id.* ¶ 56).

Liang next claims that, on or about September 23, 2008, an otherwise unidentified "Judge Grace" issued an order enjoining Tan, Tan's employees, and her "agents" from conducting business at 41–40 Kissena Boulevard and enjoining Tan from interfering with EW Studio's business operations. (*Id.* ¶ 98). On or about October 28, 2008, Liang further asserts, Steve Wong, to whom he had granted power of attorney, attempted to execute the "order" issued by "Judge Grace." That effort was stymied, however, when Tan's employees refused to leave the store premises. When Wong and an otherwise unidentified "retired police officer Phil" went to 41–40 Kissena Boulevard accompanied by two officers, one of Tan's employees, he alleges, contacted Detective Zee, who then spoke with the officers who had accompanied Wong to the premises. (*Id.* ¶¶ 99–105).

Following this episode, plaintiff claims that, in October and November of 2008, Defendant Scali convinced two individuals—Xiao Yun Li and "retired police officer Phil"—to falsely accuse him of plotting to murder Detective Zee. (*Id.* ¶¶ 106–07). Liang also alleges that Detectives Conforti and Michetti took from him the key to the store at 41–40

Kissena Boulevard on December 2, 2008 and gave it to Tan. (*Id.* ¶¶ 109–112). Finally, Liang asserts that, on May 27, 2010, he received a letter from the NYPD Investigations Unit in response to two complaints [9] he had filed against Detective Zee, stating there was sufficient evidence to prove misconduct against the detective. (*Id.* ¶¶ 96–97, 119–120).

### V. Liang's Causes of Action

Liang's 13–count complaint asserts federal causes of action based on denial of equal protection of the law in violation of the Fourteenth Amendment (Count 1), unreasonable search and seizure of property in violation of the Fourth Amendment (Count 2), false arrest in violation of the Fourth Amendment (Count 3), civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count 5), conspiracy to violate his civil rights under *42 U.S.C. § 1985* [10] (Count 10), and violations of his civil rights under *42 U.S.C. § 1983* (Counts 11–13). [11] Liang also asserts supplemental state law claims for unlawful detention and confinement (Count 4), filing of false criminal complaints (Count 6), violations of parallel rights under the New York state constitution (Count 7), tortious interference with a contract (Count 8), violation of the state's police power (Count 9), and negligent supervision (Count 10). As relief, plaintiff seeks, among other things, compensatory damages and injunctions against both the City and non-City defendants.

### *Standard of Review*

### I. Stating a Claim

**\*4** When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must assume the truth of "all well-pleaded, nonconclusory factual allegations" in the complaint. *Kiobel v. Royal Dutch Petroleum Co.,* 621 F.3d 111, 123 (2d Cir.2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). To survive the motion, the complaint must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. To the extent there are disagreements or ambiguities of fact, the Court must construe all the facts in a light most favorable to

the plaintiff and draw all reasonable inferences in his favor. *See* 🔖 *Matson v. Board of Educ. of City School Dist. of New York,* 631 F.3d 57, 72 (2d Cir.2011).

However, the court need not accept as true legal conclusions couched as factual allegations. 🔖 *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Moreover, "a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." 🔖 *Iqbal,* 556 U.S. at 678 (internal citations and quotations omitted). On the other hand, "a complaint need not pin plaintiffs claim for relief to a precise legal theory." 🔖 *Skinner v. Switzer,* ––––U.S. ––––, ––––, 131 S.Ct. 1289, 1296, 179 L.Ed.2d 233 (2011). All that is required is "a plausible 'short and plain' statement of the plaintiffs claim, not an exposition of his legal argument." *Id.*

### II. Consideration of Materials Outside the Pleadings

"[O]n a motion to dismiss, a court may only consider [1] the pleading itself, [2] documents that are referenced in the complaint, [3] documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, and [4] matters of which judicial notice may be taken." *Arrocha v. City Univ. of New York,* 878 F.Supp.2d. 364, 368 (E.D.N.Y.2012) (citing 🔖 *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) and 🔖 *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)). Throughout their briefing, the City defendants refer to various extrinsic documents they have submitted to the Court as exhibits to the Krasnow Declaration. These exhibits are as follows: Liang's amended complaint (Exh. A); arrest or complaint reports (Exhs.D, H, J, M); resulting criminal complaints and their supporting affidavits (Exhs.E, G, K, U); complaint follow-up reports (or DD5s) (Exhs.B–C, N–T); the two orders of protection issued against plaintiff (Exhs.F, L); and an invoice from the 41–40 Kissena Boulevard store (Exh. I).

There is no dispute that Liang's amended complaint is properly considered on a motion to dismiss. However, Liang contends that none of the City defendants' other exhibits fall within any of the four fair game categories described in *Arrocha.* (*See* PL's Mem. at 3). The City defendants press their consideration, claiming that all exhibits have been implicitly incorporated by reference into the complaint and/

or are proper for judicial notice. (*See* City Defs.' Reply (Dkt. No. 58) at 1–3). All but the invoice (Exh. I), the Court finds, are properly considered on this motion.

**\*5** To start, throughout his complaint, Liang explicitly references and relies upon a number of the exhibits he now seeks to exclude from the Court's consideration. These documents include the first criminal complaint preferred against Liang, (*see* Am. Compl. ¶¶ 33, 146(a)), the first order of protection, (*see id.* ¶¶ 54, 75, 86, 88), the second criminal complaint, (*see id.* ¶¶ 73, 147(a)), supporting affidavits made by Tan, Song, and Wang on March 12, 2008, (*see id.* ¶¶ 73–74, 76–77), and the second order of protection. (*See id.* ¶ 79). Exhibits E, F, G, K, and L, therefore, are clearly incorporated by reference into the complaint, and the Court may consider them as though they were part of the complaint itself.

With the exception of Exhibit I (the invoice), the remaining exhibits are all either complaint reports (Exhs.H, M), follow-up reports to the complaint (DD5s) (Exhs.B–C, N–T), arrest reports (Exhs.D, J), or documents filed in a court of record (Exhs.U, V). [12] The Court may take judicial notice of these materials, as they are in the public record. *See Wims v. New York City Police Dep't.,* No. 10–Civ–6128, 🔖 2011 WL 2946369, at *2 (S.D.N.Y. July 20, 2011) (a district court may take judicial notice of "arrest reports, criminal complaints, indictments and criminal disposition data" when deciding a 12(b)(6) motion); 🔖 *Obilo v. City Univ. of City of New York,* No. 01–CV–5118, 2003 WL 1809471, at *5 (E.D.N.Y. Apr. 07, 2003) ("[J]udicial notice can be taken of the incident report, police complaint and two DD5s completed by [defendant police officer]."); 🔖 *Wingate v. Deas,* No. 11CV1000, 2012 WL 1134893, at *1 n. 1 (E.D.N.Y. Apr. 02, 2012) (taking judicial notice of arrest reports); *Canessa v. Cnty. of Suffolk,* No. 09–CV–3256, 2010 WL 1438822, at *1–2 (E.D.N.Y. Apr.10, 2010) (taking judicial notice of arrest records). Consequently, the Court may consider these records as well, but only to establish "their existence and legal effect," or to "determine what statements [they] contained ... not for the truth of the matters asserted." 🔖 *Twine v. Four Unknown New York Police Officers,* No. 10–cv–6622, 2012 WL 6184014, at *7 (S.D.N.Y., Dec.12, 2012); *see also* 🔖 *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (internal quotation marks and emphases omitted).

## Discussion

### I. Claims Against NYPD

Among the flock of defendants sued by Liang is NYPD. But, as an organizational entity, NYPD is not a proper defendant, since agencies of New York City do not have a separate legal identity from the City. *See, e.g., Nnebe v. Daus,* 644 F.3d 147, 158 n. 6 (2d Cir.2011) ("It is well settled in this Court that, as a general matter, agencies of New York City are not suable entities in § 1983 actions."); *Graham v. City of New York,* 869 F.Supp.2d 337, 348 (E.D.N.Y.2012) (" 'All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law.' ") (quoting N.Y. City. Charter, Ch. 17 § 396); *Jenkins v. City of New York,* 478 F.3d 76, 93 n. 19 (2d Cir.2007) ("The district court correctly noted that the NYPD is a non-suable agency of the City."). Accordingly, all claims against the NYPD are dismissed with prejudice.

### II. Claims Against All Other City Defendants

#### a. The Legal Framework for § 1983 Claims

**\*6** "Section 1983 provides a civil claim for damages against 'any person' who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere. In order to prevail on a section 1983 claim, the plaintiff must show that the defendant's conduct deprived him of a federal right." *Id.* (internal citations omitted). Although individual state officials, such as police officers, may be liable under § 1983 in their individual capacities, they may assert an affirmative defense of qualified immunity if "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Southerland v. City of New York,* 680 F.3d 127, 141 (2d Cir.2012) (internal quotations omitted). "A right is 'clearly established' when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that

right." *Id.* (internal quotations and alterations omitted). An officer's actions are "objectively reasonable" if "officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Id.* (internal quotations omitted).

#### b. False Arrest Claims

Claims for false arrest under § 1983 are based on the Fourth Amendment's protection against unreasonable seizures, which includes the right to remain free from arrest absent probable cause. *See, e.g., Jaegly v. Couch,* 439 F.3d 149, 151 (2d Cir.2006). It is well established in the Second Circuit that "[p]robable cause is a complete defense to an action for false arrest brought under New York Law or § 1983." *Ackerson v. City of White Plains,* 702 F.3d 15, 19 (2d Cir.2012) (internal quotations omitted); *accord Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 118–19 (2d Cir.1995); *Jaegly,* 439 F.3d at 151. Courts will dismiss a claim for false arrest if the complaint is devoid of facts showing that the arresting officer could not have reasonably concluded that there was probable cause to make the arrest. *See, e.g., Kennie v. White Plains Police Dep't Vice Control Unit,* 108 F.3d 1369, at \*2 (2d Cir.1997); *Kafafian v. Young,* 477 Fed.Appx. 762, at \*1 (2d Cir.2012); *Pugach v. Ventrella,* 152 F.3d 920, at \*1 (2d Cir.1998).

In general, an officer has probable cause to make an arrest if he has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). Probable cause exists as a matter of law when there is no dispute as to the relevant facts and officers' knowledge at the time of arrest. *See also Fabrikant v. French,* 691 F.3d 193, 217 (2nd Cir.2012) ("Probable cause encompasses only that information available to the arresting officer prior to and including the point of seizure.") (internal quotations omitted). When information is received from a putative victim or eyewitness, probable cause exists "unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern,* 268 F.3d 65, 70 (2d Cir.2001).

**\*7** As the record makes clear, the City defendants had, at the very least, a reasonable basis to find probable cause

when arresting Liang on each of the three occasions described in the complaint. Each arrest either followed a complaint made by civilians Tan, Wang, and/or Song to officers at the 109th Precinct. That these complainants would later be named as defendants in this action is irrelevant to the analysis of the false arrest claims lodged against the City defendants. Each citizen complaint to the police involved allegations that Liang had committed (or was in the process of committing) a crime, or had violated (or was in the process of violating) an order of protection, or both. The record on this motion supports those facts convincingly, and, other than his naked assertion of conspiracy, Liang offers not a single plausibly pleaded fact to the contrary. Surely, Liang protested his innocence to the arresting officers, but points to nothing to show why it was unreasonable for them to believe the contrary claims that established probable cause to arrest him. His false arrest claims therefore fall short. *See, e.g.,* 🔖 *Coyle v. Coyle,* 354 F.Supp.2d 207, 211–12 (E.D.N.Y.2005) (dismissing false arrest claims on a 12(b)(6) motion because officers had no reason to doubt victim's statement that plaintiff violated a restraining order).

Specifically, regarding the July 9, 2007 arrest, Tan filed a criminal complaint with the 109th Precinct three days before the arrest, alleging that Liang physically assaulted her, took $5000 from her pocketbook, and used the money to purchase a round-trip ticket to Shanghai. (Am. Compl. ¶ 33; Exh. B). The complainant even advised that plaintiff had a return ticket for July 8. (*Id.*). As reflected in Exhibit E to the Krasnow Declarations—the criminal complaint issued against Liang in New York Criminal Court, Queens County—Detective Zee personally interviewed Tan on July 5. (Exh. E). Consistent with her allegations, he observed bruises on her arms and legs. (*Id.*).

With a powerful effect on this claim, opposite the one he intended, Liang acknowledges Tan made these statements to Detective Zee, but claims that her statements were "false," and asserts that Detective Zee did not conduct an investigation to verify her claims before making the arrest. (Am.Compl.¶ 34). Simply, "[t]he actual accuracy or veracity of [a witness's] statement is irrelevant to a determination of whether [an officer] had arguable probable cause. Rather, the question is whether [the officer] could have reasonably relied on it." 🔖 *Escalera v. Lunn,* 361 F.3d 737, 745 (2d Cir.2004). Although Tan's complaint alone would have been sufficient for probable cause, even without further verification, Detective Zee visually confirmed that she had

injuries consistent with her allegations of assault. (Exh. E). There can be no contest that Detective Zee had, at a minimum, an objectively reasonable basis to find probable cause. Indeed, he had probable cause. *See, e.g.,* 🔖 *Obilo,* 2003 WL 1809471, at *7 (victim's identification of plaintiff as her assailant, as well as visible bruises on her arms, supplied arresting officer with probable cause) . [13]

**\*8** If anything, the circumstances surrounding the February 28 arrest, including breach of the stay away order, demonstrate an even more compelling showing of probable cause. Detectives Zee, Hawkins, and Shim arrived at the Kissena Boulevard address in response to a complaint from Tan alleging that Liang had entered the store, in violation of the January 30 order of protection, and was threatening and harassing her employees, Song and Wang. (Exhs.G–H, K). In line with ordinary police procedures, the arresting officers, the record shows, were dispatched to the store via NYPD's control radio communications. Courts in this circuit have repeatedly found that, in the absence of reason to doubt the complainant, an allegation that an individual has violated a stay away order supports probable cause for arrest. *See, e.g.,* 🔖 *Jaegly,* 439 F.3d at 151; *Carthew v. Cnty. of Suffolk,* 709 F.Supp.2d 188, 197 (E.D.N.Y.2010) (dismissing false arrest claims because officer had probable cause based on report that plaintiff violated order of protection); *Dudley v. Torres,* No. 05–CV–1729, 2008 WL 2149603, at *4–5 (E.D.N.Y. May 21, 2008) (finding probable cause for an arrest based on plaintiff's alleged violation of a stay away order, despite plaintiff's statement that he "didn't do anything"); 🔖 *Welch v. City of New York,* 95Civ8953, 1997 WL 436382, at *5 (S.D.N.Y. Aug.4, 1997) (finding probable cause to arrest plaintiff for violation of an expired order of protection because officer had a reasonable basis to believe it was still in effect), *aff'd,* 166 F.3d 1203 (2d Cir.1998) (summary order).

Once again, Liang pleads no facts supporting even an inference that any of the City defendants had reason to doubt the information provided by Wang, Song, or Tan. Indeed, he readily admits to the existence of the January 30 order of protection, which explicitly directed him to avoid Tan's "place of employment." (Exh. F). Although the Kissena Boulevard address was not explicitly mentioned in the order, it was certainly reasonable for the officers to conclude that the store at that address constituted Tan's "place of employment," since she told the officers that it was "[her] business." (Exh. H). Nothing in any pleading or paper filed by plaintiff suggests Tan's business was not located at that address. Moreover, as

the Complaint Report specifies, Tan alleged that Liang "did steal and hold in his possession a cell phone contract which he removed from the office without authority," (*id.*), another allegation Liang does not deny anywhere in his pleadings. As a result, without a reason to disbelieve the complainants, the officers had an objectively reasonable basis to conclude that there was probable cause to arrest Liang on the evening of February 28, 2008.

Liang sees a firewall barring dismissal. He correctly observes that the January 30 stay away order still permitted "incidental contact ... at work and apartment." (*Id.;* Am. Comp. ¶¶ 54, 75). This limited option avails him nothing. But, the contact on February 28 was far from "incidental." Liang states that he went with three friends to the store that evening because "he heard that Defendant Tan had started her own company and had attempted to have the landlord assign the lease to a new company." (Am.Compl.¶ 57). By his own account, Liang went to the store to provoke a confrontation, and to resort to self-help to recover what he thought was rightfully his. Indeed, Liang stayed at the store for approximately two hours, where, arrest records show, he threatened to beat up Song if he saw him in the store again. (Exh. K). At a minimum, any officer aware of the January 30 order would have had a reasonable basis to conclude that Liang had violated the order. Admissions by plaintiff in his pleadings show that probable cause abounded.

**\*9** Nor did that probable cause evaporate because, as Liang claims, the arresting officers ignored his protestations and the visible indications that he owned and operated the business at 40–41 Kissena Boulevard—namely, two Department of Consumer Affairs licenses on the wall, certificates of incorporation, and stock certificates. (Am.Compl.¶¶ 64–66). All of it, of course, is beside the point. None of it, even if authentic, provided an exception to the January 30 order of protection. At that location, only "incidental" contact was excepted. And, obviously, business ownership and its indicia would not excuse the threatening and harassing conduct about which Tan and her employees complained to the police—crimes chargeable independent of any criminal contempt charge for violating an order of protection.

But, clearly, notwithstanding any other objectively reasonable grounds to conclude that probable cause to arrest Liang existed, the officers arrived at the store to find a confrontational scene, as the pleadings describe, with an order of protection barring the arrestee's presence there (except incidentally). This is enough to establish probable cause,

and no further investigation was required to justify the arrest. *See, e.g., Carthew,* 709 F.Supp.2d. at 197–99 (officers had probable cause based on victims statements, despite "plaintiff's claim that the building was his place of business and that [the victim] did not work there"); *Dudley,* 2008 WL 2149603 at \*5; *Welch,* 1997 WL 436382 at \*5. Indeed, "officers need not conduct an investigation which exculpates an arrestee.... To hold otherwise would be to allow every suspect, guilty or innocent, to avoid arrest simply by claiming 'it wasn't me .' " *Dukes v. City of New York,* 879 F.Supp. 335, 343 (S.D.N.Y.1995) (internal citations and quotations omitted); *see also Curley,* 268 F.3d at 70 ("[O]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.") (internal quotations omitted). [14] Liang's third arrest, which occurred on June 18, 2008, followed a similar pattern. On February 29, 2008, Tan obtained a second order of protection against Liang, the terms of which mirrored, or were stronger than, the January 30 order. (Exh. L). On March 24, Tan filed a complaint with the 109th Precinct, alleging that Liang had violated the second order two days earlier by harassing her by telephone. (Exh. M). The harassing call demanded payment of $200,000. (*Id.*). Tans' complaint also accused Liang of approaching her in the garage of the building in which they both lived while brandishing a knife at her. (Exh. M). On June 18, after learning that Detective Vaughn and other officers had been looking for him during the previous days, Liang voluntarily surrendered at the police station. (Am.Compl.¶¶ 82–84). There, he was arrested for violating the February 29 order of protection and was charged by a criminal complaint authored by Detective Vaughn. (Exh. U).

**\*10** Once again, Liang fails to plead a plausible false arrest claim. Given the antecedents of the arrest in the record, Liang is required, and fails, to offer reasons why the arresting officers should have doubted Tan's veracity. Instead, he accuses Detective Vaughn of refusing to credit his alibi for March 22, 2008. (Am.Compl.¶¶ 87–88). As discussed above, the case law makes clear that the officers were not obliged to accept Liang's explanation of events over Tan's, and were permitted to arrest him based on Tan's allegations. Stated differently, the officers had an objectively reasonable basis to believe that they had probable cause to arrest Liang for violating the February 29 order of protection.

For these reasons, the Court finds that the officers had probable cause, or a reasonable basis to find probable cause, on all three occasions Liang complains of. Consequently, his § 1983 claims and state law claims sounding in false arrest are dismissed with prejudice against the City defendants.

### c. Equal Protection Claims

In Count 1, Liang alleges that he was denied equal protection in violation of the Fourteenth Amendment because the City defendants selectively enforced state criminal laws against him. (Am.Compl.¶¶ 130–141). Specifically, he claims that he was selectively mistreated as compared to Tan on account of his gender. However, he fails to plead facts supporting his otherwise speculative assertions. Any claim of improper targeting for prosecution requires pleading of facts to support it. His equal protection claim fails because he offers no such facts in his pleading. *See, e.g., Kamholtz v. Yates County,* 350 Fed. Appx. 589, 590 (2d Cir.2009) (selective enforcement claim lacking sufficient factual support in the complaint was properly dismissed on a Rule 12(b)(6) motion); *33 Seminary LLC v. City of Binghamton,* 869 F.Supp.2d 282, 309–10 (N.D.N.Y.2012) (same).

Broadly, to succeed on a selective enforcement claim, a plaintiff must prove that "(1) compared with others similarly situated, [he] was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *See Brown v. Syracuse,* 673 F.3d 141, 151–52 (2d Cir.2012) (internal quotations omitted). There can be little doubt that an arrestee's gender is an "impermissible consideration" for the purposes of a selective enforcement claim. *See, e.g., Annis v. County of Westchester,* 136 F.3d 239, 247–48 (2d Cir.1998) (upholding jury's finding that county had selectively enforced workplace rules against plaintiff on account of her gender).

However, Second Circuit courts appear split on how to define "similarly situated." *See Viteritti v. Inc. Vill. of Bayville,* No. 10–CV–3283, 2013 WL 145811, *8 (E.D.N.Y. Jan.14, 2013) (describing competing definitions of "similarly situated"). Under the stricter definition, the aggrieved party must show that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the [treatment selectors] acted on the basis of a mistake." *Id.* (quoting *Ruston v. Town Bd. for the Town of Skaneateles,* 610 F.3d 55, 58 (2d Cir.2010)). Under the looser standard, the aggrieved party need only show that the comparator was or is "similarly situated in all material respects." *Viteritti,* 2013 WL 145811 at *8 (quoting *Vassallo v. Lando,* 591 F.Supp.2d 172, 184 (E.D.N.Y.2008)).

**11** Even under the looser standard, Liang still cannot satisfy the threshold showing described in *Brown.* He conclusorily states that he received disparate treatment as compared to Tan, (*see* Am. Compl. ¶¶ 135–38), but, from his recitation of the actual facts, it is readily apparent that the two were not "similarly situated in all material respects." As discussed in section II.b, *supra,* the City defendants arrested Liang on all three occasions after specific allegations of criminal behavior —physical abuse, verbal harassment, theft of property, violations of the orders of protection, making threatening statements, and brandishing a weapon—had been leveled against him by the putative victims. By contrast, Liang does not allege that he or anyone else ever made complaints about criminal behavior against Tan at or around the time of his arrests, let alone the kinds of allegations that would cause her to be "similarly situated in all material respects." On this ground alone, his selective enforcement claim is subject to dismissal. *See, e.g., Christian v. Town of Riga,* 649 F.Supp.2d 84, 94 (W.D.N.Y.2009) (dismissing selective enforcement claim because plaintiff failed to plead facts showing disparate treatment to similarly situated individuals).

Assuming, *arguendo,* that Liang could satisfy *Brown's* first prong, his claim would still fail on the second. Front and center are Liang's charge that law enforcement selectively targeted him based on his gender, and/or their malicious intent to deprive him of equal protection. What is missing from his pleadings is something that plausibly pegs this claim to facts. Without even a whiff of facts other than the gender difference between Liang and Tan, all that is offered are naked assertions of discrimination. (*See* Am. Compl. ¶¶ 134–35, 137). They cannot survive a 12(b)(6) motion. *See, e.g., 33 Seminary LLC,* 869 F.Supp.2d at 309–10 (plaintiffs failed to satisfy second prong of selective enforcement claim because their claims were based on "mere[ly] conclusory allegations"); *John Gil Const., Inc. v. Riverso,* 99 F.Supp.2d 345,

353 (S.D.N.Y.2000) ("[P]laintiff's assertions of selective enforcement and racial animus are wholly conclusory and unaccompanied by any supporting factual allegations.");

*Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987) ("[I]t is well settled that ... allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983."). Nor do they support Liang's claim here, which is dismissed with prejudice.

### d. Civil RICO Claims

Next for consideration are Liang's claims that he was injured by violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* To maintain a civil action under RICO, a plaintiff must show "(1) a violation of the RICO statute; (2) an injury to business or property; and (3) that the injury was caused by the violation of RICO." *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,* 268 F.3d 103, 107 (2d Cir.2001). To state a violation of the RICO statute, the plaintiff must allege "(1) conduct (2) of an enterprise [15] (3) through a pattern (4) of racketeering activity, which is defined to include specified predicate acts." [16] *Zimmerman v. Poly Prep Country Day School,* 888 F.Supp.2d 317, 327 (E.D.N.Y.2012) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473, U.S. 479 (1985)). A plaintiff may also advance a cause of action for conspiracy to violate RICO, regardless of whether the predicate acts were successfully carried out. *See* 18 U.S.C. § 1962(d). Courts have required that "each predicate act ... be articulated clearly in a civil RICO complaint. This articulation requirement is particularly enforced when, as in the case at bar, a RICO civil conspiracy claim is made." *Rafter v. Bank of America,* No. 04–Civ.–3341, 2009 WL 691929, at *14 (S.D.N.Y. Mar. 12, 2009).

**\*12** Liang alleges that the City defendants violated RICO by harassing him and taking false complaints against him. (Am.Compl.¶¶ 156–157, 160). He further claims that the City defendants conspired together and with the non-City defendants to violate his constitutional rights, harass and falsely arrest him, seize his business and property, and accept benefits from the non-City defendants in order to harm him. (*Id.* ¶¶ 158–159, 161–164). His litany of injurious wrongs include complaints that he suffered physical, emotional, mental, and financial harm as a result of the conduct violating RICO. (*Id.* ¶ 165).

At the pleading doorway, Liang's RICO claim against the City itself is dismissed because, as many previous courts in this Circuit have held, "a municipal corporation is incapable of having the criminal intent to support RICO's predicate offense requirement." *Brewer v. Vill. of Old Field,* 311 F.Supp.2d. 390, 398 (E.D.N.Y.2004) (internal quotations and alterations omitted); *see also, e.g., Rafter,* 2009 WL 691929, at *15; *Pilitz v. Inc. Vill. of Rockville Centre,* No. 07–CV–4078, 2008 WL 4326996, at *5 (E.D.N .Y. Sept. 22, 2008); *Interstate Flagging, Inc. v. Town of Darien,* 283 F.Supp.2d. 641, 645–46 (D.Conn.2003); *Frooks v. Town of Cortlandt,* 997 F.Supp. 438, 457 (S.D.N.Y.1998); *Wee v. Rome Hosp.,* No. 93–CV–498, 1996 WL 191970, at *5 (N.D.N.Y. Apr. 15, 1996); *O & K Trojan, Inc. v. Mun. & Contractors Equipment Corp.,* 751 F.Supp. 431, 434 (S.D.N.Y.1990); *Nu–Life Construction Corp. v. Bd. of Educ.,* 779 F.Supp. 248, 251 (E.D.N.Y.1991). Furthermore, because the City is immune to civil RICO liability, its individual officers and agents are similarly immune in their official capacities. *See, e.g., Frooks,* 997 F.Supp. at 457 ("[B]ecause the Town cannot be held liable under RICO as a matter of law, neither may the Town employees in their official capacities."); *Rini v. Zwirn,* 886 F.Supp. 270, 295 (E.D.N.Y.1995 ("[S]ince the municipality cannot be held liable for the acts of its agents, the Town employees, in their official capacity, cannot be held liable under RICO."). All civil RICO claims against the individual City defendants in their official capacities are dismissed. *See Wood v. Inc. Vill. of Patchogue of New York,* 311 F.Supp.2d. 344, 354 (E.D.N.Y.2004).

Plaintiff fares no better on his individual capacity claims against the City defendants. None of his allegations are more than "merely consistent" with these officers' liability, had such liability otherwise been plausibly pleaded. *Iqbal,* 556 U.S. at 678. Bluntly, he fails to state facts that plausibly allege racketeering activity. Under § 1961(1), "racketeering activity" encompasses an extensive catalogue of prohibited activities that range from murder to mail fraud. 18 U.S.C. § 1961(1); *see, supra,* p. 27 n. 16. Liang's complaint cites none of the predicate offenses listed in § 1961(1). In their stead, he alleges in vague terms that the City defendants harassed and accepted false complaints against him, and that

they conspired with the non-City defendants to do both of those things, as well as to violate his constitutional rights, falsely arrest him, and seize his business and property. (Am.Compl.¶¶ 156–164). None of these acts are among the possible predicate offenses listed in 🔖 1961(1).

**\*13** Hinged to Liang's RICO claim, but an overtone throughout the entire complaint, is his theory of a grand conspiracy—that the City defendants conspired with non-City defendants to punish him and deprive him of his constitutional rights, and did so corruptly (as RICO predicates) in exchange for bribes, gratuities, and other benefits from Tan. (*Id.* ¶¶ 2, 26, 180, 232, 159). The only "benefits" that Liang points to are a demo phone line that Detective Zee allegedly activated, which provides free cell phone calls, and a wireless account that Detective Hawkins opened with EW Studio, one of the companies Tan and Liang had operated together. (*Id.* ¶¶ 55–56).

Deemed true for the purposes of the motion, the fact train stops there. Standing alone, these acts do not qualify as predicate RICO offenses, nor even crimes. The void left by the absence of pleaded facts connecting any of the charged conduct to a conspiracy is even more gaping. No facts supporting the existence a criminal scheme of any kind are pleaded. *See* 🔖 *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (RICO conspiracy must involve a pattern of "related" offenses that "amount to or pose a threat of continued criminal activity"). Indeed, Liang does not even allege that Tan was responsible for providing Zee with access to the demo line, or that Hawkins did not pay for the wireless account with EW Studio. Liang's assertions, plainly, do not "allow[ ] the court to draw the reasonable inference that the defendant[s]" are liable for violating RICO by taking bribes in a conspiracy whose focal point is plaintiffs cell phone business. 🔖 *Iqbal,* 556 U.S. at 678.

What remains of the wrongdoing charges offered to advance the RICO claim are, at the end, Liang's allegations that Detective Zee and/or un unidentified associate threatened Liang's attorney not to proceed with a real estate transaction; that Defendant Scali convinced two individuals—Xiao Yun Li and an otherwise unidentified "retired police officer Phil"—to falsely accuse him of plotting to murder Detective Zee; that Liang had seen Detective Zee leaving the 41–40 Kissena Boulevard store in September 2008; and that in response to two complaints he had filed, the NYPD

Investigations Unit informed Liang there was sufficient evidence to prove unspecific misconduct charges against Detective Zee. (Am.Compl.¶¶ 52, 96–97, 106–107, 119–120).

RICO requires more than a scattergun blast. Accepting as true, as the Court must, the litany of peccadilloes pleaded by Liang (even those allegations that are not criminal in nature), Liang pleads no facts showing a pattern of racketeering activity within the meaning of RICO. Of the acts so alleged, only "threatening" (a conclusory allegation) an attorney not to proceed with a legal transaction might conceivably fall within one of the predicate offenses described in 🔖 § 1961(1). Yet, at the amended complaint stage, the nature of the putative "threat" is entirely undescribed. In any case, a single predicate offense will not suffice. Rather, a plaintiff must show a pattern of predicate offenses—at least two—such that the acts are "related, and that they amount to or pose a threat of *continued criminal activity."* 🔖 *H.J. Inc.,* 492 U.S. at 239 (emphasis added). Liang pleads no facts to suggest that the City defendant have constructed a network of related and ongoing racketeering activities. For this reason in isolation, his RICO claim fails against those defendants involved in this list of alleged misdeeds.

**\*14** Furthermore, Liang does not show the existence of an "enterprise" within the meaning of RICO, which defines it as "group of persons associated together for a common purpose of engaging in a course of conduct" and united by "an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." 🔖 *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Although Liang levels most of his fire against officers or detectives from NYPD's 109th Precinct, the bullets are blank. He pleads no facts to support his conclusory assertions that the City defendants constitute, control, or participate in an enterprise with a distinguishable existence or purpose. Nor, from what is in the record, may the Court infer the existence of an enterprise with the objective, as plaintiff effectively claims, to persecute him through a pattern of racketeering activity. Without such an enterprise, a RICO claim like Liang's must fail.

Finally, Liang accuses the City defendants of conspiring to violate RICO. The requirements for maintaining a cause of action under 🔖 § 1962(d), which creates a private right of action to bring RICO conspiracies to justice, "are less demanding" than those for standard-issue RICO claims. To

be liable, a " 'conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.' "

*Baisch v. Gallina,* 346 F.3d 366, 376–77 (2d Cir.2003)

(quoting *Salinas v. United States,* 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)). "In the civil context, a plaintiff must allege that the defendant knew about and agreed to facilitate the scheme." *Baisch,* 346 F.3d at 377 (internal quotations omitted).

Liang's RICO conspiracy claim is no more meritorious than his standard RICO claim, and for the simple (and identical) reason that he has pleaded no facts suggesting either the kind of "scheme" described in *Baisch* or any enterprise intent on executing such a scheme. To state a claim for a RICO conspiracy, "mere allegations of agreement to commit predicate acts are insufficient." *Browning Ave. Realty Corp. v. Rosenshein,* 774 F.Supp. 129, 145 (S.D.N.Y.1991) (describing the holding in *Morin v. Trupin,* 711 F.Supp. 97, 111–12 (S.D.N.Y.1989)). At the core, a plaintiff must plead facts from which a court may infer that a "meeting of the minds" occurred between the defendants. *Rosenshein,* 114 F.Supp. at 145. Liang fundamentally fails to meet that standard, pleading no facts to support the conclusion that there was a meeting of the minds, or to permit even an inference supporting it. As a result, all of Liang's RICO claims, including his claims alleging a conspiracy to violate RICO, are dismissed as to the City defendants.

*e. Claims Under* 42 U.S.C. § 1985(3)

Civil rights law § 1985(3) allows plaintiffs to sue state officials who have conspired to violate their constitutional rights. *Morpurgo v. Inc. Vill. of Sag Harbor,* 697 F.Supp.2d 309, 339 (E.D.N.Y.2010). A plaintiff advancing such a claim must plead facts that show: 1) a conspiracy; 2) for the purpose of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is injured in his person or property or deprived of a right or privilege of a citizen.

*See* *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999). A conspiracy is "an agreement between two or more individuals where one acts in further[ance] of the objective of the conspiracy and each member has knowledge of the nature

and scope of the agreement." *Morpurgo,* 697 F.Supp.2d at 339. To sustain a § 1985 claim, a "plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord,* 340 F.3d 105, 110 (2d Cir.2003). Further, for a § 1985(3) claim to survive dismissal, the conspiracy must also be "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas,* 165 F.3d at 146 (internal quotations omitted).

**\*15** Liang's § 1985(3) claim fails as a matter of law because, as discussed previously, he has pleaded no facts suggesting a "meeting of the minds" among the City defendants, or any subset of them, or by any one of them with any other person, to violate his civil rights. Although his complaint states, for instance, that "defendants acted together to deprive Plaintiff of equal protection and of forth (sic) amendment protection from unlawful search and seizure," and that they "conspired ... to victimize the plaintiff and take his business away from him," (Am.Compl.¶¶ 16–21, 206), these are textbook examples of the kinds of conclusory allegations that are devoid of factual content. The crumbling point is Liang's failure to plead facts to support a conspiratorial meeting of the minds. From plaintiffs vantage point, the claim is nevertheless tantalizing. Given the nature of police work, seizure of person and property (clearly a harm) is often the result of officers working together as a team to execute a common plan. What is missing from the pleadings are any facts plausibly showing that any of the City defendants' conduct was prompted by a meeting of the minds to a commit a constitutional violation. *See, e.g.,* *Webb,* 340 F.3d at 110 (rejecting a § 1985(3) claim because "plaintiffs have not alleged, except in the most conclusory fashion, that any such meeting of the minds occurred among any or all of the defendants"); *Bod die v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("[A] complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.") (internal quotations omitted).

Furthermore, plaintiff's § 1985(3) claim presents no facts supporting the charge that the conspiratorial harm flowed from "some racial or perhaps otherwise class-based,

invidious discriminatory animus behind the conspirators' action." *Thomas, 165 F.3d at 146* (internal quotations omitted). Liang asserts that the City defendants discriminated against him based on his gender and "arbitrarily chose[ ] to support the female complainant." (Am.Compl.¶¶ 134, 137). Assuming that any non-race based claims qualify, and assuming further that if gender claims *do* qualify, that males fall within a protective umbrella, all there is to support such a claim is Liang's bald assertions that gender drove the conspiracy. That is, as is his entire claim, wholly without support. The § 1985(3) claims is dismissed.

### f. Monell *Claims*

Liang also brings a claim for *Monell* liability against the City of New York under § 1983. A § 1983 cause of action against a municipality cannot be premised on *respondeat superior. See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).* Instead, a plaintiff suing a city under § 1983 must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir.2008)* (citing *Monell v. Dep't of Social Servs., 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); see also Pearl v. City of Long Beach, 296 F.3d 76, 87 (2d Cir.2002)* (under *Monell,* "a municipality could be held liable for constitutional torts committed pursuant to a municipal custom or policy"). *See also Roe, 542 F.3d at 36* ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.").

**\*16** Under *Monell,* an actionable municipal policy or custom exists in the following circumstances:

> (1) the existence of a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making

authority, which caused the alleged violation of plaintiffs civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with the municipal employees.

*Bliven v. Hunt, 478 F.Supp.2d 332, 336–37 (E.D.N.Y.2007)* (citing *Moray v. City of Yonkers, 924 F.Supp. 8, 12 (S.D.N.Y.1996)).* If a plaintiff seeks to show a city policy by referring to only a single act, that act must have been committed by a city official "responsible for establishing final policy with respect to the subject matter in question," and must represent a deliberate and considered choice among competing alternatives. *Pembaur v. City of Cincinnati, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).* If the plaintiff is challenging what he claims is an unofficial custom or practice of the city, he must show that the practice was "so widespread as to have the force of law." *Id.* (quoting *Bd. of Cnty. Comm'rs, 520 U.S. at 404).* The custom "need not [have] receive[d] formal approval by the appropriate decision-maker ... [but] plaintiff must prove ... that [it] is permanent." *Davis v. City of New York, 228 F.Supp.2d 327, 337 (S.D.N.Y.2002)* (internal citations omitted).

Plaintiff cannot establish a claim for *Monell* liability. He charges generally that the City "maintains an unconstitutional policy, practice, and custom of toleration and approval of their detectives receiving bribes from one party to harass and assault another party," as well as "policies or customs exhibiting deliberate indifference to the constitutional rights of victims of hate crimes in the jurisdiction of the 109th precinct." (Am.Compl.¶¶ 232–32). However, using the same whole cloth throughout, the complaint is entirely devoid of facts to buttress these assertions. Liang makes no claim, much less pleads facts showing, that the City has enacted any sort of official policy pursuant to which his rights were violated, and his allegations regarding an unofficial practice or custom are limited to the actions of specific detectives in a single police

unit and factually supported only by a pleader's perceptions of his own experience.

Though accepted as true on the motion, these factual allegations show nothing like the kind of "widespread" and "permanent" unconstitutional practices or customs that *Monell* implicates. Nor does Liang include any facts showing that a single city official with final decisionmaking authority had any awareness of the supposed "policies or customs" he describes, let alone enacted, formulated, or ratified those policies. Indeed, he actually pleads facts to the contrary—that NYPD's Investigations Unit was investigating Liang's claims against Detective Zee actions because they were *out* of policy. (*See* Am. Compl. ¶ 120).

 **\*17** Furthermore, Liang fails to plead facts indicating that the City's alleged failure to properly train or supervise its police officers was so egregious as to amount to "deliberate indifference" to the rights of individuals such as plaintiff. Although he contends that defendants Conforti, Michetti, and Natoli negligently supervised the officers under their command by failing to prevent the actions of which he complains, that charge is but another factually unsupported conclusion. It provides no prop for *Monell* liability.

Finally, as a related matter, Liang brings charges personally against Police Commissioner Kelly and Deputy Inspector Maguire of the 109th Precinct in their official capacities only. An official-capacity suit is in essence another avenue to sue the government entity to which the agent belongs. *See, e.g.,* 🔖 *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("An official-capacity suit against a state officer is not a suit against the official but rather is a suit against the official's office. As such it is no different from a suit against the State itself.") (internal quotations omitted); 🔖 *5 Borough Pawn, LLC v. City of New York,* 640 F.Supp.2d 268, 297 (S.D.N.Y.2009) ("A suit for damages against a municipal officer in their official capacity is the equivalent of a damage suit against the municipality itself.") (internal quotations omitted). Consequently, Liang's claims against Commissioner Kelly and Deputy Inspector Maguire, being equivalent to his *Monell* claim against the City, are dismissed along with the claims against the City, and for the same reasons.

 *g. The Sole Remaining Federal Claim for Unreasonable Search and Seizure*

The Court having dismissed Liang's federal claims for false arrest, denial of equal protection, RICO violations, and conspiracy to violate civil rights, his sole remaining federal cause of action is a 🔖 § 1983 claim for unreasonable search and seizure under the Fourth Amendment. Because the City defendants have explicitly declined to include this claim in their motion to dismiss, and since the parties have not briefed the issue, the Court does not address it. The Court does, though, observe that Liang may only sue those officers who are alleged to have been personally involved in the searches and/or seizures in question. *See, e.g.,* 🔖⚠ *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) ("It is well settled in [the Second] Circuit that *personal involvement* of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under 🔖 § 1983.") (emphasis added) (internal quotations omitted); 🔖 *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986) (a plaintiff in a 🔖 § 1983 suit must allege "a tangible connection between the acts of the defendant and the injuries suffered"). Therefore, though not deciding the viability of the claim *in toto,* the Court notes these limiting parameters of case law. At no point does Liang plead facts connecting defendants Kelly, Maguire, Scali, or Natoli to the relevant searches or seizures in any personal manner. Accordingly, to the extent plaintiff's unreasonable search and seizure claim intended to encompass these individual defendants, those claims are dismissed by force of the Court's other determinations.

 *h. State Law Claims*

 **\*18** Liang also interposes a slew of state law claims against the City defendants that are largely duplicative of his federal claims. The Court shall address them in turn. [17] First, he asserts a cause of action for unlawful detention and confinement, which is fundamentally identical to his federal false arrest claim. (Am.Compl.¶¶ 151–154). For the reasons discussed in section II.b, *supra,* the claim is dismissed. Likewise, his cause of action for filing false complaints is effectively another iteration of false arrest, (*id.* ¶¶ 167–178), and is dismissed as well. [18]

Next, Liang asserts a cause of action for tortious interference with contract. (*Id.* ¶¶ 184–192). To succeed on such a claim, Liang would have to plead "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional

procuring of the breach; and (4) damages." *Foster v. Churchill,* 87 N.Y.2d 744, 749–50, 642 N.Y.S.2d 583, 665 N.E.2d 153, 156 (1996). Liang alleges that he had "valid contracts with Open Lifetime Group and a store at 41–40 Kissena Blvd.," that the City defendants "knew of the contract as evidenced by his [sic] relationship with Plaintiffs ex-girlfriend, Defendant Tan," and that they "intentionally interfered with the contract by engaging in false arrests of Plaintiff." (Am.Compl.¶¶ 184–86). Putting aside the question of whether Liang has otherwise pleaded a plausible tortious interference claim, he does specifically plead that his false arrests were the wrongful acts of interference. Since the Court has already found that Liang has not plausibly pleaded viable false arrest claims, his tortious interference claim, with its pleaded link to these allegations, lacks an essential element, and it, too, is dismissed as a matter of law.

Incidentally, as putatively additional component of his tortious interference claim, Liang alleges that "Defendant Zee intentionally interfered with the contract by accepting the demo phone." (Am.Compl.¶ 191). First, he does not specify what contract he is referring to, nor does he plead facts indicating breach. Furthermore, aside from being a naked accusation of a *quid pro quo* (and therefore insufficiently pleaded), it is clear that even this naked claim suggests nothing more than a motive for Detective Zee's "false" arrest of Liang. Neither the interactions between Zee and Tan, nor any other factual allegations in the complaint, plausibly support a claim that Zee or any other defendant tortiously interfered in Liang's contractual relationships.

Liang's next claim is for negligent supervision against the City defendants. As discussed in Section II.f, *supra,* he pleads no material facts to support his conclusory allegations that the supervisory officials exercised improper oversight over subordinate officers. As a consequence, this claim fails as a matter of law.

Lastly, plaintiff advances catchall claims against the City defendants under the New York State Constitution for violating the same kinds of rights protected under the United States Constitution, and for violating the state's police power. (*Id.* ¶¶ 180–82, 194–98, 642 N.Y.S.2d 583, 665 N.E.2d 153). The parallel pleading on identical facts yields a

congruent result. More importantly, "a private right of action for a violation of the [New York] Constitution is unavailable where an alternative remedy ... exists." *Waxter v. State,* 33 A.D.3d 1180, 1181, 826 N.Y.S.2d 753, 754 (3d Dep't 2006) (citing *Lyles v. State of New York,* 2 A.D.3d 694, 770 N.Y.S.2d 81 (2d Dep't 2003)). As is, by now, obvious, Liang has had a whole host of alternative remedies available to him to vindicate every claim of harm. (Indeed, a federal search and seizure claim remains open.) Plaintiff has made no showing that he lacks an alternative remedy, justifying a private right of action under New York's state constitution. He has convincingly established just the opposite. That his pursuit of alternative relief fails for lack of merit *does not* mean the alternate avenues to relief did not exist.

**\*19**  As for Liang's claim that the City defendants "violat[ed] the state's police power," after the pleadings, it is hard to divine what that last straw is. It seems to amount to nothing more than a vague recapitulation of all his claims that the City and its police officers cloaked with and wielding the power of state law acted unlawfully and caused him injury. It duplicates his federal civil rights claims, but, if having any legitimacy under state law at all, it must be viewed as a private action claiming violations directly under the New York State constitution. The availability of alternative remedies defeats it.

*Conclusion*

For the reasons set forth above, the motion of New York City and its defendant employees is granted. All claims against them are dismissed, except for Liang's § 1983 claim for unreasonable search and seizure under the Fourth Amendment. That claim survives, but only as to defendants Zee, Hawkins, Shim, Vaughn, Conforti, and Michetti. [19]

So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5366394

# Footnotes

1      Captain Conforti is listed in the complaint as a lieutenant, but, according to the City defendants, his current rank is that of captain.

2      Plaintiff did not provide a first name for Sergeant Michetti. Defendants state that they have been unable to identify any such individual and have received no request for legal representation by anyone of that name. (City Defs.' Mem. (Dkt. No. 55) at 1 n. 1). However, as a purported officer in the NYPD, the Court considers him among the City defendants and considers their arguments on his behalf.

3      Although they have not moved to dismiss this count, the City defendants have hardly conceded it. They have reserved what is certainly the right to move for summary judgment later. (City Defs.' Mem. at 1 n. 2).

4      According to plaintiff, the City defendants received "benefits" from the civilian defendants that included a demo line for unlimited cell phone calls and cell phone accounts; in exchange, City defendants "took the cell phone business from [p]laintiff and gave it to [defendant] Tan." (Pl.'s Mem. (Dkt. No. 56) at 11).

5      Tan asserts in her answer that the relationship began in 2002 (Def. Tan's Ans. (Dkt. No. 38) ¶ 5), but on a motion to dismiss, the Court must accept as true all factual allegations in the complaint and decide factual disputes in favor of the nonmoving party. *See* *Midouin v. Downey Savings and Loan Ass'n, F.A.,* 834 F.Supp.2d 95, 102 (E.D.N.Y.2011).

6      The arrest was actually made shortly after midnight on July 9. (Exh. D).

7      Liang does not identify the landlord of 40–41 Kissena Boulevard.

8      It is unclear precisely which non-City defendants were at the store when Liang arrived. The criminal complaint filed against Liang mentions Wang (Krasnow Decl., Exh. G); Tan mentions Wang and Song in her statement (Krasnow Decl., Exh. K); and the Amended Complaint mentions Quek. (Am.Compl.¶ 58). That someone was there is not disputed; the identities of the entire cast *are* disputed, but the issue is immaterial to this motion.

9      Liang submitted the first of these complaints on July 11, 2008, and the second on or about September 18, 2008, after allegedly seeing Detective Zee walking out of the store at 41–40 Kissena Boulevard. (Am.Compl.¶¶ 96–97).

10      Although plaintiff does not specifically cite 42 U.S.C. § 1985 in this count, it is clear from the context of the complaint that he intends to assert this cause of action.

11      Counts 1, 2 and 3 are folded into Liang's § 1983 claim, which is the statutory vehicle by which an individual may assert a private cause of action against state officials for federal constitutional injuries.

12      Although Liang explicitly references a complaint filed against him regarding the third incident for which he was arrested, he dates this complaint March 22, 2008. (Am.Compl.¶¶ 81, 148(a)). Exhibit V is dated July 18, 2008, and is therefore not incorporated by reference into the complaint.

13      Liang also asserts a false arrest claim against Detective Shim in connection with the July 9 arrest. However, in the complaint, Liang merely alleges that he saw Detective Shim at the airport when he was being escorted a customs agent. (Am.Compl.¶ 37). This allegation cannot support a claim against Detective Shim for false arrest, and the count is dismissed as to that defendant as well.

14    In any event, it is of no moment whether Liang owned and operated a business out of 40–41 Kissena Boulevard, since stay away orders often forbid an individual from entering a place he previously shared with the victim. *See, e.g., Joan FF. v. Ivon GG,* 85 A.D.3d 1219, 1219–20, 924 N.Y.S.2d 611, 611 (3d Dep't 2011) (upholding issuance of order of protection barring plaintiff from entering apartment he had shared with victim); *People v. Qike,* 182 Misc.2d 737, 740, 700 N.Y.S.2d 640, 643 (Sup.Ct., Kings County 1999) (defendant required to vacate apartment he shared with victim after an order of protection was issued against him); *People v. Scott,* 195 Misc.2d 647, 649, 760 N.Y.S.2d 828, 830 (Sup.Ct., Kings County 2003) (noting that a home owner can be convicted of burglary for unlawfully entering his own home in defiance of an order of protection).

15    The statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." ⚑18 U.S.C. § 1961(4).

16    These predicate acts must fall within one of the following categories: a broadly-defined class of offenses encompassing most state—level felonies; an enumerated list of federal felonies; certain offenses pertaining to union and labor activities; various fraud offenses; acts indictable under the Currency and Foreign Transactions Reporting Act; specified acts indictable under the Immigration and Nationality Act; and any act that is indictable under any provision listed in ⚑18 U.S.C. § 2332b(g)(5)(B). ⚑18 U.S.C. § 1961(1). A "pattern of racketeering activity" means two or more predicate acts separated by fewer than ten years. ⚑*Id.* § 1961(5).

17    With regard to any state law claims, the Court may only exercise jurisdiction over them if they are "so related" to his remaining federal claim for unreasonable search and seizure "that they form part of the same case or controversy." ⚑*Montefiore Med. Ctr. v. Teamsters Local 272,* 642 F.3d 321, 332 (2d Cir.2011) (quoting ⚑28 U.S.C. § 1367(a)). That is, the claims "must stem from the same common nucleus of operative fact," and "must be such that the plaintiff would ordinarily be expected to try them all in one judicial proceeding." ⚑*Montefiore Med. Ctr.,* 642 F.3d at 332 (citing ⚑*United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).

18    In the fact section of his complaint, Liang alleges that defendant Scali convinced two individuals—Xiao Yun Li and an unidentified "Officer Phil"—to accuse Laing of "want[ing]" and "attempting" to murder defendant Zee. It is not clear whether he intended to include these allegations as part of his claim against the City defendants for filing false complaints. If he did, they are dismissed along with that claim. Even assuming these allegations are true, Liang makes no claim that any claims or charges were brought against him for attempt or conspiracy to commit murder, nor that he was ever arrested on those grounds. These accusations also concern entirely different events from those on which he bases his Fourth Amendment claim. Hence, they are not part of the same "common nucleus of operative fact," ⚑*Montefiore Med. Ctr.,* 642 F.3d at 332, and the court lacks jurisdiction over those claims in any event.

19    Because plaintiff has neither identified nor served John and Jane Doe defendants despite ample time to amend his complaint, and because he has not alleged facts in the complaint supporting Fourth Amendment claims against them, all causes of action against John and Jane Doe defendants are dismissed. *See* Fed.R.Civ.P. 4(m); *Hayward v. City of New York,* No. 12—CV—3220, 2012 WL 3580286, at *2 (E.D.N.Y. Aug. 17, 2012); ⚑*Cantave v. New York City Police Officers,* No. 09—CV—2226, 2011 WL 1239895, at *8 n. 4 (E.D.N.Y. Mar.28, 2011).

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 75029
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

R. Bertil PETERSON, Plaintiff,
v.
The CITY OF NEW YORK, et al., Defendants.

No. 11 Civ. 3141(DLC).
|
Jan. 9, 2012.

**Attorneys and Law Firms**

Richard Bertil Peterson, Lake Success, NY, pro se.

Diana Marsh Murray, NYC Law Department, Office of the
Corporation Counsel (N.Y.C), New York, NY, for defendants
City of New York and Kevin Watz.

OPINION & ORDER

DENISE COTE, District Judge.

**\*1** *Pro se* plaintiff R. Bertil Peterson ("Peterson") brings
this action against the City of New York (the "City"),
Police Officer Kevin Watz ("Officer Watz"), and one-hundred
unnamed employees, independent contractors, agents, and/
or assignees. Peterson brings claims for compensatory
and punitive damages, attorney's fees, and costs pursuant
to §§ 1962(c) and (d) of the Racketeer Influenced and
Corrupt Organizations Act, 🚩 18 U.S.C. § 1962, the Fourth
Amendment to the U.S. Constitution, Article I § 12 of the New
York State Constitution, 🚩 42 U.S.C. § 1983, 🚩 42 U.S.C. §
1988, 🚩 New York Civil Practice Law and Rules § 8303–a,
and New York State law. The City and Officer Watz have filed
a motion to dismiss the complaint for lack of subject matter
jurisdiction and for failure to state a claim. For the following
reasons, the motion to dismiss is granted with respect to all
of plaintiff's federal claims with the exception of his Fourth
Amendment claim of unreasonable seizure. Certain state law
claims and the unreasonable seizure claim are stayed.

*BACKGROUND*

The following facts are taken from the plaintiff's
complaint unless otherwise noted, and are taken to be
true for purposes of this motion. *LaFaro v. New York
Cardiothoracic Group, PLLC,* 570 F.3d 471, 475 (2d
Cir.2009). On March 6, 2010, Peterson was pulled over
for a traffic stop by Officer Watz, and was issued a traffic
summons for driving while using a cell phone. Peterson
claims that he was not, in fact, using his cell phone prior
to being pulled over.

On May 14, 2010, a hearing on the traffic violation
was held before Department of Motor Vehicles ("DMV")
Administrative Law Judge William Lee ("ALJ Lee"). ALJ
Lee convicted Peterson of improper cell phone use in
violation of 🚩 New York State Vehicle & Traffic Law, Article
33, § 1225–c. Peterson was fined 130 dollars, including a
30 dollar surcharge. Peterson maintains that he produced
evidence at this hearing, such as his cell phone records,
that demonstrates his innocence. He also claims that he
successfully impeached the testimony of Officer Watz during
cross-examination.

On October 12, 2010, the State of New York DMV
Appeals Board sustained the determination of ALJ Lee. On
November 1, 2010, Peterson filed a petition in the New York
State Supreme Court pursuant to Article 78 of the CPLR
seeking to annul, vacate, and set aside the determination
of the DMV Appeals Board. On January 12, 2011, the
petition was transferred to the Appellate Division, Second
Judicial Department. The defendants have asserted that this
proceeding (the "Article 78 Proceeding") is currently pending
before the Appellate Division, and Peterson has not countered
this assertion.

Peterson filed his complaint in this Court on May 10, 2011.
The complaint asserts the following nine causes of action
against all defendants:

1. A substantive RICO violation pursuant to 🚩 18
U.S.C.1962(c);

2. A RICO conspiracy pursuant to 🚩 18 U.S.C.1962(d);

**\*2** 3. An illegal search and seizure in violation of the
Fourth Amendment of the Constitution and Article I §
12 of the New York State Constitution;

4. Malicious prosecution pursuant to 🚩 § 1983 and the
Fourth Amendment;

5. Malicious abuse of process under § 1983 and the Fourth Amendment;

6. A procedural due process violation pursuant to § 1983 and the Fourteenth Amendment;

7. A claim for costs and attorney's fees pursuant to 42 U.S.C. § 1988 and CPLR § 8303–a;

8. Malicious prosecution under New York State law; and

9. Malicious abuse of process under New York State law.

On August 15, 2011, defendants the City and Officer Watz moved to dismiss the complaint under Rules 12(b)(1) and 12(b)(6), Fed.R.Civ.P., on grounds that the Court should abstain from exercising jurisdiction over the federal claims in light of plaintiff's pending state proceeding, that plaintiff failed to state a federal claim, that the Court should decline to exercise supplemental jurisdiction over State law claims, and that the complaint failed to state a State law claim in any case. The motion to dismiss was fully submitted on October 31, 2011. For the following reasons, the federal claims in counts one, two, and four through seven, and the state law claims in counts eight and nine, are dismissed for failure to state a claim. The remaining claims are stayed until completion of the Article 78 Proceeding.

*DISCUSSION*

On a motion to dismiss under Rule 12(b)(6), the court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro,* 570 F.3d at 475 (citation omitted). A complaint must do more, however, than offer "naked assertions devoid of further factual enhancement," and a court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009). Accordingly, a court may disregard "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id.* at 1940.

Furthermore, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 1949 (citation omitted). If the factual allegations "are merely consistent with a defendant's liability, [the complaint] stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation omitted).

Applying this plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. There must be a "reasonably founded hope that the discovery process will reveal relevant evidence." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 563 n. 8, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citation omitted). "Plausibility thus depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L–7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 430 (2d Cir.2011).

**\*3** Pleadings filed by *pro se* plaintiffs are to be construed liberally. *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010). The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims. *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004).

## I. The RICO Claims
The City and Officer Watz have moved to dismiss the complaint's two RICO claims. To state a viable RICO claim pursuant to 18 U.S.C. § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496. To state a RICO claim pursuant to 18 U.S.C.1962(d), a plaintiff must allege a conspiracy to commit a substantive RICO violation pursuant to 18 U.S.C. § 1962(a), (b), or (c). *See* 18 U.S.C. § 1962(d).

An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In his complaint, Peterson describes the RICO enterprise as consisting of an "associationin-fact" among the named and unnamed defendants. An "association-in-fact" enterprise must have at least three structural features: 1) a purpose, 2) relationships

among those associated with the enterprise, and 3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Boyle v. United States,* 556 U.S. 938, 129 S.Ct. 2237, 2244, 173 L.Ed.2d 1265 (2009). Accordingly, a plaintiff's "conclusory naming of a string of entities does not adequately allege an enterprise." *First Capital Asset Management, Inc. v. Satinwood, Inc.,* 385 F.3d 159, 175 (2d Cir.2004) (citation omitted).

Peterson does not plead sufficient facts to support a plausible claim to the existence of an association-in-fact enterprise. Peterson claims that the defendants participated in a racketeering scheme whereby 1) police officers would illegally stop and detain motorists and falsely accuse them of violating traffic laws, 2) police officers would present false testimony at hearings before DMV Administrative Law Judges ("ALJs"), 3) the DMV ALJs would validate this false testimony and find innocent motorists guilty of traffic violations, and 4) the DMV Appeals Board would affirm these convictions. In furtherance of this scheme, Peterson claims that defendants and their co-conspirators adopted rules that made it easier to convict motorists of traffic violations, such as not providing for prehearing discovery or a supporting deposition, and allowing ALJs to question motorists and convict them based on "clear and convincing evidence." According to Peterson, the scheme garnered over \$76 million in traffic fines, surcharges and suspension termination fees.

In support of these claims, Peterson alleges the following facts: that he was not driving while using his cell phone, that he was nonetheless subject to a traffic stop and issued a traffic summons by Officer Watz, that he was convicted by ALJ Lee after an opportunity to present his case and cross-examine Officer Watz, that this conviction was upheld on appeal, that the DMV has adopted certain rules of procedure and evidence in its adjudicatory proceedings that differ from those in more formal proceedings, and that the collection of fines, surcharges and suspension fees from motorists results in income to the City and other municipalities. These facts do not support a plausible claim that the defendants and any co-conspirators shared a common purpose to defraud motorists, that there was a relationship among the defendants, or that the defendants worked towards this common purpose for any amount of time beyond that which was necessary to sustain Peterson's conviction. The sole connection among the entities and individuals in the alleged enterprise is the traffic summons and its subsequent adjudication.[1] The complaint thus fails to plead those facts necessary to nudge plaintiff's

claim across the line "between possibility and plausibility" with respect to all three structural features of an association-in-fact enterprise. *Iqbal,* 129 S.Ct. at 1949.

**\*4** The existence of a RICO enterprise is a necessary element for liability under 28 U.S.C. § 1962(c). *City of N.Y. v. Smokes–Spirits.com, Inc.,* 541 F.3d 425, 439 (2d Cir.2008). Plaintiff's claims pursuant to 28 U.S.C. § 1962(c) must therefore be dismissed.

To state a RICO conspiracy claim pursuant to 28 U.S.C. § 1962(d), a plaintiff must successfully plead the existence of a substantive RICO violation. *See Cofacredit, S.A. v. Windsor Plumbing,* 187 F.3d 229, 244–45 (2d Cir.1999). Thus, because plaintiff has failed to state a claim pursuant to 28 U.S.C. § 1962(c), his claim pursuant to 28 U.S.C. § 1962(d) must also fail.

In his opposition to the motion to dismiss, Peterson cites to a number of cases that, he argues, demonstrate that a municipal corporation such as the City can be a member of a RICO enterprise and that Officer Watz can be named as a RICO defendant. Regardless of whether the City *can* be a member of a RICO enterprise and whether Officer Watz *can* be a RICO defendant, the pleadings do not give rise to a plausible claim that an association-in-fact enterprise *does,* in fact, exist.

Similarly, the plaintiff relies on *Floyd v. The City of New York,* 2011 WL 3856515 (S.D.N.Y.2011), which held that a triable issue of material fact exists as to whether New York Police Department supervisors have a custom or practice of imposing quotas on officers' stop and frisks, summonses, and arrests. *Id.* at \*20. *Floyd* did not involve alleged RICO violations or the alleged existence of an association-in-fact enterprise, and therefore does not salvage plaintiff's RICO claims.

## II. Malicious Prosecution and Abuse of Process

Plaintiff fails to state a claim for malicious prosecution under § 1983 and the Fourth Amendment. To state such a claim, a plaintiff must plead 1) that the defendant initiated a criminal proceeding, 2) that the proceeding was terminated favorably to the plaintiff, 3) that there was no probable cause for the criminal charged, and 4) that the defendant acted maliciously. *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003).

Plaintiff has not been the subject of a criminal proceeding that was terminated in his favor.

Likewise, plaintiff's claim for malicious abuse of process fails to meet the pleading standards of *Iqbal* and *Twombly.* To state a claim for malicious abuse of process under ⚑ § 1983 and the Fourth Amendment, a plaintiff must successfully plead that a defendant 1) employed regularly issued legal process to compel performance or forbearance of some act, 2) with intent to do harm without excuse or justification, and 3) in order to obtain a collateral objective that is outside the legitimate ends of the process. *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). Plaintiff's factual allegations that he was wrongfully subject to a traffic stop and a conviction for driving while using a cell phone, and that this conviction was wrongfully upheld on appeal, fall well short of stating a plausible claim to relief with respect to these three elements. Plaintiff offers no facts to support the conclusion that the defendants intended to do harm without justification, or that they had some collateral objective outside the legitimate ends of Peterson's traffic summons.

**\*5** The elements of malicious prosecution and malicious abuse of process are the same under state law as they are under ⚑ § 1983. *Id .* Thus, the pleadings on these state law claims are insufficient as well.

### III. Procedural Due Process

Plaintiff has not stated a ⚑ § 1983 claim for violation of procedural due process. To succeed on a procedural due process claim, a plaintiff must establish (1) a deprivation of life, liberty or property (2) without due process of law. *See* 🔶⚠ *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). In accordance with New York Vehicle and Traffic Law § 225, plaintiff has been afforded a hearing in front of an ALJ at which he could have been represented by a lawyer, an opportunity to cross-examine Officer Watz, an administrative appeal, and an appeal before the Appellate Division that is currently pending. Plaintiff has been afforded an opportunity to be heard "at a meaningful time and in a meaningful manner." ⚑ *Goldberg v. Kelly,* 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

### IV. Attorney's Fees

Plaintiff's claim for attorney's fees pursuant to ⚑ 42 U.S.C. § 1988 fails because, although plaintiff is an attorney, he is proceeding *pro se* and is thus not entitled to attorney's fees.

*See* ⚑ *Kay v. Ehrler,* 499 U.S. 432, 437–38, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991).

### V. Fourth Amendment

The sole remaining federal claim is the Fourth Amendment unreasonable search and seizure claim. "[T]he Fourth Amendment requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." 🚩 *United States v. Harrison,* 606 F.3d 42, 45 (2d Cir.2010) (citation omitted). According to the complaint, there was no legal justification whatsoever for the traffic stop because Peterson was not observed using his cell phone while driving as claimed by Officer Watz. The complaint provides detailed facts in support of this conclusion, including Peterson's cell phone records and his recollections of the traffic stop.

Defendants argue that this claim should be dismissed because a pre-arraignment, non-felony summons requiring a later court appearance does not constitute a seizure under the Fourth Amendment. *See* 🚩 *Burg v. Collen Gossellin,* 591 F.3d 95, 101 (2d Cir.2010). But Peterson claims that he was issued such a summons *and* that he was subjected to a traffic stop. His unreasonable seizure claim therefore survives.

### VI. Abstention

This litigation will be stayed pending completion of the Article 78 Proceeding. Generally, district courts have a "virtually unflagging obligation to exercise the jurisdiction given them." ⚑ *Royal and Sun Alliance Ins. Co. of Canada v. Century,* 466 F.3d 88, 92 (2d Cir.2006) (citation omitted). ❓ *Younger v. Harris,* 401 U.S. 37 (1971), and its progeny delineate an exception to this rule, requiring federal courts to abstain where appropriate to "allow state courts to resolve pending matters within their jurisdiction." ⚑ *Washington v. County of Rockland,* 373 F.3d 310, 318 (2d Cir.2004). In *Younger,* the Supreme Court explained that a federal court, "anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger,* 401 U.S. at 44.

Abstention is mandatory when "(1) there is a pending state proceeding, (2) that implicates an important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims." *Hartford Courant Co. v. Pellegrino,* 380 F.3d 83, 100–01 (2d Cir.2004) (citation omitted). While "*Younger* was a challenge to an ongoing state criminal case ... the doctrine has been extended with equal force to federal civil litigation challenging certain other state proceedings." *Kaufman v. Kaye,* 466 F.3d 83, 86 (2d Cir.2006). Such state proceedings may include Article 78 proceedings pursuant to the CPRL. *See Christ the King regional High School v. Culvert,* 815 F.2d 219, 224–25 (2d Cir.1987).

**\*6** When the *Younger* requirements are met, the doctrine mandates dismissal of claims for both injunctive and declaratory relief. *See Samuels v. Mackell,* 401 U.S. 66, 73, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971). Dismissal may not be appropriate, however, when the *Younger* requirements are met in a lawsuit for damages. *See Kirschner v. Klemons,* 225 F.3d 227, 237–38 (2d Cir.2000). In such cases, a district court may stay the federal case pending resolution of the state proceeding. *See Id.* at 238–39.

Peterson's Article 78 petition was transferred to the Appellate Division on January 12, 2011, and Peterson does not challenge defendants' claim that it is currently pending. The Article 78 Proceeding implicates an important state interest, specifically, the safety of the roads and highways. *See Dixon v. Love,* 431 U.S. 105, 114, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977). Furthermore, a finding for or against Peterson on the Fourth Amendment unreasonable seizure claim would rest on the very same factual determinations as the Article 78 Proceeding: whether Peterson was using his cell phone before Officer Watz pulled him over. Such a determination by this Court would fail to afford the Appellate Division proper respect for its function as a judicial entity capable of adjudicating federal claims, and call into question the State proceedings. *See Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 10, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (grounding abstention in "the notion of 'comity,' that is, a proper respect for state functions") (citation omitted). Accordingly, the litigation is stayed.

*CONCLUSION*

The August 15, 2011 motion to dismiss is granted with respect to plaintiff's federal claims for violations of the RICO statute under 18 U.S.C. §§ 1962(c) and (d), for malicious prosecution and malicious abuse of process under 42 U.S.C. § 1983 and state law, for violation of procedural due process under 42 U.S.C. § 1983, and for attorney's fees pursuant to 42 U.S.C. § 1988. The remainder of the action is stayed pending resolution of plaintiff's Article 78 proceedings.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 75029

## Footnotes

1    By all accounts, the proceedings were held in full accordance New York's Vehicle and Traffic Law and the Rules and Regulations of the State of New York. *See* Vehicle and Traffic Law §§ 225 and 228; 15 NYCRR § 124.4. Plaintiff does not claim otherwise; nor does he claim that these regulations themselves violate any state or federal law.

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 232 of 311

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg,
PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman Stewart,
Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant
Attorney General, Carl N. Lundberg, Chief Legal Counsel,
South Carolina Department of Probation, Columbia, SC, for
defendants Bishop, Magee, Barton, McMahan, and Stanford,
Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

**\*1**  The above matter comes to me following a Report–
Recommendation by Magistrate Judge Daniel Scanlon, Jr.,
duly filed on April 17, 1997. Following ten days from the
service thereof, the Clerk has sent me the entire file, including
any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil
rights action on November 17, 1995. On February 12,

1996, Magistrate Judge Scanlon ordered Brown to submit an
amended complaint alleging the specific acts committed by
the individuals named as defendants which Brown claimed
violated his constitutional rights. Brown filed an amended
complaint on March 21, 1996. In his amended complaint,
Brown alleged that defendants violated his rights under the
Eighth and Fourteenth Amendments by failing to process
properly his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact
he had never violated the conditions of his parole. For a
more complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made
a motion to dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2.
On August 19, 1996, defendants Bishop, Magee, Barton, and
McMahan made a motion to dismiss the complaint against
them or, in the alternative, for summary judgment. Dkt. No.
20. On October 17, 1996, defendants Herman, Stewart, and
Stanford made a motion to dismiss for failure to state a
claim. Dkt. No 34. On April 17, 1996, Magistrate Judge
Scanlon recommended that all defendants' motions to dismiss
be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave to
file a second amended complaint and a copy of his proposed
amended complaint. Dkt. No. 53. I turn first to the last motion
filed, Brown's motion for leave to amend his complaint a
second time.

Brown seeks to file a second amended complaint "setting
forth in detail the personal involvement of each defendant
and how their acts of commission and omission served to
deprive plaintiff of Constitutionally secured rights." Dkt. No.
53. The district court has discretion whether to grant leave
to amend. Ruffolo v. Oppenheimer & Co., 987 F.2d 129,
131 (2d Cir.1993). In exercising that discretion, the court
should freely grant leave to amend when justice so requires.
Fed.R.Civ.P. 15(a). However, the court need not grant leave
to amend where it appears that amendment would prove to be
unproductive or futile. Ruffolo, 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional
allegations against the named defendants. However, the

additional allegations fail to cure the deficiency which forms the basis of defendants' motion to dismiss— the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right.

*See* Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir.1987).

 **\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." Smiley v. Davis, 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge

recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo* determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint;

(5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See* Camardo v. General Motors Hourly–Rate Employees Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, \*1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, \*2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, \*1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also* Scipio v. Keane, 1997 WL 375601, \*1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P.

**Brown v. Peters, Not Reported in F.Supp. (1997)**

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 234 of 311

72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim*.

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 📖 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams,

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 235 of 311

the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992, upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

 **\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. See LaBounty v. Adler, 933 F.2d 121, 122 (2d Cir.1991) (citing Ortiz v. Cornette, 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. See Christopher v. Laidlaw Transit, Inc. 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing Ricciuti v. New York City Transit Authority, 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. Fonte v. Board of Managers of Continental Towers Condominium, 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. Id., (quoting Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. Id. Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. Gill v. Mooney, 824 F.2d 192, 196 (2d Cir.1987).

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 236 of 311

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

## CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 237 of 311

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

## Footnotes

1    I note, however, that the report-recommendation would survive even *de novo* review.

End of Document                                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2655195
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rochelle MARETTA-BROOKS, et al., Plaintiff,

v.

COMM'R OF SOCIAL SECURITY, et al., Defendants.

5:22-CV-1261 (BKS/ML)
|
Signed March 27, 2023

**Attorneys and Law Firms**

ROCHELLE MARETTA-BROOKS, Plaintiff, Pro Se, 107
Wood Ave, Syracuse, New York 13205.

### ORDER and REPORT-RECOMMENDATION

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** The Clerk has sent a *pro se* complaint in the above
captioned action together with an application to proceed *in
forma pauperis* and an application for appointment of legal
counsel, filed by Rochelle Maretta-Brooks ("Plaintiff") to the
Court for review. (Dkt. Nos. 1, 2, 3.) For the reasons discussed
below, I grant Plaintiff's *in forma pauperis* application, deny
Plaintiff's motion for appointment of counsel, and recommend
that the Complaint be dismissed in its entirety with leave
for Plaintiff to replead violations of her rights to access
records of the Social Security Administration pursuant to the
Freedom of Information Act ("FOIA") or the Privacy Act. I
further recommend that any other claims raised in Plaintiff's
Complaint, including any claims raised against defendant
Mrs. Hanley and any claims purported to be raised on behalf
of minor children F.B. or H.B., be dismissed without leave to
amend. (Dkt. No. 1.)

### I. BACKGROUND

Construed as liberally [1] as possible, Plaintiff's Complaint
alleges that named defendant "Mrs. Hanley," an employee
of the Social Security Administration, refused to provide
unspecified governmental records in response to Plaintiff's
request in November 2022. (Dkt. No. 1-1, at 1). Plaintiff
further alleges that Mrs. Hanley "told me my request for
appeal/review was denied in 2019 so I am being denied my
right to records." (*Id.*)

Plaintiff identifies two minor children, "F.B." and "H.B."
as other plaintiffs in this matter but does not include
any discernible factual allegations relating to them in the
Complaint or supporting documents. (*Id.*) She also cites
a number of criminal statutes as basis for relief, with
references to kidnapping, fraud, identity theft, embezzlement,
tax evasion, collusion and a "Ponzi scheme." (Dkt. No. 1 at 3.)

Based on these factual allegations, Plaintiff seeks significant
monetary damages, potentially reaching up to three million
dollars. (Dkt. No. 1 at 4.)

### II. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"When a civil action is commenced in a federal district court,
the statutory filing fee, currently set at $402, must ordinarily
be paid. 28 U.S.C. § 1914(a). A court is authorized, however,
to permit a litigant to proceed *in forma pauperis* status if a
party "is unable to pay" the standard fee for commencing
an action. 28 U.S.C. § 1915(a)(1). [2] After reviewing
Plaintiff's *in forma pauperis* application (Dkt. No. 2), the
Court finds that Plaintiff meets this standard. Therefore,
Plaintiff's application to proceed *in forma pauperis* is granted
for this proceeding. [3]

**\*2** Plaintiff is advised that the ability to litigate an action
without prepayment of fees is a privilege that can be denied,
revoked, or limited based upon a showing of prior abuses.

*See* In re Anderson, 511 U.S. 364, 365-66 (1994) (denying
the *pro se* petitioner's request for leave to proceed IFP where
the Court found that, like the previous twenty-two petitions
filed during the three immediately preceding years, the instant
petition was "patently frivolous"); *see also* Cuoco v.
United States Bureau of Prisons, 328 F. Supp. 2d 463, 467
(S.D.N.Y. 2004) ("The ability to proceed IFP is a privilege
provided for the benefit of indigent persons."). The authority
of a court to deny or limit a request to proceed IFP is implicit
in the permissive, rather than compulsory, language of the
controlling statute, which provides that "any court of the
United States *may* authorize the commencement, prosecution
or defense of any suit, action or proceeding, civil or criminal,
or appeal therein, without prepayment of fees or security
therefor[.]" 28 U.S.C. § 1915(a)(1) (emphasis added);
In re McDonald, 489 U.S. 180, 183 (1989). For this reason,
courts are regarded as possessing discretionary authority to

deny IFP status to litigants who have abused the privilege. *See Hurt v. Soc. Sec. Admin.*, 544 F.3d 308, 309-310 (D.C. Cir. 2008) (quoting *Butler v. Dep't of Justice*, 492 F.3d 440, 444-45 (D.C. Cir. 2007)) ("This Circuit grants IFP status to various plaintiffs, but asserts its discretion to deny or revoke this privilege for abusive litigants, looking to 'the number, content, frequency, and disposition of their previous filings[.]' ").

The exhibits included with the Complaint show that Plaintiff was previously known by the name Rochelle Coleman. (Dkt. No. 1-1, at 4). This Court notes that under that name, she was granted IFP status for a number of actions that were dismissed following review of the substance of the factual allegations in the complaints in accordance with 28 U.S.C. § 1915(e). *See Coleman v. Detter*, No. 16-CV-0834 (N.D.N.Y. filed July 8, 2016)*; Coleman v. Engle*, No. 16-CV-0833 (N.D.N.Y. filed July 8, 2016)*; Coleman v. Olinski*, No. 16-CV-0838 (N.D.N.Y. filed July 8, 2016); *Coleman v. Sutkowy*, No. 16-CV-0837 (N.D.N.Y. filed July 8, 2016); *Coleman v. Syracuse Police Dep't*, No. 16-CV-0836 (N.D.N.Y. filed July 8, 2016); *Coleman v. Hanuszczak*, No. 16-CV-0735 (N.D.N.Y. filed June 22, 2016); *Coleman v. Levandowski*, No. 16-CV-0734 (N.D.N.Y. filed June 22, 2016). Under the name Rochelle Maretta-Brooks, Plaintiff has been granted IFP status in a case that was ultimately dismissed as insufficient pursuant to 28 U.S.C. § 1915(e). *See Brooks v. Onondaga County Dep't of Children & Fam. Svcs.*, No. 17-CV-1186 (N.D.N.Y. filed April 8, 2018). In *Maretta-Brooks v. Hanuszczak*, No. 18-CV-426 (N.D.N.Y. filed April 9, 2018), Plaintiff's IFP application was deemed incomplete, and the complaint was dismissed without prejudice for failure to state a claim.

In light of her litigation history, Plaintiff is hereby cautioned that (1) proceeding IFP is a privilege that is extended to litigants at the discretion of the court, and (2) filing of patently frivolous lawsuits may result in the denial of any request to proceed IFP in an action and/or a recommendation to the Chief District Judge that a filing injunction be issued against Plaintiff, barring her from filing any future lawsuits in this district without prior permission.

## III. LEGAL STANDARD FOR INITIAL REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

**\*3** "In reviewing a complaint ... the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

"[E]xtreme caution should be exercised in ordering sua sponte dismissal of a ... complaint before the adverse party has been served and [the] parties ... have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a plaintiff's complaint to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in

law, or a dispositive defense clearly exists on the face of the complaint." *Aguilar v. United States*, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

## IV. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the Court must construe her pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that all causes of action be dismissed.

### A. Purported Claims on Behalf of Minor Children

A nonlawyer parent ordinarily cannot represent a child's interests *pro se. See Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990); *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005) (holding that it is "a well-established general rule in this Circuit that a parent not admitted to the bar cannot bring an action *pro se* in federal court on behalf of his or her child"). Minors "are entitled to trained legal assistance so their rights may be fully protected" and nonlawyer parents are not trained to represent competently the interests of their children. *Cheung*, 906 F.2d at 61. Moreover, "a district court has a duty to raise this issue *sua sponte*." *Thomas v. Astrue*, 674 F. Supp. 2d 507, 511 (S.D.N.Y. 2009).

Plaintiff has been advised of this prohibition in previous proceedings. *See, e.g., Brooks v. Onondaga County Dep't of Children and Family Svcs.*, No. 17-CV-1186 (N.D.N.Y. filed April 8, 2018) (Dkt. No. 11). Moreover, the custodial status of Plaintiff's minor children and the scope of Plaintiff's parental rights have been adjudicated in state court proceedings and were a significant issue in an earlier unrelated proceeding before Chief Judge Sannes. *See F.B. v. Saul*, No. 15-CV-148

(N.D.N.Y. filed February 10, 2015) (Dkt. Nos. 94, 95.) Because Plaintiff has not alleged any substantive claims on behalf of F.B. and H.B. in this filing, this Court declines to delve into that potentially sensitive issue here. Rather, in line with well-established caselaw, I recommend that the Court dismiss any claims Plaintiff is purporting to assert on behalf of her minor children.

### B. Claims Alleging Violations of Criminal Laws

**\*4** Without elaboration, Plaintiff cites a number of federal criminal statutes in her Complaint and the accompanying exhibits: 18 U.S.C. §§ 241 (Conspiracy against Rights), 242 (Deprivation of Rights under Color of Law), 245 (Interference with Federally Protected Activities), 246 (Deprivation of Relief Benefits), 247 (Obstruction of Free Exercise of Religion), 249 (Hate Crime Acts), and 1201 (Kidnapping). (Dkt. No. 1 at 1, 3; Dkt No. 1-1 at 1.) She also uses a number of disconnected phrases typically associated with criminal enforcement actions such as "fraud," "theft," "Ponzi scheme," "embezzlement," "tax evasion" and "kidnapping," but provides no factual allegations associated with these terms. (Dkt. No. 1 at 3.)

There is no private right of action to enforce state or federal criminal statutes. *See generally Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *see also Walker v. CIBC Ltd.*, 20-CV-1337, 2021 WL 3518439, at *5 (N.D.N.Y. Apr. 13, 2021) (Hummel, M.J.) ("It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's jurisdiction."), *report-recommendation adopted by* 2021 WL 3204860 (N.D.N.Y. July 29, 2021) (McAvoy, J.); *McFadden v. Ortiz*, 12-CV-1244, 2013 WL 1789593, at *3 (N.D.N.Y. Apr. 26, 2013) (D'Agostino, J.) (holding that "there is no private right of action to enforce either state or federal criminal statutes."). This court notes that Plaintiff has been advised in prior litigation that she may not enforce criminal statutes in a civil action. *See, e.g., Marietta-Brooks v. Hanuszcak*, 18-CV-426 (N.D.N.Y. filed September 4, 2018) (Dkt. No. 7 at 20.)

As a result, I recommend dismissal of all of Plaintiff's claims that are premised on alleged violations of federal or state criminal laws. *See Hall v. Sampson*, 21-CV-4839, 2022 WL 2068248, at *2 n.2 (E.D. Pa. June 8, 2022) (collecting cases) (holding that the plaintiff cannot bring criminal charges

against the defendants through a private lawsuit and that claims pursuant to, *inter alia*, 18 U.S.C. §§ 241, 371 do not give rise to a civil cause of action); *Patterson v. Patterson*, 16-CV-0844, 2019 WL 1284346, at *7 (W.D.N.Y. Mar. 20, 2019) (quoting *Christian v. Town of Riga*, 649 F. Supp. 2d 84, 91 (W.D.N.Y. 2009)) ("Courts within this Circuit have accordingly held consistently that criminal charges under New York law 'cannot be prosecuted by a private person.' "); *Walthour v. Herron*, 10-01495, 2010 WL 1877704, at *2 (E.D. Pa. May 6, 2010) (recognizing no private right of action under, *inter alia*, 18 U.S.C. §§ 241, 371).

### C. Purported RICO Claims [4]

Again without elaboration, Plaintiff's Complaint references the Racketeer Influenced and Corrupt Organizations ("RICO") Act. (Dkt. No. 1 at 1; Dkt. No. 1-1 at 1.)

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1964 establishes a private right of action for individuals who are harmed by racketeering activity. 18 U.S.C. § 1964. This private right of action permits a plaintiff to bring a RICO claim for sustaining injuries "in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Generally, a plaintiff bringing a civil RICO claim under "Section 1962(c) must allege that (1) the defendant has violated the substantive RICO statute, and (2) the plaintiff was injured in his business or property "by reason of a violation of section 1962." *Malvar Egerique v. Chowaiki*, 19-CV-3110, 2020 WL 1974228, at *7 (S.D.N.Y. Apr. 24, 2020) (citing *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (citing 18 U.S.C. § 1962(c))). More specifically, to assert a civil RICO claim under section 1962(c), a plaintiff must allege the following elements: "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Additionally, a plaintiff asserting a civil RICO claim must plead facts plausibly suggesting a resulting "domestic injury" to their business or property. *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2111 (2016).

**\*5** Plaintiff has failed to state a RICO claim against either defendant. To begin with, the doctrine of sovereign immunity bars federal courts from hearing all suits against the federal government, including suits against federal agencies, unless sovereign immunity has been waived. *United States v. Mitchell*, 445 U.S. 535, 538 (1980); *see Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) ("Because an action against a federal agency ... is essentially a suit against the United States, such suits are ... barred under the doctrine of sovereign immunity, unless such immunity is waived."). Any RICO claims against the Social Security Administration or Mrs. Hanley in her official capacity would thus be barred by the doctrine of sovereign immunity.

To the extent that Plaintiff attempts to allege a RICO claim against Mrs. Hanley in her individual capacity, Plaintiff fails to allege any facts plausibly suggesting the existence of an "enterprise" within the meaning of RICO. "Without such an enterprise, a RICO claim like [Plaintiff]'s must fail." *Liang v. City of New York*, 10-CV-3089, 2013 WL 5366394, at *13 (E.D.N.Y. Sept. 24, 2013); *see also Peterson v. City of New York*, 11-CV-3141, 2012 WL 75029, at *3-4 (S.D.N.Y. Jan. 9, 2012) (dismissing the plaintiff's RICO claim because "[t]he existence of a RICO enterprise is a necessary element for liability" and the plaintiff failed to allege facts plausibly suggesting the existence of a RICO enterprise). Moreover, Plaintiff fails to allege any facts plausibly suggesting a pattern of racketeering activity. 18 U.S.C. § 1961(5) (To sufficiently allege a "pattern of racketeering activity," a plaintiff must allege at least two acts of "racketeering activity" that occur within ten years of each other); *Westchester Cnty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 608 (S.D.N.Y. 2015) (emphasis in original) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)) (To qualify as a "pattern" of racketeering activity, the predicate acts "must be from the crimes listed in [Section] 1961(1) and they must be 'related, *and* ... amount to or pose a threat of continued criminal activity.' ").

As a result, I recommend that Plaintiff's RICO claims be dismissed.

#### D. Access to Public Records

As discussed in Section I, the only discernible factual allegations in the Complaint describe a denial of Plaintiff's request for governmental records in November 2022.

The Freedom of Information Act ("FOIA") allows persons to request any public records subject to disclosure. *See* 5 U.S.C. § 552(a)(3). The Privacy Act allows persons to request records pertaining specifically to them. *See* 5 U.S.C. § 552a(d)(1). Both federal statutes allow persons to bring suit in federal district court to challenge an agency's refusal to disclose properly requested records. *See* 5 U.S.C. § 552(a)(4)(B); 5 U.S.C. § 552a(g)(1)(B). Neither statute permits an action against individual governmental employees such as Mrs. Hanley. *See Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) ("The private right of civil action created by the Privacy Act is specifically limited to actions against agencies of the United States government."); *Geer v. Pheffer*, No. 14-CV-2829 (CBA), 2015 WL 332996, at *2 (E.D.N.Y. Jan. 23, 2015) ("FOIA only authorizes suits against federal agencies and does not apply to individual officers ...").

There are distinctions between the two records access statutes. In particular, while any individual may make a request for records pursuant to the FOIA, under the Privacy Act, only an individual, or his authorized representative, may request the individual's records. *See* 5 U.S.C. §§ 552, 552a(d)(1). Moreover, while the FOIA applies to any type of record, the Privacy Act narrowly applies to records that agencies maintain within their "systems of records" that are retrievable by an individual's name, social security number or other personal identifier. *See* 5 U.S.C. §§ 552, 552a(d). Additionally, unlike the FOIA, the Privacy Act allows individuals to request that agencies amend their records. *See* 5 U.S.C. § 552a(d)(2).

**\*6** Under both the FOIA and the Privacy Act, a plaintiff must first exhaust her administrative remedies, including the administrative appeals process, before a court will exercise jurisdiction over a claim based upon an agency's refusal to provide documents. *See Sussman v. United States Dep't of Justice*, No. 03-Civ-3618 (DRH/ETB), 2006 WL 2850608, at *4 (E.D.N.Y. September 30, 2006)

(summarizing administrative appeals process). In order to withstand dismissal, both a FOIA and Privacy Act claim require a proper pleading that a plaintiff has exhausted his or her administrative remedies. *Checksfield v. Internal Revenue Svc.*, No. 5:21-CV-1180 (GTS/ML), 2022 WL 2713499, at *8 (N.D.N.Y. July 13, 2022) (collecting FOIA cases); *Cross v. Potter*, No. 3:09-CV-1293 (TJM), 2013 WL 1149525, at *9 (collecting Privacy Act cases).

Plaintiff has failed to state a claim under the FOIA or the Privacy Act because she failed to describe the nature of her alleged request for records, the details of the agency's response, and the exhaustion of available administrative remedies. As a result, I recommend dismissal of Plaintiff's claims alleging denial of access to records.

### V. OPPORTUNITY TO REPLEAD

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to replead at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to replead is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[5]

With respect to Plaintiff's RICO claims and those claims alleging violations of criminal statutes including but not limited to 18 U.S.C. §§ 241, 242, 245, 246, 247, 249, and 1201, I recommend that those claims be dismissed without leave to replead because the problem with those claims is substantive such that a better pleading will not cure it.

I likewise recommend that any purported claims in the Complaint raised by Plaintiff on behalf of F.B. and H.B. be dismissed without leave to replead. *See Antonetti, on behalf of C.J.A. v. Dave & Busters 42nd Street Times Square*, 23-CV-0101, 2023 WL 1869012, at 5 (S.D.N.Y. Feb. 6, 2023) (declining leave to amend where the complaint sought to assert claims on behalf of the plaintiff's minor son).

**\*7** However, with respect to potential claims against the Social Security Administration pursuant to the FOIA or the Privacy Act, it is not clear whether better pleading would permit Plaintiff to assert a cognizable claim. Out of deference to Plaintiff's *pro se* status, I therefore recommend that Plaintiff be granted leave to replead those claims. At the same time, I recommend that any claims against Mrs. Hanley pursuant to the FOIA or the Privacy Act be dismissed without leave to replead, because such claims are not viable against individual government employees.

If Plaintiff chooses to avail herself of an opportunity to amend, such amended pleading must set forth a short and plain statement of the facts on which she relies to support any legal claims asserted. Fed. R. Civ. P. 8(a). In addition, the amended complaint must include allegations reflecting the substance of her records request, any agency response, and any attempt to exhaust administrative remedies. Finally, Plaintiff is informed that any amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See* 🚩 *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted)).

## VI. PLAINTIFF'S MOTION TO APPOINT COUNSEL

Plaintiff has also submitted a request for appointment of counsel. (Dkt. No. 3.) As an initial matter, "[a] party has no constitutionally guaranteed right to the assistance of counsel in a civil case." *Lefridge v. Connecticut State Trooper Officer No. 1283*, 640 F.3d 62, 68 (2d Cir. 2011) (citation omitted). Furthermore, there is no bright-line test determining whether counsel should be appointed on behalf of an indigent party. 🚩 *Hendricks v. Coughlin*, 114 F.3d 390, 392-393 (2d Cir. 1997). Rather, the court must carefully consider a number of factors, including whether the indigent's claims seem likely to be of substance. *See Lefridge*, 640 F.3d at 69 (stating that "[t]he court properly denies the plaintiff's motion for

counsel if it concludes that his chances of success are highly dubious.") (citations omitted).

As I have recommended dismissal of the instant matter, it cannot be said that Plaintiff's claims are likely to be of substance; therefore, the motion (Dkt. No. 3) must be denied.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED only for purposes of filing and any appeal unless the trial court certifies in writing that the appeal is not taken in good faith**; and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 3) is **DENIED without prejudice**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) only to the extent that it asserts claims against the Social Security Administration for denial of access to records pursuant to the FOIA or the Privacy Act; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD** all other claims raised in Plaintiff's Complaint (Dkt. No. 1), including all claims against defendant Ms. Hanley and all claims purportedly raised on behalf of minor children F.B. and H.B., and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this report and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [6]

**\*8 NOTICE:** Pursuant to 🚩 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [7] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 🚩 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; 🚩 *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing 🚩 *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Slip Copy, 2023 WL 2655195

## Footnotes

1    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker, 44 F.3d 169, 173 (2d Cir. 1995)* (quoting *Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)*).

2    The language of that section is ambiguous because it suggests an intent to limit availability of *in forma pauperis* status to prison inmates. *See 28 U.S.C. § 1915(a)(1)* (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making *in forma pauperis* status available to any litigant who can meet the governing financial criteria. *Hayes v. United States, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006)*; *Fridman v. City of N.Y., 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002)*.

3    Plaintiff is reminded that, although her application to proceed *in forma pauperis* has been granted, she is still required to pay fees that she may incur in this action, including copying and/or witness fees.

4    Under General Order No. 14 and N.D.N.Y. L.R. 9.2, a party who files a RICO claim must also file a Civil RICO statement within thirty days after the filing date of the Complaint. Despite thirty days having elapsed since the filing of her Complaint, Plaintiff has failed to file a Civil RICO statement. (*See generally* docket sheet.).

5    *See also Carris v. First Student, Inc., 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015)* (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 796 (2d Cir. 1999)*—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)*), *rev'd on other grounds, 682 F. App'x 30*.

6    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders, 557 F.3d 76 (2d Cir. 2009)* (per curiam).

7    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. *Fed. R. Civ. P. 6(d)*. If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. *Fed. R. Civ. P. 6(a)(1)(C)*.

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 245 of 311

Maretta-Brooks v. Hanuszczak, Not Reported in Fed. Supp. (2018)

2018 WL 2021480
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rochelle MARETTA-BROOKS, Plaintiff,

v.

Michael L. HANUSZCZAK, et al., Defendants.

Civil Action No. 5:18-CV-0426 (DNH/DEP)

|

Signed 04/26/2018

**Attorneys and Law Firms**

ROCHELLE MARETTA-BROOKS, c/o RFD, 213 Lilac
Street, Syracuse, NY 13208, pro se.

ORDER, REPORT, AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

**\*1** *Pro se* plaintiff Rochelle Maretta-Brooks, a frequent
litigator in this district, has commenced this action
against seventeen defendants, including several judges, the
Onondaga County District Attorney, the Onondaga County
Attorney, an unidentified City of Syracuse Police Officer, and
other individuals whose titles are not disclosed. Plaintiff's
complaint, which is largely devoid of factual allegations, as
well as her application for leave to proceed *in forma pauperis*
("IFP") and a motion for appointment of counsel, have been
forwarded to me for consideration. Based upon my review of
those documents, plaintiff's IFP application and motion for
appointment of counsel are denied, and I recommend that her
complaint be dismissed, with leave to amend.

I. BACKGROUND

Plaintiff commenced this action on April 9, 2018. Dkt. No.
1. Plaintiff's complaint is a compilation of five separate
documents prepared on four different forms provided by
the court to prospective litigants. Dkt. No. 1. In particular,
plaintiff has submitted (1) a form for use in commencing
a civil rights action against federal officials pursuant to
🚩 *Bivens v. Six Unknown Named Agents of Fed. Bureau
of Narcotics*, 403 U.S. 388 (1971), Dkt. No. 1 at 1-4;
(2) a form for use in asserting employment discrimination
claims pursuant to Title VII of the Civil Rights Act of 1964

("Title VII"), as amended, 🚩 42 U.S.C. § 2000e *et seq.*,
Dkt. No. 1 at 5-9; (3) two forms for use in bringing an
action under the Americans With Disabilities Act ("ADA"),
42 U.S.C. § 12101 *et seq.*, Dkt. No. 1 at 10-13, 18-21;
and (4) a form for use in asserting civil rights claims
against persons acting under color of state law pursuant
to 🚩 42 U.S.C. § 1983, Dkt. No. 1 at 14-17. Included
with plaintiff's complaint are over two hundred pages of
attachments of varying descriptions, none of which have been
identified or referenced in her complaint. Dkt. Nos. 1-1–1-3.
Named as defendants in the various form complaints are the
following individuals: (1) Onondaga County Family Court
Judge Michael L. Hanuszczak, (2) Syracuse City Court Judge
Kate Rosenthal, (3) Onondaga County Family Court Judge
Julie Cecile, (4) Onondaga County Supreme Court Justice
James C. Tormey, (5) Onondaga County Acting Supreme
Court Justice Martha Walsh Hood, (6) Onondaga County
Family Court Judge Michele Pirro Bailey; (7) Syracuse City
Court Judge Ross Andrews; (8) Onondaga County District
Attorney William Fitzpatrick; (9) Onondaga County Attorney
Robert Durr; (10) Attorney Arlene Bradshaw; (11) Joseph
Murphy; (12) Lisa Blitman; (13) Lewis Dettor; (14) William
Balduf; (15) Kevin Haywood; (16) Dorothea Hogan; and (17)
an unidentified City of Syracuse Police Officer. [1] Dkt. No. 1
at 2, 5-7, 11-12, 14-15, 19-20.

Plaintiff's complaint is wholly devoid of factual allegations
upon which her claims are based and fails to disclose
the role played by each of the named defendants in the
circumstances giving rise to her claims. Although this is
far from evident, based on a review of plaintiff's complaint
and attached documents, it appears that her claims center
upon the removal of her two daughters from her custody as
ordered by one or more of the judicial officers named as
defendants in this case, and plaintiff's arrest on March 21,
2018. *See, e.g.*, Dkt. No. 1 at 4, 13, 17; Dkt. No. 1-1 at 17,
27-28. Plaintiff's complaint cites several statutes including
(1) 🚩 18 U.S.C. §§ 241, 🚩 242, criminal statutes related
to the deprivation of constitutional rights; (2) [?] 42 U.S.C.
§ 14141, [2] which prohibits governmental employees from
depriving persons of rights, privileges, or immunities secured
or protected under the constitution; (3) 18 U.S.C. § 1514A,
which provides whistleblower protection for employees of
publicly traded companies; (4) 18 U.S.C. § 1506, a criminal
provision prohibiting the theft or alteration of record or
process, or false bail; and (5) New York Criminal 🚩 Penal
Law ("CPL") § 70.10(2), defining the phrase "[r]easonable

Maretta-Brooks v. Hanuszczak, Not Reported in Fed. Supp. (2018)

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 246 of 311

cause to believe that a person has committed an offense." *See, e.g.*, Dkt. No. 1 at 3, 7-8, 16. As relief, plaintiff seeks damages in large amounts, designed to increase in the event she is retaliated against, and further enhanced if she is murdered or assassinated. Dkt. No. 1 at 4, 9, 13, 17, 21.

## II. DISCUSSION

### A. Plaintiff's IFP Application

**\*2** When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $400, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP if it determines that she is unable to pay the required filing fee. 28 U.S.C. § 1915(a)(1). [3] Pursuant to section 1915, when a plaintiff seeks leave to proceed IFP, the court must determine whether she has demonstrated sufficient economic need to proceed without prepaying the required filing fee. 28 U.S.C. § 1915(a)(1).

The decision of whether to grant an application to proceed IFP rests within the sound discretion of the court. *Anderson v. Coughlin*, 700 F.2d 37, 42 (2d Cir. 1983). Section 1915 only provides that a court must be satisfied "that the person is unable to pay such fees or give security therefor" prior to granting IFP status. 28 U.S.C. § 1915(a)(1). To make this threshold showing, a plaintiff must demonstrate "that paying such fees would constitute a serious hardship on the plaintiff, not that such payment would render plaintiff destitute." *Fiebelkorn v. United States*, 77 Fed. Cl. 59, 62 (Fed. Cl. 2007) (citing *Adkins v. E.I. DuPont de Nemours & Co.*, 335 U.S. 331, 339 (1948) ); *see also Potnick v. E. State Hosp.*, 701 F.2d 243, 244 (2d Cir. 1983) ("Section 1915(a) does not require a litigant to demonstrate absolute destitution[.]"); *accord*, *Lee v. McDonald's Corp.*, 231 F.3d 456, 459 (8th Cir. 2000). As the Second Circuit has noted, "no party must be made to choose between abandoning a potential meritorious claim or foregoing the necessities of life." *Potnick*, 701 F.2d at 244 (citing *Adkins*, 335 U.S. at 339).

In support of an IFP application, section 1915 requires that a plaintiff submit an affidavit reflecting all of her assets. 28 U.S.C. § 1915(a)(1). Without the submission of a completed financial affidavit, a plaintiff's application is incomplete, and this defect alone warrants denial of the IFP application. *See, e.g.*, *United States v. Copen*, 378 F. Supp. 99, 103 (S.D.N.Y. 1974) ("Leave to proceed in forma pauperis may be obtainable only upon submission by the party of an affidavit made as required by [ 28 U.S.C. § 1915]."); *accord*, *Bey v. Syracuse Univ.*, 155 F.R.D. 413, 414 (N.D.N.Y. 1994) (Scullin, J.).

While plaintiff has submitted two declarations in support of her IFP application, they are incomplete. In both forms plaintiff indicates that, although she is not employed, she receives money from outside sources. Dkt. No. 2 at 1; Dkt. No. 2-1 at 2. In the first, however, she neither identifies the source(s) nor the amounts of that income. Dkt. No. 2 at 1. In the second, she does indicate that she is referring to Social Security benefits, but does not state the amounts received, as required. Dkt. No. 2-1 at 2. Plaintiff's IFP application is therefore denied, without prejudice to renewal upon submission of a complete application.

**\*3** Plaintiff is advised that the ability to litigate an action without prepayment of fees is a privilege that can be denied, revoked, or limited based upon a showing of prior abuses. *See In re Anderson*, 511 U.S. 364, 365-66 (1994) (denying the *pro se* petitioner's request for leave to proceed IFP where the Court found that, like the previous twenty-two petitions filed during the three immediately preceding years, the instant petition was "patently frivolous"); *see also Cuoco v. United States Bureau of Prisons*, 328 F. Supp. 2d 463, 467 (S.D.N.Y. 2004) ("The ability to proceed IFP is a privilege provided for the benefit of indigent persons." (quotation marks omitted) ). The authority of a court to deny or limit a request to proceed IFP is implicit in the permissive, rather than compulsory, language of the controlling statute, which provides that "any court of the United States *may* authorize the commencement, prosecution or defense of any suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees or security therefor[.]" 28 U.S.C. § 1915(a)(1) (emphasis added); *In re McDonald*, 489 U.S. 180, 183 (1989). For this reason, courts are regarded as possessing discretionary authority to deny IFP status to litigants who have abused the privilege. *See Hurt v. Soc. Sec. Admin.*, 544 F.3d 308, 309-310 (D.C. Cir. 2008) ("This Circuit grants IFP status to various plaintiffs, but asserts its discretion to deny or revoke this privilege for abusive litigants, looking

to 'the number, content, frequency, and disposition of their previous filings[.]' ") (quoting *Butler v. Dep't of Justice*, 492 F.3d 440, 444-45 (D.C. Cir. 2007) (citations, alteration omitted) ).

Plaintiff's litigation history in this district suggests that she is on the brink of being found to have abused the privilege of proceeding IFP. Plaintiff was previously known by the name Rochelle Coleman, Dkt. No. 1 at 39, 42-43, 54, 62; Dkt. No. 1-2 at 9. Under that name, she filed seven prior actions in this district in June and July of 2016. *Coleman v. Detter*, No. 16-CV-0834 (N.D.N.Y. filed July 8, 2016); *Coleman v. Engle*, No. 16-CV-0833 (N.D.N.Y. filed July 8, 2016); *Coleman v. Olinski*, No. 16-CV-0838 (N.D.N.Y. filed July 8, 2016); *Coleman v. Sutkowy*, No. 16-CV-0837 (N.D.N.Y. filed July 8, 2016); *Coleman v. Syracuse Police Dep't*, No. 16-CV-0836 (N.D.N.Y. filed July 8, 2016); *Coleman v. Hanuszczak*, No. 16-CV-0735 (N.D.N.Y. filed June 22, 2016); *Coleman v. Levandowsk*, No. 16-CV-0734 (N.D.N.Y. filed June 22, 2016). In 2017, plaintiff appears to have filed one action. *Brooks v. Onondaga Dep't of Children & Family Servs.*, No. 17-CV-1186 (N.D.N.Y. filed Oct. 25, 2017). In all of those previous actions, plaintiff requested, and was granted, permission to proceed without prepayment of fees. Like the complaint in this action, most of the complaints in those cases generally concern plaintiff losing custody of her children and the state actors and attorneys involved. All but one of those actions were dismissed following the court's review of the substance of the factual allegations in the complaints in accordance with 28 U.S.C. § 1915(e). [4]

Common to all of the actions filed by plaintiff in this district (including, as will be discussed below, the current complaint under consideration in this report) is her failure to include factual allegations in her complaints that demonstrate entitlement to relief, and the vagueness concerning the claims that she purports to assert. Accordingly, in the event plaintiff renews her IFP application upon a proper and complete showing of her finances and the application is granted, she is hereby warned that (1) proceeding IFP is a privilege that is extended to litigants at the discretion of the court, and (2) any further filing of patently frivolous lawsuits may result in the denial of any request to proceed IFP in an action and/or a recommendation to the chief district judge that a filing injunction be issued against plaintiff, barring her from filing any future lawsuits in this district without prior permission.

B. Appointment of Counsel

**\*4** With her complaint, plaintiff has requested appointment of counsel to represent her in this action *pro bono*. Dkt. No. 3. District courts are afforded broad, though not limitless, discretion in determining whether to appoint counsel to represent indigent civil litigants. 28 U.S.C. § 1915(e)(1); *see also Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986). In *Hodge*, the Second Circuit noted that, when exercising that discretion, the court should first determine whether the indigent's position seems likely to be of substance. *Hodge*, 802 F.2d at 60. If this threshold requirement is satisfied,

> the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in th[e] case why appointment of counsel would be more likely to lead to a just determination.

*Hodge*, 802 F.2d at 61-62; *see also Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994). [5]

In deciding whether to appoint counsel I note that, although the constitution guarantees indigent litigants "meaningful access" to the courts, it does not assure that all parties in civil actions will receive the benefit of *pro bono* representation. *Hodge*, 802 F.2d at 60. While the appointment of counsel to represent indigent parties in civil suits is authorized by statute, when that authority is exercised the court is required to call upon attorneys to donate their time *pro bono*, to the benefit of indigent litigants and the court. In deference to the limited resources available to the court to serve the interests of the many indigent litigants who pursue claims before them, and recognizing the "thankless burden" associated with such assignments, *Miller v. Pleasure*, 296 F.2d 283, 285 (2d Cir. 1961), the court does not grant such applications indiscriminately, but instead chooses to exercise sound judgment and restraint in doing so. *Cooper v. A. Sargenti Co., Inc.*, 877 F.2d 170, 172 (2d Cir. 1989).

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 248 of 311

Maretta-Brooks v. Hanuszczak, Not Reported in Fed. Supp. (2018)

At this juncture, and as will be discussed more completely below, it is difficult to gauge whether plaintiff's position is likely to be of substance in view of the uncertainty of her claims and the scarcity of factual allegations in the complaint to support those claims. Accordingly, based upon my finding that plaintiff's complaint does not disclose the existence of a cognizable cause of action, plaintiff's motion for appointment of counsel is denied.

### C. Sufficiency of Plaintiff's Complaint

#### 1. Standard of Review

Ordinarily, the denial of plaintiff's IPF application would end the court's discussion, and plaintiff, in light of her *pro se* status, would likely be afforded an opportunity to either prepay the full filing fee, or submit a new, completed, and certified application for IFP. Because, however, as is discussed more completely below, I find that plaintiff's complaint fails to state a claim upon which relief may be granted, 28 U.S.C. § 1915 authorizes the dismissal of the action *sua sponte* "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid[.]" 28 U.S.C. § 1915(e).

Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

**\*5** In deciding whether a complaint states a colorable claim, a court must extend a certain measure of deference in favor of *pro se* litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to address the sufficiency of plaintiff's allegations, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding

that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " *Aguilar v. United States*, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at \*2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory, for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

When reviewing a complaint under section 1915(e), the court is guided by applicable requirements of the Federal Rules of Civil Procedure. Specifically, Rule 8 of the Federal Rules of Civil Procedure provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, J.) (quotation marks and italics omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court should construe the factual allegations of a complaint in a light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing

*Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' "

*Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2) ).

2. Analysis

As was noted above in part I. of this report, plaintiff's complaint is generally lacking in factual allegations supporting any purported cause of action. Instead, the complaint largely contains mere repetition of claims against different defendants. On this basis alone, I recommend dismissal of the complaint. In addition, there are several grounds upon which all or some of plaintiff's causes of action are potentially subject to dismissal, all of which are worth discussing in light of the possibility that plaintiff will be afforded an opportunity to amend her complaint.

Plaintiff's claims against the various judges named as defendants are, in all likelihood, precluded by the absolute immunity that they enjoy by virtue of their positions. "It is well settled that judges are absolutely immune from suit for any actions taken within the scope of their judicial responsibilities." *DuQuin v. Kolbert*, 320 F. Supp. 2d 39, 40-41 (W.D.N.Y. 2004) (citing *Mireles v. Waco*, 502 U.S. 9, 10 (1991) ); *see also* *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir. 1994). This is true however erroneous an act may have been, and however injurious its consequences were to the plaintiff. *Young*, 41 F.3d at 51. It should be noted, however, that "a judge is immune only for actions performed in his judicial capacity." *DuQuin*, 320 F. Supp. 2d at 41.

**\*6** Similarly, plaintiff's claims against defendant Fitzpatrick are also likely precluded. It is well-established that "prosecutors are entitled to absolute immunity for that conduct 'intimately associated with the judicial phase of the criminal process.' " *Hill v. City of N.Y.*, 45 F.3d 653, 660-61 (2d Cir. 1995) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976) ).

Because portions of plaintiff's complaint appear to relate to proceedings in Onondaga County Family Court regarding the custody of plaintiff's two daughters, it is likely that dismissal of those claims are precluded under the *Rooker-Feldman*[6] doctrine and the domestic relations exception to federal court jurisdiction. With respect to the former, the *Rooker-Feldman* doctrine recognizes that, except for the Supreme Court, federal courts are not authorized to exercise appellate jurisdiction over state-court judgments. *McKithen v. Brown*, 481 F.3d 89, 96 (2d Cir. 2007). A district court lacks jurisdiction to consider a plaintiff's claim when "(1) the plaintiff lost in state court, (2) the plaintiff complains of injuries caused by the state court judgment, (3) the plaintiff invites district court review of that judgment, and (4) the state court judgment was entered before the plaintiff's federal suit commenced." *McKithen*, 626 F.3d at 154 (citation omitted). The *Rooker-Feldman* doctrine relates to "lack of subject matter jurisdiction, and may be raised at any time by either party or sua sponte by the court." *Moccio v. N.Y.S. Office of Court Admin.*, 95 F.3d 195, 198 (2d Cir. 1996) (citations omitted), *abrogated on other grounds by* *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283 (2005).

Turning now to the domestic relations exception to federal court subject matter jurisdiction, federal courts do not have the authority to issue divorce, alimony, and child custody decrees.[7] *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992); *accord,* *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12-13 (2004). The exception recognizes that "the states have traditionally adjudicated marital and child custody disputes and therefore have developed competence and expertise in adjudicating such matters, which federal courts lack." *Thomas*, 814 F. Supp. at 1146 (citing *Ankenbrandt*, 504 U.S. at 703-04). "The doctrine also rests on the idea that state courts are peculiarly suited to enforce state regulations and domestic relations decrees involving alimony and child custody particularly in light of the fact that such decrees often demand substantial continuing judicial oversight." *Id.* While the Supreme Court has cautioned that this does not preclude jurisdiction over claims in which plaintiffs seek monetary damages for constitutional violations, *Ankenbrandt*, 504 U.S. at 703, in this case, plaintiff seeks money damages, as well injunctive relief, including, the return of her children to her custody. *See, e.g.,* Dkt. No. 1 at 9. Where tort claims "begin and end in a domestic dispute," however, is a question better suited for state courts. *See* *Schottel v. Kutyba*, No. 06-1577, 2009 WL 230106, at *1 (2d Cir. Feb. 2, 2009) (affirming, based on

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 250 of 311

Maretta-Brooks v. Hanuszczak, Not Reported in Fed. Supp. (2018)

the domestic relations exception, the district court's dismissal of the plaintiff's complaint alleging, *inter alia*, that the defendants "fraudulently misrepresented to the court the former couple's residence in order to file divorce proceedings in New York," and, as a result, plaintiff was "deprived of custody and visitation rights").

**\*7** Finally, several other principles likely preclude plaintiff's claims in this case. To the extent that plaintiff has intended to assert a constitutional cause of action under *Bivens*, Dkt. No. 1 at 1-4, such claim is subject to dismissal in light of the absence of any allegations that any of the defendants are federal officials. *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995). In addition, although plaintiff utilized a pre-printed form for actions involving employment discrimination under Title VII, Dkt. No. 1 at 5-9, because the complaint is devoid of any allegations concerning plaintiff's employment (or discrimination in the context of an employment), any claim arising under Title VII should be dismissed.

As was noted above, plaintiff's complaint also invokes 18 U.S.C. §§ 241, 242. Dkt. No. 1 at 3. Neither of those criminal statutes, however, provides a private right of action. *Powers v. Karen*, 768 F. Supp. 46, 51 (E.D.N.Y. 1991); *Shahin v. Darling*, 606 F. Supp. 2d 525, 538 (D. Del. 2009). Similarly, 18 U.S.C. § 1506 also does not give rise to a civil action. *Shahin*, 606 F. Supp. 2d at 538. Under 34 U.S.C. § 12601, only the United States Attorney General has the authority to bring a civil action. 34 U.S.C. § 12601(b); *Sathue v. Niagara City Police Dep't*, No. 17-CV-0747, 2018 WL 550520, at \*3 (W.D.N.Y. Jan. 25, 2018). To the extent plaintiff cited CPL § 70.10(2) in an attempt to assert a claim under that provision, Dkt. No. 1 at 16, even assuming any provision under New York's CPL gives rise to a private right of action, CPL § 70.10 is a definitional section only and, therefore, cannot, on its own, serve as a basis for a legal claim. Finally, plaintiff's complaint includes a reference to 18 U.S.C. § 1514A, providing whistleblower protection. Dkt. No. 1 at 3. Setting aside the complete absence of any factual allegations suggesting that section 1514A applies, the claim is subject to dismissal because plaintiff has provided no indication that she filed a complaint with the United States Secretary of Labor prior to commencing this action, as required. 18 U.S.C. § 1514A(b)(A); *Murray v. TXU Corp.*, 279 F. Supp. 2d 799, 802 (N.D. Tex. 2003); *accord, Hoffman v. Bailey*, No. 13-CV-5153, 2017 WL 1505920, at \*3 (E.D. La. Apr. 26, 2017);

*see also Day v. Staples, Inc.*, 555 F.3d 42, 54 n.7 (1st Cir. 2009).

In summary, the difficulty in making any definitive determination as to whether any of the previously discussed legal principles provide grounds for dismissal stems from the fact that plaintiff's complaint is bereft of facts, disjointed, and largely unintelligible. Simply stated, the allegations contained within plaintiff's complaint are not drafted in a manner that allows for the court to meaningfully analyze plaintiff's claims pursuant to 28 U.S.C. § 1915(e), nor would the allegations permit any of the defendants a fair opportunity to intelligently respond and thereby allow this case to proceed in an orderly manner. Because plaintiff's complaint fails to allege any facts that could be construed as giving rise to a cognizable cause of action, I recommend that it be dismissed. *See Canning v. Hofmann*, No. 15-CV-0493, 2015 WL 6690170, at \*5 (N.D.N.Y. Nov. 2, 2015) (Hurd, J.) ("Under these circumstances, having found that none of the allegations in Plaintiff's meandering and indecipherable Complaint raise a cognizable cause of action, the Court concludes that the Complaint fails to state a claim upon which relief may be granted and is subject to dismissal."); *see also Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ("Dismissal [for failure to comply with the requirements of Rule 8 of the Federal Rules of Civil Procedure] ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.").

### D. Whether to Permit Amendment

**\*8** Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. d1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc.*

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 251 of 311

Maretta-Brooks v. Hanuszczak, Not Reported in Fed. Supp. (2018)

*v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this case, due to the sparse factual allegations in plaintiff's complaint, it is not clear whether better pleading would permit her to state a cognizable cause of action. Nevertheless, out of deference to plaintiff's *pro se* status, I recommend she be granted leave to amend to cure the deficiencies identified in this report. Plaintiff should not be permitted to amend her complaint, however, to include any purported *Bivens* claims or any causes of action purportedly arising under 18 U.S.C. §§ 241, 241, 1514A, and 1506; 34 U.S.C. § 12601; or CPL § 70.10.

If plaintiff chooses to file an amended complaint, she should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) ); *Pourzandvakil v. Humphry*, No. 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint plaintiff must clearly set forth the facts that give rise to her claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, plaintiff is informed

that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (quotation marks omitted) ).

III. SUMMARY, ORDER, AND RECOMMENDATION

Plaintiff's IFP application for leave to proceed without prepayment of fees is incomplete. Accordingly, I deny her IFP application, without prejudice to renewal. Plaintiff's motion for appointment of counsel to represent her *pro bono* is also denied, again without prejudice. Finally, I find that plaintiff's complaint does not comply with the applicable pleading requirements and does not allege sufficient facts to survive review under 28 U.S.C. § 1915(e). Accordingly, it is hereby

**\*9**  ORDERED that plaintiff's motions for leave to proceed without prepayment of fees (Dkt. No. 2) and appointment of counsel (Dkt. No. 3) are DENIED; and it is further hereby respectfully

RECOMMENDED that plaintiff's complaint in this action be DISMISSED, with leave to replead, except with regard to any purported claims pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), or any purported causes of action arising under 18 U.S.C. §§ 241, 241, 1514A, and 1506; 34 U.S.C. § 12601; and CPL 70.10.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in Fed. Supp., 2018 WL 2021480

**Footnotes**

Maretta-Brooks v. Hanuszczak, Not Reported in Fed. Supp. (2018)

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 252 of 311

1    The roles and/or titles of defendants Murphy, Blitman, Dettor, Balduf, Haywood, and Hogan are not readily discernible on the face of plaintiff's complaint.

2    Effective September 1, 2017, that section was recodified at 🚩34 U.S.C. 12601.

3    The language of that section is ambiguous, in that it suggests an intent to limit availability of IFP status to prison inmates. *See* 🚩28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). Courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *see also Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

4    In *Brooks v. Onondaga Dep't of Children & Family Servs.*, No. 17-CV-1186 (N.D.N.Y. filed Oct. 25, 2017), Magistrate Judge Therese Wiley Dancks issued a report on April 9, 2018, recommending dismissal of plaintiff's complaint. That report remains pending before Senior District Judge Gary L. Sharpe.

5    In deciding plaintiff's motion, I have taken into consideration this court's custom and practice, which is to ordinarily assign *pro bono* counsel to represent an indigent *pro se* litigant, upon request, at the time of trial.

6    🚩*D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); 🚩*Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923).

7    "[A]lthough the domestic relations exception originated in the context of diversity cases, some courts have applied the exception in cases based upon federal question jurisdiction since the policy considerations which underlie the domestic relations exception may apply with equal force in cases arising under the court's federal question jurisdiction." 🚩*Thomas v. N.Y.C.*, 814 F. Supp. 1139, 1146 (E.D.N.Y. 1993) (citations omitted).

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1789593
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Alexander McFADDEN, Plaintiff,

v.

Jose D. ORTIZ, Executive Officer Chase JP
Morgan Chase & Co., and James Simon, Manager
Chase JP Morgan Chase & Co., Defendants.

No. 5:12–CV–1244 (MAD/ATB).
|
April 26, 2013.

**Attorneys and Law Firms**

Alexander McFadden, Pine City, NY, pro se.

Jose D. Ortiz, Executive Officer for Chase JP Morgan Chase
& Co., Houston, TX.

James Simon, Manager for Chase JP Morgan Chase & Co.,
New York, NY.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

 *1  Plaintiff *pro se* Alexander McFadden ("McFadden"),
an inmate at the Southport Correctional Facility ("SCF"),
filed this action pursuant to ⚑ 42 U.S.C. § 1983. In his
complaint, Plaintiff appears to allege that Defendants, two
executives of Chase JP Morgan Chase & Co. ("Chase"),
violated his constitutional rights through conduct that, in
some way, involved a bank account. *See* Dkt. No. 1 at ¶ 4.

On August 7, 2012, Magistrate Judge Andrew T. Baxter
issued an Order and ReportRecommendation, recommending
that the Court dismiss Plaintiff's complaint in its entirety with
prejudice, pursuant to ⚑ 28 U.S.C. § 1915(e)(2)(B)(i)-(ii).
*See* Dkt. No. 5. Currently before the Court are Plaintiff's
objections to Magistrate Judge Baxter's August 7, 2012 Order
and ReportRecommendation.

**II. BACKGROUND**

In his Order and Report–Recommendation dated August 7,
2012, Magistrate Judge Baxter recommended that Plaintiff's
motion to proceed *in forma pauperis* ("IFP") should be denied
by the Court and, upon review of the complaint, that this
action be dismissed in its entirety with prejudice pursuant
to ⚑ 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at
9. Further, Magistrate Judge Baxter recommended that if
the Court approves his report, the Court should certify that
any appeal from this matter will not be taken in good faith
pursuant to ⚑ 28 U.S.C. § 1915(a)(3). *See id.*

Regarding Plaintiff's complaint, Magistrate Judge Baxter's
Order and ReportRecommendation recommends that because
there is no indication that either Defendant acted under "color
of state law," and because there are no allegations that either
or both Defendants "conspired" with any state actors to bring
this action under ⚑ section 1983, Plaintiff's complaint should
be dismissed. *See* Dkt. No. 5 at 5.

Regarding Plaintiff's claim that Defendants violated New
York Penal Law by offering false documents for filing,
tampering with public records, and falsifying business
records, Magistrate Judge Baxter recommended that because
there is no private right of action to enforce either state or
federal criminal statutes, Plaintiff is barred from bringing
a claim to enforce these provisions of the New York State
Criminal Law. *See* Dkt. No. 5 at 6.

Accordingly, Magistrate Judge Baxter recommended this
Court hold that, due to Plaintiff's failure to state a claim
under ⚑ 42 U.S.C. § 1983 upon which relief can be granted,
combined with the courts inability to determine what venue
might be appropriate, Plaintiff's motion for IFP should be
denied, and Plaintiff's complaint should be dismissed in its
entirety with prejudice pursuant ⚑ 28 U.S.C. § 1915(e)(2)(B)
(i)-(ii). *See* Dkt. No. 5 at 9.

In his "objections" to Magistrate Judge Baxter's Order and
Report–Recommendation, Plaintiff simply provides the Court
with language from various cases discussing various types of
objections and the Court's authority to review unpreserved
errors. *See* Dkt. Nos. 14, 15.

### III. DISCUSSION

**A. Review of a magistrate judge's decision**

**\*2**  If a party files specific objections to a magistrate judge's report-recommendation, the district court performs a *"de novo* determination of those portions of the report of specified proposed findings or recommendations to which objections is made." 28 U.S.C. § 636(b)(1) (2006). However, if a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that were presented] to the magistrate judge," the court simply reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). At the conclusion of the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. *In Forma Pauperis* application**

In order for a plaintiff to proceed without payment of any fees, he must first meet the financial criteria for IFP status. *See* 28 U.S.C. § 1915(a)(1). The plaintiff must submit an affidavit, including a statement of all assets, establishing his inability to pay the filing fee of $350.00. *See id.* Here, Plaintiff submitted a standard IFP application form, but answered only some of the relevant questions. Furthermore, while Plaintiff is incarcerated and has filed a motion to proceed IFP, his application states that, in the past twelve months, he has had income from "[b]usiness, profession or other self employment," and has "millions of dollars" in "cash, checking or savings accounts." *See* Dkt. No. 2 at ¶¶ 3, 4. Plaintiff, however, does not answer the question that asks him to "describe the source of money and state the amount received and what you expect you will continue to receive ." *See id.* at ¶ 3. Plaintiff answers "yes" to the questions asking whether he owns "real estate, stocks, bonds, securities, other financial instruments, automobile or any other assets." *See id.* at ¶ 5. Once again, however, Plaintiff does not complete the question by describing the property and stating its value. *See id.* Lastly, the form indicates that Plaintiff only has $9.60 in his prison account, and that during the last six months prior to this application, the average balance in his prison account was $4.03. *See* Dkt. No. 2 at 2.

If Plaintiff's claims are true and he does in fact have millions of dollars and real estate or other valuable property, then he cannot meet the financial requirements for proceeding IFP. Generally, when plaintiff has failed to properly complete the IFP request, the court will deny IFP without prejudice and allow plaintiff to resubmit the form with proper information. However, in this case, based upon the inadequacy of Plaintiff's responses, combined with his failure to state a plausible cause of action and the fact that amendment would be futile as discussed below, even if Plaintiff met the financial requirements for IFP, the Court would still find dismissal of this action to be proper.

**C. Sufficiency of the complaint**

**1. Legal Standard**

**\*3**  In addition to determining whether Plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if it determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B) (i)-(iii).

**2. Application**

**a. Color of state law**

Plaintiff brings this complaint pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1. To state a claim under section 1983, a plaintiff must allege two elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a deprivation of her rights or privileges as secured by the Constitution of the United States. *See Annis v.*

County of Westchester, 136 F.3d 239, 245 (2d Cir.1998). Under extremely limited circumstances not alleged here, private actors, such as Defendant, may be held liable under section 1983. *See White v. Monarch Pharmaceuticals,* Inc., No. 08–CV–0430, 2009 WL 3068217, *1 (2d Cir. Sept. 28, 2009); *see also Rendell—Baker v. Kohn,* 457 U.S. 830, 838–42 (1982). The law does not reach private conduct, no matter how "discriminatory or wrongful." *Annis,* 136 F.3d at 245 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1002 (1982)).

In the present matter, Plaintiff names two executives of Chase as Defendants. Along with being very difficult to determine what these Defendants allegedly did to Plaintiff, there is no indication that either Defendant acted under color of state law. Moreover, the complaint does not allege or suggest that Defendants conspired with a state actor to violate his constitutional rights. Further, Plaintiff does not allege any conduct attributable to either Defendant sufficient to establish their personal involvement in any alleged constitutional deprivation. *See* ▯*Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted).

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss the complaint.

### b. Criminal statutes

Plaintiff states in the "Causes of Action" section of his complaint that Defendants violated the New York Penal Law regarding falsifying business records, tampering with public records, and offering false documents for filing. *See* Dkt. No. 1 (citing ▯N.Y. PENAL LAW §§ 175.10, 175.25, and 175.35). Even if this is true, however, there is no private right of action to enforce either state or federal criminal statutes. *See* *Abrahams v. Incorporated Village of Hempstead,* No. 08–CV–2584, 2009 WL 1560164, *8 (E.D.N.Y. June 2, 2009)* (holding that dismissal of civil suit for perjury was proper because there is no private right of action for perjury under New York Law). Therefore, even assuming, *arguendo,* that Defendants violated some criminal statutes, Plaintiff may not bring a claim based on those statutes to enforce New York Criminal Law.

**\*4** As such, Magistrate Judge Baxter correctly recommended the Court find that Plaintiff has failed to allege a plausible cause of action.

### c. Venue

Venue in federal-question cases is generally determined by ▯28 U.S .C. § 1391(b) which provides that

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise

> provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, ... or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

▯28 U.S.C. § 1391(b). In this case, one of the Defendants is listed with a Houston, Texas address, while the other Defendant is listed as having a New York City address. *See* Dkt. No. 1 at ¶¶ 3(a) and (3)(b). Thus, neither of the Defendants reside, or are located, in the Northern District of New York. Plaintiff is incarcerated at Southport Correctional Facility, located in the Western District of New York. Therefore, since both Plaintiff and one of the Defendants are New York residents, this case could clearly not be brought as a diversity action. Moreover, under Plaintiff's ▯section 1983 claim, venue is not proper in the Northern District of New York. All Defendants do not reside in the same state, neither Defendant is located in this district, and the complaint does not allege any conduct that occurred in the Northern District of New York.

Under 28 U.S.C. § 1406, a district court faced with a case brought "laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The Second Circuit has suggested that "a district court should not dismiss for improper venue on its own motion except in extraordinary circumstances." ▯*Concession Consultants, Inc. v. Mirisch,* 355 F.2d 369 (2d Cir.1966).

In the present matter, the Court finds and agrees with Judge Baxter's Order and ReportRecommendation that this case presents precisely the extraordinary circumstances making it proper for the Court to dismiss for improper venue *sua sponte.*

### d. Leave to amend

When a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint

gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citations omitted). Of course, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] cause of action is substantive" such that "better pleading will not cure it ." *Id.* (citation omitted); *see also* *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993).

 **\*5** Here, the Court agrees with Magistrate Judge Baxter that any attempt by Plaintiff to amend his complaint would be futile. As discussed, although Plaintiff alleges "due process violations," section 1983 does not permit such actions to be brought against private individuals absent some involvement by the state. Moreover, Plaintiff does not have the right to enforce New York State criminal statutes.

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss Plaintiff's complaint with prejudice.

### IV. CONCLUSION

After carefully considering Magistrate Judge Baxter's Order and Report–Recommendation, the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's August 7, 2012 Order and Report–Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further **ORDERS** that Plaintiff's application to proceed *in forma pauperis* is **DENIED;** and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii); and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve Plaintiff with a copy of this Memorandum–Decision and Order in accordance with Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1789593

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 257 of 311

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

1995 WL 316935
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Mina POURZANDVAKIL, Plaintiff,

v.

Hubert HUMPHRY, Judisicial Systeam of The State of
Minnesota and Olmested County Court Systeam, and
State of Minnesota, Saint Peter State Hospital, Doctor
Gammel Stephelton, et el Erickson, North West Bank
and Trust, Olmested County Social Service, J.C. Penny
Insurnce, Metmore Finicial, Traveler Insurnce, Comecial
Union Insurnce, Hirman Insurnce, Amrican State
Insurnce, Farmers Insurnce, C. O Brown Insurnce, Msi
Insurnce, Steven Youngquist, Kent Chirstain, Micheal
Benson, United Airline, Kowate Airline, Fordmotor
Cridite, First Bank Rochester, George Restwich,
British Airways, Western Union, Prudenial Insurnce,
T.C.F. Bank, Judge Sandy Kieth, Judge Niergari,
Olmestead County Judgering, Judge Mores, Judge
Jacobson, Judge Challien, Judge Collin, Judge Thomase,
Judge Buttler, Judge Morke, Judge Moweer, Sera
Clayton, Susan Mudhaul, Ray Schmite, Defendants.[1]

Civ. A. No. 94-CV-1594.
|
May 23, 1995.

## Attorneys and Law Firms

Hubert H. Humphrey, III, Atty. Gen. of the State of Minn.,
St. Paul, MN, Jerome L. Getz, Asst. Atty. Gen., of counsel,
for Hubert H. Humphry, III, Judicial System of the State
of Minnesota, St. Peter Regional Treatment Center, Gerald
Gammell, MD, William Erickson, MD, Thomas Stapleton,
MD, the Honorable James L. Mork, Chief Judge Anne
Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge
Dennis Challeen, and Judge Lawrence Collins.

Condon & Forsyth, P.C., New York City, Stephen J. Fearon,
Michael J. Holland, of counsel, for British Airways, P.L.C.
and Kuwait Airways Corp.

Dunlap & Seeger, P.C., Rochester, MN, Gregory J. Griffiths,
of counsel, for Olmsted County, Raymond Schmitz, Susan
Mundahl, Norwest Bank Minnesota, N.A. (the Northwest
Bank & Trust), C.O. Brown Agency, Inc.

Arthur, Chapman, McDonough, Kettering & Smetak, P.A.,
Minneapolis, MN, Eugene C. Shermoen, Jr., of counsel, for
J.C. Penney Ins. Co. and Metropolitan Ins. Co.

Shapiro & Kreisman, Rochester, NY, John A. DiCaro, of
counsel, for Metmor Financial, Inc.

Costello, Cooney & Fearon, Syracuse, Paul G. Ferrara, Robert
J. Smith, of counsel, for Travelers Ins. Companies; Hirman
Ins.; Commercial Union Ins. Companies.

Smith, Sovik, Kendrick & Sugnet, P.C., Syracuse, Thomas
N. Kaufmann, of counsel, for American States Ins. Co. and
Prudential Ins. Co.

Steven C. Youngquist, Rochester, MN, pro se.

Thomas J. Maroney, U. S. Atty., Syracuse, NY, William F.
Larkin, Asst. U. S. Atty., of counsel, for Michael Benson,
Postmaster N. D. of New York.

George F. Restovich & Associates, Rochester, MN, George F.
Restovich, of counsel, for George F. Restovich.

Conboy, McKay, Bachman & Kendall, L.L.P., Watertown, NY,
George K. Myrus, of counsel, for Western Union.

Richard Maki, Rochester, MN, pro se.

## MEMORANDUM-DECISION AND ORDER

POOLER, District Judge.

### INTRODUCTION

**\*1** In the four and one-half months since she filed this
action, plaintiff Mina Pourzandvakil has filed three amended
complaints and ten motions. She also has sought and received
entry of default against ten defendants, none of whom she
properly served. She twice has sought and been denied
temporary restraining orders. She has included in her action
defendants with no apparent connection to this forum, that
were vindicated in actions she brought in other forums.

In response, several individual defendants and groups of
defendants have filed a total of twelve motions, some seeking
vacation of the defaults entered against them, some seeking
dismissal and others seeking both. We grant defendants'
motions insofar as they seek vacation of the clerk's entries of
default and dismissal of the complaint. We vacate *sua sponte*

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 258 of 311

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

the entries of default against the non-moving defendants. Finally, we dismiss the complaint in its entirety against all defendants.

BACKGROUND

Pourzandvakil commenced this action by filing a complaint in the Office of the Clerk on December 9, 1994 (Docket No. 1). The complaint named as defendants the Attorney General of the State of Minnesota, the State of Minnesota and Olmsted County, Minnesota judicial systems, various Minnesota judges and prosecutors, St. Peter State Hospital in Minnesota and various doctors who worked at St. Peter's. Without specifying the time or defendant involved, the complaint accused the defendants of kidnapping Pourzandvakil and her daughter, torturing Pourzandvakil in the Mayo Clinic since April 1985, and causing Pourzandvakil and her daughter to suffer physically, financially and emotionally. Pourzandvakil twice requested that we issue a temporary restraining order. We denied both requests. *See* Order entered December 14, 1994 (Docket No. 4) and Memorandum-Decision and Order entered December 22, 1994 (Docket No. 6).

On December 27, 1994, Pourzandvakil filed an amended complaint (the "first amended complaint") (Docket No. 7) that appears to differ from the original complaint by adding British Airways as a defendant without making any allegations against British Airways. The first amended complaint also differs by requesting additional damages for prior cases and adding descriptions of several previous cases. Annexed to the first amended complaint is another document labeled amended complaint (the "annexed amended complaint") (Docket No. 7) whose factual allegations differ substantially from both the original complaint and the first amended complaint. The annexed amended complaint also adds British Airways as a party but specifies only that Pourzandvakil has travelled on that airline and that British Airways, along with other airlines on which Pourzandvakil has travelled, is aware of all the crimes committed against her.

Pourzandvakil filed yet another amended complaint on January 13, 1995 (the "second amended complaint") (Docket No. 11). The second amended complaint adds as defendants several banks, other financial institutions, insurance companies, insurance agents or brokers, attorneys and airlines as well as the Postmaster of Olmsted County and Western Union. The allegations against these defendants defy

easy summarization and will be addressed only insofar as they are relevant to the various motions.

**\*2** The Clerk of the Court has entered default against the following defendants: J.C. Penny Insurnce (*sic*)[2] ("J.C. Penney"), British Airways, Kowate (*sic*) Airline ("Kuwait"), MSi Insurnce (*sic*) ("MSI"), Judge Mork, Steven Youngquist ("Youngquist"), Prudncial Insurnce (*sic*) ("Prudential"), Ford Motor Credit ("Ford"), First Bank Rochester, and TCF Bank ("TCF"). Based on the submissions Pourzandvakil made in support of her requests for entry of default, it appears that she served these defendants by certified mail.

The court has received answers from the following defendants: Hubert H. Humphrey III, St. Peter Regional Treatment Center, and Drs. Gerald H. Gammell, William D. Erickson, and Thomas R. Stapleton (joint answer filed January 9, 1995); Olmsted County, Ray Schmitz ("Schmitz"), Susan Mundahl ("Mundahl"), C.O. Brown Agency, Inc. ("C.O. Brown") (answer to amended complaint filed January 23, 1995); George Restovich ("Restovich") (answer to complaint or amended complaint filed January 30, 1995); Norwest Corporation ("Norwest") (answer to amended complaint filed January 31, 1995, amended answer of Norwest Bank Minnesota, N.A. to amended complaint filed February 13, 1995); Travelers Insurance Company ("Travelers") (answer filed February 1, 1995); Michael Benson ("Benson") (answer filed February 6, 1995); Hirman Insurance ("Hirman") (answer filed February 6, 1995); Richard Maki ("Maki") (answer to complaint or amended complaint filed February 17, 1995); Western Union (answer filed February 21, 1995); Steven C. Youngquist ("Youngquist") (answer to complaint or amended complaint filed February 23, 1995); Kuwait (answer filed March 6, 1995); J.C. Penney (answer filed March 22, 1995); Susan E. Cooper[3] (answer to amended complaint filed March 24, 1995); and Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen and Judge Lawrence Collins (joint answer filed April 3, 1995).

The court has also received a total of ten motions from Pourzandvakil since February 27, 1995. She moved for a default judgment against defendants J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways, and TCF. She moved for immediate trial and "venue in a different place" against several defendants and also requested action according to law and criminal charges. Finally, she made motions opposing defendants' motions.

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 259 of 311

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

The court also has received a total of thirteen motions [4] from defendants. Several of the defendants moved for dismissal either under Rule 56 or Rule 12 of the Federal Rules of Civil Procedure. For instance, Commercial Union Insurance Companies ("Commercial") moved for dismissal of Pourzandvakil's complaint pursuant to Fed. R. Civ. P. 12(b) or, in the alternative, for a more definite statement. Commercial argued that Pourzandvakil's complaint against it is barred by *res judicata* and collateral estoppel and that this court does not have subject matter jurisdiction over the complaints against Commercial. American States Insurance Company ("ASI") moved for dismissal based on plaintiff's failure to state a claim upon which relief can be granted. ASI further moved for an order enjoining Pourzandvakil from further litigation against it. Maki moved for summary judgment based on lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim upon which relief can be granted, and lack of subject matter jurisdiction. Hubert H. Humphrey, III, the Judicial System of the State of Minnesota, Judge James L. Mork, St. Peter Regional Treatment Center and Drs. Gammell, Erickson and Stapleton (collectively, the "state defendants") moved for summary judgment alleging lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim on which relief can be granted, lack of subject matter jurisdiction, sovereign immunity, and, on behalf of Judge Mork and the judicial system, absolute judicial immunity. The state defendants also requested costs and attorney's fees. Travelers moved for summary judgment based on *res judicata* and/or collateral estoppel, frivolity, lack of subject matter jurisdiction, and improper venue. Travelers sought a transfer of venue to Minnesota in the alternative. Hirman moved for summary judgment based on frivolity, lack of subject matter jurisdiction, and improper venue. Hirman also sought transfer of venue in the alternative. Olmsted County, Schmitz, Mundahl, C.O. Brown and Norwest sought dismissal based on lack of personal jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. With respect to Schmitz and Mundahl, defendants sought dismissal based on absolute prosecutorial immunity, and with respect to C.O. Brown, defendants sought dismissal on *res judicata* grounds. Metmor Financial, Inc. ("Metmor") sought dismissal based on lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. Finally, Restovich moved for dismissal based on lack of personal jurisdiction. [5]

**\*3** Four defendants, British Airways, Kuwait, Prudential, and Youngquist, sought vacatur of the defaults entered against them. Prudential coupled its request with a request for an order enjoining plaintiff from filing or intervening in any litigation against it. Youngquist also requested dismissal of the complaint based on lack of personal jurisdiction and lack of subject matter jurisdiction.

ANALYSIS

The Defaults

We vacate the defaults entered in this matter because plaintiff improperly served defendants. Each application for entry of default shows service by certified mail, which is not permitted by relevant federal, New York or Minnesota rules. Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. Fed. R. Civ. P. 4(e)(2). Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. Fed. R. Civ. P. 4(e)(1). Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. Fed. R. Civ. P. 4(h)(1) and 4(e)(1). Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *See* N.Y. Civ. Prac. L. & R. §§ 308, 311 (McKinney Supp. 1995); N.Y. Bus. Corp. Law § 306 (McKinney Supp. 1995); Minn. Stat. § 543.08 (1995); Minn. R. 4.03 (1995). Finally, service on states, municipal corporations or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. Fed. R. Civ. P. 4(j)(2). Minnesota law does not authorize service on a governmental entity by certified mail. *See* Minn. R. 4.03(d) and (e) (1995).

We therefore grant the motions by British Airways, Prudential, Kuwait, and Youngquist to vacate the defaults entered against them based both on the defective service and

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 260 of 311

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

also on the meritorious defenses discussed below. We vacate *sua sponte* the entries of default against MSI, Ford, First Bank Rochester and TCF, all of whom were served improperly and preserved the service issue by raising it or declining to waive it. Concomitantly, we deny Pourzandvakil's motion for a default judgment against J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways and TCF. We vacate *sua sponte* the entry of default against J. C. Penney, which preserved the issue of service in its answer. By moving to dismiss or for summary judgment without raising the issue of service, Judge Mork may have waived the service issue. However Judge Mork objected to personal jurisdiction as inconsistent with due process and otherwise presented meritorious defenses. We therefore treat his motion for summary judgment as including a motion to vacate the entry of default and accordingly grant it.

## II. The Jurisdictional Arguments

**\*4** In addition to raising various other grounds for dismissal, such as plaintiff's failure to state a claim on which relief can be granted and *res judicata,* most of the moving defendants urge (1) that this court lacks jurisdiction over either their persons or the subject matter of the controversy or (2) that this action is improperly venued. As we must, we examine jurisdiction and venue first.

### A. Personal Jurisdiction

Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich and Youngquist each allege that this court cannot exercise personal jurisdiction over them consistent with due process constraints. In support of their motions, these defendants present affidavits showing that they have had no significant contacts with the state of New York relevant to this lawsuit and that their contacts with Pourzandvakil all occurred in Minnesota. Nothing in plaintiff's voluminous submissions links any of these defendants with New York. Plaintiff's extraterritorial service of process can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York State; (2) if the defendant is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to Rule 14 or Rule 19 of the Federal Rules of Civil Procedure and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be

subject to jurisdiction in the courts of general jurisdiction in any state of the United States. Fed. R. Civ. P. 4(k). Defendants are not subject to federal interpleader jurisdiction and they were not joined pursuant to Rule 14 or Rule 19. In addition, no federal long-arm statute is argued as a basis for jurisdiction, and the moving defendants all would be subject to jurisdiction in Minnesota. Therefore, we must look to New York's long-arm statute to determine whether plaintiff's extraterritorial service of process could be effective under the one ground remaining pursuant to Rule 4(k). *See* N.Y. Civ. Prac. L. & R. § 302 (McKinney Supp. 1995). This rule provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain minimal contacts between the defendant and the state (such as transacting any business in the state) and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact. *Id.* §302(a). The moving defendants have demonstrated that plaintiff does not claim harm stemming from acts or contacts within the purview of Section 302(a). Therefore, we grant these defendants' motions to dismiss the complaint for lack of personal jurisdiction.

### B. Subject Matter Jurisdiction

Pourzandvakil's complaint does not contain the jurisdictional allegations required by Fed. R. Civ. P. 8(a)(1). Several defendants move for dismissal based either on this pleading defect or on an affirmative claim that no subject matter jurisdiction exists. Commercial, Travelers and Hirman (collectively, the "moving insurance companies") moved for dismissal because plaintiff has not pled the complete diversity of citizenship required for subject matter jurisdiction. The state defendants, relying on *District of Columbia Court of Appeals v. Feldman,* argue that we lack subject matter jurisdiction over any issue that was determined in a state court proceeding to which plaintiff was a party.

*District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 482 (1983). These issues include plaintiff's hospitalization at St. Peter Regional Treatment Center. Finally, Metmor also moved for dismissal based on lack of subject matter jurisdiction because plaintiff has failed to plead a jurisdictional basis.

**\*5** The moving insurance companies note correctly that insofar as the claims against them can be deciphered, plaintiff states that Traveler's and Commercial did not pay for damages to Pourzandvakil's property, harassed her and cancelled her policy. Pourzandvakil does not mention Hirman in her complaint, but Hirman's attorney states that Pourzandvakil

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 261 of 311

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

informed him in a telephone conversation that her complaint against Hirman stemmed from actions it took as an agent of Travelers in denying Pourzandvakil's 1985 property damage claim.

The moving insurance companies argue that this court has no jurisdiction over the state insurance law claims absent complete diversity of citizenship between plaintiff and the defendants. 🚩 28 U.S.C. § 1332. They point out that plaintiff lists a Syracuse, New York address for herself and that Kuwait's address as listed in the complaint is also in New York. Therefore, they argue, there is no complete diversity and this court lacks subject matter jurisdiction absent a basis for pendent jurisdiction under 🚩 28 U.S.C. § 1367(a). 🚩 Section 1367(a) requires a relationship between the state and federal claims so that "they form part of the same case or controversy." *Id.* Because plaintiff's claims of denial of insurance coverage bear no apparent relationship to her other claims of rape, torture, harassment and kidnapping, we do not believe that an adequate basis for supplemental jurisdiction exists. *Id.* Plaintiff's complaint therefore shows no basis for subject matter jurisdiction against the moving insurance companies, and we dismiss as against them. [6]

We also agree with the state defendants that state court decisions may render certain of plaintiff's claims against them unreviewable either because of *res judicata* or lack of subject matter jurisdiction. However, because plaintiff's claims are so generally stated and so lacking in specifics, we are unable to discern at this juncture what parts of her complaint would be outside the jurisdiction of the court. In any case, we already have determined that the state defendants are clearly entitled to dismissal on personal jurisdiction grounds. As for Metmor, we believe that plaintiff may be attempting to state a civil rights claim by alleging a conspiracy to murder in connection with a judge although she fails to articulate an actionable claim. We note that we already have determined, in any case, that Metmor is entitled to dismissal on personal jurisdiction grounds.

### C. Venue

Metmor, Travelers, Maki, Hirman, Norwest, Olmsted County, C.O. Brown, Schmitz and Mundahl also allege that Pourzandvakil's action is not properly venued in this court. Although these defendants are entitled to dismissal on independent grounds, improper venue also would support dismissal as to these defendants. The general venue statute

provides that a diversity action, except as otherwise provided by law, may be brought only in

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

**\*6** 🚩 28 U.S.C. § 1391(a). 🚩 Section 1391(b) provides that federal question actions, except as otherwise provided by law, may be brought only in

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

🚩 *Id.* § 1391(b). The majority of the defendants in this action are residents of Minnesota and all of the events of which Pourzandvakil complains occurred in Minnesota. No defendant resides in the Northern District of New York, and none of the conduct plaintiff complains of occurred in this district. Therefore, venue in the Northern District of New York is clearly improper. Where venue is laid in the wrong district, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Id.* § 1406(a). Because, as we will explain below, Pourzandvakil's complaint not only fails

to state a claim upon which relief can be granted but is also frivolous, we do not deem it to be in the interest of justice to transfer this case to another district. The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is "to eliminate impediments to the timely disposition of cases and controversies on their merits." *Minnette v. Time Warner,* 997 F.2d 1023, 1027 (2d Cir. 1993) (holding that it was an improper exercise of discretion to dismiss rather than transfer when the statute of limitations on a timely filed complaint ran between filing and dismissal). In this case, as discussed below, a review of the complaint and the plaintiff's submissions on these motions indicates that her claims are frivolous. We therefore dismiss as to the moving defendants both on venue grounds and on the other grounds already identified as applicable. We note also that plaintiff has made claims similar to those in this action against many of the same defendants in the United States District Court for the District of Minnesota. *Pourzandvakil v. Price,* Civ. No. 4-93-207 (D.Minn. 1993). This action was dismissed by Order to Show Cause entered April 12, 1993.

III. Failure to State a Claim on Which Relief Can be Granted and Frivolity

Defendants ASI, Travelers, Hirman, Norwest, C.O. Brown, Olmsted County, Schmitz, Mundahl, Prudential, Metmor, and Youngquist as well as the state defendants have attacked the sufficiency of plaintiff's complaint. Travelers and Hirman urge that the complaint is frivolous while the remaining defendants argue only that the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).[7] We already have dismissed against all the moving parties except ASI on jurisdictional grounds and therefore have the power to address the Rule 12(b)(6) issue only on ASI's motion. *See* Bell v. Hood, 327 U.S. 678, 682-83 (1946) (subject matter jurisdiction); *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 221 (2d Cir. 1963) (personal jurisdiction). We grant ASI's motion and note in passing that were we empowered to reach the merits regarding the remaining moving defendants, we also would dismiss the complaint against them for failure to state a claim upon which relief can be granted. We also dismiss *sua sponte* as frivolous the complaint against all defendants who have not been granted dismissal previously on jurisdictional grounds.

**\*7** Pourzandvakil has not specified a statutory or constitutional basis for her claims against ASI or any of the other defendants. She alleges that certain of the insurance company defendants denied her claims for damages without alleging that the denial was in any respect wrongful. She also alleges in general terms that the defendants harassed, tortured, kidnapped and raped her and perhaps were involved in a murder plot but does not supply (1) the dates on which these actions occurred, except to say that they began in 1984 and 1985; (2) the names of the specific defendants involved in any particular conduct; or (3) a description of any particular conduct constituting the harassment, torture or kidnapping. She suggests without further detail that ASI was involved in a plot to murder her by placing her in the Mayo Clinic. Although plaintiff does not allege specific constitutional provisions or statutes that defendants have violated, we assume -- largely because many of the defendants involved are state officials or state employees and she appears to complain of certain aspects of various trials -- that she wishes to complain of violations of her civil rights. Complaints that rely on civil rights statutes are insufficient unless "they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987). A *pro se* plaintiff's complaint must be construed liberally and should be dismissed only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Estelle v. Gamble, 429 U.S. 97, 106 (1976) (quotation omitted). Pourzandvakil has not satisfied even this minimal test; her complaint and submissions on this motion demonstrate that she cannot prove any set of facts in support of her claim which would entitle her to relief. Her complaint consists of a "litany of general conclusions" rather than "specific allegations of fact". Barr, 810 F. 2d at 363.

Ordinarily we would allow plaintiff an opportunity to replead to state specific allegations against ASI, but three factors militate against this course of action. First, our December 22, 1994, Memorandum - Decision and Order denying plaintiff's request for a temporary restraining order indicated that she had not shown a likelihood of success on the merits of her claim because she had not pled any specific actionable facts. Despite the fact that plaintiff since has filed three amended complaints, she still fails to set forth specific actionable conduct. Second, the defendants' motions themselves have alerted plaintiff to the need to show specific actionable facts, and yet her voluminous submissions in opposition to the motions contain no specific actionable facts. Finally, plaintiff has asserted similar allegations against many of the same defendants sued in this action -- although not ASI -- as well as

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 263 of 311

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

others in several different jurisdictions. *See Pourzandvakil v. Blackman,* [8] Civ. No. 94-C944 (D.D.C. 1994), *Pourzandvakil v. Doty* (E.D.N.Y. 1993), *Pourzandvakil v. Price,* Civ. No. 7 (D.Minn. 1993). Where the results are known to us these actions resulted in dismissals for failure to state a claim upon which relief can be granted. *Pourzandvakil v. Price,* Civ. No. 4-93-207, Order to Show Cause entered April 12, 1993; *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, Order entered April 28, 1994, *aff'd* Civ. No. 94-5139 (D.C. Cir. 1994) (per curiam). In the Minnesota case, dismissal took place after the district court offered plaintiff an opportunity to amend her pleading and plaintiff still was not able to offer specifics. [9] Even *pro se* complaints must show "some minimum level of factual support for their claims." *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, (quoting *White v. White,* 886 F. 2d 721, 724 (4th Cir. 1989)). We therefore dismiss plaintiff's complaint against ASI for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

**\*8** We note that in *Pourzandvakil v. Blackman,* Judge John H. Pratt dismissed plaintiff's *in forma pauperis* complaint *sua sponte* under 28 U.S.C. §1915(d), holding both that it failed to state a claim on which relief can be granted and that it was frivolous. We consider here whether we have the authority to dismiss *sua sponte* plaintiff's complaint, which was not filed *in forma pauperis,* as frivolous as against all non-moving defendants. The Supreme Court explicitly has acknowledged a district court's power under Section 1915(d) to dismiss as frivolous a complaint which "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). The Supreme Court explicitly declined to rule, however, on whether a district court has the authority to dismiss *sua sponte* frivolous complaints filed by non-indigent plaintiffs. *Id.* at 329 n.8. The law in this circuit is that a district court may *sua sponte* dismiss a frivolous complaint even if the plaintiff has paid the filing fee. *See Tyler v. Carter,* 151 F.R.D. 537, 540 (S.D.N.Y. 1993), *aff'd* 41 F.3d 1500 (2d Cir. 1994); *cf. Pillay v. I.N.S.,* 45 F.3d 14, 17 (2d Cir. 1995) (*per curiam*) (dismissing *sua sponte* appeal for which appellant had paid normal filing fee). We believe that *sua sponte* dismissal is appropriate and necessary here because (1) plaintiff's claims lack an arguable basis in law and fact; (2) plaintiff has repeatedly attempted to replead her claims without being able to articulate actionable conduct; (3) some of plaintiff's claims have been tested in other courts and

found to be without merit; and (4) the issue of frivolity has been presented by at least some of the moving defendants.

We therefore dismiss with prejudice plaintiff's complaint as frivolous as to all defendants -- regardless of whether they have moved for dismissal -- that have not been granted dismissal on jurisdictional grounds. We direct the clerk to return plaintiff's filing fee to her. *Tyler,* 151 F.R.D. at 540.

## IV. Requests for Sanctions, Costs, Attorney's Fees and Injunction Against Filing Further Actions

Because plaintiff is *pro se* and appears to have a belief in the legitimacy of her complaint, we do not believe that the purpose of Rule 11 would be served by awarding sanctions. *See Carlin v. Gold Hawk Joint Venture,* 778 F. Supp. 686, 694-695 (S.D.N.Y. 1991). Moreover, her litigiousness has not yet reached the point at which courts in this circuit have justified injunctive relief. *See id.* at 694 (and collected cases). We therefore deny the requests of ASI and Prudential for injunctive relief. Our refusal to grant sanctions and injunctive relief, however, is conditioned on this dismissal putting an end to plaintiff's attempts to sue these defendants on these claims in this forum. Any further attempts by plaintiff to revive these claims will result in our revisiting the issue of sanctions. *Id.* at 695.

### CONCLUSION

**\*9** All defaults entered by the clerk are vacated. Plaintiff's complaint is dismissed in its entirety against all moving and non-moving defendants. The dismissal of the complaint against Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich, Youngquist, Commercial, Travelers and Hirman is without prejudice as it is premised on this court's lack of power either over the person of the defendant or the subject matter of the controversy. *See Voisin's Oyster House, Inc. v. Guidry,* 799 F.2d 183, 188-9 (5th Cir. 1986) (dismissal for lack of subject matter jurisdiction is not a dismissal on the merits); *John Birch Soc'y. v. National Broadcasting Co.,* 377 F.2d 194, 199 n.3 (2d Cir. 1967) (dismissal for lack of subject matter jurisdiction implies no view of merits); *Orange Theatre Corp. v. Rayherstz Amusement Corp.,* 139 F.2d 871, 875 (3d Cir.) *cert. denied,* 322 U.S. 740(1944) (dismissal for lack of personal jurisdiction is not a dismissal on the merits). The dismissals against the remaining defendants are

Case 6:23-cv-00316-DNH-ML    Document 13    Filed 04/18/23    Page 264 of 311

**Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)**

with prejudice. All requests for sanctions and attorney's fees are denied. The requests of defendants ASI and Prudential for an injunction with respect to future litigation is denied. However, plaintiff is cautioned that any litigation in this forum attempting to revive the claims addressed herein may subject her to sanctions. Plaintiff's motions are denied as moot.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1995 WL 316935

## Footnotes

1    Names in the caption are spelled to reflect plaintiff's complaint.

2    Plaintiff's spelling is idiosyncratic, and we preserve the spelling in its original form only where absolutely necessary for accuracy of the record. Otherwise we substitute the word we believe plaintiff intended for the word she actually wrote, e.g., "tortured" for "tureared."

3    Susan E. Cooper is not named as a defendant in the original complaint or any amended complaint filed with this court. From correspondence with Cooper's attorney, it appears that plaintiff sent Cooper a copy of a different version of the complaint. Because the original of this version was not filed with the court, no action against Cooper is pending in this court.

4    The court has also received three additional motions returnable May 22, 1995. The first -- from Judges Davies, Klaphake, Challeen, Collins and Chief Judge Simonett requests summary judgment dismissing the complaint based on lack of personal jurisdiction. The second by Western Union also requests summary judgment based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. The third, by British Airways, also requests dismissal based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. All three motions are mooted by this memorandum-decision and order which dismisses the complaint in its entirety against non-moving defendants for failure to state a claim on which relief can be granted.

5    The court also received an affidavit and memorandum of law in support of summary judgment from J.C. Penney. However, the documents were not accompanied by a notice of motion.

6    We ordinarily would offer plaintiff an opportunity to amend her complaint because her submissions and Kuwait's answer indicate two bases on which plaintiff might be able to argue diversity of citizenship. First, although plaintiff lists her address in Syracuse, New York, she also has indicated on the civil cover sheet that she is an Iranian Citizen and we are not aware of her residence status. As a permanent resident, she would be deemed a citizen of the state in which she resides. 28 U.S.C. § 1332(a). However, if she lacks permanent resident status, her citizenship would be considered diverse from that of all the defendants. *Id.* § 1332(a) (2). Second, Kuwait has submitted an answer in which it claims to be a foreign state within the meaning of 28 U.S.C. § 1603. If Kuwait is correct, plaintiff may have an independent basis for jurisdiction over Kuwait. *See* 28 U.S.C. § 1330. If Pourzandvakil could show subject matter jurisdiction over Kuwait without resort to diversity of citizenship, then Kuwait's residence in New York may not be relevant to the issue of whether this court has diversity jurisdiction under Section 1332. *Cf. Hiram Walker & Sons, Inc. v. Kirk Line,* 877 F.2d 1508, 1511-1512 (11th Cir. 1989), *cert. denied,* 115 S.Ct. 1362 (1995) (holding that the joinder of a non-diverse defendant sued under federal question jurisdiction did not destroy diversity as to the remaining defendant). Here, however, plaintiff's complaint is subject to so many other meritorious defenses -- including

Case 6:23-cv-00316-DNH-ML   Document 13   Filed 04/18/23   Page 265 of 311

**Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)**

complete failure to state a cause of action -- that an amendment would be an exercise in futility. Additionally, plaintiff has not requested permission to amend, proffered an amended pleading, or indeed even supplied an affidavit stating her residency status or alleging a basis of jurisdiction over her claims against Kuwait other than diversity under 🚩 28 U.S.C. § 1332.

7   J.C. Penney also submits an affidavit requesting dismissal on this basis and others, but has not filed or served a notice of motion.

8   Former Supreme Court Justice Harry A. Blackmun.

9   We note also that plaintiff has not requested leave to amend in this action.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3737780

United States District Court, N.D. New York.

Susan L. POOLE; Thomas Clatterbuck; Sue Clatterbuck;
Joseph S. Cochran; Brenda S. Cochran; Charles C.
Manner; Dennis H. Owens; Brent Rogers; Robert Shaw;
New York Animal and Farm, LLC; John Doe 1; John
Doe 2; Jane Doe 2; John Doe 3; John Doe 4; John Doe
5; John Doe 6; John Doe 7; and Jane Doe 7, Plaintiffs,
v.
Brian BENDIXEN; Amber Brown; Karen Cartier;
Earl Dehmey; James Kelleher; Sharad Marthur; Alex
Bachelor; Martin Bates; Alan Bernon; Andrew Brummel;
Kristen Coady; David Darr; Doug Glade; Keith Gomes;
Brad Keating; Jackie Klippenstein; Monica Massey;
Randy McGinnis; Pat Panko; Dennis Rodenbaugh;
Rick Smith; Kevin Strathman; Edward Tilley; Jay
Waldvogel; Greg Wickham; John Wilson; Larry Bailey;
Bruce Bartley; William Besancon; Patricia Bikowsky;
Kenneth Birker; Keith Broumley; Glen Easter; Craig
Elder; Travis Fogler; Alan Gerratt; Gregory Gibson;
Buster Goff; Larry Griffith; Larry Hancock; Dean
Handy; Brian Hardy; Todd Hathorn; Jerrel Heatwole;
Kent Herman; Neil Hoff; Garry Kibler; Chris Kraft;
Lilah Krebs; Scott Lackey; Byron Lehman; Melvin
Medeiros; Randy Mooney; Larkin Moyer; Dwight
Nash; Doug Nuttelman; Thomas Oelrichs; Peter Olsen;
Leroy Ornellas; Jacques Parent; Valeri Patten; Rick
Podtburg; Jeff Raney; Brian Rexing; Terry Rowlett; Dan
Senestraro; Ron Shelton; Larry Shover; Jerry Spencer;
Sandy Stauffer; Steve Strickler; Perry Tjaarda; Case Van
Steyn; David White; and John Woebler, Defendants.

5:20-CV-0697 (GTS/ATB)
|
Signed 08/24/2021

**Attorneys and Law Firms**

LAW OFFICE of JOSHUA HAAR, Counsel for Plaintiffs,
1495 Paddock Road, West Edmeston, NY 13485, OF
COUNSEL: JOSHUA HAAR, ESQ.

BOND SCHOENECK & KING, PLLC, Counsel for
Defendants, One Lincoln Center, Syracuse, NY 14202, OF
COUNSEL: BRIAN J. BUTLER, ESQ.

**DECISION and ORDER**

Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this civil Racketeer
Influenced and Corrupt Organizations ("RICO") action filed
by the above-captioned dairy supply business, dairy company
shareholder and seventeen dairy farmers ("Plaintiffs") against
the seventy-five above-captioned agents, managers and board
members of a national dairy cooperative ("Defendants"), are
Defendants' motion to dismiss Plaintiffs' Complaint for lack
of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)
(2) and failure to state a claim pursuant to Fed. R. Civ. P.
12(b)(6), and Defendants' motion for sanctions pursuant to
Fed. R. Civ. P. 11. (Dkt. No. 11; Dkt. No. 15.) For the reasons
set forth below, Defendants' motion to dismiss is granted, and
Defendants' motion for sanctions is denied.

**I. RELEVANT BACKGROUND**

**A. Summary of Plaintiffs' Complaint**
Generally, liberally construed, Plaintiffs' Complaint alleges
that the Dairy Farmers of America, Inc. ("DFA"), through
Defendants (i.e., its agents, managers, and board members),
used extortion to gain control of both the exclusive market
for dairy farmers' raw milk and the exclusive source of
finished dairy products for retail in numerous areas of the
country. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Based
on these factual allegations, Plaintiffs' Complaint claims that
Defendants violated the Racketeer Influenced and Corrupt
Organizations Act ("RICO") 18 U.S.C. § 1964, and asks
the Court to do the following: (1) declare Defendants liable
for damages for racketeering; (2) order the receivership and
subsequent divestiture of all processing operations owned
or controlled by the DFA; (3) order the DFA be dissolved
and any equity returned to its member farms, and that those
member farms be released from any and all obligation to the
DFA; (4) award damages, costs, and attorneys' fees; and (5)
award such further relief as the Court sees fit. (*See generally
id.*)

**B. Three Alleged Predicate Acts of Extortion**
Plaintiffs' Complaint and Civil RICO Statement alleges that
Defendants committed three acts of extortion that qualify as
predicate acts sufficient to support their RICO claims. (Dkt.

No. 1; Dkt. No. 10.) [1] To provide context for the parties' legal arguments and the Court's analysis, the Court describes the alleged acts below. [2]

### 1. Consent to Settle Antitrust Claims

The first alleged predicate act originated in June 2014, when the DFA was facing a jury trial in Vermont on antitrust grounds. (Dkt. No. 1, at 42.) According to Plaintiffs, in 2016, after two unsuccessful attempts to settle the lawsuit, the DFA's leadership extorted dairy farmers (who were members of the DFA and had previously rejected the first two settlements) with threats that, if those dairy farmers did not sign and support the DFA's settlement, those farmers should consider switching to organic milk production and start looking for new processing plants, they would be dismissed from their cooperatives, and their cooperatives could lose access to DFA's nation-wide marketing entity Dairy Marketing Services [3] ("DMS"). (*Id.* at 43-44.) More than 1,200 farmers from the DFA and other entities, including "independent" dairy farmers, signed the DFA's form letters, and the suit against the DFA was settled and closed. (*Id.* at 45.)

### 2. Obtaining a Controlling Share of the National Milk Supply

**\*2**  The second alleged predicate act occurred when the DFA's leadership, emboldened by the earlier coerced settlement, used its control over national milk markets to make it impossible for a mid-sized plant to find milk outside of the DFA/DMS, or for an individual farmer or small cooperative to send its milk to such a plant. (*Id.* at ¶ 46.) According to Plaintiffs, the DFA managers gave independent farmers and cooperatives who had shipped their products through DMS a choice: market their milk through the DFA and agree to a "market adjustment" deduction from the farmers' pay price, or lose market access. (*Id.* at 47.) Although the U.S. Department of Agriculture estimated the milk per-hundredweight cost of production to be $21.74 in 2018 (including land, equipment, and labor put in by unpaid owner/operator farmers), one Midwest cooperative's DFA market adjustment was more than 25% of its farmers' per-hundredweight milk price of $16.00, and a northeast farm had to choose between losing $2.50 of its per-hundredweight price of $12.00 or having no market access for its milk. (*Id.* at 48-49.)

The DFA managers also used the cooperative's position as the primary supplier of certain regional dairy processors to dictate the terms on which those processors could accept milk from smaller cooperatives or individual farmers, thereby substantially controlling the entire milk market without exercising direct ownership of it. (*Id.* at 50.) After the DFA absorbed another cooperative in 2019, Agri-Mark and its 850 members became the only significant alternative cooperative in the northeast. (*Id.* at 52.) However, Agri-Mark was and is forbidden from taking on members from the DFA without its express permission. (*Id.*) DFA managers were able to charge milk buyers over-market prices for milk products while simultaneously paying farmers less than the cost of production, because prospective dairy farmers had no viable option, aside from the DFA, to whom to sell their milk, and prospective milk processors had no other viable option, aside from the DFA, from which to buy milk. (*Id.* at 53.) Numerous dairy farmers, regardless of whether they are members of the DFA or other smaller "independent" cooperatives, were and are afraid to raise any concern out of a fear of retaliation from the DFA. (*Id.* at 54.)

### 3. Controlling the Nation's Largest Dairy Processing Network

The third alleged predicate act concerned the DFA's relationship with Dean Foods. According to Plaintiffs, DFA's management demanded Dean Foods pay the DFA over-market prices in order to maintain access to its milk, which constituted approximately 60% of Dean Foods' milk utilization. (Dkt. No. 1 at 56.) On or about November 12, 2019, Dean Foods filed for chapter 11 bankruptcy, listing the DFA as its largest trade creditor; the DFA was owed $173 million, while the second-largest trade creditor was owed $8 million. (*Id.* at 58.) During the time leading up to the Dean Foods bankruptcy filing, the DFA was, at substantially all times, Dean Foods' primary supplier of USDA Grade A raw milk, and the amounts paid for the USDA Grade A raw milk were, at substantially all times, Dean Foods' primary input cost. (*Id.* at 59.) When Dean Foods announced its bankruptcy filing, it also announced that it was in advanced discussions with the DFA to transfer substantially all of its assets to the DFA. (*Id.* at 63.)

Despite the availability of financing for an out-of-court restructuring prior to the bankruptcy filing, Dean Foods expressed no real interest in restructuring to avoid bankruptcy.

(*Id.* at 65.) Mr. Gary Ralphs served on PepsiCo's senior management in 2015 when PepsiCo turned over a $206 million plant in Batavia, New York, to the DFA for thirty cents on the dollar following the bankruptcy of a PepsiCo dairy processing joint venture with Quaker Muller. (*Id.* at 64.) In May 2019, Mr. Ralphs became a Senior Vice President at Dean Foods in its Finance and Strategy Division; in September 2019, he became Dean Foods' CFO, a position he held for the duration of the bankruptcy and sale to the DFA. (*Id.*) Dean Foods had no alternative source for the volume of milk which the DFA provided during its working relationship, and, even if it had located an alternative source for the volume of milk, Dean Foods could not materially breach or terminate its milk supply agreement with the DFA without incurring a $96 million penalty. (*Id.* at 66.) Had Dean Foods continued operating into 2021, the penalty would have expired without any obligation to pay any portion of the principal or interest. (*Id.*)

## C. Parties' Briefing on Defendants' Motion to Dismiss

**\*3** Generally, in support of their motion to dismiss, Defendants assert the following six alternative arguments: (1) Plaintiffs' Complaint should be dismissed for failure to comply with the timely filing of a RICO statement, pursuant to Local Rule 9.2 of the District's Local Rules of Practice, because Plaintiffs were required to file their RICO statement by July 22, 2020, and instead filed their RICO statement on September 3, 2020, approximately six weeks late, with no excuse or explanation for their tardiness; (2) Plaintiffs' Complaint fails to satisfy fundamental notice and pleading requirements because (a) it fails to assert a single factual allegation about the conduct of any of the seventy-five (75) Defendants, and Plaintiffs' RICO statement similarly fails to expressly allege that any one individual Defendant actually committed two predicate acts or otherwise conspired to commit a RICO violation, and (b) even where Plaintiffs' RICO statement does refer to individual Defendants, it impermissibly lumps their conduct together without any differentiation or explanation, offering only vague, sweeping allegations that are plainly insufficient to satisfy Rule 8's minimum standard; (3) Plaintiffs lack standing to assert their RICO claim because (a) their Complaint does not allege any link between Defendants' conduct and Plaintiffs in that their first and second alleged predicate acts do not include any allegations that Defendants caused any injury to Plaintiffs, (b) the third predicate act makes no reference to any action by Defendants nor any injury that they allegedly caused Plaintiffs, and, even if the Complaint had alleged that DFA's management pressured Dean Foods to overpay

for DFA's milk (which in turn led Dean Foods to declare bankruptcy, which in turn injured Dean Foods' shareholders), it is nevertheless insufficient to establish RICO standing for Plaintiff Poole or the dairy farmer Plaintiffs, (c) the law is well settled that a company's shareholders generally lack standing to assert a civil RICO claim, and Plaintiff Poole's suit as a shareholder fails to show she suffered any different individual harm as compared to other shareholders, and (d) nothing in Plaintiffs' RICO statement asserts any particularized allegations about how any one of the individual Defendants proximately caused harm to any one of the individual Plaintiffs; (4) Plaintiffs have failed to sufficiently plead a RICO claim because (a) they have failed to allege a RICO conspiracy in that the alleged conspiracy of the operational agreement among the DFA's individual board members and managers to create and use the fear of personal failure to force substantially all U.S. dairy farmers to market their milk through Defendants' enterprise fails to allege that Defendants knowingly conspired to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity, (b) Plaintiffs have not adequately alleged a substantive RICO violation in that (i) their Complaint fails to allege which predicate act Defendants committed, and the civil RICO statement also fails to allege that any one Defendant committed two predicate acts, (ii) none of the predicate acts alleged by Plaintiffs qualifies as a RICO extortion under the Hobbs Act given that the use of economic fear as leverage to drive a hard bargain in an ordinary commercial relationship does not support a RICO claim based on extortion, (iii) even if the predicate acts were true and timely (which they are not), the first and second predicate acts cannot constitute extortion under the Hobbs Act given that Defendants' conduct was lawful hard-bargaining, and Plaintiffs did not have any "preexisting right" or entitlement to do business with the DFA, and (iv) Plaintiffs' third predicate act, even if true, alleges that Defendants committed extortion against a third party, not Plaintiffs, and, in any event, the alleged conduct does not constitute extortion under the Hobbs Act, (c) Plaintiffs' Complaint fails to allege a pattern of racketeering in that it fails to allege that any Defendant committed two cognizable predicate acts of extortion, and (d) Plaintiffs have not sufficiently alleged Defendants' relationship to a RICO enterprise in that Plaintiffs fail to pled the existence of an enterprise separate and apart from the DFA, which is insufficient as a matter of law; (5) Plaintiffs have failed to establish personal jurisdiction over Defendants because (a) Plaintiffs fail to allege facts plausibly suggesting that a specific Defendant resides in, is found in, has an agent in, or transacts his or her affairs in the Northern District of

New York, and (b) Plaintiffs' substantial business standard is inapplicable to establish personal jurisdiction for RICO claims; and (6) the claim brought by the anonymous John and Jane Doe Plaintiffs should be dismissed because there is no conceivable privacy concern that could justify any Plaintiff proceeding anonymously. (*See generally* Dkt. No. 11, Attach. 3 [Defs.' Mem. of Law].)

Generally, in opposition to Defendants' motion, Plaintiffs assert the following seven arguments: (1) their Complaint alleges both the direct and proximate cause of their RICO injuries because (a) the sequence between Defendants' alleged extortion and Plaintiffs' injury is direct in that Plaintiffs lost milk income as a result of Defendants' extortion, and (b) Plaintiff Poole's loss of invested shares in Dean Foods is a personal and independent injury in that her loss of share value constituted a personal loss to her; (2) Plaintiffs' Complaint provides fair notice to Defendants because (a) it sufficiently traces Plaintiffs' injuries to each Defendant by initially listing each individual Defendant as an "agent," "manager," or "board member," who "performed," "directed," or "aided and abetted" a conspiracy, and by subsequently describing which conduct was performed by individuals or groups of individuals, and (b) the relevant inquiry is what is the nature of each Defendant's participation in the unlawful agreement, not whether each Defendant committed each predicate act; (3) Plaintiffs' Complaint alleges an unmistakable pattern of racketeering because (a) it alleges three predicate acts of extortion and explains how each successive act made full use of the leverage gained by the preceding acts, (b) the predicate acts cannot be characterized as the use of lawful economic fear as leverage to drive a hard bargain in an ordinary commercial relationship in that Plaintiffs' fear extends beyond mere financial or business concerns due to Defendants' comprehensive control of available milk markets and the distribution network; (4) Plaintiffs' Complaint alleges a separate and distinct RICO enterprise because (a) it alleges that Defendants conspired to operate the DFA by a pattern of racketeering in order to build a personally controlled milk empire and that Defendants were acting on behalf of their own interests when engaging in their "empire building" activities, which are fundamentally different than the DFA's marketing activities, (b) although these empire-building activities benefited the DFA as a whole, they plainly did not benefit the DFA as a cooperative due to the severe injuries suffered by many of the DFA's member-owners, and (c) even where the distinction between Defendants' milk-marketing and empire-building activities is less clear, the law cannot be read so as to merge the person

and enterprise wherever some benefit from the person's illegal conduct can be attributed to the enterprise, or it would insulate racketeering under the very statute designed to eradicate it; (5) Plaintiffs' Complaint establishes personal jurisdiction over each Defendant because corporate agents are subject to personal jurisdiction within a district if their activities in the district are outside of the corporations' ordinary activities, and each Defendant has agreed to further an unlawful course of conduct outside of the DFA's ordinary activities, which is the factual scenario in this case; (6) Plaintiffs' Complaint establishes jurisdiction over the claims of the John and Jane Doe Plaintiffs because a plaintiff may proceed under a pseudonym where his or her interest in anonymity outweighs the general public interest in disclosure as well as any prejudice to Defendants and, in this case, the relative interests weigh in favor of the anonymous Plaintiffs in that they are essentially whistle-blowers and Defendants face no prejudice that the issues raised in this case arise from Defendants' own misconduct, which are not directed at any individual plaintiff or Doe Plaintiff; and (7) Plaintiffs' claims are timely because (a) the statute of limitations runs for four years from the time the plaintiff discovers or reasonably should have discovered the alleged injury (not from the date of the alleged predicate acts) and here Plaintiffs did not reasonably discover the alleged injury until the DMS ceased operations in 2017, (b) Defendants' objection to the RICO statement on timeliness grounds is moot in that they argue that Plaintiffs RICO statement "fails to aid Plaintiffs' claims" and "largely rehashed generic, undetailed, and unspecific allegations," and (c) in any event, both parties were working in good faith on other aspects of the case, and Defendants gained an additional three-and-a-half weeks to review the RICO Statement prior to filing their response to the Complaint, thereby nullifying any good-faith basis to challenge the RICO statement's timing. (*See generally* Dkt. No. 14 [Plfs.' Mem. of Law].)

**\*4** Generally, in reply to Plaintiff's opposition, Defendants repeat their original arguments, and clarify them as follows: (1) Plaintiffs' Complaint should be dismissed for failure to comply with Local Rule 9.2 because (a) they were required to file their RICO Statement by July 22, 2020, and instead filed it on September 3, 2020, without requesting leave from the Court to file six weeks late, (b) Defendants' view of the quality of Plaintiffs' RICO Statement is irrelevant to its timeliness, and (c) while both parties were working on other aspects of the case, Plaintiffs' deadline for filing their RICO Statement (or an agreement about extending the deadline) was never discussed; (2) Rule 8 of the Federal Rules of Civil Procedure requires the dismissal of Plaintiffs'

Complaint because Defendants' conduct is impermissibly lumped together, and Plaintiffs have not identified any other allegations in their RICO Statement (aside from their "grouping" of Defendants) that provide any greater notice to Defendants of their alleged misconduct; (3) Plaintiffs have failed to establish RICO standing by failing to allege that (a) they fail to allege that Defendants, alone or as a group, proximately caused an injury to any Plaintiff, (b) the subset of dairy farmer-Plaintiffs who allege they have been injured by the extortion of milk-check deductions do not allege a single fact plausibly suggesting that their injury was caused by any Defendant, and (c) Plaintiff Poole has no standing as a shareholder of Dean Foods in that the law is well settled that a company's shareholders generally lack standing to bring a civil RICO claim; (4) Plaintiffs have failed to sufficiently plead a RICO conspiracy because (a) their Complaint fails to allege an agreement to commit a substantive RICO violation in that their allegation that Defendants maintained an "operational agreement among DFA's individual board members and managers to create and use the fear of personal failure as stewards ... to force substantially all U.S. dairy farmers to market their milk through Defendants' enterprise" does not allege that Defendants agreed to commit racketeering, to commit predicate acts, or otherwise commit a substantive RICO violation, and (b) Plaintiffs have failed to allege the required elements of a substantive RICO violation in that (i) their Complaint does not allege the conspiracy included an agreement to commit cognizable predicate acts (given that the DFA, as a cooperative, can certainly engage in hard-bargaining with its members), and the second and third predicate acts do not even concern the DFA's own members, (ii) Second Circuit precedent explains that hard-bargaining can occur even where someone is desperate and the economic consequences of refusing an act are dire, and (iii) Plaintiffs' first alleged predicate act is untimely because Plaintiffs' allege that DFA's managers extorted them into signing letters in support of a settlement, thereby injuring the signees, outside of the four-year statute of limitations period, (c) Plaintiffs have failed to allege a pattern of racketeering activity in that they have failed to allege that a Defendant committed two cognizable predicate acts, and (d) Plaintiffs have failed to sufficiently allege a RICO enterprise in that (i) their Complaint alleges that the enterprise at issue is the DFA, and (ii) their Complaint does not allege that the enterprise at issue is some association-in-fact consisting of Defendants carrying out activities separate and apart from their work as DFA board members and employees; (5) Plaintiffs have failed to establish personal jurisdiction over each Defendant because, in a civil RICO action, a plaintiff must show that a

specific defendant resides in, is found in, has an agent in, or transacts his or her affairs in the district, and Plaintiffs have failed to allege any of these activities occurred within the Northern District of New York; and (6) the claims brought by anonymous Plaintiffs should be dismissed because the law provides for anonymity only in "exceptional cases," and this is no such "exceptional" case. (*See generally* Dkt. No. 16.)

### D. Parties' Briefing on Defendants' Motion for Sanctions

Generally, in support of their motion for sanctions, Defendants assert the following two arguments. First, Defendants argue that sanctions should be imposed on both Plaintiffs' counsel and Plaintiffs themselves because the Complaint is frivolous, unsupported in law, and unsupported in fact. (Dkt. No. 15, Attach. 6, at 14-23.) In support of this argument, Defendants reassert their arguments from their motion to dismiss. (*Id.*) Defendants also highlight the prior history of Plaintiffs' counsel's with the DFA, specifically his prior involvement in *Haar v. Allen*, 687 F. App'x 93, 95 (2d Cir. 2017), the denial of his *pro hac vice* application in *Carlin v. DairyAmerica, Inc.*, 09-CV-0430, 2019 U.S. Dist. LEXIS 115717, at *6-7 (E.D. Cal. July 11, 2019), and his attempt to intervene in the bankruptcy proceedings concerning Dean Foods, where, after withdrawing a motion under an apparent "threat of sanction," he filed a "highly inflammatory and unprofessional amicus brief." (Dkt. No. 15, Attach. 6, at 11-12.) Second, Defendants argue that Plaintiffs' Complaint was filed for an improper purpose because the Complaint is strikingly inadequate on its face and it was filed in service of the personal agenda of Plaintiff's counsel, not in service of justice. (*Id.* at 23-24.)

Generally, in opposition of Defendants' motion for sanctions, Plaintiffs assert the following three arguments: (1) Plaintiffs have provided each Defendant with objective notice because (a) they have pled facts showing that each Defendant participated in an agreement to use their organization to extort other dairy industry participants to gain substantial control of the U.S. dairy industry, (b) each Defendant had authority over such activities, (c) each Defendant is subject to personal jurisdiction through purposeful availment, thereby satisfying Fed. R. Civ. P. 8, (d) the declarations submitted by Defendants in support of their motion support the fact that each Defendant was well aware of the extortion methods used within their organization, and (e) Defendant Heatwole's declaration is not credible because the evidence underlying Plaintiffs' Complaint involves Defendant Heatwole telling struggling farmers to "find another job [they] like because [the] DFA

runs the dairy industry;" (2) Plaintiffs possess standing under the RICO act because (a) Defendants' definition of a legal standard omits the causation elements that places Plaintiffs' injuries within recoverable civil RICO injuries, (b) the predicate acts, by themselves, have no bearing on the statute of limitations issues, and Defendants attempt to conflate the actions of Defendants' first predicate act with the injury suffered by Plaintiffs, and (c) a shareholder has standing to recover personal injuries, and Second Circuit precedent explicitly provides for the recovery of injuries suffered by a shareholder where stock is stolen and the individual suffers an injury personal to him or her and no other; and (3) the facts alleged by Plaintiffs leave no doubt that the threats alleged are distinctly personal, not merely economic, and that the relationship between a dairy farmer and a cooperative which controls all outlets for the farm's milk is anything but an ordinary commercial relationship, both in terms of duty and of comprehensive market control. (*See generally* Dkt. No. 17.)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing a Motion to Dismiss for Failure to State a Claim

**\*5** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 211, nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, some elaboration regarding that ground is appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case). On the other hand,

the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added).[4]

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak*, 629 F. Supp. 2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677-82 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 550 U.S. at 561-62. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 555-70. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 555. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*6** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.* at 678, it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case. [5]

**B. Legal Standard Governing a Motion for Rule 11 Sanctions**

**\*7** Rule 11(b)(2) of the Federal Rules of Civil Procedure provides in pertinent part that, by presenting a complaint to the court, the attorney signing or filing the complaint

> certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.

Fed. R. Civ. P. 11(b)(2). Rule 11(c)(1) provides in pertinent part that sanctions may be imposed on the attorney or any party that is "responsible for the violation." Fed. R. Civ. P. 11(c)(1). "Rule 11 is targeted at situations where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify, or reverse the law as it stands." *Rodrick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993) (internal quotation marks omitted) (quoting *Associated Indem. Corp. v. Fairchild Indus.*, 961 F.2d 32, 34 [2d Cir. 1992]). Because the inquiry must be "reasonable under the circumstances," liability for Rule 11 violations "requires only a showing of objective unreasonableness" on the part of the attorney or party. *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 96 (2d Cir. 1997) (emphasis omitted); *accord, ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 150 (2d Cir. 2009).

**C. Legal Standard Governing Civil RICO Claims**

It is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1962(d) applies the same prohibitions

to a defendant who conspires to violate 🚩Section 1962(c). *Malvar Egerique v. Chowaiki*, 19-CV-3110, 🚩2020 WL 1974228, at \*7 (S.D.N.Y. Apr. 24, 2020). 🚩Section 1964 establishes a private right of action for individuals who are harmed by racketeering activity. 🚩18 U.S.C. § 1964. This private right of action permits a plaintiff to bring a RICO claim for sustaining injuries "in his business or property by reason of a violation of 🚩section 1962." 🚩18 U.S.C. § 1964(c). Generally, a plaintiff bringing a civil RICO claim under "🚩Section 1962(c) must allege that (1) the defendant has violated the substantive RICO statute, and (2) the plaintiff was injured in his business or property "by reason of a violation of 🚩section 1962." 🚩*Malvar Egerique*, 2020 WL 1974228, at \*7 (citing 🚩*Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 [2d Cir. 1983] [citing 🚩18 U.S.C. § 1962(c)]). More specifically, to assert a civil RICO claim under 🚩Section 1962(c), a plaintiff must allege the following elements: "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." 🚩*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Additionally, a plaintiff asserting a civil RICO claim must plead facts plausibly suggesting a resulting "domestic injury" to their business or property. 🚩*RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2111 (2016).

**\*8** Regarding the second element, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 🚩18 U.S.C. § 1961(4). To allege an enterprise, a plaintiff must allege an "ongoing organization, formal or informal" and that "the various associates function as a continuing unit." 🚩*United States v. Turkette*, 452 U.S. 576, 583 (1981). In particular, a RICO enterprise must be "an entity separate and apart from the pattern of activity in which it engages." 🚩*Turkette*, 452 U.S. at 583. The Second Circuit has "long recognized [that] the plain language and purpose of the statute contemplate that a person violates the statute by conducting an enterprise through a pattern of criminality. It thus follows that a corporate person cannot violate the statute by corrupting itself." 🚩*Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (citing 🚩*Bennet v. U.S. Tr. Co. of N.Y.*, 770

F.2d 308, 315 [2d Cir. 1985]). Accordingly, a plaintiff alleging a civil RICO claim must allege the existence of two distinct entities, a person, and an enterprise. 🚩*Chowaiki*, 2020 WL 1974228, at \*8; 🚩*Cruz*, 720 F.3d at 120.

Regarding the third and fourth elements, to sufficiently allege a "pattern of racketeering activity," a plaintiff must allege at least two acts of "racketeering activity" that occur within ten years of each other. 🚩18 U.S.C. § 1961(5). "Racketeering activity" refers to the predicate acts necessary to establish a RICO claim and includes extortion. *See* 🚩18 U.S.C. § 1961(1) (listing predicate acts that constitute a racketeering activity). To qualify as a "pattern" of racketeering activity, the predicate acts "must be from the crimes listed in [🚩Section] 1961(1) and they must be 'related, *and* ... amount to or pose a threat of continued criminal activity.' " 🚩*Westester Cnty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 608 (S.D.N.Y. 2015) (emphasis in original) (quoting 🚩*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 [2d Cir 1999]). " 'It is this factor of *continuity plus relationship* which combines to produce a pattern.' " 🚩*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original) (quoting 🚩*Sedima*, 473 U.S. at 496 n.4).

Regarding the relationship factor, for predicate crimes to be considered related to each other under RICO, they must be related to both each other (termed "horizontal relatedness") and the enterprise as a whole ("vertical relatedness"). 🚩*Reich v. Lopez*, 858 F.3d 55, 60-61 (2d Cir. 2017 (citing 🚩*United States v. Cain*, 671 F.3d 271, 284 [2d Cir. 2012]). "Vertical relatedness, which entails the simpler analysis, requires only 'that the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over the enterprises' affairs, or because the offense related to the activities of the enterprise.' " 🚩*Reich*, 858 F.3d at 61 (quoting 🚩*United States v. Burden*, 600 F.3d 204, 216 [2d Cir. 2010]). "[P]redicate acts are *horizontally* related when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 🚩*Id.* at 61 (emphasis in original) (quoting 🚩*H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 [1989]). Therefore, "when dealing with an enterprise that is primarily a legitimate business ... courts must determine whether there

is a relationship between the predicate crimes themselves' and that requires a look at, *inter alia*, whether the crimes share 'purposes, results, participants, victims, or methods of commission.' " *Id.* (quoting *H.J.*, 492 U.S. at 240).

Regarding the continuity factor, "[t]o satisfy continuity, the plaintiff must establish either 'a series of related predicate acts extending over a substantial period of time' ('closed-ended continuity') or 'a threat of continuing criminal activity' ('open-ended continuity'). *Malvar Egerique, 2020 WL 1974228, at \*9* (quoting *Cofacredit, S.A.*, 187 F.3d at 242). "RICO targets conduct that 'amounts to or poses a threat of continued criminal activity.' " *Reich, 858 F.3d at 60* (alterations omitted) (quoting *H.J.*, 492 U.S. at 239). Closed-ended continuity is "primarily a temporal concept" *id.* (quoting *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 [2d Cir. 2008]), "and it requires that the predicate crimes 'extend over a substantial period of time' " *id.* (quoting *H.J.*, 492 U.S. at 242). Generally, he is the Second Circuit "requires that the crimes extend over at least two years." *Id.* (citing *Spool, 520 F.3d at 184*). However, criminal activity that by its nature projects into the future with a threat of repetition is considered open-ended continuity and can be established in several ways, including where the predicate acts were the regular way of operating that business, even if the business itself is primarily lawful. *Id.*

**\*9** Finally, to allege a RICO conspiracy under *18 U.S.C. § 1962(d)*, a plaintiff must allege "a *conspiracy* to commit a substantive RICO violation." *Spool, 520 F.3d at 183* (emphasis added). In particular, "[b]ecause the core of a RICO civil conspiracy is an *agreement* to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990) (emphasis added). As a result, to properly allege a civil RICO conspiracy under *Section 1962(d)*, a plaintiff must allege that the defendant "knew about and agreed to facilitate the [RICO] scheme." *Salinas v. United States, 522 U.S. 52, 66 (1997)*. Regarding the facilitation requirement, "a plaintiff must allege that the conspirator intended to further an endeavor that, if completed, would satisfy all of the elements of a substantive" criminal offense; however, it is sufficient for a plaintiff to allege that the "conspirator adopted

the goal of furthering or facilitating the criminal endeavor." *Chowaiki, 2020 WL 1974228, at \*8.*

## III. ANALYSIS

### A. Whether Plaintiffs Have Standing to Pursue Their Claims

After carefully considering the matter, the Court answers the question in the negative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 11, Attach. 3; Dkt. No. 16.) To those reasons, the Court adds the following analysis, which is intended to supplement and not supplant Defendants' reasoning.

To establish Article III standing, a plaintiff must demonstrate (1) an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that can likely be redressed by a favorable decision. *Mantena v. Johnson*, 809 F.3d 731, 731 (2d Cir. 2015). "The plaintiff ... bears the burden 'clearly to allege facts [in his complaint] demonstrating that he is a proper party to invoke judicial resolution of the dispute.' " *Steinberger v. Lefkowitz*, 634 F. App'x 10, 11 (2d Cir. 2015) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 [1975]). Plaintiffs must also show that they have "prudential standing," which includes a "general prohibition on a litigant's raising another person's legal rights." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 39 (2d Cir. 2015). The Second Circuit has recognized that "[a] shareholder–even a sole shareholder–does not have standing to assert claims alleging wrongs to the corporation." *Jones v. Niagra Fronteir Transp. Auth. (NFTA)*, 836 F.2d 731, 736 (S.D.N.Y. 1983), *aff'd*, 742 F.2d 1440 (2d Cir. 1983). Rather, the plaintiff must have been injured in a "personal and individual way" in order to have standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992).

RICO standing is more rigorous than Article III standing. *Denny v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006). To establish standing to bring a civil RICO claim, a plaintiff must show the following: (1) a violation of *Section 1962, (2)* an injury to the plaintiff's business or property, and (3) that the defendant's violation was the proximate cause of the plaintiff's injury. *Baisch v. Gallina*, 346 F.3d 366, 372 (2d Cir. 2003) (citing *Lerner v. Fleet Bank, N.A.*, 318 F.3d 112, 120-24 [2d Cir. 2003]). "Proximate cause for RICO purposes ... requires 'some direct relation between

RICO Bus.Disp.Guide 13,545

the injury asserted and the injurious conduct alleged.' " *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Secs. Investor Protection Corp.*, 503 U.S. 258, 268 [1992]).

In this case, there are three groups of Plaintiffs: a dairy supply business (New York Animal and Farm, LLC), a shareholder of Dean Foods (Susan Poole), and seventeen dairy farmers. The Court first addresses the question of the standing of the dairy supply business, New York Animal and Farm, LLC ("Animal and Farm"). "[A] plaintiff does not have standing if he suffered an injury that was indirectly (and hence not proximately) caused by the racketeering activity or RICO predicate acts...." *Baish v. Gallina*, 346 F.3d 366, 373 (2d Cir. 2003) (citing *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120-24 [2d Cir. 2003]). Here, Plaintiffs' Complaint merely alleges that Plaintiff Animal and Farm's revenue stream was injured by Defendants' racketeering activity in that Defendants indirectly caused Plaintiff Animal and Farm's injury. (Dkt. No. 1, at ¶ 3.) This allegation, without more, fails to plausibly suggest a direct relationship between the injury suffered and the injurious conduct alleged. Plaintiffs' Complaint also fails to identify which of the seventy-five Defendants were involved in Plaintiff Animal and Farm's injury. In short, because Plaintiffs' Complaint fails to allege that any of the seventy-five Defendants proximately caused the injury to Plaintiff Animal and Farm, the Court finds that Plaintiff Animal and Farm lacks standing to assert a civil RICO claim.

**\*10**  The Court next addresses the question of the standing of the shareholder Plaintiff, Susan Poole. For shareholders to have standing, they must plead facts plausibly suggesting that the loss of their shares value was "separate and distinct from the injury sustained by the corporation." *Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d Cir. 1993). Although Plaintiff Poole argues that she suffered a personal injury through the loss of share value, she fails to plausibly suggest, let alone mention, how her loss is different from that of any other shareholder. Moreover, Plaintiff Poole's argument that "Dean Foods' price and asset losses *may not themselves be wholly derivative*" is speculative. (Dkt. No. 14, at 8 [emphasis added].) For each of these two alternative reasons, the Court finds that Plaintiff Poole lacks standing to assert her civil RICO claim.

Turning to the question of the standing of the dairy-farmer Plaintiffs, the Court also finds that they have failed to establish standing. Specifically, they have failed to plead facts plausibly suggesting that a single Defendant personally harmed a single dairy-farmer Plaintiff. Plaintiffs' argument that there is no requirement to show Defendants personally harmed them is inaccurate. *See Hemi*, 559 U.S. at 9) ("A link [to establish proximate cause] that is too remote, purely contingent' or indirec[t] is insufficient.") (internal quotation marks omitted); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998) (explaining that the "irreducible constitutional minimum of standing" requires "causation–a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant.")

For these reasons, as well as the reasons stated in Defendants' memoranda of law, the Court finds that Plaintiffs lack standing to sue the individual Defendants. In the interest of thoroughness, however, the Court will continue with its analysis Defendants' other arguments for dismissal.

**B. Whether Plaintiffs Have Stated a RICO Claim**
After carefully considering the matter, the Court answers the question in the negative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 11, Attach. 3; Dkt. No. 16.) To those reasons, the Court adds the following analysis, which (again) is intended to supplement and not supplant Defendants' reasoning.

Taking Defendants arguments out of order, the Court finds that Plaintiffs' Complaint fails to satisfy fundamental notice and pleading requirements under Fed. R. Civ. P. 8 (and Fed. R. Civ. P. 12[b][6]). Specifically, Plaintiffs' Complaint fails to make a single allegation about the alleged conduct of any one of the seventy-five individual Defendants, and, even where the Complaint and civil RICO statement does refer to Defendants, it lumps their conduct together by listing each Defendant as an "agent," "manager," or "board member" who "performed," "directed," or "aided and abetted" a conspiracy without any differentiation or explanation as to which "agents," "managers," or board members engaged in each predicate act. (Dkt. No. 11, Attach. 3, at 17-18.) "Although Fed. R. Civ. P. 8 does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, a minimum, that a complaint give each defendant 'fair notice of what the plaintiff's claim

RICO Bus.Disp.Guide 13,545

is and the ground upon which it rests.' " *Atauhene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (quoting *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 [2d Cir. 1961]). "By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [Plaintiffs'] complaint failed to satisfy [Fed. R. Civ. P. 8's] minimum standard." *Atauhene*, 10 F. App'x at 34. Because Plaintiffs fail to provide the individual Defendants with any meaningful notice of the factual basis underlying Plaintiffs' Complaint, they have failed to provide Defendants with sufficient notice under Fed. R. Civ. P. 8.

**\*11** Alternatively, the Court finds that Plaintiffs' Complaint warrants dismissal due to its failure to state a claim under Fed. R. Civ. P. 12(b)(6). Regarding Plaintiffs' RICO conspiracy claim, even though Plaintiffs' Complaint makes no mention of an alleged conspiracy, their allegation is first mentioned in Plaintiffs' RICO statement. (Dkt. No. 1; Dkt. No. 10.) In particular, Plaintiffs allege that Defendants participated in a conspiracy by engaging in "an operational agreement among the DFA's individual board members and managers to create and use the fear of personal failure ... to force substantially all U.S. diary farmers to market their milk through Defendants' enterprise." (Dkt. No. 10, at 14.) "Because the core of a RICO conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Malvar Egerique*, 2020 WL 1974228, at \*8 (quoting *Hecht*, 897 F.2d at 25). Such a broad-sweeping allegation, without more, woefully fails to meet the plausibility standard articulated above in Part II.A. of this Decision and Order. Plaintiffs fail to allege any factual nature of an alleged operational agreement, the particular Defendants who participated in the planning of individual predicate acts, or any particular facts such as dates, times, or locations of meetings where such an agreement was discussed. Accordingly, the Court finds that Plaintiffs have failed to plead facts sufficiently alleging that Defendants engaged in a civil RICO conspiracy.

Turning to Plaintiffs' RICO claim, the Court also finds that Plaintiffs' Complaint fails to allege a substantive RICO violation for the reasons stated in Defendants' memoranda of law. (Dkt. No. 11, Attach. 23-30; Dkt. No. 16, at 10-13.) For example, the Court finds that Defendants' alleged conduct amounted to lawful hard-bargaining due to the fact that Plaintiffs did not have any "preexisting right" or entitlement

to do business with the DFA. For this reason, as well as the reasons raised in Defendants' memoranda of law, the Court finds that Plaintiffs have failed to plead facts plausibly suggesting Defendants committed a civil RICO violation.

## C. Whether the Court Lacks Personal Jurisdiction over Defendants

After carefully considering the matter, the Court answers the question in the negative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 11, Attach. 3; Dkt. No. 16.) To those reasons, the Court adds the following analysis, which (again) is intended to supplement and not supplant Defendants' reasoning.

Section "1965(a) grants personal jurisdiction over an initial defendant in a civil RICO case to the district court for the district in which that person resides, has an agent, or transacts his or her affairs." *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 71 (2d Cir. 1998). "In other words, a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant." *PT United Can Co. Ltd.*, 138 F.3d at 71. Section 1965(b) provides for nationwide service and jurisdiction over 'other parties' not residing in the district, who may be additional defendants of any kind ...." *Id.* Jurisdiction is not automatically conferred on the additional defendants; a plaintiff must show that the "ends of justice so require." *Id.* To satisfy the "ends of justice" standard, a plaintiff must show that the RICO claim "could not otherwise be tried in a single action because no district court could exercise personal jurisdiction over all of the defendants." *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 315 (S.D.N.Y. 2010) (collecting cases).

As Defendants argue, Plaintiffs' Complaint fails to allege that a specific Defendant resides in, is found in, has an agent in, or transacts his or her affairs in the Northern District of New York. (Dkt. No. 11, Attach. 3, at 32.) Although Plaintiffs argue that Defendants, acting as corporate agents, are subject to the Northern District's personal jurisdiction because their actions were outside of the DFA's ordinary activities, the Court disagrees. In particular, Plaintiffs' Complaint fails to allege any facts plausibly suggesting that a single Defendant conducted business within the Northern District of New York. Plaintiffs also conspicuously chose to not name the DFA as a Defendant in this action. In any event, the fact that the DFA contracted business within the Northern District of New York,

RICO Bus.Disp.Guide 13,545

by itself, fails to support Plaintiffs' allegations that any of the individual Defendants were involved in business transactions that were separate from the DFA's ordinary activities within this district.

#### D. Whether Plaintiffs Violated Local Rule 9.2

**\*12** After carefully considering the matter, the Court answers the question in the negative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 11, Attach. 3; Dkt. No. 16.) To those reasons, the Court adds the following analysis, which (again) is intended to supplement and not supplant Defendants' reasoning.

Local Rule 9.2 requires a party asserting a claim under RICO to "file a RICO statement within thirty (30) days of the filing of the pleading containing such claim." N.D.N.Y. L.R. 9.2. Because Plaintiffs filed their Complaint on June 22, 2020 (Dkt. No. 1), they were required to file their RICO statement by July 22, 2020; instead, Plaintiffs filed their RICO statement on September 3, 2020. (Dkt. No. 10.) On this ground alone, the Court can dismiss Plaintiffs' Complaint. *See Spoto v. Herkimery Cnty. Trust*, 99-CV-1476, 2000 WL 533293, at *3 n.3 (N.D.N.Y. Apr. 27, 2000) (Munson, J.) ("Indeed, the Court would be justified to dismiss Plaintiff's complaint based upon their very untimely filing of their Local Rule 9.2 RIC Statement."); *Dicob v. Knuckles*, 07-CV-1044, 2007 WL 3353089, at *1 (N.D.N.Y. Nov. 7, 2007) (McAvoy, J.) (extending the deadline only 20 days for a pro se litigant); *cf. Pierce v. Homecomings Fin. LLC*, 17-CV-0882, 2017 WL 5991750, at *2 n.2 (N.D.N.Y. Dec. 4, 2017) (Sannes, J.) (noting that Plaintiff had failed to file a Civil RICO Statement pursuant to Local Rule 9.2, and explaining that "Plaintiff's RICO claim may be dismissed for this reason alone"); *Amaker v. Kelley*, 01-CV-0877, 2009 WL 385413, at *11 (N.D.N.Y. Feb. 9, 2009) (Scullin, J.) (explaining that the failure to file a RICO Statement provides a threshold for dismissal of a plaintiff's RICO claim). Despite Plaintiffs' arguments that their failure to abide by Local Rule 9.2 is moot and both parties were working in good faith on other aspects of the case, Plaintiffs' arguments defy logic for two reasons.

First, Defendants' argument that Plaintiffs' RICO statement is not helpful to Plaintiffs' claims has no bearing on the "mootness" of Plaintiffs' failure to abide by the Local Rules. Second, regardless of Plaintiffs' good-faith work on other aspects of this case, they still needed to but failed to abide by a Local Rule, and further needed to but failed to seek the Court's permission to file their RICO statement approximately six weeks late (or provide any explanation for failing to do so).

Accordingly, the Court also dismisses Plaintiffs' Complaint for failure to abide by Local Rule 9.2.

#### E. Nature of Dismissal

Finally, some discussion is appropriate regarding the nature of the dismissal in this action. Ordinarily, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (citations omitted). [6] "[A]n opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile." *Sorrentino v. Barr Labs. Inc.*, 09-CV-0591, 2010 WL 2026135, at *5 (May 20, 2010 N.D.N.Y.) (Suddaby, C.J.).

**\*13** Here, because the Court's threshold ground for dismissal was Plaintiffs' lack of standing, the Court must first determine whether that dismissal was pursuant to Fed. R. Civ. P. 12(b)(6) (which would permit a dismissal with prejudice) or Fed. R. Civ. P. 12(b)(1) (which would not permit a dismissal with prejudice). After carefully considering the matter, the Court finds that the dismissal was pursuant to Fed. R. Civ. P. 12(b)(6) for two reasons: (1) the determination was based on the allegations contained within the four corners of Plaintiffs' Complaint and not based on findings of fact derived from documents outside of the four corners of Plaintiffs' Complaint; and (2) the determination addressed the question whether the Court could grant relief to a party in *Plaintiffs'* (alleged) position, not whether the Court could grant relief to *any* plaintiff given the claim asserted. *Rent Stabilization Ass'n of City of New York v. Dinkins*, 5 F.3d 591, 594 & n.2 (2d Cir. 1993).

Having rendered that determination, the Court next must consider whether it appears that better pleading would cure the defects. The Complaint was 17 pages long, and it was effectively amended by the Civil RICO Statement and attachments (which were approximately 82 pages long). *See, supra,* note 1 of this Decision and Order. Despite the breadth and detail of facts alleged in those documents, the documents were conspicuously absent of either factual allegations establishing standing (the threshold ground for dismissal) or factual allegations plausibly suggesting a claim upon which relief can be granted (an alternative ground for dismissal). For these reasons, the Court finds that the defects

in the Complaint are substantive and not merely formal, and that it does not appear that better pleading would cure these defects.

### F. Whether Defendants Are Entitled to Sanctions
After carefully considering the matter, the Court answers this question in the negative for the reasons set forth below.

The Court begins its analysis by noting that the one of Defendants' arguments in support of sanctions essentially repeats their arguments in support of their motion to dismiss. (Dkt. No. 15, Attach. 6, at 14-23.) Instead of repeating itself, the Court relies on its analysis in Part III.B. of this Decision and Order to conclude that Plaintiffs' Complaint has a basis in law and fact, and it did not present frivolous arguments unsupported by law or factual contentions lacking evidentiary support. *See* Fed. R. Civ. P. 11(b) (indicating that sanctionable conduct includes [1] presenting a paper for an improper purpose, [2] presenting frivolous arguments unsupported by law, [3] presenting factual contentions lacking evidentiary support, and [4] denying factual contentions where denial is not warranted on the evidence). Therefore, the Court rejects Defendants' first argument.

The Court also rejects Defendants' argument that Plaintiffs' Complaint was filed for an improper purpose. "In the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice*." *Jianjun Lou v. Trutex, Inc.*, 872 F. Supp. 2d 344, 350 n.6 (S.D.N.Y. 2012); *see also* *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of a pleading in another lawsuit). "The Court

may take judicial notice of a document filed in another court to establish the fact of such litigation and related filings, but not for the truth of the matters asserted in the other litigation." *Malvar Egerique*, 2020 WL 1974228, at *7 (citing *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 [2d Cir. 2006]). The Court takes judicial notice of Plaintiffs' Counsel's prior history with the DFA, as detailed in Defendants' memorandum of law. (Dkt. No. 15, Attach. 6, at 11-12.) Although Plaintiffs' Counsel's prior conduct and history with the DFA and Defendants presents a close call, the Court is unable to grant sanctions to Defendants. Plaintiffs' Complaint, although deficient, raised legal and factually challengeable assertions, albeit barely. Plaintiffs and their counsel appear to have filed the current action in good faith on behalf of individual Plaintiffs, and not to harass the DFA and Defendants.

*14 For these reasons, the Court denies Defendants' motion for sanctions.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 11) is **GRANTED**; and it is further

**ORDERED** that Plaintiffs' Complaint (Dkt. No. 1) is **DISMISSED with prejudice**; and it is further

**ORDERED** that Defendants' motion for sanctions (Dkt. No. 15) is **DENIED**.

### All Citations

Slip Copy, 2021 WL 3737780, RICO Bus.Disp.Guide 13,545

### Footnotes

1    The Court notes that, pursuant to Local Rule 9.2 of the District's Local Rules of Practice, a Civil RICO Statement shall be construed as an amendment to the pleadings.

2    Because Plaintiffs' RICO Statement contains substantially the same allegations as their Complaint, the Court will cite Plaintiffs' Complaint only.

3    According to Plaintiffs, DMS ceased operations in 2017. (Dkt. No. 1, at 46.)

4      *Accord, Flores v. Graphtex*, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (Munson, J.); *Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998); *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y.1995) (McAvoy, C.J.).

5      *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); 🚩 *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d. Cir. 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under 🚩 Fed. R. Civ. P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.... Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint.... However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; 🚩 *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); 🚩 *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

6      *Accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted); *see also* 🚩 *Foman v. Davis*, 371 U.S. 178, 182 (1962) (finding that denial was not an abuse of discretion where an amendment would be futile); 🚩 *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") (citation omitted); 🚩 *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (citation omitted); *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) ("[W]here ... there is no merit in the proposed amendments, leave to amend should be denied").

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 819281
United States District Court, N.D. New York.

Kevin MURPHY, Plaintiff,
v.
ONONDAGA COUNTY et al., Defendants.

5:18-cv-1218 (GLS/CFH)
|
Signed 03/18/2022

**Attorneys and Law Firms**

FOR THE PLAINTIFF: JEFFREY R. PARRY, ESQ., Office of Jeffrey R. Parry, 7030 East Genesee Street, Fayetteville, NY 13066, JARROD W. SMITH, ESQ., Office of Jarrod W. Smith, 11 South Main Street, P.O. Box 173, Jordan, NY 13080.

FOR THE DEFENDANTS: JOHN E. HEISLER, JR., ESQ., Onondaga County, The Onondaga Sheriff's Department, Carl Hummel, William Fitzpatrick, Stefano Cambareri, Melanie S. Carden & Lindsey M. Luczka, Onondaga County Department of Law, John H. Mulroy Civic Center, 421 Montgomery Street, 10th Floor, Syracuse, NY 13202, ROBERT J. SMITH, ESQ., ELIZABETH A. HOFFMAN, ESQ., Eugene Conway, Joseph Ciciarelli, Michael Dickinson, Jammie Blumer, Jonathan Anderson, Joseph Peluso, Roy Gratien & Jason Cassalia, Costello, Cooney & Fearon, PLLC, 211 W. Jefferson Street, Syracuse, NY 13202, KATHERINE STEWART, ESQ., 500 Plum Street, Suite 300, Syracuse, NY 13204, JOHN L. MURAD, JR., ESQ., ANNELIESE ALIASSO, ESQ., Bryan K. Edwards & Westcott Events, LLC, Hancock Estabrook, LLP, 1800 AXA Tower I, 100 Madison Street, Syracuse, NY 13202, CHRISTINA M. VERONE JULIANO, ESQ., Goldberg, Segalla Law Firm, 5786 Widewaters Parkway, Syracuse, NY 13214.

**MEMORANDUM-DECISION AND ORDER**

Gary L. Sharpe, Senior District Judge

**I. Introduction**

*1 Plaintiff Kevin Murphy commenced this civil rights action against defendants Onondaga County, The Onondaga County Sheriff's Department, Eugene Conway, Joseph Ciciarelli, Michael Dickinson,[1] Jammie Blumer, Jonathan

Anderson, Joseph Peluso, Roy Gratien, Jason Cassalia, Carl Hummel, William Fitzpatrick, Stefano Cambareri, Melanie S. Carden, Lindsey M. Luczka, Bryan K. Edwards, and Westcott Events, LLC, pursuant to 🚩 42 U.S.C. §§ 1983 and 🚩 1985, 🚩 18 U.S.C. § 1964 (Civil Racketeer Influenced and Corrupt Organizations (RICO) Act), and New York State law, with the individual defendants all being sued in their individual and official capacities. (Am. Compl., Dkt. No. 60.)[2]

Pending before the court are motions for judgment on the pleadings filed by Conway (Dkt. No. 88), Blumer, (Dkt. No. 90), Peluso, (Dkt. No. 92), Gratien, (Dkt. No. 94), Anderson, (Dkt. No. 96), Cassalia, (Dkt. No. 98), Ciciarelli, (Dkt. No. 100), and Dickinson, (Dkt. No. 102) (hereinafter, collectively referred to as the "Sheriff Defendants"), a motion to amend the amended complaint filed by Murphy, (Dkt. No. 123), a motion to dismiss the amended complaint filed by Edwards and Westcott, (Dkt. No. 143), a motion to amend the RICO statement filed by Murphy, (Dkt. No. 157), a motion to construe their prior motion to dismiss as against any second amended complaint and/or to deny the second amended complaint filed by Edwards and Westcott, (Dkt. No. 144), a motion requesting guidance in responding to Murphy's amended RICO statement filed by the Sheriff Defendants, (Dkt. No. 155), a motion informing the court of alleged "improprieties" by defendants, requesting that the amended RICO statement be accepted as timely, and seeking to file a further amended complaint filed by Murphy, (Dkt. No. 156), an August 30, 2021, letter motion seeking relief that, admittedly, is unclear to the court filed by Murphy, (Dkt. No. 159), and, finally, another motion to further amend the amended complaint filed by Murphy, (Dkt. No. 170).

For the reasons that follow, the Sheriff Defendants' Rule 12(c) motions, (Dkt. No. 88; Dkt. No. 90; Dkt. No. 92; Dkt. No. 94; Dkt. No. 96; Dkt. No. 98; Dkt. No. 100; Dkt. No. 102), are granted in part and denied in part, as described below. Edwards and Westcott's Rule 12(b)(6) motion (Dkt. No. 143), is granted. Murphy's motion to amend the amended complaint, (Dkt. No. 123), is denied as moot. Murphy's subsequent motion to amend the amended complaint, (Dkt. No. 170), and his motion to amend the RICO statement, (Dkt. No. 157), are denied. Edwards and Westcott's motion regarding Murphy's proposed amended complaint, (Dkt. No. 144), is granted, to the extent it sought denial of Murphy's motion to amend, and denied in all other respects. The Sheriff Defendants' motion requesting guidance in responding to the amended RICO statement, (Dkt. No. 155), is denied

as moot. Murphy's motion informing the court of alleged "improprieties" by defendants, requesting that the amended RICO statement be accepted as timely, and seeking to file a further amended complaint, (Dkt. No. 156), and August 30, 2021, letter motion, (Dkt. No. 159), are denied.

## II. **Background** [3]

**\*2** Murphy is a Sergeant in the Onondaga County Sheriff's Department. (Am. Compl. ¶ 2.) The Sheriff Defendants were, or are, also members of the Sheriff's Department. (*Id.* ¶¶ 6-13.) Conway is the Sheriff, Cassalia is the Undersheriff, Gratien, who has since retired, was an Assistant Police Chief, Ciciarelli is the Chief Police Deputy, Dickinson is a Captain and Patrol Commander, Blumer and Anderson are Lieutenants, and Peluso, who has since retired, was a Sergeant and is now a Special Patrol Officer at the Onondaga County Civic Center. (*Id.* ¶¶ 6-13, 67.)

Murphy warned his superior officers in the Sheriff's Department of "illegal arrests, inadequate police work, improper training, poor supervision, racially motivated behavior and improper, unprofessional and illegal conduct" committed by members of the Sheriff's Department. (*Id.* ¶ 29.) As a result of this, Murphy was "forbidden [from] do[ing] police work," relieved of specific duties, forbidden from giving orders to subordinates, "required to sit at a desk during his entire shift doing nothing whatsoever," forbidden from using a patrol car or displaying his uniform in public, "subject[ed] to threatening and abusive behavior" by others in the Sheriff's Department, was "deprived of police assistance and ... castigated for his efforts when his ... wife was menaced and assaulted," has had his overtime opportunities reduced, "has been ordered to undertake menial tasks under circumstances that were deliberately chosen to cause him physical discomfort and agitation," passed over for a promotion, subjected to "repeated unwarranted police and grand jury investigations," "arbitrarily transferred," "depriv[ed] ... of income," and was "subjected to public ridicule and embarrassment." (*Id.* ¶ 245.)

Specifically, around November 2008, Murphy discovered improprieties surrounding the involvement of the Sheriff's Department with respect to an individual who committed suicide in the Onondaga County Justice Center. (*Id.* ¶¶ 36-38.) Murphy reported these improprieties, including the falsifying of medical records, to unnamed "supervising officers," and Conway. (*Id.* ¶¶ 39-43.)

On May 30, 2015, Murphy reported to Peluso an instance where a complaint was made by an African-American woman, which Murphy claimed was not properly addressed "due to her ethnic background and her sex," (*id.* ¶¶ 49-55), and requested that the incident be investigated internally, (*id.* ¶¶ 98-100). Murphy was later aggressively confronted by Peluso, who "was loud, screaming and belligerent," and conveyed to Murphy that Peluso did not want an investigation into the woman's complaint, and insinuated that it was inappropriate for Murphy to go against him. (*Id.* ¶¶ 63-64.) Murphy was again aggressively confronted by Peluso at a later date, and, after the confrontation, "bec[a]me[ ] sick" and was "admitted to a hospital with chest pains and high blood pressure," causing him to miss work for several weeks. (*Id.* ¶¶ 134, 140, 143.)

On March 9, 2016, Murphy informed Conway "of the improper use of a temporary holding cell to hold prisoners," potentially in violation of their rights. (*Id.* ¶¶ 69-70.) Murphy documented a similar violation shortly thereafter to "his chain of command," including Gratien, who, along with Conway, failed to remedy the situation. (*Id.* ¶¶ 72-75.)

On April 23, 2016, Murphy became aware of an unconstitutional search and seizure of a suspect's blood, and, in an attempt to investigate it, contacted Blumer. (*Id.* ¶¶ 78-90.) Blumer told Murphy that she would handle the matter. (*Id.* ¶ 90.) Murphy later discovered that Peluso "falsified the police report to cover up the illegal search and seizure." (*Id.* ¶ 92.) Murphy later learned that Blumer and Peluso contacted others in the Sheriff's Department, including Gratien, and stated that Murphy "was to blame for the illegal search." (*Id.* ¶¶ 93-95.) Murphy was later informed "that, according to ... Gratien, Murphy was not promoted to Lieutenant because he interferes with investigations of others." (*Id.* ¶ 97.) Peluso later filed a "vacuous" hostile work environment complaint against Murphy, intended to prevent him from being promoted. (*Id.* ¶ 101.) Murphy notified Ciciarelli and Gratien of the complaint, and requested that it be investigated, but his request was ignored. (*Id.* ¶¶ 102-04.)

**\*3** On August 17, 2016, Murphy met with Ciciarelli and informed him of the Sheriff's Department's prior failure to properly investigate the aforementioned complaint made by an African-American woman based on "racial and sexual discrimination." (*Id.* ¶¶ 105-06.) Murphy also informed Ciciarelli of the illegal search and seizure and "illegal and falsified reports filed by Peluso," of which Gratien knew. (*Id.*

¶¶ 107-09.) Murphy reported to Ciciarelli that "Gratien had expressed his opinion that Murphy should not be promoted due to his interference with other investigations." (*Id.* ¶ 111.) Finally, Murphy conveyed to Ciciarelli that an "inordinate number of arrests [were being] made by [members of the Sheriff's Department] that were illegal for lack of probable cause." (*Id.* ¶ 112.) After this meeting, Ciciarelli conveyed to an unnamed individual that "he investigated the situation and discovered that some of ... Murphy's allegations were true." (*Id.* ¶ 116.)

On August 29, 2016, Murphy was ordered to meet with Dickinson and Murphy's direct supervisor, Lieutenant Caruso. (*Id.* ¶¶ 59, 118.) During this meeting Murphy voiced his concerns to Dickinson regarding the illegal arrests conducted by members of the Sheriff's Department. (*Id.* ¶ 119.) Dickinson then ordered Murphy to "no longer do police work while under his command" specifically instructing Murphy "to refrain from initiating investigations ... to no longer apply for search warrants." (*Id.* ¶ 121.) Murphy and Caruso both stated that this discipline was unjustified. (*Id.* ¶¶ 122-23.) Ciciarelli was later informed of Dickinson's order. (*Id.* ¶ 132.)

From that point forward, Murphy faced various forms of discipline from members of the Sheriff's Department, including being ordered to "remove" his personal file cabinet, (*id.* ¶ 130), being required to work on Thanksgiving and Christmas, (*id.* ¶ 147), being told that he "ha[d] no duties and no responsibilities and [could not] independently perform any police related duties during his 10-hour shift[s]," (*id.* ¶ 152), and had his teaching schedule at the Police Academy reduced to just one class, at the behest of Dickinson, (*id.* ¶¶ 154-55).

Then, on June 24, 2017, Murphy's wife "was struck by an unruly security guard and subjected to other untoward conduct" while attending a concert at the Amphitheater on Onondaga Lake. (*Id.* ¶ 158b.[4]) The security guard was employed by Westcott, which is owned and operated by Edwards. (*Id.* ¶ 159b.) Murphy was working that day at the venue as "Venue Supervisor." (*Id.* ¶ 164.) Murphy reported the incident involving his wife to Captain M. Pellizzari, and was subsequently relieved of his duties at the Amphitheater based upon complaints made by Edwards, who stated "that if Murphy work[ed there] in the future, the security company w[ould] walk off the job." (*Id.* ¶ 168.)

After the incident with his wife, Murphy continued to faced inter-Department discipline, including threats of "baseless"

reprimand from Anderson for "silent insolence," (*id.* ¶¶ 196-98), which Murphy believed was at the behest of Peluso, (*id.* ¶ 198); having an internal investigation opened against him surrounding his alleged improper use of his personal vehicle, (*id.* ¶¶ 202-04), which lead to Murphy's surveillance by Dickinson, (*id.* ¶ 202); further transfer, adding thirty miles to his daily commute, (*id.* ¶¶ 206-08); being prohibited by Dickinson from using a Sheriff's Department vehicle and being forced to cover his uniform when in public, (*id.* ¶ 210). When Murphy "[wa]s flagrantly disobeyed by [his] subordinates," the subordinates "face[d] no discipline" even after Murphy reported their insubordination. (*Id.* ¶¶ 212-13.) Murphy was ordered to inspect thirty patrol vehicles "in contradiction to established policy" even though he was not sufficiently dressed to perform this task, (*id.* ¶¶ 215-16). Murphy was given two "counseling memos" at the behest of Dickinson, accusing him of intentionally misrepresenting Dickinson's past orders and alleging violations of department policy. (*Id.* ¶ 219.)

**\*4** Murphy filed this suit on October 11, 2018. (*Id.* ¶ 229; *see* Dkt. No. 1.) After doing so, he "had several improper, unsupported and baseless referrals to the Onondaga County Sheriff's Office Internal Affairs Office" by Dickinson, (Am. Compl. ¶ 229), and he was transferred "without legitimate reason to such a position that would cause him to lose secondary employment opportunities and an immediate loss of income," (*id.* ¶ 242). At an unspecified time, Conway requested that District Attorney Fitzpatrick "institute an unwarranted criminal action against Murphy because it [wa]s impossible to silence him using 'in-house' means." (*Id.* ¶ 234.)

## III. Standard of Review

### A. Leave to Amend

The filing of amended complaint is governed by Rule 15 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 15. Rule 15 provides that courts "should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend should be given "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility."

📙 *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000); *see Couloute v. Ryncarz*, No. 11-CV-5986, 2012 WL 541089, at *3 (S.D.N.Y. Feb. 17, 2012) (citation omitted). However, motions to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory

motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." 🚩 *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008); *see* 🚩 *Monahan*, 214 F.3d at 283. The decision to grant or deny a motion to amend is committed to the sound discretion of the trial court, and the court's decision is not subject to review on appeal except for abuse of discretion. *See Fielding v. Tollaksen*, 510 F.3d 175, 179 (2d Cir. 2007).

Northern District of New York Local Rule 15.1(a) states, in relevant part: "[A] motion [to amend] must set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading, either through the submission of a redline/strikeout version of the pleading sought to be amended or through other equivalent means." Failure to comply with Local Rule 15.1(a) can result in denial of a motion to amend. *See Cottone v. Does*, No. 1:17-cv-1006, 2018 WL 2021513, at \*4 (N.D.N.Y. Apr. 30, 2018)

**B. Motion to Dismiss**

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Wright v. Monroe Cmty. Hosp.*, 493 F. App'x 233, 234 (2d Cir. 2012) (internal quotation marks and citation omitted). The standard of review under 🚩 Fed. R. Civ. P. 12(b)(6) is well settled and will not be repeated here. For a full discussion of the governing standard, the court refers the parties to its prior decision in 🚩 *Ellis v. Cohen & Slamowitz, LLP*, 701 F. Supp. 2d 215, 218 (N.D.N.Y. 2010), *abrogated on other grounds by Altman v. J.C. Christensen & Assocs., Inc.*, 786 F.3d 191 (2d Cir. 2015).

### IV. Discussion

**A. Murphy's Motions to Amend**
On January 10, 2021, Murphy moved to amend his amended complaint. (Dkt. No. 123). On November 19, 2021, Murphy filed another motion to amend, (Dkt. No. 170), and therefore Murphy's former motion to amend is denied as moot. [5] *See* 🚩 *Warren v. U.S.*, 859 F. Supp. 2d 522, 526 (W.D.N.Y. 2012) (denying a pending motion to amend as moot after a subsequent motion to amend was filed).

**\*5** In accordance with the court's October, 18, 2021 Text-Only Order, (Dkt. No. 164), Murphy was required to seek leave of the court before filing anything, which he did, (Dkt. No. 165). In granting leave, the court noted that:

> Murphy's motion for leave to amend shall be filed on or before November 19, 2021. Failure to file by that deadline will result in the summary denial of the motion for failure to comply with this Text Only Order. Moreover, failure to strictly comply with the Local Rules of Practice, and, in particular, Rules 7.1 and 15.1, will result in summary denial of the motion.

(Dkt. No. 169.) The court deemed it necessary to be explicit in its instructions due to Murphy's history of untimely filings, (Dkt. 154 (filed two days after the required date)), failure to comply with the Local Rules, (Dkt. No.123 (failing to comply with Local Rule 15.1(a))), and general lack of attention to detail with respect to prior submissions. [6]

Murphy's November 19, 2021, motion to amend indicated via red text proposed amendments to his *proposed second amended complaint*, (Dkt. No. 123, Attach. 1), rather than the operative complaint, (Dkt. No. 60). Therefore, the court cannot "identify the amendments in the proposed pleading" to the "pleading sought to be amended," and can only readily discern the proposed amendments to Murphy's *proposed* second amended complaint, *which is not* the operative pleading. *See* N.D.N.Y. L.R. 15.1(a). For this reason, and because the court took special pains to ensure compliance with the Local Rules, and warned Murphy about the consequences of his failure to do so, Murphy's motion to amend, (Dkt. No. 170), is denied. *See Cottone*, 2018 WL 2021513, at \*4 ("[F]ailure to meet the requirements of [the] Local Rule[s] is an independent ground upon which to deny [a motion to amend]."); (Dkt. No. 169 ("[F]ailure to strictly comply with the Local Rules of Practice, and, in particular, Rules 7.1 and 15.1, will result in summary denial of the motion.")).

**B. RICO**
**\*6** Murphy's first and second causes of action allege RICO claims against Conway, Ciciarelli, Dickinson, Blumer,

Anderson, Peluso, Gratien, Cassalia, Hummel, Cambareri, [7] Fitzpatrick, Carden, Luczka, and Edwards in both their individual and official capacities. [8] (Am. Compl. at 47, 51.) The Sheriff Defendants and Edwards move to dismiss these causes of action, for several reasons, (Dkt. No. 88, Attach. 1 at 4-11; Dkt. No. 90, Attach. 1 at 4-11; Dkt. No. 92, Attach. 1 at 5-12; Dkt. No. 94, Attach. 1 at 4-11; Dkt. No. 96, Attach. 1 at 4-11; Dkt. No. 98, Attach. 1 at 3-11; Dkt. No. 100, Attach. 1 at 4-11; Dkt. No. 102, Attach. 1 at 4-11; Dkt. No. 143, Attach. 3 at 4-11), but, most notably, because Murphy failed to comply with Local Rule 9.2. (Dkt. No. 120 at 1; Dkt. No. 143, Attach 3. at 9.) Hummel, Cambareri, Fitzpatrick, Carden, and Luczka did not move to dismiss.

RICO grants standing to pursue a civil damages remedy to "any person injured in his business or property by reason of a violation of [⬜ 18 U.S.C. § 1962]." ⬜ 18 U.S.C. § 1964(c). The statute "imposes liability on individuals working for an 'enterprise' that commits certain predicate crimes that amount to a 'pattern of racketeering activity.' " *Reich v. Lopez*, 858 F.3d 55, 59 (2d Cir. 2017) (quoting ⬜ 18 U.S.C. §§ 1962, ⬜ 1964). A plaintiff asserting a RICO violation must adequately plead "(1) the defendant's violation of [⬜ 18 U.S.C.] § 1962, (2) an injury to plaintiff's business or property, and (3) the causation of the injury by the defendant's violation." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 283 (2d Cir. 2006) (internal quotation marks and citations omitted; alteration in original). To adequately plead the causation element of a RICO claim, the plaintiff must allege that the defendant's conduct was the "legal, or proximate, cause of [his] injury, as well as the logical, or 'but for,' cause." *Id.* at 283-84 (quoting *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys.*, 271 F.3d 374, 380 (2d Cir. 2001)).

To allege a RICO conspiracy under ⬜ 18 U.S.C. § 1962(d), a plaintiff must allege "a conspiracy to commit a substantive RICO violation." *Spool*, 520 F.3d at 183. In particular, "[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990). As a result, to properly allege a civil RICO conspiracy under ⬜ Section 1962(d), a plaintiff must allege that the defendant "knew about and

agreed to facilitate the [RICO] scheme." *Salinas v. United States*, 522 U.S. 52, 66 (1997). Regarding the facilitation requirement, "a plaintiff must allege that the conspirator intended to further an endeavor that, if completed, would satisfy all of the elements of a substantive" criminal offense; however, it is sufficient for a plaintiff to allege that the "conspirator adopted the goal of furthering or facilitating the criminal endeavor." 🚩 *Malvar Egerique v. Chowaiki*, No. 19 Civ. 3110, 2020 WL 1974228, at *8 (S.D.N.Y. Apr. 24 2020).

"Local Rule 9.2 requires a party asserting a claim under RICO to 'file a RICO statement within thirty (30) days of the filing of the pleading containing such claim.' " *Poole v. Bendixen*, No. 5:20-CV-0697, 2021 WL 3737780, at *11 (N.D.N.Y. Aug. 24, 2021). Failure to timely file a RICO statement pursuant to this rule is grounds for dismissal of the RICO claims. *See Pierce v. Homecomings Fin. LLC*, No. 17-CV-0882, 2017 WL 5991750, at *2 n.2 (N.D.N.Y. Dec. 4, 2017) (noting that, where a plaintiff failed to file a RICO statement pursuant to Local Rule 9.2, "[p]laintiff's RICO claim may be dismissed for this reason alone"); *see also Amaker v. Kelley*, No. 9:01-CV-877, 2009 WL 385413, at *11 (N.D.N.Y. Feb. 9, 2009) (holding that failure to file a RICO statement "provid[es] a threshold for dismissal of [a] plaintiff's RICO claim"); *Spoto v. Herkimer Cnty. Trust*, No. 99-CV-1476, 2000 WL 533293, at *3 n.2 (N.D.N.Y. Apr. 27, 2000) ("[T]he [c]ourt would be justified to dismiss [the] complaint based upon the[ ] very untimely filing of the[ ] Local Rule 9.2 RICO Statement.").

**\*7** Murphy filed the first iteration[9] of his amended complaint alleging RICO causes of action on July 1, 2019, (Dkt. No. 56), and he filed his RICO statement on August 16, 2021, (Dkt. No. 154), well beyond the time permitted by Local Rule 9.2. Because of this violation of Local Rule 9.2, Murphy's first and second causes of action are dismissed as against all defendants. *See Poole*, 2021 WL 3737780, at *11 (denying RICO claims where Plaintiff failed to timely file a RICO statement under Local Rule 9.2, "regardless of Plaintiffs' good-faith work on other aspects of th[e] case");

*see also* 🚩 *Citadel Mgmt., Inc. v. Telesis Trust, Inc.*, 123 F. Supp. 2d 133, 146-47 (S.D.N.Y. 2000) (dismissing complaint against non-moving defendants where moving defendants raised arguments that supported dismissal of all defendants because plaintiff was "on notice" of these arguments and had "responded in full").

Given that Murphy's RICO statement was untimely, and his RICO claims are dismissed, Murphy's motion to amend the RICO statement, (Dkt. No. 157), is denied, and his motion that, among other things, requested that the amended RICO statement be accepted as timely, to the extent it sought such relief, (Dkt. No. 156), is denied as moot. Further, the Sheriff Defendants' motion requesting guidance on responding to Murphy's amended RICO statement, (Dkt. No. 155), is also denied as moot.

## C. Retaliation

Murphy's third, fourth, and sixth causes of action allege retaliation in violation of 42 U.S.C. § 1983 and Article 1, Section 8 of the New York State Constitution against Onondaga County, the Onondaga County Sheriff's Department, the Sheriff Defendants, Hummel, Fitzpatrick, Carden, and Luczka. (Am. Compl. at 52, 56, 64.) The Sheriff Defendants moved to dismiss these claims, arguing that there is no causal connection between Murphy's speech and any alleged adverse employment action. (Dkt. No. 88, Attach. 1 at 11-13; Dkt. No. 90, Attach. 1 at 11-13; Dkt. No. 92, Attach. 1 at 12-13; Dkt. No. 94, Attach. 1 at 12-13; Dkt. No. 96, Attach. 1 at 12-14; Dkt. No. 98, Attach. 1 at 11-12; Dkt. No. 100, Attach. 1 at 12-14; Dkt. No. 102, Attach. 1 at 13-15.) Dickinson also contends that Murphy's speech was made as an employee of the Sheriff's Department, rather than as a member of the public, and that any actions taken by Dickinson were "at most *de minimis* inconvenience[s]" but not adverse employment actions. (Dkt. No. 102, Attach. 1 at 14-15.) Onondaga County, the Onondaga County Sheriff's Department, Hummel, Fitzpatrick, Carden, and Luczka do not move to dismiss.

Murphy fails to address any of the arguments made by Blumer, Anderson, Peluso, Gratien, and Ciciarelli. (Dkt. No. 124; Dkt. No. 125; Dkt. No. 126.) With respect to Conway, Murphy appears to contend that supervisory liability provides a basis to avoid dismissal, and that a further amended complaint will also support his retaliation claims against Conway. (Dkt. No.116 at 15-16.) Regarding Dickinson and Cassalia, Murphy appears to also argue that supervisory liability provides a basis to avoid dismissal, and that Dickinson and Cassalia's "efforts were focused on the fabrication of false reports." (Dkt. No. 117 at 13; 118 at 13.) Murphy does not provide a single citation to the amended complaint in support of this position. (*Id.*)

To withstand a motion to dismiss on a First Amendment retaliation claim, a plaintiff must demonstrate: (1) that he "engaged in protected First Amendment activity;" (2) that "he suffered an adverse employment action;" and (3) that "there was a causal connection between the protected activity and the adverse employment action." *Osuan v. City of New York*, No. 18cv151, 2019 WL 2544866, at \*4 (S.D.N.Y. June 20, 2019) (quoting *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007)); *see Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015).

**\*8** Whether an employee's speech is protected by the First Amendment is a two-part inquiry. *See Reynolds v. Village of Chittenango*, No. 5:19-cv-416, 2020 WL 1322509, at \*3 (N.D.N.Y. Mar. 20, 2020) (citation omitted). First, the subject of the employee's speech must be "a matter of public concern." *Id.* (quoting *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011)). Second, the employee must be speaking "as a citizen rather than solely as an employee." *Id.* (quoting *Jackler*, 658 F.3d at 235).

An adverse employment action is qualified as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Shanks v. Vill. of Catskill Bd. of Trs.*, 653 F. Supp. 2d 158, 166 (N.D.N.Y. 2009) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225-26 (2d Cir. 2006)). "Under this definition, adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand[;] as well as lesser actions such as negative reviews, false accusations, and menial job assignments." *Id.* (quoting *Zelnik*, 464 F.3d at 226) (internal quotation marks and other citation omitted).

Finally, a plaintiff must establish "a causal relationship between the protected speech and the adverse employment action." *Id.* "The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action." *Cotarelo v. Vill. of Sleepy Hollow Police Dept.*, 460 F.3d 247, 251 (2d Cir. 2006) (citation omitted). "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Shanks*, 653 F. Supp. 2d at 167 (citation omitted). To

demonstrate a causal connection, such to "survive a motion to dismiss," a plaintiff "need not clearly establish that the defendant harbored retaliatory intent. It is sufficient to allege facts which could reasonably support an inference to that effect." *Stajic v. City of New York*, 214 F. Supp. 3d 230, 235 (S.D.N.Y. 2016) (quoting *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 418 (2d Cir. 1999)).

The Second Circuit has recently clarified that "there is no special rule for supervisory liability [under § 1983]. Instead, a plaintiff must plead and prove that each ... defendant, through [their] own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (internal quotation marks and citation omitted).

As a preliminary matter, Murphy's retaliation claim pursuant to Article I, Section 8 of the New York State Constitution is duplicative of his § 1983 First Amendment retaliation claim. See *Leibovitz v. City of New York*, No. 14-CV-7106, 2018 WL 1157872, at *21 (E.D.N.Y. Mar. 2, 2018) ("[V]arious federal courts in this circuit have held that there is no private right of action under the New York State Constitution where ... remedies are available under [§] 1983.") (internal quotation marks and citations omitted); *cf.* *Sanders v. City of New York*, No. 12 CV 2906, 2015 WL 2331105, at *9 (S.D.N.Y. May 11, 2015). Thus, Murphy's sixth cause of action, alleging a violation of the New York Constitution, is dismissed as to all defendants.

**\*9** With respect to Murphy's First Amendment retaliation claims brought pursuant to § 1983, he has adequately pleaded that he was speaking as a citizen on matters of public concern when he reported to his superior officers "illegal arrests, inadequate police work, improper training, poor supervision, racially motivated behavior and improper, unprofessional[,] and illegal conduct" committed by members of the Sheriff's Department. (Am. Compl. ¶ 29); *see* *Raymond v. City of New York*, 317 F. Supp. 3d 746, 755-56 (S.D.N.Y. 2018) (holding that a police officer "engaged in speech in his capacity as a private citizen on a matter of public concern" when he alerted his commanding officer of improper arrests); *see also* *Matthews v. City of New York*, 779 F.3d 167, 174 (2d Cir. 2015) ("[W]hen a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy ... engages in speech

concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee."); *see also* *Shanks*, 653 F. Supp. 2d at 165 (N.D.N.Y. 2009) (finding that a firefighter reporting fire department safety violations was protected speech).

Further, Murphy has adequately pleaded that he faced adverse employment action. Specifically, Murphy alleges that Conway requested that Fitzpatrick "institute an unwarranted criminal action against Murphy," (Am. Compl. ¶ 234), that Gratien, Blumer, [10] and Peluso colluded to create a falsified police report in an attempt to blame Murphy for an illegal search and seizure conducted by others in the Sheriff's Department, raised by Murphy, (*id.* ¶ 322), that Anderson filed an unsubstantiated internal complaint against Murphy, (*id.* ¶¶ 198, 322), that Peluso filed multiple unsubstantiated internal complaints against him, (*id.* ¶¶ 101, 137), at least one of which was "specifically intended to prevent ... Murphy from being promoted," (*id.* ¶ 101), and, finally, that Dickinson drastically reduced Murphy's duties and responsibilities, including his teaching role at the police academy, and made "several improper, unsupported and baseless referrals [of Murphy] to the Onondaga County Sheriff's Office Internal Affairs Office," (*id.* ¶¶ 121, 154-55, 229). These all constitute adverse employment actions. See *Shanks*, 653 F. Supp. 2d at 166. [11]

Finally, Murphy has adequately pleaded a causal connection between his speech and these adverse actions with respect to the Sheriff Defendants, other than Ciciarelli and Cassalia. The amended complaint alleges that, after Murphy informed Conway of the alleged corruption in the Sheriff's Department, Conway requested that Fitzpatrick "institute an unwarranted criminal action against Murphy, because it [wa]s impossible to silence him using 'in-house' means." (Am. Compl. ¶¶ 69, 234.) At this stage in the litigation, this is adequate to demonstrate a causal connection between Murphy's speech and the alleged adverse employment action carried out by Conway. See *Reynolds*, 2020 WL 1322509, at *3 (holding a causal connection existed where "after [plaintiff] complained about his defective patrol car, he was subject to ... threats of false and malicious criminal prosecution" (internal quotation marks and citation omitted)).

**\*10** With respect to Gratien, Blumer, and Peluso, the amended complaint alleges that, shortly after raising concerns to Blumer regarding an improper search and seizure

conducted by members of the Sheriff's Department, which involved Peluso falsifying a policy report to cover the incident up, Gratien, Blumer, and Peluso "collu[ded]" to create a falsified police report in an attempt to blame Murphy for the incident. (Am. Compl. ¶¶ 88-95, 322). Further, after that incident, Gratien expressed that Murphy "was not promoted to Lieutenant because he interferes with investigations of others." (*Id.* ¶ 97.) At this stage in the litigation, these allegations are adequate to demonstrate a causal connection between Murphy's speech and the adverse employment actions carried out by Gratien, Blumer, and Peluso. [12] *See Jackson*, WL 5698535, at *5 (finding a causal connection existed based on allegations that the defendants threatened and harassed the plaintiff, and falsely represented the plaintiff's performance reviews).

With respect to Anderson, the amended complaint alleges that, he filed an internal affairs complaint against Murphy, "following Peluso's lead." (Am. Compl. ¶¶ 198, 322). Given that Peluso's complaint was brought shortly after Murphy raised concerns to Peluso about an instance where a complainant was not "attent[ed to] by [the Sheriff's Department] ... due to her ethnic background and her sex," that the complaint was "specifically intended to prevent ... Murphy from being promoted," and because Anderson, was "following Peluso's lead," (Am. Compl. ¶¶ 44-55, 101, 322), Anderson's Rule 12(c) motion is denied. *Stajic*, 214 F. Supp. 3d at 235 (holding, that to "survive a motion to dismiss," a plaintiff "need not clearly establish that the defendant harbored retaliatory intent. It is sufficient to allege facts which could reasonably support an inference to that effect" (citation omitted)).

With respect to Ciciarelli and Cassalia, Murphy has failed to adequately plead a cause of action for retaliation. Regarding Cassalia, there is not a single *specific* allegation in the amended complaint demonstrating that Cassalia was a participant in any adverse employment action. Regarding Ciciarelli, Murphy alleges simply that Ciciarelli was aware of the adverse employment action, but not that he was involved in anyway, which is inadequate. *See Tangreti*, 983 F.3d at 618.

To the extent Murphy argues that future amendments will cure any defect with respect to this clause of action, (*see, e.g.*, Dkt. No.116 at 15-16), this argument does not save his claim. [13] *See Austin Air Sys., Ltd. v. Sager Elec. Supply Co., Inc.*, No. 19-CV-562JLS, 2022 WL 464230, at *8 (W.D.N.Y.

Feb. 15, 2022) ("In ruling on a motion under Rule 12(b)(6), ... the court may consider only 'the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated into the complaint by reference.' ") (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007)); *see also supra* Part IV.A. (denying Murphy's pending motions to amend).

**\*11** For these reasons, Murphy's third and fourth causes of action are dismissed as against Ciciarelli and Cassalia, and may proceed against all of the other Sheriff Defendants, as well as the non-moving parties: Onondaga County, the Onondaga County Sheriff's Department, Hummel, Fitzpatrick, Carden, and Luczka.

### D. Section 1985 Conspiracy

Murphy alleges a § 1985 conspiracy against Onondaga County, the Onondaga County Sheriff's Department, the Sheriff Defendants, Hummel, Fitzpatrick, Carden, and Luczka. The Sheriff Defendants move to dismiss this claim, arguing among other things, that, if the court is to construe this cause of action as brought under § 1985(2), that the "amended complaint contains only vague and conclusory allegations which fail to identify a single act [by any of the Sheriff Defendants] in furtherance of any conspiracy." (Dkt. No. 129 at 7; *see* Dkt. No. 130 at 6; Dkt. No. 131 at 6; Dkt. No. 135 at 6-7; Dkt. No. 136 at 6-7; Dkt. No. 137 at 6-7.) Onondaga County, the Onondaga County Sheriff's Department, Hummel, Fitzpatrick, Carden, and Luczka do not move to dismiss.

Murphy argues that "unquestionably, [he] was the subject of efforts by all of the defendants to impede, hinder, obstruct and/or defeat his pursuit of justice during the course of this federal proceeding," citing only one example in support of this position, that he "was the subject of a grand jury target letter" that "was based on no probable cause and was purely an attempt to deter [him]." (Dkt. No. 116 at 18; Dkt. No. 124 at 12; Dkt. No. 125 at 12-13; Dkt. No. 126 at 12.) Further, with respect to certain defendants, Murphy argues that future "supplement[ations]" will cure any defect in the amended complaint regarding his § 1985 claim. (Dkt. No. 117 at 14; Dkt. No. 118 at 14.)

As a preliminary matter, there is some dispute pursuant to which paragraph of 42 U.S.C. § 1985 Murphy brings his fifth cause of action. Murphy's fifth claim is for "conspiracy to retaliate in violation of the first amendment" under 42 U.S.C. § 1985. (Am. Compl. at 60-61.) It appears that Murphy brings this cause of action under 42 U.S.C. § 1985(3) (Am. Compl. ¶ 321 ("Defendants ... entered into a corrupt agreement to injure ... Murphy ... [and] deprive him of his Constitutional rights")); *see Oliver v. N.Y. State Police*, No. 1:19-cv-233, 2020 WL 1849484, at *9 (N.D.N.Y. Apr. 13, 2020) (holding that, "[t]o state a conspiracy claim under Section 1985(3), among other things, a plaintiff must allege: "1) a conspiracy; 2) for the purpose of depriving ... any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws' " (quoting *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015)).

However, after the Sheriff Defendants, in their various Rule 12(c) motions, noted that, under 42 U.S.C. § 1985(3), a plaintiff must allege "some class based discriminatory amicus," which Murphy had not adequately pleaded, (*see, e.g.*, Dkt. No. 88, Attach. 1 at 14) (citing *Trombley v. O'Neill*, 929 F. Supp. 2d 81, 96 (N.D.N.Y. 2013)), Murphy argues that his fifth cause of action is actually conspiracy to obstruct justice, in violation of the second clause of 42 U.S.C. § 1985(2), (*see, e.g.*, Dkt. 116 at 17-18.)

Even though the court is not persuaded that Murphy intended to bring this cause of action under 42 U.S.C. § 1985(2), out of an abundance of caution, it will analyze it as such.

**\*12** The second clause of 42 U.S.C. § 1985(2) prohibits "two or more persons" from conspiring for to purpose of:

> [I]mpeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or

class of persons, to the equal protection of the laws.

With respect to a claim brought under this clause of § 1985(2), a plaintiff must plead "(1) a conspiracy, (2) for the purpose of impeding, hindering, obstructing, or defeating, in any manner, (3) the due course of justice in any State or Territory, (4) with intent to deny any citizen the equal protection of the laws." *Thomas v. DeCastro*, No. 14-CV-6409, 2018 WL 1322207, at *12 (S.D.N.Y. Mar. 13, 2018) (internal quotation marks and citation omitted). "[A] claim under the second clause of [§] 1985(2) requires a showing of class-based invidiously discriminatory animus on the part of the conspiring parties." *Langton v. Town of Chester Library Bd.*, No. 14-cv-9474, 2020 WL 2850898, at *4 (S.D.N.Y. June 1, 2020) (internal quotation marks and citation omitted); *see Ruggiero v. City of Cortland*, No. 5:17-CV-790, 2018 WL 5983505, at *8 (N.D.N.Y. Nov. 14, 2018) (dismissing a conspiracy claim brought under the second clause of § 1985(2) where, plaintiff "failed to plausibly allege that any of th[e] conspiratorial misconduct stem[ed] from the kind of racial or other class-based animus required by controlling federal law" (internal quotation marks and citation omitted)).

Murphy concedes the fact that he "has not alleged that damages were caused as a result of racial discrimination or other discriminatory means," (*see, e.g.*, Dkt. No. 124 at 11), a requirement under the second clause of § 1985(2). *See Langton*, 2020 WL 2850898, at *4; *see Ruggiero*, 2018 WL 5983505, at *8. Because Murphy makes no attempt to demonstrate racial or other class-based animus [14] on behalf of any defendant, he has failed to adequately plead a claim under the second clause of § 1985(2), and, thus, his fifth cause of action is dismissed as against all defendants. [15] *See Citadel*, 123 F. Supp. at 146-47.

### E. Equal Protection

**\*13** Murphy's seventh cause of action alleges violations of the Equal Protection Clause of the Fourteenth Amendment, under 42 U.S.C. § 1983 against Onondaga County, the Onondaga County Sheriff's Department, the Sheriff Defendants, Hummel, Fitzpatrick, Carden, and Luczka. (Am. Compl. at 68.) The Sheriff Defendants move to dismiss this

claim, raising several arguments in support of their position, (Dkt. No. 88, Attach. 1 at 15-17; Dkt. No. 90, Attach. 1 at 16-17; Dkt. No. 92, Attach. 1 at 16-17; Dkt. No. 94, Attach. 1 at 16-18; Dkt. No. 96, Attach. 1 at 16-17; Dkt. No. 98, Attach. 1 at 14-16; Dkt. No. 100, Attach. 1 at 16-18; Dkt. No. 102, Attach. 1 at 17-18). Relevant here, they contend that Murphy bases his equal protection claim on a class-of-one theory, which is inapplicable. (Dkt. No. 129 at 7-8; Dkt. No. 130 at 7; Dkt. No. 131 at 7; Dkt. No. 135 at 7-8; Dkt. No. 136 at 7-8; Dkt. No. 137 at 7-8.) Onondaga County, the Onondaga County Sheriff's Department, Hummel, Fitzpatrick, Carden, and Luczka do not move to dismiss.

"The Equal Protection Clause of the Fourteenth Amendment requires the government to treat all similarly situated individuals alike." *Young v. Suffolk County*, 705 F. Supp. 2d 183, 204 (E.D.N.Y. 2010) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, (1985)). When a plaintiff does not allege an equal protection violation due to their membership in a protected class, they may still prevail on their claim under a "class-of-one" theory. *See NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177 (2d Cir. 2019) ("[T]he Supreme Court has ... endorsed a class-of-one theory for equal protection claims, under which a single individual can claim a violation of her Equal Protection rights based on arbitrary disparate treatment." (internal quotation marks and citations omitted)); *see also Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). To succeed under a class-of-one theory, a plaintiff must demonstrate "[1] that [ ]he has been intentionally treated differently from others similarly situated and [2] that there is no rational basis for the difference in treatment." *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019) (citation omitted).

In *Engquist v. Oregon Department of Agriculture*, the Supreme Court held that the class-of-one theory has no application in the public employment context. *See* 553 U.S. 591, 607-08 (2008); *see also Booker v. City of New York*, No. 14 Civ. 9801, 2017 WL 151625, at *5 (S.D.N.Y. Jan. 13, 2017) ("[B]ecause 'class-of-one' Equal Protection claims are unavailable in the public employment context, plaintiff cannot state a viable federal Equal Protection claim [under § 1983].").

Because Murphy's equal protection claim relies on the class of one theory, (Dkt. No. 116 at 18-19 ("It has long been held that plaintiff might bring a suit based upon his membership in

[a] class[-]of[-]one.... [Murphy's] class ... may be articulated in any number of ways including 'all Sheriff's Deputies', 'all Sheriff's Deputies in Onondaga County', 'all police officers', etc." (internal citation omitted)); *see* Dkt. No. 117 at 15; Dkt. No. 118 at 15; Dkt. No. 124 at 12-13; Dkt. No. 125 at 13; Dkt. No. 126 at 12-13), and Murphy's claim is in the context of public employment, it must be dismissed. *See Stas v. Lynch*, 576 F. Supp. 2d 322, 323, 325 (D. Conn. 2008) (finding that former Connecticut State Police Trooper did not have a valid claim against Connecticut State Police official pursuant to § 1983, under the class-of-one theory, because this theory was inapplicable in the context of public employment). For this reason, Murphy's seventh cause of action is dismissed as against all defendants. See *Citadel*, 123 F. Supp. 2d at 146-47.

### F. **Defamation**

Murphy's eighth cause of action is for defamation, defamation per se, slander, and libel against Onondaga County, the Onondaga County Sheriff's Department, the Sheriff Defendants, Hummel, Fitzpatrick, Carden, Luczka, and Edwards. (Am. Compl. at 70.)

The Sheriffs Defendants and Edwards move to dismiss these claims, with the Sheriffs Defendants arguing that Murphy has not adequately pleaded defamation, (Dkt. No. 88, Attach. 1 at 17-18; Dkt. No. 90, Attach. 1 at 18-20; Dkt. No. 92, Attach. 1 at 18-19; Dkt. No. 94, Attach. 1 at 19-20; Dkt. No. 96, Attach. 1 at 18-19; Dkt. No. 98, Attach. 1 at 16-17; Dkt. No. 100, Attach. 1 at 18-20; Dkt. No. 102, Attach. 1 at 19-21), and that, even if he did, the claims are time-barred, (Dkt. No. 88, Attach. 1 at 19-20; Dkt. No. 90, Attach. 1 at 17-18; Dkt. No. 92, Attach. 1 at 17-18; Dkt. No. 94, Attach. 1 at 18-19; Dkt. No. 96, Attach. 1 at 17-18; Dkt. No. 100, Attach. 1 at 18; Dkt. No. 102, Attach. 1 at 18-19), and Edwards making similar arguments, (Dkt. No. 143, Attach. 3 at 11-14). Onondaga County, the Onondaga County Sheriff's Department, Hummel, Fitzpatrick, Carden, and Luczka do not move to dismiss.

**\*14** Murphy argues that the statute of limitations does not bar his claims because "[e]ven if the slanderous comments made by defendants during the meeting that [sic.] the Onondaga County District Attorney's Office were the only comments to base his claim on, ... [that] this meeting occurred in or about January of 2019." (Dkt. No. 116 at 20-21; *see* Dkt. No. 117 at 17; Dkt. No. 118 at 17; Dkt. No. 124 at 14-15; Dkt. No. 125 at 15; Dkt. No. 126 at 14-15; Dkt. No. 148

at 24.) He also contends that the statute of limitation does not bar his claims because the defendants' "investigations and allegations against Murphy continued even as this case progressed." (Dkt. No. 124 at 15; Dkt. No. 125 at 15; Dkt. No. 126 at 150; see Dkt. No. 148 at 25.) Murphy further asserts that he has sufficiently pleaded all elements to his defamation claims because "[a]s to who the defaming remarks were made, that would include the defendants herein, selected members of the District Attorney's Office, possibly grand jury participants and others. As to the words stated, that would include false allegations that Murphy had committed a crime." (Dkt. No. 116 at 20; see Dkt. No. 117 at 18; Dkt. No. 118 at 18; Dkt. No. 124 at 15; Dkt. No. 125 at 15; Dkt. No. 126 at 15; see Dkt. No. 148 at 25.) Murphy also asserts that his proposed second amended complaint establishes additional support for his defamation claims. (Dkt. No. 116 at 21; Dkt. No. 124 at 15; Dkt. 125 at 15-16; Dkt. No. 126 at 15.) Finally, he argues that discovery would allow him to cure any defects in his defamation cause of action. (Dkt. No. 118 at 18; Dkt. No. 148 at 25 ("As it cannot be denied that there was a Grand Jury investigation, there must be a criminal complaint from Edwards/ Westcott. Further, it is obvious that there is no probable cause to institute such an investigation. Undeniably, someone lied. Plaintiff asks only the opportunity to view these documents. That is only fair.").)

"Defamation ... consist[s] of the twin torts of libel and slander." *Alexander v. City of Syracuse*, No. 5:17-CV-1195, 2018 WL 6591426, at *6 (N.D.N.Y. Dec. 13, 2018) (quoting *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001)). To state a claim for defamation under New York law, a plaintiff must allege "a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, ... caus[ing] special harm or constitut[ing] defamation per se." *Jackie's Enters., Inc. v. Belleville*, 165 A.D.3d 1567, 1569-70 (3d Dep't 2018) (citations omitted). "While the Second Circuit has abandoned the stringent *in haec verba* standard in defamation cases, to comply with the dictates of Rule 8(a) a plaintiff must still 'afford defendant sufficient notice of the communications complained of to enable him to defend himself.' " [16] *Simons v. New York*, 472 F. Supp. 2d 253, 267 (N.D.N.Y. 2007) (quoting *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986)).

For a defamation claim to survive a motion to dismiss, in compliance with Rule 8, a plaintiff must "identify (1) the allegedly defamatory statements; (2) the person who made the statements; (3) the time when the statements were made; and,

(4) the third parties to whom the statements were published." *Hillary v. Vill. of Potsdam*, No. 7:12-cv-1669, 2015 WL 902930, at *11 (N.D.N.Y. Mar. 3, 2015) (citation omitted). In other words, the allegations must include "the time, place, and manner of the false statement." *Arvanitakis v. Lester*, 145 A.D.3d 650, 651 (2d Dep't 2016).

As to slander per se, there are four categories of statements for which damages need not be shown: statements "(i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992) (citations omitted).

**\*15** "Under New York law, the statute of limitations for a defamation claim is one year." *McKenzie v. Dow Jones & Co., Inc.*, 355 F. App'x 533, 535 (2d Cir. 2009) (citing N.Y. C.P.L.R. § 215(3)).

With respect to Conway, Murphy fails to adequately plead a claim for defamation. Murphy alleges two arguably [17] defamatory statements attributable to Conway in the amended complaint. (Am. Compl. ¶¶ 73, 234.) The first of these statements occurred on March 9, 2016, (*Id.* ¶ 73), assuming *arguendo* that this statement was defamatory, it is time-barred, as it occurred more than one year prior to the commencement of this action, on October 11, 2018, (Dkt. No. 1). The second statement attributable to Conway is: "Conway request[ed] ... Fitzpatrick to institute an unwarranted criminal action against Murphy because it is impossible to silence him using 'in-house' means." (Am. Compl. ¶ 234.) Although Murphy appears to argue in his opposition papers that this occurred "in or about January of 2019," (Dkt. No. 116 at 21), the amended complaint does not allege when this statement was made, (Am. Compl. ¶ 234), and, thus, fails to adequately plead a claim for defamation against Conway. *See Moleon v. Alston*, No. 21 Civ. 1398, 2021 WL 5772439, at *15 (S.D.N.Y. Dec. 3, 2021) ("Where a plaintiff fails to identify ... the time ... in which [the statement] w[as] made, a defamation claim does not survive a motion to dismiss." (internal quotation marks and citation omitted)); *see also Austin Air Sys.*, 2022 WL 464230, at *8 ("In ruling on a motion under Rule 12(b)(6), ... the court may consider only 'the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated

RICO Bus.Disp.Guide 13,617

into the complaint by reference.' " (quoting 🔖 *McCarthy,* *482 F.3d at 191*)).

Murphy also fails to adequately plead a claim for defamation against Blumer, Peluso, Anderson, Gratien, and Dickinson. Murphy alleges several arguably defamatory statements attributable to these defendants in the amended complaint. (Am. Compl. ¶¶ 65, 95, 97,111, 118, 124, 136, 141-42, 154, 168, 196, 322.) As alleged in the amended complaint, these statements were made "[a] few days [after]" May 30, 2015, (*id.* ¶¶ 49, 63, 65), on or about April 24, 2016, (*id.* ¶¶ 78, 93, 95), on or before June 3, 2016, (*id.* ¶ 97), on or before August 10, 2016, (*id.* ¶ 101), on September 29, 2016, (*id.* ¶¶ 134, 136-137), on October 5, 2016, (*id.* ¶ 141), "[d]uring the November, 2016 time period," (*id.* ¶ 154), and "on or about June 24, 2017," (*id.* ¶¶ 158, 168), and in or before September 2017, (*id.* ¶ 196). Assuming without deciding that these statements were defamatory, they are time-barred, as they occurred more than one year prior to the commencement of this action, on October 11, 2018, (Dkt. No. 1). [18]

 **\*16** Nowhere in the amended complaint does Murphy attribute any specific defamatory statements to Cassalia or Ciciarelli, [19] and, thus, he has not made out a claim for defamation as against them. *See Hillary,* 2015 WL 902930, at \*11 (for a defamation claim to survive a motion to dismiss, a plaintiff must "identify ... the allegedly defamatory statements ... [and] the person who made the statements" (internal quotation marks and citation omitted)).

Finally, with respect to Edwards, Murphy has failed to adequately plead defamation. The only arguably defamatory statement made by Edwards included in the amended complaint was made "on or about June 24, 2017." (Am. Compl. ¶¶ 158, 168.) Again, assuming *arguendo* that this statement was defamatory, it is time-barred, as it occurred more than one year prior to the commencement of this action, on October 11, 2018. (Dkt. No. 1.)

Finally, in Murphy's various opposition papers, he appears to make the same, or substantially similar, arguments, regardless of the applicability of the arguments to the specific motion he is opposing. (*See, e.g.,* Dkt. 118 at 17-18 (responding to a statute of limitations argument that was not made with respect to this specific defendant).) He argues that his claims are not time-barred because "[e]ven if the slanderous comments made by defendants during the meeting that the Onondaga County District Attorney's Office were the only comments

to base his claim on, there is no problem with the statute of limitations ... [because] this meeting occurred in or about January of 2019." (Dkt. No. 116 at 20-21; Dkt. 117 at 17; Dkt. No. 118 at 17; Dkt. No. 124 at 14-15; Dkt. No. 125 at 15; Dkt. No. 126 at 14-15). This is borderline nonsensical. It is not apparent to the court to which "meeting that [sic.] the Onondaga County District Attorney's Office" Murphy is referring, as the amended complaint does not discuss such a meeting. If Murphy is referring to his allegation that "Conway request[ed] District Attorney Fitzpatrick ... institute an unwarranted criminal action against Murphy," (Am. Compl. ¶ 234), then this argument would have no baring on any claim against any defendant besides Conway, [20] as there is nothing indicating that any defendant besides Conway and Fitzpatrick were present or involved in this meeting, let alone made defamatory statements during the meeting. Further, Murphy contends that "[defendant's] investigations and allegations against Murphy continued even as this case progressed," (Dkt. No. 124 at 15; Dkt. No. 125 at 15; Dkt. No. 126 at 150; see Dkt. No. 148 at 25), yet he provides no citations to the amended complaint in support of this position. Finally, Murphy's contention that future discovery would cure any defects in his defamation cause of action, (Dkt. No. 118 at 18; Dkt. No. 148 at 25), is equally unpersuasive. *See* 🔖 *Arrindel-Martin v. City of Syracuse,* No. 5:18-CV-780, 2018 WL 6622193, at \*6 (N.D.N.Y. Dec. 18, 2018) ("[T]he purpose of the plausibility standard is to require a plaintiff to allege sufficient facts to state a claim; it is not a license for a plaintiff to conduct a fishing expedition in an attempt to obtain discovery that might support his allegations." (citation omitted)).

 **\*17** For these reasons, Murphy's eighth cause of action for defamation, defamation per se, slander, and libel is dismissed as against the Sheriff Defendants and Edwards, and remains against the non-moving defendants: Onondaga County, the Onondaga County Sheriff's Department, Hummel, Fitzpatrick, Carden, and Luczka.

### G. Conspiracy to Defame

Murphy's ninth cause of action is for conspiracy to defame against Onondaga County, the Onondaga County Sheriff's Department, the Sheriff Defendants, Hummel, Fitzpatrick, Carden, Luczka, Edwards, and Westcott. (Am. Compl. at 73.)

"In order to properly plead a cause of action to recover damages for civil conspiracy, the plaintiff must allege *a cognizable tort,* coupled with an agreement between the

conspirators regarding the tort, and an overt action in furtherance of the agreement." *Fairstein v. Netflix, Inc.*, No. 20-cv-8042, 2021 WL 3501527, at \*23 (S.D.N.Y. Aug. 9, 2021) (emphasis added) (quoting *Perez v. Lopez*, 948 N.Y.S.2d 312, 314 (2d Dep't 2012)).

Where a plaintiff fails to adequately plead "facts sufficient to demonstrate the underlying tort of defamation" their claims for civil conspiracy to commit defamation must also be dismissed. *See Sparrow Fund Mgmt. LP v. MiMedx Group, Inc.*, No. 18 Civ. 4921, 2019 WL 1434719, at \*12 (S.D.N.Y. Mar. 31, 2019); *see also Nunes v. Cable News Network, Inc.*, 520 F. Supp. 3d 549, 561 (S.D.N.Y. Feb. 19, 2021) ("In light of [p]laintiff's failure to plead a viable defamation claim, there is no underlying tort to support a viable claim for conspiracy here.").

Because Murphy's defamation claims against the Sheriff Defendants and Edwards are dismissed, his ninth cause of action for conspiracy to defame as against these same defendants and Westcott is likewise dismissed. *See Sparrow*, 2019 WL 1434719, at \*12. His defamation claims remain against the non-moving parties: Onondaga County, the Onondaga County Sheriff's Department, Hummel, Fitzpatrick, Carden, and Luczka.

## H. Intentional Infliction of Emotional Distress

Murphy's tenth cause of action alleges intentional infliction of emotional distress (IIED) against Onondaga County, the Onondaga County Sheriff's Department, the Sheriff Defendants, and Hummel. (Am. Compl. at 77.)

The Sheriff Defendants argue that this claim must be dismissed for several reasons, (Dkt. No. 88, Attach. 1 at 21-23; Dkt. No. 90, Attach. 1 at 21-23; Dkt. No. 92, Attach. 1 at 22-23; Dkt. No. 94, Attach. 1 at 22-23; Dkt. No. 96, Attach. 1 at 22-23; Dkt. No. 98, Attach. 1 at 28-20; Dkt. No. 100, Attach. 1 at 22-23; Dkt. No. 102, Attach. 1 at 22-24), but most notably here, because Murphy's allegations do not meet the high standard required for a claim of intentional affliction of emotional distress, (Dkt. No. 88, Attach. 1 at 22-23; Dkt. No. 90, Attach. 1 at 22-23; Dkt. No. 92, Attach. 1 at 22-23; Dkt. No. 94, Attach. 1 at 22-23; Dkt. No. 96, Attach. 1 at 22-23; Dkt. No. 96, Attach. 1 at 22-23; Dkt. No. 98, Attach. 1 at 19-20; Dkt. No. 100, Attach. 1 at 22-23; Dkt. No. 102, Attach. 1 at 23-24). Onondaga County, the Onondaga County Sheriff's Department, and Hummel do not move to dismiss.

With respect to Conway, Dickinson, and Cassalia, Murphy appears to concede this point, (Dkt. No. 116 at 23-24 ("Plaintiff's proposed amended complaint alleviates this inadvertent error ... [a]ccordingly, plaintiff will move for an amended complaint to alleviate this inadvertent error and place this extreme conduct before the Court in th[i]s ... cause[ ] of action."); *see* Dkt. No. 117 at 19-20; Dkt. No. 118 at 19-20), and argues, that with respect Blumer, Peluso, Gratien, Anderson, and Ciciarelli, the standard has been met, (Dkt. No. 124 at 16-17; Dkt. No. 125 at 17-18; Dkt. No. 126 at 16-17).

**\*18** IIED is a "highly disfavored tort under New York law.... to be invoked only as a last resort." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 158 (2d Cir. 2014) (internal quotation marks and citations omitted). Under New York law, IIED has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress." *Chanko v. Am. Broad. Cos.*, 27 N.Y.3d 46, 56 (2016) (citation omitted). As to the first element, the "conduct [must have] been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (internal quotation marks and citation omitted). This standard is "rigorous[ ] and difficult to satisfy." *Id.* Establishing extreme and outrageous conduct "is difficult, even at the pleadings stage." *Ifill v. United Parcel Serv.*, No. 04Civ.5963, 2005 WL 736151, at \*6 (S.D.N.Y. Mar. 29, 2005) (quoting *Conboy v. AT & T Corp.*, 84 F. Supp. 2d 492, 507 (S.D.N.Y. 2000)). Indeed, "of the IIED claims considered by [the New York Court of Appeals], 'every one has failed because the alleged conduct was not sufficiently outrageous.' " *Taylor v. N.Y.C. Fresh Market*, No. 19 CV 4797, 2020 WL 10356230, at \*8 (E.D.N.Y. Dec. 23, 2020) (quoting *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 122 (1993)).

Under the IIED heading in the amended complaint, Murphy alleges that he "was not allowed to appear in public in uniform," "was not allowed to supervise patrol officers," "was not allowed to do police work," "was required to sit at a desk all day, with no work, while others looked on," "was wrongly passed over for promotion in favor of an officer with less experience," and that his "wife was assaulted without the [Sheriff's] Department so much as instituting an

investigation." (Am. Compl. ¶ 391; *see id.* ¶ 245.) These allegations do not meet the standard for IIED. *See Kolchinsky v. Moody's Corp.*, No. 10 Civ. 6840, 2012 WL 639162, at *1-3, 7 (S.D.N.Y. Feb. 28, 2012) (holding that, where a plaintiff alleged, because of his role as a whistle blower, he was barred from meetings, demoted, had his responsibilities and salary decreased, defamed, and ultimately suspended from the company, that these "allegations do not have a hint" of the required extreme and outrageous conduct); *see also Ifill v. United Parcel Serv.*, No. 04Civ.5963, 2005 WL 736151, at *1-2, 7 (S.D.N.Y. Mar. 29, 2005) (finding that allegations that employer harassed, discriminated, demoted, and retaliated against plaintiff were insufficient to state IIED). For this reason, Murphy's tenth cause of action for IIED is dismissed as against the Sheriff Defendants. This cause of action remains against the non-moving defendants: Onondaga County, the Onondaga County Sheriff's Department, and Hummel.

## I. Negligent Infliction of Emotional Distress

Murphy's eleventh cause of action is for negligent infliction of emotional distress (NIED) against Onondaga County, the Onondaga County Sheriff's Department, the Sheriff Defendants, Hummel, Fitzpatrick, Carden, and Luczka. (Am. Compl. at 79.)

The Sheriff Defendants argue that this cause of action must be dismissed against them because none of the Sheriff Defendants breached a duty owed to Murphy which resulted in a threat or endangerment to his physical safety. (Dkt. No. 88, Attach. 1 at 24-25; Dkt. No. 90, Attach. 1 at 24-25; Dkt. No. 92, Attach. 1 at 24-25; Dkt. No. 94, Attach. 1 at 24-25; Dkt. No. 96, Attach. 1 at 24; Dkt. No. 98, Attach. 1 at 21; Dkt. No. 100, Attach. 1 at 24-25; Dkt. No. 102, Attach. 1 at 25.) Onondaga County, the Onondaga County Sheriff's Department, Hummel, Fitzpatrick, Carden, and Luczka do not move to dismiss.

With respect to Conway, Dickinson, and Cassalia, Murphy appears to concede this point. (Dkt. No. 116 at 23-24; Dkt. No. 117 at 19-20; Dkt. No. 118 at 19-20), and completely fails to address Blumer, Peluso, Gratien, Anderson, and Ciciarelli's arguments regarding NIED. (Dkt. No. 124 at 16-17; Dkt. No. 125 at 17-18; Dkt. No. 126 at 16-17.)

**\*19** Under New York law, a plaintiff may establish a claim for NIED in two ways, under the "bystander theory" or "direct duty theory." See *Mortise v. United States*, 102

F.3d 693, 696 (2d Cir. 1996). A plaintiff may recover "under the 'bystander' theory when: (1) [he] is threatened with physical harm as a result of defendant's negligence; and (2) consequently [he] suffers emotional injury from witnessing the death or serious bodily injury of a member of [his] immediate family." *Id.* (citation omitted); *see Quinn v. U.S.*, 946 F. Supp. 2d 267, 278 (N.D.N.Y. 2013). "A plaintiff may recover under a direct duty theory when [he] suffers an emotional injury from defendant's breach of a duty which unreasonably endangered [his] own physical safety." *Quinn*, 946 F. Supp. 2d at 278 (internal quotation marks and citation omitted); *see Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996). Importantly, "[t]he duty in such cases must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *See Mortise*, 102 F.3d at 696 (citation omitted); *see also Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 285 (N.D.N.Y. 2018).

Murphy appears to seek recovery under a direct duty theory. (Am. Compl. ¶¶ 393-99.) However, Murphy does not plead that any of the Sheriff Defendants owned him a specific duty, but rather that "[d]efendants had a duty not only to avoid such conduct but, to conduct themselves in a civilized and professional manner." (Am. Compl. ¶ 395.) Because Murphy has failed to plead a violation of a *specific* duty owed to him to him by any of the defendants, his eleventh cause of action for NIED is dismissed as against the Sheriff Defendants. See *Burroughs*, 325 F. Supp. 3d at 285; *see also Leibenguth v. U.S.*, No. 08-CV-6008, 2009 WL 3165846, at *4 (W.D.N.Y. Sept. 29, 2009). This claim remains against the non-moving defendants: Onondaga County, the Onondaga County Sheriff's Department, Hummel, Fitzpatrick, Carden, and Luczka.

## J. Murphy's Other Motions

Although it is admittedly not entirely clear to the court the full extent of the relief sought by Murphy in his motion informing the court of alleged "improprieties" by defendants, (Dkt. No. 156), and his August 30, 2021, letter motion, (Dkt. No. 159), to the extent they seek relief inconsistent with the above, they are denied.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

RICO Bus.Disp.Guide 13,617

**ORDERED** that Conway's motion for judgment on the pleadings (Dkt. No. 88) is **GRANTED IN PART and DENIED IN PART** as follows:

    **GRANTED** as to the following claims, which are **DISMISSED**, Murphy's RICO claims; 🚩 § 1985 conspiracy claim; retaliation claim pursuant to Article 1, Section 8 of the New York State Constitution; 🚩 § 1983 equal protection claim; defamation claims; conspiracy to defame claim; IIED; and NIED; and

    **DENIED** in all other respects; and it is further

**ORDERED** that Blumer's motion for judgment on the pleadings (Dkt. No. 90) is **GRANTED IN PART and DENIED IN PART** as follows:

    **GRANTED** as to the following claims, which are **DISMISSED**, Murphy's RICO claims; 🚩 § 1985 conspiracy claim; retaliation claim pursuant to Article 1, Section 8 of the New York State Constitution; 🚩 § 1983 equal protection claim; defamation claims; conspiracy to defame claim; IIED; and NIED; and

    **DENIED** in all other respects; and it is further

**ORDERED** that Peluso's motion for judgment on the pleadings (Dkt. No. 92) is **GRANTED IN PART and DENIED IN PART** as follows:

    **GRANTED** as to the following claims, which are **DISMISSED**, Murphy's RICO claims; 🚩 § 1985 conspiracy claim; retaliation claim pursuant to Article 1, Section 8 of the New York State Constitution; 🚩 § 1983 equal protection claim; defamation claims; conspiracy to defame claim; IIED; and NIED; and

    **DENIED** in all other respects; and it is further

**ORDERED** that Gratien's motion for judgment on the pleadings (Dkt. No. 94) is **GRANTED IN PART and DENIED IN PART** as follows:

    **\*20** **GRANTED** as to the following claims, which are **DISMISSED**, Murphy's RICO claims; 🚩 § 1985 conspiracy claim; retaliation claim pursuant to Article 1, Section 8 of the New York State Constitution; 🚩 § 1983

equal protection claim; defamation claims; conspiracy to defame claim; IIED; and NIED; and

    **DENIED** in all other respects; and it is further

**ORDERED** that Anderson's motion for judgment on the pleadings (Dkt. No. 96) is **GRANTED IN PART and DENIED IN PART** as follows:

    **GRANTED** as to the following claims, which are **DISMISSED**, Murphy's RICO claims; 🚩 § 1985 conspiracy claim; retaliation claim pursuant to Article 1, Section 8 of the New York State Constitution; 🚩 § 1983 equal protection claim; defamation claims; conspiracy to defame claim; IIED; and NIED; and

    **DENIED** in all other respects; and it is further

**ORDERED** that Cassalia's motion for judgment on the pleadings (Dkt. No. 98) is **GRANTED**; and it is further

**ORDERED** that Ciciarelli's motion for judgment on the pleadings (Dkt. No. 100) is **GRANTED**; and it is further

**ORDERED** that Dickinson's motion for judgment on the pleadings (Dkt. No. 102) is **GRANTED IN PART and DENIED IN PART** as follows:

    **GRANTED** as to the following claims, which are **DISMISSED**, Murphy's RICO claims; 🚩 § 1985 conspiracy claim; retaliation claim pursuant to Article 1, Section 8 of the New York State Constitution; 🚩 § 1983 equal protection claim; defamation claims; conspiracy to defame claim; IIED; and NIED; and

    **DENIED** in all other respects; and it is further

**ORDERED** that the following claims remain: Murphy's third and fourth causes of action for 🚩 § 1983 retaliation against Onondaga County, the Onondaga County Sheriff's Department, Conway, Dickinson, Blumer, Anderson, Peluso, Gratien, Hummel, Fitzpatrick, Carden, Luczka; Murphy's eighth cause of action for defamation, defamation per se, libel, and slander against Onondaga County, the Onondaga County Sheriff's Department, Hummel, Fitzpatrick, Carden, and Luczka; Murphy's ninth cause of action for conspiracy to commit defamation, defamation per se, libel, and slander against Onondaga County, the Onodaga County Sheriff's

Department, Hummel, Fitzpatrick, Carden, and Luczka; Murphy's tenth cause of action for IIED against Onondaga County, the Onondaga County Sheriff's Department, and Hummel; and, Murphy's eleventh cause of action for NIED against Onondaga County, the Onondaga County Sheriff's Department, Hummel, Fitzpatrick, Carden, and Luczka; and it is further

**ORDERED** that Murphy's motion to amend the amended complaint (Dkt. No. 123) is **DENIED** as moot; and it is further

**ORDERED** that Edwards and Westcott's motion to dismiss (Dkt. No. 143) is **GRANTED**; and it is further

**ORDERED** that Edwards and Westcott's motion regarding Murphy's proposed amended complaint (Dkt. No. 144) is **GRANTED IN PART and DENIED IN PART** as follows:

   **GRANTED** to the extent it sought denial of Murphy's motion to amend, and

   **DENIED** in all other respects; and it is further

**ORDERED** that the Sheriff Defendants' motion requesting guidance in responding to the amended RICO statement (Dkt. No. 155) is **DENIED** as moot; and it is further

**ORDERED** that the following defendants are dismissed: Cassalia, Ciciarelli, Cambareri, Edwards, and Westcott; and it is further

**ORDERED** that Murphy's motion informing the court of alleged "improprieties" by defendants, requesting that the amended RICO statement be accepted as timely, and seeking to file a further amended complaint (Dkt. No. 156) is **DENIED**; and it is further

 **\*21** **ORDERED** that Murphy's motion to amend the RICO statement, (Dkt. No. 157) is **DENIED**; and it is further

**ORDERED** that Murphy's August 30, 2021, letter motion (Dkt. No. 159), to the extent it seeks relief from the court, is **DENIED**; and it is further

**ORDERED** that Murphy's motion to amend, (Dkt. No. 170) is **DENIED**; and it is further

**ORDERED** that the parties shall contact Magistrate Judge Christian F. Hummel to schedule further proceedings; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 819281, RICO Bus.Disp.Guide 13,617

### Footnotes

1    Plaintiff refers to Dickinson as both "Dickinson" and "Dickenson," the court will refer to this defendant as Dickinson.

2    For the sake of clarity, Dkt. No. 60, is deemed the operative pleading. On June 7, 2019, Murphy filed a motion to amend the complaint. (Dkt. No. 50.) The motion was unopposed, and the clerk of the court was directed to file Exhibit A to the motion, (Dkt. No. 50, Attach. 1), as the amended complaint, (Dkt. No. 53). On July 1, 2019, the amended complaint was filed. (Dkt. No. 56.) However, on July, 2, 2019, the amended complaint was filed again, by Murphy, with the only apparent change being the inclusion of counsel's name. (Dkt. No. 58.) Then again the amended complaint was filed on July 19, 2019, by Murphy, this time attaching previously omitted summonses. (Dkt. No. 60.) To the extent defendants address Dkt. No. 56, 58, and/or 60 in their submissions, the court will construe them as against Dkt. No. 60.

3    The facts are drawn from Murphy's amended complaint, (Dkt. No. 60), and presented in the light most favorable to him.

4    The amended complaint contains two paragraphs numbered "158" and two numbers "159." To the extent these paragraph are cited, they will be denoted as "158a" and "158b," and "159a" and "159b."

5    On August 8, 2021, Murphy filed a motion informing the court of alleged "improprieties" by defendants, requesting that the amended RICO statement be accepted as timely, and seeking to file a further amended complaint. (Dkt. No. 156.) To the extent this motion sought leave to amend, it is denied as moot for the same reasons. Further, Edwards and Westcotts' motion regarding Murphy's proposed amended complaint, (Dkt. No. 144), is granted, to the extent it sought denial of Murphy's motion to amend, and denied in all other respects.

6    For example, Murphy's amended complaint contains multiple errors in paragraph numbering (*e.g.* subsequent paragraphs being numbered as follows: 157, 158, 159, 158, 159, 160; 266, 195, 267; and omitting paragraph number 248). Further, the amended complaint spells defendant's names in alternating fashions (*e.g.* Dickinson and Dickenson; Blumer and Bloomer). In his response to Ciciarelli's motion for judgment on the pleadings, (Dkt. No. 100), Murphy refers to defendant Conway rather than Ciciarelli, (Dkt. No. 126 at 5). Many of Murphy's responses to the Sheriff Defendants' 🚩 Rule 12(c) motions contained errors in the table of contents, including omitting or repeating Roman numerals (*e.g.*, subsequent sections being enumerated as follows: I., III., V., VI.; and repeating the numeral VII.). (*See, e.g.*, Dkt. No. 124.) Murphy submitted his motion to amend without a cover page and unsigned. (Dkt. No. 170.) In Murphy's response to Cassalia's motion for judgment on the pleadings, (Dkt. No. 98), Murphy responds to a statute of limitations argument that was not made by Cassalia, (Dkt. No. 118 at 17-18.) Finally, in his various responses to the Sheriff Defendants' 🚩 Rule 12(c) motions, Murphy completely fails to address arguments made by these defendants. (*See, e.g.*, Dkt. No. 125 (failing to address arguments regarding his 🚩 § 1983 retaliation claims).) While the court can tolerate the occasional inadvertent typographical error, Murphy's errors are numerous, and occur after his counsel has requested a substantial amount of extension of filing deadlines. (Dkt. No. 106; Dkt. No. 109; Dkt. No. 114; Dkt. No. 119; Dkt. No. 146.)

7    Cambareri is not listed as a defendant in any of the causes of action headings in the amended complaint, but is listed as a defendant in the paragraphs following Murphy's first cause of action, (Am. Compl. ¶¶ 250-53), therefore the court will construe Cambareri as a defendant to Murphy's first cause of action only.

8    Unless otherwise noted, for all of Murphy's causes of action, the individual defendants are sued in their individual and official capacities.

9    *See supra* note 2.

10   While the amended complaint refers to an individual named "Bloomer," out of an abundance of caution, the court will assume this was an error by Murphy, and assume he intended to refer to defendant Blumer.

11   Murphy also pleads numerous "lesser" actions, which, when considered together would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." 🚩 *Zelnik*, 464 F.3d at 225-26; *see* 🚩 *Philips v. Bowan*, 278 F.3d 103, 109 (2d Cir. 2002). For example, Murphy alleges he was forbidden from giving orders to subordinates, forbidden from using a patrol car or from displaying his uniform in public, "subject[ed] to threatening and abusive behavior" by others in the department, had his overtime opportunities reduced, was "ordered to undertake menial tasks under circumstances that were deliberately

chosen to cause him physical discomfort and agitation," was arbitrarily transferred, and was "subjected to public ridicule and embarrassment." (Am. Compl. ¶ 245.)

12    Further, with respect to Peluso, the amended complaint also alleges that shortly after raising concerns to Peluso that a complainant was not properly "attent[ed to] by [the Sheriff's Department] ... due to [the complainant's] ethnic background and her sex," Murphy was aggressively confronted by Peluso, who later filed a "vacuous" internal complaint against Murphy which was "specifically intended to prevent ... Murphy from being promoted." (Am. Compl. ¶¶ 44-55, 63-66, 101.) This further demonstrates a causal connection between Murphy's speech and the adverse employment actions carried out by Peluso. *See* 🚩 *Shanks*, 653 F. Supp. 2d at 167.

13    To the extent Murphy makes this argument with respect to his other causes of action, it is similarly unpersuasive. (*See, e.g.*, Dkt. No. 116 at 21, 23-24; Dkt. No. 117 at 14, 19-20; Dkt. No. 118 at 14, 19-20; Dkt. No. 124 at 15; Dkt. 125 at 15-16; Dkt. No. 126 at 15.)

14    Murphy's argument that he is a member of a "class of one," (*see, e.g.*, Dkt. No. 125 at 13), is inapplicable here. *See infra* Part IV.E.; *see also Volunteer Fire Ass'n of Tappan, Inc. v. Cty. of Rockland*, No. 09-CV-4622, 2010 WL 4968247, at \*8 n.13 (S.D.N.Y. Nov. 24, 2010) ("A plaintiff alleging a 🚩 Section 1985 violation may not proceed under a 'class of one' theory." (citation omitted)).

15    Because Murphy is represented by counsel, his amended complaint is not entitled to the special solicitude afforded to pro se pleadings. *See* 🚩 *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006). Therefore, the court has not considered whether the amended complaint states a claim pursuant to the first clause of 🚩 § 1985(2), which requires that a plaintiff plead: "(1) a conspiracy between two or more persons, (2) to deter a witness by force, intimidation or threat from attending court or testifying freely in any pending matter, which (3) results in injury to the plaintiff," *Greene v. City of New York*, No. 08-cv-00243, 2017 WL 1030707, at \*31 (E.D.N.Y. Mar. 15, 2017) (quoting 🚩 *Chalal v. Paine Webber Inc.*, 725 F.2d 20, 23 (2d Cir. 1984)), and which does not require a showing of any class-based animus. *See* 🚩 *Kush v. Rutledge*, 460 U.S. 719, 726 (1983); *c.f. Langton v. Town of Chester*, No. 14 Civ. 9474, 2017 WL 6988708, at \*6 (S.D.N.Y. Sept. 26, 2017) (citation omitted).

16    The Sheriff Defendants' argument that Murphy has failed to state a claim for defamation appears to be premised on the more stringent pleading requirements of 🚩 N.Y. C.P.L.R. § 3016(a), which requires that "the particular words complained of shall be set forth in the complaint." (*See, e.g.*, Dkt. No. 88, Attach. 1 at 19.) While the amended complaint does not meet this standard, "state procedural rules do not apply to federal courts ... and federal courts instead apply the pleading standards set forth in Rule 8 of the Federal Rules of Civil Procedure." *Nouinou v. Smith*, No. 20-CV-8682, 2021 WL 4340952, at \*5 (S.D.N.Y. Sept. 22, 2021) (citing *Triestman v. Wacks*, No. 12-CV-1897, 2017 WL 639322, at \*4 (N.D.N.Y. 2017)); *but see Nichols v. BAC Home Loans Servicing LP*, No. 1:13-CV-00224, 2013 WL 5723072, at \*12 (N.D.N.Y. Oct. 18, 2013) (applying the heightened pleading standard of 🚩 C.P.L.R. 3016 and requiring the plaintiff to plead "the particular words giving rise to his [defamation] claim"). However, as explained herein, Murphy's cause of action fails under either pleading standard.

17    The court will not discuss statements attributable to any of the defendants that are clearly non-defamatory, such as: "Blumer indicated that she would address the matter with the deputy," (Am. Compl. ¶ 90), "Peluso ... stated ... that when he 'sixes' a complaint, it stays 'sixed,' " (*id.* ¶ 63), or "Ciciarelli informed Murphy that Gratien had not recorded the fact of the illegal search and seizure in his Duty Commander log for that night," (*id.* ¶ 110). *See Premier Med. Sys., LLC v. NeuroLogica Corp.*, No. 1:21-cv-1337, 2022 WL 603999, at \*12

RICO Bus.Disp.Guide 13,617

(S.D.N.Y. Feb. 28, 2022) (finding that a defamatory statement must "expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and ... deprive him of ... friendly intercourse in society") (citation omitted).

18     Murphy also alleges, with respect to Dickinson, that, after Murphy brought this suit, Dickinson made "had several improper, unsupported and baseless referrals to the Onondaga County Sheriff's Office Internal Affairs Office." (Am. Compl. ¶ 229.) Murphy does not provide the content of these referrals, however, and, thus, this allegation does not allow him to avoid dismissal as to Dickinson. *See Hillary*, 2015 WL 902930, at \*11 (holding that, for a defamation claim to survive a motion to dismiss, a plaintiff must "identify ... the allegedly defamatory statements" (citation omitted)).

19     Murphy lists five ambiguous statements within his defamation cause of action, none of which are attributed to a particular defendant. (Am. Compl. ¶ 360.) To the extent these are alleged as against Cassalia, Ciciarelli, or any of the defendants, they do not make out a claim of defamation. See *Hillary*, 2015 WL 902930, at \*11 (for a defamation claim to survive a motion to dismiss a plaintiff must "identify ... the person who made the statements" (citation omitted)).

20     For the reasons noted above, Murphy's defamation claims against Conway are dismissed, regardless of this argument.

---

**End of Document**                                                 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 9815186
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

ENTRETELAS AMERICANAS S.A., Plaintiff,

v.

Rafael Ignacio SOLER, Defendant.

19 Civ. 03658 (LAK) (RWL)
|
Signed 02/03/2020

**Attorneys and Law Firms**

Paul Amandio Batista, Paul A. Batista, PC, New York, NY, for Plaintiff.

Richard Walker Trotter, Feuerstein & Kulick LLP, Vincent Joseph Syracuse, Tannenbaum Helpern Syracuse & Hirschtritt LLP, New York, NY, for Defendant.

## REPORT AND RECOMMENDATION TO HON. LEWIS A. KAPLAN: MOTION TO DISMISS

ROBERT W. LEHRBURGER, United States Magistrate Judge.

**\*1** Plaintiff Entretelas Americanas S.A. ("Entretelas" or "Plaintiff") filed suit against its former Chief Executive Officer, Defendant Rafael Ignacio Soler ("Soler" or "Defendant"). Entretelas alleges, *inter alia*, that Soler diverted its corporate funds over approximately a decade, ending with his departure from the company in 2017. The Complaint alleges three claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"); a breach of contract claim premised upon the parties' employment agreement; and an unjust enrichment claim. Plaintiff estimates its damages to exceed seven million dollars.

Now before the Court is Soler's motion to dismiss the Complaint on multiple grounds. (Dkt. 15.) Soler argues, *inter alia*, that the RICO claims are legally meritless; this Court lacks jurisdiction over the remaining claims; and even if the Court did exercise jurisdiction over the remaining claims, they too would be meritless. The Court agrees, and for the following reasons, recommends that Soler's motion be GRANTED and the action dismissed.

## Procedural History

Entretelas initiated this action on February 22, 2019 in New York County Supreme Court by a Summons with Notice, and Soler removed it to this Court by filing a Notice of Removal on April 24, 2019. (Dkt. 1.) The case was assigned to the Honorable Lewis A. Kaplan, U.S.D.J. On April 29, 2019, Judge Kaplan referred the case to the undersigned for general pretrial management and dispositive motions. (Dkt. 4.) Entretelas filed a federal court Complaint, now the operative pleading, on May 16, 2019. (Dkt. 5.) The Complaint asserts five causes of action: (I) Violation of RICO, 18 U.S.C. § 1962(c) predicated on mail and wire fraud; (II) Money Laundering in violation of RICO, 18 U.S.C. § 1956; (III) Extortion in violation of RICO, 18 U.S.C. § 1951; (IV) Breach of Employment Agreement; and (V) Unjust Enrichment.

On September 13, 2019, Soler filed his motion to dismiss (Dkt. 15), which included a Memorandum of Law in Support ("Def. Mem.") (Dkt. 16) and the Declaration of Richard W. Trotter in Support with Exhibits 1-3 ("Trotter Decl.") (Dkt. 17.) After two extensions, Entretelas filed its opposition to the motion on December 10, 2019, including the Declaration of Paul Batista in Opposition with Exhibits 1-3 ("Batista Decl.") (Dkt. 22) and a Memorandum of Law in Opposition ("Pl. Mem.") (Dkt. 23). On January 16, 2020, Soler filed his Memorandum of Law in Reply. (Dkt. 24.)

## Factual Background [1]

**\*2** Entretelas, registered in France and headquartered in Argentina, is a business entity engaged in wholesale trade of textiles, among other activities. (Complaint ¶¶ 8, 17.) The Complaint does not allege that Entretelas maintains any business operations or earns any profits in the United States. (Complaint ¶ 17.) Soler was an executive-level employee of Entretelas and its Chief Executive Officer ("CEO") for many years. (Complaint ¶ 3.) He worked for Entretelas in various capacities between January 1, 1999 and sometime in 2017. (Complaint ¶¶ 4, 10.)

Though he had already been working there for about five years, Soler's relationship with Entretelas was memorialized

through an Employment Agreement dated July 26, 2004 (the "Employment Agreement"). [2] (Batista Decl., Ex. 3.) The Employment Agreement provides for an annual salary, subject to adjustment for inflation, to be paid partially in American currency and partially in Argentinean currency. (*Id.*) The Employment Agreement provides that Soler would be based in the company's Argentina headquarters and states that he had certain loyalties to Entretelas: "You will devote all of your time, experience and attention to carrying out your work; you will not be directly or indirectly involved in any work outside of the Company." (*Id.*; Complaint ¶¶ 16-17.)

The Employment Agreement includes a confidentiality provision, requiring Soler to "observe secrecy regarding ... work and ... not disclose any information, manufacturing processes [and] know-how which you may learn during the course of your work, neither during nor after the contract period" including prohibiting him from "writ[ing] articles for the press [or] giv[ing] speeches related to your activity...." (*Id.*; Complaint ¶¶ 11-12.) The Employment Agreement further includes a non-compete provision, providing that for a period of three years, Soler agrees "to refrain from directly or indirectly working, in any way and in any form, for any company with activities related to the production and/or marketing of woven and non-woven products for interfacings and shirts, in all countries in South and North America, and to not "take any direct or indirect stake in such a company." " (*Id.*; Complaint ¶ 15.) The non-compete commitment "is binding regardless of the reasons and circumstances related to the cancellation of the contract." (*Id.*)

The Complaint alleges that Soler breached various aspects of this Employment Agreement. First, Entretelas claims that Soler diverted various monies from Argentinian bank accounts into American ones. The Complaint alleges that between 2007 and 2017, Soler "ordered that significant portions of his salary ... and other remuneration ... be transferred from foreign sources to banks and other financial institutions in the United States." (Complaint ¶ 21.) Entretelas further alleges that discovery will show that the transfers in question involved "thousands of dollars" and were "designed to evade payment of foreign and United States taxes." (Complaint ¶¶ 23-24.)

Second, Entretelas alleges that Soler filed a legal claim in Argentina in 2017 that contained false and defamatory information (the "Argentina Action"). Statements from the Argentina Action that Entretelas contends are false include

(among others) statements that Soler was merely a "simple worker" and not CEO of Entretelas; that Entretelas paid Soler "off the books" while denying him bonuses and other compensation; that Entretelas' treatment of Soler caused him physical and emotional damage; and that Entretelas demanded $7 million from Soler. (Complaint ¶¶ 19, 26.) Entretelas claims that all these statements in the Argentina Action are false and designed to obfuscate Soler's obligations under the Employment Agreement. [3] (Complaint ¶ 20.)

**\*3** Third, the Complaint alleges that Soler failed to fulfil his commitment to "devote his full-time efforts and loyalty" to Entretelas. (Complaint ¶ 25.) Soler purportedly established two companies in the textile industry, Rasol S.A. and Loomtex S.A., during his employment, and was "a major shareholder of DHJ Industries, Inc." (*Id.*) Although the Complaint does not explicitly plead that DHJ Industries was a competitor, it does allege that this conduct violated the contractual "non-ownership" provision of the Employment Agreement. (*Id.*)

The Complaint parlays Soler's alleged misconduct into five causes of action. The first three claims allege racketeering under RICO based on mail and wire fraud, money laundering and extortion. The fourth claim is for breach of the Employment Agreement, and the fifth claim is for unjust enrichment.

### Legal Standard for Motion to Dismiss

To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a district court must accept all factual claims in the complaint as true, and "draw[ ] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Industry Co.*, 753 F.3d 395, 403 (2d

Cir. 2014) (internal quotations omitted); *see also Clavin v. County of Orange*, 620 Fed. App'x 45, 47 (2d Cir. 2015) (in deciding motions to dismiss, courts must "accept[ ] all factual allegations as true and draw[ ] all reasonable inferences in the non-moving party's favor."); *Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909, 2013 WL 6087400, at *3 (S.D.N.Y. Nov. 19, 2013) (same).

This tenet, however, is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's [f]actual allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks omitted). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

For the purposes of considering a motion to dismiss pursuant to 12(b)(6), a court generally is confined to the facts alleged in the complaint. *Cortec Industries v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). A court may, however, consider documents attached to the complaint, statements or documents incorporated into the complaint by reference, matters of which judicial notice may be taken, and public records. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013) (citing *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). "If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *Poindexter v. EMI Record Group Inc.*, No. 11 Civ. 559, 2012 WL 1027639, at *2 (S.D.N.Y. March 27, 2012).

## Discussion

**\*4** Soler moves to dismiss on multiple grounds.[4] First, Soler argues that the RICO claims fail to state a cause of action under the relevant statutes and also fail to meet applicable pleading standards. Second, with respect to common law claims for breach of the Employment Agreement and unjust enrichment, Soler argues that this Court lacks subject matter jurisdiction in the absence of a cognizable federal claim. Alternatively, Soler argues that the common law claims should be dismissed on *forum non conveniens* grounds. For the reasons discussed below, the Court agrees and recommends dismissal of all five causes of action.

### A. RICO Claims

The Complaint asserts three causes of action under RICO. The First Cause of Action alleges a violation of RICO, 18 U.S.C. § 1962(c) citing the predicate acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343);[5] the Second Cause of Action alleges the predicate act of money laundering in violation of RICO, 18 U.S.C. § 1956; and the Third Cause of Action alleges the predicate act of extortion in violation of RICO, 18 U.S.C. § 1951. The Court begins its analysis by discussing the general standards governing all claims under civil RICO and the required elements of such claims. The Court then discusses why the Complaint fails to meet all requisite elements. Finally, the Court discusses why each of the predicate acts alleged in the Complaint – mail fraud, wire fraud, money laundering, and extortion – also fails to state a claim, independently requiring dismissal. Ultimately, the Court finds that all three RICO claims should be dismissed.

### 1. Limits of Civil RICO

Courts have frequently described civil RICO as an extreme cause of action and " 'an unusually potent weapon – the litigation equivalent of a thermonuclear device.' " *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997) (internal citations omitted). "Because the 'mere assertion of a RICO claim ... has an almost inevitable stigmatizing effect on those named as defendants ... courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.' " *Id.*; *see also Bell v. Hubbert*, No. 95 Civ. 10456, 2007 WL 60513, at *5 (S.D.N.Y. Jan. 8, 2007) (same); *DLJ Mortgage Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 236 (E.D.N.Y. 2010) ("plaintiffs have often been overzealous in pursuing RICO claims, flooding federal courts by dressing up run-of-the-mill fraud claims as RICO violations"). Plaintiffs "wielding RICO almost always miss the mark." *Flexborrow LLC v. TD Auto Finance LLC*, 255 F. Supp. 3d 406, 414 (E.D.N.Y. 2017) (citing *Gross*

*v. Waywell*, 628 F.Supp.2d 475, 479-83 (S.D.N.Y. 2009)) (conducting survey of 145 civil RICO cases filed in the Southern District of New York from 2004 through 2007, and finding that all cases resolved on the merits resulted in judgments against the plaintiffs, mostly at the motion to dismiss stage).

**\*5** Accordingly, courts have generally approached civil RICO claims with a skeptical eye. In this case, that skepticism is well justified. As explained below, the Complaint does not meet the baseline standards for a RICO action, nor does it sufficiently plead the required predicate acts.

### 2. Elements of a RICO Claim Under 18 U.S.C. § 1962(c)

Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). RICO provides a private civil cause of action, allowing that "[a]ny person injured in his business or property by reason of a violation of [ 18 U.S.C. § 1962] may sue therefor in any appropriate United States district court." 18 U.S.C. § 1964(c).

To state a violation of § 1962(c), a plaintiff must plead four elements: " '(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity.' " *Anatian v. Coutts Bank Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)); *see also S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996) ("[A] plaintiff must allege that a defendant, 'employed by or associated with' an enterprise affecting interstate or foreign commerce, conducted or participated in the conduct of this enterprise's affairs 'through a pattern of racketeering activity.' ") (quoting 18 U.S.C. § 1962(c); *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983)). The Court analyzes each of these four elements below.

### a. The Complaint Pleads a Baseline Level of "Conduct"

A civil RICO plaintiff must allege that a defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of [an] enterprise's affairs." 18 U.S.C. § 1962(c). The Supreme Court has interpreted this statutory language broadly to mean that the RICO defendant must have somehow participated "in the operation or management of the enterprise." *DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) (citing *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)); *see also First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (holding that " 'one is liable under RICO only if he participated in the operation or management of the enterprise itself' ") (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994)). Under this standard, a person may not be held liable merely for taking directions and performing tasks that are "necessary and helpful to the enterprise," or for providing "goods and services that ultimately benefit the enterprise." *United States Fire Insurance Co. v. United Limousine Service, Inc.*, 303 F. Supp. 2d 432, 451-52 (S.D.N.Y. 2004) (internal citations and quotations omitted). Instead, "the RICO defendant must have played '*some* part in directing [the enterprise's] affairs.' " *First Capital Asset Management*, 385 F.3d at 176 (quoting *DeFalco*, 244 F.3d at 310) (emphasis and brackets in original).

In the Second Circuit, "the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." *Id.* at 177 (internal citations omitted); *see, e.g.*, *Baisch v. Gallina*, 346 F.3d 366, 376-77 (2d Cir. 2003); *United States v. Allen*, 155 F.3d 35, 42-43 (2d Cir. 1998) (holding the question whether defendant "operated or managed" the affairs of an enterprise to be essentially one of fact); *AIU Insurance Co. v. Olmecs Medical Supply, Inc.*, No. 04 CV 2934, 2005 WL 3710370, at *8 (E.D.N.Y. Feb. 22, 2005) ("[W]here the role of the particular defendant in the RICO enterprise is unclear, plaintiffs may well be entitled to take discovery on this question.").

**\*6** Here, Entretelas pleads that Soler was an executive at the company and engaged in various bad acts while working there. (Complaint ¶¶ 29-32.) Based on the allegations in the Complaint, which the Court must accept as true for purposes

of the instant motion, and based on the low bar for this first element, these allegations are enough to establish "conduct."

### b. The Complaint Pleads an "Enterprise"

As for the second element, the Complaint pleads that Entretelas itself is the "enterprise." (Complaint ¶ 29.) This is a somewhat unusual configuration for a RICO action; the "enterprise" is typically the defendant in a RICO case, not the plaintiff. Nevertheless, Entretelas has plead the required elements to establish an "enterprise" within the meaning of the statute to avoid dismissal on this basis.

A RICO enterprise is defined broadly and includes any "individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Such an enterprise need not be a formal; the statute is satisfied by a showing of a formal or informal group of persons, "associated together for a common purpose of engaging in a course of conduct" which then functions as a "continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *see also United States v. Morales*, 185 F.3d 74, 80 (2d Cir. 1999). Defendants alleged to be members of the enterprise unit must "share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve" their goal. *First Capital Asset Management*, 385 F.3d at 174. In support of a claim that there exists a RICO enterprise, a plaintiff must also plead that a defendant participated in the "operation or management" of the enterprise. *Id.* at 175-76. This requires a showing that each had "some part" in "directing the enterprise's affairs." *Reves*, 507 U.S. at 179.

A corporate entity such as Entretelas certainly qualifies as an "enterprise." And Soler – as former CEO of Entretelas – participated in "directing the enterprise's affairs" within the meaning of the statute. *First Capital Asset Management*, 385 F.3d at 176. Accordingly, Plaintiff has successfully plead the existence of an enterprise.

### c. The Complaint Pleads a "Pattern" of Activity

The Complaint also pleads the pattern of racketeering activity necessary to survive dismissal on this ground. A plaintiff seeking to demonstrate a pattern of racketeering activity under 18 U.S.C. § 1962 "must allege (1) at least two predicate acts of racketeering occurring within a ten-year period; (2) that the predicate acts are related to each other; and (3) that the predicate acts amount to or pose a threat of continued criminal activity." *United States Fire Insurance Co.*, 303 F. Supp. 2d at 448 (citing *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999); *H.J. Inc. v. Northwestern Bell*, 492 U.S. 229, 239 (1989)).

A plaintiff may satisfy the continuity requirement "by alleging either a close-ended pattern – that is, criminal conduct extending over a substantial period of time – or an open-ended pattern, i.e., past criminal conduct coupled with a threat of future criminal activity." *Liberty Mutual Insurance Co. v. Blessinger*, No. 06 CV 391, 2007 WL 951905, at *12 (E.D.N.Y. March 27, 2007) (citing *H.J. Inc.*, 492 U.S. at 242). Since the Supreme Court outlined these standards in *H.J. Inc.*, " 'the Second Circuit has never held a period of less than two years to constitute a substantial period of time for purposes of closed end continuity.' " *Id.* (quoting *Oak Beverages, Inc. v. Tomra of Massachusetts, L.L.C.*, 96 F. Supp. 2d 336, 347 (S.D.N.Y. 2000)). To establish a "pattern of racketeering activity," a plaintiff must plead at least two predicate acts, and must show that the predicate acts are related and that they amount to, or pose a threat of, continuing criminal activity. *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 465-466 (2d Cir. 1995) (citing *H.J. Inc.*, 492 U.S. at 239). "Predicate acts are related if they have the 'same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Davis Lee Pharmacy, Inc., v. Manhattan Central Capital Corp.*, 327 F. Supp. 2d 159, 164 (E.D.N.Y. 2004) (citing *H.J. Inc.*, 492 U.S. at 240).

 *7 Here, the Complaint pleads a closed-ended pattern of criminal conduct. All criminal conduct – mail fraud, wire fraud, money laundering, and extortion – is alleged to have occurred while Soler was still CEO of Entretelas over a period of more than two years. (Complaint ¶¶ 23-24.) While the legal validity of these predicate acts is a separate matter addressed below, the Complaint properly pleads the continuity of their duration.

#### d. The Complaint Pleads "Racketeering Activity," But Without Stating Any Legally Cognizable Claims

"Racketeering activity" is defined in 18 U.S.C. § 1961 with a list of the predicate "acts" and "offenses" that must underlie a RICO claim. It is not the acts or offenses in isolation but the pattern of such acts or offenses that constitute the racketeering activities that are necessary for the existence of a RICO violation. *See* 18 U.S.C. § 1961; *CMG Holdings Group. v. Wagner*, No. 15 Civ. 5814, 2016 WL 4688865, at *3 (S.D.N.Y. Sept. 7, 2016) (listing potential offenses). These criminal acts specified in 18 U.S.C. § 1961 are colloquially referred to as "RICO 'predicates.' " *European Community v. RJR Nabisco, Inc.*, 783 F.3d 123, 124 (2d Cir. 2015). They commonly include claims of mail fraud, wire fraud, money laundering, and extortion, all of which are alleged in the Complaint. Accordingly, Plaintiff has plead "racketeering activity" as defined by 18 U.S.C. § 1961.

But although the Complaint sufficiently pleads some of the basic elements of a RICO claim, it entirely fails to state a claim for any of the predicate acts and thus fails to state a RICO claim at all. [6] The Court will next address those deficiencies.

#### 3. All RICO Claims Fail to Sufficiently Plead "Predicate Acts"

Entretelas' RICO claims are grounded on alleged predicate acts of mail and wire fraud, money laundering and extortion. The Complaint fails to plausibly plead any one of these, thus requiring dismissal.

#### a. Mail and Wire Fraud

Entretelas has failed to sufficiently plead the predicate acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

A RICO complaint alleging mail and wire fraud as predicate acts must show "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc.*,

84 F.3d at 633. "The term 'scheme to defraud' is measured by a non-technical standard reflecting fundamental notions of honesty, fair play and right dealing." *AIU Insurance Co.*, 2005 WL 3710370 at *10. It has been described as "a plan to deprive a person 'of something of value by trick, deceit, chicane or overreaching.' " *Id.* (quoting *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)). "In order to state a RICO claim on the basis of wire or mail fraud, '[t]he use of the mails need not be essential to the fraudulent scheme as long as the mailing is incident to an essential part of the scheme.' " *Republic of Colombia v. Diageo North America, Inc.*, 531 F. Supp. 2d 365, 442 (E.D.N.Y. 2007). Fraud "require[s] a misrepresentation or concealment of material fact." *Neder v. United States*, 527 U.S. 1, 22 (1999).

**\*8** RICO claims for mail and wire fraud are subject to the stricter pleading requirements for all allegations of fraud under Federal Rule of Civil Procedure 9(b). *In re Sumitomo Copper Litigation*, 995 F. Supp. 451, 455–56 (S.D.N.Y. 1998) (noting pleading requirements). Rule 9(b) reads: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge and other condition of mind of a person may be alleged generally." Fed. R. Civ. P. 9(b). In order to comply with Rule 9(b), a complaint must "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Colony at Holbrook, Inc. v. Strata G.C., Inc.*, 928 F. Supp. 1224, 1230 (E.D.N.Y. 1996) (quoting *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989)); *Trautz v. Weisman*, 809 F. Supp. 239, 246 (S.D.N.Y. 1992) ("With a fraud claim, the time, place, speaker and content of the alleged misrepresentation must be specified"). For reasons explained earlier (the potential for unfairly stigmatizing a defendant), Rule 9(b) has "even greater urgency" in civil RICO actions. *Schmidt v. Fleet Bank*, No. 96 Civ. 5030, 1998 WL 47827, *5 (S.D.N.Y. Feb. 4, 1998) (quoting *Morin v. Trupin*, 778 F. Supp. 711, 716 (S.D.N.Y. 1991)). Accordingly, the "overwhelming trend" among "courts is to apply Rule 9(b) strictly in order to effect dismissal of civil RICO suits"

alleging mail and wire fraud. *In re Sumitomo Copper Litigation,* 995 F. Supp. at 455.

Here, the First Cause of Action contains no particular examples of mail or wire fraud. Searching elsewhere in the Complaint, Plaintiff alleges that the Argentina Action "filed in 2017 and transmitted to the United States by mail and wire[ ] is replete with false and fraudulent allegations." (Complaint ¶ 26.) But the Complaint does not allege the essential elements of mail or wire fraud, namely that Soler had an intent to defraud, who precisely was defrauded, or what detrimental reliance resulted from the allegedly false statements. [7] *See, e.g., Ritchie v. Taylor,* 701 F. App'x 45, 47-48 (2d Cir. 2017) (noting that mail fraud and wire fraud both require defendant's specific intent under RICO);

*FindTheBest.com, Inc. v. Lumen View Technology LLC,* 20 F. Supp. 3d 451, 458 (S.D.N.Y. 2014) ("Because a plaintiff must show that he is 'injured in his business or property by reason of' a pattern of mail or wire fraud, reliance is an essential part of demonstrating causation between a defendant's misrepresentation and the plaintiff's injury") (quoting 18 U.S.C. § 1964(c)).

The first RICO claim for racketeering therefore cannot withstand Soler's motion to dismiss. *See Gross v. Waywell,* 628 F. Supp. 2d 475, 495 (S.D.N.Y. 2009) (dismissing RICO claims for lack of specificity and citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993)) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to [defendant]" without particularity); *Spool v. World Child International Adoption Agency,* 520 F.3d 178, 185 (2d Cir. 2008) (holding that the plaintiff's mail and wire fraud allegations were not "pled with the requisite particularity" under Rule 9(b)). Here, the Complaint's lack of specificity fails to satisfy the rigorous pleading standards of Rule 9(b). Accordingly, the claim for mail and wire fraud cannot survive dismissal.

The First Cause of Action also should be dismissed for failure to sufficiently plead causation. The RICO statute "limits standing to plaintiffs whose injuries were both factually and proximately caused by the RICO violation." *In re American Express Co. Shareholder Litigation,* 39 F.3d 395, 399 (2d Cir. 1994); *Martin Hilti Family Trust v. Knoedler*

*Gallery, LLC,* 137 F. Supp. 3d 430, 480 (S.D.N.Y. 2015) ("To state a civil RICO claim, a plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well' ") (quoting *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268 (1992)). "Proximate cause for RICO purposes requires 'some direct relation between the injury asserted and the injurious conduct alleged.' " *Id.* "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Id.* (brackets in original).

**\*9** Plaintiff has failed to plead with particularity how Defendant's alleged mail and wire fraud has caused any harm. Instead, Entretelas makes a conclusory and generalized allegation that Soler's conduct has resulted in damages "believed to exceed $7 million" (Complaint ¶ 33) but contains no allegations as to how Soler's mail and wire fraud caused harm, in that amount or any other amount. Thus, even if the Complaint were to plead a cognizable violation of 18 U.S.C. § 1962(c) for mail and wire fraud, it fails to plead causation between the alleged violation and resulting harm to Entretelas with any degree of particularity or plausibility and should be dismissed for that reason as well. *See, e.g., Empire Merchants, LLC v. Reliable Churchill LLP,* 902 F.3d 132, 147 (2d Cir. 2018) (affirming dismissal of RICO claim partially predicated on mail fraud where "[plaintiff] failed adequately to allege that these predicate acts of racketeering proximately caused its injuries"); *Toohey v. Portfolio Recovery Associates, LLC,* No. 15 Civ. 8098, 2016 WL 4473016, at \*10 (S.D.N.Y. Aug. 22, 2016) (dismissing RICO claim with predicate acts of mail and wire fraud where plaintiff failed to allege with particularity how defendant's conduct resulted in damage); *Leung v. Law,* 387 F. Supp. 2d 105, 121 (E.D.N.Y. 2005) (dismissing mail and wire fraud claims and fining that "[n]one of the defendants' purported racketeering activities has been adequately alleged to have been the proximate cause of [plaintiff's] injuries").

### b. Money Laundering

Plaintiff's Second Cause of Action asserts that Defendant engaged in the predicate act of money laundering as defined in 18 U.S.C. § 1956, subjecting him to liability under RICO. (Complaint ¶¶ 34-37.) As defined in 18 U.S.C. § 1956(a)(1)(B)(i), a defendant is liable for money laundering when: "knowing that [ ] property involved in a financial transaction

represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity-knowing that the transaction is designed in whole or in part-to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

To state a claim for money laundering under RICO, a plaintiff must plead: "(1) that the defendant conducted a financial transaction; (2) that the transaction in fact involved the proceeds of specified unlawful activity as defined in 18 U.S.C.] § 1956(c)(7); (3) that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and (4) that the defendant knew that the financial transaction was designed in whole or in part to conceal or disguise the source, ownership, control, etc., of those proceeds." *Dale v. Banque SCS Alliance S.A.*, No. 02 Civ. 3592, 2005 WL 2347853, at *5 n.2 (S.D.N.Y. Sept. 22, 2005) (citing *United States v. Maher*, 108 F.3d 1513, 1527-28 (2d Cir. 1997)); *In re 650 Fifth Ave. & Related Properties*, 777 F. Supp. 2d 529, 559 (S.D.N.Y. 2011) (same); *Casio Computer Co. v. Sayo*, No. 98 Civ. 3772, 2000 WL 1877516, at *16 (S.D.N.Y. Oct. 13, 2000) (same).

Here, Plaintiff has failed to plead most of the core elements of money laundering. The Complaint successfully pleads the first element – that Soler conducted a financial transaction. Entretelas alleges that Soler ordered "significant portions of his salary, director's fees, bonuses, reimbursement for expenses, profit sharing and other remuneration be transferred from foreign sources to banks ... in the United States." (Complaint ¶ 21.) But critically, as to the second element, Entretelas does not allege how these monies were "the proceeds of specified unlawful activity." *Dale*, 2005 WL 2347853, at *5, n.2. To the contrary, Entretelas alleges that these moneys were forms of "remuneration from plaintiff" – that is, salary and compensation to which Soler was apparently entitled. (Complaint ¶¶ 3, 21.) The Complaint thus fails to sufficiently set forth the second element required for money laundering. *See West 79th Street Corp. v. Congregation Kahl Minchas Chinuch*, No. 03 Civ. 8606, 2004 WL 2187069, at *10 (S.D.N.Y. Sept. 29, 2004) ("In the absence of adequate allegations as to the existence of a specified unlawful activity, [RICO plaintiff] has failed to adequately plead money laundering as a predicate racketeering activity [to support] its civil RICO claim");

*Casio Computer Co.*, 2000 WL 1877516, at *16-17 (a RICO plaintiff "must plead all elements of the offense" in order to adequately plead money laundering as a predicate act under RICO and withstand motions to dismiss)).

**\*10**  Entretelas also has not met the third and fourth elements of the claim involving scienter – that the defendant "*knew* that the property involved in the financial transaction represented the proceeds of some form of unlawful activity" and that the defendant "*knew* that the financial transaction was designed in whole or in part to conceal or disguise the source, ownership, [or] control" of the monies. *Dale*, 2005 WL 2347853, at *5 (emphasis added). Put differently, the Complaint does not allege that Soler knew that the monies he supposedly transferred to American banks were the product of illegal activity, or that Soler knew that his transfer would conceal the illegal monies. *See Rosner v. Bank of China*, 528 F. Supp. 2d 419, 429 (S.D.N.Y. 2007) (plaintiff must plead all essential elements of the offense including scienter); *Zhu v. First Atlantic Bank*, No. 05 Civ. 96, 2005 WL 2757536, at *3 (S.D.N.Y. Oct. 25, 2005) ("plaintiff insufficiently alleges the scienter element of ... money laundering").

At best, the Complaint makes conclusory statements such as stating that the transfers were "illicit" (Complaint ¶ 22) and that Soler transferred the monies to avoid unspecified taxation. (Complaint ¶ 24.) Such threadbare allegations do not meet the pleading requirements for particularity and plausibility under *Iqbal*, 556 U.S. at 678 and *Twombly*, 550 U.S. at 557. *See Jus Punjabi LLC v. Get Punjabi US, Inc.*, 640 Fed. Appx. 56, 58 (2d Cir. 2016) (affirming dismissal of RICO claim for failure to plead that transfer involved proceeds of unlawful activity); *Schlesinger v. Schlesinger*, No. 05 CV 5016, 2007 WL 9706976, at *9 (E.D.N.Y. Feb. 8, 2007) (dismissing RICO claims where "Plaintiff's allegation of money laundering consists of the conclusory assertion that [defendant] used various corporations to ... launder funds. This conclusory statement fails to satisfy the essential elements of the statute"); *Casio Computer Co.*, 2000 WL 1877516, at *17 (dismissing money laundering RICO claim based on "sweeping allegations" that "only provide conclusory statements that defendants' transactions were conducted with the purpose of concealing 'the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity' ") (internal citations omitted); *Bernstein v. Misk*, 948 F. Supp. 228, 236 n.2 (E.D.N.Y. 1997) (dismissing RICO action predicated

on money laundering due to "conclusory assertions ... unsupported by any facts"). Accordingly, the Second Cause of Action for RICO money laundering should be dismissed.

### c. Extortion

Entretelas alleges that Soler has "falsely and fraudulently" asserted various allegations in the Argentina Action. (Complaint ¶¶ 19-20, 26.) These allegedly false claims are the basis for Plaintiff's Third Cause of Action for Extortion in Violation of RICO, 18 U.S.C. §§ 1951 and 1962. (Complaint ¶¶ 38-43.) The allegations, however, do not state a viable cause of action.

Extortion is defined by 18 U.S.C. § 1951(b)(2) as "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Applying that definition, courts have held that RICO applies to extortionate acts where they constitute a "wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Park South Associates v. Fischbein*, 626 F. Supp. 1108, 1114 (S.D.N.Y. 1986), *aff'd*, 800 F.2d 1128 (2d Cir. 1986) (quoting 18 U.S.C. § 1951(b)(2)).

Here, as in *Park South Associates*, "[n]othing in the pleadings alleges anything to do with force, violence or fear." *Park South Associates*, 626 F. Supp. at 1114. Instead, Entretelas alleges that Soler asserted false allegations against it in the Argentina Action and that Soler "persistent[ly]" demanded various payments. (Complaint ¶ 41.) The absence of allegations of force, violence or fear is fatal to Entretelas' extortion claim. *See, e.g., Battle v. Associates For Women's Medicine, PLLC*, No. 05 Civ. 8373, 2006 WL 2642137, at *7 (S.D.N.Y. Sept. 15, 2006) ("plaintiff's extortion allegation is insufficient because it does not allege any 'wrongful use of actual or threatened force, violence, or fear' ") (quoting *McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992)); *Kimm v. Lee*, No. 04 Civ. 5724, 2005 WL 89386, at *6 (S.D.N.Y. Jan. 13, 2005) (dismissing RICO claim premised on alleged threats to banish plaintiff from his community as the complaint failed to allege that such acts included any threat of force, violence, or fear); *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 137 (E.D.N.Y. 2010) (holding that allegations of extortion under RICO were "insufficient" when focused only on defamation); *Andrea Doreen Ltd. v.*

*Building Material Local Union 282*, 299 F. Supp. 2d 129, 149 (E.D.N.Y. 2004) (rejecting RICO extortion claim and noting that under both federal law, 18 U.S.C. § 1951, and New York State law, N.Y. Penal Law § 155.05(2)(e), extortion must involve "threat of force, violence, or fear").

**\*11** To the extent that Entretelas suggests it "feared" the Argentina Action, courts routinely have rejected the argument that legal action can be a predicate act in the RICO context. *See, e.g.,* *FindTheBest.com, Inc.*, 20 F. Supp. 3d at 457 ("fil[ing] frivolous lawsuits with the wrongful intent and effect of causing fear of economic loss [or] the instigation of meritless litigation cannot constitute extortion [or constitute] predicate acts" under RICO). As explained by one court:

> The law is clear that litigation – even if frivolous or malicious – cannot constitute extortion. 'There are sound policy reasons against recognizing the instigation of meritless litigation as a RICO predicate act. Recognizing such litigation as a predicate RICO act would give complainants unprecedented access to federal courts and the treble damage remedy authorized under RICO. Such a significant extension of RICO's reach is best made, if at all, by Congress. Moreover, allowing these suits to proceed as RICO suits risks chilling parties resort to the judicial system to resolve their disputes.'

*Ritchie v. Northern Leasing Systems, Inc.*, No. 12 Civ. 4992, 2016 WL 1241531, at *13 (S.D.N.Y. March 28, 2016), *aff'd sub nom. Ritchie v. Taylor*, 701 F. App'x 45 (2d Cir. 2017) (quoting *FindTheBest.com, Inc.*, 20 F. Supp. 3d at 457). *See also* G-I Holdings, Inc. v. Baron & Budd, 179 F.Supp.2d 233, 259 (S.D.N.Y. 2001) ("Threats of litigation, and even threats of meritless litigation or the actual pursuit of such litigation, have been held not to constitute acts of extortion"); *von Bulow by Auersperg v. von Bulow*, 657 F. Supp. 1134, 1143-45 (S.D.N.Y. 1987) (malicious prosecution is not a predicate act for RICO purposes).

In short, even if Entretelas' allegations are correct and Soler's statements in the Argentina Action are false or defamatory, that conduct cannot constitute a predicate action for extortion under RICO. No other allegation in the Complaint supports a claim for extortion. Accordingly, the Third Cause of Action for RICO extortion should be dismissed.

**B. Breach of Contract and Unjust Enrichment Claims Should Be Dismissed**

Having determined that the Complaint does not state a viable cause of action under RICO, the Court now considers Entretelas' two remaining claims: the Fourth Cause of Action for Breach of Contract (Complaint ¶¶ 44-47) and Fifth Cause of Action for Unjust Enrichment (Complaint ¶¶ 48-50). As discussed below, the Court lacks original jurisdiction over these claims and should decline to exercise jurisdiction over them given the absence of any federal cause of action. Alternatively, the Court should exercise its discretion to dismiss them on the basis of *forum non conveniens*.

**1. The Court Lacks Original Jurisdiction Over the Fourth and Fifth Causes of Action**

Both the Fourth and Fifth Causes of Action are common law claims under state law predicated on the employment relationship between Soler and Entretelas. To determine whether this Court should hear these claims, it must first determine whether it has independent jurisdiction over them on the basis of either federal question or diversity, and second, must determine whether, in the absence of such jurisdiction, it should exercise supplemental jurisdiction to hear the claims anyway. The answer to both questions is no.

First, the Court plainly does not have federal question jurisdiction over Plaintiff's Fourth and Fifth Causes of Action. *See* 28 U.S.C. § 1331 (vesting federal district courts with jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States"). The Fourth and Fifth Causes of Action do not cite to any federal law or authority that would raise a federal question under 28 U.S.C. § 1331. (*See generally*, Complaint ¶¶ 44-47, 48-50.)

**\*12** Second, without a federal claim, diversity jurisdiction would be the only potential avenue into an American federal court. *See* 🚩 28 U.S.C. § 1332 (to obtain federal jurisdiction in diversity, a case must have diversity of citizenship and an amount in controversy in excess of $75,000). The Complaint successfully alleges the first element of diversity jurisdiction: that the parties are diverse. Entretelas is a French company doing business in Argentina (Complaint ¶ 3) and Soler is alleged to be a United States citizen residing in Florida with occasional presence in New York. (Complaint ¶¶ 4, 28.)

However, Entretelas fails to allege the second critical element to establish diversity jurisdiction: the amount in controversy.

While the Complaint alleges damages "in an amount to be determined at trial but believed to exceed $7 million" for all three of its RICO claims (Complaint ¶¶ 33, 37, 43), it does not do so for the breach of contract and unjust enrichment claims. Rather, it merely alleges "in an amount to be determined at trial" without reference to any particular amount. (Complaint ¶¶ 47, 50.) No factual allegations made in the Complaint allow the Court to calculate or intuit the damage totals with respect to these two causes of action – certainly not to establish damages above the $75,000 threshold. Entretelas thus has failed to plead the requisite amount in controversy to qualify for diversity jurisdiction. *See, e.g.*, *Brown v. Microsoft Corp.*, No. 19 Civ. 6649, 2019 WL 4805572, at \*2 (S.D.N.Y. Oct. 1, 2019) (dismissing action where "Plaintiff has not pleaded facts that, if true, would allow her to recover sufficient damages to invoke the Court's diversity jurisdiction"); *Garrett v. Western Union*, No. 19 Civ. 7500, 2019 WL 6619298, at \*3 (S.D.N.Y. Dec. 3, 2019) (dismissing action where "Plaintiff's complaint does not allege any facts suggesting that his claims satisfy the jurisdictional amount for a diversity action, an amount in excess of the sum or value of $75,000"); *Gilot v. Equivity c/o ID Experts*, No. 18 CV 3492, 2018 WL 3653150, at \*3 (E.D.N.Y. July 31, 2018) (same).

Accordingly, the Court lacks original jurisdiction to hear Plaintiff's Fourth and Fifth Causes of Action.

**2. The Court Should Decline to Exercise Supplemental Jurisdiction Over the Fourth and Fifth Causes of Action**

In some circumstances, courts may exercise supplemental jurisdiction over "other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 🚩 28 U.S.C. § 1367(a). Here, however, there is no basis for the exercise of supplemental jurisdiction over the Fourth and Fifth Causes of Action. Supplemental jurisdiction under 🚩 28 U.S.C. § 1367 is discretionary. A court need not hear a claim for which it would lack original jurisdiction if "there are ... compelling reasons for declining jurisdiction." 🚩 28 U.S.C. § 1367(c)(4). A district court thus "may decide to refuse to exercise supplemental jurisdiction if (1) the state law claim raises a novel or complex issue of state law, (2) the state law claim substantially predominates over the federal claim, (3) the district court has dismissed all other claims over which it had federal jurisdiction, or (4) there are exceptional circumstances." *Blackrock Balanced Capital*

*Portfolio v. HSBC Bank USA, National Association*, 95 F.
Supp. 3d 703, 708-09 (S.D.N.Y. 2015) (citing *Shahriar
v. Smith & Wollensky Restaurant Group, Inc.*, 659 F.3d 234,
245 (2d Cir. 2011)). "When deciding whether to exercise
supplemental jurisdiction, a federal court should consider and
weigh the values of judicial economy, convenience, fairness,
and comity." *Id.*

**\*13** As most relevant here, courts will generally decline
to exercise supplemental jurisdiction where they dismiss all
federal claims from an action. *See, e.g.,* *Giordano v.
City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) ("it
is particularly appropriate for the district court to dismiss
[common law claims] where 'the federal claim on which
the state claim hangs has [also] been dismissed' ") (internal
citations omitted); *Blackrock Balanced Capital Portfolio,*
95 F. Supp. 3d at 708-09 (citing *Shahriar*, 659 F.3d at 245)
(district court "may decide to refuse to exercise supplemental
jurisdiction if ... the district court has dismissed all other
claims over which it had federal jurisdiction...."); *Rodriguez v.
Mount Vernon Hospital*, No. 09 Civ. 5691, 2011 WL 3874814,
at \*2 (S.D.N.Y. Sept. 2, 2011) ("Without any federal claim,
this Court declines to exercise supplemental jurisdiction over
Plaintiffs remaining state law claims") (citing *Giordano*,
274 F.3d at 754); *Rosario v. International Auto Mall &
Leasing Center, Inc.*, No. 12 Civ. 4059, 2013 WL 1144893, at
\*4 (S.D.N.Y. March 19, 2013) (dismissing state claim where
the court "has no independent basis for federal jurisdiction").

That is precisely the situation here. The Court has already
determined that the Complaint's RICO claims fail to state a
cause of action, meaning that there is no viable federal claim
remaining. All the relevant factors favor dismissal: comity is
promoted by consideration of the state claims in state court;
judicial economy is preserved as this action is only at its
earliest stages; pursuing claims in New York State court will
be no less convenient than litigation in New York's Southern
District of New York; and Plaintiff has not suggested that
having to pursue its claims in state court would be any less
fair than pursuing them in federal court. The Court should
decline to exercise supplemental jurisdiction over the Fourth
and Fifth Causes of Action. [8]

### 3. Alternatively, the Court Should Dismiss the Claims on the Basis of *Forum Non Conveniens*

Soler also argues, correctly, that Entretelas' common law
claims should be subject to dismissal on *forum non
conveniens* grounds. The doctrine of *forum non conveniens*
"is a discretionary device permitting a court ... to dismiss
a claim even if the court is a permissible venue with
proper jurisdiction over the claim." *Wiwa v. Royal Dutch
Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000) (internal
citations and quotations omitted).

In the Second Circuit, courts apply a three-step process
to determine whether to dismiss an action for *forum non
conveniens*. *Wilson v. Eckhaus,* 349 Fed. App'x. 649,
650 (2d Cir. 2009). First, the court must "determine[ ] the
degree of deference properly accorded the plaintiff's choice
of forum." *Norex Petroleum Ltd. v. Access Industries, Inc.*,
416 F.3d 146, 153 (2d Cir. 2005). Second, "after determining
whether the plaintiff's choice is entitled to more or less
deference," the court must determine "whether an adequate
alternative forum exists." *Iragorri v. United Technologies
Corp.*, 274 F.3d 65, 73 (2d Cir. 2001). Third, the court must
"then balance a series of factors involving the private interests
of the parties in maintaining the litigation in the competing
fora and any public interests at stake." *Wiwa*, 226 F.3d at
100.

**\*14** Here, all three factors weigh in favor of dismissal.
First, although plaintiffs are generally entitled to some degree
of deference for their chosen forum, "a foreign plaintiff is
entitled to a far weaker presumption than is a United States
Citizen." *Morris v. Chemical Bank*, No. 85 Civ. 9838, 1987
WL 16973, at \*2 (S.D.N.Y. Sept. 10, 1987), aff'd, 847 F.2d
835 (2d Cir. 1988) (citing *Piper Aircraft Co. v. Reyno*,
454 U.S. 235 (1981)). Entretelas is not a citizen of the
United States. Rather, it is a member of a group of French
companies that operates in Argentina; and it does not allege
any substantial connection to the United States. (Complaint ¶¶
3, 8, 26.) Accordingly, its choice of forum warrants minimal
deference.

Second, Entretelas does not provide any reason why
Argentina is an inadequate alternative forum in which to
litigate its common law claims, particularly given the fact
that the Argentina Action is apparently already pending there.
(Complaint ¶¶ 19-20.) Third and finally, the private and public
interests favor Argentina as a forum. After all, most if not
all of the relevant documents and witnesses are likely to
be located in Argentina where Entretelas is headquartered

and where Soler largely worked. The Complaint does not allege any material connection or evidence tying the breach of contract or unjust enrichment claims to this District. Indeed, despite the allegation that there may be monies in American bank accounts to which Entretelas has a property right, there is no substantial nexus to the United States at all, much less New York. In short, even if this Court chose to exercise supplemental jurisdiction over the common law claims, they would still be subject to dismissal on the basis of *forum non conveniens*.

#### Conclusion

For the foregoing reasons, I recommend that Defendant's Motion to Dismiss be GRANTED and the case dismissed without prejudice. The parties' remaining arguments, to the extent not addressed herein, have been considered by the Court and found to be without merit. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Lewis A. Kaplan, United States Courthouse, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, 500 Pearl Street, New York, New York 10007. **Failure to file timely objections will result in a waiver of objections and will preclude appellate review.**

#### All Citations

Slip Copy, 2020 WL 9815186

---

### Footnotes

1    In accordance with the standard for assessing a motion to dismiss, all non-conclusory facts described herein are derived from Plaintiff's Complaint, and accepted as true, and all reasonable inferences are made in Plaintiff's favor. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013). In addition to the Complaint, the Court also draws upon statements and documents incorporated into the Complaint by reference, as well as matters of which judicial notice may be taken. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013) (citing *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

2    The Employment Agreement acknowledges that Soler had been serving as "General Manager for South America since January 1, 1999." (*Id.*; Complaint ¶ 10.)

3    A copy of the document Entretelas refers to as the Argentina Action is attached to the declaration of Plaintiff's counsel. (Batista Decl., Ex. 2.) That document does not bear a caption, government stamp, or case number. Neither party states whether this document is a pleading in an Argentinian court, or some sort of private tribunal. Although the national language of Argentina is Spanish, the document is in English, including a lengthy personal narrative by Soler about his disputes with Entretelas. Regardless, the Court accepts as true Plaintiff's allegation that this document pertains to a legal action filed by Soler in Argentina.

4    In Soler's pre-motion letter, he primarily argued that dismissal is required because this Court lacks personal jurisdiction over him. (Dkt. 6.) Soler asserted that he is a resident of Florida who visits New York only occasionally for medical treatment, and argued that the Complaint does not assert any substantive connection between the underlying dispute and New York. Plaintiff's opposition alleges that Soler has a "significant presence" in New York, but without any details or support for that assertion. (Pl. Mem. at 1.) Regardless, in Soler's motion, he noted that "in light of the numerous substantive deficiencies in Entretelas' claims – Soler waives his jurisdictional argument so as to allow the Court to dismiss the Complaint on the merits." (Def. Mem. at 1.) Accordingly, the Court need not address potential issues related to personal jurisdiction.

5    As discussed in greater detail below, the First Cause of Action is styled as alleging a "Violation of RICO 1962(c)." (*See* Complaint ¶ 32.) That provision of RICO, however, is the broad provision under which all three RICO claims are made, each citing different predicate acts. Accordingly, the First Cause of Action is better understood as alleging a violation of RICO for the predicate acts of mail fraud and wire fraud as those are the specific statutory offenses invoked by the First Cause of Action. (*See* Complaint ¶ 30.)

6    Soler argues, as another potential basis for dismissal of the Complaint's three RICO claims, that Plaintiff has failed to state a "domestic injury" and that such an injury is a prerequisite for RICO liability. (Def. Mem. at 7-10.) Entretelas, in turn, counters that the application of the "domestic injury" requirement is an unsettled area of law in light of a recent decision from the Second Circuit. (Pl. Mem. at 12-17, citing *Bascuñán v. Elsaca,* 927 F.3d 108 (2d Cir. 2019).) Because there are other independent grounds for dismissal of Plaintiff's three RICO claims, the Court need not base its conclusions on whether Entretelas has properly stated a qualifying domestic injury under RICO.

7    The only "misrepresentations" alleged in the Complaint relate not to allegations of mail and wire fraud, but rather to the allegedly false and defamatory statements contained in the Argentina Action, which is simultaneously the basis for Plaintiff's extortion claim. This is but one example of how the Complaint conflates or confuses legal concepts; mail and wire fraud are predicate acts that have different elements than extortion.

8    While the Court does not decide the issue, it notes that, as currently plead, the unjust enrichment claim is improperly duplicative of the contractual claim and therefore subject to dismissal for failure to state a claim. The Fifth Cause of Action – essentially three sentences long – merely references the employment relationship between Soler and Entretelas that is also the basis for the breach of contract claim under the Employment Agreement. It makes no new or different allegations. Accordingly, as currently plead, the claim could not survive even if the Court exercised supplemental jurisdiction. *See Clark-Fitzpatrick, Inc. v. Long Island Railroad Co.,* 70 N.Y.2d 382, 388 (1987) ("[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter"); *see also Blum v. Spaha Capital Management, LLC,* 44 F. Supp. 3d 482, 496 (S.D.N.Y. 2014) (dismissing plaintiff's unjust enrichment claim where a valid, enforceable contract existed).

---

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.